# EXHIBIT 1

No. 15–2234

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MATTHEW GRACE and | ) | |
| PINK PISTOLS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 15-2234 (RJL) |
| v. | ) | |
| | ) | |
| DISTRICT OF COLUMBIA and | ) | |
| CATHY LANIER, in her official capacity as | ) | |
| Chief of Police for the Metropolitan Police | ) | |
| Department, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' APPLICATION FOR A PRELIMINARY AND/OR PERMANENT INJUNCTION

Charles J. Cooper (Bar No. 248070)
David H. Thompson (Bar No. 450503)
Peter A. Patterson (Bar No. 998668)
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
ccooper@cooperkirk.com

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................................... ii

INTRODUCTION ...................................................................................................... 1

BACKGROUND ........................................................................................................ 3

I.      The District of Columbia Bars Typical, Law-Abiding Citizens
        from Carrying Firearms in Public .................................................................. 3

II.     The District Denied Matthew Grace's Application for a Concealed-Carry License .......... 5

SUMMARY OF ARGUMENT ................................................................................... 7

ARGUMENT .............................................................................................................. 8

I.      Plaintiffs Are Likely to Succeed on the Merits of Their Claim that the District's
        "Proper Reason" Requirement Violates the Second Amendment ..................... 8

        A.      The Text and History of the Second Amendment Make Clear that the District's
                Ban Impinges Upon the Second Amendment Right ............................... 9

        B.      The District's Ban on Typical, Law-Abiding Citizens Carrying Arms Is
                Categorically Unconstitutional ............................................................ 20

        C.      The District's Ban Fails Any Measure of Heightened Constitutional Scrutiny ..... 26

        D.      This Court Should Not Follow Out-of-Circuit Decisions
                Upholding Laws Similar to the District's .............................................. 34

II.     Plaintiffs Will Continue to Suffer Irreparable Harm
        in the Absence of Preliminary Relief ............................................................ 36

III.    The Balance of Equities Tips in Plaintiffs' Favor ......................................... 38

IV.     An Injunction Is in the Public Interest .......................................................... 39

V.      The Court Should Enter Final Judgment for Plaintiffs ................................... 40

CONCLUSION .......................................................................................................... 41

# TABLE OF AUTHORITIES

**Cases** **Page**

*Aamer v. Obama*, 742 F.3d 1023 (D.C. Cir. 2014) ........................................................8

*Andrews v. State*, 50 Tenn. 165 (1871) ......................................................................19

*Atwater v. City of Lago Vista*, 532 U.S. 318 (2001) ..................................................13

*Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014) ...............................24, 31

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006) ................36, 37

*City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002) ........................28, 35

*Cox v. New Hampshire*, 312 U.S. 569 (1941) .............................................................23

*Crawford v. Washington*, 541 U.S. 36 (2004) ............................................................24

*Curtis 1000, Inc. v. Suess*, 24 F.3d 941 (7th Cir. 1994)..............................................40

\* *District of Columbia v. Heller*, 554 U.S. 570
(2008) ........................1, 7, 8, 9, 10, 11, 12, 15, 16, 17, 18, 19, 20, 21, 22, 23, 25, 27, 31, 34, 38

*Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013) ..................................................34, 35, 36

*Dred Scott v. Sandford*, 60 U.S. (19 How.) 393 (1856) ..............................................16

*Elrod v. Burns*, 427 U.S. 347 (1976) .........................................................................37

*Employment Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872 (1990) ...................24

*Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011) ...............................37, 38

*Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123 (1992) ....................................23

*Gordon v. Holder*, 721 F.3d 638 (D.C. Cir. 2013) ........................................36, 37, 39

\* *Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) ........................8, 9, 20, 21, 26, 27

*K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99 (3d Cir. 2013) ..........................39

*Kachalsky v. Cnty. of Westchester*, 701 F.3d 81 (2d Cir. 2012) ......................34, 35, 36

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803) .................................................9, 10

*McCullen v. Coakley*, 134 S. Ct. 2518 (2014) ....................................................27, 33

\* *McDonald v. City of Chicago*, 561 U.S. 742 (2010) ..................................7, 12, 13, 17, 20, 24, 26

\* *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) ............10, 11, 12, 19, 21, 30, 31, 34, 35, 40, 41

*Morris v. District of Columbia*, 38 F. Supp. 3d 57 (D.D.C. 2014) ...............................40

*Near v. Minnesota ex rel. Olson*, 283 U.S. 697 (1931) ...............................................23

*New York Times Co. v. United States*, 403 U.S. 713 (1971) .......................................23

*Nunn v. State*, 1 Ga. 243 (1846) ................................................................................18

*Palmer v. District of Columbia*, 59 F. Supp. 3d 173 (D.D.C. 2014) ........................1, 19

*Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007) ..................................14

*People v. Aguilar*, 2 N.E.2d 321 (Ill. 2013) ..................................................................19

\* *Peruta v. County of San Diego*, 742 F.3d 1144
  (9th Cir. 2014) ........................................10, 13, 17, 19, 21, 32, 34, 35, 36

*Rex v. Knight*, 90 Eng. Rep. 330 (1686) ......................................................................14

*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973) ................................26

*State v. Chandler*, 5 La. Ann. 489 (1850) ...................................................................18

*Staub v. City of Baxley*, 355 U.S. 313 (1958) .............................................................23

*Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707 (1981) ..........................24

*United States v. Virginia*, 518 U.S. 515 (1996) ..........................................................28

*Winter v. NRDC*, 555 U.S. 7 (2008) ............................................................................36

*Woollard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013) ...................................34, 35, 36

*Wrenn v. District of Columbia*, __ F. Supp. 3d __, 2015 WL 3477748 (D.D.C. 2015) .................2

*Wrenn v. District of Columbia*, __ F.3d __, 2015 WL 8746334 (D.C. Cir. 2015) .........................2

## Constitutional Materials and Statutes

U.S. Const. amend. II ...............................................................................................7, 9

D.C. Code

§ 7-2502.03(a)..................................................................................................26, 39
§ 7-2509.02(a)..................................................................................................26, 39
§ 7-2509.02(a)(4)....................................................................................................26
§ 7-2509.07......................................................................................................26, 39
§ 7-2509.11(1)(A).............................................................1, 2, 3, 21, 22, 25, 27
§ 7-2509.11(1)(B).......................................................................................................3
§ 22-4503.........................................................................................................26, 39
§ 22-4504(a)................................................................................................3, 26, 39
§ 22-4504(a)(1)..........................................................................................................3
§ 22-4504(a-1)...........................................................................................................3
§ 22-4506(a)...............................................................................................................3

D.C. Mun. Regs. tit. 24

§ 2333.1....................................................................................................................3, 4
§ 2333.2.........................................................................................................................4
§ 2333.4.........................................................................................................................4
§ 2334.1.........................................................................................................................4

Fed. R. Civ. P. 65(a)(2) .................................................................................................40

An Act To Punish Certain Offences Therein Named, and for Other Purposes,
  ch. 23, § 1, 1865 Miss. Laws 165 .............................................................................17

**Other**

John Adams, *First Day's Speech in Defence of the British Soldiers Accused of Murdering Attucks, Gray and Others, in the Boston Riot of 1770, in* 6 Masterpieces of Eloquence (Hazeltine et al. eds. 1905) ...................................................................................16

THE AMERICAN STUDENTS' BLACKSTONE (G. Chase ed., 1884) ...................................19

1 WILLIAM BLACKSTONE, COMMENTARIES ...................................................................14

2 WILLIAM BLACKSTONE, COMMENTARIES (Christian ed., 1794) .................................14

4 WILLIAM BLACKSTONE, COMMENTARIES ...................................................................13

5 WILLIAM BLACKSTONE, COMMENTARIES (St. George Tucker ed., 1803) ...................16

H. Sterling Burnett, National Center for Policy Analysis, *Texas Concealed Handgun Carriers: Law-Abiding Public Benefactors* (2000), http://goo.gl/1Ebwpb ............................................33

CBSNEWS.COM, *Responding to an Active Shooter* (Nov. 22, 2015), http://goo.gl/n96ANS ...............................................................................29, 36, 38

Philip J. Cook et al., *Gun Control After Heller: Threats and Sideshows From a Social Welfare Perspective*, 56 UCLA L. REV. 1041 (2009) ..........................................28, 33

Mike DeBonis, *Security, Not Street Crime, at Risk After Gun Ruling, D.C. Police Chief Cathy Lanier Says*, Wash. Post., https://goo.gl/wPYekP .................31, 32, 36, 38

1 DOCUMENTARY HISTORY OF RECONSTRUCTION ........................................................17

FEDERAL BUREAU OF INVESTIGATION, CRIME IN THE UNITED STATES BY STATE: 2014 https://goo.gl/hgoZBR ...................................................................................31

Florida Dep't of Agric. & Consumer Servs., *Division of Licensing, Concealed Weapon or Firearm License Summary Report, Oct. 1, 1987 – November 30, 2015*, http://goo.gl/yFzIwv ........................................................................................33

Robert Hahn et al., *Firearms Laws and the Reduction of Violence: A Systematic Review*, 28 AM. J. PREV. MED. 40 (2005), http://goo.gl/zOpJFL .......................................29

Stephen P. Halbrook, *What the Framers Intended:  A Linguistic Analysis of the Right To Bear Arms*, 49 LAW & CONTEMP. PROBS. 151 (1986) ...................................................32

MATTHEW HALE, 1 HISTORIA PACITORUM CORONAE (Sollum Emlyn ed., 1736) ...................13, 14

1 WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN (1716) ....................13

INSTITUTE OF MEDICINE AND NATIONAL RESEARCH COUNCIL, PRIORITIES FOR RESEARCH TO REDUCE THE THREAT OF FIREARM-RELATED VIOLENCE (2013), http://goo.gl/oO6oRp ..........30

1 THE WRITINGS OF THOMAS JEFFERSON (letter of August 19, 1785) (H. A. Washington ed., 1853) ...................................................................................15

NICHOLAS J. JOHNSON & DAVID B. KOPEL ET AL., FIREARMS LAW & THE SECOND AMENDMENT (2012) ...............................................................................16

2 J. KENT, COMMENTARIES ON AMERICAN LAW (O. Holmes, Jr. ed., 12th ed., 1873) ...................18

Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense With a Gun*, 86 J. CRIM. L. & CRIMINOLOGY 150 (1995)......................................29, 30

Gary Kleck & Marc Gertz, *Carrying Guns for Protection: Results from the National Self-Defense Survey*, 35 J. OF RES. IN CRIME & DELINQ. 193, 195 (1998)......................................30

David B. Kopel, *Pretend "Gun-Free" School Zones: A Deadly Legal Fiction*, 42 CONN. L. REV. 515 (2009), http://goo.gl/Ao8W3M ...........................................33

*Legality of the London Military Foot-Association* (1780), *reprinted in* William Blizzard, Desultory Reflections on Police (1785)...................................................................14

METROPOLITAN POLICE DEPARTMENT, CONCEALED CARRY PISTOL LICENSE APPLICATION, http://goo.gl/utPzua...........................................................................................4, 5

NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE: A CRITICAL REVIEW (2005), http://goo.gl/WO1ZNZ ....................................................................................29, 30

National Rifle Association Institute for Legislative Action, *Right-to-Carry*, https://goo.gl/F8Mdrc .......................................................................................32, 33

3 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES (1833) ...........23

BENJAMIN OGLE TAYLOE, IN MEMORIAM: ANECDOTES AND REMINISCENCES (Washington, D.C., 1872)......................................................................................15

Br. of the Dist. of Columbia and Metro. Police Dep't Chief Cathy Lanier, *Wrenn v. District of Columbia*, No. 15-7057, Doc. No. 1570115 (D.C. Cir. Aug. 27, 2015)..................................28

## INTRODUCTION

The public record leaves no doubt at all that the District of Columbia is bound and determined to treat the Second Amendment not as a fundamental constitutional right but rather as a government-bestowed privilege to be doled grudgingly and even then only upon compulsion of higher authority. For over 30 years prior to the Supreme Court's landmark decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008), the District generally prohibited law-abiding citizens from keeping handguns for self-defense in their own homes. *Heller* held that the Second Amendment protects a fundamental, individual right to possess firearms for self-defense, and it therefore struck down the District's handgun ban as categorically unconstitutional.

In obedience to *Heller*, the District enacted legislation allowing residents to possess handguns within their homes. The District, however, continued to maintain a general ban on the right of law-abiding citizens to carry firearms outside the home. Thus, while the District begrudgingly recognized the right to *keep* arms, it continued to maintain a categorical ban on the right to *bear* them. This Court struck down the District's ban on carrying arms in *Palmer v. District of Columbia*, 59 F. Supp. 3d 173 (D.D.C. 2014), recognizing that "[i]n light of *Heller*, *McDonald* [*v. City of Chicago*, 561 U.S. 742 (2010)], and their progeny, there is no longer any basis on which this Court can conclude that the District of Columbia's total ban on the public carrying of ready-to-use handguns outside the home is constitutional under any level of scrutiny." *Id.* at 182–83.

Despite the repeated judicial repudiation of the District's attempts to limit the Second Amendment rights of its residents, the District responded to *Palmer* by passing a law that continues to bar responsible, law-abiding citizens from carrying firearms outside the home. District law now offers the theoretical possibility of obtaining a concealed carry license, but in

order to get such a license an individual must have a so-called "proper reason" for carrying a firearm. And to satisfy this requirement a person must have a "need for self-protection *distinguishable* from the general community . . . ." D.C. CODE § 7-2509.11(1)(A) (emphasis added). As a result, the typical, law-abiding citizens of the District of Columbia, who by definition cannot *distinguish* their need for self-defense from the general community, remain categorically barred from carrying firearms outside the home. The District's current carry ban is no more constitutional than its last one. As this Court concluded in enjoining the current carry ban, "for all intents and purposes, this [good reason/proper reason] requirement makes it impossible for the overwhelming majority of law-abiding citizens to obtain licenses to carry handguns in public for self-defense, thereby depriving them of their Second Amendment right to bear arms." *Wrenn v. District of Columbia*, __ F. Supp. 3d __, __, 2015 WL 3477748, at *8 (D.D.C. 2015), *vacated on other grounds*, __ F.3d __, 2015 WL 8746334 (D.C. Cir. 2015).[1]

This Court should issue an injunction preliminarily enjoining the District's licensing scheme. Plaintiffs are likely to prevail on their claim that the District's licensing scheme violates the Second Amendment because it prohibits typical, law-abiding citizens from exercising their Second Amendment right to bear arms outside the home. Plaintiffs are suffering irreparable harm due to this ongoing constitutional violation. And both the equities and the public interest weigh strongly in favor of the injunction. Indeed, given that this case presents only legal issues and given that Plaintiffs plainly are entitled to prevail, this Court should enter final judgment permanently enjoining the District from enforcing its unconstitutional laws.

---

[1] While the *Wrenn* decision was vacated on appeal on reasons unrelated to the merits, *see Wrenn v. District of Columbia*, 2015 WL 8746334, the Court's reasoning retains its persuasive force.

2

# BACKGROUND

## I.     The District of Columbia Bars Typical, Law-Abiding Citizens from Carrying Firearms in Public.

District law provides that "[n]o person shall carry within the District of Columbia either openly or concealed on or about their person, a pistol, without a license issued pursuant to District of Columbia law . . . ." D.C. CODE § 22-4504(a). First-time offenders who violate this provision by carrying a handgun in public face up to five years in prison. *Id*. § 22-4504(a)(1). District law also generally prohibits the carrying of a rifle or a shotgun in public. *Id*. § 22-4504(a-1). Chief Lanier "may" issue applicants a license to carry a concealed firearm only "if it appears that the applicant has good reason to fear injury to his or her person or property or has any other proper reason for carrying a pistol . . . ." *Id.* § 22-4506(a).

The District's laws and regulations defining the "proper reason" requirement subject typical law-abiding citizens to a flat ban on carrying firearms outside the home. That is because the District does not consider a typical, law-abiding citizen to have a "proper reason" for carrying a handgun. First, the law expressly directs Chief Lanier to issue rules establishing that the phrase "good reason to fear injury to his or her person . . . shall at a minimum require a showing of a *special need for self-protection distinguishable from the general community* as supported by evidence of specific threats or previous attacks that demonstrate a special danger to the applicant's life." *Id.* § 7-2509.11(1)(A) (emphasis added). Similarly, the phrase "any other proper reason for carrying a concealed pistol . . . shall at a minimum include types of employment that require the handling of cash or other valuable objects that may be transported upon the applicant's person." *Id.* § 7-2509.11(1)(B).

Pursuant to these laws, Chief Lanier has issued rules that extinguish the right of typical, law-abiding citizens to carry firearms outside the home. Those regulations provide that "[a]

person shall demonstrate a good reason to fear injury to his or her person by showing a special

need for self-protection distinguishable from the general community as supported by evidence of

specific threats or previous attacks which demonstrate a special danger to the applicant's life."

D.C. Mun. Regs. tit. 24, § 2333.1 (emphasis added). The regulations provide that an applicant

must "allege, in writing, serious threats of death or serious bodily harm, any attacks on his or her

person, or any theft of property from his or her person." *Id.* § 2333.2. The applicant must also

"allege that the threats are of a nature that the legal possession of a pistol is necessary as a

reasonable precaution against the apprehended danger." *Id*. The regulations further provide that

"[t]he fact that a person resides in or is employed in a high crime area shall not by itself establish

a good reason to fear injury to person or property for the issuance of a concealed carry license."

*Id*. § 2333.4. Chief Lanier's regulations also provide that the proper reason requirement may be

satisfied if the applicant's employment "requires the handling of large amounts of cash or other

highly valuable objects that must be transported upon the applicant's person"; or if the applicant

has an immediate family member who is physically or mentally incapacitated, cannot act in

defense of himself or herself, and "can demonstrate a good reason to fear injury to his or her

person by showing a special need for self-protection distinguishable from the general

community . . . ." *Id.* § 2334.1.

These limitations are further reflected in the application form for a concealed carry

license. The application form states that "an applicant must demonstrate that either they have

good reason to fear injury to himself or herself or property or they have another proper reason for

carrying a concealed pistol." Metropolitan Police Department, Concealed Carry Pistol

License Application 3, http://goo.gl/utPzua (attached as Exhibit 6). Another portion of the

application makes clear, in bold font, that "[p]ursuant to District of Columbia law, the fact that

you live or work in a high crime area shall not by itself establish a good reason to fear injury to yourself or your property for the issuance of a concealed carry license." *Id*. Basis for Request for a Concealed Carry Pistol 1.

## II.     The District Denied Matthew Grace's Application for a Concealed-Carry License.

Matthew Grace is a law-abiding adult citizen of the United States and resident of the District of Columbia. Declaration of Matthew Grace ("Grace Decl.") ¶¶ 1-2 (attached as Exhibit 3). Mr. Grace is also a member of Pink Pistols, an organization that advocates the use of lawfully owned, lawfully concealed firearms for the self-defense of the sexual minority community. *Id*. ¶ 2; Declaration of Gwendolyn S. Patton ¶¶ 3, 6 ("Patton Decl.") (attached as Exhibit 5). The formation of Pink Pistols was inspired by a statement by Jonathan Rauch published in Salon Magazine in 2000: "[H]omosexuals should embark on organized efforts to become comfortable with guns, learn to use them safely and carry them. They should set up Pink Pistols task forces, sponsor shooting courses and help homosexuals get licensed to carry. And they should do it in a way that gets as much publicity as possible." Patton Decl. ¶ 4. The District of Columbia's restrictive carry laws are a direct affront to Pink Pistols' central mission.

Mr. Grace owns four handguns that are lawfully registered with the District of Columbia. He keeps these handguns in his home, and he desires to carry them outside the home for self-defense. Mr. Grace has completed the firearms training that is required to obtain a District of Columbia concealed carry license. Grace Decl. ¶ 3.

In August 2015, Mr. Grace applied for a District of Columbia concealed carry license. *Id*. ¶ 7. On October 19, 2015, the District denied Mr. Grace's application. The denial letter stated that he had failed to "[d]emonstrate a good reason to fear injury to person or property, or other proper reason for a concealed carry license." The letter added:

5

> Specifically the applicant did not meet the minimum requirement of showing: "a special need for self-protection distinguishable from the general community as supported by evidence of specific threats or previous attacks that demonstrate a special danger to the applicant's life," and did not demonstrate "Employment of a type that requires the handling of large amounts of cash or other highly valuable objects that must be transported upon the applicant's person."

Exhibit 4 (citations omitted). No reason was given for the denial of Mr. Grace's application other than the failure to meet the "proper reason" requirement. Mr. Grace meets all of the other requirements for a concealed carry license, and but for the "proper reason" requirement he would qualify for one.

Although Mr. Grace does not face specific threats that differentiate him from the typical, law-abiding citizen, his desire to carry a firearm for self-defense is well-founded. For example, on one occasion gun shots were fired in front of his home; four shell casings were found directly in front of his home on the sidewalk. There was a person carrying a firearm in his neighborhood robbing people at gunpoint who was never caught. And his wife was robbed on a public street in the District in broad daylight. Grace Decl. ¶ 5. Despite his desire to carry a firearm to protect himself outside the home, Mr. Grace refrains from doing so for fear of being prosecuted, convicted, and imprisoned for violating the District of Columbia's laws making carrying a firearm in public a crime. *Id.* ¶ 6.

On December 22, 2015, Mr. Grace and Pink Pistols filed a complaint in this Court, alleging that the District's laws and regulations, including the "proper reason" requirement, violate the Second Amendment, which guarantees the right of typical, law-abiding citizens to carry a firearm in public. The relief that Plaintiffs have requested includes (1) an injunction forbidding Defendants from denying concealed carry licenses to applicants who meet the eligibility requirements (other than the "proper reason" requirement), (2) an injunction forbidding Defendants from enforcing the District's laws and regulations establishing and further

defining the "proper reason" requirement, and (3) an injunction directing Defendants to issue concealed carry licenses to Mr. Grace and other members of Pink Pistols who, apart from the "proper reason" requirement, are eligible for a concealed carry license.

## SUMMARY OF ARGUMENT

The Second Amendment guarantees that "the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. The Supreme Court has twice affirmed, in *Heller* and *McDonald*, that the core of the Second Amendment guarantee is the right to keep and bear arms for purposes of self-defense. And the Second Amendment's distinction between the twin rights to "keep" and "bear" arms makes clear that the core of this right to self-defense applies both inside and outside the home.

Although the District has reluctantly complied with *Heller* by allowing individuals to "keep" arms in their home for self-defense, it continues to deny the Second Amendment right of typical, law-abiding citizens to "bear" arms outside the home for self-defense. The text and history of the Second Amendment alone resolve this case: the District's laws are flatly unconstitutional and inconsistent with the enumerated constitutional right to bear arms for self-defense. But even if the Court were to apply one of the "tiers" of heightened constitutional scrutiny, the District's laws easily fail both strict and intermediate scrutiny.

Plaintiffs do not seek a broad invalidation of the District's gun laws. They do not seek the right to carry unusual weapons. They do not seek a right to carry firearms in sensitive places. They do not seek rights for felons or the mentally ill. They do not seek a right to carry a firearm without a license. They seek only a narrow injunction that would guarantee the right of typical, law-abiding citizens to carry handguns—"the quintessential self-defense weapon," *Heller*, 554 U.S. at 629—outside the home for self-defense.

Plaintiffs are entitled both preliminary and permanent injunctive relief. Plaintiffs are likely to succeed on the merits, and the other requirements for a preliminary injunction are easily satisfied: the denial of Plaintiffs' constitutional right constitutes irreparable harm, the balance of equities weighs strongly in Plaintiffs' favor, and the continued violation of constitutional rights is never in the public interest. And a permanent injunction is appropriate now because the final outcome of this case does not depend on any facts that may be presented at trial, and because there is no genuine uncertainty about what the outcome of this case will be on the merits.

## ARGUMENT

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (quotation marks omitted). Each of these factors support Plaintiffs' motion for a preliminary injunction.

**I.      Plaintiffs Are Likely to Succeed on the Merits of Their Claim that the District's "Proper Reason" Requirement Violates the Second Amendment.**

In *Heller*, the Supreme Court struck down the District's handgun ban on the basis of a textual and historical analysis demonstrating that the ban infringed the Second Amendment right to keep arms. 554 U.S. at 628–29 (holding that the D.C. handgun ban would "fail constitutional muster" under "any of the standards of scrutiny we have applied to enumerated constitutional rights").

The D.C. Circuit has since established a "two-step approach to determining the constitutionality of the District's gun laws." *Heller v. District of Columbia*, 670 F.3d 1244, 1252 (D.C. Cir. 2011) (*Heller II*). First, courts must ask "whether a particular provision impinges upon a right protected by the Second Amendment." *Id.* Second, if the provision impinges upon such a

8

right, courts must "go on to determine whether the provision passes muster under the appropriate level of scrutiny." *Id.*[2]

This section proceeds in four parts. First, Plaintiffs explain why the District's concealed-carry laws, including the "proper reason" requirement, impinge upon a right protected by the Second Amendment. Second, Plaintiffs argue that the District's flat ban on the right to bear arms is categorically unconstitutional. Third, Plaintiffs demonstrate why the ban cannot withstand any level of heightened scrutiny. Fourth, Plaintiffs explain why the Court should not follow out-of-Circuit decisions upholding laws similar to the District's.

A.      **The Text and History of the Second Amendment Make Clear that the District's Ban Impinges Upon the Second Amendment Right.**

1. The text of the Second Amendment makes clear that the Second Amendment applies outside the home. The substance of the Second Amendment right reposes in the twin verbs of the operative clause: "the right of the people to *keep* and *bear* Arms, shall not be infringed." U.S. CONST. amend. II (emphasis added). This turn-of-phrase is not, the Supreme Court has held, "some sort of term of art" with a "unitary meaning," but is rather a conjoining of two related guarantees. *Heller*, 554 U.S. at 591. Interpreting the protections of the Second Amendment as confined to the home would read the second of these guarantees—the right to *bear* arms—out of the Constitution's text, for the right to *keep* arms standing alone would be sufficient to protect the right to have arms in the home. Any such interpretation would directly contradict the

---

[2] As Judge Kavanaugh demonstrated in dissent in *Heller II*, the Supreme Court's decision in *Heller* forecloses the application of any levels-of-scrutiny analysis in Second Amendment cases. *See Heller II*, 670 F.3d at 1271–85 (Kavanaugh, J., dissenting). This Court, of course, is bound by the *Heller II* majority, but Plaintiffs reserve the right to challenge that decision on appeal. At any rate, for the reasons explained in the text, even under the *Heller II* majority's approach, the District of Columbia's laws denying the right to carry firearms to all typical, law-abiding citizens "would fail constitutional muster under any standard of scrutiny." *Id.* at 1268 (majority opinion) (quotation marks omitted).

fundamental canon that "[i]t cannot be presumed that any clause in the constitution is intended to be without effect." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 174 (1803).

Furthermore, as the Court explained in *Heller*, "the natural meaning of 'bear arms' " is to " 'wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person.' " 554 U.S. at 584 (quoting *Muscarello v. United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting)). And because "[t]o speak of 'bearing' arms within one's home would at all times have been an awkward usage," the Constitution's explicit inclusion of the "right to *bear* arms thus implies a right to carry a loaded gun outside the home." *Moore v. Madigan*, 702 F.3d 933, 936 (7th Cir. 2012). "[T]he idea of carrying a gun," after all, "does not exactly conjure up images of father stuffing a six-shooter in his pajama's pocket before heading downstairs to start the morning's coffee." *Peruta v. County of San Diego*, 742 F.3d 1144, 1152 (9th Cir. 2014), *reh'g en banc granted*, 2015 WL 1381752 (9th Cir. Mar. 26, 2015).[3]

Limiting the Second Amendment to the home would thus do great violence to its text, as it would effectively read the term "bear" out of the Constitution altogether. Indeed, it would be strange to interpret "the individual right to possess and carry weapons in case of confrontation," *Heller*, 554 U.S. at 592, as applying only in the privacy of the home, and not outside the home where one is more likely to face "confrontation." This common sense animates the Supreme Court's ruling that the Second Amendment was originally understood to guarantee the right to " 'wear, bear, or carry [weapons] upon the person or in the clothing or in a pocket, for the

---

[3] Although the 9th Circuit has granted en banc review in *Peruta*, the panel's opinion retains its persuasive authority.

purpose of being armed and ready for offensive or defensive action in a case of conflict with another person.' " *Id.* at 584 (quoting *Muscarello*, 524 U.S. at 143) (alterations omitted).

The Second Amendment's "prefatory" clause cements the interpretation of the right to carry protected by the operative clause. The prefatory clause "announces the purpose for which the right was codified: to prevent elimination of the militia." *Id.* at 599. Indeed, "it was understood across the political spectrum that the right helped to secure the ideal of a citizen militia, which might be necessary to oppose an oppressive military force if the constitutional order broke down." *Id.* A right to bear arms limited to the home plainly would be ill-suited to the purpose of "the rearing up and qualifying a well-regulated militia," *id.* at 612 (quoting *Nunn v. State*, 1 Ga. 243, 251 (1846)), for if citizens could be prohibited from carrying arms in public they simply could not act as the militia at all.

Of course, the militia was not "the only reason Americans valued the ancient right; most undoubtedly thought it even more important for self-defense and hunting." *Id.* at 599. Hunting, like self-defense from assailants at large, cannot be conducted by those bearing arms only within their homes.

2. While preservation of the militia may have been the reason the Second Amendment was *codified*, *Heller* holds that individual self-defense is at the core of the *right itself*. This binding principle must guide this Court's analysis, and it demonstrates that the right to bear arms rationally cannot be limited to the home: "The Supreme Court has decided that the [Second Amendment] confers a right to bear arms for self-defense, which is as important outside the home as inside." *Moore*, 702 F.3d at 942.

*Heller* and *McDonald* make clear that individual self-defense is at the core of the Second Amendment right. Not individual self-defense *in the home*, but individual self-defense, *period*.

11

*Heller* emphasizes that "individual self-defense" is "*the central component* of the right itself." 554 U.S. at 599; *see also id.* at 628 ("[T]he inherent right of self-defense has been central to the Second Amendment right."). Individual self-defense is the "core lawful purpose" for keeping and bearing arms that the Second Amendment protects. *Id.* at 630.

*McDonald* reinforces the conclusion that individual self-defense is at the core of the Second Amendment right. The very first sentence of the *McDonald* opinion states that "in *District of Columbia v. Heller*, we *held* that the Second Amendment protects the right to keep and bear arms for the purpose of self-defense, *and* we struck down a District of Columbia law that banned the possession of handguns in the home." 561 U.S. at 749–50 (emphases added) (citation omitted). *McDonald* later reiterates that "in *Heller*, we held that individual self-defense is the central component of the Second Amendment right." *Id.* at 767 (quotation marks omitted). It is thus plain that the final outcome of *Heller*—the Court striking down the District of Columbia's handgun ban—should be read not to *limit* the Court's holding that the Second Amendment protects a core right to armed self-defense, but rather as the natural *result* of that holding.

Indeed, "one doesn't have to be a historian to realize that a right to keep and bear arms for personal self-defense in the eighteenth century could not rationally have been limited to the home." *Moore*, 702 F.3d at 936. For example, a pioneer living "in what was then the wild west . . . would need from time to time to leave [the] home to obtain supplies from the nearest trading post, and en route . . . would be as much (probably more) at risk if unarmed as . . . in [the] home unarmed." *Id.* Thus, "[t]o confine the right to be armed to the home is to divorce the Second Amendment from the right of self-defense described in *Heller* and *McDonald*." *Id.* at 937.

12

3. While one does not need to be a historian to understand that a right to armed self-defense cannot be confined to the home, that conclusion is amply supported by the historical record. The historical understanding of the Second Amendment—at the time of its proposal and ratification, in the post-ratification early republic, and during the aftermath of the Civil War—strongly supports what is obvious from the provision's text: it applies outside the home. *See generally Peruta*, 742 F.3d at 1151–66 (conducting a comprehensive review of the history of the Second Amendment and concluding that it includes the right to carry firearms in public for self-defense).

As *McDonald* explains, "[s]elf-defense is a basic right, recognized by many legal systems from ancient times to the present day." 561 U.S. at 767. And because the need for self-defense may *arise* in public, it has long been recognized that the right to self-defense may be *exercised* in public. Blackstone, in the same discussion cited by *McDonald* for the deep roots of the right to self-defense, *see id.* at 767 n.15, emphasizes that killing another "for the prevention of any forcible and atrocious crime, is justifiable by the law of nature; and also by the law of England . . . ." 4 WILLIAM BLACKSTONE, COMMENTARIES *180 (footnote omitted). Thus, "[i]f any person attempts a robbery or murder of another, *or* attempts to break open a house in the night time, . . . and shall be killed in such attempt, the slayer shall be acquitted and discharged." *Id.* (emphasis added). "Sergeant William Hawkins's widely read Treatise of the Pleas of the Crown," *Atwater v. City of Lago Vista*, 532 U.S. 318, 331 (2001), similarly explained that "the killing of a Wrong-doer . . . may be justified . . . where a Man kills one who assaults him *in the Highway* to rob or murder him." 1 WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN 71 (1716) (emphasis added). Indeed, there was "no Reason why a Person, who without Provocation, is assaulted by another *in any Place whatsoever*, in such a Manner as plainly shews

an Intent to murder him, . . . may not justify killing such an Assailant . . . ." *Id*. at 72 (emphasis

added). *See also, e.g.*, MATTHEW HALE, 1 HISTORIA PACITORUM CORONAE 481 (Sollum Emlyn

ed., 1736) ("If a thief assault a true man *either* abroad *or* in his house to rob or kill him, the true

man is not bound to give back, but may kill the assailant, and it is not felony." (emphasis

added)).

Because the right to self-defense was understood to extend beyond the home, the right to

*armed* self-defense naturally was as well, for "the subjects of England [were] entitled . . . to the

right of having and using arms for self-preservation and defence." 1 WILLIAM BLACKSTONE,

COMMENTARIES *140. By the late 17th century, the English courts recognized that it was the

practice and privilege of "gentlemen to ride armed for their security." *Rex v. Knight*, 90 Eng.

Rep. 330 (1686). A century later, the Recorder of London—a judge and "the foremost legal

advisor to the city," *Parker v. District of Columbia*, 478 F.3d 370, 382 n.8 (D.C. Cir. 2007)—

opined that "the right of his majesty's Protestant subjects, to have arms for their own defense,

and to use them for lawful purposes, is most clear and undeniable." *Legality of the London

Military Foot-Association* (1780), *reprinted in* William Blizzard, Desultory Reflections on Police

59, 59 (1785). These "lawful purposes, for which arms may be used," were not limited to the

home, for they included "immediate self-defence, . . . suppression of violent and felonious

breaches of the peace, and assistance of the civil magistrate in the execution of the laws, and the

defence of the kingdom against foreign invaders." *Id*. at 63. Edward Christian, a law professor at

Cambridge, published an edition of Blackstone in which he noted that "every one is at liberty to

keep or carry a gun, if he does not use it for the destruction of game." 2 BLACKSTONE

COMMENTARIES *411-12 n.2 (Christian ed., 1794).

14

4. The right to bear arms was understood to extend beyond the home on this side of the Atlantic as well. In *Heller*, the Court noted a wealth of support for this interpretation of the public scope of the right to bear arms. "The most prominent examples are those most relevant to the Second Amendment: nine state constitutional provisions written in the 18th century or the first two decades of the 19th, which enshrined a right of citizens to 'bear arms in defense of themselves and the state' or 'bear arms in defense of himself and the state.' " *Heller*, 554 U.S. at 584–85. Just as "[i]t is clear from those formulations that 'bear arms' did not refer only to carrying a weapon in an organized military unit," *id*. at 585, it is likewise clear that "bear arms" did not refer only to toting a weapon from room to room in one's house. Citizens could not effectively bear arms either in defense of themselves or in defense of the state if they were not free to carry their weapons where they were needed for both purposes. As *Heller* recognized, "Justice James Wilson interpreted the Pennsylvania Constitution's arms-bearing right . . . as a recognition of the natural right of defense 'of one's person *or* house,' " demonstrating that the right of "bearing arms" in defense of the person was understood to extend beyond the home. *Id*. at 585 (quoting 2 COLLECTED WORKS OF JAMES WILSON 1142, at n.x (K. Hall & M. Hall eds., 2007)) (emphasis added).

The practices of the Founding generation confirm that the right to carry a firearm was well-established. George Washington rode between Alexandria and Mount Vernon with pistols holstered to his horse's saddle, "[a]s was then his custom." BENJAMIN OGLE TAYLOE, IN MEMORIAM: ANECDOTES AND REMINISCENCES 95 (Washington, D.C., 1872). Thomas Jefferson advised his nephew to "[l]et your gun . . . be the constant companion on your walks." 1 THE WRITINGS OF THOMAS JEFFERSON 398 (letter of August 19, 1785) (H. A. Washington ed., 1853). And even in defending the British soldiers charged in the Boston Massacre, John Adams

conceded that, in this country, "every private person is authorized to arm himself; and on the strength of this authority I do not deny the inhabitants had a right to arm themselves at that time for their defence." John Adams, *First Day's Speech in Defence of the British Soldiers Accused of Murdering Attucks, Gray and Others, in the Boston Riot of 1770*, *in* 6 Masterpieces of Eloquence 2569, 2578 (Hazeltine et al. eds. 1905).

The practices of these eminent Founders were representative of the population at large. As Judge St. George Tucker observed, "In many parts of the United States, a man no more thinks, of going out of his house on any occasion, without his rifle or musket in his hand, than an European fine gentleman without his sword by his side." 5 BLACKSTONE COMMENTARIES App. n.B, at 19 (St. George Tucker ed., 1803). Indeed, Tucker made clear that Congress would exceed its authority were it to "pass a law prohibiting any person from bearing arms." *Id*. App. n.D, at 289.

In addition, "about half the colonies had laws *requiring* arms-carrying in certain circumstances," such as when traveling or attending church. NICHOLAS J. JOHNSON & DAVID B. KOPEL ET AL., FIREARMS LAW & THE SECOND AMENDMENT 106-08 (2012) (emphasis added). Plainly, if the law imposed on individuals a civic duty to bear arms "for public-safety reasons," *Heller*, 554 U.S. at 601, the law necessarily conferred on those citizens a corresponding right to do so.

Those who wrote and ratified the 14th Amendment in 1868 understood the right to bear arms in precisely the same way. Indeed, Chief Justice Taney recoiled so strongly in the infamous *Dred Scott* case from recognizing African Americans as part of "We the People of the United States" precisely because he understood that doing so would entitle them "to keep and carry arms wherever they went." *Dred Scott v. Sandford*, 60 U.S. (19 How.) 393, 417 (1856). During

16

Reconstruction, Congress labored mightily to entomb this legacy of prejudice—and to defeat the post-war South's attempts to (in the words of one Mississippi statute) deprive every "freedman, free negro or mulatto" of their right to "keep or carry fire-arms of any kind." An Act To Punish Certain Offences Therein Named, and for Other Purposes, ch. 23, § 1, 1865 Miss. Laws 165. This effort culminated in the adoption of the Fourteenth Amendment, which established that *all* Americans, regardless of race, are entitled to carry firearms to defend themselves.

Thus bearing arms included carrying them for personal self-defense. The Supreme Court embraced this understanding in *McDonald* when it cited, as examples of laws that would be nullified by the 14th Amendment, not only the Mississippi statute just quoted but also the "Regulations for Freedman in Louisiana," which stated that no freedman "shall be allowed to carry firearms, or any kind of weapons, within the parish, without the written special permission of his employers, approved and indorsed by the nearest and most convenient chief of patrol." 1 DOCUMENTARY HISTORY OF RECONSTRUCTION 279-80. *See McDonald*, 561 U.S. at 771.

5. The Second Amendment, to be sure, does not protect a right "to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626. But *Heller*'s discussion of historical limitations on Second Amendment rights only lends further support to the conclusion that the Second Amendment protects a general right to carry firearms in public for self-defense.

First, the Court stated that its decision should not "cast doubt on . . . laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Id.* This statement implicitly recognizes a general right to bear arms in public because, "[w]ere the right restricted to the home, the constitutional invincibility of such restrictions would go without saying." *Peruta*, 742 F.3d at 1153. The obvious implication is that the Second Amendment

forbids the District from *generally banning* the carrying of firearms for self-defense in *all* public spaces, but not in particularly sensitive places where such regulation is appropriate and traditional.

Second, the Court recognized that "the majority of the 19th-century courts to consider the question held that prohibitions on carrying *concealed* weapons were lawful under the Second Amendment or state analogues." *Heller*, 554 U.S. at 626 (emphasis added). While this statement implies that the government has the authority to prescribe the *manner* in which firearms are to be carried (i.e., openly or concealed), it does not support a general authority to bar the carrying of firearms *altogether*. Indeed, the very sources *Heller* cites for its statement about 19th-century concealed carry laws prove that the opposite is true. In *State v. Chandler*, the Supreme Court of Louisiana rejected a challenge to a law barring the carrying of concealed weapons, but only because it "interfered with no man's right to carry arms . . . in full open view," 5 La. Ann. 489, 490 (1850) (internal quotation marks omitted), and thus did not amount to a total destruction of the right to carry. In *Nunn v. State*, 1 Ga. 243 (1846), the Supreme Court of Georgia *reversed* a conviction for carrying a pistol because the legislature was powerless to ban both concealed and open carry and because it was not proven that the defendant carried concealed.

The conclusion that the right to bear arms extends beyond the home is reinforced by the commentaries *Heller* cites alongside of *Chandler* and *Nunn*. The first, an edition of *Kent's Commentaries on American Law* edited by Oliver Wendell Holmes, states that there had been "grave discussion" and "a great difference of opinion" in the state courts on the question "whether a statute prohibiting persons … from *wearing or carrying concealed weapons*, be constitutional." 2 J. KENT, COMMENTARIES ON AMERICAN LAW *340 n.2 (O. Holmes, Jr. ed., 12th ed., 1873). *See Heller*, 554 U.S. at 626. That laws prohibiting only one *manner* of carrying

arms engendered such grave discussion and difference of opinion is utterly inconsistent with the conclusion that individuals lacked a general right to carry firearms in public in *some* manner. The point is even clearer in the second commentary cited by *Heller*, an edition of *The American Students' Blackstone* from 1884: "[I]t is generally held that statutes prohibiting the carrying of *concealed* weapons are not in conflict with [the Second Amendment and similar state] constitutional provisions, since they merely forbid the carrying of arms *in a particular manner* . . . ." THE AMERICAN STUDENTS' BLACKSTONE 84 n.11 (G. Chase ed., 1884) (second emphasis added). *See Heller*, 554 U.S. at 626.

Elsewhere, *Heller* approvingly cites *Andrews v. State*, 50 Tenn. 165 (1871), for its holding that "a statute that forbade openly carrying a pistol 'publicly or privately, without regard to time or place, or circumstances,' 50 Tenn., at 187," violated Tennessee's Second Amendment analogue "even though the statute did not restrict the carrying of long guns," *Heller*, 554 U.S. at 629. *Heller* similarly cites the Alabama Supreme Court's statement that "[a] statute which, under the pretence of regulating, amounts to a destruction of the right, *or which requires arms to be so borne as to render them wholly useless for the purpose of defence*, would be clearly unconstitutional." *Id.* (emphasis added) (quoting *State v. Reid*, 1 Ala. 612, 616-17 (1840)).

\*     \*     \*     \*     \*

The foregoing analysis of the text and history of the Second Amendment definitively establishes that the right to bear arms extends outside the home. Numerous courts, including this one, have already reached this conclusion. *See, e.g.*, *Moore*, 702 F.3d at 936; *Peruta*, 742 F.3d at 1166 (9th Cir. 2014); *Palmer*, 59 F. Supp. 3d at 181; *People v. Aguilar*, 2 N.E.2d 321, 327-28 (Ill. 2013). Indeed, *no* federal court of appeals to address this issue in the wake of *Heller* has held that the Second Amendment is limited to the home, as any such conclusion is untenable.

**B.    The District's Ban on Typical, Law-Abiding Citizens Carrying Arms Is Categorically Unconstitutional.**

1. Given that the Second Amendment applies outside the home, *Heller* makes the next analytical steps clear. Because the Second Amendment "elevates" the rights it most centrally protects "above all other interests," infringements upon its "core protection" must be held unconstitutional categorically, not "subjected to a freestanding 'interest-balancing' approach." *Heller*, 554 U.S. at 634–35. The District's wholesale ban on the right of typical, law-abiding citizens to bear arms for the purpose of self-defense is just such an infringement of core Second Amendment conduct. Accordingly, it is unconstitutional *per se*.

*Heller* requires *per se* invalidation of broad bans that strike at the heart of the Second Amendment. In *Heller*, addressing the District's ban on the right to keep arms, the Supreme Court declined the invitation to apply "an interest-balancing inquiry" based on the "approach . . . the Court has applied . . . in various constitutional contexts, including election-law cases, speech cases, and due process cases," 554 U.S. at 689–90 (Breyer, J., dissenting), holding instead that the right to keep and bear arms was "elevate[d] above all other interests" the moment that the People chose to enshrine it in the Constitution's text, *id.* at 635 (majority opinion). And in *McDonald*, the Court reaffirmed that *Heller* had deliberately and "expressly rejected the argument that the scope of the Second Amendment right should be determined by judicial interest balancing." 561 U.S. at 785 (plurality opinion). This reasoning applies equally to the broad ban on the right to bear arms at issue here.

To be sure, the D.C. Circuit has concluded that laws burdening Second Amendment conduct should be subjected to scrutiny the stringency of which "depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the right." *Heller II*, 670 F.3d at 1257. *Heller II* also implicitly recognized, however, that this tiers-of-scrutiny

20

approach is not necessarily called for when a court is faced with a law—like the one struck down in *Heller*—that amounts to a "total prohibition" of core Second Amendment conduct. *Id.* at 1266. Because such a "severe" restriction "would fail constitutional muster" under "any of the standards of scrutiny," it is unconstitutional *per se*. *See id.* (quoting *Heller*, 554 U.S. at 628–29). And the District's restriction on bearing arms outside the home is just such a law. *See, e.g.*, *Peruta*, 742 F.3d at 1170 (striking down ban on carrying arms categorically despite circuit precedent applying levels-of-scrutiny analysis in other Second Amendment cases); *Moore*, 702 F.3d at 942 (same).

2. The District's ban on public carrying amounts to a total ban on the exercise of the Second Amendment right to bear arms by typical, law-abiding citizens. To be sure, the District's regulation of the public carrying of firearms comes in the guise of a licensing requirement rather than a flat-out ban. But because the District makes licensure contingent on its assessment of whether an applicant has shown "good reason"—a requirement that it has concluded is not satisfied by the "general" "need for self-protection," D.C. CODE § 7-2509.11(1)(A)—it is no better than a complete prohibition. Though clad in sheep's clothing, the District's scheme is an unconstitutional wolf—flatly inconsistent with the Second Amendment. And this is clear not only as a matter of logic but also from the ordinary doctrinal rules that apply to a wide variety of constitutional rights. Indeed, this is clear from *Heller* itself, which held that, "[a]ssuming that Heller is not disqualified from the exercise of Second Amendment rights, the District *must* permit him to register his handgun and *must* issue him a license to carry it in the home." 554 U.S. at 635 (emphasis added).

The District's demand that a citizen prove to its satisfaction that he has a good enough reason to carry a handgun is flatly inconsistent with the nature of the Second Amendment right.

The existence of that right is itself reason enough for its exercise. The Constitution has conferred a right to armed self-defense, and the District is not free to deny a handgun permit to a trained, law-abiding citizen who has met every legitimate public-safety requirement but has failed to persuade a government official that his desire to exercise his constitutional right of armed self-defense is driven by more than the "general community['s]" desire "for self-protection." D.C. CODE § 7-2509.11(1)(A). A constitutional right to engage in conduct means *not* having to give a "proper reason" before engaging in that conduct. And this is all the more true where, as here, the District finds as a matter of course that law-abiding, responsible adults do not have a proper reason to exercise the enumerated right to bear arms.

Constitutional rights by their very nature and design are meant to settle, at least to some extent, the permissible scope of state power; they settle nothing at all if the state has authority to require law-abiding citizens to give a "proper reason" before exercising the right. Put differently, the Second Amendment right has force *as a right* only if those who disagree with the central value choice made by those who adopted it—that an individual's interest in self-defense is of such paramount importance that the freedom "to possess and carry weapons in case of confrontation" must be given constitutional protection, *Heller*, 554 U.S. at 592—are bound to follow it in the teeth of that disagreement. By seizing the authority to veto the ordinary, law-abiding citizen's choice to carry a firearm, the District has thus struck at the heart of the Second Amendment.

And although *Heller* suggests that certain "longstanding" regulations on firearms may be "presumptively lawful," 554 U.S. at 626 & 627 n.26, there is no longstanding tradition of limiting the right to bear arms to a select group of individuals the government deems to have a proper reason to exercise their right. To the contrary, as the historical evidence described above

demonstrates, *see supra* Part I.A, the right to carry firearms "belongs to *all* Americans." *Heller*, 554 U.S. at 581 (emphasis added). Laws, like the District's, that "under the pretence of regulating, amoun[t] to a destruction of the right" are "clearly unconstitutional." *Id.* at 629.

3. These principles are deeply embedded in the law. Across a wide variety of constitutional rights, courts have recognized that the government has utterly failed to honor a right if it demands to know—and assess *de novo*—the reasons justifying each occasion of its exercise.

The Supreme Court has repeatedly rejected requirements that citizens give a proper reason before exercising a constitutional right. The rejection of this argument is most familiar in the context of the First Amendment's free speech guarantee. There, it has been understood for centuries that the most serious infringement on the right of free expression is the "prior restraint": a requirement that before you get permission to speak, you must explain to the government why what you have to say is worth hearing. *See New York Times Co. v. United States*, 403 U.S. 713, 714 (1971); *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 713–23 (1931); 3 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES 732–44 (1833). While the state can require that you seek its approval before exercising your First Amendment rights for the purpose of regulating the time, place, and manner of your speech, *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 130 (1992); *Cox v. New Hampshire*, 312 U.S. 569, 574 (1941), the Constitution simply will not brook a licensing scheme that allows government officials to bar you from speaking because "they do not approve" of the proposed speech's "effects upon the general welfare," *Staub v. City of Baxley*, 355 U.S. 313, 322 (1958).

The rule that the government can no more demand an explanation for the desire to engage in constitutionally protected conduct than it may prohibit such conduct altogether is also well-

established in the free exercise context. Of particular importance here, the government cannot arrogate to itself the authority to second-guess citizens' religious judgments. Those judgments are for citizens, and citizens alone, to make. Thus, while courts can determine whether an asserted religious conviction is an "honest" one, *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 716 (1981), they cannot proceed to "question the centrality" or "plausibility" of that conviction, *Employment Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872, 887 (1990); *see also Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2778 (2014).

Finally, very similar considerations inform the Court's Confrontation Clause jurisprudence. In *Crawford v. Washington*, 541 U.S. 36, 54 (2004), the Supreme Court held that the Confrontation Clause prohibits the introduction of testimonial statements by a nontestifying witness unless the witness is "unavailable to testify, and the defendant had had a prior opportunity for cross-examination." In other words, a person's right to confront witnesses testifying against him must be respected no matter how reliable a judge deems that testimony to be—i.e., regardless of whether a judge thinks there is a good or proper reason for exercising the confrontation right. The Framers "knew that judges, *like other government officers*, could not always be trusted to safeguard the rights of the people," and they thus "were loath to leave too much discretion in judicial hands." *Id.* at 67 (emphasis added).

A shared principle unites all of these doctrinal contexts: if the government cannot prohibit a person from engaging in certain constitutionally protected conduct, it also cannot condition a person's right to engage in the protected conduct upon demonstration of a "proper reason" for wanting to engage in it.

4. Because the Second Amendment is not a "second-class right," *McDonald*, 561 U.S. at 780 (plurality opinion), it should also be unsurprising that the Court has already embraced the

principle that the exercise of Second Amendment rights cannot be conditioned on the government's ad hoc weighing of that right's importance. "A Constitutional guarantee subject to future . . . assessments of its usefulness is no constitutional guarantee at all." *Heller*, 554 U.S. at 634. By necessity, "[t]he very enumeration of the right takes out of the hands of government . . . the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Id.* But the District has seized *precisely* this power. By requiring its residents to prove to its officials that they have a "proper reason" to exercise their right to bear arms, the District has arrogated to itself the authority to ban any exercise of this core Second Amendment conduct by typical, law-abiding citizens.

Indeed, the District's restrictions here *embody* the danger this type of licensing regime poses to constitutionally protected conduct. Its conclusion that "the general community['s]" desire for self-defense is not sufficient reason for carrying firearms, D.C. CODE § 7-2509.11(1)(A), could not more flatly contradict the choice the founding generation made when it elevated the right to bear arms to constitutional status. The Second Amendment is itself "the very *product* of an interest-balancing by the people," and those who ratified that provision thereby "elevate[d] above all other interests" the right to bear arms for "the core lawful purpose of self-defense." *Heller*, 554 U.S. at 630, 635. The Constitution will simply not tolerate a regime where government officials are vested with the naked power to ignore the central choice the sovereign people made when they enshrined the Second Amendment in that document's text.

To be clear, Plaintiffs *are not* seeking an unfettered right to bear arms free from any regulation or oversight by the District. Plaintiffs only challenge the District's restrictions on carrying handguns—the type of firearm "overwhelmingly chosen by American society" for self-defense, *id.* at 628—and do not challenge restrictions on carrying other types of firearms.

Moreover, Plaintiffs request only that the District be directed to issue licenses to carry handguns to law-abiding citizens like Mr. Grace who meet all of the eligibility requirements apart from the "proper reason" requirement. Such an injunction would leave in place myriad laws regulating the right to carry arms in public. For example: anyone without a carry license would be barred from carrying in public, D.C. CODE § 22-4504(a); carry license applicants would be required to complete firearms training prescribed by the District, *id.* § 7-2509.02(a)(4); violent felons, drug addicts, and other prohibited persons would be ineligible for a carry license, *id.* §§ 7-2509.02(a), 7-2502.03(a), 22-4503; and licensed individuals would still be restricted from carrying their firearms in specified places such as schools and government buildings, *id.* § 7-2509.07.

**C.     The District's Ban Fails Any Measure of Heightened Constitutional Scrutiny.**

1. Even if this Court concludes that the District's law is not *categorically* unconstitutional, the law is nonetheless subject to strict scrutiny, which requires the District to justify the ban as necessary to advance the most compelling of government interests. Strict scrutiny applies because the District's law effectively amounts to a total ban on the exercise of the Second Amendment right to bear arms by typical, law-abiding citizens. As the Supreme Court has explained, "strict judicial scrutiny [is] required" whenever a law "impinges upon a fundamental right explicitly or implicitly protected by the Constitution." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973). And the right to bear arms is not only specifically enumerated in the constitutional text; it was also counted "among those fundamental rights necessary to our system of ordered liberty" by "those who drafted and ratified the Bill of Rights." *McDonald*, 561 U.S. at 768, 778.

Indeed, the D.C. Circuit held in *Heller II* that "a regulation that imposes a substantial burden upon the core right of self-defense protected by the Second Amendment" must be

subjected to strict scrutiny. 670 F.3d at 1257; *see also id.* at 1266. As shown above, the District's law—by *specifically rejecting* the ordinary "need for self-protection" as a reason that justifies bearing arms, D.C. CODE § 7-2509.11(1)(A)—substantially burdens the core of the Second Amendment.

2. But even if this Court concludes that only intermediate scrutiny applies, the District's law still fails constitutional muster. As the Supreme Court recently reaffirmed, intermediate scrutiny demands that restrictions of constitutionally protected conduct be "narrowly tailored," *McCullen v. Coakley*, 134 S. Ct. 2518, 2535 (2014); *see also id.* at 2542, 2548 (Scalia, J., concurring), and possess a "close fit between ends and means," *id.* at 2534 (majority opinion). Here, that close fit is absent.

As an initial matter, the District's law must fail any means-ends fit test as a matter of law, since the "means" the District has chosen *extinguishes* the right to bear arms for ordinary law-abiding citizens. As demonstrated above, the District's requirement that citizens give a "proper reason" for exercising an enumerated constitutional right amounts to an outright ban on carrying firearms in public; it applies indefinitely and it applies to the very "law-abiding, responsible citizens" that the Second Amendment was centrally designed to protect. *Heller*, 554 U.S. at 635. The government cannot adopt a restriction that wholly and indefinitely prohibits the core conduct protected by the Second Amendment no matter *what* its reasons, since that would empty that constitutional protection of all meaningful content. "[T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table," *id.* at 636, and surely the choice to completely prohibit the core conduct that the right was enshrined to protect is one of them.

The District's ban fails constitutional muster as a matter of law for another reason as well. The District's "proper reason" requirement has nothing to do with public safety, since there

is no evidence that individuals who can meet it are less likely to engage in negligent or criminal activity than those who cannot meet it. Instead—as the District has admitted—its law reduces public handgun violence, if at all, only as a side-effect of its *true* aim: "reduc[ing] the number of handguns carried in public." *See* Br. of the Dist. of Columbia and Metro. Police Dep't Chief Cathy Lanier at 21, *Wrenn v. District of Columbia*, No. 15-7057, Doc. No. 1570115 (D.C. Cir. Aug. 27, 2015); *see also id.* at 11–12, 33–36. That end cannot justify its ban, since it is "not a permissible strategy" to reduce alleged negative effects of a constitutionally protected right by simply reducing the number of people exercising the right. *See City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 445 (2002) (Kennedy, J., concurring in judgment) (controlling opinion); *see also id.* ("Though the inference may be inexorable that a city could reduce secondary effects by reducing speech, . . . [t]he purpose and effect of a zoning ordinance must be to reduce secondary effects and not to reduce speech.").

3. Even if these threshold objections are set aside, the District's ban still fails. To survive intermediate scrutiny, a restriction must be "substantially related to the achievement" of the government's objective. *United States v. Virginia*, 518 U.S. 515, 533 (1996). "The burden of justification is demanding and it rests entirely on the State." *Id.* Here, the District simply cannot meet that burden because the relevant social science fails to demonstrate that the District's restrictions on carrying firearms advance public safety.

Even public health experts who advocate firearm controls have acknowledged that, "based on available empirical data," they would expect "relatively little public safety impact if courts invalidate laws that prohibit gun carrying outside the home, assuming that some sort of permit system for public carry is allowed to stand." Philip J. Cook et al., *Gun Control After Heller: Threats and Sideshows From a Social Welfare Perspective*, 56 UCLA L. REV. 1041,

1082 (2009). There is therefore no reason to believe that striking down the District's "proper reason" requirement, while otherwise leaving the requirements for a carry permit in place, will threaten public safety in a meaningful way.

This conclusion is consistent with other leading studies finding a lack of evidence that easing restrictions on the right to carry arms in public increases criminal violence. *See, e.g.*, Robert Hahn et al., *Firearms Laws and the Reduction of Violence: A Systematic Review,* 28 AM. J. PREV. MED. 40, 40, 54 (2005), http://goo.gl/zOpJFL (CDC-supported, "systematic revie[w] of scientific evidence" concluding that "[f]urther research is needed to assess the effects of shall issue laws on violence"); NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE: A CRITICAL REVIEW 1-2 (2005) ("NRC REVIEW"), http://goo.gl/WO1ZNZ (committee charged with providing a comprehensive "assessment of the strengths and limitations of the existing research and data on gun violence" "found no credible evidence that the passage of right-to-carry laws decreases or increases violent crime").

Taking guns out of the hands of law-abiding citizens means that they will not be able to use them defensively. In a recent appearance on the television show *60 Minutes*, Defendant Lanier made clear that swift civilian intervention may be the key to saving lives in a potential mass shooting incident: "If you're in a position to try and take the gunman down, to take the gunman out, it's the best option for saving lives before police can get there." CBSNEWS.COM, *Responding to an Active Shooter* (Nov. 22, 2015), http://goo.gl/n96ANS. It is not clear how Defendant Lanier expects law-abiding citizens to be in a position to "take down" an armed madman if they are not allowed to carry firearms.

Although the number of defensive gun uses is difficult to measure, the leading study on the issue, the National Self-Defense Survey, "indicate[s] that each year in the U.S. there are

about 2.2 to 2.5 million [defensive uses of guns] of all types by civilians against humans." Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense With a Gun*, 86 J. CRIM. L. & CRIMINOLOGY 150, 164 (1995) (attached as Exhibit 7). "At least 19 other surveys have resulted in [similar] estimated numbers of defensive gun uses." NRC REVIEW at 103. Many of these defensive gun uses involve carrying firearms in public. The National Self-Defense Survey indicates that "anywhere from 670,000 to 1,570,000 [defensive gun uses] a year occur in connection with gun carrying in a public place." Gary Kleck & Marc Gertz, *Carrying Guns for Protection: Results from the National Self-Defense Survey*, 35 J. OF RES. IN CRIME & DELINQUENCY 193, 195 (1998) (attached as Exhibit 8). What is more, "[a]lmost all national survey estimates indicate that defensive gun uses by victims are at least as common as offensive uses by criminals, with estimates of annual uses ranging from about 500,000 to more than 3 million, in the context of about 300,000 violent crimes involving firearms in 2008." INSTITUTE OF MEDICINE AND NATIONAL RESEARCH COUNCIL, PRIORITIES FOR RESEARCH TO REDUCE THE THREAT OF FIREARM-RELATED VIOLENCE 15 (2013), http://goo.gl/oO6oRp (citation omitted).

Depriving law-abiding citizens of the right to carry firearms also may embolden criminals to commit additional crimes. "[Q]uite apart from their effects in disrupting crimes that have already been initiated, gun carrying among prospective victims may discourage some crimes from being attempted in the first place, due to criminals anticipating greater risks of injury to themselves and lower rates of success completing the crimes." Kleck & Gertz, *Carrying Guns for Protection*, *supra*, at 195. In other words, "knowing that many law-abiding citizens are walking the streets armed may make criminals timid." *Moore*, 702 F.3d at 937.

Denying the law-abiding citizens of the District of Columbia of the right to carry firearms is particularly perverse. The District's violent-crime rate dwarfs that of any State in the Union.

*See, e.g.*, FEDERAL BUREAU OF INVESTIGATION, CRIME IN THE UNITED STATES BY STATE: 2014,

Table 5, https://goo.gl/hgoZBR (In 2014, the District had a violent crime rate of 1,244.4 per

100,000 residents; the highest rate of any state was 635.8 and the national rate was 365.5). It is

readily apparent that the District's carry laws are not working to deter criminals from committing

violent crimes, and the District's law-abiding residents need firearms to defend themselves.

Second Amendment rights are especially important in places where the need for self-defense is

particularly "acute," *Heller*, 554 U.S. at 628, and in few places in the Nation is this need more

acute than in the District of Columbia. *Cf. Moore*, 702 F.3d at 937 ("[A] Chicagoan is a good

deal more likely to be attacked on a sidewalk in a rough neighborhood than in his apartment on

the 35th floor of the Park Tower.").

  4. Finally, even if the District were able to show that its restrictive carry laws would

advance public safety (and, as explained above, it cannot), the District's ban would still have to

be struck down because it fails intermediate scrutiny's narrow tailoring requirement. That

requirement "demand[s] a close fit between means and ends," and it forbids the government

from "burden[ing] substantially more [protected conduct] than is necessary to further the

government's legitimate interests." *McCullen*, 134 S. Ct. at 2534–35. While intermediate

scrutiny does not require the government to adopt the least restrictive alternative that will

advance its interests, "the government must demonstrate that alternative measures that burden

substantially less [protected conduct] would fail to achieve the government's interests." *Id*. at

2540.

  Contrary to these requirements, the District of Columbia's carry restrictions are vastly

overinclusive. Indeed, Chief Lanier essentially conceded this point when she stated, after this

Court struck down the District's ban on carry in *Palmer*, that "[l]aw-abiding citizens that register

31

firearms, that follow the rules, are not our worry." Mike DeBonis, *Security, Not Street Crime, at Risk After Gun Ruling, D.C. Police Chief Cathy Lanier Says*, WASH. POST., https://goo.gl/wPYekP. Yet the District's laws ban not just criminals from carrying firearms but also all typical, law-abiding adult residents of the District. *See Peruta*, 742 F.3d at 1177 (explaining that a ban on the right of citizens to carry firearms is overbroad because it is not tailored to keep guns "out of the hands of those adjudged most likely to misuse them, such as criminals or the mentally ill").

The lack of evidence that a ban such as this advances public safety should not be surprising, because violent criminals will continue to carry guns in public regardless, leaving law-abiding citizens who obey the carry ban defenseless when confronted with criminal violence. This is not a novel proposition. In a passage Thomas Jefferson copied into his personal quotation book, the influential Italian criminologist Cesare Beccaria reasoned that laws forbidding the

> wear[ing] of arms . . . disarm[ ] those only who are not disposed to commit the crime which the laws mean to prevent. Can it be supposed, that those who have the courage to violate the most sacred laws of humanity, and the most important of the code, will respect the less considerable and arbitrary injunctions, the violation of which is so easy, and of so little comparative importance? . . . [Such a law] certainly makes the situation of the assaulted worse, and of the assailants better, and rather encourages than prevents murder.

*See* Stephen P. Halbrook, *What the Framers Intended:  A Linguistic Analysis of the Right To Bear Arms*, 49 LAW & CONTEMP. PROBS. 151, 154 (1986).

Furthermore, there is a readily available alternative that would better respect the rights of law-abiding citizens that the District has ignored, and it is one that has been adopted by the vast majority of the States in the Nation. Forty States have "shall issue" laws that require the issuance of a concealed carry license to individuals who meet objective criteria. *See* National Rifle

Association Institute for Legislative Action, *Right-to-Carry*, https://goo.gl/F8Mdrc. (Five states—four of the "shall issue" states and one additional state—allow law-abiding citizens to carry concealed firearms without a license. *Id.*) The District simply cannot show that such a shall-issue permitting system would fail to advance its interests. Unlike violent criminals with a total disregard for the law, evidence indicates that duly-licensed citizens who carry firearms pose a disproportionately *small* threat to public safety. "The available data about [carry] permit holders . . . imply that they are at fairly low risk of misusing guns, consistent with the relatively low arrest rates observed to date for permit holders." Cook, *Gun Control After* Heller, 56 UCLA L. REV. at 1082. Indeed, concealed carry license holders as a group are "much more law-abiding than the general population." David B. Kopel, *Pretend "Gun-Free" School Zones: A Deadly Legal Fiction*, 42 CONN. L. REV. 515, 572 (2009), http://goo.gl/Ao8W3M; *id.* at 564–70 (discussing government data from Minnesota, Michigan, Ohio, Louisiana, Texas, and Florida). For example, researchers found that "concealed carry licensees [in Texas] had arrest rates far lower than the general population for every category of crime." H. Sterling Burnett, National Center for Policy Analysis, *Texas Concealed Handgun Carriers: Law-Abiding Public Benefactors* 1 (2000), http://goo.gl/1Ebwpb. Similarly, Florida has issued nearly 3 million concealed carry licenses since 1987 and has revoked less than 0.5% of them for any reason, with the vast majority of those revocations having nothing to do with misuse of a firearm. *See* Florida Dep't of Agric. & Consumer Servs., *Division of Licensing, Concealed Weapon or Firearm License Summary Report, Oct. 1, 1987 – November 30, 2015*, http://goo.gl/yFzIwv.

There is, moreover, an utter lack of fit between the category of citizens actually permitted to carry under District law (those who can demonstrate heightened risk) and the District's objective of public safety. "The fact that one has a greater need for self-defense tells us nothing

about whether he is less likely to misuse or accidentally use handguns. This limitation will neither make it less likely that those who meet the justifiable need requirement will accidentally shoot themselves or others, nor make it less likely that they will turn to a life of crime. Put simply, the solution is unrelated to the problem it intends to solve." *Drake v. Filko*, 724 F.3d 426, 454 (3d Cir. 2013) (Hardiman, J., dissenting).

"In short, the [District] has not shown that it seriously undertook to address the problem with less intrusive tools readily available to it," *see McCullen*, 134 S. Ct. at 2539, but instead "has too readily foregone options that could serve its interests just as well" without unduly burdening Second Amendment rights, *id.* at 2537.

> **D.   This Court Should Not Follow Out-of-Circuit Decisions Upholding Laws Similar to the District's.**

Five circuits have considered laws or policies that generally prohibit law-abiding citizens from carrying firearms in public, whether through a flat ban (in Illinois) or through a licensing scheme like the District's that disqualifies typical, law-abiding citizens by requiring the demonstration of a special need to carry a firearm (in Maryland, New Jersey, New York, and San Diego). Two circuits have struck down these measures, *see Moore*, 702 F.3d 933 (7th Cir. 2012); *Peruta*, 742 F.3d 1144 (9th Cir. 2014) (as noted above, en banc review has been granted in *Peruta*), while three have upheld them, *see Drake*, 724 F.3d 426 (3d Cir. 2013); *Woollard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013); *Kachalsky v. County of Westchester*, 701 F.3d 81 (2d Cir. 2012). The issue is an open one in the D.C. Circuit, and this Court should follow the Seventh and the Ninth Circuits, rather than the Second, Third, and Fourth.

First, as explained above, the constitutional text and history, as authoritatively interpreted by the Supreme Court, establish that the Second Amendment at its core protects the right to law-abiding citizens "to possess *and carry*" firearms for self-defense. *Heller*, 554 U.S. at 592

34

(emphasis added). *See supra* Part I.A.2. In other words, "[t]he Supreme Court has decided that the amendment confers a right to bear arms for self-defense, which is as important outside the home as inside." *Moore*, 702 F.3d at 942. The Second, Third, and Fourth Circuits erroneously purported to limit the Second Amendment's core protection to the home. *See Drake*, 724 F.3d at 431; *Woollard*, 712 F.3d at 876; *Kachalsky*, 701 F.3d at 94.

Second, after improperly demoting the right to bear arms to subordinate status, the Second, Third, and Fourth Circuits proceeded to apply intermediate scrutiny rather than striking down the challenged laws as *per se* unconstitutional as required by *Heller*, *see Peruta*, 742 F.3d at 1170 (recognizing that "*Heller*-style per se invalidation" is required when policy "destroys" Second Amendment rights of ordinary law-abiding citizens), or, at a minimum, applying strict scrutiny.

Third, the Second, Third, and Fourth Circuits misapplied intermediate scrutiny in myriad ways: (i) The theory behind laws like the District's is that they will advance public safety by limiting the exercise of the right to bear arms. But under any form of heightened scrutiny, including intermediate scrutiny, it is illegitimate for the government to seek to achieve a governmental objective simply by reducing the amount of constitutionally protected activity. *See Alameda Books*, 535 U.S. at 445 (Kennedy, J., concurring in judgment); (ii) There is no substantial basis for concluding that banning typical, law-abiding citizens from carrying firearms in public will advance public safety in any meaningful way. Indeed, after canvassing the social-science evidence Judge Posner concluded that a general ban on carrying firearms outside the home could at most pass rational basis review. *See Moore*, 702 F.3d at 942; *supra* Part I.C.3; and (iii) The Second, Third, and Fourth Circuits failed to conduct a proper tailoring analysis and thus erroneously held that New York, New Jersey, and Maryland were justified in rejecting a shall-

35

issue permitting system in favor of those States' more restrictive systems. *See Peruta*, 742 F.3d at 1177–78; *supra* Part I.C.4.

Finally, Defendant Lanier, the District's chief law-enforcement officer, has admitted that the District's police force is not worried about "[l]aw-abiding citizens that register firearms," DeBonis, *Security, Not Street Crime, at Risk, supra*, and that in certain circumstances civilians exercising the right to self-defense may be "the best option for saving lives before police can" arrive, CBSNEWS.COM, *Responding to an Active Shooter, supra*. Even under the flawed analytical structure applied by *Kachalsky*, *Drake*, and *Woollard*, these admissions would undermine the District's law.

**II.    Plaintiffs Will Continue to Suffer Irreparable Harm in the Absence of Preliminary Relief.**

The second question in the preliminary injunction analysis is whether the applicant is likely to suffer irreparable harm unless an injunction issues. *See Winter v. NRDC*, 555 U.S. 7, 22 (2008). The irreparable harm inquiry requires the Court to assume that Plaintiffs have demonstrated a likelihood of success on the merits and then to ask "whether that violation, if true, inflicts irremediable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 303 (D.C. Cir. 2006).

An allegation that the defendant's actions violate the plaintiff's constitutional rights typically satisfies the requirement of "irreparable injury." As the D.C. Circuit has explained, "[s]uits for declaratory and injunctive relief against the threatened invasion of a constitutional right do not ordinarily require proof of any injury other than the threatened constitutional deprivation itself." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (brackets omitted) (quoting *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998)). Thus, "although a plaintiff seeking equitable relief must show a threat of substantial and immediate irreparable

injury, a prospective violation of a constitutional right constitutes irreparable injury for these

purposes." *Id.* (brackets omitted) (quoting *Davis*, 158 F.3d at 1346).

The principle that the violation of a constitutional right, without more, typically amounts

to irreparable harm derives from the statement of a plurality of the Supreme Court in *Elrod v.*

*Burns* that "[t]he loss of First Amendment freedoms, for even minimal periods of time,

unquestionably constitutes irreparable injury." 427 U.S. 347, 373 (1976). As the Seventh Circuit

has explained:

> The loss of a First Amendment right is frequently presumed to cause irreparable
> harm based on the intangible nature of the benefits flowing from the exercise of
> those rights; and the fear that, if those rights are not jealously safeguarded, persons
> will be deterred, even if imperceptibly, from exercising those rights in the future.

*Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011) (internal quotation marks omitted).

And the Second Amendment also protects "intangible and unquantifiable interests." *Id.* Indeed,

its "central component is the right to possess firearms for protection," and violations of that right

plainly "cannot be compensated by damages." *Id.* Thus, for violations of Second Amendment

rights, as for violations of First Amendment rights, "irreparable harm is presumed." *Id.*

For these reasons, law-abiding citizens like Mr. Grace suffer irreparable harm each day

that they suffer an ongoing deprivation of their constitutional right to carry a firearm in public for

self-defense. The allegation of the violation, without more, satisfies the irreparable injury

requirement. Even if Mr. Grace were required to establish a likelihood that the District's carry

ban will "chill" his exercise of constitutionally protected conduct, *see Chaplaincy of Full Gospel*,

454 F.3d at 299, he has satisfied this requirement by declaring that, but for the District's laws, he

would carry a firearm in public for self-defense. *See* Grace Decl. ¶¶ 6, 11. Indeed, Mr. Grace

applied for a carry license, but the police denied that application solely on the basis of his failure

to satisfy the "proper reason" requirement. *See* Exhibit 4. Each day that the unconstitutional ban

continues in force, Mr. Grace and others like him risk physical injury because they are unable to exercise their Second Amendment right to self-defense. Of course, that injury cannot be compensated through money damages. *See Ezell*, 651 F.3d at 699. And each day that the District's law remains in effect, Mr. Grace and others like him face the choice of limiting their travel to neighborhoods in which they feel safe without a gun—or entering those neighborhoods without the ability to protect themselves against violent crime. If Plaintiffs prevail, the only appropriate remedy (and the only remedy Plaintiffs seek) is declaratory and injunctive in nature. *See id.* at 699 n.10.

### III.   The Balance of Equities Tips in Plaintiffs' Favor.

The equities weigh strongly in Plaintiffs' favor. Plaintiffs continue to suffer an ongoing violation of their constitutional rights, and this ongoing violation constitutes irreparable injury. On the other side of the ledger, any interests invoked by the District are entirely speculative. Plaintiffs only seek an injunction to allow Matthew Grace and other trained, law-abiding citizens like him the right to carry arms in public for purposes of self-defense. Indeed, as noted above, Chief Lanier has essentially conceded the balance-of-equities point when she stated, after this Court struck down the District's ban on carry in *Palmer*, that "[l]aw-abiding citizens that register firearms, that follow the rules, are not our worry." DeBonis, *Security, Not Street Crime, at Risk, supra*. Indeed, Chief Lanier acknowledged that armed, law-abiding citizens can save lives when she advised on *60 Minutes*, "If you're in a position to try and take the gunman down, to take the gunman out, it's the best option for saving lives before police can get there." CBSNEWS.COM, *Responding to an Active Shooter, supra*.

Furthermore, to repeat the point made in Part I.B.4, *supra*, Plaintiffs do not seek an unfettered right to bear arms free from any regulation or oversight by the District. Plaintiffs

challenge only the District's limitations on carrying handguns, "the quintessential self-defense weapon," *Heller*, 554 U.S. at 629, and the injunction that Plaintiffs request would leave in place myriad laws regulating the right to carry handguns in public, including the prohibitions on carrying without a license, D.C. CODE § 22-4504(a); on carrying in specified places such as schools and government buildings, *id*. § 7-2509.07; and on carrying by violent felons, drug addicts, and other prohibited persons, *id*. §§ 7-2509.02(a), 7-2502.03(a), 22-4503.

In short, enjoining the operation of the challenged provisions of District of Columbia law would result in licensed, vetted, and trained individuals having a general but not unrestricted right to carry handguns outside the home. This is the situation that prevails across the Nation, and bringing it to the Nation's capital would be a boon, not a harm, to the District and its residents.

## IV. An Injunction Is in the Public Interest.

For similar reasons, an injunction is also in the public interest. The D.C. Circuit has acknowledged the "obvious" fact that "enforcement of an unconstitutional law is always contrary to the public interest." *Gordon*, 721 F.3d at 653. So too have other circuits. *E.g.*, *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 114 (3d Cir. 2013) ("[T]he enforcement of an unconstitutional law vindicates no public interest."). Because enforcement of this unconstitutional law is by definition contrary to the public interest, the entry of a preliminary injunction serves the public interest as a matter of law. Moreover, the analysis with respect to the balancing of the equities indicates that the public interest is served by vindicating citizens' constitutional rights and affording them an opportunity to defend themselves in public, not by perpetuating an unconstitutional and ineffective restrictions on that right.

**V.     The Court Should Enter Final Judgment for Plaintiffs.**

The Federal Rules of Civil Procedure permit this Court to "advance the trial on the merits

and consolidate it with the hearing" for a preliminary injunction. FED. R. CIV. P. 65(a)(2).

"[W]hen the eventual outcome on the merits is plain at the preliminary injunction stage, the

judge should, after due notice to the parties, merge the stages and enter a final judgment." *Morris*

*v. District of Columbia*, 38 F. Supp. 3d 57, 62 n.1 (D.D.C. 2014) (quoting *Curtis 1000, Inc. v.*

*Suess*, 24 F.3d 941, 945 (7th Cir. 1994)).

A permanent injunction is appropriate now. The final outcome of this case will not

depend on any facts presented at trial, and there is no "genuine uncertainty at the preliminary-

injunction stage concerning what that outcome will be." *See Curtis 1000*, 24 F.3d at 945. At this

stage, the Court has all the facts that it needs—only questions of law remain. As in *Moore*, "[t]he

constitutionality of the challenged statutory provisions does not present factual questions for

determination in a trial." 702 F.3d at 942. To the extent there are any questions of disputed fact,

those questions involve only "legislative facts" that bear on the justification for legislation, not

"adjudicative facts" that must be determined at trial. *Id.* The Seventh Circuit's disposition in

*Moore* is particularly instructive here, as that court remanded for entry of a declaration of

unconstitutionality and a permanent injunction upon reversing the district court's judgment

granting the State of Illinois's motion to dismiss:

> The usual consequence of reversing the dismissal of a suit (here a pair of suits) is
> to remand the case for evidentiary proceedings preparatory to the filing of
> motions for summary judgment and if those motions fail to an eventual trial. But
> there are no evidentiary issues in these two cases. The constitutionality of the
> challenged statutory provisions does not present factual questions for
> determination in a trial . . . . Only adjudicative facts are determined in trials, and
> only legislative facts are relevant to the constitutionality of the Illinois gun law.
> The key legislative facts in this case are the effects of the Illinois law; the state
> has failed to show that those effects are positive.
>
> We are disinclined to engage in another round of historical analysis to determine

whether eighteenth-century America understood the Second Amendment to include a right to bear guns outside the home. The Supreme Court has decided that the amendment confers a right to bear arms for self-defense, which is as important outside the home as inside. The theoretical and empirical evidence (which overall is inconclusive) is consistent with concluding that a right to carry firearms in public may promote self-defense. Illinois had to provide us with more than merely a rational basis for believing that its uniquely sweeping ban is justified by an increase in public safety. It has failed to meet this burden. The Supreme Court's interpretation of the Second Amendment therefore compels us to reverse the decisions in the two cases before us and remand them to their respective district courts for the entry of declarations of unconstitutionality and permanent injunctions.

*Moore*, 702 F.3d at 942 (citations omitted). Likewise in this case, the Court will have all the information it needs to make a final judgment upon conclusion of the preliminary injunction proceedings. The Court should enter final judgment and put a final end to the District of Columbia's laws prohibiting typical, law-abiding, responsible citizens from exercising their fundamental, individual right to carry a firearm outside the home for self-defense.

## CONCLUSION

For the foregoing reasons, the Court should preliminarily and permanently enjoin the District of Columbia's unlawful restrictions on the Second Amendment right to bear arms.

Dated:  December 28, 2015                    Respectfully submitted,

                                             s/ Charles J. Cooper
                                             Charles J. Cooper (Bar No. 248070)
                                             David H. Thompson (Bar No. 450503)
                                             Peter A. Patterson (Bar No. 998668)
                                             COOPER & KIRK, PLLC
                                             1523 New Hampshire Avenue, N.W.
                                             Washington, D.C. 20036
                                             (202) 220-9600
                                             (202) 220-9601 (fax)
                                             ccooper@cooperkirk.com

                                             *Attorneys for Plaintiffs*

41