**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

MATTHEW GRACE, *et al.*,

     *Plaintiffs*,

     v.

DISTRICT OF COLUMBIA, *et al.*,

     *Defendants*.

_____

)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 15-2234 (RJL)

**MOTION OF THE NATIONAL RIFLE ASSOCIATION OF AMERICA, INC.
FOR LEAVE TO FILE *AMICUS CURIAE* BRIEF IN SUPPORT OF PLAINTIFFS**

Pursuant to LCvR 7(o), the National Rifle Association of America, Inc. ("NRA") respectfully moves for leave to file a brief as *amicus curiae* in support of plaintiffs' application for a preliminary or permanent injunction.

The NRA is America's oldest civil rights organization and is widely recognized as America's foremost defender of the Second Amendment. The NRA was founded in 1871 by Union generals who, based on their experiences in the Civil War, desired to promote marksmanship and expertise with firearms among the citizenry. Today, the NRA has approximately five million individual members, and its programs reach millions more. Among its many public service and education initiatives, the NRA is the Nation's leading provider of firearms marksmanship and safety training for both civilians and law enforcement.

The NRA has a strong interest in this case because a substantial number of its members reside in the District of Columbia and seek to carry handguns outside the home for the lawful purpose of self-defense. These members, however, cannot qualify for carry licenses for the sole reason that they do not satisfy the District's exceedingly narrow "good cause" requirement. These

members believe that the District's carry law effectively eliminates their Second Amendment right to keep and bear arms for self-defense. If the law were enjoined, they would obtain carry licenses and would, in their view, make the District a safer place.

The NRA also has an interest—and, it respectfully believes, an ability to assist the Court—in this case because it is the Nation's leading research and advocacy organization specializing in the Second Amendment. The NRA has participated actively in litigation to vindicate Second Amendment rights in state and federal courts across the country. It filed briefs in the United States Supreme Court in both *District of Columbia v. Heller*, 554 U.S. 570 (2008) (as an *amicus*), and *McDonald v. City of Chicago*, 561 U.S. 742 (2010) (as a party). It participated as an *amicus* in other leading Second Amendment cases reviewing the District's firearms regulations, including *Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007), *Heller v. District of Columbia*, 801 F.3d 26 (D.C. Cir. 2015), and *Wrenn v. District of Columbia*, No. 15-7057, 2015 WL 8746334 (D.C. Cir. Dec. 15, 2015). It also participated as *amicus* in highly relevant out-of-circuit litigation challenging carry laws that include "good cause" requirements materially similar to the one at issue in this case. *See Moore v. Madigan,* 702 F.3d 933 (7th Cir. 2012); *Woollard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013); *Peruta v. Cnty. of San Diego*, 742 F.3d 1144 (9th Cir. 2014), *reh'g en banc granted* 781 F.3d 1106 (9th Cir. 2015).[1]

The NRA's unique national perspective, experience, and expertise give it "a special interest in this litigation as well as a familiarity and knowledge of the issues raised therein that could aid in the resolution of this case." *Ellsworth Assocs., Inc. v. United States*, 917 F. Supp. 841, 846 (D.D.C. 1996); *see also District of Columbia v. Potomac Elec. Power Co.*, 826 F. Supp. 2d 227,

---

[1] Counsel of record for the NRA in this case argued *Peruta* before the Ninth Circuit at the panel and *en banc* rehearing stages of that case.

237 (D.D.C. 2011) (granting leave to file *amicus* brief to organization "with relevant expertise and a stated concern for the issues at stake in this case"). The NRA respectfully believes that its "brief will assist the [Court] by presenting ideas, arguments, theories, insights, facts, or data that are not to be found in the parties' briefs." *Matter of Search of Info. Associated with [redacted]@mac.com that is Stored at Premises Controlled by Apple, Inc.*, 13 F. Supp. 3d 157, 167 (D.D.C. 2014) (quotation marks omitted). Specifically, the NRA's proposed *amicus* brief analyzes important historical evidence, empirical and academic literature, out-of-circuit case law, and aspects of heightened scrutiny doctrine that plaintiffs' brief does not address.

These and other issues addressed by the NRA's proposed *amicus* brief are likely to prove relevant to the disposition in this case, as they have in similar Second Amendment litigation. The NRA accordingly believes that its proposed *amicus* brief is desirable and may assist the Court in ways similar to the *amicus* briefs filed by trade associations, research organizations, and advocacy groups in other significant constitutional or statutory cases before this Court. *See, e.g.*, *NACS v. Bd. of Governors of Fed. Reserve Sys.,* 958 F. Supp. 2d 85 (D.D.C. 2013) (leading bank and credit union trade associations granted leave to file *amicus* brief); *R.J. Reynolds Tobacco Co. v. FDA*, 823 F. Supp. 2d 36 (D.D.C. 2011) (major advertising associations and Washington Legal Foundation granted leave to file *amicus* briefs); *Hettinga v. United States*, 770 F. Supp. 2d 51 (D.D.C. 2011) (dairy producers association granted leave to file *amicus* brief).

Plaintiffs have consented to the filing of this proposed *amicus* brief. Defendants do not oppose the filing of this motion but have indicated that they will defer a decision on whether to consent to or oppose the proposed brief.

The proposed amicus brief (including a certificate of corporate disclosure) is attached as Exhibit 1 to this motion. A proposed order is attached as Exhibit 2.

Respectfully submitted,

Paul D. Clement (D.C. Bar No. 433215)
  *Counsel of Record*
Erin E. Murphy (D.C. Bar No. 995953)
Christopher G. Michel (VA Bar No. 89403)
BANCROFT PLLC
500 New Jersey Avenue, NW
Seventh Floor
Washington, DC 20001
(202) 234-0090
pclement@bancroftpllc.com

*Counsel for Amicus Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 4, 2016, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system.  I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Paul D. Clement
Paul D. Clement (D.C. Bar No. 433215)

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

)
)
MATTHEW GRACE, *et al.*,                                  )
)
     *Plaintiffs*,                                      )
)         Civil Action No. 15-2234 (RJL)
     v.                                                      )
)
DISTRICT OF COLUMBIA, *et al.*,                     )
)
)
     *Defendants*.                                      )
_____ )

**BRIEF OF *AMICUS CURIAE* NATIONAL RIFLE ASSOCIATION
OF AMERICA, INC. IN SUPPORT OF PLAINTIFFS**

Paul D. Clement (D.C. Bar No. 433215)
Erin E. Murphy (D.C. Bar No. 995953)
Christopher G. Michel (VA Bar No. 89403)
BANCROFT PLLC
500 New Jersey Avenue, NW
Seventh Floor
Washington, DC 20001
(202) 234-0090
pclement@bancroftpllc.com

*Counsel for Amicus Curiae*

**CORPORATE DISCLOSURE STATEMENT**

The National Rifle Association of America, Inc., has no parent corporation.  It has no stock, and, therefore, no publicly held company owns ten percent or more of its stock.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ................................................................. ii

TABLE OF AUTHORITIES........................................................................................ iv

IDENTITY AND INTEREST OF *AMICUS CURIAE*................................................... 1

INTRODUCTION ........................................................................................................ 1

ARGUMENT ............................................................................................................... 4

I.       The Right To Bear Arms Necessarily Extends Beyond The Home ................................... 4

II.     Because The Public Carry Law Amounts To A Destruction Of The Core Right To Bear Arms For The Lawful Purpose Of Self-Defense, It Is *Per Se* Invalid................. 10

III.    If The Court Applies A Tiers-of-Scrutiny Approach, Strict Scrutiny Is Required, But The Law Would Fail Under Intermediate Scrutiny, Too ............................................ 19

CONCLUSION............................................................................................................ 23

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES[*]

**Cases**

*Andrews v. State*,
  50 Tenn. 165 (1871) ..................................................................................... 7, 10

*Bonidy v. U.S. Postal Serv.*,
  790 F.3d 1121 (10th Cir. 2015) ............................................................................ 4

*District of Columbia v. Heller*,
  554 U.S. 570 (2008)................................... 1, 2, 3, 5, 7, 8, 9, 10, 11, 13, 14, 15, 16, 17, 18, 19

*Drake v. Filko*,
  724 F.3d 426 (3d Cir. 2013) .......................................................................... 4, 16

*FEC v. Wis. Right To Life, Inc.*,
  551 U.S. 449 (2007).......................................................................................... 22

*Heller v. District of Columbia*,
  670 F.3d 1244 (D.C. Cir. 2011).......................................... 4, 10, 12, 17, 18, 19, 20

*Heller v. District of Columbia*,
  801 F.3d 264 (D.C. Cir. 2015) ...................................................................... 20, 22

*Kachalsky v. Cty. of Westchester*,
  701 F.3d 81 (2d Cir. 2012) ......................................................................... 5, 8, 16

*McCullen v. Coakley*,
  134 S. Ct. 2518 (2014)..................................................................................... 21

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010)........................................................................... 1, 10, 15, 17

*Moore v. Madigan*,
  702 F.3d 933 (7th Cir. 2012) ........................................................... 4, 7, 8, 13, 22

*Muscarello v. United States*,
  524 U.S. 125 (1998)......................................................................................... 5, 6

*Nunn v. State*,
  1 Ga. 243, 251 (1846) ................................................................................... 7, 10

*Palmer v. District of Columbia*,
  59 F. Supp. 3d 173 (D.D.C. 2014) ................................................................... 2, 5

---

[*] Authorities on which this brief chiefly relies are marked with an asterisk.

*Parker v. District of Columbia,*
  478 F.3d 370 (D.C. Cir. 2007) ....................................................... 9, 13

*Peruta v. Cty. of San Diego,*
  742 F.3d 1144 (9th Cir. 2014) .............................................. 4, 6, 8, 9, 13

*Riley v. California,*
  134 S. Ct. 2473 (2014) ..................................................................... 16

*Schad v. Borough of Mount Ephraim,*
  452 U.S. 61 (1981) .......................................................................... 13

*State v. Huntly,*
  25 N.C. 418 (1843) .......................................................................... 18

*State v. Reid,*
  1 Ala. 612 (1840) ....................................................................... 10, 19

*United States v. Masciandaro,*
  638 F.3d 458 (4th Cir. 2011) ............................................................... 4

*United States v. Stevens,*
  559 U.S. 460 (2010) ........................................................................ 16

*Ward v. Rock Against Racism,*
  491 U.S. 781 (1989) .................................................................... 20, 21

*Woollard v. Gallagher,*
  712 F.3d 865 (4th Cir. 2013) ............................................................. 16

*Wrenn v. District of Columbia,*
  No. 15-162, 2015 WL 3477748 (D.D.C. May 18, 2015) ............................ 2, 17

**Statutes**

2 Edw. 3 ............................................................................................ 18

D.C. Code §22-4506 ............................................................................. 2

D.C. Code §7-2509.11 ....................................................................... 2, 11

Pub. L. No. 78-182, 57 Stat. 586 ........................................................... 17

**Other Authorities**

1 W. Hawkins, Treatise of the Pleas of the Crown (1716) ............................ 18

4 W. Blackstone, Commentaries on the Laws of England (1769) .................... 18

Br. for Appellants, *Wrenn v. District of Columbia*,
2015 WL 8746334 (D.C. Cir. 2015) (No. 15-7057)........................... 13, 14, 15, 16, 17, 18, 21

Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense*,
UCLA L. Rev. 1443 (2009)............................................................................................... 6, 22

Federal Bureau of Investigation, *Crime in the United States by State: 2014*,
perma.cc/kbt7-fv6a ..................................................................................................... 6

Michael P. O'Shea, *Modeling the Second Amendment Right to Carry Arms*,
61 Am. U. L. Rev. 585 (2012)................................................................................. 6, 9

Michael Smith & Faiz Siddiqui, *AU Graduate Gunned Down Outside Metro Station
in Broad Daylight*, Wash. Post, Aug. 16, 2015, perma.cc/5e36-3mdb ................................... 6

Peter Hermann et al., *Horrified Passengers Witnessed Brutal July 4 Slaying Aboard
Metro Car*, Wash. Post, July 7, 2015, perma.cc/ge48-y2d9....................................... 6

Peter Hermann, *Woman and Child Attacked by Teens in Georgetown*,
Wash. Post, Nov. 18, 2015, perma.cc/y6nf-3k9c .................................................... 6

## IDENTITY AND INTEREST OF *AMICUS CURIAE*

The National Rifle Association of America, Inc., ("NRA") is a not-for-profit membership corporation founded in 1871.  NRA has approximately five million individual members and more than ten thousand affiliated members (clubs and associations) nationwide.  The NRA has a strong interest in this case because its outcome will affect the ability of members who reside in the District of Columbia to exercise their constitutional right to carry a handgun outside the home for the purpose of self-defense.  *Amicus curiae* submits this brief with a motion for leave to file, as authorized by LCvR 7(o)(2).[1]

## INTRODUCTION

The Second Amendment protects an individual right to keep and bear arms for self-defense—in other words, "to possess and carry weapons in case of confrontation." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008).  The decision of the founding generation to enshrine this right in the Constitution as one guaranteed to "the People" "necessarily takes certain policy choices off the table." *Id.* at 636.  As the Supreme Court has explained, the Second Amendment means that municipal leaders cannot simply "enact any gun control law that they deem to be reasonable." *McDonald v. City of Chicago*, 561 U.S. 742, 783 (2010).  Instead, they may enact only those measures that are consistent with the reality that the Constitution protects an individual and fundamental right to keep and bear arms.

Unfortunately, the District has repeatedly failed to heed that teaching and refused to take the Founders and the Supreme Court at their word when it comes to the Second Amendment.  First, the District banned the possession of handguns in the home, a prohibition that the Supreme Court

---

[1] *Amicus* certifies that this brief was not written in whole or in part by counsel for any party, and that no person or entity other than *amicus*, its members, and its counsel has made a monetary contribution to the preparation and submission of this brief.

held unconstitutional "under any of the standards of scrutiny" because it nullified "the inherent right of self-defense" that is "central to the Second Amendment." *Heller*, 554 U.S. at 628. Next, the District banned the carrying of handguns outside the home, even by law-abiding citizens for self-defense. That law too was held unconstitutional "under any level of scrutiny." *Palmer v. District of Columbia*, 59 F. Supp. 3d 173, 183 (D.D.C. 2014). Undeterred, the District once again enacted a broad prohibition on carrying handguns outside the home, while at the same time recognizing the utility of handguns for self-defense. Thus, the District has limited the constitutional right given broadly to "the People" to the subset of "the People" who can identify a "good reason to fear injury to [their] person or property or ha[ve] any other proper reason for carrying a pistol." D.C. Code §22-4506(a). And lest there be any doubt about the intended scope of that restriction, the Council confirmed that a "good reason" requires "a showing of a special need for self-protection *distinguishable from the general community*." D.C. Code §7-2509.11(1)(A) (emphasis added). Accordingly, the state of affairs today in the District is not meaningfully different from what it was in *Palmer*: An *ordinary* law-abiding citizen still may not carry a gun outside the home for the purpose of self-defense.

Under a straightforward application of the Supreme Court's decisions in *Heller* and *McDonald*, the unconstitutionality of the District's carry law is plain.[2] Those precedents authoritatively interpret the Second Amendment to protect the right of law-abiding citizens to carry arms to defend themselves "in case of confrontation." *Heller*, 554 U.S. at 592. There can be no serious dispute that this right extends outside the home; indeed, in a place like the District, where violent public confrontations regrettably have become alarmingly frequent, the need for self-

---

[2] Indeed, a judge sitting in this Court invalidated the law, but that decision was vacated on grounds unrelated to the merits. *Wrenn v. District of Columbia*, No. 15-162, 2015 WL 3477748 (D.D.C. May 18, 2015), *vacated by* No. 15-7057, 2015 WL 8746334 (D.C. Cir. Dec. 15, 2015).

defense both inside *and outside* the home is self-evident.  There likewise can be no serious dispute that restricting this right to the fortunate few who can document some particularized need for self-protection that "distinguishes" them "from the general community" is incompatible with the Framers' decision to enshrine the right of "the People" to keep and bear arms in the Constitution.  Nothing in *Heller* or history confines the "inherent right of self-defense" to a subset of "the People" who can convince the government that they have a particularly acute need to exercise their constitutional right.  *Id.* at 628.  By adopting such a narrow conception of the right and refusing to honor the rights of *ordinary* law-abiding citizens, the District's law once again violates the Second Amendment "under any of the standards of scrutiny."  *Id.*

Tellingly, the District all but concedes the constitutional flaw in its law.  The "good cause" requirement, the District explains, is not actually aimed at keeping handguns away from those most likely to misuse them.  Rather, the Council enacted the law to reduce the total number of handguns on the streets, based on its view that handgun carrying, which the Constitution protects, is inherently problematic, so the less of it the better.  That reasoning is flatly foreclosed by the Second Amendment itself, which enshrines into the Constitution a judgment that the fundamental right of the typical, law-abiding citizen to carry a handgun outside the home is a societal good to be protected, not a societal evil to be suppressed.  Worse still, the District recognizes that carrying a handgun outside the home serves the constitutionally protected end of self-defense.  That is why it begrudgingly extended the right to those with a particularly acute need for self-defense.  But having acknowledged that carrying a handgun outside the home serves a constitutionally legitimate end, the District is not free to limit the right to a subset of "the People" protected by the Constitution.  That policy choice is just as a constitutionally verboten as a legislative effort to reserve the First Amendment to those with a particularly good reason to criticize the government,

or to reserve the Takings Clause to those with a particularly strong attachment to their property. By extending constitutional rights broadly, the Framers prevented later city councils from reserving the right to the lucky few whom the government deems particularly worthy of a protection that the Framers enshrined for all.  Because the D.C. carry law ignores that basic constitutional reality, it is just as unconstitutional as the District's last two attempts to prohibit law-abiding citizens from exercising their fundamental constitutional right to keep and bear arms.

## ARGUMENT

### I.       The Right To Bear Arms Necessarily Extends Beyond The Home.

In determining whether the District's public carry law "impinges upon a right protected by the Second Amendment," *Heller v. District of Columbia*, 670 F.3d 1244, 1252 (D.C. Cir. 2011) (*Heller II*), the threshold question is whether the "right to bear arms" encompasses the right to carry a handgun outside the home for the purpose of self-defense.  Although *Heller* did not answer this question explicitly, its reasoning leaves no doubt that the right to bear arms extends beyond the home.  It is therefore unsurprising that every federal appellate court to have squarely decided the issue—along with many respected judges addressing the matter in separate writings—has concluded that the Second Amendment is not confined to the home.  *Peruta v. Cty. of San Diego,* 742 F.3d 1144, 1149-67 (9th Cir. 2014), *reh'g en banc granted* 781 F.3d 1106 (9th Cir. 2015)[3]; *Moore v. Madigan,* 702 F.3d 933, 935-37 (7th Cir. 2012); *see Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1130-32 (10th Cir. 2015) (Tymkovich, J., concurring in part and dissenting in part); *Drake v. Filko*, 724 F.3d 426, 444-46 (3d Cir. 2013) (Hardiman, J., dissenting); *United States v. Masciandaro,* 638 F.3d 458, 467-68 (4th Cir. 2011) (Niemeyer, J., specially concurring); *see also*

---

[3] Although the *Peruta* opinion was vacated when the Ninth Circuit granted rehearing en banc, the panel's opinion retains its persuasive authority.

*Kachalsky v. Cty. of Westchester,* 701 F.3d 81, 89 (2d Cir. 2012) (assuming that the Second Amendment "must have *some* application" outside the home). Indeed, when the issue arose before a judge sitting in this Court, he concluded that the right to bear arms "means nothing if not the general right to carry a common weapon outside the home for self-defense." *Palmer*, 59 F. Supp. 3d at 181, *appeal dismissed* 2015 WL 1607711 (D.C. Cir. Apr. 2, 2015).

Any inquiry into the scope of the right to "bear arms" must begin with the text of the Second Amendment. As the Court explained in *Heller*, "[a]t the time of the founding, as now, to 'bear' meant to 'carry.'" *Heller*, 554 U.S. at 584. To "bear arms" referred to "carrying for a particular purpose—confrontation." *Id.* The Court elaborated on that meaning by endorsing the definition offered by Justice Ginsburg's opinion in *Muscarello v. United States,* 524 U.S. 125 (1998): "wear, bear, or carry … upon the person or in the clothing or in a pocket, for the purpose ... of being armed and ready for offensive or defensive action in a case of conflict with another person." *Id.* at 143 (quotation marks omitted). Reasoning from this textual analysis, the *Heller* Court concluded—and reiterated throughout its opinion—that the Second Amendment guarantees "the individual right to possess and carry weapons in case of confrontation." *Id.* at 592; *see id.* at 594 ("individual right protecting against both public and private violence"); *id.* ("right to enable individuals to defend themselves"); *id.* at 595 ("right of self-preservation"); *id.* at 616 ("individual right to use arms for self-defense"); *id.* at 628 ("inherent right of self-defense"). The Court emphasized that self-defense was not merely a "subsidiary interest of the right to keep and bear arms," but rather "the *central component* of the right itself." *Id.* at 599 (quotation marks omitted).

*Heller*'s definition of the Second Amendment right points strongly toward the answer here. As a matter of common sense, the right to be "armed and ready for offensive or defensive action in a case of conflict with another person" must extend beyond the home. *Heller*, 554 U.S. at 584

(quoting *Muscarello*, 524 U.S. at 143 (Ginsburg, J., dissenting)).  The notion of carrying a gun to be "armed and ready" for confrontation, after all, naturally "brings to mind scenes such as a woman toting a small handgun in her purse as she walks through a dangerous neighborhood, or a night-shift worker carrying a handgun in his coat as he travels to and from his job site." *Peruta*, 742 F.3d at 1152.  Indeed, Justice Ginsburg's dissent in *Muscarello* explained that "one could carry his gun to a car, transport it to the shooting competition, and use it to shoot targets." *Muscarello*, 524 U.S. at 147 (Ginsburg, J., dissenting).  Thus, the very opinion that *Heller* relied on to define the meaning of "bear arms" expressly used the term in reference to carrying a gun outside the home.

Moreover, the reality that the need for self-defense is as likely to arise outside the home as inside it remains as true today as it was when the Second Amendment was ratified.  Even if a person's home is not literally a castle, it does provide a measure of protection that a person lacks when walking or driving on a deserted street in a dangerous neighborhood.  And as several legal scholars have noted, statistics show that a substantial majority of rapes, armed robberies, and other serious assaults occur outside the home. *See* Michael P. O'Shea, *Modeling the Second Amendment Right to Carry Arms*, 61 Am. U. L. Rev. 585, 610-11 (2012); Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense*, UCLA L. Rev. 1443, 1518 (2009).  That is especially true in the District, where violent public confrontations regrettably occur often. *See, e.g.*, Peter Hermann et al., *Horrified Passengers Witnessed Brutal July 4 Slaying Aboard Metro Car*, Wash. Post, July 7, 2015, perma.cc/ge48-y2d9; Michael Smith & Faiz Siddiqui, *AU Graduate Gunned Down Outside Metro Station in Broad Daylight*, Wash. Post, Aug. 16, 2015, perma.cc/5e36-3mdb; Peter Hermann, *Woman and Child Attacked by Teens in Georgetown*, Wash. Post, Nov. 18, 2015, perma.cc/y6nf-3k9c; Federal Bureau of Investigation, *Crime in the United States by State: 2014*, Tbl. 5, perma.cc/kbt7-fv6a (violent crime rate in the District exceeded the

rate in any State and was more than three times the national rate); *cf. Moore*, 702 F.3d at 937 ("a Chicagoan is a good deal more likely to be attacked on a sidewalk in a rough neighborhood than in his apartment on the 35th floor of the Park Tower").

To be sure, *Heller* recognized that the need for self-defense may be "most acute" in the home. *Heller*, 554 U.S. at 628. But it by no means suggested that the home is the *only* place where that need arises, let alone the only place where the Second Amendment applies. To the contrary, in the entirety of its nearly 50-page analysis of the scope of the Second Amendment right (as opposed to its application of the right to the challenge at hand), the Court referred to the "home" or "homestead" a grand total of three times, in each instance quoting a historical source that recognized a right to keep and bear arms to defend both one's home and one's person and family. *See id.* at 615-16, 625. And when the Court searched in vain for past restrictions as severe as the District's handgun ban, it deemed restrictions that applied *outside* the home most analogous, and noted with approval that "some of those [restrictions] have been struck down." *Id.* at 629 (citing *Nunn v. State*, 1 Ga. 243, 251 (1846) (striking down prohibition on carrying pistols openly), and *Andrews v. State*, 50 Tenn. 165, 187 (1871) (same)). Such laws could hardly be analogous or represent "severe" restrictions on the right to self-defense, *id.*, if the Second Amendment's protection were limited to the home.

The remainder of the Second Amendment's text reinforces the conclusion that the right is not confined to the home. As *Heller* explained, the Amendment's prefatory clause—"[a] well regulated Militia, being necessary to the security of a free State"—performs a "clarifying function" with respect to any ambiguities in the operative clause. *Heller*, 554 U.S. at 577-78. Here, the prefatory clause's reference to the militia clarifies that the operative clause's protection of the right to "bear Arms" must encompass a right that extends beyond the home. The Court in *Heller* divided

sharply over whether the Second Amendment protects an individual or a collective right, but all the Justices agreed that the right was codified at least in part to ensure the viability of the militia. *See id.* at 599; *id.* at 637 (Stevens, J., dissenting).  Militia service, of course, necessarily includes bearing arms in public; the Revolutionary War was not won with muskets left at home.  Nor were the Minutemen notorious for their need to return home first before being ready for action.  Thus, the Court *unanimously* agreed that the right to bear arms extends beyond the home.  *See Kachalsky,* 701 F.3d at 89 (recognizing this implication of the *Heller* dissent).

Most importantly—and utterly dispositive here—the historical understanding of the right to bear arms confirms that it encompasses the right to carry a handgun in public for self-defense.  "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures … think that scope too broad."  *Heller*, 554 U.S. at 634-35.  The Second Amendment, "like the First and Fourth Amendments, codified a *pre-existing* right," *id.* at 592, and that right undoubtedly included carrying arms in public for self-defense.  In his seminal commentary on English law in the 18th century, William Blackstone described "the right of having and using arms for self-preservation and defence," which—as *Heller* authoritatively concluded—corresponded to "an individual right protecting against *both public and private* violence."  *Id.* at 594 (emphasis added).  As St. George Tucker explained in his American version of Blackstone's Commentaries, "[i]n many parts of the United States, a man no more thinks, of going out of his house on any occasion, without his rifle or musket in his hand, than a European fine gentleman without his sword by his side."  *Peruta*, 742 F.3d at 1155 (quotation marks omitted); *see also Moore*, 702 F.3d at 936 (in 18th century America, one "would need from time to time to leave one's home to obtain supplies from the nearest trading post, and en route one would be as much (probably more) at risk if unarmed as one would be in one's home unarmed").

Moreover, as the D.C. Circuit explained in its opinion affirmed by *Heller*, "[t]he correspondence and political dialogue of the founding era indicate that arms were kept for lawful use in self-defense and hunting"—two purposes that inherently extend outside the home.  *Parker v. District of Columbia*, 478 F.3d 370, 382-83 (D.C. Cir. 2007).  To support that conclusion, the D.C. Circuit pointed to the Pennsylvania Constitution of 1776, which guaranteed the right "to fowl and hunt in seasonable times on the lands they hold, *and on all other lands therein not enclosed*." *Id.* at 383 (emphasis added).  Other state constitutions at the founding and in the early years of the Republic enshrined a right to "bear arms for the defense of themselves and the State" or "bear arms in defense of himself and the state," formulations that cannot reasonably be read as confined to the home.  *Heller*, 554 U.S. at 585 n.8.  Interpreting one of these provisions, Justice James Wilson recognized a "natural right of defense of one's person *or* house."  *Id.* at 585 (quotation marks omitted) (emphasis added).  As the D.C. Circuit summarized, "it would hardly have been unusual for a writer at the time [of the founding] … to have said that, after an attack on a house by thieves, the men *set out* to find them 'bearing arms.'"  *Parker*, 478 F.3d at 384 (emphasis added).  That binding construction of the Second Amendment is simply incompatible with a homebound right.

Finally, the beyond-the-home understanding of the right to "bear arms" also is reinforced by longstanding precedent.  "Over the past two centuries, American courts applying the individual right to bear arms for the purpose of self-defense have held with near-uniformity that this right includes the carrying of handguns and other common defensive weapons outside the home." O'Shea, *Modeling the Second Amendment Right*, 61 Am. U. L. Rev. at 590; *id.* at 623-37 (discussing cases in detail); *see Peruta*, 742 F.3d at 1156-60 (same).  In an illustrative case, the Georgia Supreme Court held that a state statute that banned the public carrying of handguns *both*

openly *and* concealed "is in conflict with the Constitution, and *void*." *Nunn*, 1 Ga. at 251; *see also* *Andrews*, 50 Tenn. at 187 (same); *State v. Reid*, 1 Ala. 612, 615-17 (1840) (same).

None of this is to suggest that the right to bear arms outside the home is absolute. *Heller* cited with approval cases that upheld limits on the *method* of carrying in public (while striking down total prohibitions on public carriage). *Id*. at 629. *Heller* also stated that certain regulatory measures were "presumptively lawful," including "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Id.* at 626-27 & n.26. But even these limitations implicitly indicate that the right to bear arms must extend beyond the home; after all, why else would the opinion need to single out "sensitive places such as schools and government buildings" as sites of permissible prohibitions on carriage? *See McDonald*, 561 U.S. at 802 (Scalia, J., concurring) ("traditional restrictions go to show the scope of the right"). In sum, text, history, and precedent all dictate that the right to bear arms extends beyond the home.

## II.   Because The Public Carry Law Amounts To A Destruction Of The Core Right To Bear Arms For The Lawful Purpose Of Self-Defense, It Is *Per Se* Invalid.

Because the D.C. carry law "impinges upon a right protected by the Second Amendment," the next step is "determine whether the provision passes muster under the appropriate level of constitutional scrutiny." *Heller II*, 670 F.3d at 1252. Although there may be contexts in which that inquiry is difficult, this is not one of them. Because the District's law amounts to "a complete prohibition" on carrying outside the home arms "overwhelmingly chosen by American society for [the] lawful purpose" of self-defense, it fails to pass muster under any level of constitutional scrutiny. *Heller*, 554 U.S. at 628-29. In short, this case is to the right to "bear" arms what *Heller* was to the right to "keep" arms.

As explained above, the Second Amendment protects the right to carry a handgun outside the home "for the core lawful purpose of self-defense." *Heller*, 554 U.S. at 630. That right

extends—as the text of the Second Amendment provides—to "the people," a term that "unambiguously refers to all members of the political community," except those subject to certain "longstanding prohibitions" on the exercise of the right, such as "felons and the mentally ill." *Id.* at 580, 626.  In other words, the Second Amendment right belongs to all "law-abiding, responsible citizens." *Id.* at 635.  Yet the District's public carry law confines the right to carry a handgun outside the home to those who can document "a special need for self-protection *distinguishable* from the general community." D.C. Code §7-2509.11(1)(A) (emphasis added).  By definition, that means that *ordinary*, law-abiding citizens cannot exercise the right at all—just as was the case with the home possession ban at issue in *Heller* itself. *See Heller*, 554 U.S. at 575 n.1 (noting that the law had minor exceptions but dismissing them as irrelevant).  *Heller* dictates the constitutional fate of such a "severe restriction" on the Second Amendment right:  Because the public carry law is so restrictive as to "fail constitutional muster" under "any of the standards of scrutiny," it is categorically "invalid." *Id.* at 628-29; *see also id.* at 630 (law "makes it impossible for citizens to use [guns] for the core lawful purpose of self-defense *and is hence unconstitutional*" (emphasis added)).

Indeed, to make matters worse, the D.C. carry law *itself* recognizes that carrying handguns outside the home is useful for the very constitutionally protected end emphasized in *Heller*—namely, self-defense.  That is why the law begrudgingly provides a means for public carrying to those with the greatest need for self-defense.  Thus, unlike a government effort to restrict a kind of firearm or manner of carry that the government deems either unrelated to the constitutionally valid goal of self-defense or peculiarly dangerous, the D.C. carry law recognizes that the public carrying of handguns directly furthers the constitutionally valid end of self-defense.  But having acknowledged that much, the District is in no position to limit the carrying of handguns to a subset

11

of "the People" protected by the Second Amendment.  Wholly apart from any levels-of-scrutiny approach, this effort to limit the pursuit a constitutionally protected end by a constitutionally protected means to a subset of those protected by the Constitution is invalid.  It is no different— and no more constitutional—than an effort to limit the First Amendment to those with an extraordinarily good reason to criticize the government (as judged by the government).

This mode of analysis is entirely consistent with the D.C. Circuit's approach in *Heller II* and subsequent Second Amendment cases.  *Heller II* explained that "the level of scrutiny applicable under the Second Amendment surely 'depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the right.'"  *Heller II*, 670 F.3d at 1257.  A "regulation that imposes a substantial burden upon the core right of self-defense protected by the Second Amendment must have a strong justification, whereas a regulation that imposes a less substantial burden should be proportionately easier to justify."  *Id.*  *Heller II* dealt only with firearms regulations that, in the Court's analysis, either did not impinge on the Second Amendment at all, *see id.* at 1253-55, or imposed only a "less substantial burden" on Second Amendment rights, *see id.* at 1256-58, 1260-63.  The D.C. Circuit expressly stated that the challenged laws did "not affect the core right protected by the Second Amendment" and did not specify the mode of review that would apply to a law that eliminated a "core" Second Amendment right.  *Id.* at 1266.[4]

Here, by contrast, the District's law not only impinges on a core component of the Second Amendment right, but flatly prohibits the vast majority of law-abiding D.C. residents from exercising the right to bear arms outside the home at all.  The right analogy, then, is not to *Heller II*, but to *Heller* itself, and to *Parker* before it, where the D.C. Circuit concluded that the District's

---

[4] *Amicus* disagrees with *Heller II*'s ultimate resolution of the challenges to these laws for the reasons stated in Judge Kavanaugh's dissent, but that disagreement has no bearing on this case.

ban on handgun possession in the home violated the Second Amendment without subjecting the law to any traditional tier of scrutiny. Once the Court determined that ban "impair[ed] the core conduct on which the right was premised," it simply held that "it is not open to the District" to pass such a law. *Parker*, 478 F.3d at 399-400. That approach, affirmed by the Supreme Court in *Heller*, 554 U.S. at 628-29, governs the resolution of this case. *See Peruta*, 742 F.3d at 1170 (striking down carry ban under "*Heller*-style per se invalidation" despite circuit precedent applying tiers of scrutiny analysis to lesser burdens); *Moore*, 702 F.3d at 941 (same).

In defending its public carry law in prior litigation, the District contended that the law does not actually amount to a complete ban on the right of typical, law-abiding citizens to bear arms for the purpose of self-defense because its citizens remain free to "carry an operable handgun in [the] home." Br. for Appellants 49, *Wrenn v. District of Columbia*, 2015 WL 8746334 (D.C. Cir. 2015) (No. 15-7057) ("D.C. *Wrenn* Br."). But that argument cannot possibly be reconciled with the reality that the right to keep and bear arms is not confined to the home. If the right applies outside the home as well—which, for the reasons outlined at length above, it plainly does—then whether the District's residents remain free to carry a handgun *inside* the home is beside the point. The principle that "one is not to have" a fundamental constitutional right "abridged on the plea that it may be exercised in some other place," *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 76-77 (1981), is just as applicable to the Second Amendment as to any other fundamental constitutional right. *Cf. Heller*, 554 U.S. at 629 ("It is no answer to say … that it is permissible to ban the possession of handguns so long as the possession of other firearms … is allowed."); *Parker*, 478 F.3d at 400 (dismissing as "frivolous" the argument that the "prohibition does not implicate the Second Amendment because it does not threaten total disarmament").

The District also argued that the law did not amount to a total ban on the right of typical, law-abiding citizens to bear arms for the purpose of self-defense because "any law-abiding citizen can obtain a license if he can demonstrate a particularized need to carry a handgun in public for self-defense, and any law-abiding citizen could at some point find himself in this situation."  D.C. *Wrenn* Br. 49; *see id.* at 50 ("Any person could, at some point in time, find himself particularly threatened.  When that happens, the District's law allows him to apply for a carry license.").  But again, that exception for extraordinary citizens is no help for the ordinary law-abiding citizens fully protected by the Second Amendment, and the exception only underscores that even the District fully concedes that the public carrying of handguns is a particularly useful means of self-defense.  Having conceded that much, the District is poorly positioned to deny the right to *all* "the People" protected by the Second Amendment.

Moreover, the District's argument displays a startlingly narrow and implausible conception of the need for self-defense—one that is both detached from the reality of life in D.C. and utterly incompatible with *Helle*r's description of the Second Amendment right.  As noted above, violent confrontations arise on the streets of the District with regrettable frequency, and few of these incidents can be predicted with specificity in advance.  To state what should be obvious, it does no good for a citizen who is being violently attacked to know that, if only he had foreseen the confrontation and documented it with particularity, he could have defended himself with a handgun.  And it is cold comfort that the current attack may bolster the victim's chances of obtaining a weapon for self-defense in the future.  Nothing in *Heller* even remotely suggests that the right to self-defense protected by the Second Amendment is limited to *foreseeable* confrontations or limited to victims of past crime.  Quite the contrary, the opinion defines the right to carry a handgun "*in case* of confrontation."  554 U.S. at 592 (emphasis added); *see id.* at 584

("being armed *and ready* for offensive or defensive action") (emphasis added); *id.* at 595 (right to "repel force by force when the intervention of society in his behalf, may be too late to prevent an injury") (quotation marks omitted).  The District's position on this issue rings especially hollow to citizens like plaintiffs who face a heightened risk of violent attack because of their personal status or place of residence but cannot document any particular threat with adequate specificity to meet the "good cause" requirement.  *Cf. McDonald*, 561 U.S. at 790 ("the Second Amendment right protects the rights of minorities and other residents of high-crime areas whose needs are not being met by elected public officials"); *id.* at 790 n.33 (citing amicus brief of Pink Pistols).

The District's other principal argument in support of the law has been that courts should defer to the Council's determination that "any increase in handgun carrying in the District's densely populated public areas would increase the risk of criminal violence and public harm." D.C. *Wrenn* Br. 11.  In essence, the District's position is that the carrying of handguns—even by law-abiding citizens who meet all other licensing requirements, even for the sole purpose of self-defense, even outside sensitive places like government buildings and schools—is simply too dangerous to allow.  *See id.* at 35 ("Every citizen is law-abiding until he breaks the law.").

That argument is "at war" not only "with [the] central holding in *Heller* … that the Second Amendment protects a personal right to keep and bear arms for lawful purposes," but also with the basic purpose of a written Constitution.  *McDonald*, 561 U.S. at 780.  The whole point of the Bill of Rights is to "take[] certain policy choices off the table."  *Heller*, 554 U.S. at 636.  And by protecting a right to carry outside the home, the Second Amendment necessarily prohibits the District from second-guessing the determination that the benefits of permitting typical, law-abiding citizens to carry handguns for self-defense outweigh the risks.  To be sure, the District is free to disagree with that judgment.  But no amount of deference is enough to allow the District to

override that judgment or "conduct … anew" the interest balancing that the drafters and ratifiers of the Second Amendment already performed. *Id.* at 635. The Second Amendment "is the very *product* of an interest balancing by the people," and the "enumeration of the right takes out of the hands of government … the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Id.* at 634-65; *cf. United States v. Stevens*, 559 U.S. 460, 470 (2010) ("The First Amendment itself reflects a judgment by the American people that the benefits of its restrictions on the Government outweigh the costs. Our Constitution forecloses any attempt to revise that judgment simply on the basis that some speech is not worth it.").

The District has noted that some courts have upheld laws similar to the District's after granting deference to a legislature's "finding" that more handgun carrying would lead to more crime. D.C. *Wrenn* Br. 20 (citing *Kachalsky*, *Drake*, and *Woollard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013)). Tellingly, none of those courts actually examined the scope of the right to bear arms; instead, each simply assumed that the right applies beyond the home and then subjected the carry prohibitions to intermediate scrutiny. That approach has produced statements like this one: "The duty of the courts is to ensure that the legislature's policy choice substantially serves a significant governmental interest." *Woollard*, 712 F.3d at 881. With respect, that cannot be the law where a fundamental constitutional right is at stake. A statute allowing the government to search houses without suspicion or to try criminal defendants without juries might "substantially serve a significant governmental interest" in detecting and punishing crime. But those laws would still amount to forbidden efforts to override the judgments reflected in the very enumeration of those constitutional rights. *See, e.g.*, *Riley v. California*, 134 S. Ct. 2473, 2493 (2014). The same is true of the District's attempt to replace the judgment reflected in the Second Amendment with its own judgment that people are safer without handguns than with them. To "defer" to that naked attempt

16

to conduct the constitutional balance anew thus would relegate the Second Amendment to exactly the kind of "second-class right" that the Supreme Court has admonished it is not.  *McDonald*, 561 U.S. at 780.

Finally, the District has argued that its public carry law should be considered a "longstanding prohibition[]" that is "presumptively lawful."  D.C. *Wrenn* Br. 39 (quoting *Heller*, 554 U.S. at 626-27 & n.26).  As an initial matter, it is telling that *Heller*'s list of presumptively lawful prohibitions did not include public carry bans of the kind imposed by the District.  Instead, the list cited concealed carry prohibitions of the kind upheld by the Georgia Supreme Court in *Nunn*, which—as explained above—authorized a concealed carry ban only while striking down a prohibition on open carrying.  *Heller*, 554 U.S. at 626, 629.

Moreover, the public carry law at issue here cannot meaningfully be characterized as "longstanding."  The "good cause" licensing requirement took effect in D.C. with respect to both open and concealed carry in 1943, *see* Pub. L. No. 78-182, 57 Stat. 586—more than a century and a half after the ratification of the Bill of Rights.  *See Wrenn*, 2015 WL 3477748 at *6 ("Defendants have not presented any historical evidence to support their argument that the District of Columbia's "good reason"/"proper reason" requirement is longstanding.").[5]  And even if the District could somehow show that it has long maintained the prohibition at issue here, *Heller* makes clear that a court may not base its "interpretation of the Second Amendment upon a single law, in effect in a single city, that contradicts the overwhelming weight of other evidence regarding the right to keep and bear arms."  *Heller*, 554 U.S. at 632; *see Heller II*, 670 F.3d at 1253-54 (looking to the laws of numerous states in conducting "longstanding" inquiry).

---

[5] The District also appears to have banned all public carriage for about a year between 1857 and 1858, *see* D.C. *Wrenn* Br. 42, but that can hardly be the basis for a "longstanding" prohibition.

As the District has noted, there have been various historical carry regulations dating back to the English Statute of Northampton in 1328.  D.C. *Wrenn* Br. 39-40 (citing 2 Edw. 3, c. 3).  But just as was the case with the purportedly probative historical statutes cited by the dissent in *Heller*, none of those laws provides "support for the severe restriction in the present case."  *Heller*, 554 U.S. at 632.  The Northampton statute, for example, applied only to "the offence of riding or going armed, with *dangerous or unusual weapons*," and thereby "terrifying the good people of the land." 4 W. Blackstone, Commentaries on the Laws of England 148 (1769) (emphasis added).  It certainly did not apply to weapons that even the government conceded were particularly useful for self-defense when it comes to the citizens subject to demonstrable threats.  Another respected commentator, William Hawkins, explained that "no wearing of Arms is within the meaning of this Statute, *unless it be accompanied with such circumstances as are apt to terrify the People*."  1 W. Hawkins, Treatise of the Pleas of the Crown, ch. 63, §9 (1716) (emphasis added).  Early American courts construed the American analogues of the statute the same way.  For example, the North Carolina Supreme Court explained that "[a] man may carry a gun for any lawful purpose of business or amusement; but he cannot go about with that or any other dangerous weapon, to terrify and alarm, and in such manner as naturally will terrify and alarm, a peaceful people."  *State v. Huntly*, 25 N.C. 418, 418 (1843).  In short, neither the Northampton statute nor its American successors prohibited carrying for the purpose of self-defense.  They are therefore not remotely analogous to the D.C. carry law.

In all events, whether the D.C. carry law is "longstanding" is largely beside the point.  A longstanding prohibition establishes a "presumption" of constitutionality, but a "plaintiff may rebut this presumption by showing the regulation [has] more than a de minimis effect upon his right." *Heller II*, 670 F.3d at 1253.  By any fair measure, a law that completely prohibits typical, law-

abiding citizens from carrying anywhere outside the home has far "more than a de minimis effect" on their right to bear arms for the purpose of self-defense.  Indeed, the burden imposed by the D.C. carry law in this case is the same one imposed by the 19th century carry laws that were struck down by state court decisions cited with approval in *Heller*.  As one of those courts explained, "[a] statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional."  *Heller*, 554 U.S. at 629 (quoting *Reid*, 1 Ala. 616-17).  Unlike a law prohibiting carriage in certain sensitive places, or a licensing scheme limiting carriage to responsible citizens who have undergone firearms training, or a regulation permitting only either concealed or open carry, the D.C. law bans *all* typical, law-abiding citizens from carrying a handgun *anywhere* outside the home in *any* manner.  The law therefore "amounts to a destruction of" the Second Amendment right and is "clearly unconstitutional."  *Id.*

III.    **If The Court Applies A Tiers-of-Scrutiny Approach, Strict Scrutiny Is Required, But The Law Would Fail Under Intermediate Scrutiny, Too.**

If the Court decides to review the law under one of the traditional tiers of scrutiny, strict scrutiny is clearly required.  As explained above, the D.C. Circuit applied intermediate scrutiny in *Heller II* because it concluded that the challenged laws did "not affect the core right protected by the Second Amendment."   *Heller II*, 670 F.3d at 1266.   More specifically, the challenged registration requirements did not prevent "an individual from possessing a firearm in his home or elsewhere" and the challenged "assault weapons" ban did "not prohibit the possession of 'the quintessential self-defense weapon,' to wit, the handgun." *Id.* at 1258, 1261-62 (quoting *Heller*, 554 U.S. at 629).  The law challenged here does both those things: it prohibits the possession of the quintessential self-defense weapon by typical, law-abiding citizens, and it does so not only "elsewhere" but *everywhere* outside the home.  If this severe restriction does not amount to an

outright "destruction" of the right to keep and bear arms requiring *per se* invalidation, it surely constitutes a "substantial burden upon the core right of self-defense" and accordingly "must have a strong justification"—*i.e.*, it must withstand strict scrutiny. *Id.* at 1257.

Although strict scrutiny is the only appropriate tier of scrutiny, the result of this case would be the same under either strict or intermediate scrutiny. As the D.C. Circuit has explained, intermediate scrutiny in this context requires the District to "establish a tight fit" between the regulation and an important or substantial governmental interest. *Id.* at 1258 (quotation marks omitted). More specifically, the District must show that the challenged law "promotes a substantial governmental interest that would be achieved less effectively absent the regulation" and that "the means chosen are not substantially broader than necessary to achieve that interest." *Id.* (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 782-83 (1989)). The First Amendment "time, place, or manner" doctrine from which the D.C. Circuit derived this formulation also includes a third requirement: a restriction must "leave open ample alternative channels" for the constitutionally protected activity. *Ward*, 491 U.S. at 802; *see Heller II*, 670 F.3d at 1262 (referencing the "alternative channels" prong).

The D.C. carry law fails all three prongs of the intermediate scrutiny test. Most obviously, the District cannot demonstrate that "the means chosen are not substantially broader than necessary to achieve" its interest in addressing any legitimate public safety concerns associated with carrying handguns outside the home. *Heller II*, 670 F.3d at 1258. As the D.C. Circuit recently explained in analyzing other firearms laws under intermediate scrutiny, "[t]o meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less [protected activity] would fail to achieve the government's interests, not simply that the chosen route is easier." *Heller v. District of Columbia*, 801 F.3d 264, 277-78 (D.C. Cir. 2015) (*Heller III*)

(quoting *McCullen v. Coakley*, 134 S. Ct. 2518, 2540 (2014)).  The District has not even attempted to demonstrate how alternative measures—such as regulations based on indicia of likely dangerousness or criminality—would fail to address public safety concerns.  Nor has it made any effort to demonstrate that the D.C. carry law reflects even a good-faith attempt to minimize the burden on Second Amendment rights.

Instead, the District candidly concedes that the law "was never meant to predict which particular licensee is more likely to cause harm"; rather, it was meant to make it harder for *anyone* to carry a handgun because, in the Council's view, "*any* increase in public carrying increases the risk of public harm."  D.C. *Wrenn* Br. 12.  In other words, the law was designed to implement the Council's view that the exercise of Second Amendment rights is *itself* a threat to public safety, no matter who is doing the exercising.  But the District does not have a legitimate—let alone substantial or compelling—interest in suppressing the exercise of Second Amendment rights just for the sake of suppressing the exercise of Second Amendment rights.  The District's insistence that its law is tailored to achieve that forbidden interest thus succeeds only in confirming the law's unconstitutionality.

For largely the same reasons, the District cannot demonstrate that the D.C. carry law "leave[s] open ample alternative channels" for exercising the right.  *Ward*, 491 U.S. at 802.  Unlike a limitation on carrying in sensitive public places (which leaves open the option of carrying in all other public places) or a ban on concealed carry alone (which leaves open the option of carrying openly), the District's law leaves *no* way for a typical, law-abiding citizen to carry a handgun outside the home for self-defense—a core aspect of the Second Amendment right.  Of course, that is no accident:  The law does not leave open alternative channels for carrying a handgun outside the home because the whole point of the law is to prevent typical, law-abiding citizens from doing

so.  But, once again, the District cannot justify the sweeping scope of its law by measuring it against an interest that is at fundamental odds with the Second Amendment itself.  Indeed, as the D.C. Circuit recently observed in striking down a different D.C. firearms regulation under intermediate scrutiny, "taken to its logical conclusion, that reasoning would justify a total ban on firearms kept in the home"—exactly what *Heller* found unconstitutional.  *Heller III*, 801 F.3d at 280.

But in all events, even if the District could second-guess the judgment reflected in the Second Amendment itself, the relevant empirical literature simply does not support its "fewer guns, less crime" theory.  *See, e.g.*, *Moore*, 702 F.3d at 937 ("the net effect on crime rates in general and murder rates in particular of allowing the carriage of guns in public is uncertain both as a matter of theory and empirically") (citing multiple studies); Volokh, *Implementing the Right to Keep and Bear Arms*, 56 UCLA L. Rev. at 1465-67 (reviewing many studies and finding them inconclusive). At best, the District's evidence is ambiguous.  And just as "the tie goes to the speaker, not the censor" where "the First Amendment is implicated," *FEC v. Wis. Right To Life, Inc.*, 551 U.S. 449, 474 (2007) (controlling opinion of Roberts, C.J.), so too the tie must go to the rights holder, not the government, where the Second Amendment is implicated.

In sum, the plaintiffs have demonstrated (many times over) a substantial likelihood of success on the merits.  Because the plaintiffs also readily satisfy the other aspects of the governing standard, the Court should grant their request for preliminary or permanent injunctive relief.

**CONCLUSION**

For the reasons set forth above, this Court should enter a preliminary or permanent injunction as requested by the plaintiffs.

Respectfully submitted,

s/Paul D. Clement
Paul D. Clement (D.C. Bar No. 433215)
  *Counsel of Record*
Erin E. Murphy (D.C. Bar No. 995953)
Christopher G. Michel (VA Bar No. 89403)
BANCROFT PLLC
500 New Jersey Avenue, NW
Seventh Floor
Washington, DC 20001
(202) 234-0090
pclement@bancroftpllc.com

*Counsel for Amicus Curiae*

January 4, 2016

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

This brief complies with the type-volume limitation of Local Rule 7(o)(4) because it contains fewer than 25 pages, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

Dated:  January 4, 2016

s/Erin E. Murphy
Erin E. Murphy (D.C. Bar No. 995953)

## CERTIFICATE OF SERVICE

I hereby certify that on January 4, 2016, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system.  I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Paul D. Clement
Paul D. Clement (D.C. Bar No. 433215)

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

MATTHEW GRACE, *et al.*,

    *Plaintiffs*,

    v.

DISTRICT OF COLUMBIA, *et al.*,

    *Defendants*.

_____

Civil Action No. 15-2234 (RJL)

**[PROPOSED] ORDER GRANTING MOTION OF THE NATIONAL RIFLE
ASSOCIATION OF AMERICA, INC. FOR LEAVE TO FILE *AMICUS CURIAE* BRIEF
IN SUPPORT OF PLAINTIFFS**

It is hereby ORDERED that the motion of the National Rifle Association of America,

Inc. for leave to file an *amicus curiae* brief in support of plaintiffs, filed with this Court on

January 4, 2016, is GRANTED; and it is further

ORDERED that the Brief of *Amicus Curiae* National Rifle Association of America, Inc.

in Support of Plaintiffs is deemed filed in the above captioned proceeding.

Dated:

_____
**Hon. Richard J. Leon**
**United States District Judge**

## CERTIFICATE OF SERVICE

I hereby certify that on January 4, 2016, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system.  I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Paul D. Clement
Paul D. Clement (D.C. Bar No. 433215)