**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MATTHEW GRACE, *et al.,*<br><br>Plaintiffs,<br><br>v.<br><br>DISTRICT OF COLUMBIA, *et al.,*<br><br>Defendants. | Civ. Action No. 15-2234 (RJL) |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'
APPLICATION FOR A PRELIMINARY AND/OR PERMANENT INJUNCTION**

KARL A. RACINE
Attorney General for the District of Columbia

ELIZABETH SARAH GERE
Acting Deputy Attorney General
Public Interest Division

TONI MICHELLE JACKSON (#453765)
Chief, Equity Section

ANDREW J. SAINDON (#456987)
Senior Assistant Attorney General
441 Fourth Street, N.W., Sixth Floor South
Washington, D.C. 20001
Telephone: (202) 724-6643
Facsimile: (202) 730-1470
Email: andy.saindon@dc.gov

CHAD A. NASO (#1001694)
Assistant Attorney General
441 Fourth Street, N.W., Sixth Floor South
Washington, D.C. 20001
Telephone: (202) 724-7854
Facsimile: (202) 741-8951
Email: chad.naso@dc.gov

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

STATEMENT OF FACTS ........................................................................................ 2

STANDARDS FOR A PRELIMINARY INJUNCTION ............................................. 6

ARGUMENT ........................................................................................................... 7

    I.    PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIM; RATHER, THE DISTRICT IS LIKELY TO PREVAIL ........... 7

        A.    Because regulation of public carrying in cities is longstanding, the District's "good reason" standard is beyond the scope of the Second Amendment ................................................................................. 8

        B.    Alternatively, the "good reason" standard is likely to survive heightened scrutiny ................................................................................. 15

            1.  The "good reason" standard is not categorically unconstitutional ....... 15

            2.  Even if constitutional scrutiny is warranted, the appropriate standard is intermediate scrutiny ......................................................... 21

            3.  The "good reason" standard survives intermediate scrutiny ............... 25

                a. The evidence relied on by the Council ...................................... 28

                b. The evidence the District will introduce here ........................... 32

                c. The Council's tailoring of the "good reason" standard to accomplish its objectives ............................................................. 35

    II.    PLAINTIFFS HAVE NOT SHOWN IRREPARABLE INJURY ........................ 38

    III.    THE BALANCE OF EQUITIES TIPS HEAVILY IN FAVOR OF THE DEFENDANTS ................................................................................................. 41

    IV.    ALLOWING BROAD CARRYING OF CONCEALED WEAPONS IS NOT IN THE PUBLIC INTEREST .................................................................... 42

    V.    PLAINTIFFS' MOTION FOR JUDGMENT AS A MATTER OF LAW SHOULD BE REJECTED .................................................................................. 43

CONCLUSION ........................................................................................................ 45

# TABLE OF AUTHORITIES*

**Cases**

*Baze v. Rees,*
  553 U.S. 35 (2008) .................................................................................. 27

*Bonidy v. USPS,*
  790 F.3d 1121 (10th Cir. 2015) ......................................................... 23, 37

*Chaplaincy of Full Gospel Churches v. England,*
  454 F.3d 290 (D.C. Cir. 2006) ........................................................... 38, 40

*Cincinnati v. Discovery Network,*
  507 U.S. 410 (1993) ................................................................................. 24

*CityFed Fin. v. Office of Thrift Supervision,*
  58 F.3d 738 (D.C. Cir. 1995) ................................................................... 38

*Clapper v. Amnesty Int'l,*
  133 S.Ct. 1138 (2013) .............................................................................. 38

*Cobell v. Norton,*
  455 F.3d 301 (D.C. Cir. 2006) ................................................................... 7

*Dearth v. Lynch,*
  791 F.3d 32 (D.C. Cir. 2015) ................................................................... 22

*Dist. 50, United Mine Workers of Am. v. Int'l Union, United Mine Workers of Am.,*
  412 F.2d 165 (D.C. Cir. 1969) ................................................................... 7

*\*District of Columbia v. Heller,*
  554 U.S. 570 (2008) (*Heller I*) ........................................................Passim

*\*Drake v. Filko,*
  724 F.3d 426 (3d Cir. 2013) ............................................................Passim

*Edenfield v. Fane,*
  507 U.S. 761 (1993) ................................................................................. 23

*Edwards v. District of Columbia,*
  755 F.3d 996 (D.C. Cir. 2014) ................................................................. 28

---

\*        Authorities upon which we chiefly rely are marked with asterisks.

*Friedman v. Highland Park,*
   784 F.3d 406 (7th Cir. 2015) ................................................................ 14

*Fyock v. City of Sunnyvale,*
   25 F. Supp. 3d 1267 (N.D. Cal. 2014) ................................................ 42

*Gonzales v. Carhart,*
   550 U.S. 124 (2007) ...................................................................... 16, 27

*Gordon v. Holder,*
   721 F.3d 638 (D.C. Cir. 2013) ...................................................... 39, 44

*Hecht Co. v. Bowles,*
   321 U.S. 321 (1944) ............................................................................ 42

*\*Heller v. District of Columbia,*
   670 F.3d 1244 (D.C. Cir. 2011) (*Heller II*) ................................ Passim

*Hightower v. City of Boston,*
   693 F.3d 61 (1st Cir. 2012) ................................................................ 20

*Holder v. Humanitarian Law Project,*
   561 U.S. 1 (2010) ................................................................................ 16

*In re Navy Chaplaincy,*
   738 F.3d 425 (D.C. Cir 2013) .............................................................. 7

*Kachalsky v. Cacace,*
   817 F.Supp.2d 235 (S.D.N.Y. 2011) .................................................. 18

*\*Kachalsky v. Cnty. of Westchester,*
   701 F.3d 81 (2d Cir. 2012) ............................................................ Passim

*Keystone Bituminous Coal v. DeBenedictis,*
   480 U.S. 470 (1987) ............................................................................ 24

*Lorillard Tobacco Co. v. Reilly,*
   533 U.S. 525 (2001) ............................................................................ 28

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992) ............................................................................ 39

*Maryland v. King,*
   133 S. Ct. 1 (2012) .............................................................................. 41

*Mazurek v. Armstrong,*
  520 U.S. 968 (1997) ................................................................................................ 8

*McDonald v. City of Chicago,*
  561 U.S. 742 (2010) ........................................................................................... 3, 8

*Mills v. District of Columbia,*
  571 F.3d 1304 (D.C. Cir. 2009) .............................................................................. 40

*Minney v. OPM,*
  2015 WL 5442403 n.6 (D.D.C. Sept. 15, 2015) ...................................................... 7

*Moore v. Madigan,*
  702 F.3d 933 (7th Cir. 2012) ................................................................ 11, 17, 19, 20

*Nat'l Taxpayers Union, Inc. v. United States,*
  68 F.3d 1428 (D.C. Cir. 1995) ................................................................................ 38

*Neb. Dep't of Health & Human Servs. v. U.S. Dep't of Health & Human Servs.,*
  435 F.3d 326, (D.C. Cir. 2006) ............................................................................... 41

*Nken v. Holder,*
  556 U.S. 418 (2009) ................................................................................................. 7

*Ohralik v. Ohio State Bar Ass'n,*
  436 U.S. 447, 456 (1978) (1978) ...................................................................... 23, 24

*Palmer v. District of Columbia,*
  59 F. Supp. 3d 173 (D.D.C. 2014) ........................................................................... 3

*Peruta v. County of San Diego,*
  742 F.3d 1144 (9th Cir. 2014), *vacated*, 781 F.3d 1106 ................................... 9, 19

*Reichle v. Howards,*
  132 S. Ct. 2088 (2012) ........................................................................................... 16

*Rumber v. District of Columbia,*
  595 F.3d 1298 (D.C. Cir. 2010) .............................................................................. 41

*\*Schrader v. Holder,*
  704 F.3d 980 (D.C. Cir. 2013) .......................................................................... Passim

*Sherbert v. Verner,*
  374 U.S. 398 (1963) ............................................................................................... 24

*Sherley v. Sebelius,*
  644 F.3d 388 (D.C. Cir. 2011) ................................................................................ 7

*Sweis v. U.S. Foreign Claims Settlement Comm'n,*
  950 F. Supp. 2d 44 (D.D.C. 2013) ...................................................................... 7, 39

*\*Turner Broadcasting System v. FCC,*
  512 U.S. 622 (1994) (*Turner I*) ...................................................................... Passim

*\*Turner Broadcasting System v. FCC,*
  520 U.S. 180 (1997) (*Turner II*) ..................................................................... Passim

*United States v. Chester,*
  628 F.3d 673 (4th Cir. 2010) ............................................................................... 22

*\*United States v. Masciandaro,*
  638 F.3d 458 (4th Cir. 2011) ................................................................... 22, 25, 43

*United States v. McCane,*
  573 F.3d 1037 (10th Cir. 2009) ........................................................................... 14

*United States v. Oakland Cannabis Buyers' Co-op,*
  532 U.S. 483 (2001) ............................................................................................ 42

*United States v. O'Brien,*
  391 U.S. 367 (1968) ............................................................................................ 24

*United States v. Skoien,*
  614 F.3d 638 (7th Cir. 2010) ......................................................................... 19, 25

*United States v. Williams,*
  616 F.3d 685 (7th Cir. 2010) ............................................................................... 19

*United States v. Yancey,*
  621 F.3d 681 (7th Cir. 2010) ............................................................................... 19

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council,*
  425 U.S. 748 (1976) ............................................................................................ 23

*Ward v. Rock Against Racism,*
  491 U.S. 781 (1989) ............................................................................................ 25

*Weinberger v. Romero-Barcelo,*
  456 U.S. 305 (1982) ............................................................................................ 42

*Winter v. Nat. Res. Def. Council,*
   555 U.S. 7 (2008) .................................................................................................. 7, 39

*Wisc. Gas Co. v. FERC,*
   758 F.2d 669 (D.C. Cir. 1985) ................................................................................ 39

*\*Woollard v. Gallagher,*
   712 F.3d 865 (4th Cir. 2013) ...........................................................................Passim

*Wrenn v. District of Columbia,*
   808 F.3d 81 (D.C. Cir. 2015) .................................................................................. 43

*Zauderer v. Office of Disciplinary Counsel,*
   471 U.S. 626 (1985) ............................................................................................... 23

**Statutes**

18 U.S.C. § 926A ....................................................................................................... 17

18 U.S.C. § 930 .......................................................................................................... 18

27 Stat. 116 (1892).................................................................................................. 2, 12

47 Stat. 651, ch. 465, § 4 (1932) ............................................................................... 12

57 Stat. 586, ch. 296 (1943) ...................................................................................... 12

An Act to Prevent the Carrying of Concealed and Dangerous Weapons in the
   City of Washington (Nov. 18, 1858) ....................................................................... 12

An Act to Prevent the Carrying of Dangerous Weapons in the
   City of Washington (Nov. 4, 1857) ......................................................................... 12

D.C. Code § 22-4504 (2009 Supp.) ............................................................................. 3

D.C. Code § 22-4504.01 ............................................................................................. 17

D.C. Code § 22-4506(a)........................................................................................... 1, 3

D.C. Code § 7-2501.01(a) ............................................................................................ 2

D.C. Code § 7-2502.02(a)(4) .................................................................................... 2, 3

D.C. Code § 7-2509.06(a)........................................................................................... 18

D.C. Code § 7-2509.11(1)(A) ...................................................................................... 3

D.C. Code § 7-2509.11(1)(B) ...................................................................................... 3

D.C. Code § 7-2509.11(1)........................................................................................... 20

**Rules**

Fed. R. Civ. P. 12(c) ............................................................................................ 43

Fed. R. Civ. P. 56 ................................................................................................. 44

**Other Authorities**

2 Edw. 3, 258, ch. 3 (1328) (Statute of Northampton) ................................................ 9

1694 Mass. Laws 12, No. 6 ......................................................................................... 11

1859 N.M. Laws 94, § 2 ............................................................................................. 11

1870 S.C. Laws 402 .................................................................................................... 11

1870 W. Va. Laws 702 ............................................................................................... 12

1871 Tex. Laws 1322, art. 6512 ................................................................................. 12

1873 Minn. Laws 1025 ............................................................................................... 12

Ayres & Donohue, *Nondiscretionary Concealed Weapons Laws: A Case Study of Statistics, Standards of Proof, and Public Policy*, 1 Am. L. & Econ. Rev. 436 (1999) (1999) .................29

Ayres & Donohue, *Shooting Down the "More Guns, Less Crime" Hypothesis,* 55 Stan. L. Rev. 1193 (2003) ......................................................................................... 29

Bill for the Office of Coroner and Constable (Mar. 1, 1882) (N.J. Constable Oath) ................... 11

Blocher, *Firearm Localism,* 123 Yale L.J. 82 (2013) ............................................................................................. 12, 13

Bogus, *A Symposium on Firearms, the Militia, and Safe Cities,* 1 Alb. Gov't L. Rev. 440 (2008) ................................................................................. 13

Charles, *The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of Review,* 60 Clev. St. L. Rev. 1 (2012) ......................................................... 9, 10, 11

Checotah, Okla., Ordinance No. 11 (1890) ................................................................. 13

Cook, *et al., Gun Control After Heller: Threats and Sideshows from a Social Welfare Perspective,* 56 UCLA L. Rev. 1041 (2009) .............................................................34

Dallas, Tex., Ordinance of July 18, 1887 (1887) ....................................................... 13

Dodge City, Kan., City Ordinances no. 16, § 11 (Sept. 22, 1876) .............................................. 13

Donohue, *Guns, Crime, and the Impact of State Right-to-Carry Laws,*
73 Fordham L. Rev. 623 (2004) ................................................................................................. 29

Dunlapp, The New York Justice (New York 1815) ...................................................................... 11

Henigan, *The Woollard Decision and The Lessons of the Trayvon Martin Tragedy,*
71 Md. L. Rev. 1188 (2012) .......................................................................................................10

Herz, *Gun Crazy: Constitutional False Consciousness and Dereliction of Dialogic
Responsibility,* 75 B.U. L. Rev. 57 (1995) .................................................................................24

Kleck & Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense With a
Gun,* 86 J. Crim. L. & Criminology 150 (1995)........................................................................28

Kleck & Gertz, *Carrying Guns for Protection: Results from the National Self-Defense
Survey*, 35 J. of Res. in Crime & Delinquency 193, 195 (1998)) ............................................. 29

Los Angeles, Cal., Ordinance Nos. 35-36 (1878)....................................................................... 13

Lott & Mustard, *Crime, Deterrence, and Right-to-Carry Concealed Handguns,*
26 J. Legal Stud. 1 (1997) ......................................................................................................... 29

McKinney, Tex., Ordinance No. 20 (1899) ................................................................................. 13

Md. Const. of 1776, art. III, § 1 ................................................................................................. 11

Nashville, Tenn., Ordinance Ch. 108 (1873) .............................................................................. 13

Nebraska City, Neb., Ordinance no. 7 (1872).............................................................................. 13

Niles, The Connecticut Civil Officer: In Three Parts…: with Suitable and approved forms for
each: together with numerous legal forms of common use and general convenience. 2nd ed.,
ch. 14 (Hartford, Conn. 1833) .................................................................................................. 11

Rawlins, Wyo., Rev. Ordinances Art. 7 (1893) .......................................................................... 13

Ruben & Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case
Law in Context*, 126 Yale L.J. Forum 121, 129 n.43 (2015).....................................................11

Salina, Kan., Ordinance No. 268 (1879).................................................................................... 13

Syracuse, N.Y., Ordinances Ch. 27 (1885)................................................................................. 13

U.S. Government Accountability Office, *Gun Control: States' Laws and Requirements for Concealed Carry Permits Vary Across the Nation*, Report to Congressional Requesters, GAO-12-717 ...................................................................................................................................15

Wichita, Kan., Ordinance No. 1641 (1899) ............................................................................. 13

Winkler, *Gunfight: The Battle over the Right to Bear Arms in America* 13 (2011) [[[p13]]

Winkler, *Scrutinizing the Second Amendment,* 105 Mich. L. Rev. 683 (2007) ................................................................................................. 21

## INTRODUCTION

District of Columbia law authorizes the Chief of Police to issue licenses for the public carrying of concealed handguns if, among other requirements, the applicant has "good reason to fear injury to his or her person or property or has any other proper reason for carrying a pistol[.]" D.C. Code § 22-4506(a). Plaintiffs Matthew Grace and Pink Pistols argue that this "good reason" requirement amounts to a "wholesale ban on the right of typical, law-abiding citizens to bear arms for the purpose of self-defense" and is thus "unconstitutional *per se*." P.Mem. at 20. They ask the Court to issue an order preliminarily and permanently enjoining the District (1) from enforcing the "good reason" requirement and (2) "to issue concealed carry licenses to Mr. Grace and to members of Pink Pistols who, apart from the 'proper reason' requirement, are otherwise eligible for a concealed carry license." *See* Doc. No. 6-2 (plaintiffs' proposed order).

Plaintiffs are not entitled to this extraordinary relief. Three courts of appeals have found the "good reason" standard constitutional, and the District is just as likely to prevail here. Moreover, the plaintiffs cannot establish irreparable injury, as is necessary for a preliminary injunction to issue, and indeed they concede that they cannot demonstrate any particularized reason to fear harm. In contrast, the overbroad injunction plaintiffs demand would threaten the safety of the public, a risk that weighs heavily against granting such relief.

Neither the D.C. Circuit, nor any controlling court, has held that there is an absolute right to carry guns in public for self-defense. And, contrary to Plaintiffs' repeated arguments, the District's public-carry licensing scheme does *not* impose a complete ban on public carrying, but is a mechanism that furthers the District's important public safety interests by ensuring that public carrying of firearms is limited to those individuals who have a particularized need for self-defense.

The District has a compelling interest in public safety, prevention of crime, and the protection of law-enforcement officers. Plaintiffs do not dispute these obvious points. Nor do they contest—or even mention—the evidence relied on by the Council of the District of Columbia when it enacted the "good reason" standard. The Council found the standard necessary to prevent crime and promote public safety, and this finding is entitled to deference under any level of scrutiny. Plaintiffs have failed to meet their burden for the extraordinary and drastic relief of a mandatory preliminary injunction, and their motion should be denied. And even if they could meet this burden, they have not shown that they are entitled to judgment as a matter of law—a permanent injunction—without even affording the District an opportunity to develop a record or fully brief the question.

## STATEMENT OF FACTS

For more than a century, the District of Columbia has regulated the carrying of handguns in public. *See* Committee on the Judiciary and Public Safety, D.C. Council, Report on Bill 20-930 (Nov. 26, 2014), Defendants' Appendix (DA) 2–3.[1] For much of that time, some carrying was allowed under a licensing scheme. *See*, *e.g.*, 27 Stat. 116 (1892); 57 Stat. 586, ch. 296 (1943). Starting in 1976, however, the District generally banned the possession of handguns. D.C. Code §§ 7-2502.01(a), 7-2502.02(a)(4) (2001).

The Supreme Court found this ban unconstitutional in *District of Columbia v. Heller*, 554 U.S. 570 (2008) (*Heller I*), under the Second Amendment, which directs that "the right of the people to keep and bear Arms, shall not be infringed." The Court held that the Second

---

[1]     The Committee Report and its relevant attachments are included in the Defendants' Appendix. The complete report (188 pages long, including attachments) are available online at *http://lims.dccouncil.us/Download/32576/B20-0930-CommitteeReport1.pdf*. A video of the public hearing of October 16, 2014, on the legislation is available at *http://lims.dccouncil.us/Download/32576/B20-0930-HearingRecord1.pdf*.

Amendment codified a pre-existing, individual right and that, "whatever else it leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." 554 U.S. at 592, 635. In *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Court found this right "fully applicable to the States," but assured that "state and local experimentation with reasonable firearms regulation will continue." *Id.* at 750, 785.

In response to *Heller I*, the Council of the District of Columbia amended the law to allow use of handguns for self-defense in the home, which the Court described as the core right enshrined in the Second Amendment. D.C. Code § 7-2502.02(a)(4); *Heller I*, 554 U.S. at 628–30. Carrying handguns in public remained prohibited. D.C. Code § 22-4504 (2009 Supp.). The district court struck down this carrying ban in *Palmer v. District of Columbia*, 59 F. Supp. 3d 173 (D.D.C. 2014). In response, the Council enacted comprehensive legislation to permit the issuance of concealed-carry licenses if, among other qualifications, the applicant has either "good reason to fear injury to his or her person or property" or "any other proper reason for carrying a pistol." D.C. Law 20-279, § 3(b), 62 D.C. Reg. 1944 (effective June 16, 2015) (codified at D.C. Code § 22-4506(a)). To show "good reason to fear injury," an applicant must demonstrate "a special need for self-protection distinguishable from the general community as supported by evidence of specific threats or previous attacks that demonstrate a special danger to the applicant's life." D.C. Law 20-279, § 2(f) (codified at D.C. Code § 7-2509.11(1)(A)). "[O]ther proper reason . . . shall at a minimum include types of employment that require the handling of cash or other valuable objects that may be transported upon the applicant's person." D.C. Code § 7-2509.11(1)(B).

The Council based the "good reason" standard on similar provisions in New York, Maryland, and New Jersey, all of which "have withstood constitutional challenges in federal courts of appeal." DA 1, 9 & n.39 (citing *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81 (2d Cir. 2012); *Woollard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013); *Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013)). This "revival of the original concealed carry law reinstates the District as a 'may issue' jurisdiction," unlike states with "'shall issue' laws, which require the issuing authority to grant most permits." DA 8. The Council credited empirical studies demonstrating that the "right-to-carry laws" enacted in "shall issue" states "are associated with substantially higher rates of aggravated assault, rape, robbery and murder." DA 17; *see* DA 133–240. It found "undeniable" that "introducing a gun into any conflict can escalate a limited danger into a lethal situation," and that this "danger extends to bystanders and the public at large." DA 18. Given the "substantial governmental interest in public safety and crime prevention," the Council concluded that the "good reason" standard "offers a reasonable, balanced approach to protecting the public safety and meeting an individual's specific need for self-defense." DA 18–19.

The Council also found the licensing regime necessary to prevent federal and local law enforcement agencies from "turn[ing] the District into a semi-police state" in an effort to protect its thousands of "high-value security targets." DA 5, 17. Unlike any state, the District's "68 square miles . . . is completely contained in a dense urban setting." DA 7. And compared to other large cities, the District has greater "public safety and national security concerns" given that "[i]t is the home of the President" and "all high-ranking federal officials and members of Congress," many of whom "are under constant protection" by the Secret Service or Capitol Police. DA 4, 7. It also "is home to a diplomatic corps more extensive and omnipresent than anywhere else in the country"—"approximately 3,000 foreign dignitaries spend[] time in our city each year"—and

4

"threats are a constan[t] for the diplomatic corps." DA 5, 6. The Metropolitan Police Department (MPD) "also provides security support for more than 4,000 special events annually." DA 6.

Moreover, the Council noted, the city is already "heavily patrolled and protected by the more than two dozen law enforcement entities that operate here," few of which fall under the District's authority. DA 7. Without the licensing regime, these entities would have to account for the increased risk associated with increased carrying—a result that, the Council found, would unfairly infringe on the constitutional rights of its citizenry. DA 4–7. "At some point the presence of law enforcement crosses a psychological line between providing public safety and infringing upon a sense of freedom. Citizens of the United States take pride in the freedom granted to them through the Constitution—freedom of expression, freedom of movement." DA 7. "But increasing the posting of armed officers, or clearing streets of all automobiles and restricting pedestrian movement except through checkpoints, tips society away from the freedom and openness we value in our society." *Id*. Thus, "[t]he circumstances unique to the District require a regulatory system different than perhaps any other jurisdiction, and especially, far different than what would be necessary for public safety in a rural place." *Id*.

Just like the Council's law, the regulations issued by MPD were modeled on standards applied in New York, Maryland, and New Jersey. They define "good reason" as a "special need for self-protection distinguishable from the general community." 24 DCMR § 2333.1. To satisfy this standard, an applicant must "allege, in writing, serious threats of death or serious bodily harm, any attacks on his or her person, or any theft of property from his or her person," and that "the threats are of a nature that the legal possession of a pistol is necessary as a reasonable precaution." 24 DCMR § 2333.2. "The fact that a person resides in or is employed in a high crime area shall not by itself establish a good reason . . . for the issuance of a concealed carry

license." 24 DCMR § 2333.4. Alternatively, an applicant can demonstrate any "other proper reason" for carrying a handgun in public, such as employment that requires the personal transport of "large amounts of cash or other highly valuable objects" or the need to protect a family member who has "good reason" but "cannot act in defense of himself or herself." 24 DCMR § 2334.1. If the Chief of Police denies an application for a concealed-carry license, the applicant may appeal to the Concealed Pistol Licensing Review Board, 1 DCMR § 1202, and then "pursue judicial review" if needed, 1 DCMR § 1221.6.

On December 22, 2015, plaintiffs Matthew Grace and Pink Pistols (PP) brought this suit. Complaint [Doc. No. 1]. A week later, they moved for a preliminary and/or permanent injunction. Plaintiffs' Application for a Preliminary and/or Permanent Injunction [Doc. No. 6]. Grace alleges that his concealed-carry application was denied because he failed to "[d]emonstrate a good reason to fear injury to person or property, or other proper reason for a concealed carry license." P.Mem. [Doc. No. 6-1] at 5. He concedes that he does not meet the requirements of the District's law because he "does not face specific threats that differentiate him from the typical, law-abiding citizen[.]" *Id.* at 6. PP is an organization "that advocates the use of lawfully owned, lawfully concealed firearms for self-defense of the sexual minority community." Plaintiffs' Exhibit No. 4 (Declaration of Gwendolyn S. Patton) ("Pink Pistols believes that the right to bear arms is particularly important for members of discriminated against minorities."). It alleges that, "[b]ut for the District of Columbia laws and regulations set forth above, at least one member . . . would carry a firearm outside the home for self-defense." *Id.*

## STANDARDS FOR A PRELIMINARY INJUNCTION

A plaintiff seeking a preliminary injunction must establish that: (1) "he is likely to succeed on the merits"; (2) "he is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in his favor"; and (4) "an injunction is in the public

interest." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011). The last two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Because injunctive relief is such an extraordinary remedy, a plaintiff seeking such relief must prove all four prongs of the standard before relief can be granted. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008); *In re Navy Chaplaincy*, 738 F.3d 425, 428 (D.C. Cir 2013).

"The usual role of a preliminary injunction is to preserve the status quo pending the outcome of litigation." *Cobell v. Norton*, 455 F.3d 301, 314 (D.C. Cir. 2006) (quoting *Dist. 50, United Mine Workers of Am. v. Int'l Union, United Mine Workers of Am.*, 412 F.2d 165, 168 (D.C. Cir. 1969)). Where a plaintiff seeks a "mandatory injunction"—*i.e.*, one that would compel a positive act by the defendant—this Court has required the plaintiff to meet a higher standard and show "extreme or very serious damage" or that he is "clearly entitled" to immediate relief. *Sweis v. U.S. Foreign Claims Settlement Comm'n*, 950 F. Supp. 2d 44, 48 (D.D.C. 2013) (citations omitted)). *But see Minney v. OPM*, No. 1:15-cv-1092 (RJL), 2015 WL 5442403, at *3 n.6 (D.D.C. Sept. 15, 2015) (noting that the D.C. Circuit "has yet to address whether [a] plaintiff [seeking a mandatory injunction] carries a heightened burden"). Becauses the plaintiffs here seek a "mandatory injunction" that would require the District to issue concealed-carry licenses to plaintiff Grace and all members of PP who, apart from the "good reason" requirement are eligible for a concealed carry license, in derogation of the status quo, the Court should hold them to this higher standard.

## ARGUMENT

## I. PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIM; RATHER, THE DISTRICT IS LIKELY TO PREVAIL.

The District of Columbia is unique. Unlike any state, its jurisdiction is entirely urban and densely populated. Unlike any city, it is filled with thousands of high-ranking federal officials and diplomats from around the world, and it hosts hundreds of heavily attended events each year,

including numerous political marches and protests. The Second Amendment preserves the ability of local jurisdictions "to devise solutions to social problems that suit local needs and values," *McDonald*, 561 U.S. at 784–85, and that is precisely what the Council has done through the "good reason" standard.

Against the weight of established precedent and the Council's considered judgment, plaintiffs contend that the Second Amendment requires the District—and every jurisdiction in the nation, irrespective of local conditions—to allow carrying of handguns in public spaces without considering any particular license applicant's self-defense needs. Anything else, they say, "*extinguishes*" the right, which they take as an absolute right to carry a firearm without a good reason. P.Mem. at 27 (emphasis in original). They argue that the circuits that unanimously conclude otherwise are wrong, and that the quarter of the American population in "may issue" jurisdictions must change to "shall issue," no matter what they and their elected representatives wish and what the public-safety consequences will be.[2]

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11 A.C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2948 (2d ed. 1995). Plaintiffs cannot meet this high standard.

A.     **Because regulation of public carrying in cities is longstanding, the District's "good reason" standard is beyond the scope of the Second Amendment.**

"Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Heller I*, 554 U.S. at 634–35. "[L]ongstanding" firearm prohibitions,

---

[2]     Plaintiffs assert that the "vast majority" of states are "shall issue" jurisdictions and, implicitly, that this "readily available alternative" demonstrates that the District's regime violates the Second Amendment. *See* P.Mem. at 32–33. But the interpretation of the Constitution is not a popularity contest, and the District faces unique challenges not present elsewhere.

those in place during the Framing era, and those reaching into the early 20th Century, are considered "presumptively lawful." *Id*. at 626–27 & n.6; *see also Heller v. District of Columbia*, 670 F.3d 1244, 1253 (D.C. Cir. 2011) (*Heller II*) (noting that "[t]he Court in *Heller* considered 'prohibitions on the possession of firearms by felons' to be 'longstanding' although states did not start to enact them until the early 20th century"). The District's regulation of public carrying—providing licenses only to individuals who have a particularized self-defense need—is less restrictive than longstanding prohibitions on public carrying, and therefore does not infringe on a Second Amendment right.

For as long as citizens have owned firearms, English and American law has restricted any right to carry in populated public places. In 1328, England enacted the Statute of Northampton, which stated that "no Man great nor small" shall "go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere." 2 Edw. 3, 258, ch. 3 (1328). The statute reflected a general rule that, in populated public places, "the authority to ensure the public peace rested with the local government authorities," not individually armed citizens. Patrick Charles, *The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of Review*, 60 Clev. St. L. Rev. 1, 20 (2012) ("Charles 2012"); *see also Peruta v. County of San Diego*, 742 F.3d 1144, 1182 (9th Cir. 2014) (Thomas, J., dissenting) ("Restrictions on the carrying of open and concealed weapons in public have a long pedigree in England."), *vacated*, 781 F.3d 1106 (9th Cir. Mar. 26, 2015).

Plaintiffs argue that the right to carry in public was recognized by both William Blackstone and William Hawkins in the 18th century, noting that both scholars' treatises described the right of self-defense. P.Mem. at 13–14. But these provisions are consistent with the Statute of Northampton, which was understood to permit carrying in the countryside, where

individuals hunted with firearms and travelers could not expect police protection. *See* Charles 2012, *supra*, at 19. The Statute also explicitly excluded from its prohibition "the King's servants in his presence," "his ministers," and citizens summoned to "keep the peace," 2 Edw. 3, 258, ch. 3, making it consistent with the Second Amendment's prefatory "militia" clause. *See* P.Mem. at 11. And both Blackstone and Hawkins, along with virtually every other legal scholar at the time, acknowledged the continued vitality of the Statute of Northampton's broad prohibition on public carrying. Historian Patrick Charles has examined the treatises, restatements, and prosecutorial records published from the sixteenth to early-eighteenth centuries and found it "abundantly clear" that the Statute barred "the carrying of dangerous weapons in the public concourse" "without the license of government." Charles, *The Statute of Northampton by the Late Eighteenth Century: Clarifying the Intellectual Legacy*, 41 Fordham Urb. L.J. City Square 10, 21 (2013) ("Charles 2013"); *see also* Charles 2012, *supra*, at 32–33 (analyzing additional historical material); *see* Ruben & Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 Yale L.J. F. 121, 129 (2015).

The Statute of Northampton's broad prohibition continued into the 17th and 18th centuries, *id.* at 23–25, and the "tradition of restricting both the concealed and the open carry of firearms in public places . . . was reflected in various state laws immediately following the ratification of the Constitution." Dennis Henigan, *The* Woollard *Decision and The Lessons of the Trayvon Martin Tragedy*, 71 Md. L. Rev. 1188, 1202 (2012). Massachusetts, Virginia, North Carolina, Tennessee, Maine, Delaware, New Mexico, and South Carolina all adopted the public-