# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MATTHEW GRACE, *et al.,* | |
| Plaintiffs, | |
| v. | Civ. Action No. 15-2234 (RJL) |
| DISTRICT OF COLUMBIA*, et al.,* | |
| Defendants. | |

## DEFENDANTS' APPENDIX

KARL A. RACINE
Attorney General for the District of Columbia

ELIZABETH SARAH GERE
Acting Deputy Attorney General
Public Interest Division

/s/ Toni Michelle Jackson
TONI MICHELLE JACKSON (#453765)
Chief, Equity Section

/s/ Andrew J. Saindon
ANDREW J. SAINDON (#456987)
Senior Assistant Attorney General
441 Fourth Street, N.W., Sixth Floor South
Washington, D.C. 20001
Telephone: (202) 724-6643
Email: andy.saindon@dc.gov

        /s/ Chad A. Naso
CHAD A. NASO (#1001694)
Assistant Attorney General
Office of the Attorney General, DC
441 Fourth Street, N.W., Sixth Floor South
Washington, D.C. 20001
Telephone: (202) 724-7854
Email: chad.naso@dc.gov

# TABLE OF CONTENTS

Committee on the Judiciary and Public Safety, D.C. Council, Report on Bill 20-930 (Nov. 26, 2014) (some attachments omitted) ...........................................1

John Donohue, *The Impact of Right to Carry Laws and the NRC Report: The Latest Lessons for the Empirical Evaluation of Law and Policy* (2014)...........133

Jens Ludwig, *Concealed-Gun-Carrying Laws and Violent Crime: Evidence from State Panel Data*, 18 Int'l L. Rev. L. & Econ. 239 (1998).......................241

Hashem Dezhbakhsh & Paul Rubin, *Lives Saved or Lives Lost? The Effects of Concealed-Handgun Laws on Crime*, 88 Am. Econ. Rev. 468 (1998) .........257

Philip Cook & Jens Ludwig, *The Social Costs of Gun Ownership*, 90 J. Pub. Econ. 379 (2006)................................................................................264

Charles Branas, *et al.*, *Investigating the Link Between Gun Possession and Gun Assault*, 99 Amer. J. Pub. Health 2034 (2009) ...........................................277

Philip Cook, *et al.*, *Criminal Records of Homicide Offenders*, 294 JAMA 598 (2005) ........................................................................................284

Minnesota Drug & Violent Crime Task Forces, 2011 Annual Report...............288

District of Columbia Organic Act, 2 Stat. 103 (1801) .....................................305

D.C. Code of 1803 at 18-19 .............................................................................311

D.C. Code of 1818 at 253-54............................................................................314

D.C. Code of 1855 at 567-68 ...........................................................................316

An Act to Prevent the Carrying of Dangerous Weapons in the City of Washington (Nov. 4, 1857) ..............................................................................320

An Act to Prevent the Carrying of Concealed and Dangerous Weapons in the City of Washington (Nov. 18, 1858) ................................................................321

An Act to punish the carrying or selling of deadly or dangerous weapons, 27 Stat. 116 (1892)............................................................................................322

An Act to control the possession, sale, transfer and use of pistols and other dangerous weapons, 47 Stat. 651, ch. 465, § 4 (1932) .....................................324

An Act to amend the law of the District of Columbia relating to the carrying of concealed weapons, 57 Stat. 586, ch. 296 (1943) .........................................329

# COUNCIL OF THE DISTRICT OF COLUMBIA
# COMMITTEE ON THE JUDICIARY AND PUBLIC SAFETY
# COMMITTEE REPORT
1350 Pennsylvania Avenue, NW, Washington, DC 20004

*2014 NOV 26 PM 2:24*

*OFFICE OF THE SECRETARY*

**TO:**         All Councilmembers

**FROM:**     Councilmember Tommy Wells, Chairperson
              Committee on the Judiciary and Public Safety

**DATE:**     November 25, 2014

**SUBJECT:**  Report on Bill 20-930, "License to Carry a Pistol Amendment Act of 2014"

The Committee on the Judiciary and Public Safety, to which Bill 20-930, the "License to Carry a Pistol Amendment Act of 2014" was referred, reports favorably thereon, with amendments, and recommends approval by the Council.

## CONTENTS

| | | |
|---|---|---|
| I. | Background And Need | 1 |
| II. | Legislative Chronology | 19 |
| III. | Position Of The Executive | 20 |
| IV. | Comments Of Advisory Neighborhood Commissions | 21 |
| V. | Summary Of Testimony | 21 |
| VI. | Impact On Existing Law | 26 |
| VII. | Fiscal Impact | 26 |
| VIII. | Section-By-Section Analysis | 27 |
| IX. | Committee Action | 35 |
| X. | Attachments | 36 |

Bill 20-930, the License to Carry a Pistol Amendment Act of 2014, was introduced on September 23, 2014, by Chairman Mendelson and Councilmember Wells, co-sponsored by Councilmembers Orange, Barry, and Bonds, and referred to the Committee on the Judiciary and Public Safety.[1] On October 16, 2014, the Committee held a public hearing on the bill; a summary of the testimony provided at the hearing is found below in section V.

## I.   BACKGROUND AND NEED

On July 24, 2014, the U.S. District Court for the District of Columbia ruled in *Palmer v. District of Columbia* that the District's total ban on the carrying of handguns outside the home is unconstitutional.[2] The Court also prohibited the District from "completely banning the carrying

---

[1] On October 20, 2014, Bill 20-930 was re-referred sequentially to the Committee on the Judiciary and Public Safety and then to the Committee of the Whole.
[2] *Tom G. Palmer v. District of Columbia*, July 24, 2014 (docket entry 51 on July 26, 2014), case no. 1:09-cv-01482-FJS, U.S. District Court for the District of Columbia.

**DA 1**

of handguns in public for self-defense by otherwise qualified non-residents based solely on the fact that they are not residents of the District."[3]

The executive and the Council worked closely on the District's legislative response to *Palmer*, in order to ensure that the District's laws and regulations would be in compliance with the decision while also balancing the government's interest in public safety. This interest is heightened given the District's role as the nation's capital. The result was emergency legislation,[4] passed by the Council on September 23, 2014, and Bill 20-930. Both the emergency and permanent legislation follow the models of states such as New York, New Jersey, and Maryland, which have adopted a similar licensing scheme and which have withstood Constitutional challenges in federal courts of appeal.

Bill 20-930 is sound legislation that will enhance public safety in the District, while comporting with the requirements of the Second Amendment of the U.S. Constitution. The main provisions of this legislation are discussed in greater detail below.

## SUMMARY OF GUN CONTROL IN THE DISTRICT OF COLUMBIA

The process of regulating the carrying of pistols in the District of Columbia dates back to at least 1857. The common law regulated the carry of pistols when a person was "without reasonable cause to fear an assault or other injury or violence to his person . . . ."[5] Some 75 years later, and two years before adoption of the National Firearms Act of 1934, Congress enacted An Act To control the possession, sale, transfer and use of pistols and other dangerous weapons in the District of Columbia, to provide penalties, to prescribe rules of evidence, and for other purposes ("Pistols and Other Dangerous Weapons Act").[6]

The then-newly elected Council of the District of Columbia adopted the Firearms Control Regulations Act of 1975.[7]  Codified as chapter 25 of Title 7, the Firearms Control Regulations Act imposes a broad regulatory scheme on the acquisition, possession, and transfer of firearms. The act requires registration of all firearms, restricts who may register a firearm, and prohibits certain firearms entirely. Until 2008, the act also prohibited all private individuals from registering a handgun. In 2008, the Supreme Court, in *District of Columbia v. Heller*, held that the Second Amendment of the Constitution guarantees an individual's right to possess a firearm for the lawful purpose of self-defense within the home, thereby invalidating the District's then-total ban on handguns.[8] It also struck down the District's safe storage provision[9] – a provision

---

[3] *Id.* at p. 17.

[4] License to Carry a Pistol Emergency Amendment Act of 2014, Act 20-447 (expires Jan. 7, 2015).

[5] Revised Code of the District of Columbia Prepared Under the Authority of the Act of Congress at 570 (A.O.P. Nicholson, Washington 1857).

[6] 47 Stat. 650 (approved July 8, 1932) (codified at D.C. OFFICIAL CODE § 22-4501 *et seq.*). Although amended periodically during the last 70 years, this act remains in effect and is codified as Chapter 45 of Title 22 of the D.C. Official Code.

[7] D.C. Law 1-85, effective September 24, 1976 (codified at D.C. OFFICIAL CODE § 7-2501.01 *et seq.*).

[8] 554 U.S. 570, 635 (2008).

[9] *Id.* at 571.

that required all firearms, including rifles and shotguns be kept unloaded and disassembled or bound by a trigger lock because it lacked an explicit exception for self-defense.

Following the *Heller* case, the Council revised the 1975 Firearms Control Regulations Act through the Firearms Control Amendment Act of 2008[10], "seeking to accommodate that constitutional right while also protecting the community from gun violence."[11] The 2008 act included registration requirements for handguns and clarification regarding safe storage. It also included several strong public safety measures, including the prohibition of possession of dangerous assault weapons and large-capacity ammunition magazines – military-style devices commonly employed in mass shootings. Other changes included limiting the number of handguns any one individual may register at one time, though not the total that an individual may possess, and adding being convicted of an intrafamily offense to the list of disqualifications to registration.[12]

These changes were subsequently challenged in *Heller v. District of Columbia* (known as *Heller II*), where the plaintiffs argued that the registration requirements were unconstitutional restrictions on their Second Amendment rights.[13,14] The District Court upheld the constitutionality of the law; on appeal, the D.C. Circuit upheld most aspects of the 2008 act, including the District's ban on assault weapons and large-capacity ammunition magazines, and the registration requirement as it applied specifically to handguns.[15] The rest of the case was sent back to the District Court in order to gather more facts.[16] On May 15, 2014, the District Court, in a memorandum opinion, held that the District's efforts to "combat gun violence and promote public safety were done so in a constitutionally permissible manner."[17]

While *Heller II* was being litigated, another case challenging the District's gun laws was being argued. In 2009, several plaintiffs joined together in *Palmer v. District of Columbia* to file suit against the District because they were denied a permit to carry a handgun outside their homes, or because they were denied carry permits because they were not District residents.[18] On July 24, 2014, the District Court for the District of Columbia issued the *Palmer* decision, ruling that the District's "complete ban on the carrying of handguns in public is unconstitutional."[19] The Court also prohibited the District from "completely banning the carrying of handguns in

---

[10] D.C. Law 17-0372, effective March 31, 2009.
[11] *Heller v. District of Columbia*, ___ F.Supp.2d ----, 2014 WL 1978073 (D.D.C.) at *1.
[12] The Council also revisited firearms regulation in 2012, eliminating vision requirements, except for the legally blind; modifying the training requirements; and eliminating most limitations on what ammunition a registrant may possess. *See* D.C. Law 19-170, Firearms Amendment Act of 2012 (effective Sept. 26, 2012).
[13] *See Heller v. District of Columbia*, 698 F.Supp.2d 179, 181 (D.D.C.2010).
[14] The Committee notes that since the *Heller* decision, there have been 3,307 handguns and 1,814 long guns registered in the District (as of October 3, 2014; data provided by Chief Lanier during questioning at Oct. 16, 2014 hearing for Bill 20-930).
[15] *Heller v. District of Columbia (Heller II)*, 670 F3d 1244, 1264 (D.C.Cir.2011).
[16] *Id.*
[17] *Heller v. District of Columbia*, ___ F.Supp.2d ____, 2014 WL 1978073 (D.D.C.) at *1.
[18] *Palmer v. District of Columbia*, *supra* n.1.
[19] *Id.* at 16.

public for self-defense by otherwise qualified non-residents based **solely** on the fact that they are not residents of the District."[20] (emphasis in original)

It is with this background that Bill 20-930 was developed and is considered. The Committee notes that none of these cases, not even *Palmer*, stand for unregulated and absolute gun ownership, carrying, or use.[21] These decisions have recognized that sensible regulation of gun ownership and behavior designed to protect the public and law enforcement officers that does not prohibit gun use by responsible individuals is within the scope of the Second Amendment.

## UNIQUENESS OF THE DISTRICT

Before the Committee discusses the provisions of Bill 20-930, the context within which the District's firearms law and regulations operate is also useful.

Cities across the country are grappling with gun violence. The problem is not limited to violent crime, but includes accidental shootings and suicide. It is a substantial problem, both as a matter of public safety and public health. Dense, urban jurisdictions have higher rates of violent crime than suburbs and rural areas, and when it comes to crime, handguns are very effective. As a result, major cities such as New York and Chicago utilize a variety of gun control regulations. Washington, D.C. is no different and has been regulating firearms since the Congressional act of 1932.

While the District of Columbia shares the problem of gun violence with other dense, urban jurisdictions, its public safety and national security concerns are greater. It is the home of the President of the United States; four U.S. presidents have been assassinated by gunfire (two in the District), and at least five others have been shot at, including Ronald Reagan who was seriously wounded outside a local hotel in 1981. The Secret Service will not disclose all incidents where it has recovered firearms associated with threats on the President, but we do know they happen; indeed, just two years ago someone hit the White House with gun fire. The consequences of an assassination would be grave to the nation.

The District is home to all high-ranking federal officials and members of Congress. The January 2011 assassination attempt of then-Congresswoman Gabrielle Giffords highlights the concern, as well as the heavy security protecting a number of Cabinet Secretaries including the Secretary of State and the Attorney General. All of the Congressional leadership (e.g., the Speaker of the House and the majority and minority leaders of both the House and Senate) are under constant protection by the Capitol Police. The Capitol Police will not disclose all incidents where they have recovered firearms associated with threats on members of Congress, but we do know they happen. In 1998 two Capitol Police officers were killed trying to stop a shooter; in 1970 and 1983 bombs exploded in the Capitol; in 1954, five Congressmen were shot by Puerto

---

[20] *Id.* at 16-17.
[21] *See*, e.g. *Palmer* at 15: stating that the government can "place some reasonable restrictions on carrying of handguns."

Rican nationalists. These incidents speak to the constancy of security needs far greater than present in any other U.S. city.

The District also is home to a diplomatic corps more extensive and omnipresent than anywhere else in the country. Virtually every nation has a presence in the District, as do foreign missions. As outlined in this Committee's report on Bill 19-614 (the "Firearms Amendment Act of 2012"), threats are a constancy for the diplomatic corps. Although the Secret Service did not provide Committee requests for details, it requested that the emergency legislation preceding Bill 20-930 prohibit carrying within a buffer surrounding every embassy and chancery in the District. Here again, the security presence speaks to the difference between the District and other major U.S. cities.

In her testimony before the Committee on Bill 20-930, Chief Cathy Lanier stated that the frequency of movements and security details makes it both difficult and undesirable to provide protection in the same manner as in other cities – namely, to clear the streets. For instance, in other cities streets are cleared of automobiles, essentially closed off, to accommodate a Presidential visit, while in the District the President travels so frequently and on so many different routes that, while traffic may be stopped (for the President, but not other dignitaries), the streets are not cleared.

The District presents a "unique attraction to mentally ill persons who are a danger to themselves and to others . . . this is not rural Oklahoma or open-sky Montana. It isn't every-kid-grows-up-hunting Kentucky. This is the crowded national capital city filled with high-value security targets,"[22] as evidenced this fall when a mentally disturbed man broke his way into the East Room of the White House, just minutes after the President left.

Police Chief Cathy Lanier discussed the uniqueness of the District in her testimony before the Committee on Bill 20-930:

> The proposed law would prohibit concealed carry licensees from carrying handguns in the types of places that firearms have been traditionally prohibited such as government buildings, premises where alcohol is sold and served, schools and universities, and in circumstances where protection of public officials, visiting dignitaries, and demonstrators is paramount. The latter is critical here in the District of Columbia. As the Supreme Court noted in *Heller*, "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" are constitutional.

> As I have testified before, the District of Columbia, as the seat of the federal government, with its multitude of critical official and symbolic buildings, monuments, and events, and high-profile public officials traversing its streets every day, is a city filled with sensitive places from a public safety perspective. Our laws should reflect that reality. Government facilities, dignitaries, and public servants are prime targets for terrorists, both foreign and domestic. Protecting government officials and infrastructure is a challenge for every city

---

[22] Testimony of Rev. Robert Schenck, public witness, at the public hearing on Bill 20-930 on Oct. 16, 2014, p. 2.

in the United States. But in the District the likelihood of attack is higher, and the challenges to protecting the city are greater. As recently as 2011, we saw an assassination attempt on the president – where fortunately the only thing the shooter hit was the White House – and another shooter firing at military installations. Both of these incidents were carried out by a lone gunman, angry at one facet or another of the U.S. government.

The high-profile human targets—from the nation's top elected leaders to the more than 400 foreign dignitaries that make official visits to DC each year—are an obvious and potentially attractive target. The District is also vulnerable due to the sheer volume of secure motorcades traveling in Washington on any given day. The daily movements around the city of the President, Vice President, and their families, and the approximately 3,000 foreign dignitaries spending time in our city each year means that all of our roadways are a challenge to secure. And as the September 19th incident earlier this year at the White House demonstrated, even the home and office of the President of the United States are not easy to secure. Law enforcement needs to be able to prohibit guns from entering the perimeter of a secure area in order to be able to lessen the likelihood that an armed gunman will be able to make it close to protected targets.[23]

The Chief testified that the threat level for dignitaries can change frequently; for example, certain dignitaries consistently require higher levels of security similar to what is provided for presidential movements, such as shutting down areas around hotels and using full motorcade security, particularly when those visits coincide with times of conflict. Because of the consistent presence of a variable number of high-value targets, there is a threat level and a coincident level of concern on behalf of law enforcement that simply does not exist elsewhere.

In addition to assisting the Secret Service with daily movements of the President, Vice President, and foreign dignitaries around the city, MPD also provides security support for more than 4,000 special events annually. The District is also unique because of what the buildings and location represent all around the world:

> Symbolically, we stand out with so many targets like the White House, the Monument, or the Capitol. That backdrop stands out for people who want to do harm to the United States government.[24]

The District's unique status is also reflected in the type of training the Metropolitan Police Department receives. Chief Lanier testified the Department receives training with the

---

[23] Testimony of Cathy L. Lanier, Chief of Police, Metropolitan Police Department, at the public hearing on Bill 20-930 on Oct. 16, 2014 [hereinafter Chief Lanier Oct.16, 2014 testimony].

[24] Chief Lanier Oct. 16, 2014 verbal testimony. The Chief has previously noted that the Federal Government considers the Supreme Court building to be so sensitive that, no matter who one is, he or she cannot wear their firearm in the building. "I would argue that similar caution should apply to the District of Columbia. [T]he District of Columbia, as the seat of the Federal government, with its multitude of critical official and symbolic buildings, monuments, and events, and high-profile public officials traversing its streets every day, is a city filled with "sensitive" places. Our laws should reflect that reality." Testimony of Cathy L. Lanier, Chief of Police, Metropolitan Police Department, at the hearing on the "Impact of Proposed Legislation on the District of Columbia's Gun Laws" before the U.S. House of Representatives Committee on Oversight & Government Reform on Sept. 9, 2008.

Secret Service, as well as training involving very large demonstrations, dignitary protection, and other events related to the activities and circumstances that exist here – training that other city police departments do not receive.[25] Both the United States Capitol Police and the United States Secret Service submitted recommendations to the Committee on Bill 20-930, further exemplifying the special nature of the District of Columbia.[26] The Secret Service cited its "unique protective mission responsibilities in the District of Columbia" as the reason for its high interest in Bill 20-930:

> While the Secret Service's protective operations occur around the world, given that the President, First Family, Vice President, foreign leaders, and other protectees reside, visit and work here, we maintain a particularly high level of protection-related activities with the District . . .[27]

Because DC has so many high-value targets, it is also heavily patrolled and protected by the more than two dozen law enforcement entities that operate here. The District's distinctive geography is helpful in this regard. At just 68 square miles – and 10 percent water – the District is completely contained in a dense urban setting. At some point the presence of law enforcement crosses a psychological line between providing public safety and infringing upon a sense of freedom. Citizens of the United States take pride in the freedom granted to them through the Constitution – freedom of expression, freedom of movement. But increasing the posting of armed officers, or clearing streets of all automobiles and restricting pedestrian movement except through checkpoints, tips society away from the freedom and openness we value in our society. At some point the Second Amendment infringes on the First Amendment.

It must be noted that when the Founding Fathers and the states drafted and ratified the Second Amendment, they were not considering today's armament. Today's firearms were inconceivable to the Founding Fathers; today's pistols are similar to their 18th Century counterparts in name only. Flintlock pistols were unreliable, inaccurate, unrifled, single-shot, ball-shot, and slow to load. Breachloading firearms were four generations away, and semiautomatic firing mechanisms with hollow-point bullets were unimaginable. The Founding Fathers were not oblivious to public safety, and the then-unimaginable lethality of today's firearms requires restrictions in the nation's capital such as provided by Bill 20-930.

It must also be noted, because the District's response to gun control has engendered criticism from gun enthusiasts across the country, that the regulation of firearms must differ between jurisdictions. The circumstances unique to the District require a regulatory system different than perhaps any other jurisdiction, and especially, far different than what would be necessary for public safety in a rural place.

---

[25] Chief Lanier Oct. 16, 2014 verbal testimony.
[26] *See* submitted statements in section V.
[27] *See* letter dated November 14, 2014 from A.T. Smith, Deputy Director, United States Secret Service, to the Honorable Tommy Wells, Chairman, Committee on the Judiciary and Public Safety (p. 1).

## SPECIFIC PROVISIONS OF BILL 20-930

The development of Bill 20-930 has been guided by the analysis and decisions in other urban areas and reflects the District's significant interests in protecting public safety and preventing crime,[28] while providing a mechanism for those individuals who have a specialized need for self-defense.

To achieve this balance, Bill 20-930 revives the District's longstanding concealed carry law, with minor amendment, as section 3(b) of the bill.[29] Section 6 of the Pistols and Other Dangerous Weapons Act was approved July 8, 1932 and provided the parameters for issuing licenses to carry:

> The superintendent of police of the District of Columbia may . . . issue a license to such person to carry a pistol within the District of Columbia for not more than one year from date of issue, if it appears that the *applicant has a good reason to fear injury to his person or property or has any other proper reason for carrying a pistol and that he is a suitable person to be so licensed.*[30] (emphasis added)

The District's previous regulations implementing the Pistols and Other Dangerous Weapons Act stated that for the purposes of satisfying the "have reason to fear injury to his or her person or property or any other proper reason" clause, the applicant "shall allege serious threats of death or serious bodily harm to his or her person or theft or destruction of property in writing, under oath. The applicant shall also allege that the threats are of a nature that the legal possession of a pistol would provide adequate protection."[31]

This revival of the original concealed carry law reinstates the District as a "may issue" jurisdiction – where the issuing authority has discretion in granting permits to carry concealed handguns. [32] Of the 50 states, four do not require a permit to carry. The other 46 have permit requirements, but the mechanisms differ: Nine states have "may issue" laws; the remaining 37 states have "shall issue" laws, which require the issuing authority to grant most permits, though at least 20 of these provide the issuing authority with some discretion.[33] For example, in Georgia,

---

[28] There can be little question that preventing crime and promoting public safety are important government goals. *See, e.g., United States v. Salerno,* 481 U.S. 739, 750 (2nd Cir. 1987); *Schall v. Martin,* 467 U.S. 252, 264 (1984).

[29] Under *Heller,* "longstanding" prohibitions are presumptively lawful. *Kachalsky v. County of Westchester,* 701 F.3d 81 at 90, n. 11.

[30] 47 Stat. 650 at 651.

[31] 24 DCMR 2303.11; previously contained in Article 52 of the Police Regulations, 1955 Edition-1968 Reprint, Title 35, District of Columbia Rules and Regulations (DCRR the predecessor of the DCMR).

[32] Gun Control States' Laws and Requirements for Concealed Carry Permits Vary across the Nation, U.S. Government Accountability Office, Report to Congressional Requesters (July 2012) GAO-12-717, p. 5 (accessed Oct. 19, 2014 at http://www.gao.gov/assets/600/592552.pdf).

[33] Information compiled at Law Center to Prevent Gun Violence, http://smartgunlaws.org/concealed-weapons-permitting-policy-summary/ (accessed Oct. 19, 2014).

a "shall issue" state, issuing authorities may deny the permit if they determine, among other things, that the applicant is not of good moral character.[34]

In the "may issue" states, issuing authorities may issue a permit to eligible individuals after considering additional requirements, such as the applicant's history and personal character.[35] Maryland, for example, issues handgun permits to residents who can demonstrate a good and substantial reason for needing a permit. Maryland's issuing authority is responsible for making the determination of what constitutes a good and substantial reason, "such as a finding that the permit is necessary as a reasonable precaution against apprehended danger."[36] In New Jersey, a Superior Court judge issues permits if he or she believes that the applicant satisfies the requirement of good character, familiarity with safe handling, and a justifiable need to carry a handgun.[37] New York requires "proper cause," which is demonstrated by "a special need for self-protection" that is distinguishable from that of the general community.[38] These provisions all have been upheld in federal court as constitutional.[39]

*Application requirements*

Section 902[40] enumerates the requirements for applicants who wish to carry a concealed weapon. The applicant must certify and demonstrate to the satisfaction of the Chief that he or she is (1) at least 21 years of age; (2) meets all the requirements for a person registering a firearm under existing law; (3) does not currently suffer nor has suffered in the previous five years from any mental illness or condition that creates a substantial risk that he or she is a danger to himself or herself or others; (4) has completed at least 16 hours of firearms training, conducted by a certified instructor, that covers enumerated topics; (5) has completed at least two hours of range training; and (6) any procedures the Chief may establish by rule.

---

[34] *See* Ga. Code Ann. § 16-11-129(d)(4): ". . . the judge of the probate court shall issue an applicant a license or renewal license to carry any weapon unless facts establishing ineligibility have been reported or unless the judge determines such applicant has not met all the qualifications, is not of good moral character, or has failed to comply with any of the requirements contained in this Code section."

[35] GAO, *supra* n. 22, at p.13.

[36] Md. Code Ann. Pub. Safety § 5-306(a)(6).

[37] NJAC 13:54-2.3. "Justifiable Need" is defined as "the urgent need for self-protection, as evidenced by specific threats or previous attacks which demonstrate a special danger to the applicant's life that cannot be avoided by means other than by issuance of a permit to carry a handgun." (NJ Admin Code 13:54-2.4(d)(1)).

[38] N.Y. Penal Law § 400.00(2)(f). Examples include employment that requires handling cash/valuable negotiable objects; threats documented in police reports; other documentation of a specific threat to the applicant; target practice; and hunting.

[39] *Woolard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013) (upholding Maryland's "good and substantial reason standard"); *Drake v. Filko*, 724 F.3d 426 (3rd Cir. 2013) (cert denied- May 5, 2014) (upholding New Jersey's "justifiable need" standard stating it qualifies as a "presumptively lawful, longstanding regulation and therefore does not burden conduct within the scope of the Second Amendment's guarantee."); *Kachalsky v. County of Westchester*, 701 F.3d 81 (2nd Cir. 2012) (upholding New York's "proper cause" standard: "Limiting Handgun possession to persons who have an articulable basis for believing they will need the weapon for self defense is in the best interest of public safety and outweighs the need to have a handgun for an unexpected confrontation.").

[40] For the purposes of discussing the provisions of Bill 20-930, the committee report refers directly to the individual sections created in the new Title IX, found in subsection 2(e) of Bill 20-930 (i.e. "section 907").

*Existing firearm registration requirement.* In order to legally possess a firearm in the District of Columbia, an individual must have registered the weapon, pursuant to The Firearms Control Regulations Act of 1975, effective September 24, 1976 (D.C. Law 1-85; D.C. Official Code § 7-2501.01 *et seq.*). Accordingly, in order for an applicant to qualify for a carry permit, the applicant must first meet the requirements to possess a firearm in the District, which section 902(a)(2) makes clear. This requirement ensures compliance with District registration laws, and verifies an applicant's eligibility to possess and ultimately carry a firearm. It also ensures that nonresidents who apply for a carry permit do so understanding what weapons are allowed in the District.

*Mental health requirement.* Forty-four states regulate the possession of a firearm by the mentally ill. Bill 20-930 reaffirms the District's longstanding carry regulations, which required the applicant be of sound mind and free of mental illness or disorder for the past five years.[41] The committee print expands section 902(a)(3) to provide the Chief with the authority to consider information that the applicant who has suffered in the previous five years from such a condition no longer suffers from that condition, echoing a provision in the original carry regulations. Section 902(a)(3)(A) requires that the applicant "does not currently suffer from any mental illness or condition that creates a substantial risk that he or she is a danger to himself or herself or others," a standard that exists explicitly in several states and is reflected indirectly in the others.[42]

*Training requirement.* The Committee believes training in the safe handling and use of firearms is essential for any owner, but is particularly critical for those who carry in public, where untrained use of a firearm may result in injury to innocent bystanders. Section 902(a)(4) requires a carry permit applicant to have completed at least 16 hours of training by a certified instructor, which includes principles of safety, marksmanship, care and use, local law, situational awareness, conflict management, and the use of deadly force. Section 902(a)(5) requires that the applicant has completed at least two hours of range training conducted by a certified instructor, including shooting a qualification course of 50 rounds of ammunition from a maximum distance of 45 feet.

Such training requirements are not unusual[43] or burdensome.[44] More than half of the states require a carry applicant to demonstrate they have received training in firearm use and/or safety. Federal courts have agreed that such training is essential for public safety. As Judge Richard Posner, writing for the U.S. Court of Appeals for the Seventh Circuit, noted, "some states sensibly require an applicant for a handgun permit establish his competence in handling

---

[41] 24 DCMR 2303.4 and 2303.5.

[42] *See, e.g.* Ariz. Rev. Stat. §§13-3101-02; Cal. Welfare and Inst. Code §§ 8100 – 8108; Md. Pub. Safety Code § 5-133; Neb. Rev. Stat. § 69-2433; and S.D. Codified Laws § 23-7-7.1.

[43] *See, e.g.* Md. PUBLIC SAFETY Code Ann. § 5-306 (5).

[44] Some media outlets, reporting on the emergency regulations issued pursuant to the post-*Palmer* emergency Act 20-447, have implied that the District has set up a barrier by requiring training but not having any certified trainers. However, as detailed in the emergency regulations and application instructions, individuals can request preliminary approval from MPD for their concealed pistol license application, and, if granted, will then have 45 days to meet the training requirements. In addition, some applicants for a concealed pistol license may be eligible for an exemption from most of the firearms training requirements.

firearms. A person who carries a gun in public but is not well trained in the use of firearms is a menace to himself and others."[45] Indeed, one concealed carry proponent – himself a plaintiff in *Heller* and *Palmer* – testified regarding the importance of carry applicants being properly trained:

> What they need to do is practice. 16 hours is a good start, I would encourage more. We encourage people to do "dry fire" practice, practicing presses, reloading and drawing with an empty firearm. These are skills that you lose if you don't practice them over time. If someone doesn't practice for a couple of months they're going to be rusty.[46]

As with existing training requirements for the registration to possess a firearm, section 902(c) exempts from the carrying training requirement an individual who can demonstrate that he or she has received firearms training in the U.S. military or can otherwise demonstrate that a firearms training or safety course has been completed that is at least equal to that required by section 902(a)(4) and (5).

Additionally, under section 902(d), any applicant may satisfy the training component by demonstrating the applicant has met similar requirements in his or her own residence. This provision ensures that Bill 20-930's training requirements are not repetitive for nonresidents – or new residents – who possess such training and seek a carry permit in the District. The 1932 Pistols and Other Dangerous Weapons Act also allowed for carry permits for nonresidents, provided they met the other requirements of the law, including the good reason to fear injury provision.

In-person application. Section 907(f) requires an applicant to appear for an in-person interview at MPD headquarters, for purposes including verification of the applicant's identity and verification of the information submitted as part of the applicant process for a carry license. At a minimum, the in-person application is essential to verify the applicant's identity and ensure there is no fraud. This requirement is also not unusual. A cursory review finds similar standards in counties in California, Nebraska, North Carolina, and Pennsylvania. Additionally, the in-person discussion will assist both the Chief and the applicant in the consideration of good cause for a carry permit.

### Licensee duties

Section 904 enumerates the duties of concealed carry licensees. Section 904(b) requires a licensee to notify the Chief of the loss, theft, or destruction of the license and any change in name or address. Subsection (c) requires the licensee to carry the license and the registration certificate whenever the licensee carries the pistol. Subsection (d) dictates what a licensee must do when stopped by a law enforcement officer, specifically that the licensee must disclose to the officer that he or she is carrying a concealed pistol, present the license and registration, identify the pistol's location, and comply with all lawful orders and directions from the officer. Chief

---

[45] *Moore v. Madigan*, 702 F.3d 933, 941 (7th Cir. 2012) (striking down the Illinois ban on carrying in public).
[46] Verbal testimony of George L. Lyon, Jr., President, DC Chapter, Community Association for Firearms Education, at the public hearing on Bill 20-930 on Oct. 16, 2014.

Lanier testified at the public hearing for Bill 20-930 that federal law allows sworn officers to carry their weapons off duty and outside their sworn jurisdiction, but requires the sworn officers to disclose to other law enforcement who they are and how they are carrying. She stated that the requirements in Bill 20-930 are modeled on the federal requirements and are reasonable procedures to protect both law enforcement and the licensees.[47]

### Revocation and suspension of licenses

Section 905 includes a provision for the revocation of a license upon a finding that the licensee no longer meets the standards and requirements of the law, and includes the ability to appeal to the Concealed Pistol Licensing Review Board. The committee print for Bill 20-930 amends this section to include summary suspension, without a hearing, when the Chief has determined that the conduct of a licensee presents an imminent danger to the health and safety of the public or a member of the public. The provision includes the right to a hearing within 72 hours of a timely request and then a decision within 72 hours of such a hearing. These provisions are in addition to section 906, which details that a licensee may not carry a pistol while impaired.

### Sensitive places

In *Heller*, the Supreme Court pointed out that "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" are presumptively lawful.[48] Almost every state places some restrictions on where concealed firearms may be carried. The most common areas identified as sensitive and in need of this prohibition include schools, jails, courthouses, and other government buildings.[49] Restrictions exist for a wide range of other locations. For example, prohibitions on carrying exist for college campuses (20 states) [50], establishments that serve alcohol (17 states), places of worship (12 states), polling places (10 states), and public sporting events (six states), among others.[51] States also permit private businesses and other private institutions to ban guns from their premises.[52]

Bill 20-930 aims to be as clear as possible regarding prohibitions on concealed carry; licensees must be able to easily understand where they can and cannot carry their firearms. Section 907 approaches this in three ways: sensitive locations, sensitive circumstances, and presumptions.

---

[47] Section 901(2) defines law enforcement officer for the purposes of Title IX to include MPD reserve officers, special police officers appointed pursuant to D.C. Official Code § 5-129.02, and campus and university special police officers appointed pursuant to 6A DCMR § 1200 *et seq.*; however, it should not be construed to designate these entities as law enforcement agencies.

[48] *Heller*, 554 U.S. at 626 (n. 26 states, "We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive.").

[49] Law Center to Prevent Gun Violence, *supra* n. 22.

[50] "Guns on Campus: Overview", National Conference of State Legislatures, March 7, 2014, http://www.ncsl.org/research/education/guns-on-campus-overview.aspx (accessed Oct. 19, 2014); 23 other states allow each college or university to make the decision to ban or allow concealed carry on campus.

[51] Law Center to Prevent Gun Violence, *supra* n. 22.

[52] *Supra*, n. 40 (Posner noting existing limits on carrying concealed weapons).

Locations. In the bill as introduced, the list of sensitive places where carrying is prohibited was limited to 14 categories or circumstances, which primarily reflected government buildings and property, facilities that serve children or other vulnerable populations, businesses that serve alcohol, confined spaces such as buses and sports arenas, large gatherings, and sensitive locations unique to the District. The committee print expands this list by two. The print also includes "any polling place while voting takes place" to ensure that residents may exercise their fundamental right to vote without fear or intimidation, something protected even in states with high rates of gun ownership, such as Texas, Arkansas, and South Carolina.[53] The final addition is the U.S. Naval Observatory and its grounds, which is the home of the Vice President of the United States, and was included at the request of the U.S. Secret Service.[54]

Two witnesses at the public hearing on Bill 20-930 raised concerns about the prohibition of carrying on public transportation, section 907(a)(6) of the introduced bill. Public transportation in the District is particularly crowded and the use of a weapon in such a confined space would most certainly result in injury to innocent bystanders.[55] Additionally, the Washington Metropolitan Area Transit Authority ("WMATA") specifically requested inclusion of its vehicles and Metrorail stations.[56] Accordingly, the committee print retains this prohibition in section 907(a)(8), but does make two changes to the paragraph. First, the print adds Metrorail transit stations, to make it explicit that concealed pistols are not allowed therein, as requested by WMATA.[57] Second, the print strikes the phrase "but not including taxicab operators." The committee believes that taxi drivers are no more likely to be subject to specific threats or previous attacks than any other resident. An individual taxi operator may still apply with a specific need. In addition, the committee print defines public transportation in section 907(g)(3) as "any publicly owned or operated commercial vehicle, including any DC Circulator bus, DC Streetcar, MetroAccess vehicle, Metrobus, or Metrorail train."[58]

Circumstances. Bill 20-930 also takes into consideration two circumstances unique to the District: movements of dignitaries and high-ranking officials, and demonstrations in public places. As introduced, the bill prohibited concealed carry in these circumstances, requiring a buffer zone up to 1,000 feet, and specifying that no criminal penalty would attach unless the licensee was advised by a law enforcement officer that the movement or demonstration was occurring and the licensee was ordered to leave the area until he or she removed the pistol and the licensee did not comply.

---

[53] Testimony of Tracy Zorpette, Washington, D.C. Chapter Advocacy Lear, Moms Demand Action for Gun Sense in America, at the public hearing on Bill 20-930 on Oct. 16, 2014 (p. 2).
[54] Supra, n. 25 at p. 2.
[55] Other jurisdictions have similar prohibitions. See e.g. 430 Ill. Comp. Stat. 66/65(a)(8) (Prohibiting carrying on any bus, train, or form of transportation paid for in whole or in part with public funds, and any building, real property, and parking area under the control of a public transportation facility paid for in whole or in part with public funds).
[56] WMATA meeting with council staff, Aug. 25, 2014; see also Letter dated Oct. 30, 2014 from Ronald A. Pavlik, Jr., Chief, Metro Transit Police.
[57] The Committee notes that this addition extends to Metrorail transit stations only, not to bus stops or bus shelters; someone carrying a pistol should not be prohibited from seeking shelter from the rain, for instance.
[58] The committee does not intend for this definition to extend to Capital Bikeshare.

One witness at the public hearing said the 1000-foot buffer zone is overbroad and irrational.[59] The Committee disagrees. First, the language read "within 1,000 feet, or other lesser distance designated by the Chief," which means the perimeter is set by the Chief for the particular movement or demonstration. In many situations, the perimeter will not be that large, but law enforcement may need such a distance for other circumstances that require additional security. Second, the 1,000-foot buffer has been used previously in District law to draw drug-free and gun-free zones around areas of particular sensitivity, such as day care centers, schools, and public libraries.[60]

The Committee agrees, however, with the Chief's testimony that it would be difficult for the police to comply with the personal notification requirement in Bill 20-930 as introduced.[61] The committee print amends these sections to reflect common sense notification: a licensee should not carry where the "law enforcement agency provides notice of the perimeter by the presence of signs, law enforcement vehicles or officers acting as a perimeter, or other means to make the area of protection obvious" in the event of protected movements, and in the event of demonstrations, where the "law enforcement agency provides notice of the perimeter by the presence of signs, law enforcement vehicles or officers acting as a perimeter, or other means to make the area of the demonstration obvious". This alleviates the personal notification burden on police and relies on posted signs or other obvious signs of police perimeters. However, although a licensee is prohibited from carrying within these designated areas, no criminal penalty applies unless (a) the above presence or notice has occurred, or (b) the licensee is informed by an officer that it is a designated area and fails to leave.

<u>Presumptions</u>. Bill 20-930, as introduced, also contains two presumptions in section 907(b): (1) private residences are presumed to prohibit concealed carry unless the property owner or person in control of the premises communicates authorization personally to the licensee in advance, and (2) non-residential private property is presumed to allow concealed carry, unless posted with conspicuous signage prohibiting carry or unless the owner or authorized agent communicates the prohibition personally to the licensee. The committee print of Bill 20-930 adds an additional presumption, providing a presumed prohibition in places of worship, unless the property is posted with conspicuous signage allowing concealed pistols, or the owner or person in control of the premises communicates authorization personally to the licensee in advance.[62] There are at least a dozen stated that include houses of worship on a prohibited locations list or as presumptively prohibited locations.[63] The Committee received testimony in support of this addition at the public hearing, as well as in submitted statements.[64]

---

[59] *See* George Lyon Oct. 16, 2014 testimony (p. 4).
[60] D.C. Official Code § 48-904.07a and § 22-4502.01, respectively.
[61] Chief Lanier Oct. 16, 2014 testimony (p. 3).
[62] However, such places of worship may not authorize concealed carry when services are conducted in locations already prohibited by section 907(a).
[63] *See, e.g.* A.C.A. §5-73-306(16)(A); O.C.G.A. §16-11-127(b)(4); La. R.S. §40:1379.3(N)(8); MCLS §§28.425o(e); Miss. Code Ann. §45-9-101(13); R.R.S. Neb. §69-2441(1)(a); Ohio Rev. Code Ann. §2923.126(B)(6).
[64] *See, e.g.* submitted statement from Terry Lynch, Executive Director, The Downtown Cluster of Congregations; *see also* testimony at the public hearing on Bill 20-930 on Oct. 16, 2014 by Dean Gary Hall, Washington National Cathedral; Bishop Mariann Budde, Episcopal Diocese of Washington; Patricia Riley Johnson, Canon Missioner at the Washington National Cathedral; Rev. Rebecca Justice Schunior, St. Mark's Episcopal Church, Capitol Hill; Rev.

*Review process*

Bill 20-930, as introduced, includes section 908, which establishes the Concealed Carry Licensing Review Board for the purposes of hearing appeals from a denial of any application or renewal application for a carry license, as well as a revocation of a carry license. The committee print also provides the Review Board with the authority to hear appeals from summary suspensions, consistent with the new subsection 905(b). The committee print expands the membership of the Review Board from five to seven members, and changes the makeup of the Review Board to (1) remove the Chief Judge of the Superior Court or his or her designee (at the request of the sitting Chief Judge); and (2) include three public members, one who is a mental health professional and two District residents with experience in the operation, care, and handling of firearms. The Committee believes the addition of these public members will provide other important perspectives to the Review Board.

The remaining provisions of section 908 remain substantially the same, though reworded for clarity and consistency. The committee print clarifies that the Review Board may conduct hearings using three member panels; for those panels, two members shall constitute a quorum, and the decisions of the panels will be considered final decisions of the Review Board. This clarification was made to ensure the Review Board could provide timely response to any request for a hearing. One final subsection, 905(g), was included to ensure any party – including the Chief of Police – aggrieved by a final action of the Review Board may file an appeal.

*Privacy concerns*

When the Council considered the License to Carry a Pistol Emergency Amendment Act[65] of 2014, there was discussion on the dais related to the emergency bill's exemption of concealed carry license information from the Freedom of Information Act.[66] Upon amendment, that section was removed from the emergency legislation.[67] However, under current MPD policy, personally identifiable information provided by applicants on firearms-registration forms is considered exempt from disclosure to the public as "a clearly unwarranted invasion of personal privacy."[68] During discussion at the public hearing on Bill 20-930, Chief Lanier testified that the Department releases general information only, such as the number of guns registered per zip code, and stated her concerns on publicizing personal information:

> Suppose that person is someone who has obtained that permit because they transport large amounts of cash or valuables. By making that a public record, you're now letting people know they carry large amounts of cash and valuables. Same thing for a victim of

---

Dr. Crystal A. Kuykendall, Esq., Associate Minister, Shiloh Baptist Church; and Tracy Zorpette Washington, D.C. Chapter Advocacy Lear, Moms Demand Action for Gun Sense in America.
[65] Act 20-447 (expires Jan. 7, 2015).
[66] Freedom of Information Act of 1976, effective March 25, 1977 (D.C.Law 1-96; D.C. Official Code § 2-532); *see generally,* video of Sep. 23, 2014 discussion at Bill History, http://lims.dccouncil.us/Legislation/B20-0926 (accessed Nov. 1, 2014).
[67] *See* Amendment #3 (Grosso) at Bill History, http://lims.dccouncil.us/Legislation/B20-0926 (accessed Nov. 1, 2014).
[68] *Heller II* at *2.

domestic violence . . . I don't think making that public serves the interest of public safety, and it could increase the risk for somebody who has already demonstrated that they have a specific threat.[69]

The Committee shares the concerns about the impact such disclosure might have on licensees. Accordingly, the committee print for Bill 20-930 retains section 909.

### *Rulemaking*

Legislation routinely delegates reasonable implementation rulemaking to the Mayor in a *pro forma* clause. Bill 20-930, however, sets out minimum standards to ensure that the implementing regulations appropriately address a number of significant provisions. Section 908(e) directs the Mayor to issue rules establishing procedures for a contested case review of any appeal, including the manner and time of appeals, and procedures for the Review Board to assign panels of three Review Board members to conduct hearings and issue final decisions.

Section 911 directs the Chief of Police to issue rules to implement the provisions of Bill 20-930. Specifically, the rules must (1) establish criteria for meeting the good or other proper reason for carrying a concealed pistol requirement, and the applicant's suitability to carry a concealed pistol requirement; (2) establish the type and amount of ammunition that may be carried concealed; (3) establish the methods by which a pistol may be carried; (4) establish all application forms, investigation procedures, background checks, and fees necessary to process an application; (5) specify procedures or requirements specific to non-residents; (6) specify requirements for signage on any private property prohibiting concealed carry therein; and (7) establish renewal procedures.

### *Non-residents*

The *Palmer* decision stated that the District could not ban otherwise qualified non-residents from public carrying for self-defense based solely on the fact that they are not residents of the District. Bill 20-930 addresses this concern by providing a mechanism for non-residents to obtain carry licenses. In section 3(b), the bill revives Section 6 of the License to Carry a Pistol Amendment Act, which specifies that any person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his or her person issued by the lawful authorities of any State or subdivision of the United States may apply for a concealed carry license, so long as the applicant "has good reason to fear injury to his or her person or property or has any other proper reason for carrying a pistol, and that he or she is a suitable person to be so licensed." For the non-resident who lives in a state that does not require a license to carry a concealed pistol, he or she may also apply for a carry license, provided that he or she meets the same requirements.

---

[69] Chief Lanier Oct. 16, 2014 verbal testimony; the Chief's concerns were shared by George L. Lyon, Jr., who testified that making the identity of carry license holders public was an "utterly dangerous idea" that would "put innocent victims of stalking and crime at such risk."

Additionally, under section 902(d), any applicant may satisfy the training component by demonstrating the applicant has met similar requirements in his or her own state of residence. This provision ensures that the training requirements of Bill 20-930 are not repetitive for nonresidents or new residents who possess such training and seek a carry permit in the District.

## CONCLUSION

### General Observations

The Committee has felt far greater opposition to Bill 20-390 than support, both from councilmembers and the public. Nonetheless, the court has made clear that a complete ban on carrying is inconsistent with the Second Amendment. Despite criticism, the Committee believes a regulatory scheme is possible that: (1) Sufficiently vets applicants to ensure that licensees are presumably safe people – knowledgeable about gun safety and use, no proclivity to violence, and no issue with mental illness; and (2) Minimizes the need for law enforcement (MPD, Secret Service, Capitol Police, etc.) to turn the District into a semi-police state with restricted freedom for its citizens.

Second Amendment supporters criticize the Bill as not going far enough to permit un-infringed carrying. Although the legality of gun regulation must be viewed in light of Second Amendment jurisprudence, the criticism should still be discussed. The most common criticism is that the District will be a safer place with gun carrying citizens:

> The notion stems from a paper published in 1997 by economists John Lott and David Mustard, who looked at county-level crime data from 1977 to 1992 and concluded that "allowing citizens to carry concealed weapons deters violent crimes and it appears to produce no increase in accidental deaths."[70]

There has been significant research since the Lott and Mustard study. A 2004 analysis from the National Research Council concluded that there was no credible statistical evidence that right-to-carry laws reduced crime. Most recently, an analysis out of Stanford University finds that:

> The totality of the evidence based on educated judgments about the best statistical models suggests that right-to-carry laws are associated with substantially higher rates of aggravated assault, rape, robbery and murder. (internal quotation marks omitted)[71]

---

[70] Christopher Ingraham, *More guns, more crime: New research debunks a central thesis of the gun rights movement*, WASHINGTON POST, WONKBLOG, November 14, 2014, http://www.washingtonpost.com/blogs/wonkblog/wp/2014/11/14/more-guns-more-crime-new-research-debunks-a-central-thesis-of-the-gun-rights-movement/.
[71] Clifton B. Parker, *Right-to-carry gun laws linked to increase in violent crime, Stanford research shows*, STANFORD REPORT, November 14, 2014, http://news.stanford.edu/news/2014/november/donohue-guns-study-111414.html.

This is consistent with anecdotal observations by Chief Lanier at the October 16 public hearing on Bill 20-930. In response to questions she stated that she had not seen a reduction in crime as a result of the reinstatement of handgun registration in the District following the *Heller* decision. She noted that burglaries had gone up after *Heller*; she was not suggesting a cause and effect, rather, that the ability of residents to now possess guns in their home did not seem to deter burglaries.

In this regard, the Committee notes its own observation that much of the District's violent crime is the result of gang members carrying guns. It may be that they are illegal, but the fact that they are carrying provokes gun violence, rather than lessens it, between gang members.

In addition, a study published in The New England Journal of Medicine in 1991 looked specifically at the effect of gun control in the District and concluded that:

> Restrictive licensing of handguns was associated with a prompt decline in homicides and suicides by firearms in the District of Columbia. No such decline was observed for homicides or suicides in which guns were not used, and no decline was seen in adjacent metropolitan areas where restrictive licensing did not apply. [72]

### Reasonable Regulation

It is clear from the caselaw that reasonable regulations are permissible under the Second Amendment. Even in *Palmer*, the Court noted that under *Heller* and its progeny, the Second Amendment right is "not unlimited":

> Furthermore, it is not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. Rather, it is a right subject to traditional restrictions, which themselves and this is a critical point tend to show the scope of the right. (For now, we state that a longstanding presumptively lawful regulatory measure . . . would likely [burden conduct] outside the ambit of the Second Amendment.) (citations, internal quotations omitted) [73]

It is undeniable that introducing a gun into any conflict can escalate a limited danger into a lethal situation. In response to a question by Council Chairman Phil Mendelson about the inclusion of training on situational awareness, conflict management, and the decisions on use of deadly force, *Heller* and *Palmer* plaintiff George L. Lyons, Jr. replied that "any confrontation or fight that you have could end up escalating into a deadly force encounter." When the deadly force being used is a gun, the danger extends to bystanders and the public at large. When considering concealed carry in a densely populated city, it is clear that the balancing equation must include the District's substantial governmental interest in public safety and crime prevention.

---

[72] Colin Loftin, Ph.D., David McDowell, Ph.D., Brian Wiersema, and Talbert J. Cottey, M.S., Effects of Restrictive Licensing of Handguns on Homicide and Suicide in the District of Columbia, *The New England Journal of Medicine*, Vol. 325, No. 23 at 1615 (1991).
[73] *Palmer, supra* n. 16 at 11.

A law to regulate the carrying of firearms in our city . . . provides a unique opportunity to press the public safety purpose of regulating gun use to its utmost, where it is most needful of such regulation: outside the home, in a densely populated area that also happens to be our Nation's capital; where danger to members of the public and vulnerability of government officials to armed attack is particularly sensitive; where we all have a right to be free from criminal and negligent gunfire; and where responsible gun use requires the strictest level of supervision while respecting our Constitution, mindful of the posture of the Supreme Court.[74]

The jurisprudence is unclear whether the Second Amendment confers a right of self-defense outside the home. The Committee notes, however, that the government's role in protecting citizens and promoting public safety has evolved dramatically in 225 years. A handful of constables who may have been on duty in 1789 have since been replaced by a Metropolitan Police Department with approximately 4,000 sworn (and armed) officers – and MPD is but one of over two-dozen police forces operating within the District of Columbia. Further, as with all rights protected under the Bill of Rights, the Second Amendment is not unfettered and must be balanced against other rights: the right of citizens to associate freely without fear either of an omnipresent police force or of an armed citizen who is a little too quick to shoot.

Bill 20-930 offers a reasonable, balanced approach to protecting the public safety and meeting an individual's specific need for self-defense. Built-in safeguards to the Chief's discretion, including the Concealed Carry Licensing Review Board and the right to appeal, further this balanced approach. For all the reasons explained above, the Committee recommends approval of Bill 20-930, as amended.

## II.   LEGISLATIVE CHRONOLOGY

September 23, 2014    Bill 20-930, "License to Carry a Pistol Amendment Act of 2014", is introduced by Chairman Mendelson and Councilmember Wells.

September 23, 2014    Bill 20-930 is referred to the Committee on the Judiciary and Public Safety.

September 26, 2014    Abbreviated Notice of Intent to act on Bill 20-930 is published in the *District of Columbia Register.*

September 26, 2014    Notice of a Public Hearing is published in the *District of Columbia Register.*

October 16, 2014      The Committee on the Judiciary and Public Safety holds a public hearing on Bill 20-930.

---

[74] Testimony of Doug Pennington, public witness, at the hearing on Bill 20-930 on Oct. 16, 2014 (p. 5).

**DA 19**

October 20, 2014       Bill 20-930 is re-referred sequentially to the Committee on the Judiciary
                       and the Public Safety and the Committee of the Whole.

October 24, 2014       The re-referral is published.

November 25, 2014    The Committee on the Judiciary and Public Safety marks-up Bill 20-930.

## III.   POSITION OF THE EXECUTIVE

*Cathy Lanier, Chief, Metropolitan Police Department*, testified on behalf of the executive in support of Bill 20-930. She stated that the legislation maintains the District's "commitment to keeping guns out of wrong hands, while fully respecting the Second Amendment of the U.S. Constitution." Chief Lanier provided a brief overview of the *Palmer* ruling, the joint effort by the Executive, Council Chairman Phil Mendelson, and Councilmember Tommy Wells to develop the legislative response, and the key elements of the bill. She also discussed the uniqueness of the District of Columbia, stating that as the seat of the federal government, it is "a city filled with sensitive places from a public safety perspective." She stated that protecting government officials and infrastructure is challenging in every city, but "in the District the likelihood of attack is higher, and the challenges to protecting the city are greater," with so many critical official and symbolic buildings, monuments, events, public officials, dignitaries, and public servants present in the city every day. She cited the recent security breaches into the White House as examples of the importance of prohibiting guns from entering the perimeter of a secure area.

Chief Lanier also urged the Council to make three changes to the list of places where carrying handguns would be prohibited First, she urged the Council to expand the prohibition of handguns in government buildings to also include the surrounding grounds and parking lots. She cited two examples of law enforcement officers in Virginia and Pennsylvania gunned down in police parking lots. Second, she urged the Council to remove the requirements that a law enforcement officer advised a licensee that a public gathering, dignitary movement, or demonstration is occurring and ordered the licensee to leave before criminal penalties apply. Instead, she argued, notice should be satisfied by signs at event entrances, in advertisements, and tickets. Third, she urged the Council to preclude taxi drivers from being able to obtain a carry permit based only on their status as a taxi driver.

Chief Lanier further made it known that the police department was presently at work on emergency regulations to issue no later than October 22nd. She stated that these regulations would be based in part of prior District regulations, and in part on models from Maryland, New York, and New Jersey, whose licensing programs have been found to be constitutional by their respective federal Courts of Appeal. Finally, she concluded her remarks by explaining that any trainer already certified to provide firearm training for special police officers will be able to be certified to train new licensees simply by providing training curriculum for initial certification.

## IV.   COMMENTS OF ADVISORY NEIGHBORHOOD COMMISSIONS

The Committee did not receive testimony from any Advisory Neighborhood Commission.

## V.   SUMMARY OF TESTIMONY AND STATEMENTS

The Committee on the Judiciary and Public Safety held a public hearing on Bill 20-930 on Thursday, October 16, 2014. The testimony summarized briefly below is from that hearing. A copy of the witness list is attached to this report and the hearing record, including copies of the full testimony, is available from the Office of the Secretary.

*Brian Wrenn, Public Witness:* Mr. Wrenn testified in opposition to the bill. He expressed a belief that the bill is overly restrictive of where a licensee may carry a firearm. In particular, he cited the restriction against being within 1,000 of a dignitary, as their movements are unpredictable, and the restriction against public transit, as many people ride Metro or Metrobus. Mr. Wrenn further postulated reasons why the bill violates the *Palmer* decision, and why allow "non-criminals" to carry firearms would make the city safer. He further stated that with advances in technology, including 3D printers, there will be an increase in illegally obtained or possessed firearms everywhere.

*Dr. Ankoor Shah, Pediatrician and Member, DC Chapter of the American Academy of Pediatrics:* Dr. Shah shared the story of a five year old girl who accidentally shot herself in the head and died using her father's gun, that had been left loaded and unlocked in a bedroom. He stated that over 2,000 children 18 years old and younger were unintentionally injured by a firearm in 2013. He noted that the bill's language of "on or about a person" with regard to a carried firearm implies a potential danger for children. A firearm should only be allowed on a person's body or in a locked box; anything short of that will endanger children.

*Reverend Crystal Kuykendall, Shiloh Baptist Church:* Rev. Kuykendall spoke her personal experiences with gun violence, and urged the Council to enact a law that gives discretion to the Chief of Police to issue carry permits; requires the Chief to affirm that an applicant has a legitimate need to carry a loaded, hidden handgun; requires the applicant to be cleared through the National Instant Background Check System; requires the applicant to have at least 16 hours of training; and includes houses or worship as locations in which the carrying of load, hidden handguns is prohibited.

*Reverend Rebecca Justice Schunior, Associate Rector, St. Mark's Episcopal Capitol Hill:* Rev. Schunior testified about the nature of violence, the ability of any person to commit it, and the importance of prohibiting firearms from houses of worship, where people "we bring our deepest passions."

*Patricia Johnson, Canon Missioner, Washington National Cathedral:* Ms. Johnson testified on behalf of Dean Gary Hall of the Washington National Cathedral and Bishop Mariann Budde of the Episcopal Diocese of Washington. Ms. Johnson requested the Council include houses of worship in the list of prohibited locations.

**Reverend Robert Schenck, Public Witness:** Rev. Schenck testified in favor of the bill, but recommended removal of the requirement that applicants must prove they have good reason to fear for their lives or safety. He also spoke about DC's unique attraction to mentally ill and delusional persons owing to the concentration of government institutions and workers. He also stated that data demonstrates that the presence of lethal weapon in the home greatly increases the potential of deadly domestic violence, successful suicide, and grave injury or death to children, and that requiring 16 hours of training is only the beginning of mastering one's emotions, intellect, bodies, and souls to yield the lethal power safely.

**Kris Hammond, Public Witness:** Mr. Hammond is a Ward 5 resident and testified that the high standards imposed on a person seeking a handgun carry permit would place DC outside the mainstream of American law today. He expressed disagreement with certain of the prohibited locations and requested the Council provide rationales for each prohibition, including in government owned or controlled buildings and at permitted public gatherings. He concluded by opining that law abiding registrants do not commit gun crime.

**Antonio Goicochea, Public Witness:** Mr. Goicochea, of McLean, VA, testified in opposition to the bill and called it "deliberately burdensome." He also asserted that concealed carry reduces crime. He recommended that the District enact legislation more in line with laws in Alaska, Arkansas, Arizona, Wyoming, and Vermont.

**Doug Pennington, Public Witness:** Mr. Pennington, a Ward 5 resident, testified about the legal backdrop upon which the bill is written. He made three recommendations for the bill, including (1) enacting a "Barney Fife" rule to automatically and temporarily suspend gun carry licenses of those who fire their weapons accidentally; (2) before issuing a gun carry license, investigate applications who were respondents in any domestic violence complaint but in which no civil protection order or criminal conviction results; and (3) include a specific provision to prohibit an applicant convicted of any stalking offense from being issued a gun carry license.

**George L. Lyon, Jr., President, DC Chapter of Community Association for Firearms Education:** Mr. Lyon testified in opposition to the bill. He discussed his background as a DC resident, firearms enthusiast, and legal party in the *District of Columbia v. Heller* case. He strongly criticized the proposition to publish the identities of carry license holders and the requirement that applicants prove their specific need for self-protection. He further criticized the prohibition on restaurants and public transportation, saying that such prohibitions go even beyond the laws in other restrictive, shall issue states like California, Hawaii, Maryland, Massachusetts, New Jersey, and New York. He urged the legalization of drugs, the improvement of the mental health system, and the loosening up of the carry requirements and restrictions. He also argued that allowing increased carry permits does not increase crime and provided statistics.

**Tracy Zorpette, Advocacy Lead, DC Chapter Advocate Lead, Moms Demand Action for Gun Sense in America:** Ms. Zorpette testified in favor of the bill. She stated her belief that the bill borrows the best provisions from the concealed carry laws in other jurisdictions and will provide a model for the nation. Additionally, she suggested three changes to the bill to reverse the presumption allowing guns on private property, to add houses of worship and polling places

to the prohibited locations list, and to allow journalists and scholars to FOIA records on licenses for scholarship purposes.

*Matthew Bergstrom, Managing Partner, Arsenal Attorneys*: Mr. Bergstrom testified that his law firm represents thousands of gun owners across America and that he was speaking on behalf of "the many clients who have contacted [him] with their concerns about Bill 20-930." He called the bill vague and inconsistent, setting up subjective standards and creating overly complex compliance requirements. He also commented on the wisdom of a shall issue scheme.

*Ron Campbell, Public Witness:* Mr. Campbell testified in opposition to the bill. He spoke about his experiences with gun violence as the owner of an automotive shop in DC.

*Martin Moulton, Public Witness:* Mr. Moulton spoke about his personal experience of gun violence in and around Shaw and asserted that ending the war on drugs, regulating and licensing all drugs like alcohol and tobacco would go a long way toward decreasing criminal gun violence.

*Jackie, Public Witness:* Jackie testified at the public hearing in opposition to Bill 20-930, but did not provide a written statement.

In addition to the testimony above, the following statements were submitted for the record:

*Lee F. Satterfield, Chief Judge, Superior Court of the District of Columbia*, submitted a letter to the Chairman declining to serve as a member of the Concealed Pistol Licensing Review Board or designating another Superior Court associate or senior judge to serve in his stead. Chief Judge Satterfield cited Rule 3.9 of the Code of Judicial Conduct, which states that a judge "shall not . . . perform other judicial functions apart from the judge's official" and suggested it would be more appropriate to appoint a retired Superior court judge to serve on the Board.

*Kim C. Dine, Chief of Police, United States Capitol Police*, submitted comments for the record. Chief Dine highlighted the U.S. Capitol Police's (USCP) daily partnership with the MPD and stated that Bill 20-930 directly impacts the USCP's law enforcement duties and responsibilities in maintaining security and safety within DC. On behalf of the USCP, Chief Dine requested three amendments: (1) the addition of the phrase "including U.S. Capitol Buildings and Grounds" in section 907(a)(10); the addition of a phrase detailing additional prohibitions related to the work of the USCP for protected movements in section 907(a)(12); and the addition of the phrase "other than federal property" in the prohibition in section 907(a)(13). Chief Dine stated that "given the statutory responsibilities of the U.S. Capitol Police and federal statutes prohibiting firearms on federal property, as well as the specific Capitol Buildings and Ground prohibitions enumerated in federal and D.C. statutes, these edits are essential to effective law enforcement within the District of Columbia."

*Ronald A. Pavlik, Jr., Chief, Metro Transit Police*, submitted written testimony urging an amendment to the bill that would clearly prohibit firearms from any WMATA Metrorail station or building.

**A.T. Smith, Deputy Director, United States Secret Service,** submitted comments for the record supporting the Council's efforts to clearly define the circumstances surrounding an individual's ability to carry a concealed weapon in the District. Deputy Director Smith outlined the unique nature of the District, and made two recommendations specific to the Secret Service's protective mission. First, he requested adding the Vice Presidents residence and surrounding area to the list of locations where carrying a pistol is prohibited. Second, he requested the provision related to high-ranking officials moving under MPD protection be expanded to include where a protectee has arrived at his or her intended destination or had temporarily stopped en route to that destination.

**Terry Lynch, Executive Director, The Downtown Cluster of Congregations,** submitted a letter requesting that houses of worship and their related facilities be included among the locations where concealed carry is prohibited. He noted that he believe at least 14 states have such a prohibition, including Kansas, Louisiana, Michigan, Mississippi, Missouri, Nebraska, North Dakota, South Carolina, Texas, Utah, Virginia and Wyoming. Mr. Lynch wrote that it "is popularly understood houses of worship serve as sanctuaries - places where there should be freedom from threats, violence and danger. Persons should be able to attend worship services of their choice secure in the knowledge that they are indeed sanctuaries."

**Rev. Alfonso Harrod-McKendrie, Simms Brookland UMC; Dr. Helen S. Fleming, Douglas Memorial UMC; Dr. Bernard Hillen Beaad, Foundry UMC; Rev. Joe Liles Sr., Bright Light Church; Rev. Donald Robinson, First Baptist Church; Rev. Charles B. Jackson, St. John Baptist; Rev. Monica M. Lowe Howard, New Day Church of Christ; Dr. Lewis T. Tait Jr., Faith Bible Church; Andre H. Owen, St. Phillips Baptist Church; Joyce McKeithon, St. John Baptist Church; Dr. Earl D. Trent Jr., Florida Ave Baptist Church; Rev. Raymond Bell, Solad Baptist Church; Rev. Eldridge Spearman, Mt. Jezreel Baptist Church; Patricia R. Johnson, Washington National Cathedral; Preston Horribal, Washington National Cathedral; Jan Core, Washington National Cathedral** submitted a sign-on letter requesting that houses of worship be on the list of prohibited places.

**Rev. Dr. Barbara A. Reynolds, Chaplain, Black Women for Positive Change,** submitted written testimony opposing allowing the carry law to permit the carrying of firearms into churches.

**DC residents Meghan Abrams, Miriam Szubin, Aliza Glasner, Anna Ravvin, Cheryl Aaron, Josh, Rachel Brandenburg, and Stacey Apter,** each submitted statements opposing the section 907(b) presumption that businesses and private property allow concealed carry. All urged the Council to reverse the presumption and instead require establishments that want to allow guns to put conspicuous signs up. As frequent patrons of retail stores and restaurants, they stated they should feel safe inside establishments. Also, sharing the perspective as parents of young children, they want to know what new precautions they will have to take before taking their children out.

**Katerina Herodotou, Partner, Meeps Vintage,** submitted a statement in opposition to the presumption for businesses. She wrote that requiring businesses across the District to post

conspicuous signage is undesirable and a better policy would reverse the presumption. She also posed several questions, including: (1) Where is the immunity clause? (2) What if a business does not post a conspicuous sign and something goes wrong? (3) Can the business be held liable? She concluded that guns have no business in small, crowded, and enclosed areas, which describes most of the businesses in DC's dense urban setting.

*Barbara Ward, DC Resident*, submitted testimony that she opposes allowing concealed weapons on the business property and premises in Adams Morgan.

*Dr. Jodi Zender*, no residency listed, submitted testimony opposing the bill for several reasons. She asserted that "may issue" means that getting a gun could be too late for many with specific threats against applicants. She also criticizes the bill's training requirement, the in-person interview, the delegation of rulemaking, the 1000-foot limitations, and the "numerous and unprecedented hurdles to acquiring a license to carry under this bill." Moreover, she wrote that MPD would have "essentially unfettered discretion."

*Marshall Brinson, Pensacola, FL*, submitted testimony in opposition to the bill, finding it unresponsive to *Palmer*. He also stated that he wants to know how the bill will allow nonresidents to receive concealed carry permits.

*Dawn Longenecker, Director, Discipleship Year Program at the Festival Center, Inc., and Joseph P. Deck III, Festival Center Executive Director*, submitted testimony opposing any legislation allowing people to carry concealed weapons.

*Michael Scott, Director, D.C. Catholic Conference*, submitted written testimony in favor of the bill, however requested the Council include houses of worship in the list of prohibited locations.

*Joe Sternlieb, President, and Natalie Avery, Executive Director, DC BID Council*, submitted a joint letter expressing serious concerns about the bill's presumption that any private property that is not a residence permits licensees to carry a pistol onto the property. The authors expressed concern that businesses posting a conspicuous sign prohibiting guns would negatively change the look and feel of the city's commercial districts and place an undue burden on the businesses.

*Adam Crain, Secretary of the Board, Adams Morgan Partnership Business Improvement District ("AMPBID")*, submitted a resolution unanimously passed by AMPBID expressing their opposition to the bill's presumption that any private property that is not a residence permits licensees to carry a pistol onto the property.

*Everytown for Gun Safety* submitted comments on Bill 20-930, stating the bill "strikes an appropriate balance between granting handgun permits to those persons known to be in need of self-protection and precluding a dangerous proliferation of handguns on the streets" of the nation's capital (citing *Woollard v. Gallagher*). The organization further commended the Council for "striking an appropriate, fully constitutional balance between allowing law-abiding gun owners to carry concealed weapons in public and protecting residents and visitors in the

**DA 25**

District." The organization also recommended that the provisions regarding FOIA be amended to allow aggregate or general information to be released to persons conducting journalist or academic research.

*Brian Malte, Senior National Policy Director, Brady Campaign to Prevent Gun Violence:* Law enforcement discretion is important b/c it provides law enforcement with the ability to prevent dangerous and potentially violent people from carrying a concealed handgun in public. B20-930 respects the balance between public safety and the Second Amendment.

*Juliet A. Leftwich, Legal Director, Law Center to Prevent Gun Violence*, submitted comments on the bill, stating the Law Center believes B20-930 creates a lawful, common sense regulatory scheme to govern the issuance of concealed weapons licenses in the District and to protect public safety. The Law Center proposed several amendments, including (1) clarifying that persons seeking to carry a loaded handgun to and from their place of business must obtain a concealed weapons license; (2) narrowing the FOIA exception so that it prohibits the disclosure of personal information regarding individuals who have applied for, received, or had a license revoked, while permitting disclosure of aggregate information regarding such individuals; (3) adding places of worship to the prohibited places; and (4) clarifying the meaning of the term "defensive pistol and ammunition selection" in the provision governing safety training. Ms. Leftwich further stated that the possession of loaded, hidden guns in public created a significant threat to public safety, and that many states take reasonable steps to minimize the risks created by the presence of hidden guns in public by limiting licenses only to those with specific need, requiring safety training and testing, restricting the locations where guns may be carried, and limiting the duration of the license.

## VI.   IMPACT ON EXISTING LAW

Bill 20-930 amends the Firearms Control Regulations Act of 1975 to make several conforming amendments related to carrying concealed pistols and adds a new Title IX to provide the related definitions, application requirements, license expiration and renewal provisions, duties of licensees, revocation and suspension of licenses provisions, prohibitions on carrying while impaired, a list of locations and circumstances where carrying a concealed pistol is prohibited, for the establishment of a Review Board, an exception to the Freedom of Information Act, penalties, and a rulemaking provision.

The bill also amends revives section 6 of An Act To control the possession, sale, transfer, and use of pistols and other dangerous weapons in the District of Columbia, to provide penalties, to prescribe rules of evidence, and for other purposes; and to make conforming amendments therein related to carrying concealed pistols.

Finally, Bill 20-930 repeals section 101 of the Omnibus Public Safety and Justice Amendment act of 2009.

## VII.   FISCAL IMPACT

The attached November 25, 2014 Fiscal Impact Statement from the Chief Financial Officer states that funds are sufficient to implement Bill 20-930.

## VIII.   SECTION-BY-SECTION ANALYSIS

Section 1      States the short title of Bill 20-930.

Section 2      Amends the Firearms Control Regulations Act of 1975 as follows:

(a) Adds "place of business of the registrant" to where a person may temporarily possess a firearm registered to another person provided that person is not otherwise prohibited from possessing a firearm and reasonably believes such possession is necessary to prevent imminent death or great bodily harm to himself or herself.

(b) Amends the exceptions for prohibitions on registering a pistol to include self-defense within a person's place of business or as part of the license to carry application.

(c) Adds stalking offenses to the list of offenses that disqualify an applicant from receiving a firearm registration.

(d) Provides that records related to registration are not to be made available under the Freedom of Information Act.

(e) Adds a conforming reference in the penalties section to the new Title IX, created below.

(f) Adds a new Title IX – License to Carry a Pistol as follows:
- Section 901 provides definitions.

- Section 902 provides application requirements:
  (a) The applicant shall certify and demonstrate to the Chief's satisfaction that the applicant:
  o  (1) Is at least 21 years of age;
  o  (2) Meets all existing requirements for registering a firearm and has a registration certificate for the pistol the applicant wants to carry concealed;
  o  (3) Has not suffered from any mental illness or condition in the previous 5 years that created risk of danger to self or others; or has been cleared from such illness or condition;
  o  (4) Has completed a firearms training course or combination of courses that meets specific requirements;
  o  (5) Has completed at least 2 hours of range training;
  o  (6) Follows any procedures established by rule.

(b) Requires that the applicant have certification from the firearms instructor stating that the applicant (1) Demonstrated satisfactory completion of the requirement; and (2) Possesses the proper knowledge, skills, and attitude to carry a concealed pistol.

(c) Provides that the training requirements may be satisfied if the applicant submits evidence that he or she has already received, as determined by the Chief, is equal or greater training than required in subsection (a)(4)(5).

(d) Provides that any component of the training requirement may be satisfied by demonstrating to the satisfaction of the Chief, that the applicant has already met that component as part of a successful application to carry elsewhere in the United States.

(e) Requires the applicant to attest to the truth of the information required under penalty of perjury.

(f) Requires an in-person interview at MPD for purposes including verification of the applicant's identity and verification of the information submitted as part of the application process.

- Section 903 provides for expiration and renewal of licenses:
(a) States licenses expire no later than 2 years, unless revoked.

(b) Explains what is required of the applicant to be eligible for renewal, including continuing to meet all of the initial application requirements, (except that only 4 hours of training and 2 hours of range practice within the previous 12 months are required) and any other procedures the Chief may establish by rule); and that timely renewal is the licensee's responsibility.

(c) Provides that persons who have renewal applications denied by appeal to the Concealed Pistol Licensing Review Board within 15 days of notice of the denial.

- Section 904 provides the duties of licensees:
(a) Requires the licensee to comply with all limits and conditions stated in the issuance of the license;

(b) Requires the licensee to notify the Chief in writing (1) immediately upon discovery of the loss, theft, or destruction of the license; and (2) within 30 days of a change in the licensee's name or address as it appears on the license.

(c) Requires the licensee to carry the license to carry and the registration of the pistol, each time the pistol is carried.

(d) Requires the licensee, when stopped by the police for an investigative stop, to disclose he or she is carrying a pistol, present the license and registration, disclose where the pistol is located, and comply with all lawful directions and orders from the officer, including giving the pistol to the officer for so long as necessary for the safety of the officer or the public.

(e) Provides that these duties are in addition to any other requirements imposed by this act or applicable law.

(f) Provides that violating this section subjects the licensee to revocation of the license and any other penalty provided by law.

- Sec. 905. Revocation of licenses.
  (a) Chief can revoke if the licensee no longer meets the standards and requirements.

  (b) Anybody (including USAO & OAG) can apply to MPD for revocation. Any person who knows a licensee no longer meets requirements can notify the Chief or officer (who may then take action as appropriate).

  (c) Any person whose license has been revoked may, within 15 days of notice of the revocation, appeal to the Review Board.

- Sec. 906. Carrying while impaired.
  (a) Prohibits a licensee from carrying while impaired.

  (b) Provides that failure to submit to field sobriety, breathalyzer, or urine tests after reasonable suspicion has been established are grounds for immediate revocation and seizure of the license.

  (c) Provides that a violation of this section subjects the licensee to any existing penalties and license revocation.

  (d) Defines "impaired" to mean that a licensee has consumed alcohol or a drug or a combination thereof and that it has affected the licensee's behavior in a way that can be perceived or noticed.

- Sec. 907. Prohibitions on carrying licensed pistols.
  (a) Provides a list of locations and circumstances where licensees are prohibited to carry:

(1) Any building or office occupied by the District government, its agencies, or instrumentalities;

(2) The buildings and grounds, including any adjacent parking lot, of any childcare facility, preschool, public or private elementary or secondary school, or any public or private college or university;

(3) Any hospital or any office where medical or mental health services are the primary services provided;

(4) Any penal institution, secure juvenile residential facility, or halfway house;

(5) Any polling place while voting takes place;

(6) Any public transportation vehicle, including the Metrorail transit system and its stations;

(7) Any premises, or portion thereof, licensed as a tavern or nightclub;

(8) Any stadium or arena;

(9) Any gathering or special event open to the public; provided that no criminal prosecution shall occur unless the organizer or the District provided notice in advance and by posting signs or the licensee has been ordered by a law enforcement officer to leave and has not complied.

(10) The public memorials on the National Mall and along the Tidal Basin, and any area where firearms are prohibited under federal law or by a federal agency or entity, including U.S. Capitol buildings and grounds;

(11) The area around the White House between Constitution Avenue, N.W., and H Street, N.W., and between 15th Street, N.W., and 17th Street, N.W.;

(12) The U.S. Naval Observatory and its grounds, and from the perimeter of its fence to the curb of Massachusetts Avenue, N.W. from 34th Street, N.W. south on Massachusetts Avenue, N.W. to Observatory Circle, N.W.;

(13) Within a perimeter designated by the Chief when a dignitary or high-ranking official is moving under protection; provided that no criminal prosecution shall occur unless there was notice of the perimeter or the licensee has been ordered by a law enforcement officer to leave and has not complied;

(14) Within a perimeter designated by the Chief of a demonstration in a public place; provided that no criminal prosecution shall occur unless there was notice of the perimeter or route, or the licensee has been ordered by a law enforcement officer to leave and has not complied;

(15) Any prohibited circumstance that the Chief determines by rule; provided, that for spontaneous circumstances, no criminal penalty shall apply unless the licensee has notice of the prohibition and has failed to comply.

(b) Provides presumptions related to concealed carry in specific locations:

(1) Provides that any private residence shall be presumed to prohibit concealed pistols unless the property owner or person in control of the premises otherwise authorized and communicated personally to the licensee in advance of entry.

(2) Provides that any church, synagogue, mosque, or other place where people regularly assemble for religious worship shall be presumed to prohibit concealed pistols unless the property is posted with conspicuous signage allowing concealed pistols, or the owner or authorized agent communicates such allowance personally to the licensee in advance of entry onto the property, provided that such places may not authorize concealed pistols where services are conducted in locations on the list of prohibited places listed in subsection (a).

(3) Provides that any private property that is not a residence shall be presumed to permit a licensee carrying a concealed pistol to enter the property unless conspicuous signage prohibiting concealed pistols is posted, or the owner or authorized agent communicates such prohibition personally to the licensee.

(c) Requires a licensee who approaches any prohibited location or is subject to any prohibited circumstance to (1) secure the pistol in a vehicle if one is available; or (2) immediately leave the prohibited location or circumstance.

(d) Provides that a licensee shall not be in violation of this section (1) while on adjacent roads or sidewalks; or (2) while driving a vehicle into and immediately parking at any location listed in subsection (a)(2) or (3) of this section, for the purpose of picking up or dropping off a student or a child; provided, that the licensee shall secure the concealed weapon, before leaving the parked vehicle.

(e) Prohibits a licensee to carry a pistol openly.

(f) Provides that a licensee who violates this section shall be subject to revocation of his or her license in addition to any other penalty provided by law.

(g) Defines demonstration, public transportation, and residence.

Sec. 908. Concealed Pistol Licensing Review Board.
(a) Establishes a review board to hear appeals from carry application or denials, summary suspension or restriction of a license; or revocation of a license.

(b) Establishes the membership of the Review Board as consisting of seven members (the United States Attorney for the District of

Columbia or his or her designee; the Attorney General for the District of Columbia or his or her designee; and five members appointed by the Mayor: a mental health professional from the Department of Behavioral Health; a former sworn officer of a law enforcement agency other than MPD; one mental health professional; and two District residents with experience in the operation, care, and handling of firearms); establishes the process of appointment, the terms, vacancy appointments, and removal; and states that members shall serve without compensation but may receive actual and necessary expenses incurred in the performance of official duties.

(c) Requires the Mayor to provide hearing facilities and administrative support from existing resources in fiscal year 2015.

(d) Provides that four members shall constitute a quorum, except that two members shall be a quorum when hearing panels of three members are assigned to conduct a hearing and make a final decision; also provides that the hearing panel shall include at least one member from the USAO, OAG, or former law enforcement.

(e) Requires the Mayor to establish hearing procedures by rule.

(f) Provides that Board meetings and hearings shall be confidential and closed to the public.

(g) Provides that any person or the Chief aggrieved by a final action of the Board may file an appeal.

- Sec. 909. Freedom of information exception; report.
(a) Provides that records related to those who have applied, received, or had revoked any license are not to be made available under the Freedom of Information Act; provided that aggregate data may be used for the purposes of the public report in subsection (b).
(b) Requires MPD to make public a report, every 2 years, that includes information on the number of licenses issued in the most recent 2-year period; the total number of valid licenses; the number of licensees convicted of a crime involving a pistol in the most recent 2-year period; the number of pistols for which a license was issued that were reported lost or stolen in the reporting period; and the number of pistols for which a license was issued that were found or recovered as stolen that were unreported by a licensee as lost or stolen in the most recent 2-year period.

- Sec. 910. Penalties.

(a) Provides that except as otherwise provided in this title, a person convicted of a violation of a provision of this title, rules or regulations issued under authority of this title, shall be fined according to the Criminal Fine Proportionality Act or imprisoned for not more than 180 days.

(b) Provides that civil fines, penalties, and fees may be imposed as alternative sanctions.

(c) Provides that all prosecutions for violations of this title shall be brought by OAG.

- Sec. 911. Rules.
Requires the Chief to issue rules to implement the provisions of this act, including rules:
(1) To establish criteria for determining when an applicant has:
    (A) Demonstrated a good reason to fear injury to his or her person, which shall at a minimum require a showing of a special need for self-protection distinguishable from the general community as supported by evidence of specific threats or previous attacks which demonstrate a special danger to the applicant's life;
    (B) Demonstrated any other proper reason for carrying a concealed pistol, which shall at a minimum include types of employment that require the handling of cash or other valuable objects that may be transported upon the applicant's person; and
    (C) Demonstrated the applicant's suitability to carry a concealed pistol, which shall at a minimum include evidence that the applicant meets the requirements of section 902;
(2) To establish the type and amount of ammunition that may be carried concealed by a licensee;
(3) To establish the methods by which a pistol may be carried, including any standards for safe holstering;
(4) To establish all application forms, investigation procedures, background checks, and fees necessary to process an application for a license to carry a concealed pistol;
(5) To specify any procedures or requirements specific to non-residents who apply to carry a concealed pistol, with regard to the registration requirements in this act;
(6) To specify requirements for signage on any private premises where the owner or person in control of the premises prohibits carrying concealed pistols, pursuant to section 907(b); and
(7) To establish procedures for the renewal of licenses.

Section 3    Amends An Act To control the possession, sale, transfer, and use of pistols and other dangerous weapons in the District of Columbia, to provide penalties, to

**DA 33**

prescribe rules of evidence, and for other purposes, approved July 8, 1932 (47 Stat. 650; D.C. Official Code § 22-4501 *et seq.*) as follows:

(a) Amends the lead-in language in Section 4(a) to reflect the addition of the ability to carry concealed; and makes a conforming amendment to reflect a concealed carry license.

(b) Revives section 6, Issuance of a license to carry a pistol, with five subsections:

- Subsection (a) provides that the Chief of Police may issue a concealed carry license to (1) any person with a residence or business in the District; or (2) any person with a residence or business in the United States and a concealed carry license issued by a lawful authority, for not more than 2 years, if the applicant has good reason to fear injury to his or her person or property or has any other proper reason for carrying a pistol, and is otherwise suitable to be so licensed.

- Subsection (b) provides that a non-resident who lives in a state that does not require a carry license may apply for a carry license in the District, provided he or she meets the same reasons and requirements in subsection (a).

- Subsection (c) provides that the Chief may limit the geographic area, circumstances, or times in which the license is effective and may revoke the license for good cause.
- Subsection (d) provides that the license application must be on a form prescribed by the Chief, that includes name, address, description, photograph, and signature of the licensee.
- Subsection (e) provides for an appeal to the Concealed Pistol Licensing Review Board.

Section 4   Repeals section 101 of the Omnibus Public Safety and Justice Amendment act of 2009, effective Dec. 10, 2009 (D.C. Law 18-88; D.C. Official Code § 22-2511), which made it unlawful for a person to be voluntarily in a motor vehicle if that person knows that a firearm is in the vehicle, unless the firearm is being lawfully carried or lawfully transported. This section was held unconstitutional in Conley v. United States, 2013 D.C. App. LEXIS 633, - A.3d – (Sept. 26, 2013).

Section 5   Adopts the fiscal impact statement.

Section 6   Provides the effective date.

## IX.  COMMITTEE ACTION

On November 25, 2014, the Committee met to consider B20-930, the "License to Carry a Pistol Amendment Act of 2014". The meeting was called to order at 10:50 am. After ascertaining a quorum (Chairperson Wells and Councilmembers Bonds, Cheh, and Evans present, with Chairman Mendelson also in attendance), Chairperson Wells made opening remarks, providing background on gun regulation in the District and the impact of the *Heller* and *Palmer* decisions, before discussing changes in the committee print. He then moved the print with leave for staff and the General Counsel to make technical and conforming changes.

Councilmember Cheh began the discussion, commenting that the bill reflected an enormous effort. She then moved an amendment to reverse the presumption for non-residential property from one of permission to carry a concealed pistol on the premises unless otherwise notified of a prohibition, to one of prohibition from carrying a concealed pistol on the premises unless otherwise notified of permission. Chairman Mendelson argued against this amendment, stating that this amendment would essentially prohibit licensees from carrying anywhere. He also stated that the Council has a responsibility to ensure that the bill is not overwhelming stacked against the person allowed to carry. Councilmember Bonds concurred, stating that while the amendment reflected her personal feelings, the Council must address the *Palmer* ruling. Chairperson Wells also stated that the amendment reflected his personal feelings, but that as a Councilmember, he has an obligation to ensure that the District's laws reflect the reality imposed by the *Palmer* court. Chairperson Wells then called for a vote on the amendment, which failed 3-1 (Chairman Mendelson, Chairperson Wells, and Councilmember Bonds voting against; Councilmember Cheh voting for; and Councilmember Evans absent).

Councilmember Cheh then moved a second amendment, which would require MPD to collect and make public aggregate data regarding the number of licenses issued, the number of licensee convicted of a crime involving a pistol, and the number of pistols reported lost or stolen in order to better analyze the consequences of our concealed carry law. Councilmember Cheh stated that having this aggregate, anonymous data would put the District in a better position to glean some basic information about the consequences of the concealed carry law. Chairperson Wells accepted this amendment as friendly.

Following the discussion, the vote on the print was unanimous. Chairperson Wells then moved the report with leave for staff to make technical, editorial, and conforming changes. After an opportunity for discussion, the vote on the report was unanimous.

The meeting adjourned at 11:40 am.

# X.   ATTACHMENTS

1.   Bill 20-930 as introduced
2.   Witness list
3.   1857 law
4.   1932 law
5.   Police Regulations Act 50-55 (1968)
6.   1974 regulations
7.   Statements from the Chief of Police, the U.S. Secret Service, and the U.S. Capitol Police
8.   Christopher Ingraham, *More guns, more crime: New research debunks a central thesis of the gun rights movement*, Washington Post, November 14, 2014
9.   Clifton B. Parker, *Right-to-carry gun laws linked to increase in violent crime, Stanford research shows*, STANFORD REPORT, November 14, 2014
10.  *Effects of Restrictive Licensing of Handguns on Homicide and Suicide in the District of Columbia*, The New England Journal of Medicine, 1991
11.  Fiscal impact statement
12.  Legal sufficiency determination by the General Counsel
13.  Comparative Print
14.  Committee Print for Bill 20-930

# 3

Revised Code of the District of Columbia Prepared

Under the Authority of the Act of Congress

(A.O.P. Nicholson, Washington 1857)

# NOTE.

—

THE undersigned, commissioners appointed by virtue of " An act to improve the laws of the District of Columbia, and to codify the same," approved March 3, 1855, herewith submit the result of their labors.  The framer of that act was the Hon. HENRY MAY, formerly a citizen of this District, who, from an extensive practice in our courts, was made fully aware of the evils, from which it was intended by that law to relieve us.  The people of this District will, in a great degree, be indebted to the exertions of that gentleman for any benefits which may result to them from this Code.

The commissioners were required " to revise, simplify, digest, and codify the laws of said District, and also the rules and principles of practice, of pleadings, of evidence, and conveyancing."  The Code itself is the best commentary on the manner in which that duty has been discharged.  The laws which it was made their duty " to revise and simplify," consisted, in the language of the Maryland declaration of rights, of such of the English statutes as existed at the time of the first emigration to Maryland, and "which by experience have been found applicable to local and other circumstances, and of such others as have been since made in England or Great Britain, and have been introduced, used, and practised by the courts of law and equity ;" also of the declaration of rights, constitution, and statutes of Maryland, passed prior to the 27th day of February, 1801, as modified by the constitution and laws of the United States.

Our statute law thus flowing from three distinct sources, is almost necessarily inconsistent in many of its parts.  Much of it is also obsolete.  Much of it is disfigured by the prejudices of a past age. In many cases, the circumstances that called forth the statute have since passed away, or been materially changed.  But perhaps the best founded complaint of all is the entire absence of any statutory provisions in relation to matters which, in the progress of time and development of society, have been made the subjects of legislation in almost every other civilized community.

Digitized by Google

vi

Deeply impressed with these views, the commissioners have endeavored, in the preparation of this Code, to give to the people of this District the benefit of provisions which, in many cases, have even been adopted by those from whom we have derived our present system. In no instance where there has been a departure from former law has any principle or provision been introduced which has not the sanction of modern, and, as we believe, enlightened legislation.

The law of March 3, 1855, required that this Code should be approved by a majority of the board appointed to consider the same. The members of that board have certified to the President of the United States that they have considered the provisions thereof, and do unanimously approve the same. In further pursuance of said law, it is now submitted to the people of this District for their consideration.

<div align="right">ROBT. OULD,<br>WM. B. B. CROSS.</div>

WASHINGTON CITY,
      *November*, 1857.

Digitized by Google

567

Sec. 2. On the trial of every indictment, the party accused shall be allowed to be heard by counsel, and he may defend himself, and he shall have a right to produce witnesses and proofs in his favor, and to be confronted with the witnesses who are produced against him.

Sec. 3. No person indicted for an offence shall be convicted thereof, unless by confession of his guilt in open court, or by admitting the truth of the charge against him by his plea or demurrer, or by the verdict of a jury, accepted and recorded by the court.

Sec. 4. No person shall be held to answer on a second indictment for any offence of which he has been acquitted by the jury, upon the facts and merits, on a former trial; but such acquittal may be pleaded by him in bar of any subsequent prosecution for the same offence, notwithstanding any defect in the form or in the substance of the indictment on which he was acquitted.

Sec. 5. No person who is charged with any offence against the law, shall be punished for such offence, unless he shall have been duly and legally convicted thereof in a court having competent jurisdiction of the cause and of the person.

# CHAPTER 141.

### OF PROCEEDINGS TO PREVENT AND DETECT THE COMMISSION OF CRIMES.

SECTION

1. Officers authorized to keep the peace.
2. Complaint ; how made.
3. Arrest.
4. Trial ; recognizance to keep the peace.
5. Party ; when to be discharged.
6. Refusing to recognise, to be committed.
7. Party, when discharged ; and complainant, when to pay costs.
8. Payment of costs in other cases.
9. Appeal allowed.
10. On appeal, witnesses to recognise.
11. Proceedings upon an appeal.
12. Recognizance ; when to remain in force.
13. Persons committed for not recognising ; how discharged.
14. Recognizances to be transmitted to the court.

SECTION

15. Recognizances ; when to be required on view of the court or magistrate.
16. Persons who go armed may be required to find sureties for the peace, &c.
17. Proceedings when person is suspected of selling liquor contrary to law.
18. Surety may surrender his principal, who may recognise anew.

SEARCH WARRANTS.

19. Search warrants for property stolen.
20. In what other cases to be issued.
21. } Warrant; to whom directed, and when
22. } and how executed.
23. Property seized may be kept as evidence, and then restored to owner or destroyed.

Digitized by Google

DA 40

568

SECTION

CORONERS' INQUESTS.

24. Coroners' inquests; when to be held.
25. Coroner to issue a warrant to constable to summon jury. Form of warrant.
26. Penalty for constable's or juror's neglect.
27. Jurors; how empanneled and sworn.
28. Witness; how summoned, &c.
29. Oath of witnesses.
30. When and how post mortem to be made, or chemical analysis to detect poison; and fees, &c., for same.
31. Testimony of witnesses reduced to writing.
32. Inquisition; how taken, and form thereof.

SECTION

33. Coroner; duty in case of felonious killing, &c.
34. Burial of dead body and payment of costs.
35. Jury to report money, &c., found; and same, how disposed of.
36. When coroner to publish description of deceased.
37. Duty of officer in relation to such money.
38. Coroner; failing to pay over same.
39. Property on body to be sold and disposed of as money.
40. When justice of the peace to act as coroner.

SECTION 1. The judge of the criminal court, or any judge of the circuit court, in vacation as well as in term, and also all justices of the peace, shall have power to cause all laws made for the preservation of the public peace to be kept, and, in the execution of that power, may require persons to give security to keep the peace, or for their good behavior, or both, in the manner provided in this chapter.

SEC. 2. Whenever complaint shall be made to any such magistrate that any person has threatened to commit an offence against the person or property of another, the magistrate shall examine the complainant, and any witness who may be produced, on oath, and reduce such complaint to writing, and cause the same to be subscribed by the complainant. A wife may pray surety of the peace against her husband, or anybody else may pray such surety, in her behalf, against him, and such person shall, in such proceeding, be deemed the complaining witness.

SEC. 3. If, upon examination, it shall appear that such affidavit is made only to secure the protection of the law, and not from anger or malice, and that there is just cause to fear that any such offence may be committed, the magistrate shall issue a warrant under his hand, reciting the substance of the complaint, and requiring the officer to whom it may be directed forthwith to apprehend the person complained of and bring him before such magistrate, or some other magistrate or court having jurisdiction of the cause.

SEC. 4. When the party complained of is brought before the magistrate, he shall be heard in his defence, and he may be required to enter into a recognizance, with sufficient sureties, in such sum as the

Digitized by Google

569

magitrate shall direct, to keep the peace towards all the people of this District, and especially towards the person requiring such security, for such term as the magistrate may order, not exceeding one year, but shall not be bound over to the next court, unless he is also charged with some other offence for which he ought to be held to answer at such court.

SEC. 5. Upon complying with the order of the magistrate, the party complained of shall be discharged.

SEC. 6. If the person so ordered to recognise shall refuse or neglect to comply with such order, the magistrate shall commit him to the county jail during the period for which he was required to give security, or until he shall so recognise; stating in the warrant the cause of commitment, with the sum and the time for which security was required.

SEC. 7. If, upon examination, it shall not appear that there is just cause to fear that any such offence will be committed by the party complained of, he shall be forthwith discharged; and if the magistrate shall deem the complaint unfounded, frivolous, or malicious, he shall order the complainant to pay the costs of prosecution, who shall thereupon be answerable to the magistrate and the officer for their fees as for his own debt.

SEC. 8. When no order respecting the costs is made by the magistrate, they shall be allowed and paid in the same manner as costs before justices in criminal prosecution; but in all cases where a person is required to give security for the peace, or for his good behavior, the court or magistrate may further order that the costs of prosecution, or any part thereof, shall be paid by such person, who shall stand committed until such costs are paid, or he is otherwise legally discharged.

SEC. 9. Any person aggrieved by the order of any justice of the peace requiring him to recognise as aforesaid, may, on giving the security required, appeal to the criminal court at its next session to be discharged therefrom.

SEC. 10. The magistrate from whose order an appeal is so taken shall require such witnesses as he may think necessary to support the complaint, to recognise for their appearance at the court to which the appeal is made.

SEC. 11. The criminal court may affirm the order of the justice or

Digitized by Google

discharge the appellant, or may require the appellant to enter into a new recognizance, with sufficient sureties, in such sum and for such time as the court shall think proper, and may also make such order in relation to the costs of prosecution as may be deemed just and reasonable.

SEC. 12. If any party appealing shall fail to prosecute his appeal, his recognizance shall remain in full force and effect, as to any breach of the condition, without an affirmation of the judgment or order of the magistrate, and shall also stand as a security for any costs which shall be ordered by the court appealed to, to be paid by the appellant.

SEC. 13. Any person committed for not finding sureties, or refusing to recognise, as required by the court or magistrate, may be discharged by any judge or justice of the peace on giving such security as was required.

SEC. 14. Every recognizance taken pursuant to the foregoing provisions shall be transmitted by the magistrate to the criminal court on or before the first day of the next term, and shall be there filed by the clerk.

SEC. 15. Every person who shall, in the presence of any officer mentioned in the first section of this chapter, make an affray, or threaten to kill or beat another, or to commit any violence or outrage against his person or property, and every person who, in the presence of such officer, shall contend with hot and angry words, to the disturbance of the peace, may be ordered, without process or any other proof, to recognise for keeping the peace, or being of good behavior, for a term not exceeding one year, and in case of refusal may be committed as before directed.

SEC. 16. If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury or violence to his person, or to his family or property, he may, on complaint of any person having reasonable cause to fear an injury or breach of the peace, be required to find sureties for keeping the peace for a term not exceeding six months, with the right of appealing as before provided.

SEC. 17. If any justice of the peace suspect any person of selling, by retail, wine or ardent spirits, or a mixture thereof, contrary to law, he shall summon the person and such witnesses as he may think

Digitized by Google

proper, to appear before him; and, upon such person appearing, or failing to appear, if the justice, on examining the witnesses on oath, find sufficient cause, he shall inform the district attorney, or other proper officer, that a prosecution or suit may be instituted, and shall recognise the material witnesses to appear at the next term of the court before which the case is heard. Such justice may also require the person suspected to enter into a recognizance to keep the peace and be of good behavior for any time not exceeding one year. If such recognizance be given, the condition thereof shall be deemed to be broken if, during the period for which it is given, such person shall sell, by retail, wine or ardent spirits, or a mixture thereof, contrary to law.

Sec. 18. Any surety in a recognizance to keep the peace, or for good behavior, or both, shall have authority and right to take and surrender his principal, and, upon such surrender, shall be discharged and exempt from all liability for any act of the principal, subsequent to such surrender, which would be a breach of the condition of the recognizance. Such person may recognise anew, with sufficient sureties, before any justice of the peace, for the residue of the term, and be thereupon discharged.

SEARCH WARRANTS.

Sec. 19. When complaint shall be made on oath to any magistrate authorized to issue warrants in criminal cases, that personal property has been stolen or embezzled, or obtained by false tokens or pretences, and that the complainant believes that it is concealed in any particular house or place, the magistrate, if he be satisfied that there is reasonable cause for such belief, shall issue a warrant to search for such property.

Sec. 20. Any such magistrate may also, upon a like complaint made on oath, issue search warrants, when satisfied that there is reasonable cause, in the following cases, to wit:

First, to search for and seize any counterfeit or spurious coin, forged bank notes, and other forged instruments, or any tools, machines, or materials, prepared or provided for making either of them;

Secondly, to search for and seize any books pamphlets, ballads, printed papers, or other things containing obscene language, or obscene prints, pictures, figures, or descriptions, manifestly tending



to corrupt the morals of youth, and intended to be sold, loaned, circulated or distributed, or to be introduced into any family, school or place of education;

Thirdly, to search for and seize lottery tickets, or materials for a lottery, unlawfully made, provided, or procured, for the purpose of drawing a lottery;

Fourthly, to search for and seize any gaming apparatus or implements used, or kept and provided to be used, in unlawful gaming, in any gaming house, or in any building, apartment, or place resorted to for the purpose of unlawful gaming;

Fifthly, to search for any harbored runaway slave.

Sec. 21. All search warrants shall be directed to the marshal of the District, or his deputy, or to any constable, commanding such officer to search, in the day time, the house or place where the stolen property or other things, for which he is required to search, are believed to be concealed, which place and property or things to be searched for shall be designated and described in the warrant; and to bring such stolen property or other things, when found, and the persons in whose possession the same shall be found, before the magistrate who issued the warrant, or before some other magistrate or court having cognizance of the case.

Sec. 22. If there be satisfactory evidence that any property stolen or embezzled, or obtained by false tokens or pretences, or that any of the other things for which a search warrant may be issued by the provisions of this chapter, are concealed, kept, prepared or used, in any particular house or place, a warrant may be issued by any two magistrates, to authorize a public officer to search such house or place in the night time, and to bring the property or things described in the warrant, if found, and the persons in whose possession the same shall be found, before either of the magistrates who issued the warrant, or before some other magistrate or court having cognizance of the case.

Sec. 23. If any such search warrant be executed by the seizure of a runaway slave, he shall be returned to the owner, or committed to jail as a runaway, by the justice before whom he is brought; and if it be executed by the seizure of other property, or of any of the things aforesaid, the same shall be safely kept by order of the justice, to be used in evidence; and as soon afterwards as may be, such stolen

Digitized by Google

or embezzled property shall be restored to its owner, and the other things specified burnt or otherwise destroyed under the direction of such justice.

### CORONERS' INQUESTS.

SEC. 24. Coroners shall take inquests upon the view of the dead bodies of such persons only as shall be supposed to have come to their death by violence, and not when death is believed to have been occasioned by casualty, or to have happened in a course of nature.

SEC. 25. As soon as the coroner shall have notice of the dead body of any person, supposed to have come to his death by violence, found or lying within this county, he shall make his warrant to a constable requiring him forthwith to summon six good and lawful men of the county to appear before such coroner, at the time and place expressed in the warrant, which may be issued with or without a seal, and in substance as follows:

—— ——, *ss.*

To A B, constable of ——, Greeting :

You are hereby required immediately to summon six good and lawful men of the county of ——, to appear before me, —— ——, coroner of said county, at the dwelling house of —— ——, (or at a place called ——,) within the city, (or town, or county) of ——, at the hour of ——, then and there to inquire, upon the view of the body of —— ——, there lying dead, when, how, and by what means he came to his death.   Hereof fail not.

Given under my hand the —— day of ——, in the year ——.

—— ——, *Coroner.*

SEC. 26. The constable to whom such warrant shall be directed and delivered shall forthwith execute the same, and shall, at the time mentioned in the warrant, repair to the place where the dead body is, and make return thereof to the coroner, and of his doings thereon, under his hand; and any constable who shall unnecessarily neglect or fail to execute or return such warrant, shall be fined the sum of twenty dollars; and if any person summoned as a juror shall fail to appear, without reasonable excuse therefor, he shall be fined the sum of ten dollars.   If the six jurors returned shall not all appear, the coroner may require the constable, or any other officer whom he shall appoint, to return other jurors, from the body of the county, and not from bystanders, to complete the number.

Digitized by Google

574

Sec. 27. When the jurors who have been summoned appear, the coroner shall call over their names, and then, in view of the body, he shall administer to them the following oath:

You solemnly swear that you will diligently inquire, and true presentment make, on behalf of the United States, when, how, and by what means, the person, whose body lies here dead, came to his death; and you shall return a true inquest thereof, according to your knowledge and such evidence as shall be laid before you: So help you God.

Sec. 28. The coroner may issue subpœnas for witnesses, returnable forthwith, or at such time and place as he shall therein direct; and the attendance of all persons served with such subpœna may be enforced in the same manner, by the coroner, and subject to the same penalties, as if they had been served with a subpœna to attend a court of justice.

Sec. 29. An oath to the following effect shall be administered to the witnesses by the coroner:

You solemnly swear that the evidence which you shall give to this inquest, concerning the death of the person here lying dead, shall be the truth, the whole truth, and nothing but the truth: So help you God.

Sec. 30. The coroner, in all cases where the cause of death shall be doubtful, shall call to his aid some competent surgeon, who, when he may deem the same necessary, shall make a post mortem examination of the body, and report, in writing, signed by him, the condition of the same, together with his opinion as to the cause of death. The coroner shall also cause to be made, by a competent person, an analysis of the stomach and its contents, when poison is supposed to have been taken or administered; and a like report shall be made by the chemist or other person employed, as is required of a surgeon. Fees for said services shall be paid out of the treasury of the United States, and shall, within the following limits, be determined by the judge of the criminal court. For the external examination of the body, from five to ten dollars; for dissection of body before interment, from ten to twenty dollars; for dissection of body after disinterment, from twenty to thirty dollars; for making a chemical analysis, from ten to forty dollars. The expenses of analysis, apart from the fee, shall be paid in like manner, but shall in no case exceed the sum of

Digitized by Google

575

ten dollars, unless previously sanctioned by the judge of the criminal court.

SEC. 31. The testimony of all witnesses examined before any inquest shall be reduced to writing by the coroner, or some other person by his direction, and be subscribed by the witnesses.

SEC. 32. The jury, upon the inspection of the dead body, and after hearing the testimony of the witnesses, and making all needful inquiries, shall draw up and deliver to the coroner their inquisition, under their hands, in which they shall find and certify when, how, and by what means the deceased person came to his death, and his name, if it was known, a minute description of his person, together with all the material circumstances attending his death; and if it shall appear that he was killed feloniously, the jurors shall further state who were guilty, either as principals or accessories, if known, or were in any manner the cause of his death; which inquisition may be, in substance, as follows:

—— —— *ss.* An inquisition taken at ——, in the county of ——, on the —— day of ——, in the year ——, before —— ——, corner of the said county, upon the view of the body of —— ——, (or a person,) there lying dead, by the oaths of the jurors whose names are hereunto subscribed, who, being sworn to inquire, on behalf of the United States, when, how, and by what means the said —— —— (or person) came to his death, upon their oaths do say, (then insert description of person, and when, how, and by what persons, means, weapon, or instrument he was killed.) In testimony whereof, the said coroner and the jurors of this inquest have hereunto set their hands, the day and year aforesaid.

SEC. 33. If the jury find that any murder, manslaughter, assault, or other offence has been committed on the person of the deceased, the coroner shall bind over, by recognizance, such witnesses as he shall think proper, to appear and testify at the next session of the criminal court; he shall also return to the same court the inquisition, written evidence, and all recognizances and examinations by him taken, and may commit to jail any witnesses who shall refuse to recognise in such manner as he shall direct.

SEC. 34. If any person charged by the inquest with having committed such offence shall not be in custody, the coroner shall have the same power as a justice of the peace to issue process for his

Digitized by Google

576

apprehension, and such warrant shall be made returnable before any justice of the peace, or other magistrate or court having cognizance of the case, who shall proceed therein as if such person had been arrested on complaint duly made.

SEC. 35. When the coroner shall take an inquest upon the view of the dead body of a stranger, or, being called for that purpose, shall not think it necessary, on view of such body, that any inquest should be taken, he shall cause, in the absence of other provision, the body to be decently buried; and if the coroner shall certify that, to the best of his knowledge and belief, the person found dead was a stranger, not belonging to this District, the expenses of burial, with the coroner's fees, and all the expenses of the inquisition, if any was taken, shall be paid to the coroner from the treasury of the United States, the account of such expenses being first examined and allowed by the judge of the criminal court; in all other cases the expenses of the inquisition only shall be paid, in like manner, by the United States.

SEC. 36. The coroner shall require the jury empanneled, to make a report, signed by them and the coroner, and to be returned with the inquisition, giving the amount of money or other valuables found on or with the dead body, and such money or other property, if there be no person to take charge of the same, shall be placed in the hands of the judge of the orphans' court, and by him paid over to the person authorized to receive the same, on being called for. But so much thereof as may be necessary may, in the event of the deceased being a stranger, be appropriated to paying his burial expenses.

SEC. 37. In case the body shall not be identified, it shall be the duty of the coroner to publish, in some newspaper printed in this District, a description of the deceased, and the amount of money or other valuables found in his possession. And though the body may be identified, if money or other valuables be found thereon, and no person entitled thereto shall claim the same within sixty days, it shall be the duty of the coroner to give public notice, as aforesaid, of the facts. The cost of such advertising shall be paid in like manner as the expense of the inquisition.

SEC. 38. It shall be the duty of the said judge, if said money shall not be called for within one year from the time of his receiving the

Digitized by Google

577

same, to loan it out on the most advantageous terms he can, taking bond and good security, and the proceeds therefrom shall be applied to the maintenance of the public schools, in the manner hereinbefore provided with regard to fines. Such money, without interest, may be claimed at any time thereafter by the parties entitled to the same.

SEC. 39. If any coroner shall fail to pay to the judge of the orphan's court the money or other property which may come into his hands as aforesaid, within three months of its receipt, it shall be the duty of said judge to sue for and collect the same in his own name, annexing his title, before the circuit court; and for such delinquency the coroner shall be fined a sum not exceeding five hundred dollars.

SEC. 40. The judge of the orphans' court shall cause to be sold, as property is sold on execution, by the marshal, all property found on a dead body and remaining unclaimed sixty days, and the proceeds of such sale shall be disposed of as is required in case of money so found.

SEC. 41. When the coroner shall be absent from the District, or unable to attend, any justice of the peace may hold the inquest, and shall proceed in all respects as coroners are directed by the foregoing provisions, and subject to the same penalties.

---

# CHAPTER 142.

## OF THE ARREST AND EXAMINATION OF OFFENDERS, COMMITMENT FOR TRIAL, AND TAKING BAIL.

SECTION

1. Officers empowered to act under this chapter.
2. Complaint, warrant, and summonses for witnesses.
3. What officers may bail, and when.
4. Prisoners; when to be brought before magistrate, on arrest, &c.
5. Magistrate, if he take bail, to return the recognizance to court, &c.
6. Magistrate may adjourn the examination, &c.
7. In case of default, magistrate to certify recognizance to criminal court.

SECTION

8. Proceedings when the party fail to recognise.
9. 
10. 
11. 
12. } Manner of conducting the examination.
13. 
14. 
15. Testimony may be reduced to writing.
16. Prisoner; when to be discharged.
17. Prisoner; when to be bailed, or committed.
18. Witnesses to recognise.

40

Digitized by Google

**DA 50**

# # 4

An Act To control the possession, sale, transfer and use of pistols and other dangerous weapons in the District of Columbia, to provide penalties, to prescribe rules of evidence, and for other purposes

47 Stat. 650 (approved July 8, 1932)

650                72d CONGRESS.   SESS. I.   CHS. 464, 465.   JULY 8, 1932.

States, for the purpose of having such communication delivered by the post-office establishment of such foreign country to the post-office establishment of the United States and by it delivered to such addressee in the United States, and as a result thereof such communication is delivered by the post-office establishment of such foreign country to the post-office establishment of the United States and by it delivered to the address to which it is directed in the United States, then such person shall be punished in the same manner and to the same extent as provided in section 1 of this Act: *Provided,* That any person violating this section may be prosecuted either in the district into which such letter or other communication was carried by the United States mail for delivery according to the direction thereof, or in which it was caused to be delivered by the United States mail to the person to whom it was addressed.

*Punishment for.*
*Proviso.*
*Jurisdiction.*

Approved, July 8, 1932.

----

[CHAPTER 465.]

AN ACT

*July 8, 1932.*
*[H. R. 8754.]*
*[Public, No. 275.]*

To control the possession, sale, transfer, and use of pistols and other dangerous weapons in the District of Columbia, to provide penalties, to prescribe rules of evidence, and for other purposes.

*Unauthorized use, etc., of pistols and other dangerous weapons in District of Columbia.*

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

*Definitions.*

DEFINITIONS

*"Pistol."*

SECTION 1. "Pistol," as used in this Act, means any firearm with a barrel less than twelve inches in length.

*"Sawed-off shot-gun."*

"Sawed-off shotgun," as used in this Act, means any shotgun with a barrel less than twenty inches in length.

*"Machine gun."*

"Machine gun," as used in this Act, means any firearm which shoots automatically or semiautomatically more than twelve shots without reloading.

*"Person."*

"Person," as used in this Act, includes, individual, firm, association, or corporation.

*"Sell" and "purchase," etc.*

"Sell" and "purchase" and the various derivatives of such words, as used in this Act, shall be construed to include letting on hire, giving, lending, borrowing, and otherwise transferring.

*"Crime of violence."*

"Crime of violence" as used in this Act, means any of the following crimes, or an attempt to commit any of the same, namely: Murder, manslaughter, rape, mayhem, maliciously disfiguring another, abduction, kidnaping, burglary, housebreaking, larceny, any assault with intent to kill, commit rape, or robbery, assault with a dangerous weapon, or assault with intent to commit any offense punishable by imprisonment in the penitentiary.

COMMITTING CRIME WHEN ARMED

*Committing crime of violence when armed. Punishment for.*

SEC. 2. If any person shall commit a crime of violence in the District of Columbia when armed with or having readily available any pistol or other firearm, he may, in addition to the punishment provided for the crime, be punished by imprisonment for a term of not more than five years; upon a second conviction for a crime of violence so committed he may, in addition to the punishment provided for the crime, be punished by imprisonment for a term of not more than ten years; upon a third conviction for a crime of violence so committed he may, in addition to the punishment provided for the

Case 1:15-cv-02234-RJL   Document 19-1   Filed 01/15/16   Page 56 of 332

crime, be punished by imprisonment for a term of not more than fifteen years; upon a fourth or subsequent conviction for a crime of violence so committed he may, in addition to the punishment provided for the crime, be punished by imprisonment for an additional period of not more than thirty years.

#### PERSONS FORBIDDEN TO POSSESS CERTAIN FIREARMS

SEC. 3. No person who has been convicted in the District of Columbia or elsewhere of a crime of violence shall own or have in his possession a pistol, within the District of Columbia.

*Persons forbidden to possess certain firearms.*
*Convicted of a crime.*

#### CARRYING CONCEALED WEAPONS

SEC. 4. No person shall within the District of Columbia carry concealed on or about his person, except in his dwelling house or place of business or on other land possessed by him, a pistol, without a license therefor issued as hereinafter provided, or any deadly or dangerous weapon.

*Illegally carrying, etc., dangerous weapon.*

#### EXCEPTIONS

SEC. 5. The provisions of the preceding section shall not apply to marshals, sheriffs, prison or jail wardens, or their deputies, policemen or other duly appointed law-enforcement officers, or to members of the the Army, Navy, or Marine Corps of the United States or of the National Guard or Organized Reserves when on duty, or to the regularly enrolled members of any organization duly authorized to purchase or receive such weapons from the United States, provided such members are at or are going to or from their places of assembly or target practice, or to officers or employees of the United States duly authorized to carry a concealed pistol, or to any person engaged in the business of manufacturing, repairing, or dealing in firearms, or the agent or representative of any such person having in his possession, using, or carrying a pistol in the usual or ordinary course of such business or to any person while carrying a pistol unloaded and in a secure wrapper from the place of purchase to his home or place of business or to a place of repair or back to his home or place of business or in moving goods from one place of abode or business to another.

*Exceptions.*
*Law enforcement officers.*
*Army, Navy, or Marine Corps.*
*National Guard, etc., on duty.*
*Other organizations.*
*Carrying to places of assembly, etc.*
*Manufacturer, etc.*

#### ISSUE OF LICENSES TO CARRY

SEC. 6. The superintendent of police of the District of Columbia may, upon the application of any person having a bona fide residence or place of business within the District of Columbia or of any person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his person issued by the lawful authorities of any State or subdivision of the United States, issue a license to such person to carry a pistol within the District of Columbia for not more than one year from date of issue, if it appears that the applicant has good reason to fear injury to his person or property or has any other proper reason for carrying a pistol and that he is a suitable person to be so licensed. The license shall be in duplicate, in form to be prescribed by the Commissioners of the District of Columbia and shall bear the name, address, description, photograph, and signature of the licensee and the reason given for desiring a license. The original thereof shall be delivered to the licensee, and the duplicate shall be retained by the superintendent of police of the District of Columbia and preserved in his office for six years.

*Licenses.*

DA 53

652          72d CONGRESS.  SESS. I.  CH. 465.  JULY 8, 1932.

### SELLING TO MINORS AND OTHERS

Selling to minors or others.

SEC. 7. No person shall within the District of Columbia sell any pistol to a person who he has reasonable cause to believe is not of sound mind, or is a drug addict, or is a person who has been convicted in the District of Columbia or elsewhere of a crime of violence or, except when the relation of parent and child or guardian and ward exists, is under the age of eighteen years.

### TRANSFERS REGULATED

Time, etc., provisions.

SEC. 8. No seller shall within the District of Columbia deliver a pistol to the purchaser thereof until forty-eight hours shall have elapsed from the time of the application for the purchase thereof, except in the case of sales to marshals, sheriffs, prison or jail wardens or their deputies, policemen, or other duly appointed law-enforcement officers, and, when delivered, said pistol shall be securely wrapped and shall be unloaded.  At the time of applying for the purchase

Register to be kept.

of a pistol the purchaser shall sign in duplicate and deliver to the seller a statement containing his full name, address, occupation, color, place of birth, the date and hour of application, the caliber, make, model, and manufacturer's number of the pistol to be purchased and a statement that he has never been convicted in the District of Columbia or elsewhere of a crime of violence.  The seller shall, within six hours after such application, sign and attach his address and deliver one copy to such person or persons as the superintendent of police of the District of Columbia may designate, and shall retain the

Limitation.

other copy for six years.  No machine gun, sawed-off shotgun, or blackjack shall be sold to any person other than the persons designated in section 14 hereof as entitled to possess the same, and then only after permission to make such sale has been obtained from the

Wholesale trade.

superintendent of police of the District of Columbia.  This section shall not apply to sales at wholesale to licensed dealers.

### DEALERS TO BE LICENSED

Dealers to be licensed.

SEC. 9. No retail dealer shall within the District of Columbia sell or expose for sale or have in his possession with intent to sell, any pistol, machine gun, sawed-off shotgun, or blackjack without being licensed as hereinafter provided.  No wholesale dealer shall, within the District of Columbia, sell, or have in his possession with intent to sell, to any person other than a licensed dealer, any pistol, machine gun, sawed-off shotgun, or blackjack.

### DEALERS' LICENSES, BY WHOM GRANTED AND CONDITIONS THEREOF

Conditions, etc., for issuing dealers' licenses.
*Ante*, p. 652.

SEC. 10. The Commissioners of the District of Columbia may, in their discretion, grant licenses and may prescribe the form thereof, effective for not more than one year from date of issue, permitting the licensee to sell pistols, machine guns, sawed-off shotguns, and blackjacks at retail within the District of Columbia subject to the following conditions in addition to those specified in section 9 hereof, for breach of any of which the license shall be subject to forfeiture and the licensee subject to punishment as provided in this Act.

1. The business shall be carried on only in the building designated in the license.

2. The license or a copy thereof, certified by the issuing authority, shall be displayed on the premises where it can be easily read.

3. No pistol shall be sold (a) if the seller has reasonable cause to believe that the purchaser is not of sound mind or is a drug addict or has been convicted in the District of Columbia or elsewhere of a crime of violence or is under the age of eighteen years, and (b) unless the purchaser is personally known to the seller or shall present clear evidence of his identity. No machine gun, sawed-off shotgun, or blackjack shall be sold to any person other than the persons designated in section 14 hereof as entitled to possess the same, and then only after permission to make such sale has been obtained from the superintendent of police of the District of Columbia.

4. A true record shall be made in a book kept for the purpose, the form of which may be prescribed by the Commissioners, of all pistols, machine guns, and sawed-off shotguns in the possession of the licensee, which said record shall contain the date of purchase, the caliber, make, model, and manufacturer's number of the weapon, to which shall be added, when sold, the date of sale. *Records.*

5. A true record in duplicate shall be made of every pistol, machine gun, sawed-off shotgun, and blackjack sold, said record to be made in a book kept for the purpose, the form of which may be prescribed by the Commissioners of the District of Columbia and shall be personally signed by the purchaser and by the person effecting the sale, each in the presence of the other and shall contain the date of sale, the name, address, occupation, color, and place of birth of the purchaser, and, so far as applicable, the caliber, make, model, and manufacturer's number of the weapon, and a statement signed by the purchaser that he has never been convicted in the District of Columbia or elsewhere of a crime of violence. One copy of said record shall, within seven days, be forwarded by mail to the superintendent of police of the District of Columbia and the other copy retained by the seller for six years.

6. No pistol or imitation thereof or placard advertising the sale thereof shall be displayed in any part of said premises where it can readily be seen from the outside. No license to sell at retail shall be granted to anyone except as provided in this section. *Display, etc., forbidden.*

### FALSE INFORMATION FORBIDDEN

SEC. 11. No person shall, in purchasing a pistol or in applying for a license to carry the same, or in purchasing a machine gun, sawed-off shotgun, or blackjack within the District of Columbia, give false information or offer false evidence of his identity. *False information or evidence forbidden.*

### ALTERATION OF IDENTIFYING MARKS PROHIBITED

SEC. 12. No person shall within the District of Columbia change, alter, remove, or obliterate the name of the maker, model, manufacturer's number, or other mark or identification on any pistol, machine gun, or sawed-off shotgun. Possession of any pistol, machine gun, or sawed-off shotgun upon which any such mark shall have been changed, altered, removed, or obliterated shall be prima facie evidence that the possessor has changed, altered, removed, or obliterated the same within the District of Columbia: *Provided, however,* That nothing contained in this section shall apply to any officer or agent of any of the departments of the United States or the District of Columbia engaged in experimental work. *Alteration, etc., of identification marks, prohibited.* *Proviso. Experimental work.*

### EXCEPTIONS

SEC. 13. This Act shall not apply to toy or antique pistols unsuitable for use as firearms. *Toys, etc., excepted.*

654　　　　72d CONGRESS.　SESS. I.　CHS. 465, 466.　JULY 8, 1932.

### POSSESSION OF CERTAIN DANGEROUS WEAPONS

Possession of certain dangerous weapons forbidden.

SEC. 14. No person shall within the District of Columbia possess any machine gun, sawed-off shotgun, or any instrument or weapon of the kind commonly known as a blackjack, slung shot, sand club, sandbag, or metal knuckles, nor any instrument, attachment, or appliance for causing the firing of any firearm to be silent or intended to lessen or muffle the noise of the firing of any firearms: *Provided, however,* That machine guns, or sawed-off shotguns, and blackjacks may be possessed by the members of the Army, Navy, or Marine Corps of the United States, the National Guard, or Organized Reserves when on duty, the Post Office Department or its employees when on duty, marshals, sheriffs, prison or jail wardens, or their deputies, policemen, or other duly appointed law-enforcement officers, officers or employees of the United States duly authorized to carry such weapons, banking institutions, public carriers who are engaged in the business of transporting mail, money, securities, or other valuables, wholesale dealers and retail dealers licensed under section 10 of this Act.

*Proviso.*
*Exceptions.*

### PENALTIES

Punishment for violations.

SEC. 15. Any violation of any provision of this Act for which no penalty is specifically provided shall be punished by a fine of not more than $1,000 or imprisonment for not more than one year, or both.

### CONSTITUTIONALITY

Invalidity of any provision not to affect remainder.

SEC. 16. If any part of this Act is for any reason declared void, such invalidity shall not affect the validity of the remaining portions of this Act.

### CERTAIN ACTS REPEALED

Vol. 31, p. 1328, repealed.

SEC. 17. The following sections of the Code of Law for the District of Columbia, 1919, namely, sections 855, 856, and 857, and all other Acts or parts of Acts inconsistent herewith, are hereby repealed.

Approved, July 8, 1932.

---

[CHAPTER 466.]

### JOINT RESOLUTION

July 8, 1932.
[H. J. Res. 462.]
[Pub. Res., No. 35.]

Making an appropriation to provide transportation to their homes for veterans of the World War temporarily quartered in the District of Columbia.

World War veterans. Appropriation for, to provide transportation from District of Columbia to their homes.
*Post, p. 791.*

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That to enable the Administrator of Veterans' Affairs, upon the request of any honorably discharged veteran of the World War, temporarily quartered in the District of Columbia, who is desirous of returning to his home, to provide such veteran with railroad transportation thereto prior to July 15, 1932, together with travel subsistence at the rate of 75 cents per day, there is hereby appropriated, out of any money in the Treasury not otherwise appropriated, the sum of $100,000: *Provided,* That all amounts expended under this appropriation in behalf of any veteran shall constitute a loan without interest which, if not repaid to the United States, shall be deducted from any amounts payable to such veteran on his adjusted-service certificate.

*Proviso.*
Credited as a loan.

Approved, July 8, 1932.

# # 5

Article 52 of the Police Regulations, 1955 Edition-1968 Reprint, Title 35, District of Columbia Rules and Regulations (DCRR the predecessor of the DCMR)

# POLICE
# TRAFFIC AND MOTOR
# VEHICLE REGULATIONS
## OF THE
# DISTRICT OF COLUMBIA



DA 58

Office of the General Counsel
Metropolitan Police Department

# POLICE REGULATIONS

### OF THE

# DISTRICT OF COLUMBIA



**Amended to**
**August 12, 1968**

DA 59

For sale by the Department of Licenses and Inspections, District Building.
Per Copy
$4.50

PRINTING DIVISION

DA 60

## TABLE OF CHANGES—Continued

| Article and Section No. (or other divisions) | Commissioners' Order No. | Commissioners' Order Date of | Revised Page No. and Date Printed | |
|---|---|---|---|---|
| Sec. 2 (a) | 63-2076 | Oct. 10, 1963 | 152E4 | (1-10-64) |
| Sec. 2 (a) | 66-1498 | Sept. 27, 1966 | 154E4 | (5-10-67) |
| Sec. 2 (a) | 65-1230 | Aug. 26, 1965 | 154E4 | (5-10-67) |
| Sec. 2 (a) | 66-1596 | Oct. 18, 1966 | 154E4 | (5-10-67) |
| Sec. 2 (a) | 66-1595 | Oct. 18, 1966 | 154E4 | (5-10-67) |
| Sec. 2 (a) | 66-604-A | May 6, 1966 | 154E4 | (5-10-67) |
| Sec. 2 (a) | 66-812-A | June 10, 1966 | 154E4 | (5-10-67) |
| Sec. 2 (a) | 66-866-A | June 23, 1966 | 134 | (5-10-67) |
| Sec. 2 (a) | 66-959 | July 7, 1966 | 138 | (5-10-67) |
| Sec. 2(a) | 67-544 | April 27, 1967 | 152-E4 | (1-30-68) |
| Sec. 3 | 61-1206 | July 11, 1961 | 152E4 | (8-29-61) |
| Sec. 4 | 61-1206 | July 11, 1961 | 152E5 | (8-29-61) |
| Sec. 5 | 61-1206 | July 11, 1961 | 152E6 | (8-29-61) |
| Sec. 6 | 61-1206 | July 11, 1961 | 152E7 | (8-29-61) |
| Sec. 7 | 61-1206 | July 11, 1961 | 152E7 | (8-29-61) |
| Sec. 7 (b) | 67-445 | April 4, 1967 | 152E9 | (5-10-67) |
| Sec. 8 | 61-1206 | July 11, 1961 | 152E9 | (8-29-61) |
| Art. 44 | | | | |
| Sec. 1, 9 | 63-1355 | June 6, 1963 | 152E10 | (7-11-63) |
| Art. 45 | 67-1481 | Sept. 28, 1967 | 152-E12 | (1-30-68) |
| Art. 45 | | | | |
| Sec. 1 | 63-2437 | Dec. 31, 1963 | 152E12 | (2-10-64) |
| Art. 46 | 64-225 | Feb. 18, 1964 | 152E18 | (3-31-64) |
| | | | 152E17 | |
| Art. 47 | 65-768 | June 10, 1965 | 152E-18 | (9-30-65) |
| Sec. 4 (i) | 68-222 | Mar. 11, 1968 | 152-E25 | (8-12-68) |
| *Sec. 6 | 68-744 | Nov. 18, 1968 | 152-E25 | (4-25-69) |
| Sec. 10 | 68-222 | Mar. 11, 1968 | 152E-28 | (8-12-68) |
| Art. 48 | 68-432 | June 19, 1968 | 152E-28 | (8-12-68) |
| *Art. 50 thru 55 | 68-500 | July 19, 1968 | 152E-33 | (4-25-69) |
| | 69-39a | Jan. 30, 1969 | | |
| Appendix A | | | 152F | (11-29-57) |
| Sec. 1 2 | | | 152G | (11-29-57) |
| Sec. 3, 4 | | | 152H | (11-29-57) |
| Sec. 5 | | | 152I | (11-29-57) |
| Sec. 6 | | | 152J | (11-29-57) |
| Sec. 7 | | | 152K | (11-29-57) |
| Sec. 8 | | | 152L | (11-29-57) |
| Sec. 9, 10 | | | 152M | (11-29-57) |
| Sec. 11 | | | 152N | (11-29-57) |
| Sec. 12, 13, 14 | | | 152O | (11-29-57) |
| Sec. 15, 16, 17, 18, 19 | | | 152P | (11-29-57) |
| Sec. 20, 21 | | | | |
| Appendix B | | | 152Q | (11-29-57) |
| Part I, II | | | | |
| Appendix C | | | 152R | (11-29-57) |
| Part I | | | 152S | (3-4-65) |
| Appendix D | | | 178 | (7-27-56) |
| Index | | | 182 | (10-12-56) |
| Index | | | 188 | (10-12-56) |
| Index | | | | |

## ARTICLE 50.  DEFINITIONS

**Section 1.** When used in these Regulations (Article 50 through 55 of the Police Regulations of the District of Columbia), unless the context requires otherwise, the terms "pistol," "sawed-off shotgun," "machine gun," "person," and "sell" and "purchase" shall have the meanings ascribed to them in the Act of Congress entitled "An act to control the possession, sale, transfer and use of pistols and other dangerous weapons in the District of Columbia," as amended, approved July 8, 1932 (47 Stat. 650, D. C. Code, sec. 22-3201 et seq.). Other terms used in these Regulations, unless the context otherwise requires, shall have the meanings ascribed to them as follows:

(a) "Commissioner" means the Commissioner of the District of Columbia or his designated agent.

(b) "Chief of Police" and "Chief" mean the Chief of Police of the Metropolitan Police Department of the District of Columbia or his designated agent.

(c) "District" means the District of Columbia.

(d) "Firearm" means any pistol, rifle or shotgun which will or is designed to, or may readily be converted to, expel a projectile by the action of an explosive; or the frame or receiver of any such pistol, rifle, or shotgun; but does not include a firearm that is not designed or redesigned to use rim fire or center fire fixed ammunition or manufactured in or before 1898.

(e) "Rifle" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use energy of the explosive in a fixed metallic cartridge to fire a single projectile through a rifle bore for each single pull of the trigger.

(f) "Short-barreled rifle" means a rifle having one or more barrels less than sixteen inches in length and a weapon made from a rifle, whether by alteration, modification, or otherwise, if such weapon as modified has an overall length of less than twenty-six inches.

(g) "Shotgun" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed shotgun shell to fire through a smooth bore either a number of ball shot or a single projectile for each single pull of the trigger.

(h) "Ammunition" means ammunition or cartridge cases, primers, bullets, or propellant powder designed for use in any firearm, machine gun, short-barrel rifle or sawed-off shotgun.

(i) The term "destructive device" means any firearm, weapon or automatic weapon which is not a pistol, rifle, shotgun, sawed-off shotgun or machine gun defined herein and includes any

explosive not commonly used for lawful commercial purposes, explosive bomb, poison gas bomb, tear gas or tear gas bomb, grenade, mine, rocket, missile, or similar device; and includes any type of weapon which will, or is designed to or may readily be converted to expel a projectile by the action of any explosive and having any barrel with a bore of one-half inch or more in diameter; excluding however,

    (1) a pneumatic gun, spring gun, or B-B gun which expels a single globular projectile not exceeding .18 inch in diameter;

    (2) any device used exclusively for the firing of stud cartridges, explosive rivets, or similar industrial ammunition; or

    (3) any device used exclusively for signalling or safety, and required or recommended by the United States Coast Guard or the Interstate Commerce Commission.

(j) "Dealer" means (i) any person engaged in the business of selling firearms or ammunition, (ii) any person engaged in the business of manufacturing or repairing firearms or of making or fitting special barrels, stocks or trigger mechanisms to firearms, or (iii) any person whose business or occupation includes the taking or receiving, by way of pledge or pawn, of any firearm or ammunition as security for the payment or repayment of money. The term "licensed dealer" means any dealer licensed under the provisions of these Regulations.

(k) "Manufacturing" means manufacturing, producing, making or remaking any firearm, destructive device or ammunition for sale or distribution."

(l) "Act" means the Act of Congress, entitled "An Act to control the possession, sale, transfer and use of pistols and other dangerous weapons, in the District of Columbia, as amended, approved July 8, 1932 (41 Stat. 650, D. C. Code, sec. 22-3201 **et seq.**).

(m) The term "these Regulations" means the regulations and provisions contained in Articles **50** through **55** of the Police Regulations of the District of Columbia as adopted by the District of Columbia Council and any orders issued by the Commissioner pursuant to authority transferred to him by the Council in such Articles.

(n) "Carry" means to carry, transport or possess on or about one's person, or in such close proximity to one's person as to be easily and readily accessible.

### ARTICLE 51. REQUIRING THE REGISTRATION OF FIREARMS IN THE DISTRICT OF COLUMBIA

**Section 1.** Except as herein provided, no person shall within the District, possess, or keep under his control, or sell or otherwise dispose of any pistol, or rifle or shotgun unless such person is the

holder of a valid registration certificate for such pistol, rifle or shotgun.

**Sec. 2**  (a) Each licensed dealer who sells a pistol, rifle or shotgun to a person in whose possession the pistol, rifle or shotgun must be registered shall require from the purchaser a completed application for the registration of the pistol, rifle or shotgun and shall file the application with the Chief of Police at the time of sale.

(b) Each person who within the District possesses, or keeps under his control any pistol, rifle or shotgun purchased or acquired prior to the effective date of these Regulations, shall make an application to register such pistol, rifle or shotgun within 120 days immediately following the effective date of these Regulations.

(c) Each person who brings into the District any pistol, rifle or shotgun acquired outside of the District, or who causes a rifle or shotgun to be lawfully delivered to him within the District, shall make an application to register such pistol, rifle or shotgun within forty-eight hours after he brings such pistol, rifle or shotgun into the District or within forty-eight hours after such rifle or shotgun is delivered to him in the District.

(d) Each person within the District who otherwise acquires possession or control of any pistol, rifle or shotgun shall make an application to register such pistol, rifle or shotgun within forty-eight hours after he acquires possession or control of the same; except as provided in Art. 55, sec. 6 of these Regulations.

(e) The executor or administrator of an estate containing a registered firearm shall promptly notify the Chief of Police of the death of the registered owner, and at the time of any transfer of the firearm, shall return the registration certificate for the firearm to the Chief. The executor or administrator of an estate containing an unregistered firearm shall make an application to transfer such firearm within thirty days of his appointment or qualification.

**Sec. 3**  (a) Each application required by this Article shall contain when filed with the Chief of Police the following information:

(1) "The name, occupation, residence and business address, and date of birth of the applicant. Where the applicant is not a natural person, this information shall refer to principal officer of the applicant, and shall contain in addition the name and address of the applicant."

(2) "The make, model, caliber, or gauge, manufacturer's identification number, serial number and other identifying marks of the pistol, rifle or shotgun; and

(3) "The name and address of the person from whom the firearm was acquired, and the date and place of acquisition."

(b) Each application to register a pistol, rifle, or shotgun shall be made in duplicate on forms provided by the Chief of Police and

be signed by the applicant. The original shall be filed with the Chief of Police, and the duplicate shall be retained by the applicant as temporary evidence of registration. The Chief of Police, after receipt of a duly filed application, shall send to the applicant a numbered registration certificate identifying the applicant as the registered owner of the pistol, rifle or shotgun described in the application.

**Sec. 4.** No information or evidence obtained from an application to register a firearm required to be submitted or retained by a natural person in order to comply with any section of this Article or orders issued by the Chief of Police implementing this Article shall be used as evidence against such natural person in any criminal proceeding with respect to the violation of law occurring prior to or concurrently with the filing of the application containing the information or evidence; **Provided,** that this section shall not apply to any violation of subsections (a) and (b) of Art. 55, Sec. 1 respecting such application.

**Sec. 5.** A fee, in an amount fixed by the Commissioner, shall be paid upon the application for a registration certificate, but such fee shall not exceed $2.00 for each pistol, rifle or shotgun registered, and the fee need not be uniform for all pistols, rifles or shotguns registered to a single person; **Provided,** that no natural person, regardless of the number of guns acquired or owned by him prior to the effective date of these regulations shall be required to pay a registration fee hereunder in excess of $100 for the registration of all firearms acquired by him prior to the effective date of these Regulations.

**Sec. 6.** Any person within the District carrying or having in his immediate possession any pistol, rifle or shotgun for which a registration certificate has been issued as provided in these Regulations shall have such certificate on his person or within his immediate custody. Any person having such possession of a pistol, rifle or shot gun shall upon demand exhibit such certificate to a law enforcement officer. The failure of any person to exhibit such certificate as provided herein shall be cause for the revocation of any and all certificates issued to him under these Regulations.

**Sec. 7.** It shall be the duty of the registered owner of a pistol, rifle or shotgun—

(a) to notify the Chief of Police in writing of the loss, theft or destruction of a registration certificate; or of any change of name or address from that recorded on a registration certificate, within forty-eight hours following discovery of such loss, theft or destruction, or of any change of name or address. Failure to notify the Chief of Police shall be grounds for revocation of the registration certificate.

(b) to notify the Chief of Police in writing of the sale, transfer or other disposition of any pistol, rifle or shotgun registered to him within forty-eight hours following such sale, transfer or disposition, except as provided for in Art. 55, Sec. 6 of these Regulations. Such notification shall contain—

 (1) the name, residence and business address within the District, the occupation, and date of birth of the person to whom the pistol, rifle or shotgun has been sold or transferred;

 (2) the make, model, caliber or gauge, manufacturer's identification number, serial number, and other identifying marks of the pistol, rifle or shotgun sold or transferred; and

 (3) the number of the registration certificate issued to the registered owner.

(c) to return to the Chief of Police of registration certificate for any pistol, rifle or shotgun which is lost, stolen or destroyed, or which he sells, transfers or otherwise disposes of at the time he notifies the Chief of Police of such loss, theft, destruction, sale, transfer or other disposition.

**Sec. 8.** No person shall within the District—

(a) lend or give, or allow the use of a registration certificate issued to him by any other person for identification; **Except,** that when a registered owner of a pistol, rifle or shotgun lends or delivers the same to another person in accordance with the provisions of Art. 55, sec. 6 of these Regulations he shall deliver to such other person the registration certificate for each pistol, rifle or shotgun so loaned or delivered.

(b) represent himself as the owner of a registration certificate issued to another person.

**Sec. 9.** (Deleted)

**Sec. 10.** This Article of these Regulations shall not apply to—

(a) any person licensed under Art. 55 of these Regulations as a licensed retail dealer; **Provided,** that this exception shall only apply to pistols, rifles or shotguns acquired by such person in the normal conduct of his business and kept by such person at his place of business; and further **Provided,** that this exception shall not apply to such person for any pistol, rifle or shotgun kept by him for his private use or protection, or for the protection of his business; or

(b) any non-resident of the District participating in any lawful recreational activity in the District involving the use of pistols, rifles or shotguns; or transporting such pistol, rifle or shotgun to or from such lawful recreational activity; **Provided,** that such non-resident shall upon demand of any enforcement officer exhibit proof that his possession of such pistol, rifle or shotgun is registered and

legal in the jurisdiction in which he resides; or proof of residence in a jurisdiction which does not require registration of a pistol, rifle or shotgun;

(c) any officer, agent or employee of the District of Columbia or the Federal Government, or any officer, agent or employee of the government of any state or subdivision thereof, or any member of the Armed Forces of the United States, the National Guard or the Organized Reserves, when such officer, agent, employee or member is authorized to carry a pistol, rifle or shotgun and who is carrying a pistol, rifle or shotgun while on duty in the perform- ance of his official authorized functions; or

## ARTICLE 52.   REGULATING THE SALE AND CARRYING OF FIREARMS IN THE DISTRICT OF COLUMBIA

**Section 1.** (a) Any person who is not subject to any of the disabilities enumerated in Sec. 7 of the Act (D.C. Code, sec. 22-3207) shall be entitled to purchase a pistol within the District, and a seller is lawfully entitled to sell a pistol to such a person. No such person shall be denied the purchase of a pistol except as provided in the Act.

(b) Any person who meets the requirement of Sec. 6 of the Act (D. C. Code, sec. 22-3206) shall be entitled to carry a pistol within the District, and no such person shall be denied a license to carry a pistol except as provided in the Act.

(c) Any person who is not subject to any of the disabilities set forth in sec. 5 (c) of this article shall be entitled to purchase and carry a rifle or shotgun in the District, and a seller shall be entitled to sell a rifle or shotgun to such a person.

**Sec. 2.** (a) No person shall carry either openly or concealed on or about his person any pistol unless he possesses a valid license therefor issued to him pursuant to Sec. 4 of the Act (D. C. Code, sec. 22-3204); except as otherwise authorized by said sec- tion of the Act.

(b) No person shall purchase, own, possess or carry on or about his person any rifle or shotgun unless he possesses a valid rifle and shotgun license therefor issued to him pursuant to Sec. 5 of this Article.

(c) No person shall within the District sell or transfer any rifle or shotgun to a purchaser who is not a retail dealer licensed under Art. 54 of these Regulations; and no person who is not a licensed retail dealer shall purchase or otherwise acquire any rifle or shotgun from any seller unless—

(1) the purchaser exhibits to the seller a valid rifle and shotgun license issued according to Section 5 of this Article; and

(2) the seller forwards to the Chief of Police at the time of the sale the purchaser's application register the rifle or shotgun being sold pursuant to Art. 51, Sec. 2 (a) of these Regulations; or within forty-eight hours following the sale, a written notification of sale pursuant to Art. 51, Sec 8 (b).

(d) No person within the District shall import or cause to be delivered to him within the District any rifle or shotgun unless he shall within forty-eight hours following delivery to him, submit an application to register the rifle or shotgun pursuant to Art. 51, Sec. 2 (c) of hese Regulations.

**Sec. 3.** Each person who required by Sec. 8 of the Act (D. C. Code, Sec. 22-3208) to submit a statement when applying to purchase a pistol, or who is required by Sec. 4 of the Act (D. C. Code, sec. 22-3204) to have a license to carry a pistol, or who is required by sec. 2 (b) of this Article to have a license to purchase or carry a rifle or shotgun shall submit such statement to the seller or an application for such license directly to the Chief of Police in the form and number prescribed by the Chief.

**Sec. 4.** (a) Each statement on application to purchase a pistol shall be signed by the applicant purchaser and the seller, and each application for a license shall be signed by the applicant for the license.

(b) Each such statement or application shall contain that information prescribed by the Chief of Police which in his judgment is necessary to conduct efficient and thorough investigations, and to effectuate the purposes of the Act and these Regulations. Each statement or application shall contain at least the following information:

(1) the full name, and any other name by which the applicant is or has been known;

(2) the home address, and any other address at which the applicant has resided within five years immediately prior to the submission of the statement or application.

(3) the present business or occupation, any business or occupation in which the applicant has engaged for five years immediately prior to the application, and the addresses of such businesses or places of employment;

(4) the date and place of birth of the applicant;

(5) the sex of the applicant;

(6) a statement by the applicant that he is not ineligible to purchase or possess a pistol under Section 7 of the Act (D. C. Code, sec. 22-3207) or not ineligible for a license to carry a pistol under Sec. 6 of the Act (D. C. Code, sec. 22-3206), or not ineligible under Sec. 5 (c) of this Article to purchase or carry a rifle or shotgun; and indicating whether he has previously been denied any pistol, or rifle or shotgun

license, registration certificate or permit by the Federal Government or any state government or subdivision thereof including the District Government; and whether he has been involved in any mishap involving a pistol, or rifle or shotgun, including the date, place, and circumstances and the names of any persons injured or killed;

(7) a statement by the applicant of his need to purchase or carry a pistol, rifle or shotgun, and his intended use of the same;

(8) the caliber, make, model, manufacturer's identification number, serial number, and any other identifying marks on the pistol, rifle or shotgun to be purchased or carried; and

(9) the name and address of the seller, and his retail license number if he is a licensed dealer under Art. 55 of these Regulations.

(c) The Chief of Police may require each applicant to be fingerprinted if this in his judgment is necessary to conduct efficient and thorough investigations and to effectuate the purposes of the Act and these Regulations; **Provided,** that any person who has been fingerprinted by the Chief within five years prior to submitting his statement or application shall not be fingerprinted again if he offers other satisfactory proof of his identity. In addition, the Chief may require each applicant for a license to carry a pistol, or a rifle or shotgun to submit with his application two full face, black and white photographs of himself, 1-3/4 by 1-7/8 inches in size which shall have been taken within thirty days of the filing of the application.

**Sec. 5.** (a) No person shall be approved by the Chief of Police to purchase a pistol if the Chief after investigation determines that a pistol could not lawfully be sold to such person under Section 7 of the Act (D. C. Code, Sec. 22-2307).

(b) No person shall be issued a license to carry a pistol by the Chief of Police if the Chief after investigation determines that such person is ineligible for such license under Section 6 of the Act (D. C. Code, Sec. 3206).

(c) Except as provided for in subsection (d) of this section, no person shall be issued a license to purchase or carry a rifle or shotgun if the Chief of Police determines after investigation that such person—

(1) is under the age of twenty-one years;

(2) is not of sound mind; **Provided,** that the Chief of Police shall determine that the person is not of sound mind to purchase, possess and carry a rifle or shotgun if he determines that such person has been adjudicated mentally incompetent, or has been acquitted of any criminal charge by reason of insanity by any court or has been adjudicated a

chronic alcoholic by any court **and Provided,** that three years after such conviction adjudication or acquittal, the Chief of Police shall disregard the disabilities of this subsection if, after an investigation, he is satisfied that the applicant is mentally and physically capable of owning, possessing and using a pistol in a safe and responsible manner.

(3) is a drug addict; **Provided,** that the Chief of Police shall determine that the person is a drug addict if he determines that such person (i) is an abusive user of narcotic drugs as defined by section 4731 of the Internal Revenue Code 1954, as amended (Aug. 16, 1954, 68A Stat. 557, ch. 736; Apr. 22, 1960, 74 Stat. 57 Pub. L. 88–429, sec. 4(a), (b); 26 U.S.C., sec. 4731); or (ii) is an abusive user of dangerous drugs as defined by or under the Act entitled the "Dangerous Drug Act for the District of Columbia", approved July 24, 1956 (70 Stat. 612, title II, sec. 202 D. C. Code, sec. 33–701);

(4) has been convicted in any jurisdiction of a crime involving the use of physical force against a person punishable by imprisonment for more than one year, or is under indictment for such a crime; or

(5) he has been convicted in any jurisdiction of any of the following offenses punishable by imprisonment for less than one year: any offense involving a physical assault; any offense committed while carrying a firearm or weapon; using, possessing or selling any narcotic or dangerous drug; or any violation of a law restricting the sale, receipt, possession, use or transportation of a firearm or destructive device; **Provided,** that three years after such conviction, the Chief of Police may disregard the disabilities of this subsection if, after an investigation, he is satisfied that the applicant is mentally and physically capable of owning, possessing and using a rifle or shotgun in a safe and responsible manner; or

(6) suffers from a physical defect which would make it unsafe for him to use a rifle or shotgun; or

(7) has indicated by threatening speech or other behavior that he is likely to make unlawful use of a rifle or shotgun; or

(8) has been adjudicated negligent in a firearms mishap causing death or injury to another human being; or

(9) is otherwise ineligible to purchase or possess a pistol under section 3 of the Act (D. C. Code, sec. 22–3203).

(d) The Chief of Police shall deny a rifle or shotgun license if the Chief determines, after investigation or test, that the applicant—

(1) does answer to one or more of the descriptions

enumerated in subparagraphs (c) (1) through (c) (9) of this section; or

(2) has failed to demonstrate satisfactorily a knowledge of the laws of the District of Columbia pertaining to rifles and shotguns and the safe and responsible use of the same in accordance with tests and standards prescribed by the Chief of Police; or

(3) has vision less than that required to obtain a valid driver's license under the laws of the District; **Provided,** that possession of a valid driver's license shall be prima facie evidence that an applicant's vision is not deficient.

(e) The Chief of Police shall issue to applicant a numbered rifle and shotgun license if the Chief determines, after investigation that the applicant does not answer to any of the descriptions enumerated in subparagraphs (c) (1) through (c) (9) of this section.

(f) The Chief of Police may issue to an applicant between the ages of eighteen and twenty-one years old who is otherwise qualified under subsection (c) a numbered restricted rifle and shotgun license if—

(1) the application is accompanied by a signed statement by the parent or guardian of the applicant (i) that the applicant has the permission of the parent or guardian to use a rifle or shotgun, and (ii) that the parent or guardian assumes civil liability for all damages resulting from the actions of the applicant in the use of the rifle or shotgun; and

(2) if the applicant is not disqualified by subsection (d) in any respect except his age.

**Sec. 6.** Any person in the District carrying of having in his immediate possession any pistol for which a license has been issued to him pursuant to sec. 6 of the Act (D. C. Code, sec. 22–3206), or any rifle or shotgun for which a license has been issued to him pursuant to sec. 5(e) or (f) of this Article, shall have such license within his immediate possession, and upon demand of any law enforcement officer shall exhibit his license.

**Sec. 7.** Any rifle and shotgun license issued under this Article—

(a) may include such reasonable restrictions and prohibitions consistent with applicable laws of the District with respect to the possession, purchase or carrying about of such rifle or shotgun as the Chief of Police may deem essential to the public safety or in the public interest; any license issued under section 3(d) of this Article shall be limited to use of the rifle or shotgun for sport or recreation, only during daylight hours, and only in the presence and under the supervision of a person licensed under section 5(e) of this Article.

(b) may be revoked by the Chief of Police when he has reason to believe that the licensee no longer has the qualification requisite for the issuance of such a license: **Provided,** that the Chief of Police shall first issue and serve upon the licensee, an order to show cause why his license should not be revoked. This licensee may request in writing a hearing before the Chief within 5 days, and the Chief shall grant such hearing within 15 days. If the licensee does not request a hearing or show proper cause why his license should not be revoked the Chief of Police shall issue and serve upon the licensee an order revoking the license and no license issued under these Regulations shall be in effect beyond the date of an order revoking such a license.

(c) shall expire five years after issuance unless sooner revoked.

**Sec. 8.** (a) Section 2 (a) of this Article shall not apply to—

(1) any person directly transporting a registered pistol to the business address of a licensed dealer for purpose of repair or sale, or to any person directly transporting such pistol from the business address of a licensed dealer to his residence, place of business or other land owned by him after the purchase or repair.

(2) Any person directly transporting a registered pistol to the residence, place of business or land owned by the purchaser after the private sale of such pistol approved by the Chief of Police;

(3) any person directly transporting any pistol to any police precinct house to surrender the same to the Chief of Police;

(4) any nonresident of the District actively participating in any lawful recreational activity in the District involving the use of a pistol, or transporting such pistol directly to or directly from such lawful recreational activity; **Provided,** that such nonresident shall upon demand of any law enforcement officer exhibit proof that his carrying about of a pistol is permitted and legal in the jurisdiction in which he resides; or proof of residence in a jurisdiction which does not license the carrying about of a pistol;

(5) any officer, agent or employee of the District of Columbia or the Federal Government, or any officer, agent or employee of the government of any state or subdivision thereof, or any member of the Armed Forces of the United States, the National Guard, or the Organized Reserves, when such officer, agent, employee or member is authorized to carry a pistol, and is carrying a pistol while on duty in the performance of his official authorized functions; or

(6) the regularly enrolled members of any organization duly authorized to purchase or receive such weapons from the United States, provided such members are at or are going to or from their places of assembly or target practice as required by Section 5 of Act (D. C. Code, Sec. 22-3205).

(b) Any pistol carried by any person not having a licensed issued under these Regulations shall be carried in a closed container or securely wrapped, and while being carried shall be kept unloaded. Containers of such pistols or such securely wrapped pistols shall be carried in open view.

**Sec. 9.** (a) Section 2 (b) of this Article shall not apply to—

(1) any person directly transporting any rifle or shotgun to any police precinct house to surrender the same to the Chief of Police;

(2) any nonresident of the District actively participating in any lawful recreational activity in the District involving the use of a rifle or shotgun, transporting a rifle or shotgun directly to or directly from such lawful recreational activity; **Provided,** that such nonresident shall upon demand of any law enforcement officer exhibit proof that his carrying about of a rifle or shotgun is permitted and legal in the jurisdiction in which he resides; or proof of residence in a jurisdiction which does not license the carrying about of a rifle or shotgun;

(3) any officer, agent or employee of the District of Columbia or the Federal Government, or any officer, agent or employee of the government of any state or subdivision thereof, or any member of the armed forces of the United States, the National Guard or the Organized Reserves, when such officer, agent, employee or member is authorized to carry a rifle or shotgun, and who is carrying a rifle or shotgun while on duty in the performance of his official authorized functions;

(4) any person between the ages of 15 and 18 years of age uses a rifle or shotgun as authorized by Art. 55, sec. 8(b) of these Regulations.

(b) Notwithstanding any provision of this Article, it shall be lawful in the District for a seller to sell a rifle or shotgun to a nonresident of the District who is a citizen of the United States and who does not have a license issued under this Article; **Provided,** that such nonresident purchaser possesses and exhibits to the seller a valid license or permit for the purchase, possession or use a rifle or shotgun issued to him by the United States government or by any state or subdivision thereof.

(c) Any rifle or shotgun being carried shall, except when lawful use is imminent, be unloaded and securely wrapped or encased in a closed container.

## ARTICLE 53: REGULATING THE
## SALE OF FIREARM AMMUNITION

**Section 1.** No person shall within the District sell or otherwise transfer ammunition for a firearm to another unless

(a) The sale or transfer is made in a face-to-face transaction;

(b) The purchaser exhibits at the time of the sale or transfer a valid certificate of registration issued under these regulations;

(c) The ammunition sold or transferred is of the same caliber or gauge as the firearm described in the certificate of registration and suitable for use therein;

(d) The purchaser signs a receipt for the ammunition, which receipt shall be maintained by the seller for six months.

**Sec. 2.** No person shall within the District of Columbia purchase or possess ammunition for a firearm unless he is the holder of a valid certificate of registration issued under the regulations; and unless the ammunition is of the same gauge or caliber as the firearm described in the certificate of registration issued to such person.

**Sec. 3.** For purposes of Secs. 1 and 2 above, a valid firearm registration certificate issued by the United States or any state or subdivision thereof shall be sufficient to authorize ammunition sales to and purchases by persons who are not residents of the District.

**Sec. 4.** This Article shall not apply to sales or transfers to government agencies, duly appointed law enforcement officers, or persons duly licensed as dealers of weapons under Section 10 of the Act (D. C. Code, sec. 22-3210).

**Sec. 5.** This Article shall not apply to bona fide collectors of ammunition who are purchasing ammunition for their collections. Any such collector may obtain an ammunition collector's certificate from the Chief of Police, upon proof, submission of a statement, verified by the Chief, that he is, in fact, a bona fide collector. This certificate shall be exhibited to the seller whenever the collector purchases ammunition for his collection. The seller shall keep records of all ammunition sales to collectors for six months.

## ARTICLE 54: REGULATING AND LICENSING
## DEALERS IN DANGEROUS WEAPONS

**Section 1.** (a) No person shall within the District engage in the business of selling, or manufacturing, or repairing any pistol,

rifle, shotgun, or ammunition without first obtaining a license as provided in sec. 2 of this Article.

(b) The Commissioner may grant licenses, effective for not more than one year from date of issue, permitting the licensee to sell, or to manufacture, or to repair pistols, rifles, shotguns or ammunition. Whenever any such licensee breaches any condition upon which his license was issued or violates any provision of these Regulations or of any provision of section 7 of the Act (D. C. Code, sec. 22–3207), which is applicable to any such licensee or any applicable regulation made pursuant to such Act, the license shall be suspended or revoked and the licensee shall be subject to punishment as provided in these Regulations.

(c) The Commissioner is authorized and empowered to fix, and from time to time increase or decrease, fees for any services rendered under this Article. The Commissioner shall increase, decrease, or fix fees in such amount as will in the judgment of the Commissioner approximate the cost to the District of administering this Article.

**Sec. 2.** (a) The Chief of Police shall within 30 days of receipt of an application issue a license to deal in firearms to any person who is not ineligible to purchase a pistol, rifle or shotgun under these Regulations and who has not previously violated any of the conditions set forth in Art. 54, secs. 5 and 6 of these Regulations.

(b) Each application for a license to deal in firearms or ammunition shall be in the form prescribed by the Chief of Police; and shall be signed by the Chief of Police; and shall be signed by the applicant and shall contain—

    (1) the full name of the applicant;

    (2) the home address of the applicant;

    (3) the address of the establishment to be licensed and the principal place of business of the applicant;

    (4) and such other information as may be required by the Chief of Police.

**Sec. 3.** A license to deal in firearms or ammunition may be revoked or suspended by the Chief of Police when he has reason to believe the licensee—

(a) ceases to qualify for a license under Sec. 2 (a) of this Article; or

(b) fails to comply with any of the conditions imposed by Art. 54, secs. 5 and 6; **Provided,** that the Chief of Police shall first issue and serve upon the licensee, an order to show cause why his license should not be revoked. The licensee may request in writing a hearing before the Chief within 5 days, and the Chief shall grant such hearing within 15 days. If the licensee does not request a hearing or show proper cause why his license should

not be revoked the Chief of Police shall issue and serve upon the licensee an order revoking the license and no license issued under this Article shall be in effect beyond the date of an order revoking such a license.

**Sec. 4.** (a) Any dealer within the District who transports or delivers firearms to another dealer in the District shall, before delivery of the firearm, furnish to the Chief of Police an invoice listing his name, his home and business addresses, his license number, the name and address of the dealer to whom such firearms are to be delivered, the place of origin of the shipment, the quantity of firearms transported, and the serial number of each firearm in the shipment.

(b) If such shipment is by common carrier, a copy of the invoice shall be delivered to the common carrier. No common carrier shall knowingly deliver a shipment of firearms to a dealer within the District without having received a copy of such invoice. The copy of the invoice shall be left with the dealer at the time of delivery.

(c) If such shipment is by other than common carrier, the copy of the invoice shall be furnished to the dealer at the time of delivery.

**Sec. 5.** (a) No person licensed under this Article shall sell a pistol, rifle, shotgun, or ammunition to any person whom he knows or has reasonable cause to believe is ineligible to own a pistol, rifle or shotgun under Section 7 of the Act (D. C. Code, Sec. 22–3207) or Article 52, Sec. 5 (c) of these Regulations.

(b) Each licensed dealer shall keep at his place of business a true record in book form of all pistols, rifles, and shotguns in his possession or under his control which he has acquired to sell or offer for sale, and shall, upon demand exhibit such record book to any policeman or law enforcement officer exercising his official duty. Each licensed dealer must enter upon such record book for each pistol, rifle, and shotgun in his possession the information required for pistols by section 10 of the Act (D. C. Code, sec. 22–3210 (4), and the name and address of the purchaser when such items are sold.

(c) Each licensed dealer shall submit a periodic report to the Chief of Police on all sales of ammunition. The Chief of Police shall fix the times when such reports are due, and he may establish such other procedures under this subsection as he deems necessary. Such periodic reports shall contain—

(1) the name and address of each purchaser of ammunition during that period;

(2) the number on the registration certificate issued under Article 2 of these Regulations which exhibited by the purchaser; and

(3) the quantity and description of the ammunition sold to each purchaser during the period.

(d) Each licensed dealer shall otherwise conform to all provisions of the Act, and nothing contained in these Regulations shall be construed to excuse noncompliance with any provision of the Act.

**Sec. 6.** (a) No licensed dealer shall display any pistol, rifle or shotgun, or ammunition in windows visible from a street or sidewalk. All pistols, rifles and shotguns and ammunition shall be kept in a securely locked place at all times except those firearms or ammunition being shown to a customer, repaired or otherwise worked on.

(b) No licensed dealer shall knowingly permit any person in his establishment to display, sell or repair any pistol, rifle, shotgun or ammunition if such person would not be qualified for a licensed to carry a pistol issued under Section 6 of the Act (D. C. Code, Sec. 22–3206) or if such person has not received from the Chief of Police approval to display, sell or repair any pistol, rifle, shotgun or ammunition in said establishment, **Provided,** that this subsection shall not apply to any relative of the licensed dealer who is eighteen years old or older, if otherwise qualified under Section 6 of the Act (D. C. Code, Sec. 22-3206).

**Sec. 7.** Beginning one year after the effective date of these Regulations, no retail dealer licensed under this Article shall sell or offer for sale in the District any pistol, rifle or shotgun, which does not have imbedded into the metal portion of such pistol, rifle or shotgun a unique manufacturer's identification number or serial number unless the retail dealer shall have imbedded into the metal portion of such pistol, rifle or shotgun a unique dealer's identification number.

**Sec. 8.** (a) No pawnbroker in the District shall sell or offer for sale any firearm or ammunition, or loan money secured by mortgage, deposit or pledge of any firearm or ammunition without obtaining a license under this Article.

(b) No licensed dealer shall take or receive any firearm by way of mortgage, pledge or pawn without also taking and retaining during the term of such pledge or pawn, the registration certificate of the firearm mortgaged, pledged or pawned. If such firearm is not redeemed, the dealer shall return the registration certificate to the Chief of Police and register the firearm in his own name.

## ARTICLE 55.  MISCELLANEOUS PROVISIONS

**Section 1.** (a) It shall be unlawful for any person purchasing any pistol, rifle, shotgun or ammunition, or applying for any certificate of registration or license under these Regulations, or in giving any information pursuant to the requirements of these Regulations, to give false information or offer false evidence of his identity.

(b) It shall be unlawful for anyone to forge or alter any application, registration certificate, temporary evidence of registration, or license submitted, retained or issued under these Regulations.

(c) It shall be unlawful for any person within the District to change, alter, remove, or obliterate the name of the maker, model, manufacturer's identification number, serial number, or other mark of identification on any pistol, rifle or shotgun; **Provided,** that nothing contained in this section shall apply to any officer or agent of any department or agency of the United States or the District Government who is engaged in research or experimental work.

(d) It shall be unlawful for any person within the District to own, possess, sell, offer for sale, purchase or offer to purchase any destructive device, or military type weapon including weapons known as hand grenades, cannons, anti-tank guns and bazookas; **Provided,** that this section shall not apply to any agency or department of the District of Columbia or Federal Government or to any person licensed or authorized by the Federal Government to own, possess, sell or purchase such weapons.

**Sec. 2.** (a) If any person within the District voluntarily delivers and abandons to the Metropolitan Police Department any pistol or rifle or shotgun during an amnesty period which the Chief of Police is hereby authorized to proclaim at regular intervals, the voluntary delivery of such weapon shall preclude the arrest and prosecution of such person on a charge of violating any provisions of these Regulations with respect to the weapon voluntarily delivered. A voluntary delivery of any pistol or rifle or shotgun shall be made to any police precinct and such weapon shall be securely wrapped and unloaded.

(b) Any person within the District may summon a police officer to his residence or place of business for the purpose of voluntarily delivering to a police officer a pistol or rifle or shotgun which shall be securely wrapped and unloaded.

**Sec. 3.** Notwithstanding any provision of Art. 52 or Art. 54 of these Regulations, an application to transfer a pistol or a rifle or shotgun license shall not be required for the transfer of a pistol, rifle or shotgun upon the death of an owner thereof to his heir

or legatee whether the transfer be by testamentary bequest or by the laws of intestacy; **Provided,** that the heir or legatee shall be subject to all other provisions of these Regulations; and **Provided,** that if the heir or legatee does not qualify to possess or carry the pistol, rifle or shotgun under these Regulations, he may possess the same for the purposes of sale for a period not to exceed 60 days.

**Sec. 4.** (a) When an application for a registration certificate under Art. 51 or a license under Art. 52 or Art. 54 of these Regulations is denied, or when the Chief of Police fails to act on any such application within 30 days of its receipt, or when such registration certificate or license is revoked as provided for these Regulations, the aggrieved party may within five days appeal in writing to the Commissioner, and the Commissioner shall schedule a hearing before him within 15 days after the appeal has been made. Any ruling from such hearing and any order of the Commissioner denying an application for a dealer license made pursuant to Art. 55 of these Regulations shall be subject to appropriate judicial review.

(b) The Commissioner is authorized to make orders to carry out the purposes of these Regulations, including without limitation orders prescribing the form, content, and requirements respecting the number of copies of reports, applications, or certificates required under or authorized by these Regulations and for recording and identifying each firearm owned, possessed or under the custody or control of a person; providing for the keeping and disposition of records by persons selling, purchasing, manufacturing, repairing, or delivering firearms and ammunition covered by these Regulations and further regulating the conduct of the business required to be licensed under these Regulations.

(c) The Commissioner may prohibit the sales of ammunition when he determines that the design, construction or material composition of such ammunition makes it unsuitable or unsafe for any lawful use.

**Sec. 5.** Whenever any firearm, ammunition or destructive device is found within the District in an automobile, boat or other vehicle, or in any dwelling unit, business establishment or other structure or building, it shall be prima facie evidence that such firearm, ammunition or destructive device is in the possession of the occupants of the vehicle, structure or building; or, if the vehicle, structure or building is unoccupied, it shall be prima facie evidence of possession by the registered owner in the case of a vehicle, or by the last known occupants or owner in the case of a vehicle, or by the last known occupants or owner in the case of a structure or building.

**Sec. 6.** Except for transfers to licensed dealers, no person shall loan or otherwise allow another person to possess, carry or use any firearm unless such firearm is being loaned for a legitimate purpose, and for a period not to exceed 30 days; and unless—

"(a) the person to whom the firearm is loaned possesses a valid license for such firearm issued to him pursuant to section 6 of the Act (D. C. Code, Sec. 22-3206) or to Art. 52 of these Regulations; or

(b) such person to whom the firearm is loaned is at least fifteen years of age, does not possess a valid license because of his age, and is a member or student of an organization or school which teaches firearm safety and use. Where such circumstances exist, it shall be lawful to loan a rifle or shotgun to such person for instruction, military or military type drill, or legitimate recreational activity; **Provided,** that the use of the rifle or shotgun is immediately supervised by a person licensed pursuant to Art. 52 of these Regulations; and **Provided,** the rifle or shotgun is registered to the organization, school, parent or guardian of the user; and **Further Provided,** that the rifle or shotgun is surrendered immediately following its use to the organization, school, or parent or guardian of the user."

**Sec. 7.** (a) Except as provided in the immediately preceding section, no person shall within the District keep any firearm or ammunition for, or intentionally make any firearm or ammunition available to any person who would not qualify under these Regulations for a License for such firearm.

(b) No person shall hold a firearm or loan any money on a firearm as security for the payment or repayment of any debut or pledge, except as otherwise provided for in Art. 55, sec. 8 of these Regulations.

**Sec. 8.** No person shall within the District sell or otherwise transfer a firearm or ammunition to a purchaser who is under the influence of alcohol or a narcotic or dangerous drug. No person shall within the District carry or use any firearm while under the influence of alcohol or a narcotic or dangerous drug.

**Sec. 9.** "The Chief of Police is hereby authorized to issue and promulgate such other orders, rules and regulations as he deems necessary to carry out the purposes of the Act and these Regulations."

**Sec. 10.** (a) "Applications required by these Regulations for registration or licensing of firearms possessed, purchased or acquired by, or delivered to, persons within the District prior to the effective date of these regulations must be submitted within 120 days after that date. No such person shall be deemed in default under the registration provisions of these regulations if his application to register is submitted within that time. Nor shall

any such person be deemed in default under the licensing provisions of these regulations while his application for a license, submitted within that time, is still pending.

(b) The registration and licensing requirements established by these regulations shall be immediately effective, from the effective date of these Regulations, for firearms purchased or acquired by, or delivered to, persons within the District after that date."

**Sec. 11.** Any person who violates any provision of these Regulations shall, upon conviction be fined not more than $300, or be imprisoned for not more than ten days; **Except** that any dealer who violates any provision of Article 55 of these Regulations shall upon conviction be fined not more than $300 or be imprisoned for not more than ninety days; and **Provided,** that the penalties prescribed herein for violating these Regulations shall not supersede but shall supplement all statutes, other regulations, or municipal actions of the District of Columbia or the United States under which similar conduct is prohibited and penalties for engaging therein are prescribed.

**Sec. 12.** Any provision of any Regulation of the District inconsistent with any provision of these Regulations is hereby repealed.

**Sec. 13.** If any provision of these Regulations or the application thereof to any person or circumstance is held invalid, the remainder of these Regulations and the application of such provision to other persons not similarly situated or to other circumstances shall not be affected thereby.

**Sec. 14.** "These Regulations shall become effective on February 15, 1969; provided that the Chief of Police may accept applications for registration of firearms immediately upon adoption of these Regulations." (C.O. 68–500 and C.O. 69–39a)

# 6

24 DCMR 2303 and 2304

(1974)

## 2303   APPLICATION REQUIREMENTS FOR LICENSES FOR CONCEALED WEAPONS

2303.1    The residence requirements for a license to carry a concealed weapon shall be as follows:

    (a)    Applicant shall have a bona fide residence or place of business in the District of Columbia; or

    (b)    If the applicant does not have a bona fide residence or place of business in the District of Columbia, the applicant shall have a bona fide residence or place of business within the United States, and a license to carry a pistol concealed upon his or her person issued by the lawful authorities of that State or sub-division of the United States.

2303.2    No applicant shall be a person prohibited from possessing a pistol under D.C. Code §§22-3201 through §22-3217 (1981).

2303.3    Applicant shall be of sound mind. The Chief of Police or his or her designated agent may presume an applicant is not of sound mind if any of the following conditions are present:

    (a)    Applicant was previously determined by a court or administrative agency to be of unsound mind;

    (b)    Applicant was found not guilty of a crime by reason of insanity;

    (c)    Applicant was ever civilly committed to a mental institution, whether that commitment was voluntary or involuntary;

    (d)    Applicant received treatment for a mental disorder on a regular basis;

    (e)    A reliable witness or witnesses supplies the Chief of Police a written, notarized statement that the applicant is of unsound mind; or

    (f)    Observation by police officials indicate that the applicant is not mentally competent. In this instance, at least two (2) officials of the rank of Sergeant or above shall state in writing their conclusion and facts supporting their conclusion that the applicant is mentally incompetent.

2303.4    The Chief of Police or his or her designated agent may disregard the impediments of §§2303.3 (a), (b), (c) or (d) if five (5) years have elapsed since the last recorded treatment or judicial determination of mental incompetence.

2303.5    To rebut a presumption that the applicant is of unsound mind, an applicant may offer the notarized report of a registered psychologist or psychiatrist that the psychologist or psychiatrist has examined the applicant within six (6) months prior to submitting the statement and found the applicant to be of sound mind.

2303.6    The Chief of Police or his or her designated agent may require the applicant to submit to psychiatric testing by a psychiatrist or psychologist selected by the Chief of Police at the expense of the Metropolitan Police Department.

2303.7    No applicant shall ever have been convicted in the District of Columbia or elsewhere of a felony or shall ever have been convicted of violation of any of the following:

    (a)    D.C. Code §§22-3201 through 22-3217 (1981); or

**DA 83**

      (b)     A weapons offense in any jurisdiction.

2303.8    No applicant shall be any of the following:

      (a)     Under indictment for a felony or facing criminal misdemeanor charges involving wrongful use of a firearm in any jurisdiction;

      (b)     Charged in any competent court in any jurisdiction of a felony at the time his or her application is pending;

      (c)     A fugitive from justice or have previously been convicted of a firearm violation in any jurisdiction; or

      (d)     An alcoholic, or a user of illegal narcotic or hallucinogens.

2303.9    Applicant shall comply with the following requirements:

      (a)     Be over twenty-one (21) years of age;

      (b)     Be free from physical defects which would impair his or her safe use of the weapon, such as paralysis of hand or arm, poor vision, or lack of coordination due to age;

      (c)     Have reason to fear injury to his or her person or property or any other proper reason;

      (d)     Be properly trained and experienced in the use, functioning, and safe operation of the pistol; and

      (e)     Present a certificate from a certified firing range stating that the applicant has satisfactorily completed a course of supervised training approved by the Chief of Police with the weapon from which the license is requested and is fully familiar with the use and servicing of the weapon.

2303.10   Applicant shall test fire his or her weapon at the standard police course under Metropolitan Police Department supervision to demonstrate his or her ability to shoot accurately and safely. An additional fee of twenty dollars ($20) shall be required for this service. However, this test and fee shall not be required for license renewals.

2303.11   For the purposes of satisfying the specifications of §2303.9(c), applicant shall allege serious threats of death or serious bodily harm to his or her person or theft or destruction of property in writing, under oath. The applicant shall also allege that the threats are of a nature that the legal possession of a pistol would provide adequate protection.

2303.12   The Chief of Police or his or her designated agent shall conduct and investigation into the allegations of the applicant to determine if the alleged threats are serious and factual and are of a nature that can be protected by carrying a pistol. Factors to be considered include the substance of the alleged threat, whether or not the applicant made a timely report to the police of such threats, and whether or not the applicant has made a sworn complaint to the police in the courts of the District of Columbia.

2303.13   The Chief of Police or his or her designated agent shall find that normal police protection, a commission as a Special Police Officer pursuant to D.C. Code §4-114 (1981), or at the discretion of the Chief of Police, special police protection is insufficient to protect the applicant from the alleged threat to his or her person or property.

2303.14   An example of "any other proper reason" used to satisfy the requirements of §2303.9(c) may include an application by a parent, son, daughter, sibling or other adult member of the immediate family of the person for the protection of the other person who is physically or mentally incapacitated to a point where he or she cannot act in defense of himself or herself, or his or her property.

2303.15   "Any other proper reason" shall not include the carrying of a pistol to or from the place of purchase of the weapon, or to or from the place of target practice, sporting or recreational activity.

SOURCE: Final Rulemaking published at 21 DCR 413 (September 3, 1974).

## 2304   LICENSES FOR CONCEALED WEAPONS

2304.1   A license granted for concealed weapons shall be valid for one (1) month from the date of issuance.

2304.2   A license may be renewed at the end of one (1) month upon a written showing of continue d need for the license. Applicants who fail to apply for a renewed license before the expiration date, shall be required to pay the application fee for re-application.

2304.3   Only one (1) weapon shall be carried pursuant to a license. The description and serial number of the weapon shall be part of the license. A new license shall be required for each different weapon carried.

2304.4   At the time of the initial interview with the Chief of Police or his or her designated agent, applicant shall bring the pistol which he or she will carry pursuant to the license and the holster or holsters in which the weapon will be carried.

2304.5   Applicant shall surrender possession of the weapon and holster to the Metropolitan Police Department for a check to determine whether the weapon was reported stolen, to verify that the weapon is safe, in good operating condition, and to obtain test fired ballistics specimens for future comparison if the weapon is fired and to ensure that the holster(s) meets minimum standards for safe carrying of the weapon.

2304.6   If the weapon is reported stolen, the weapon shall not be returned to the applicant until it is properly processed through the Metropolitan Police Department Property Division and a determination of the rightful owner is made.

2304.7   If the pistol is found not to be in good operating condition, the pistol shall be returned to the applicant. No license shall be issued for a pistol which is not in the rightful possession of the applicant or which is not in good operating condition.

2304.8   The pistol for which the license is applied shall be a five (5) or six (6) shot revolver of no greater than a thirty-eight (.38) calibre. Automatic or semi-automatic pistols shall not be approved.

2304.9   Ammunition for the weapon may be no greater in size than a one hundred fifty-eight (158) grain round nose lead bullet and have a velocity of no greater than eight hundred feet (800 ft.) per second. Each weapon shall be carried in a holster approved by the Chief of Police or his or her designated agent.

2304.10   Any intentional false statement made on an application can be grounds for criminal charges for making a false report to the police under this chapter.

2304.11   Any information contained on the application for a license to carry a pistol shall be available to any law enforcement agency for law enforcement purposes. Otherwise, the information contained on the application for a license to carry a pistol shall be considered confidential and shall not be released without the written permission of the applicant.

2304.12   An applicant shall identify all known medical and mental records and sign written release for the Chief of Police or his or her designated agent to obtain the records. These records shall be used only for determining eligibility to be licensed to carry a pistol and for no other purpose.

2304.13   This section shall apply to all applicants for a license to carry a pistol and all renewals of licenses currently possessed.

2304.14   Each licensee shall submit a report to the Chief of Police each time he or she fires his or her weapon. The report shall state the complete details of the shooting of the weapon.

2304.15   An applicant shall register the pistol for which the license will apply.

2304.16   A license to carry a weapon shall be required whether the weapon is to be carried openly or on or about the person in a concealed manner.

2304.17   Applicants shall first be personally interviewed by the Chief of Police or his or her designated agent at which time applicant shall be fingerprinted and photographed and shall obtain an application form.

2304.18   Applications shall be made in writing only on the forms provided by the Chief of Police or his or her designated agent for that purpose.

2304.19   Applicants shall submit to the Chief of Police or his or her designated agent the following:

    (a)       A completed application; and

    (b)       The required fee of two dollars ($2) which is non-refundable.

2304.20   Upon receipt of a duly filed application, the Chief of Police or his or her designated agent shall, within thirty (30) days, do the following:

    (a)       Determine whether the application shall be approved;

    (b)       Determine whether the application shall be denied;

    (c)       Determine whether the applicant shall submit further information including further personal interviews or medical information, if necessary; and

    (d)       Notify the applicant in writing that his or her application has been approved or disapproved.

2304.21   Upon notification that his or her application has been approved, the Chief of Police, or his or her designated agent shall, within ten (10) days, issue the applicant a license to carry a pistol.

2304.22   An issued license may be revoked for any reason which would act as a bar to an original application for a license. In addition, a license may be revoked for misuse of the weapon. Misuse includes, but is not limited to the following:

    (a)       Firing warning shots; and

    (b)       Playing or "clowning" with the weapon.

2304.23   Revocation shall be in writing and shall be served in the same manner a civil process in the D.C. Superior Court.

2304.24   If the Chief of Police or his or her designated agent has not sent notice to the applicant that the application has been approved within thirty (30) days of the date of application, the application shall be presumed to be denied.

2304.25   Application forms shall include a written release of medical records necessary for a determination that the applicant is a suitable person to be licensed to carry a pistol.

    SOURCE: Final Rulemaking published at 21 DCR 413, 417 (September 3, 1974).

**DA 87**

# # 7

Testimony:

Chief of Police, MPD

U.S. Secret Service

U.S. Capitol Police

# Government of the District of Columbia



# Metropolitan Police Department

Testimony of
# Cathy L. Lanier
# Chief of Police

# *License to Carry a Pistol Amendment Act of 2014*

Committee on the Judiciary & Public Safety
## Tommy Wells, Chair
Council of the District of Columbia
October 16, 2014

John A. Wilson Building
1350 Pennsylvania Avenue, NW
Washington, DC 20004

Good morning, Councilmember Wells, members of the Committee, and guests. As the Chief of Police, I am testifying on behalf of the Executive in support of the *License to Carry a Pistol Amendment Act of 2014*. As you know, the Executive has worked closely with Chairman Mendelson and you to draft this legislation in response to the ruling by the U.S. District Court in the case of *Palmer v. District of Columbia*. The *Palmer* ruling, which may be subject to revision after further consideration by the district court or in an appeal, is the first in the District finding that a person's Second Amendment right to keep and bear arms for self-defense must extend beyond the home. The judge's ruling in the case – that there is a constitutional right to carry a handgun in public for self-defense – goes beyond the 2008 Supreme Court ruling in *Heller v. District of Columbia*, which ruled that there is a constitutional right to have a handgun for self-defense specifically in the home. The proposed bill maintains our commitment to keeping guns out of the wrong hands, while fully respecting the Second Amendment of the U.S. Constitution.

Since the ruling was made public on July 26, 2014, the Executive has worked closely with Chairman Mendelson and Councilmember Wells on emergency and the proposed permanent legislation amending the District's laws to conform to the Court's ruling. The legislation determines the essential guidelines about who can carry a handgun and where, by adapting a 1931 law enacted by Congress that authorized the Chief of Police to issue a license to carry a concealed pistol if it appears that the applicant has demonstrated:

- Good reason to fear injury to his or her person, including evidence of specific threats or previous attacks;
- Any other proper reason for carrying a pistol, such as employment that requires the applicant to transport cash or other valuables upon the applicants person; and
- That the applicant is a suitable person to be so licensed.

The proposed legislation follows models of states such as New York, New Jersey, and Maryland, which have adopted a similar licensing scheme, each of which has had its state licensing scheme upheld against Constitutional challenges by a federal court of appeals.

Other highlights of the draft bill include that anyone applying for a concealed carry license must:

- Meet the existing requirements for a person to register a firearm;
- Successfully complete a training program on gun safety and relevant District laws; and
- Establish that he or she does not currently suffer nor has suffered in the previous five years from any mental illness or condition that creates a substantial risk that he or she is a danger to him or herself or others.

In response to the court ruling, the legislation also establishes that a non-resident may obtain a license to carry a concealed pistol if they meet the same standards as a District resident. So an applicant from outside the District must meet all other eligibility requirements, aside from residing in or owning a business in the District.

1

In addition to including criminal and civil penalties for license-holders who fail to follow the duties and requirements for licensees, the law establishes a 5-person panel to hear appeals for any denials or revocations of licenses. The panel will include a representative from the mental health profession, as well as a prosecutor and a current or former law enforcement officer not employed by MPD.

The proposed law would prohibit concealed carry licensees from carrying handguns in the types of places that firearms have been traditionally prohibited such as government buildings, premises where alcohol is sold and served, schools and universities, and in circumstances where protection of public officials, visiting dignitaries, and demonstrators is paramount. The latter is critical here in the District of Columbia. As the Supreme Court noted in *Heller*, "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" are constitutional.

As I have testified before, the District of Columbia, as the seat of the federal government, with its multitude of critical official and symbolic buildings, monuments, and events, and high-profile public officials traversing its streets every day, is a city filled with sensitive places from a public safety perspective. Our laws should reflect that reality. Government facilities, dignitaries, and public servants are prime targets for terrorists, both foreign and domestic. Protecting government officials and infrastructure is a challenge for every city in the United States. But in the District the likelihood of attack is higher, and the challenges to protecting the city are greater. As recently as 2011, we saw an assassination attempt on the president – where fortunately the only thing the shooter hit was the White House – and another shooter firing at military installations. Both of these incidents were carried out by a lone gunman, angry at one facet or another of the U.S. government.

The high-profile human targets are an obvious and potentially attractive target. The District is vulnerable due to the sheer volume of secure motorcades traveling in Washington on any given day. The daily movements around the city of the President, Vice President, and their families, and the approximately 3,000 foreign dignitaries on official visits or just spending time in our city each year means that all of our roadways are a challenge to secure. And as the September 19th incident earlier this year at the White House demonstrated, even the home and office of the President of the United States has some vulnerability. Law enforcement needs to be able to prohibit guns from entering the perimeter of a secure area in order to be able to lessen the likelihood that an armed gunman will be able to make it close to protected targets.

I would urge the Council to make three changes to the list of places from which handguns will be prohibited.

- First, although the proposed bill prohibits handguns from government buildings, it should be broadened to prohibit them from the grounds and parking lots. We note, for example, the fatal shooting at the Pennsylvania State Police barracks in Blooming Grove, and the 2006 fatal

2

**DA 91**

shooting in the District suburb of Fairfax, Virginia[1]. In both instances, officers were gunned down in police parking lots during shift changes. While these two examples are of police, according to a 2013 study published by the U.S. Department of Justice, government employees are more than three times as likely as private-sector employees to be victims of workplace violence.[2] While prohibiting guns from being carried in the lots is not sufficient to stop a determined gunman, it does give police the authority to stop anyone in the parking lot or on the grounds that they have a reasonable suspicion is armed. This can help to save lives. Of course, people seeking to register a gun at the police headquarters can still bring their unloaded gun. Moreover, the provision in Section 907(d)(2) allows a firearm to be stored in compliance with lawful transportation requirements in relevant parking lots. This currently applies to subsections (a)(2) and (3), and can be expanded to cover (a)(1).

- Secondly, subsections 907(a)(8), (12), and (13) all indicate that guns can be prohibited from certain events or locations, but provide however, that no criminal penalty shall apply unless:

    A) The licensee has been advised by a law enforcement officer that such a public gathering, dignitary movement, or demonstration is occurring; and

    B) The licensee has been ordered by the law enforcement officer to leave the area until he or she removes the handgun from his or her possession in compliance with the law.

We have several concerns about these provisions. For one, the licensee should not need to be personally informed of the requirement. There are plenty of opportunities to provide due notice to a licensee, including event materials, signs at all entrances, advertisements, and tickets. It may be a reasonable defense that a licensee did not have due notice, but officers should not have to determine that fact on the spot before being able to take action against someone with a gun at an event open to the public. Moreover, event organizers should not have to rely on hiring police officers to notify attendees that firearms are prohibited. Imagine, for instance, how many officers would be needed at the Barbecue Battle—an annual competition held in the District among restaurants from around the country and dozens of entertainers from around the country—in order to ensure personal notice to licensees? If the fact that the event is a gun-free event is both posted and advertised, that should be sufficient for notice purposes. In addition, once so notified that firearms are prohibited, licensees are already required to know District law directing them to remove the handgun from the event. They should not therefore have another legal defense, to unnecessarily complicate prosecution, that they were not personally directed by law enforcement to remove the gun from the event.

---

[1] http://www.washingtonpost.com/wp-dyn/content/article/2006/05/08/AR2006050800968.html
[2] US Department of Justice, Bureau of Justice Statistics. *Special Report: Workplace Violence Against Government Employees, 1994-2011.*

- Lastly, the bill would prohibit carrying a concealed handgun on all public transportation except for taxi drivers, who would be authorized to apply for a handgun. We urge the ban to extend to taxi cabs as well. Taxi drivers are no more likely to be subject to specific threats or previous attacks than any other resident. Indeed, one would think it would be more difficult for a person to stalk or ambush a taxi driver because of the randomness of their daily travel. On the other hand, a potential passenger should not have to worry about whether their taxi driver is armed. In New York City, neither taxi drivers nor passengers can carry a firearm. We think this is a better plan for public safety.

We urge the Council to consider these changes to the legislation.

In addition to the legislation, more detailed regulations will be appropriate to establish the process for getting a license to carry a handgun.  In consult with District lawyers, the MPD is writing the regulations, based in part on our review of previous regulations in the District and on models from Maryland, New York, and New Jersey, whose licensing programs have already been found to be constitutional by their respective federal Courts of Appeal. To ensure that interested applicants can apply, most of the emergency regulations will be issued no later than October 22nd. Emergency regulations on obtaining certification to provide training will be issued by Monday so that potential trainers can apply for certification. To help ensure that training is available for licensees, any trainer who is already certified to provide firearm training for special police officers -- who are essentially the highest level of private building security -- will only need to provide training curriculum for initial certification.

This concludes my prepared remarks. At this time, I will be happy to address any of your questions.

4



U.S. Department of Homeland Security
## UNITED STATES SECRET SERVICE
*Washington, D.C. 20223*

DEPUTY
DIRECTOR

November 14, 2014

The Honorable Tommy Wells
Chairman
Committee on Judiciary and Public Safety
1350 Pennsylvania Ave. NW, Suite 109
Washington, DC 20004

Dear Chairman Wells:

I am writing to highlight the United States Secret Service's perspective on the proposed
"License to Carry a Pistol Amendment Act of 2014," which is currently under your
committee's consideration. Given the Secret Service's unique protective mission
responsibilities in the District of Columbia, we are highly interested in this proposal and
have reviewed the draft permanent legislation. I appreciate the opportunity to provide
you with both our overall perspective on the bill and suggestions for your consideration.

While the Secret Service's protective operations occur around the world, given that the
President, First Family, Vice President, foreign leaders, and other protectees reside, visit
and work here, we maintain a particularly high level of protection-related activities
within the District pursuant to our duties under 18 U.S.C. §§ 3056 and 3056A. Beyond
our permanent operations at the White House, Vice President's Residence, and around
the numerous foreign missions located in the District, the Secret Service often secures
venues around the District and transports the President and other protectees throughout it.

As a result of these responsibilities, the Secret Service supports the D.C. Council's efforts
to clearly define the circumstances surrounding an individual's ability to carry a
concealed weapon within the District. Based on our review of the draft legislation, we
suggest your consideration of two important items specific to our protective mission:

- Similar to the specific reference to the prohibition of carrying a concealed weapon
  in the area around the White House Complex, we suggest a specific reference to a
  50 foot area beyond the perimeter fence surrounding the U.S. Naval Observatory
  and the grounds where the Vice President's Residence is located.

- In its current form, the legislation establishes a 1,000 feet zone around dignitaries
  and other high ranking officials (where handguns would remain prohibited) when
  they are moving under the protection of the Metropolitan Police Department

The Honorable Tommy Wells
Page 2

(MPD).  We suggest eliminating the requirement that a protectee in these instances must be "moving" so that the 1,000 feet zone may also include situations when a protectee has arrived at his or her intended destination or has temporarily stopped en route to that destination.  Further, because the movements of Secret Service protectees within the District may not involve MPD assistance, we suggest clarifying that this provision also applies to protectees of other agencies with arrest authority in the District, such as the Secret Service Uniformed Division.

Again, I thank you for your willingness to consider our perspective on this piece of legislation.  I would like to highlight that the Secret Service's mission success is directly tied to the unwavering support of our partners at the local, state and Federal levels.  In particular, we greatly appreciate the MPD and the strong partnership we maintain with it.  If you require any additional information from the Secret Service as you consider this bill, I encourage you to contact me.

Respectfully,

A.T. Smith

cc: The Honorable Phil Mendelson, Chairman,
    Council of the District of Columbia



PHONE: 202-224-9806

# UNITED STATES CAPITOL POLICE

OFFICE OF THE CHIEF
119 D STREET, NE
WASHINGTON, DC 20510-7218

October 15, 2014

Phil Mendelson, Chairman
Council of the District of Columbia
John A. Wilson Building
1350 Pennsylvania Ave., N.W.
Washington, D.C. 20004
Pmendelson@dccouncil.us

Councilmember Tommy Wells, Chairperson
Committee on the Judiciary & Public Safety
Council of the District of Columbia
John A. Wilson Building
1350 Pennsylvania Ave., N.W.
Washington, D.C. 20004
twells@dccouncil.us

Subject: D.C. Bill 20-930, *License to Carry Pistol Amendment Act of 2014*

Dear Chairman Mendelson and Chairperson Wells:

Thank you for the opportunity to comment on D.C. Bill 20-930, the "License to Carry Pistol Amendment Act of 2014." It is my understanding that a hearing will take place on Thursday, October 16, 2014, on this bill and that you have invited comment on the bill that will be made part of the official record provided it is submitted no later than Thursday, October 30, 2014. I respectfully request that my comments on behalf of the U.S. Capitol Police be made part of the official record on this important bill.

As a daily partner with the Metropolitan Police Department and as a federal law enforcement entity fulfilling its statutory duties, Bill 20-930 directly impacts our law enforcement duties and responsibilities in maintaining security and safety within the District of Columbia. Therefore, the U.S. Capitol Police submitted comments to the draft legislation through MPD which do not currently appear in the legislation before the Committee and the D.C. Council and which we would like to have included in the permanent bill.

To highlight our comments, which are few in number, the U.S. Capitol Police requests that Capitol Buildings and Grounds be specifically listed as areas where firearms may not be possessed, concealed or not. As you are aware, federal law and D.C. law prohibit firearms within Capitol Buildings and Grounds. See 40 U.S.C. § 5104(e) and D.C. Code 10-503.16(a). Therefore, I respectfully request that new Title IX, Licenses to Carry a Pistol, Section 907(a) be further amended by the language in red to read as follows:

> *(10) The public memorials on the National Mall and along the Tidal Basin, and any other area where firearms are prohibited under federal law or by a federal agency or entity, including U.S. Capitol Buildings and Grounds;*

...

   *(12) Within 1,000 feet, or other lesser distance designated by the Chief,* <u>*his or her designee, or the Chief of the U.S. Capitol Police, when a dignitary or*</u> <u>*high ranking official of the United States or a state, local, or foreign government*</u> <u>*is moving under the protection of the MPD or the U.S. Capitol Police, or other*</u> <u>*law enforcement agency assisting or working in concert with MPD; provided*</u> <u>*that no criminal penalty shall apply unless:*</u>

...

   *(13) Within 1,000 feet, or other lesser distance designated by the Chief* *or his or her designee, of a demonstration in a public place,* <u>*other than federal*</u> <u>*property,*</u> *provided no criminal penalty shall apply unless:*

...

   Given the statutory responsibilities of the U.S. Capitol Police and federal statutes prohibiting firearms on federal property, as well as the specific Capitol Buildings and Grounds prohibitions enumerated in federal and D.C. statutes, these edits are essential to effective law enforcement within the District of Columbia.

   I sincerely appreciate your solicitation of comments and acceptance of U.S. Capitol Police comments into the official record. I look forward to working with you and the Metropolitan Police Department in enforcing the governing laws and maintaining our cooperative relationships. Thank you for your long record of leadership for public safety.

   Thank you again for your consideration as you move forward with this important legislation.

                                    Very respectfully,

                                    Kim C. Dine
                                    Chief of Police

Cc:    Chief Cathy L. Lanier
       Metropolitan Police Department

       Nicole Goines, Administrative Clerk
       Committee on the Judiciary and Public Safety
       Council of the District of Columbia
       ngoines@dccouncil.us

**DA 97**

# 8

X

Sunday, November 16 2014



UTC Aerospace Systems' Aces 5™ Ejection Seat **PROTECTING AMERICA'S ACES.**

United Technologies | Carrier | Otis | Pratt & Whitney | Sikorsky | UTC Aerospace Systems

**LEARN MORE**

Ad

**Wonkblog**

# More guns, more crime: New research debunks a central thesis of the gun rights movement

⬛  🐦  in  ✉  ＋   BUYPOWER CARD  Capital One  LEARN MORE ❯   A  🖨  💬 176

**By Christopher Ingraham** November 14  ✉

Follow @_cingraham

Making the world safer, or less safe? (Flickr user Robert Nelson / CC)

"More guns, less crime" - surely you've heard this mantra before? There's even an entire book devoted to it. As Emily Badger noted awhile back, it has become a staple of our national gun control debate: "The idea that more guns lead to less crime appears on gun policy 'fact sheets,' as evidence debunking gun control 'myths,' in congressional committee reports."

Advertisement

**The Most** Popular

All Over

The notion stems from a paper published in 1997 by economists John Lott and David Mustard, who looked at county-level crime data from 1977 to 1992 and concluded that "allowing citizens to carry concealed weapons deters violent crimes and it appears to produce no increase in accidental deaths." Of course, the study of gun crime has advanced significantly since then (no thanks to Congress). Some researchers have gone so far as to call Lott and Mustard's original study "completely discredited."

One of the major critiques of the study came from the National Research Council, which in 2004 extended the data through the year 2000 and ultimately concluded that "with the current evidence it is not possible to determine that there is a causal link between the passage of right-to-carry laws and crime rates." Or in other words, "More guns, less crime? ¯\_(ツ)_/¯"

Now, Stanford law professor John Donohue and his colleagues have added another full decade to the analysis, extending it through 2010, and have concluded that the *opposite* of Lott and Mustard's original conclusion is true: more guns equal *more* crime.

"The totality of the evidence based on educated judgments about the best statistical models suggests that right-to-carry laws are associated with substantially higher rates" of aggravated assault, robbery, rape and murder, Donohue said in an interview with the Stanford Report. The

ST. LOUIS POST-DISPATCH
Mizzou wins with offensive explosion   X

THE BALTIMORE SUN
Agents question North Carolina man discovered with missing...

FAST COMPANY
How To Make New Friends As An Adult

**Our Online Games**
Play right from this page

**Spider Solitaire**
**Genre(s):** Card
Spider Solitaire is known as the king of all solitaire games!

**52 card pickup**
**Genre(s):** Card
Pick up cards as fast as you can!

**Tri-Peaks Solitaire**
**Genre(s):** Card
Reveal cards as you clear your way to the top!

**Carniball**
**Genre(s):** Arcade
This amusement park classic will bring back some joyous memories

evidence suggests that right-to-carry laws are associated with an 8 percent increase in the incidence of aggravated assault, according to Donohue. He says this number is likely a floor, and that some statistical methods show an increase of 33 percent in aggravated assaults involving a firearm after the passage of right-to-carry laws.

These findings build on and strengthen the conclusions of Donohue's earlier research, which only used data through 2006. In addition to having nearly two decades' worth of additional data to work with, Donohue's findings also improve upon Lott and Mustard's research by using a variety of different statistical models, as well as controlling for a number of confounding factors, like the crack epidemic of the early 1990s.

These new findings are strong. But there's rarely such a thing as a slam-dunk in social science research. Donohue notes that "different statistical models can yield different estimated effects, and our ability to ascertain the best model is imperfect." Teasing out cause from effect in social science research is often a fraught proposition.

But for this very reason it's important for policymakers on both sides of the gun control debate to exercise caution in interpreting the findings of any one study. Gun rights advocates have undoubtedly placed too much stock in Lott and Mustard's original study, which is now going on 20 years old. The best policy is often

X

informed by good research. And as researchers revisit their data and assumptions, it makes sense for policymakers to do the same.

X

Christopher Ingraham writes about politics, drug policy and all things data. He previously worked at the Brookings Institution and the Pew Research Center.

# 9

Stanford Report, November 14, 2014

# Right-to-carry gun laws linked to increase in violent crime, Stanford research shows

*Stanford research reaffirms that right-to-carry gun laws are connected with an increase in violent crime. This debunks – with the latest empirical evidence – earlier claims that more guns actually lead to less crime.*

By Clifton B. Parker

New Stanford research confirms that right-to-carry gun laws are linked to an increase in violent crime.

Right-to-carry or concealed-carry laws have generated much debate in the past two decades – do they make society safer or more dangerous?

While there is no federal law on concealed-carry permits, all 50 states have passed laws allowing citizens to carry certain concealed firearms in public, either without a permit or after obtaining a permit from local government or law enforcement.



Vartanov Anatoly/Shutterstock

Research co-authored by law Professor John Donohue finds that right-to-carry gun laws are linked to an increase in violent crime.

Recently published scholarship updates the empirical evidence on this issue. Stanford law Professor John J. Donohue III, Stanford law student Abhay Aneja and doctoral student Alexandria Zhang from Johns Hopkins University were the co-authors of the study.

"Trying to estimate the impact of right-to-carry laws has been a vexing task over the last two decades," said Donohue, the C. Wendell and Edith M. Carlsmith Professor of Law, in an interview.

He explained that prior research based on data through 1992 indicated that the laws decreased violent crime. But in 2004, he noted, the National Research Council issued a report that found that even extending this data through 2000 revealed no credible statistical evidence these particular laws reduced crime.

## 'Totality of the evidence'

Now, Donohue and his colleagues have shown that extending the data yet another decade (1999-2010) provides the most convincing evidence to date that right-to-carry laws are associated with an increase in violent crime.

Case 1:15-cv-02234-RJL   Document 19-1   Filed 01/15/16   Page 108 of 332

"The totality of the evidence based on educated judgments about the best statistical models suggests that right-to-carry laws are associated with substantially higher rates" of aggravated assault, rape, robbery and murder, said Donohue.

The strongest evidence was for aggravated assault, with data suggesting that right-to-carry (RTC) laws increase this crime by an estimated 8 percent – and this may actually be understated, according to the researchers.

"Our analysis of the year-by-year impact of RTC laws also suggests that RTC laws increase aggravated assaults," they wrote.

The evidence is less strong on rape and robbery, Donohue noted. The data from 1979 to 2010 provide evidence that the laws are associated with an increase in rape and robbery.

The murder rate increased in the states with existing right-to-carry laws for the period 1999-2010 when the "confounding influence" of the crack cocaine epidemic is controlled for. The study found that homicides increased in eight states that adopted right-to-carry laws during 1999-2010.

### Research obstacles, next step

"Different statistical models can yield different estimated effects, and our ability to ascertain the best model is imperfect," Donohue said, describing this as the most surprising aspect of the study.

He said that many scholars struggle with the issue of methodology in researching the effects of right-to-carry laws. But overall, his study benefits from the recent data.

Donohue suggested it is worth exploring other methodological approaches as well. "Sensitive results and anomalies – such as the occasional estimates that right-to-carry laws lead to higher rates of property crime – have plagued this inquiry for over a decade," he said.

### Media Contact

John J. Donohue III, Stanford Law School: (650) 721-6339, donohue@law.stanford.edu

Clifton B. Parker, Stanford News Service: (650) 725-0224, cbparker@stanford.edu

---

© Stanford University. All Rights Reserved. Stanford, CA 94305. (650) 723-2300.

**DA 105**

# 10

# SPECIAL ARTICLE

## EFFECTS OF RESTRICTIVE LICENSING OF HANDGUNS ON HOMICIDE AND SUICIDE IN THE DISTRICT OF COLUMBIA

Colin Loftin, Ph.D., David McDowall, Ph.D., Brian Wiersema, and Talbert J. Cottey, M.S.

**Abstract** *Background.* Whether restricting access to handguns will reduce firearm-related homicides and suicides is currently a matter of intense debate. In 1976 the District of Columbia adopted a law that banned the purchase, sale, transfer, or possession of handguns by civilians. We evaluated the effect of implementing this law on the frequency of homicides and suicides.

*Methods.* Homicides and suicides committed from 1968 through 1987 were classified according to place of occurrence (within the District of Columbia or in adjacent metropolitan areas where the law did not apply), cause (homicide or suicide), mechanism of death (firearms or other means), and time of occurrence (before or after the implementation of the law). The number of suicides and homicides was calculated for each month during the study period, and differences between the mean monthly totals before and after the law went into effect were estimated.

*Results.* In Washington, D.C., the adoption of the gun-licensing law coincided with an abrupt decline in homicides by firearms (a reduction of 3.3 per month, or 25 percent) and suicides by firearms (reduction, 0.6 per month, or 23 percent). No similar reductions were observed in the number of homicides or suicides committed by other means, nor were there similar reductions in the adjacent metropolitan areas in Maryland and Virginia. There were also no increases in homicides or suicides by other methods, as would be expected if equally lethal means were substituted for handguns.

*Conclusions.* Restrictive licensing of handguns was associated with a prompt decline in homicides and suicides by firearms in the District of Columbia. No such decline was observed for homicides or suicides in which guns were not used, and no decline was seen in adjacent metropolitan areas where restrictive licensing did not apply. Our data suggest that restrictions on access to guns in the District of Columbia prevented an average of 47 deaths each year after the law was implemented. (N Engl J Med 1991;325:1615-20.)

BY any measure, firearms — especially handguns — are a leading instrument of violent injury. In 1987, firearms accounted for 32,919 fatalities in the United States: 18,144 suicides, 12,665 homicides, and 2110 unintentional fatalities, legal interventions (killings by law-enforcement officials), or deaths of undetermined type.[1] Sixty percent of all homicides and suicides during this year were committed with guns,[1] and handguns accounted for three fourths of the homicides by firearms.[2]

A central question in research on the prevention of gun-related mortality is whether restricting access to handguns would reduce deaths by firearms.[3] One approach to the issue is to examine patterns of mortality associated with changes in local, state, or national regulations. In 1976 the District of Columbia adopted one of the most restrictive handgun policies in the nation. The law prohibited the purchase, sale, transfer, and possession of handguns by civilians in Washington, D.C., unless a citizen already owned the handgun and had registered it under an existing system.[4] We conducted an interrupted time-series study to determine whether the implementation of the law reduced gun-related homicides and suicides.

## METHODS

### The Law

The District of Columbia's Firearms Control Regulations Act was signed by the mayor on July 23, 1976, and went into effect on September 24, 1976. A restraining order issued on December 9, 1976, interrupted its enforcement for 49 days, but the Appeals Court

of the District of Columbia reinstated the law, and its provisions became fully effective again on February 21, 1977.[5]

The law restricts the possession of firearms to persons who hold registration certificates. Persons who owned firearms at the time the law was implemented and who had registered them under the provisions of the 1968 code were given 60 days to reregister them. After the initial reregistration period, handguns became "unregisterable" and therefore illegal. Newly acquired rifles and shotguns can be registered if they are obtained in person from a licensed dealer in the district and if the owner meets specified requirements relating to age, criminal record, physical fitness, and knowledge of firearms laws and safe use. Finally, the law requires that registrants keep firearms unloaded and disassembled or locked up except while they are being used for lawful recreational purposes or when they are kept at a place of business. The penalty originally specified for violation of the law was 10 days in jail and a $300 fine. It was increased to one year in jail and a $1,000 fine in March 1981.

### Study Design

We undertook a longitudinal study, comparing the mean monthly numbers of gun-related homicides and suicides in the District of Columbia before the law was implemented with the numbers after its implementation. Comparisons with other areas and other types of deaths were used to determine whether the observed differences were specific to the District of Columbia. For comparison we used suicides and homicides committed in the district without firearms, homicides and suicides committed with firearms in adjacent metropolitan areas in Maryland and Virginia, and homicides and suicides committed without firearms in the adjacent metropolitan areas.

### Definition and Classification of Cases

Monthly totals of homicides and suicides in the District of Columbia and suburban Maryland and Virginia during the period 1968 through 1987 (the last year for which data were available) were obtained from tapes produced by the National Center for Health Statistics (NCHS).[1] The cases were classified according to place of occurrence (within the District of Columbia or in an adjacent metropolitan area), cause of death (homicide or suicide), mode

From the Violence Research Group, Institute of Criminal Justice and Criminology, University of Maryland at College Park, 2220 Lefrak Hall, College Park, MD 20742-8235, where reprint requests should be addressed to Dr. Loftin.

The New England Journal of Medicine
Downloaded from nejm.org at GEORGE MASON UNIVERSITY on February 2, 2016. For personal use only. No other uses without permission.
Copyright © 1991 Massachusetts Medical Society. All rights reserved.

DA 107

**Table 1. Mean Numbers of Homicides and Suicides per Month, According to Jurisdiction and Method, before and after the Implementation of the District of Columbia Law.**

| TYPE OF FATALITY AND LOCATION | BEFORE THE LAW | CHANGE AFTER THE LAW* | | | t-STATISTIC |
|---|---|---|---|---|---|
| | no./mo | no./mo | SE | % | |
| **Homicide** | | | | | |
| District of Columbia | | | | | |
|   Gun-related | 13.0 | −3.3 | 0.49 | −25 | −6.73 |
|   Non-gun-related | 7.3 | −0.3 | 0.36 | −4 | −0.83 |
| Maryland and Virginia | | | | | |
|   Gun-related | 5.8 | −0.4 | 0.35 | −7 | −1.14 |
|   Non-gun-related | 3.0 | 0.7 | 0.26 | 23 | 2.69 |
| **Suicide** | | | | | |
| District of Columbia | | | | | |
|   Gun-related | 2.6 | −0.6 | 0.20 | −23 | −3.00 |
|   Non-gun-related | 4.4 | −0.4 | 0.29 | −9 | −1.38 |
| Maryland and Virginia | | | | | |
|   Gun-related | 9.2 | 1.1 | 0.45 | 12 | 2.44 |
|   Non-gun-related | 9.9 | −0.2 | 0.49 | −2 | −0.41 |

*Difference between the mean number of fatalities per month before the implementation of the gun-licensing law and the mean number after its implementation.

of death (firearms or other means), and month of occurrence. The adjacent metropolitan areas were the parts of the Washington, D.C.–Maryland–Virginia Standard Metropolitan Statistical Area (SMSA) as constituted in 1967,[6] exclusive of the District of Columbia. Specifically, this area included the cities of Alexandria, Fairfax, and Falls Church, Virginia; Arlington, Fairfax, Loudoun, and Prince William counties in Virginia; and Montgomery and Prince George's counties in Maryland.

The cause and mechanism of death in each case were classified according to the codes in the *International Classification of Diseases, 8th Revision* (ICD-8) and *International Classification of Diseases, 9th Revision, Clinical Modification* (ICD-9-CM).[7,8] Four groups were defined: homicide by firearms (codes E965 in ICD-8 and E965.0 through E965.4 in ICD-9-CM); homicide by other means (E960 through E964 and E966 through E969 in ICD-8, and E960 through E964 and E965.5 through E969 in ICD-9-CM); suicide by firearms (E955 in ICD-8 and E955.0 through E955.4 in ICD-9-CM); and suicide by other means (E950 through E954 and E956 through E959 in ICD-8, and E950 through E954 and E955.5 through E959 in ICD-9-CM). Unintentional deaths (E922) and deaths caused by firearms in which the intent was unknown (E980 through E989) were excluded because the monthly frequencies were too low for meaningful analysis. A further refinement that would have classified deaths as caused by specific types of firearms, such as handguns, was not possible because the ICD-8 codes did not distinguish handguns from other firearms. In all, eight separate 240-month time series (105 months before the implementation of the law and 135 months thereafter) were analyzed. The first month after the law went into effect was October 1976.

As a check against possible effects of changes in the population, we conducted a similar analysis using annual mortality rates. For the District of Columbia, which is treated as a state for reporting purposes, annual population estimates from 1968 through 1987 for five age groups (<5, 5 through 19, 20 through 44, 45 through 64, and ≥65 years) were taken from NCHS vital-statistics records.[9] For the adjacent metropolitan areas, population estimates according to age were not available, but total population estimates for 1968 through 1987 were obtained from the Census Bureau's *Current Population Reports* (the values for 1969, 1978, and 1979 were interpolated, because county-level estimates were not generated by the Census Bureau for those years).[10,11] For the District of Columbia, age-standardized rates were calculated by the direct method, with the population of the district enumerated in the 1970 census as the standard.[12] Crude rates were calculated for the surrounding metropolitan areas. The first year after the law was implemented that is included in the annual analysis is 1977.

## Statistical Analysis

Statistical inferences were based on two approaches. First, the observations were assumed to be independently sampled from the populations in the District of Columbia before and after the im-



**Figure 1. Number of Homicides by Firearms per Month in Washington, D.C.**
The horizontal lines show the means before and after the implementation of the gun-licensing law, indicated by the vertical line.

The New England Journal of Medicine
Downloaded from nejm.org at GEORGE MASON UNIVERSITY on February 27, 2012. For personal use only. No other uses without permission.
Copyright © 1991 Massachusetts Medical Society. All rights reserved.

Vol. 325   No. 23      EFFECTS OF LICENSING HANDGUNS ON HOMICIDE AND SUICIDE — LOFTIN ET AL.      1617



Figure 2. Number of Suicides by Firearms per Month in Washington, D.C.
The horizontal lines show the means before and after the implementation of the gun-licensing law, indicated by the vertical line.

plementation of the law. According to this model, the difference between the mean monthly rates of fatalities is an estimate of the magnitude of the intervention (i.e., the effect of the law), and the statistical significance of the differences can be assessed with the usual t-test.[12] Second, because observations in time series are often not independent (that is, they are serially correlated), we also applied Box and Tiao's methods[14] for intervention analysis. Box–Tiao methods are based on the autoregressive, integrated, moving-average time-series models proposed by Box and Jenkins.[15] Following a strategy recommended by Box and Jenkins, we used the data to identify and estimate appropriate models for within-series correlation. Components representing the effect of the intervention (the law) were then added. For each series, we considered models in which change was abrupt and permanent, gradual and permanent, or abrupt and temporary.[16] All these analyses were conducted with use of algorithms in the SCA Statistical System software.[17]

For the analysis of the data on monthly frequency, serial correlation was minimal; therefore, the simple t-test statistics are presented. For some of the annual mortality rates, there was evidence of a relatively strong serial correlation among the observations. For these series, statistical inferences are based on the more complex Box–Tiao models. Details about the Box–Tiao estimates are available elsewhere.* All P values are two-tailed.

## Results

In the District of Columbia, the mean frequency of both suicides and homicides by firearms declined by about one quarter in the period after the law went into effect (Table 1). Gun-related homicides, with a mean

*See NAPS document no. 04909 for four pages of supplementary material. Order from NAPS c/o Microfiche Publications, P.O. Box 3513, Grand Central Station, New York, NY 10163-3513. Remit in advance (in U.S. funds only) $7.75 for photocopies or $5 for microfiche. Outside the U.S. and Canada add postage of $4.50 ($1.75 for microfiche postage). There is a $15 invoicing charge on all orders filled before payment.

of 13.0 per month before the law was implemented, declined to a mean of 9.7 per month thereafter (Fig. 1). Similarly, suicides in which guns were used declined from a mean of 2.6 per month to 2.0 per month (Fig. 2). When we used both a sampling model that assumed independent observations (Table 1) and one that assumed serial dependence of observations,* these differences between the means before and after the law went into effect were statistically significant (P<0.001 for homicides and P = 0.005 for suicides). Accordingly, the data are consistent with a model in which there was a decrease in the number of deaths by firearms after the law was implemented.

In contrast, none of the comparison time series showed declines of similar magnitude during the same period. Non-gun-related homicides (Fig. 3) and non-gun-related suicides (Fig. 4) in the District of Columbia declined only slightly (by 0.3 per month, or 4 percent, for homicides, and by 0.4 per month, or 9 percent, for suicides). Neither of these differences was statistically significant.

The adjacent areas in Maryland and Virginia, which were not subject to the change in gun regulations, did not have declines in gun-related homicides and suicides similar to those observed in the District of Columbia. The mean for gun-related homicides in these adjacent areas after the District of Columbia law was implemented was lower by 0.4 homicide per month (a decline of 7 percent), but the rate of suicides in which guns were used was higher by 1.1 per month (an increase of 12 percent). Neither difference represents a statistically significant decline.

The New England Journal of Medicine
Downloaded from nejm.org at GEORGE MASON UNIVERSITY on February 27, 2012. For personal use only. No other uses without permission.
Copyright © 1991 Massachusetts Medical Society. All rights reserved.

DA 109

1618                           THE NEW ENGLAND JOURNAL OF MEDICINE                        Dec. 5, 1991



Figure 3. Number of Homicides by Means Other than Firearms per Month in Washington, D.C.
The horizontal lines show the means before and after the implementation of the gun-licensing law, indicated by the vertical line.

The series of cases in Maryland and Virginia provide additional evidence that the decline in fatalities was specific to suicides and homicides by firearms in the District of Columbia. Homicides committed with other weapons in Maryland and Virginia increased by 23 percent, or 0.7 homicide per month, whereas the frequency of suicides by other methods changed very little: there was a decrease of 0.2 suicide per month, or 2 percent.

The analysis of annual mortality rates gave results similar in general pattern to those of the analysis of the monthly data. The Box–Tiao estimates are available elsewhere.* In the District of Columbia the rates of both homicides and suicides by firearms declined in the period after the law went into effect ($P<0.001$ and $P = 0.085$, respectively); at the same time, the rate of homicides committed by other means increased ($P = 0.082$) and that of suicides by other means did not change ($P = 0.653$). In the surrounding metropolitan area there were no significant changes in the annual mortality rates.

In summary, there was an abrupt decline in both suicides and homicides by firearms that coincided with the implementation of the restrictive licensing law. The reductions were specific to fatalities involving guns in the District of Columbia. No similar reduction was observed in homicides or suicides committed without guns, nor were there reductions in the adjacent areas of Maryland and Virginia, where the provisions of the law were not in effect.

## DISCUSSION

The strongest argument for attributing the reductions in homicides and suicides by firearms in the District of Columbia to the restrictive licensing law is the relative implausibility of alternative explanations. Earlier studies of the District of Columbia law, which were published a few years after the law was implemented,[18,19] were limited by a paucity of data and by the investigators' failure to compare deaths by firearms and deaths by other means. These studies demonstrated declines in violent crime but did not successfully show that the declines were limited to the District of Columbia or to violence involving guns. Accordingly, critics noted that the declines were probably due to confounding demographic trends or to unrelated criminal-justice policies.[20,21]

In the light of our study, alternative explanations appear implausible. The pattern of change in mortality rates that would be predicted from the effects of the gun law is specific and is unlikely to be simulated by coincidental changes in demographic, economic, cultural, or social factors. For example, economic factors might alter the homicide rate or the suicide rate, but it is unlikely that they would affect only deaths involving guns and that the changes would be limited to the

*See NAPS document no. 04909 for four pages of supplementary material. Order from NAPS c/o Microfiche Publications, P.O. Box 3513, Grand Central Station, New York, NY 10163-3513. Remit in advance (in U.S. funds only) $7.75 for photocopies or $5 for microfiche. Outside the U.S. and Canada add postage of $4.50 ($1.75 for microfiche postage). There is a $15 invoicing charge on all orders filled before payment.

The New England Journal of Medicine
Downloaded from nejm.org at GEORGE MASON UNIVERSITY on February 27, 2012. For personal use only. No other uses without permission.
Copyright © 1991 Massachusetts Medical Society. All rights reserved.

**DA 110**



Figure 4. Number of Suicides by Means Other than Firearms per Month in Washington, D.C.
The horizontal lines show the means before and after the implementation of the gun-licensing law, indicated by the vertical line.

District of Columbia. Similarly, improvements in the medical treatment of gunshot wounds since the Vietnam War or marked changes in the activities of the drug underworld might have reduced gun-related fatalities, but the expected pattern of changes would not be those that we observed. Improved medical treatment would be available in both the city and the suburbs, and changes in the drug underworld would not influence both homicides and suicides. Furthermore, the analysis of mortality rates indicates that the declines in homicides and suicides by firearms were not due to changes in characteristics of the resident population. The population estimates are, of course, subject to error, and complex changes in high-risk groups are also possible. Nevertheless, the population at risk was the same for both gun-related and non-gun-related mortality. Therefore, the differences between the rate of mortality by firearms and that of mortality due to other causes cannot be attributed to a failure to study the appropriate population.

The best explanation for the District of Columbia data is the weapon-choice theory developed by Zimring,[22] Cook,[23] and others.[24,25] According to this view, assaults, whether against others or self-directed, vary with respect to intent to kill. Some are characterized by a sustained, single-minded determination, whereas in others the intention is more episodic and ambivalently motivated. If the resolve is weak or short-lived, the relative frequency with which a particular type of weapon is used will be influenced by its availability.[23] The key element in the theory is that

firearms are more likely to cause death than are other weapons that are likely to be substituted. It follows that even if there is no change in the number of assaults or suicide attempts, a reduction in the availability of guns will result in a reduction in the number of deaths. The theory recognizes that people with more deadly intent may tend to select guns rather than other means, but it assumes that the association is less than perfect. Some people select guns because they are determined to kill, but others do so only because a gun is readily available.

The observations in the District of Columbia fit the predictions of the Zimring–Cook theory well. Especially interesting is the fact that in the District of Columbia there were no compensating increases in homicides or suicides by methods other than guns, as has been suggested in other studies.[26,27] The effects of the law were apparently truly preventive, in the sense that there was an overall reduction in the number of deaths. There may have been an increase in nonlethal injuries from weapons other than guns, but surveillance data on nonfatal injuries are not available.

The most surprising feature of the District of Columbia experience is the magnitude and suddenness of the effect. Observers expected the gun-licensing law to have limited or gradual effects because it "grandfathered" previously registered handguns and did not directly remove existing guns from their owners. In addition, observers argued that social conditions, including high levels of criminal violence and fear of victimization, were not affected and that there would

The New England Journal of Medicine
Downloaded from nejm.org at GEORGE MASON UNIVERSITY on February 27, 2012. For personal use only. No other uses without permission.
Copyright © 1991 Massachusetts Medical Society. All rights reserved.

DA 111

thus continue to be a high level of demand for illegal guns that could easily be supplied from neighboring jurisdictions.[23,28] In spite of these limitations, the law reduced gun-related suicides and homicides substantially and abruptly. Because people voluntarily disposed of guns or altered their patterns of storage and use, or because it was more difficult to obtain a new gun, the District of Columbia had about 47 fewer gun deaths each year after the restrictive licensing law was implemented.

The facts that the frequency of gun-related homicides remained high in the District of Columbia after the gun law went into effect and that there have been dramatic increases in homicides very recently are not incompatible with the argument that the restrictive licensing law had a preventive effect on homicides. The number of homicides is determined by many factors other than legal restrictions on access to guns. Since the economic and social conditions in the district are similar to those associated with high rates of homicide in other cities, it is not surprising that the frequency of homicide remained high in the District of Columbia or that in the district, as in many other cities in the late 1980s, there were dramatic increases in homicides attributable to the spread of "crack" cocaine.[23,29,30] It is reasonable to assume that the restrictions on access to guns in the district continued to exert a preventive effect even as homicide rates were driven up by conflict over drugs and other factors.

The data from the District of Columbia provide strong evidence that restrictive licensing of handguns reduced gun-related homicides and suicides, but they have limited usefulness in generalizing to other jurisdictions or to other policies designed to limit access to handguns. Comparative studies of other gun-licensing laws would provide information on which to base wider generalizations and increase our understanding of the factors that influence the preventive effect of licensing laws.

## REFERENCES

1. Department of Health and Human Services, National Center for Health Statistics. Mortality detail files, 1968 to 1987. Ann Arbor, Mich.: Interuniversity Consortium for Political and Social Research [distributor], 1990 (computer files).
2. Federal Bureau of Investigation. Crime in the United States, 1987. Washington, D.C.: Federal Bureau of Investigation, 1988.
3. Mercy JA, Houk VN. Firearm injuries: a call for science. N Engl J Med 1988;319:1283-5.
4. District of Columbia Firearms Control Regulations Act (D.C. Law 1-85), D.C. Code Ann. §6-2301, et seq. (1990). Charlottesville, Va.: Michie, 1990.
5. Wentworth E. Strict gun control law revived by Court of Appeals. Washington Post. February 5, 1977:B1.
6. Bureau of the Budget. Standard metropolitan statistical areas. Washington, D.C.: Government Printing Office, 1967.
7. National Center for Health Statistics. International classification of diseases, adapted for use in the United States. 8th rev. Washington, D.C.: Government Printing Office, 1967. (PHS publication no. 1693.)
8. Department of Health and Human Services. ICD-9-CM: international classification of diseases, clinical modification. 3rd ed., 9th rev. Vol. 1. Washington, D.C.: Government Printing Office, 1989. (DHHS publication no. (PHS) 89-1260.)
9. National Center for Health Statistics. Vital statistics of the United States. Vol. 2. Mortality, part A. 1968 to 1987. Washington, D.C.: Government Printing Office, 1972–1990.
10. Bureau of the Census. Current population reports 1968 to 1974. Series P-25. Nos. 452, 517, 537, 629, 688, 694. Washington, D.C.: Government Printing Office, 1969–1977.
11. Idem. Current population reports 1974 to 1987. Series P-26. Nos. 75-46, 76-20, 76-46, 77-20, 77-46, 78-20, 78-46, 85-MD-C, 85-VA-C, 88-B. Washington, D.C.: Government Printing Office, 1976–1990.
12. Idem. Census of the population, 1970, characteristics of the population, District of Columbia. Vol. 1. Part 10. Washington, D.C.: Government Printing Office, 1973.
13. Cochran WG. Planning and analysis of observational studies. New York: John Wiley, 1983.
14. Box GEP, Tiao GC. Intervention analysis with applications to economic and environmental problems. J Am Stat Assoc 1975;70:70-9.
15. Box GEP, Jenkins GM. Time-series analysis: forecasting and control. Rev. ed. San Francisco: Holden-Day, 1976.
16. McDowall D, McCleary R, Meidinger EE, Hay RA. Interrupted time series analysis. Beverly Hills, Calif.: Sage, 1980.
17. Liu LM, Hudak GB, Box GEP, Muller ME, Tiao GC. The SCA statistical system: reference manual for forecasting and time series analysis. Version III for MSDOS. DeKalb, Ill.: Scientific Computing Associates, 1986 (computer software program).
18. Nicholson R, Garner A. The analysis of the Firearms Control Act of 1975: handgun control in the District of Columbia. Washington, D.C.: United States Conference of Mayors, 1980.
19. Jones ED III. The District of Columbia's "Firearms Control Regulations Act of 1975": the toughest handgun control law in the United States — or is it? Ann Am Acad Polit Soc Sci 1981;455:138-49.
20. Wright JD, Rossi PH, Daly K. Under the gun: weapons, crime, and violence in America. New York: Aldine, 1983.
21. Valentine PW. Study cites decline over last 3 years in handgun crime. Washington Post. June 29, 1980:B1.
22. Zimring F. Is gun control likely to reduce violent killings? U Chicago Law Rev 1968;35:721-37.
23. Cook PJ. The technology of personal violence. In: Tonry M, ed. Crime and justice: an annual review of research. Vol. 14. Chicago: University of Chicago Press, 1991:1-71.
24. Baker SP. Without guns, do people kill people? Am J Public Health 1985;75:587-8.
25. Sloan JH, Kellermann AL, Reay DT, et al. Handgun regulations, crime, assaults, and homicide: a tale of two cities. N Engl J Med 1988;319:1256-62.
26. Rich CL, Young JG, Fowler RC, Wagner J, Black NA. Gun suicide: possible effects of some specific legislation. Am J Psychiatry 1990;147:342-6.
27. Sloan JH, Rivara FP, Reay DT, Ferris JAJ, Kellermann AL. Firearm regulations and rates of suicide: a comparison of two metropolitan areas. N Engl J Med 1990;322:369-73.
28. Zimring FE. Firearms in the twenty-first century: alternative policy futures. Ann Am Acad Polit Soc Sci 1981;455:1-10.
29. Office of Criminal Justice Plans and Analysis, Statistical Analysis Center. Homicide in the District of Columbia. Washington, D.C.: Office of Criminal Justice Plans and Analysis, 1988.
30. Morin R. Demographic line between slain, slayer indistinguishable. Washington Post. January 1, 1989:A1.

The New England Journal of Medicine
Downloaded from nejm.org at GEORGE MASON UNIVERSITY on February 27, 2012. For personal use only. No other uses without permission.
Copyright © 1991 Massachusetts Medical Society. All rights reserved.

# 12

## Legal Sufficiency



**OFFICE OF THE GENERAL COUNSEL**
Council of the District of Columbia
1350 Pennsylvania Avenue NW, Suite 4
Washington, DC 20004
(202) 724-8026

## MEMORANDUM

**TO:**        **Councilmember Tommy Wells**

**FROM:**    **V. David Zvenyach, General Counsel**     Certified by V. David Zvenyach
General Counsel
Council of the District of Columbia

**DATE:**    **November 25, 2014**

**RE:**        **Legal sufficiency determination for Bill 20-930, the
License to Carry a Pistol Amendment Act of 2014**

---

The measure is legally and technically sufficient for Council consideration.

Bill 20-930 amends the Firearm Control Regulations Act of 1975, effective September 24, 1976 (D.C. Law 1-85; D.C. Official Code § 7-2501.01 *et seq.*), to:

    (1) Permit a person to register a firearm for self-defense in their home or place of business;[1]

    (2) Provide Freedom of Information Act exceptions for records regarding individuals who have applied for, received, or had revoked a pistol registration or license to carry a concealed pistol.

    (3) Establish application requirements for a license to carry a concealed pistol, including requirements for completion of a firearms training course and range training;

    (4) Provide that a license to carry a concealed pistol shall expire 2 years after the date of issuance and set forth requirements for renewal of the license;

    (5) Provide for summary revocation, suspension, and permanent revocation of a license to carry a concealed pistol;

    (6) Prohibit the carrying of a concealed pistol while impaired;

---

[1] Under current law, a person may only register a firearm for use of self-defense in that person's home. *See* D.C. Official Code § 7-2502.02(a)(4)(C).

**LSD for Bill 20-930**
**Page 2 of 2**

(7) Establish prohibitions on carrying a concealed pistol in specified locations, including District buildings, hospitals, penal institutions, public transportation vehicles and metro stations, and premises licensed as a tavern or nightclub, and in specified circumstances, including circumstances in which a property owner or religious place of worship has not expressly allowed the carrying of a concealed pistol; and

(8) Establish the Concealed Pistol Licensing Review Board to hear appeals from a denial of an application or renewal application to carry a concealed pistol, summary suspension of or restriction on the license to carry a concealed pistol, or permanent revocation of a license to carry a concealed pistol; and to

(9) Set forth penalties.

Bill 20-930 also makes conforming amendments.

I am available if you have any questions.

VDZ

The Council of the District of Columbia
1350 Pennsylvania Avenue, N.W.
Washington, D.C. 20004

Dear Mayor-Elect Bowser, Chairman Mendelson and Council Members,

We represent the city's broad and diverse faith community. We believe and practice our faiths differently. However, we share the same values regarding peace, שָׁלוֹם (shalom), and سلام (salaam).

We come together to express our deep concern with the License to Carry a Pistol Amendment Act of 2014. The proposed legislation presumes that concealed pistols are permissible within houses of worship unless they post "conspicuous signage" prohibiting these pistols. This requirement is inappropriate and impractical in view of the overwhelming number of congregations that object to guns in their sacred spaces.

Moreover houses of worship are considered sanctuaries - places where people are safe from violence or the threat of violence. They are places for prayer, reflection, reconciliation, and solace. People should be able to do so without the fear of violence. They must be free to fulfill their spiritual needs at these holy places knowing they are indeed sanctuaries where peace is both sought and found.

The legislation prohibits pistols in numerous locations such as universities, schools, childcare facilities. We believe the legislation must also prohibit or presumptively prohibit pistols within houses of worship. Twelve other states---some with less restrictive gun laws---have similar prohibitions.

Accordingly we strongly urge you to revise the legislation to prohibit or presumptively prohibit pistols within our houses of worship.

Thank You.

cc: Mayor Vincent Gray


Respectfully yours,

The Rt. Rev. Marianne Edgar Budde
Bishop
Episcopal Diocese of Washington

Terrance Lynch
Executive Director
Downtown Cluster of Congregations

Talib M. Shareef, CMSgt, USAF-Retired
Imam / President
The Nation's Mosque, Masjid Muhammad

The Very Rev. Gary R. Hall
Dean
Washington National Cathedral

Rev. Susan Taylor
President
Founding Church of Scientology

Rev. Patrick Walker
President
Baptist Convention of D.C. and Vicinity

Monsignor John Enzler
President and CEO
Catholic Charities of the Archdiocese of Washington

Rev. Dr. James Coleman
Pastor
All Nations Baptist Church

Ronald Halber
Executive Director
Jewish Community Relations Council of Greater Washington

Michael Scott
Director
D.C. Catholic Conference

**DA 116**

Dr. Stephanie E. Myers, National Co-Chair
National Co-Chair
Black Women for Positive Change

Rev. Mark Horak
Pastor
Holy Trinity Catholic Church

Patty Johnson
Canon Missioner
Washington National Cathedral

Rev. Dr. Barbara Reynolds
Chaplain
Black Women for Positive Change

Rev. David Bava
Pastor
Holy Redeemer Catholic Church

Rev. Rebecca Justice Schunior
Associate Rector
St. Mark's Episcopal Church, Capitol Hill

**DA 117**

ENROLLED ORIGINAL

AN ACT

## D.C. ACT 20-621

IN THE COUNCIL OF THE DISTRICT OF COLUMBIA

## FEBRUARY 6, 2015

To amend the Firearms Control Regulations Act of 1975 to permit a person to register a firearm
for self-defense in his or her place of business, to provide a Freedom of Information Act
exception for pistol registration information, to specify application requirements for
applying for a license to carry a concealed pistol, to specify the duration of such licenses
and requirements for renewal of licenses, to establish duties of licensees, to provide for
revocation of licenses, to create a criminal offense of carrying while consuming alcohol
or while impaired, to specify prohibitions on licensees, to establish a Concealed Pistol
Licensing Review Board, to provide a Freedom of Information Act exception for license
information, to specify penalties for violations, and to require the Mayor to issue rules;
and to amend An Act To control the possession, sale, transfer, and use of pistols and
other dangerous weapons in the District of Columbia, to provide penalties, to prescribe
rules of evidence, and for other purposes to authorize the Chief of Police to issue licenses
to carry a concealed pistol to District residents and non-residents provided certain
conditions are met.

BE IT ENACTED BY THE COUNCIL OF THE DISTRICT OF COLUMBIA, That this
act may be cited as the "License to Carry a Pistol Amendment Act of 2014".

Sec. 2. The Firearms Control Regulations Act of 1975, effective September 24, 1976
(D.C. Law 1-85; D.C. Official Code § 7-2501.01 *et seq.*), is amended as follows:
(a) Section 201(b)(4) (D.C. Official Code § 7-2502.01(b)(4)) is amended by striking the
phrase "the home" and inserting the phrase "the home or place of business" in its place.
(b) Section 202(a)(4)(C) (D.C. Official Code § 7-2502.02(a)(4)(C)) is amended to read as
follows:
"(C) Any person who seeks to register a pistol:
"(i) For use in self-defense within that person's home or place of
business; or
"(ii) As part of the application process for a license to carry a
concealed pistol pursuant to section 902; or".
(c) Section 203(a)(4) (D.C. Official Code § 7-2502.03(a)(4)) is amended as follows:
(1) Subparagraph (D) is amended by striking the word "or" at the end.
(2) Subparagraph (E) is amended by adding the word "or" at the end.
(3) A new subparagraph (F) is added to read as follows:

1

"(F) Violation of section 503 of the Omnibus Public Safety and Justice Amendment Act of 2009, effective December 10, 2009 (D.C. Law 18-88; D.C. Official Code § 22-3133);".

(d) A new section 211a is added to read as follows:

"Sec. 211a. Freedom of information exception.

"Any record regarding a person who has applied for, received, or had revoked any registration issued pursuant to this title shall not be made available as a public record under section 202 of the Freedom of Information Act of 1976, effective March 25, 1977 (D.C. Law 1-96; D.C. Official Code § 2-532).".

(e) Section 706(a) (D.C. Official Code § 7-2507.06(a)) is amended by striking the phrase "Except as provided in sections 205, 208, 702, and 807" and inserting the phrase "Except as provided in sections 205, 208, 702, 807, and Title IX" in its place.

(f) A new Title IX is added to read as follows:

"TITLE IX – LICENSES TO CARRY A PISTOL.

"Sec. 901. Definitions.

"For the purposes of this title, the term:

"(1) "Child" means a person under 18 years of age.

"(2) "Concealed pistol" means a loaded or unloaded pistol carried on or about a person entirely hidden from view of the public, or carried on or about a person in a vehicle in such a way as it is entirely hidden from view of the public.

"(3) "Law enforcement officer" means a sworn member of the Metropolitan Police Department or of any other law enforcement agency operating and authorized to make arrests in the District of Columbia, and includes an MPD reserve officer, a special police officer appointed pursuant to section 202 of An Act Making appropriations to provide for the expenses of the government of the District of Columbia for the fiscal year ending June thirtieth, nineteen hundred, and for other purposes, approved March 3, 1899 (30 Stat. 1057; D.C. Official Code § 5-129.02), and a campus and a university special police officer appointed pursuant to the College and University Campus Security Amendment Act of 1995, effective October 18, 1995 (D.C. Law 11-63; 6A DCMR § 1200 *et seq.*).

"(4) "License" means a license to carry a concealed pistol issued pursuant to section 6 of the Pistols and Other Dangerous Weapons Act.

"(5) "Licensee" means a person who has been issued a license pursuant to section 6 of the Pistols and Other Dangerous Weapons Act.

"(6) "MPD" means the Metropolitan Police Department.

"(7) "Section 6 of the Pistols and Other Dangerous Weapons Act" means section 6 of An Act To control the possession, sale, transfer, and use of pistols and other dangerous weapons in the District of Columbia, to provide penalties, to prescribe rules of evidence, and for other purposes, approved July 8, 1932 (47 Stat. 650; D.C. Official Code § 22-4506).

"Sec. 902. Application requirements.

"(a) A person who submits an application pursuant to section 6 of the Pistols and Other Dangerous Weapons Act shall certify and demonstrate to the satisfaction of the Chief that he or she:

"(1) Is at least 21 years of age;

"(2) Meets all of the requirements for a person registering a firearm pursuant to this act, and has obtained a registration certificate for the pistol that the person is applying to carry concealed;

"(3)(A) Does not currently suffer from a mental illness or condition that creates a substantial risk that he or she is a danger to himself or herself or others; or

(B) If he or she has suffered in the previous 5 years from a mental illness or condition that created a substantial risk that he or she was a danger to himself or herself or others, no longer suffers from a mental illness or condition that creates a substantial risk that he or she is a danger to himself or herself or others;

"(4) Has completed a firearms training course or combination of courses, conducted by an instructor (or instructors) certified by the Chief, which includes at least 16 hours of training, and covers the following:

"(A) Firearm safety;

"(B) Firearm nomenclature;

"(C) Basic principles of marksmanship;

"(D) Care, cleaning, maintenance, loading, unloading, and storage of

pistols;

"(E) Situational awareness, conflict management, and use of deadly force;

"(F) Selection of pistols and ammunition for defensive purposes; and

"(G) All applicable District and federal firearms laws, including the requirements of this act, An Act To control the possession, sale, transfer, and use of pistols and other dangerous weapons in the District of Columbia, to provide penalties, to prescribe rules of evidence, and for other purposes, approved July 8, 1932 (47 Stat. 650; D.C. Official Code § 22-4501 *et seq.*), and District law pertaining to self-defense;

"(5) Has completed at least 2 hours of range training, conducted by an instructor certified by the Chief, including shooting a qualification course of 50 rounds of ammunition from a maximum distance of 15 yards (45 feet); and

"(6) Has complied with any procedures the Chief may establish by rule.

"(b) An applicant shall satisfy the requirements of subsection (a)(4) and (a)(5) of this section with a certification from a firearms instructor that the applicant:

"(1) Demonstrated satisfactory completion of the requirements of subsection (a)(4) and (a)(5) of this section; and

"(2) Possesses the proper knowledge, skills, and attitude to carry a concealed pistol.

"(c) An applicant may be exempt from some or all of the requirements of subsection (a)(4) and (a)(5) of this section if the applicant has submitted evidence that he or she has received firearms training in the United States military or has otherwise completed firearms training conducted by a firearms instructor that, as determined by the Chief, is equal to or greater than that required under subsection (a)(4) and (a)(5) of this section.

"(d) An applicant for a license may satisfy any component of the requirements of subsection (a)(4) and (a)(5) of this section by demonstrating to the satisfaction of the Chief that

the applicant has met that particular component as part of a successful application to carry a concealed pistol issued by the lawful authorities of any state or subdivision of the United States.

"(e)(1) An applicant shall sign an oath or affirmation attesting to the truth of all the information required by section 6 of the Pistols and Other Dangerous Weapons Act and this section.

"(2) Any declaration, certificate, verification, or statement made for purposes of an application for a license to carry a concealed pistol pursuant to this act shall be made under penalty of perjury pursuant to section 401 of the District of Columbia Theft and White Collar Crimes Act of 1982, effective December 1, 1982 (D.C. Law 4-164; D.C. Official Code § 22-2402).

"(f) An applicant is required to appear for an in-person interview at the MPD headquarters for purposes including verification of the applicant's identity and verification of the information submitted as part of the application process for a license.

"(g) Any person whose application has been denied may, within 15 days after the date of the notice of denial, appeal to the Concealed Pistol Licensing Review Board established pursuant to section 908.

"Sec. 903. Expiration and renewal of licenses.

"(a) A license shall expire no later than 2 years after the date of issuance unless revoked by the Chief or renewed pursuant to this title.

"(b)(1) A license shall be eligible for renewal if:

"(A) The licensee continues to meet the requirements of section 6 of the Pistols and Other Dangerous Weapons Act and section 902, except that:

"(i) With regard to section 902(a)(4), only 4 hours of such training shall be required for renewal; and

"(ii) With regard to section 902(a)(5), the licensee shall provide proof of 2 hours of range practice within the previous 12 months; and

"(B) The licensee follows any procedures the Chief may establish by rule.

"(2) Timely renewal shall be the responsibility of the licensee, pursuant to any procedures the Chief may establish by rule.

"(c) Any person whose renewal application has been denied may, within 15 days after the date of the notice of denial, appeal to the Concealed Pistol Licensing Review Board established pursuant to section 908.

"Sec. 904. Duties of licensees.

"(a) A licensee shall comply with all limits and conditions of the license.

"(b) A licensee shall notify the Chief in writing:

"(1) Immediately upon discovery of the loss, theft, or destruction of the license and include the circumstances of the loss, theft, or destruction, if known; and

"(2) Within 30 days after a change in the licensee's name or address as it appears on the license.

"(c) A licensee shall have on or about his or her person each time the pistol is carried in the District:

"(1) The license; and

4

"(2) The registration certificate for the pistol being carried, issued pursuant to this act.

"(d) If a law enforcement officer initiates an investigative stop of a licensee carrying a concealed pistol pursuant to section 6 of the Pistols and Other Dangerous Weapons Act, the licensee, and any other licensee carrying a concealed pistol pursuant to section 6 of the Pistols and Other Dangerous Weapons Act who is with the stopped licensee at the time of the investigative stop, shall:

"(1) Disclose to the officer that he or she is carrying a concealed pistol;

"(2) Present the license and registration certificate;

"(3) Identify the location of the concealed pistol; and

"(4) Comply with all lawful orders and directions from the officer, including allowing a pat down of his or her person and permitting the law enforcement officer to take possession of the pistol for so long as is necessary for the safety of the officer or the public.

"(e) The duties set forth in this section are in addition to any other requirements imposed by this act or applicable law.

"(f) In addition to any other penalty provided by law, a person who violates this section shall be subject to revocation of his or her license.

"Sec. 905. Revocation and suspension of licenses.

"(a)(1) The Chief may limit or revoke a license upon a finding that the licensee no longer meets the requirements of section 6 of the Pistols and Other Dangerous Weapons Act and this title, or as a penalty as specified in this act.

"(2) The United States Attorney for the District of Columbia, the Attorney General for the District of Columbia, or any person may apply to the MPD at any time for limitation or revocation of a license.

"(3) Any person having knowledge that a licensee no longer meets the requirements of this act or the requirements of section 6 of the Pistols and Other Dangerous Weapons Act may so notify the Chief or any other law enforcement officer who may take such action as may be appropriate.

"(4) Before a limitation or revocation taking effect, the Chief shall serve a notice of intent to limit or revoke the license. The limitation or revocation shall take effect unless the licensee requests an appeal to the Concealed Pistol Licensing Review Board established pursuant to section 908 no later than 15 days after the date of the notice of intent.

"(b)(1) The Chief may summarily suspend or limit, without a hearing, a license, when the Chief has determined that the conduct of a licensee presents an imminent danger to the health and safety of a person or the public.

"(2) At the time of the summary suspension or limitation of a license, the Chief shall provide the licensee with written notice stating the action that is being taken, the basis for the action, and the right of the licensee to request a hearing.

"(3) A licensee shall have the right to request a hearing within 72 hours after service of notice of the summary suspension or limitation of the license. The Concealed Pistol Licensing Review Board shall hold a hearing within 72 hours after receipt of a timely request, and shall issue a written decision within 72 hours after the hearing.

"Sec. 906. Carrying a pistol while impaired.

"(a) A licensee shall not carry a pistol while he or she is consuming alcohol.

"(b) A licensee shall not carry a pistol while impaired.

"(c) Upon establishing reasonable suspicion that a licensee has been consuming drugs or alcohol, a licensee's failure to submit to one or more field sobriety, breathalyzer, or urine tests, administered to determine whether the licensee is impaired while carrying a pistol, shall be grounds for summary suspension of the license pursuant to section 905(b).

"(d) In addition to any other penalty provided by law, any person who violates this section shall be subject to revocation of his or her license.

"(e) For the purposes of this section, the term "impaired" means a licensee has consumed alcohol or other drug or drugs and that it has affected the licensee's behavior in a way that can be perceived or noticed.

"Sec. 907. Prohibitions on carrying licensed pistols.

"(a) No person holding a license shall carry a pistol in the following locations or under the following circumstances:

"(1) A building or office occupied by the District of Columbia, its agencies, or instrumentalities;

"(2) The building and grounds, including any adjacent parking lot, of an childcare facility, preschool, public or private elementary or secondary school; or a public or private college or university;

"(3) A hospital, or an office where medical or mental health services are the primary services provided;

"(4) A penal institution, secure juvenile residential facility, or halfway house;

"(5) A polling place while voting is occurring;

"(6) A public transportation vehicle, including the Metrorail transit system and its stations;

"(7) Any premises, or portion thereof, where alcohol is served, or sold and consumed on the premises, pursuant to a license issued under Title 25 of the District of Columbia Official Code; provided, that this prohibition shall not apply to premises operating under a temporary license issued pursuant to D.C. Official Code § 25-115, a C/R, D/R, C/H, D/H or caterer license issued pursuant to D.C. Official Code § 25-113, or premises with small-sample tasting permits issued pursuant to D.C. Official Code § 25-118, unless otherwise prohibited pursuant to subsection (b)(3) of this section;

"(8) A stadium or arena;

"(9) A gathering or special event open to the public; provided, that no licensee shall be criminally prosecuted unless:

"(A) The organizer or the District has provided notice prohibiting the carrying of pistols in advance of the gathering or special event and by posted signage at the gathering or special event; or

"(B) The licensee has been ordered by a law enforcement officer to leave the area of the gathering or special event and the licensee has not complied with the order;

"(10) The public memorials on the National Mall and along the Tidal Basin, and any area where firearms are prohibited under federal law or by a federal agency or entity, including U.S. Capitol buildings and grounds;

"(11) The area around the White House between Constitution Avenue, N.W., and H Street, N.W., and between 15th Street, N.W., and 17th Street, N.W.;

"(12) The U.S. Naval Observatory and its grounds, and from the perimeter of its fence to the curb of Massachusetts Avenue, N.W., from 34th Street, N.W., south on Massachusetts Avenue, N.W., to Observatory Circle, N.W.;

"(13)(A) When a dignitary or high-ranking official of the United States or a state, local, or foreign government is moving under the protection of the MPD, the U.S. Secret Service, the U.S. Capitol Police, or other law enforcement agency assisting or working in concert with MPD, within an area designated by the Chief, the Chief of the U.S. Secret Service, or the Chief of the U.S. Capitol Police, or a designee of any of the foregoing, that does not include any point at a distance greater than 1,000 feet from the moving dignitary or high-ranking official; provided, that no licensee shall be criminally prosecuted unless:

"(i) The law enforcement agency provides notice of the designated area by the presence of signs, law enforcement vehicles or officers acting as a perimeter, or other means to make the designated area of protection obvious;

"(ii) The District or federal government has provided notice prohibiting the carrying of pistols along a designated route or in a designated area in advance of the event, if possible, and by posted signage along a route or in a designated area; or

"(iii) The licensee has been ordered by a law enforcement officer to leave the designated area and the licensee has not complied with the order.

"(B) For the purposes of this paragraph, the term "moving" shall include any planned or unplanned stops, including temporary stops, in locations open to the public.

"(14) When demonstration in a public place is occurring, within an area designated by the Chief or his or her designee, or other law enforcement agency, that does not include any point at a distance greater than 1,000 feet from the demonstration; provided, that no licensee shall be criminally prosecuted unless:

"(A) The law enforcement agency provides notice of the designated area by the presence of signs, law enforcement vehicles or officers acting as a perimeter, or other means to make the designated area of the demonstration obvious;

"(B) The District or federal government has provided notice prohibiting the carrying of pistols along or within a demonstration route or designated area in advance of the event, if possible, and by posted signage along a demonstration route or designated area; or

"(C) The licensee has been ordered by a law enforcement officer to leave the designated area and the licensee has not complied with the order; or

"(15) Any prohibited location or circumstance that the Chief determines by rule; provided, that for spontaneous circumstances, no criminal penalty shall apply unless the licensee has notice of the prohibition and has failed to comply.

"(b)(1) The carrying of a concealed pistol on private residential property shall be presumed to be prohibited unless otherwise authorized by the property owner or person in

control of the premises and communicated personally to the licensee in advance of entry onto the residential property.

"(2) The carrying of a concealed pistol in a church, synagogue, mosque, or other place where people regularly assemble for religious worship shall be presumed to be prohibited unless the property is posted with conspicuous signage allowing the carrying of a concealed pistol, or the owner or authorized agent communicates such allowance personally to the licensee in advance of entry onto the property; provided, that such places may not authorize the carrying of a concealed pistol where services are conducted in locations listed in subsection (a) of this section.

"(3) The carrying of a concealed pistol on private property that is not a residence shall be presumed to be permitted unless the property is posted with conspicuous signage prohibiting the carrying of a concealed pistol, or the owner or authorized agent communicates such prohibition personally to the licensee.

"(c) Whenever a licensee carries a concealed pistol and approaches any prohibited location, or is subject to any prohibited circumstance, under subsection (a) or (b) of this section, the licensee shall:

"(1) If the licensee is in a vehicle or if a vehicle is readily available, immediately secure the pistol in the manner prescribed in section 4b(b) of An Act To control the possession, sale, transfer, and use of pistols and other dangerous weapons in the District of Columbia, to provide penalties, to prescribe rules of evidence, and for other purposes, effective May 20, 2009 (D.C. Law 17-388; D.C. Official Code § 22-4504.02(b)); or

"(2) If the licensee does not have a vehicle available, immediately leave the prohibited location or circumstance.

"(d) A licensee shall not be in violation of this section:

"(1) While he or she is traveling along a public street, road, or highway, including an adjacent public sidewalk that touches the perimeter of any of the premises where the carrying of a concealed pistol is prohibited under subsection (a) or subsection (b) of this section if the concealed pistol is carried on his or her person in accordance with this act, or is being transported by the licensee in accordance with section 4b of An Act To control the possession, sale, transfer, and use of pistols and other dangerous weapons in the District of Columbia, to provide penalties, to prescribe rules of evidence, and for other purposes, effective May 20, 2009 ( D.C. Law 17-388; D.C. Official Code § 22-4504.02); or

"(2) While driving a vehicle into and immediately parking at any location listed in subsection (a)(2) of this section for the purpose of picking up or dropping off a student or a child; provided, that the licensee shall secure the concealed pistol in accordance with section 4b(b) of An Act To control the possession, sale, transfer, and use of pistols and other dangerous weapons in the District of Columbia, to provide penalties, to prescribe rules of evidence, and for other purposes, effective May 20, 2009 (D.C. Law 17-388; D.C. Official Code § 22-4504.02(b)), before leaving the parked vehicle.

"(e) A licensee shall not carry a pistol openly or otherwise in a manner that is not concealed.

"(f) In addition to any other penalty provided by law, any person who violates this section shall be subject to revocation of his or her license.

"(g) For the purposes of this section, the term:

"(1) "Demonstration" means one or more persons demonstrating, picketing, speechmaking, marching, holding a vigil, or engaging in any other similar conduct that involves the communication or expression of views or grievances and that has the effect, intent, or propensity to attract a crowd or onlookers. The term "demonstration" does not include the casual use of property by visitors or tourists that does not have the effect, intent, or propensity to attract a crowd or onlookers.

"(2) "Public place" means a place to which the general public has access and a right to occupy for business, entertainment, or other lawful purpose. The term "public place" is not limited to a place devoted solely to the uses of the public, and includes:

"(A) The front or immediate area or parking lot of a store, restaurant, tavern, shopping center, or other place of business;

"(B) A public building, including its grounds and curtilage;

"(C) A public parking lot;

"(D) A public street, sidewalk, or right-of-way;

"(E) A public park; and

"(F) Other public grounds.

"(3) "Public transportation vehicle" means any publicly owned or operated commercial vehicle, including any DC Circulator bus, DC Streetcar, MetroAccess vehicle, Metrobus, or Metrorail train.

"(4) "Residence" means a building wholly or partly used or intended to be used for living and sleeping by human occupants, together with any fences, walls, sheds, garages, or other accessory buildings appurtenant to the building, and the area of land surrounding the building and actually or by legal construction forming one enclosure in which such a building is located, but does not include adjacent common areas or commercial property contained in any part of the building.

"Sec. 908.  Concealed Pistol Licensing Review Board.

"(a) There is established a Concealed Pistol Licensing Review Board ("Board") for the purpose of hearing appeals from:

"(1) A denial of an application or renewal application for a license to carry a concealed pistol in the District pursuant to this act;

"(2) A summary suspension or limitation of a license to carry a concealed pistol; or

"(3) A limitation or revocation of a license to carry a concealed pistol.

"(b)(1) The Board shall consist of 7 members as follows:

"(A) The United States Attorney ("USAO") for the District of Columbia or his or her designee; provided, that if the USAO declines to provide a representative, the Mayor shall appoint a person who is a former employee of the USAO;

"(B) The Attorney General for the District of Columbia or his or her designee;

"(C) A mental health professional employed by the Department of Behavioral Health, appointed by the Mayor;

"(D) A former sworn officer of a law enforcement agency other than the MPD, appointed by the Mayor;

"(E) Three public members appointed by the Mayor, as follows:

"(i) One mental health professional; and

"(ii) Two District residents with experience in the operation, care, and handling of firearms.

"(2) The appointment of members designated by subsection (b)(1)(D) and (b)(1)(E) of this section shall be made in accordance with the following provisions:

"(A) Each member shall be appointed for a term of 4 years, and shall continue to serve during that time as long as the member remains eligible for the appointment;

"(B) A member may be reappointed;

"(C) A Board member whose term has expired may continue to serve as a member until a replacement member has been appointed;

"(D) A person appointed to fill a vacancy occurring before the expiration of a term shall serve for the remainder of the term or until a successor has been appointed; and

"(E) A member may be removed by the appointing authority only for incompetence, neglect of duty, or misconduct.

"(3) The Mayor shall select a chairperson.

"(4) Members shall serve without compensation, but shall be compensated for actual and necessary expenses incurred in the performance of their official duties.

"(c) Four members of the Board shall constitute a quorum, except that 2 members shall be a quorum when hearing panels of 3 members are assigned by the Board to conduct a hearing and make a final decision required by this section. Each hearing panel shall contain at least one member designated by subsection (b)(1)(A), (B), or (D) of this section.

"(d)(1) Within 30 days after the effective date of the License to Carry a Pistol Amendment Act of 2014, passed on 2nd reading on December 17, 2014 (Enrolled version of Bill 20-930) , the Mayor, by rule, shall establish hearing procedures for a contested case review of any appeal, including the manner and time of appeals, and procedures for the Board to assign panels of 3 Board members to conduct such hearings and issue final decisions, pursuant to subsection (c) of this section.

"(2) The rules shall include that the burden of production of evidence, and the burden of persuasion, at a hearing before the Board shall be upon the applicant or licensee that is challenging a denial of an application or renewal application or limitation or revocation of a license.

"(e) The meetings and hearings conducted by the Board shall be confidential and not open to the public.

"(f) Any person, including the Chief, aggrieved by a final action of the Board  may file an appeal in accordance with Title I of the District of Columbia Administrative Procedure Act, approved October 21, 1968 (82 Stat. 1204; D.C. Official Code § 2-501 *et seq.*).

"Sec. 909. Freedom of information exception; report.

**DA 127**

"(a) Any record regarding a person who has applied for, received, or had revoked a license shall not be made available as a public record under section 202 of the Freedom of Information Act of 1976, effective March 25, 1977 (D.C. Law 1-96; D.C. Official Code § 2-532); provided, that aggregate data, excluding any personal identifying information, may be used for the purposes of the public report in subsection (b) of this section.

"(b) Every 2 years, the MPD shall make public a report that includes the following information:

"(1) The total number of valid licenses; and

"(2) For the most recent 2-year period:

"(A)  The number of applications for a  license received;

"(B) The number of licenses issued;

"(C)  The number of licenses renewed, suspended, revoked, or denied;

"(D)  The number of licensees convicted of a crime involving a pistol, classified by type of crime;

"(E)  The number of pistols for which a license was issued that were reported lost or stolen; and

"(F) The number of pistols for which a license was issued that were found or recovered as stolen that were unreported by a licensee as lost or stolen.

"Sec. 910. Penalties.

"(a)(1) Except as otherwise provided in this title, a person convicted of a violation of a provision of this title, or rules or regulations issued under the authority of this title, shall be fined not more than the amount set forth in section 101 of the Criminal Fine Proportionality Amendment Act of 2012, effective June 11, 2013 (D.C. Law 19-317; D.C. Official Code § 22-3571.01), or imprisoned for not more than 180 days.

"(2) Civil fines, penalties, and fees may be imposed as alternative sanctions for any infraction of the provisions of this title, or any rules or regulations issued under the authority of this title.

"(b) All prosecutions for violations of this title shall be brought in the name of the District of Columbia and prosecuted by the Office of the Attorney General for the District of Columbia.

"Sec. 911. Rules.

"The Chief of the MPD, pursuant to Title I of the District of Columbia Administrative Procedure Act, approved October 21, 1968 (82 Stat. 1204; D.C. Official Code § 2-501 *et seq.*), shall issue rules to implement the provisions of the License to Carry a Pistol Amendment Act of 2014, passed on 2nd reading on December 17, 2014 (Enrolled version of Bill 20-930), including rules:

"(1) To establish criteria for determining when an applicant has, pursuant to section 6 of the Pistols and Other Dangerous Weapons Act:

"(A) Demonstrated a good reason to fear injury to his or her person, which shall at a minimum require a showing of a special need for self-protection distinguishable from the general community as supported by evidence of specific threats or previous attacks that demonstrate a special danger to the applicant's life;

11

**DA 128**

"(B) Demonstrated any other proper reason for carrying a concealed pistol, which shall at a minimum include types of employment that require the handling of cash or other valuable objects that may be transported upon the applicant's person; and

"(C) Demonstrated the applicant's suitability to carry a concealed pistol, which shall at a minimum include evidence that the applicant meets the requirements of section 902;

"(2) To establish the type and amount of ammunition that may be carried concealed by a licensee;

"(3) To establish the methods by which a pistol may be carried, including any standards for safe holstering;

"(4) To establish all application forms, investigation procedures, background checks, and fees necessary to process an application for a license to carry a concealed pistol;

"(5) To specify any procedures or requirements specific to non-residents who apply to carry a concealed pistol pursuant to section 6 of the Pistols and Other Dangerous Weapons Act, with regard to the registration requirements in this act;

"(6) To specify requirements for signage on any private premises where the owner or person in control of the premises prohibits the carrying of a concealed pistol pursuant to section 907(b); and

"(7) To establish procedures for the renewal of licenses.".

Sec. 3. An Act To control the possession, sale, transfer, and use of pistols and other dangerous weapons in the District of Columbia, to provide penalties, to prescribe rules of evidence, and for other purposes, approved July 8, 1932 (47 Stat. 650; D.C. Official Code § 22-4501 *et seq.*), is amended as follows:

(a) Section 4(a) (D.C. Official Code § 22-4504(a)) is amended as follows:

(1) The lead-in language is amended as follows:

(A) Strike the phrase "a pistol" and insert the phrase "a pistol, without a license issued pursuant to District of Columbia law" in its place.

(B) Strike the phrase "capable of being so concealed".

(2) Paragraph (1) is amended by striking the phrase "a pistol" and inserting the phrase "a pistol, without a license issued pursuant to District of Columbia law" in its place.

(b) Section 6 (D.C. Official Code § 22-4506) is revived as of the effective date of the License to Carry a Pistol Emergency Amendment Act of 2014, effective October 9, 2014 (D.C. Act 20-447; 61 DCR 10765), and is amended to read as follows:

"Sec. 6. Issuance of a license to carry a pistol.

"(a) The Chief of the Metropolitan Police Department ("Chief") may, upon the application of a person having a bona fide residence or place of business within the District of Columbia, or of a person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his or her person issued by the lawful authorities of any State or subdivision of the United States, issue a license to such person to carry a pistol concealed upon his or her person within the District of Columbia for not more than 2 years from the date of issue, if it appears that the applicant has good reason to fear injury to his

or her person or property or has any other proper reason for carrying a pistol, and that he or she is a suitable person to be so licensed.

"(b) A non-resident who lives in a state that does not require a license to carry a concealed pistol may apply to the Chief for a license to carry a pistol concealed upon his or her person within the District of Columbia for not more than 2 years from the date of issue; provided, that he or she meets the same reasons and requirements set forth in subsection (a) of this section.

"(c) For any person issued a license pursuant to this section, or renewed pursuant to section 903 of the Firearms Control Regulations Act of 1975, passed on 2nd reading on December 17, 2014 (Enrolled version of Bill 20-930), the Chief may limit the geographic area, circumstances, or times of the day, week, month, or year in which the license is effective, and may subsequently limit, suspend, or revoke the license as provided under section 905 of the Firearms Control Regulations Act of 1975, passed on 2nd reading on December 17, 2014 (Enrolled version of Bill 20-930).

"(d) The application for a license to carry shall be on a form prescribed by the Chief and shall bear the name, address, description, photograph, and signature of the licensee.

"(e) Except as provided in section 905(b) of the Firearms Control Regulations Act of 1975, passed on 2nd reading on December 17, 2014 (Enrolled version of Bill 20-930), any person whose application has been denied or whose license has been limited or revoked may, within 15 days after the date of the notice of denial or notice of intent, appeal to the Concealed Pistol Licensing Review Board established pursuant to section 908 of the Firearms Control Regulations Act of 1975, passed on 2nd reading on December 17, 2014 (Enrolled version of Bill 20-930).".

Sec. 4. Section 101 of the Omnibus Public Safety and Justice Amendment Act of 2009, effective December 10, 2009 (D.C. Law 18-88; D.C. Official Code § 22-2511), is repealed.

Sec. 5. Fiscal impact statement.
The Council adopts the fiscal impact statement in the committee report as the fiscal impact statement required by section 602(c)(3) of the District of Columbia Home Rule Act, approved December 24, 1973 (87 Stat. 813; D.C. Official Code § 1-206.02(c)(3)).

Sec. 6. Effective date.
This act shall take effect following approval by the Mayor (or in the event of veto by the Mayor, action by the Council to override the veto), a 60-day period of congressional review as

**DA 130**

provided in section 602(c)(2) of the District of Columbia Home Rule Act, approved December 24, 1973 (87 Stat. 813; D.C. Official Code § 1-206.02(c)(2)), and publication in the District of Columbia Register.

_____
Chairman
Council of the District of Columbia


_____
Mayor
District of Columbia
APPROVED
February 6, 2015

**DA 131**



# COUNCIL OF THE DISTRICT OF COLUMBIA
## WASHINGTON, D.C. 20004

Docket No. **B20-930**

[ ] ITEM ON CONSENT CALENDAR
[X] ACTION & DATE                    **ADOPTED FIRST READING, 12/2/2014**

[X] VOICE VOTE
    RECORDED VOTE ON REQUEST      **APPROVED**

ABSENT

[ ] ROLL CALL VOTE – Result                                          (          )

| Councilmember | Aye | Nay | NV | AB | Councilmember | Aye | Nay | NV | AB | Councilmember | Aye | Nay | NV | AB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Chmn. Mendelson | X | | | | Cheh | X | | | | Orange | X | | | |
| Alexander | X | | | | Evans | X | | | | Wells | X | | | |
| Bonds | X | | | | Graham | X | | | | | | | | |
| Bowser | X | | | | Grosso | | X | | | | | | | |
| Catania | X | | | | McDuffie | X | | | | | | | | |

X – Indicate Vote                     AB – Absent                    NV – Present, Not Voting

CERTIFICATION RECORD

_____          1 · 14 · 15
Secretary to the Council                    Date

[ ] ITEM ON CONSENT CALENDAR
[X] ACTION & DATE                    **ADOPTED FINAL READING, 12/17/2014**

[X] VOICE VOTE
    RECORDED VOTE ON REQUEST      **APPROVED**

ABSENT

[ ] ROLL CALL VOTE – Result                                          (          )

| Councilmember | Aye | Nay | NV | AB | Councilmember | Aye | Nay | NV | AB | Councilmember | Aye | Nay | NV | AB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Chmn. Mendelson | X | | | | Cheh | X | | | | Orange | X | | | |
| Alexander | X | | | | Evans | X | | | | Wells | X | | | |
| Bonds | X | | | | Graham | X | | | | | | | | |
| Bowser | X | | | | Grosso | | X | | | | | | | |
| Catania | X | | | | McDuffie | X | | | | | | | | |

X – Indicate Vote                     AB – Absent                    NV – Present, Not Voting

CERTIFICATION RECORD

_____          1 · 14 · 15
Secretary to the Council                    Date

[ ] ITEM ON CONSENT CALENDAR
[ ] ACTION & DATE
[ ] VOICE VOTE
    RECORDED VOTE ON REQUEST
ABSENT

[ ] ROLL CALL VOTE – Result                                          (          )

| Councilmember | Aye | Nay | NV | AB | Councilmember | Aye | Nay | NV | AB | Councilmember | Aye | Nay | NV | AB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Chmn. Mendelson | | | | | Cheh | | | | | Orange | | | | |
| Alexander | | | | | Evans | | | | | Wells | | | | |
| Bonds | | | | | Graham | | | | | | | | | |
| Bowser | | | | | Grosso | | | | | | | | | |
| Catania | | | | | McDuffie | | | | | | | | | |

X – Indicate Vote                     AB – Absent                    NV – Present, Not Voting

CERTIFICATION RECORD

_____
Secretary to the Council                    Date

**DA 132**

# The Impact of Right to Carry Laws and the NRC Report: The Latest Lessons for the Empirical Evaluation of Law and Policy

Abhay Aneja, John J. Donohue III, Alexandria Zhang[1]

Abhay Aneja: School of Law, Stanford University, 559 Nathan Abbott Way, Stanford, CA 94305 (email: aaneja@stanford.edu);  John J. Donohue III: School of Law, Stanford University, 559 Nathan Abbott Way, Stanford, CA 94305 (email: donohue@law.stanford.edu); Alexandria Zhang: Department of Economics, Johns Hopkins University, 440 Mergenthaler Hall, 3400 N. Charles Street, Baltimore, MD 21218 (azhang4@jhu.edu).

December 1, 2014

[1] The authors wish to thank David Autor, Alan Auerbach, Phil Cook, Peter Siegelman, Hugh LaFollette, and an anonymous referee for helpful comments, Todd Elder for assistance in understanding the technique of testing for omitted variable bias, Akshay Rao, Vikram Rao, Andrew Baker, and Kyle Weber for outstanding research assistance, and Stanford Law School and Yale Law School for financial support.

1

**DA 133**

**Abstract**

For over a decade, there has been a spirited academic debate over the impact on crime of laws that grant citizens the presumptive right to carry concealed handguns in public – so-called right-to-carry (RTC) laws.  In 2004, the National Research Council (NRC) offered a critical evaluation of the "More Guns, Less Crime" hypothesis using county-level crime data for the period 1977-2000.  15 of the 16 academic members of the NRC panel essentially concluded that the existing research was inadequate to conclude that RTC laws increased or decreased crime.  One member of the panel thought the NRC's panel data regressions showed that RTC laws decreased murder, but the other 15 responded by saying that "the scientific evidence does not support" that position.

We evaluate the NRC evidence, and improve and expand on the report's county data analysis by analyzing an additional six years of county data as well as state panel data for the period 1979-2010.  We also present evidence using both a more plausible version of the Lott and Mustard specification, as well as our own preferred specification (which, unlike the Lott and Mustard model presented in the NRC report, does control for rates of incarceration and police).  While we have considerable sympathy with the NRC's majority view about the difficulty of drawing conclusions from simple panel data models and re-affirm its finding that the conclusion of the dissenting panel member that RTC laws reduce murder has no statistical support, we disagree with the NRC report's judgment on one methodological point: the NRC report states that cluster adjustments to correct for serial correlation are not needed in these panel data regressions, but our randomization tests show that without such adjustments the Type 1 error soars to 22 - 73 percent.

Our paper highlights some important questions to consider when using panel data methods to resolve questions of law and policy effectiveness.  We buttress the NRC's cautious conclusion regarding the effects of RTC laws by showing how sensitive the estimated impact of RTC laws is to different data periods, the use of state versus county data, particular specifications (especially the Lott-Mustard inclusion of 36 highly collinear demographic variables), and the decision to control for state trends.

Across the basic seven Index I crime categories, the strongest evidence of a statistically significant effect would be for aggravated assault, with 11 of 28 estimates suggesting that RTC laws increase this crime at the .10 confidence level. An omitted variable bias test on our preferred Table 8a results suggests that our estimated 8 percent increase in aggravated assaults from RTC laws may understate the true harmful impact of RTC laws on aggravated assault, which may explain why this finding is only significant at the .10 level in many of our models.  Our analysis of the year-by-year impact of RTC laws also suggests that RTC laws increase aggravated assaults.  Our analysis of admittedly imperfect gun aggravated assaults provides suggestive evidence that RTC laws may be associated with large increases in this crime, perhaps increasing such gun assaults by almost 33 percent.

In addition to aggravated assault, the most plausible state models conducted over the entire 1979-2010 period provide evidence that RTC laws increase rape and robbery (but usually only at the .10 level).  In contrast, for the period from 1999-2010 (which seeks to remove the confounding influence of the crack cocaine epidemic), the preferred state model (for those who accept the Wolfers proposition that one should not control for state trends) yields statistically significant evidence for only one crime -- suggesting that RTC laws *increase* the rate of murder at the .05 significance level.  It will be worth exploring whether other methodological approaches and/or additional years of data will confirm the results of this panel-data analysis and clarify some of the highly sensitive results and anomalies (such as the occasional estimates that RTC laws lead to higher rates of property crime) that have plagued this inquiry for over a decade.

Keywords: Crime control, econometric methodology, right-to-carry legislation, model sensitivity

2

**DA 134**

## I. Introduction

The debate on the impact of "shall-issue" or "right-to-carry" (RTC) concealed handgun laws on crime—which has now raged on for over a decade—is a prime example of the many difficulties and pitfalls that await those who try to use observational data to estimate the effects of changes in law or policy.[2]  John Lott and David Mustard initiated the "More Guns, Less Crime" discussion with their widely cited 1997 paper arguing that the adoption of RTC laws has played a major role in reducing violent crime.  However, as Ayres and Donohue (2003a) note, Lott and Mustard's period of analysis ended just before the extraordinary crime drop of the 1990s.  They concluded that extending Lott and Mustard's dataset beyond 1992 undermined the "More Guns, Less Crime" (MGLC) hypothesis.  Other studies have raised further doubts about the claimed benefits of RTC laws (for example, see Black and Nagin, 1997 and Ludwig, 1998).

But even as the empirical support for the Lott and Mustard thesis was weakening, its political impact was growing.  Legislators continued to cite this work in support of their votes on behalf of RTC laws, and the "More Guns, Less Crime" claim has been invoked often in support of ensuring a personal right to have handguns under the Second Amendment.  In the face of this scholarly and political ferment, in 2003, the National Research Council (NRC) convened a committee of top experts in criminology, statistics, and economics to evaluate the existing data in hopes of reconciling the various methodologies and findings concerning the relationship between firearms and violence, of which the impact of RTC laws was a single, but important, issue.  With so much talent on board, it seemed reasonable to expect that the committee would reach a decisive conclusion on this topic and put the debate to rest.

The bulk of the NRC report on firearms, which was finally issued in 2004, was uncontroversial.  The chapter on RTC laws was anything but.  Citing the extreme sensitivity of

---

[2] The term "RTC laws" is used interchangeably with "shall-issue laws" in the guns and crime literature.

**DA 135**

point estimates to various panel data model specifications, the NRC report failed to narrow the domain of uncertainty about the effects of RTC laws.  Indeed, it may have increased it. However, while the NRC report concluded there was no reliable statistical support for the "More Guns, Less Crime" hypothesis, the vote was not unanimous.  One dissenting committee member argued that the committee's own estimates revealed that RTC laws did in fact reduce the rate of murder.  Conversely, a different member went even further than the majority's opinion by doubting that *any* econometric evaluation could illuminate the impact of RTC laws owing to model specification and endogeneity issues.

Given the prestige of the committee and the conflicting assessments of both the substantive issue of RTC laws' impact and the suitability of empirical methods for evaluating such laws, a reassessment of the NRC's report would be useful for researchers seeking to estimate the impact of other legal and policy interventions.  Our systematic review of the NRC's evidence—its approach and findings—also provides important lessons on the perils of using traditional observational methods to elucidate the impact of legislation.  To be clear, our intent is not to provide what the NRC panel could not—that is, the final word on how RTC laws impact crime.  Rather, we show how fragile panel data evidence can be, and how a number of issues must be carefully considered when relying on these methods to study politically and socially explosive topics with direct policy implications.

The outline of this paper is as follows. Section II offers background on the debate over RTC laws, and Section III describes relevant aspects of the NRC report in depth.  Section IV discusses how the NRC majority presented some panel data models based on the Lott and Mustard specification in support of the conclusion that one could not reach a definitive conclusion about the impact of RTC laws.  While this conclusion was correct, the models

4

**DA 136**

contained an array of errors that opened the door for the Wilson dissent to argue that RTC laws reduce murder.  We discuss these errors in depth and show that Wilson would have been unable to make his dissent if the errors in the presented models (and standard error calculations) had been corrected.

Sections V and VI explore two key econometric issues in evaluating RTC laws—whether to control for state-specific trends (which the NRC panel did not address) and whether to adjust standard errors to account for serial or within-group correlation (we show that the NRC report was in error when it concluded such adjustment was not needed).  Section VII extends the analysis through 2006, and Section VIII offers improvements to the NRC model by revising the regression specification in accordance with past research on crime.  Section IX discusses the issue of whether the impact of RTC laws can be better estimated using county- or state-level data.  Section X delves further into the issue of omitted variable bias in assessing the impact of RTC laws, and in particular, how the difficult-to-measure effect of the crack epidemic may influence our estimates.  Section XI offers concluding comments on the current state of the research on RTC laws, the difficulties in ascertaining the causal effects of legal interventions, and the dangers that exist when policy-makers can simply pick their preferred study from among a wide array of conflicting estimates.


## II. Background on the Debate

In a widely-discussed 1997 paper, "Crime, Deterrence, and Right-to-Carry Concealed Handguns," John Lott and David Mustard (1997) argued, based on a panel-data analysis, that right-to-carry laws were a primary driving force behind falling rates of violent crime.  Lott and Mustard used county-level crime data (including county and year fixed effects, as well as a set of

5

control variables) to estimate the impact of RTC laws on crime rates over the time period 1977-1992.  In essence, Lott and Mustard's empirical approach was designed to identify the effect of RTC laws on crime in the ten states that adopted them during this time period.  Using a standard difference-in-difference model, the change in crime in RTC regions is compared with the change in crime in non-RTC regions.  The implicit assumption is that the controls included in the regression will explain other movements in crime across states, and the remaining differences in crime levels can be attributed to the presence or absence of the RTC laws.

Lott and Mustard estimated two distinct difference-in-difference-type models to test the impact of RTC laws: a dummy variable model and a trend, or "spline," model.[3]  The "dummy model" tests whether the average crime level in the pre-passage period is statistically different from the post-passage crime level (after controlling for other factors).  The "spline model" measures whether crime *trends* are altered by the adoption of RTC laws.  Lott and Mustard noted that the spline approach would be superior if the intervention caused a reversal in a rising crime rate. Such a reversal could be obscured in a dummy variable model that only estimates the average change in crime between the pre- and post-passage periods. An effective RTC law might show no effect in the dummy model if the rise in the pre-passage crime rate and the fall in the post-passage rate were to leave the average "before" and "after" crime levels the same.

---

[3] In Lott's "dummy model" specification, RTC laws are modeled as a dummy variable which takes on a value of one in the first full year after passage and retains that value thereafter (since no state has repealed its RTC law once adopted).  In Lott's "trend model," RTC laws are modeled as a spline variable indicating the number of years post-passage.  In prior work, including previous drafts of this article, we had followed this specification choice. But this approach adds noise to this key RTC variable because of heterogeneity across states in the effective dates of RTC laws.  Accordingly, we decided to modify our approach to these laws in the most recent version of this paper to more precisely model the impact of the RTC laws based on the actual effective dates of these statutes.  Using the text of relevant statutes and information on the court cases that challenged them, we determined the exact date when each state's RTC law took effect. (A more precise description of what was involved in this process can be found in Footnote 17.)  Our "dummy model" specification uses a variable that takes a value of one for every full year after each law takes effect and is equal to the fraction of the year that the law is in effect the first year it is implemented.  Similarly, our "trend model" specification uses a spline variable indicating the number of years post-passage which takes into account the portion of the year the law was initially implemented.

6

**DA 138**

In both regression models, Lott and Mustard included only a single other criminal justice explanatory variable -- county-level arrest rates -- plus controls for county population, population density, income, and thirty-six(!) categories of demographic composition.  As we will discuss shortly, we believe that many criminological researchers would be concerned about the absence of important explanatory factors such as the incarceration rate and the level of police force.

Lott and Mustard's results seemed to support the contention that laws allowing the carry of concealed handguns lead to less crime.  Their estimates suggested that murder, rape, aggravated assault, and overall violent crime fell by 4 to 7 percent following the passage of RTC laws.  In contrast, property crime rates (auto theft, burglary, and larceny) were estimated to have increased by 2 to 9 percent.  Lott and Mustard thus concluded that criminals respond to RTC laws by substituting violent crime with property crime to reduce the risk that they would be shot (since, according to them, victims are more often absent during the commission of a property crime).  They also found that the MGLC contention was strengthened by the trend analysis, which ostensibly suggested significant *decreases* in murder, rape, and robbery (but no significant increases in property crime).

From this evidence, Lott and Mustard (1997) concluded that permissive gun-carrying laws deter violent crimes more effectively than any other crime reduction policy: "concealed handguns are the most cost-effective method of reducing crime thus far analyzed by economists, providing a higher return than increased law enforcement or incarceration, other private security devices, or social programs like early education."  They went even further by claiming that had remaining non-RTC states enacted such legislation, over 1,400 murders and 4,100 rapes would have been avoided nationwide, and that each new handgun permit would reduce victim losses by up to $5,000.

7

### A. The Far-Reaching Impact of "More Guns, Less Crime"

The first "More Guns, Less Crime" paper and Lott's subsequent research (and pro-gun advocacy) have had a major impact in the policy realm.  Over the past decade, politicians as well as interest groups such as the National Rifle Association have continually trumpeted the results of this empirical study to oppose gun control efforts and promote less restrictive gun-carrying laws.  Lott has repeatedly invoked his own research to advocate for the passage of state-level concealed-carry gun laws, testifying on the purported safety benefits of RTC laws in front of several state legislatures, including Nebraska, Michigan, Minnesota, Ohio, and Wisconsin (Ayres and Donohue 2003a).

The impact of the Lott-Mustard paper can also be seen at the federal level.  In 1997, ex-Senator Larry Craig (R-Idaho) introduced the Personal Safety and Community Protection Act with Lott's research as supporting evidence.  This bill was designed to allow state nonresidents with valid handgun permits in their home state to possess concealed firearms (former football athlete Plaxico Burress sought to invoke this defense when he accidentally shot himself in a Manhattan nightclub with a gun for which he had obtained a Florida permit).  According to Craig, Lott's work confirmed that positive externalities of gun-carrying would result in two ways: by affording protection for law-abiding citizens during criminal acts, and by deterring potential criminals from ever committing offenses for fear of encountering an armed response.[4]  Clearly, Lott's work has provided academic cover for policymakers and advocates seeking to justify the view—on public safety grounds—that the 2nd Amendment conferred a private right to possess handguns.

---

[4] 143 CONG. REC. S5109 (daily ed. May 23, 1997) (statement of Sen. Craig). The bill was again introduced in 2000 by Congressman Cliff Stearns (R-Florida), who also cited Lott's work. 146 CONG. REC. H2658 (daily ed. May 9) 2000) (statement of Rep. Stearns).
Indeed, this proposed legislation, now derisively referred to as "Plaxico's Law," is a perennial favorite of the NRA and frequently introduced by supportive members of Congress (Collins 2009).

8

**DA 140**

### B. Questioning "More Guns, Less Crime"

Immediately after the publication of the Lott-Mustard paper, scholars started raising serious questions about the theoretical and empirical validity of the "More Guns, Less Crime" hypothesis. For example, Zimring and Hawkins (1997) claimed that the comparison of crime between RTC and non-RTC states is inherently misleading because of factors such as deprivation, drugs, and gang activity, which vary significantly across gun-friendly and non-gun-friendly states (and are often difficult to quantify). To the extent that the relatively better crime performance seen in shall-issue states during the late 1980s and early 1990s was the product of these other factors, researchers may be obtaining biased impact estimates. Underscoring this point, Ayres and Donohue (2003a) pointed out that crime rose across the board from 1985 to 1992, and most dramatically in non-RTC states. Since the data set used in Lott and Mustard (1997) ended in 1992, it could not capture the most dramatic reversal in crime in American history.

Figures 1-7 depict the trends of violent and property crimes over the period 1970-2010. For each of the seven crimes, we calculate average annual crime rates for four groupings of states: non-RTC states (those states that had not passed RTC laws by 2006), states that adopted RTC laws over the period 1985-1988 ("early adopters"), those that adopted RTC laws over the period 1989-1991 ("mid-adopters"), and those that adopted RTC laws over the period 1994-1996 ("late adopters"). The crime rate shown for each group is a within-group average, weighted by population. The figures corroborate Ayres and Donohue's point: crime rates declined sharply across the board beginning in 1992. In fact, there was a steady *upward* trend in crime rates in the years leading up to 1992, most distinctly for rape and aggravated assault. Moreover, the average crime rates in non-RTC states seemed to have dropped even more drastically than those in RTC

9

**DA 141**

states, which suggests that crime-reducing factors other than RTC laws were at work.

**DA 142**

Figure 1:



Figure 2:



DA 143

**Figure 3:**



**Figure 4:**



**DA 144**

**Figure 5:**



**Figure 6:**



**DA 145**

**Figure 7:**



Ayres and Donohue (2003a) also recommended the use of a more general model, referred to as the "hybrid model," which essentially combined the dummy variable and spline models, to measure the immediate *and* long-run impact of RTC laws on crime.  Since the hybrid model nests both the dummy and spline models, one can estimate the hybrid and generate either of the other models as a special case (depending on what the data show).  This exercise seemed to weaken the MGLC claim.  Their analysis of the county data set from 1977-1997 using the Lott-Mustard specification (revised to measure state-specific effects) indicated that RTC laws across all states *raised* total crime costs by as much as $524 million.

Just as Lott had identified a potential problem with the dummy model (it might understate a true effect if crime followed either a V-shaped or inverted V-shaped pattern), there is a potential problem with models (such as the spline and the hybrid models) that estimate a post-passage linear trend.  Early adopters of RTC laws have a far more pronounced impact on the

14

**DA 146**

trend estimates of RTC laws than later adopters, since there may only be a few years of post-passage data available for a state that adopts RTC laws close to the end of the data period. If those early adopters were unrepresentative of low crime states, then the final years of the spline estimate would suggest a dramatic drop in crime, not because crime had in fact fallen in adopting states, but because the more representative states had dropped out of the estimate (since there would be no post-passage data after, say, three years for a state that had adopted the RTC law only three years earlier, but there would be such data for Maine and Indiana, which were the earliest RTC adopters). We recognize that each model has limitations, and present the results of all three in our tables below.[5]

### III. Findings of the National Research Council

The sharply conflicting academic assessments of RTC laws specifically and the impact of firearms more generally, not to mention the heightened political salience of gun issues, prompted the National Research Council to impanel a committee of experts to critically review the entire range of research on the relationships between guns and violence. The blue-chip committee, which included prominent scholars such as sociologist Charles Wellford (the committee chair), political scientist James Q. Wilson, and economists Joel Horowitz, Joel Waldfogel, and Steven Levitt, issued its wide ranging report in 2004.

While the members of the panel agreed on the major issues discussed in eight of the nine chapters of the NRC report, the single chapter devoted to exploring the causal effects of RTC laws on crime proved to be quite contentious. After reviewing the existing (and conflicting)

---

[5]We note that in the latest version of his book, Lott (2010) criticizes the hybrid model, but he fails to appreciate that the problem with the hybrid model –and with the spline model he prefers—is that they both yield estimates that are inappropriately tilted down as the more representative states drop out of the later years, which drive the post-passage trend estimates. An apples to apples comparison that included the identical states to estimate the post-passage trend would not suggest a negative slope. This is clear in Figure 1 and Table 1 of Ayres and Donohue (2003a).

**DA 147**

literature and undertaking their own evaluation of Lott's county-level crime data, 15 of the 16 academic members of the committee concluded that the data provided no reliable and robust support for the Lott-Mustard contention.  In fact, they believed the data could not support any policy-relevant conclusion.  In addition, they claimed they could not estimate the true impact of these laws on crime because: (1) the empirical results were imprecise and highly sensitive to changes in model specification, and (2) the estimates were not robust when the data period was extended eight years beyond the original analysis (through 2000), a period during which a large number of states adopted the law.

### A. The NRC Presents Two Sets of Estimates of the Impact of RTC Laws

One can get an inkling of the NRC majority's concern about model sensitivity by examining Table 1 below, which reports estimates from the NRC report on the impact of RTC laws on seven crimes.  The Table 1b estimates are based on the Lott and Mustard (1997) dummy and spline models using county data for the period 1977-2000 with the full set of Lott and Mustard controls.  The Table 1a estimates use the same data but provide a more sparse specification that drops the Lott and Mustard controls and provides estimates with no covariates other than year and county fixed effects.  The vastly different results produced by these different models gave the majority considerable pause. For example, if one believed the dummy model in Table 1b, then RTC laws considerably *increased* aggravated assault and robbery, while the spline model in Table 1b suggested RTC laws *decreased* the rate of both of these crimes.  Noting that the RTC impact estimates disagreed across their two models (dummy and spline) for six of the seven crime categories, the NRC report concluded that there was no reliable scientific support for the more guns, less crime thesis.

16

**DA 148**

## Table 1

### Table 1a[6]

Estimated Impact of RTC Laws – Published NRC Estimates – No Controls, All Crimes, County Data, 1977-2000

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | -1.95 | 17.91*** | 12.34*** | 19.99*** | 23.33*** | 19.06*** | 22.58*** |
| | (1.48) | (1.39) | (0.90) | (1.21) | (0.85) | (0.61) | (0.59) |
| Spline Model: | 0.12 | -2.17*** | -0.65*** | -0.88*** | 0.57*** | -1.99*** | -0.71*** |
| | (0.32) | (0.30) | (0.20) | (0.26) | (0.19) | (0.13) | (0.13) |

### Table 1b[7]

Estimated Impact of RTC Laws – Published NRC Estimates – Lott-Mustard Controls, All Crimes, County Data 1977-2000

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | -8.33*** | -0.16 | 3.05*** | 3.59*** | 12.74*** | 6.19*** | 12.40*** |
| | (1.05) | (0.83) | (0.80) | (0.90) | (0.78) | (0.57) | (0.55) |
| Spline Model: | -2.03*** | -2.81*** | -1.92*** | -2.58*** | -0.49** | -2.13*** | -0.73*** |
| | (0.26) | (0.20) | (0.20) | (0.22) | (0.19) | (0.14) | (0.13) |

Interestingly, the conflicting estimates of Table 1 also led to substantial intra-panel dissention, with two members of the Committee writing separately from the NRC's majority evaluation of RTC laws. One sought to refute the majority's skepticism, and one sought to reinforce it. Noted political scientist James Q. Wilson offered the lone dissent to the Committee's report, claiming that Lott and Mustard's "More Guns, Less Crime" finding actually held up under the panel's reanalysis.  Specifically, Wilson rejected the majority's interpretation of the

---

[6] Estimations include year and county fixed effects, and are weighted by county population. Standard errors are in parentheses below estimations.  Robust standard errors are not used in the published NRC estimates. * Significant at 10%; ** Significant at 5%; *** Significant at 1%.  Throughout this paper, the standard errors appear just below the corresponding parameter estimate.

[7] Estimations include year and county fixed effects, and are weighted by county population.  Standard errors are provided beneath point estimates in parentheses.  Robust standard errors are not used in the published NRC estimates. The control variables (adopted from the Lott-Mustard model) include: arrest rate, county population, population density, per capita income measures, and 36 demographic composition measures indicating the percentage of the population belonging to a race-age-gender group.  * Significant at 10%; ** Significant at 5%; *** Significant at 1%.

17

## DA 149

regression estimates seen in Table 1. Although the majority saw sharp conflicts in the Table 1b results between the dummy and spline models, Wilson was impressed that for one of the seven crimes -- murder -- the dummy and spline models of Table 1b generated estimates that seemingly suggested there were statistically significant drops in crime associated with RTC laws. This agreement in the Table 1b murder estimates led him to heartily endorse the "More Guns, Less Crime" view. Indeed, after dismissing papers that had cast doubt on the MGLC hypothesis (such as Black and Nagin, 1998) on the grounds that they were "controversial," Wilson concluded: "I find the evidence presented by Lott and his supporters suggests that RTC laws do in fact help drive down the murder rate, though their effect on other crimes is ambiguous" (NRC Report, p. 271.).

The Committee penned a response to Wilson's dissent (separate from its overall evaluation of RTC legislation), which stressed that the only disagreement between the majority and Wilson (throughout the entire volume on gun issues) concerned the impact of RTC laws on murder. They noted that, while there were a number of negative estimates for murder using the Lott-Mustard approach, there were also several positive estimates that could not be overlooked. In addition, as the NRC panel noted, even the results for murder failed to support the MGLC contention when restricting the period of analysis to five years or less after law adoption.[8] The important task was to try to reconcile these contradictions—and the panel majority believed that was not possible using the existing data.

Committee member (and noted econometrician) Joel Horowitz was the ardent skeptic, and not without merit. Horowitz joined the refutation of Wilson but also authored his own appendix discussing at length the difficulties of measuring the impact of RTC laws on crime

---

[8] The importance of this restriction on the post-passage data was mentioned earlier: as states dropped out of the post-passage data, the estimated impact of RTC laws became badly biased (since one was no longer deriving the estimated effect from a uniform set of states).

18

**DA 150**

using observational rather than experimental data.[9]   He began by addressing a number of flaws in the panel-data approach.   First, if factors other than the adoption of the RTC law change but are not controlled for in the model, then the resulting estimates would not effectively isolate the impact of the law (we demonstrate the likelihood of this possibility in Section X below). Second, if crime increases before the adoption of the law at the same rate it decreases after adoption, then a measured zero-difference would be misleading.   The same problem arises for multiyear averages.   Third, the adoption of RTC laws may be a *response* to crime waves.   If such an endogeneity issue exists, the difference in crime rates may merely reflect these crime waves rather than the effect of the laws.   Lastly, as even Lott (2000) found in his data, RTC states differ noticeably from non-RTC states (e.g., RTC states are mainly Republican and had low but rising rates of crime).   It would not be surprising if these distinctive attributes influence the measured effect of RTC laws. In this event, looking at the impact of RTC laws in current RTC states may not be useful for predicting the likely result if these laws were adopted in very different states.

Ideally, states would be randomly selected to adopt RTC laws, thereby eliminating the systematic differences between RTC states and non-RTC states.   In the absence of such randomization, researchers introduce controls to try to account for these differences, which generates debate over which set of controls is appropriate.   Lott (2000) defended his model by claiming that it included "the most comprehensive set of control variables yet used in a study of crime" (p. 153).   But Horowitz was unimpressed by Lott's claim, noting that it is possible to control for too many variables – or too few.   He pointed out that Donohue (2003) found a significant relationship between crime and *future* adoption of RTC legislation, suggesting the likelihood of omitted variable bias and/or the endogenous adoption of the laws. Horowitz

---

[9] While his chapter is directed at the analysis of RTC laws, Horowitz's comments applied to an array of empirical studies of policy that were discussed throughout the entire NRC volume.

**DA 151**

concluded by noting that there is no test that can determine the right set of controls: "it is not possible to carry out an empirical test of whether a proposed set of $X$ variables is the correct one…it is largely a matter of opinion which set [of controls] to use" (NRC Report, p. 307). Noting the likelihood of misspecification in the evaluation of RTC laws, and that estimates obtained from a misspecified model can be highly misleading, he concluded that there was little hope of reaching a scientifically supported conclusion based on the Lott-Mustard/NRC model (or any other).[10]

### B. The Serious Need for Reassessment

The story thus far has been discouraging for those hoping for illumination of the impact of legislation through econometric analysis. If the NRC majority is right, then years of observational work by numerous researchers, topped off with a multi-year assessment of the data by a panel of top scholars, were not enough to pin down the actual impact of RTC laws. If Horowitz is right, then the entire effort to estimate the impact of state right-to-carry policies from observational data is doomed. Indeed, there may be simply too much that researchers do not know about the proper structure of econometric models of crime. Notably, however, the majority did not join Horowitz in the broad condemnation of all observational microeconometrics for the study of this topic. Perhaps a model that better accounts for all relevant, exogenous, crime-influencing factors and secular crime trends could properly discern the effects of RTC laws – whether supporting or refuting the Wilson conclusion that RTC laws reduce murder. On the other hand, an examination of additional models might only serve to strengthen the NRC majority conclusion that the models generated estimates that were too

---

[10] Note that this nihilistic conclusion was very close to that found by a more recent NRC report investigating the deterrent effect of the death penalty. Daniel S. Nagin and John V. Pepper, editors, Deterrence and the Death Penalty (2012). This recent NRC report reviewed 30 years of studies on this deterrent question and found the entire literature to be "uninformative."

**DA 152**

variable to provide clear insight into the effect of RTC laws on crime.

## IV. Panel Data Estimates in the NRC Report

Previous research on guns and crime has shown how data and methodological flaws can produce inaccurate conclusions.  In a follow-up to their initial 2003 *Stanford Law Review* paper, Ayres and Donohue (2003b) demonstrated how coding errors can yield inaccurate and misleading estimates of the effect of RTC laws on crime. Commenting on a study in support of the MGLC premise by Florenz Plassman and John Whitley (2003), Ayres and Donohue (2003b) described numerous coding flaws.  After correcting these errors, the existing evidence supporting the "More Guns, Less Crime" hypothesis evaporated.

### A. The NRC's Panel-Data Models

Since the NRC panel based their reported estimates on data provided by John Lott, we thought it prudent to carefully examine the NRC committee's own estimates.  With the help of the NRC committee members who provided the NRC 1977-2000 county data set, we were ultimately able to generate the NRC panel data estimates.[11]  Once we fully understood the way in which these NRC estimates were generated (shown in Table 1 above), it became clear that the NRC report presented estimates that essentially had three flaws: 1) the specification (used by Lott and Mustard) was problematic in a number of dimensions; 2) the standard errors were incorrect in two ways, both of which made the results appear more significant than they were; and 3) there were some errors in the data, which had been supplied by Lott.

Given the NRC majority conclusion that the Lott and Mustard thesis was not supported by the data, it was a reasonable choice to simply take the Lott and Mustard data and

---

[11] The initial published version of this article -- Aneja, Donohue, and Zhang (2011) -- noted that we had originally failed to replicate the NRC results, with our efforts complicated because the Committee had misplaced the do files that generated the NRC estimates.  After publication, we were informed of the precise specification the NRC had employed, which did generate the published NRC estimates (although these estimates are flawed in the manner described in the text).

**DA 153**

specifications and adhere to their method of computing standard errors. In essence, the NRC majority was shrewdly saying, "Even if we fully accept everything that Lott and Mustard have argued for, we still find no support for their conclusion." The only problem with the NRC majority approach, though, was that presenting the estimates in Table 1b above opened the door for James Q. Wilson to argue that some support for RTC laws could be gleaned from the ostensibly conflicting evidence.

Wilson's claim, once again, was that Table 1b spoke with clarity, albeit on only one point. He conceded that the Lott and Mustard dummy and spline estimates conflicted for six of the seven crime categories, but since they both showed statistically significant reductions in murder, Wilson claimed that the murder finding was robust and he concluded that RTC laws save lives. The NRC majority responded that Table 1a did not similarly suggest that RTC laws reduced murder but Wilson swatted that response aside by saying that a model with no covariates would not be as persuasive as the Table 1b models with covariates. The NRC majority could have countered Wilson's claim far more effectively if they had simply shown that the Lott and Mustard model was highly assailable and greatly underestimated its standard errors. Indeed, nothing would have been left standing for Wilson to construct a positive story of RTC laws if the NRC majority had simply calculated the correct standard errors for the Table 1b models, since doing so would have eliminated any claim that the RTC laws generated a statistically significant reduction in murder or any other crime.

### B. Problems with the Lott and Mustard Models and Data Published in the NRC Report

Our goal in this section is to improve on the estimates presented in the NRC report (Table 1 above) by correcting what we consider to be clear errors in the Lott and Mustard specification, data, and standard errors. Thus, we began by constructing our own county-level data set, which

22

**DA 154**

we will refer to as the "Updated 2013 Data Set."  We create the same variables found in Lott's data—crime rates, demographic composition, arrest rates, income, population, and population density—and extend our new set to 2006 (the NRC data ended in 2000).[12]  This data extension will also provide us an opportunity to explore how the NRC's results are affected when using more current data.  As we will see in Section VII, the additional years of data will also enable us to estimate the effect of six additional state adoptions of RTC laws not present in the NRC analysis: Michigan (2001), Colorado (2003), Minnesota (2003), Missouri (2004), New Mexico (2004), and Ohio (2004).[13]

We obtained our county crime data from the University of Michigan's Interuniversity Consortium for Political and Social Research, which maintains the most comprehensive collection of UCR data.  Unfortunately, county-level crime data for 1993 is currently unavailable.  The National Archive of Criminal Justice Data recently discovered an error in the crime data imputation procedure for 1993 and for this reason, has made 1993 data inaccessible until the error has been corrected.  Thus, for all of the following tables with estimates using our updated county data, we are missing values for 1993.

In Table 2, we will replicate and extend the Table 1 NRC estimates correcting for three errors:  1) some data errors that were transmitted to the NRC when they used the Lott county data set; 2) a clear specification error in the arrest rate controls; and 3) the failure to use both robust and clustered standard errors.  We also modify the RTC variables used in this analysis to take into account additional information that we have gathered on the effective dates of these laws.

---

[12] We also add 0.1 to *all zero* crime values before taking the natural log in our county-level data set, as the NRC did.

[13] Kansas and Nebraska adopted RTC laws which took effect in 2007, which is too late to be captured in our analysis.  A more complete explanation of how these years were determined can be found in Footnote 17 and Appendix G.

23

**DA 155**

### 1.  The Lott Data Errors Used in the NRC Estimates

In our original efforts at trying to replicate the NRC estimates derived from their Lott data set, we discovered a number of small errors in that data set.[14]  First, Philadelphia's year of adoption is coded incorrectly—as 1989 instead of 1995.  Second, Idaho's year of adoption is coded incorrectly—as 1991 instead of 1990.  Third, the area variable, which is used to compute county density, has missing data for years 1999 and 2000.  Fourth, we determined that the NRC data set was missing all county identifiers for 1999 and 2000, which meant that that both these years were dropped for the NRC estimates depicted in Table 1.   Our analysis corrects all these errors.

### 2.  Lott and Mustard's Erroneous Arrest Rate Variables

Since the NRC report followed the Lott-Mustard specification, the regressions it presented (which we reproduce in Table 1) used arrest rates as the sole criminal justice control variable in estimating the effect of RTC laws.  Although we have already noted Lott's claim that his is "the most comprehensive set of control variables yet used in a study of crime," in fact, the Lott and Mustard model omits controls for police and incarceration, which many studies -- e.g., Kovandzic, Vieraitis, and Boots, (2009) -- have found to be key influences on crime (we will re-introduce those variables in Section VIII).

Lott and Mustard's use of the arrest rate variables is not a good modeling choice in general, and the particular approach that Lott and Mustard employed is especially problematic.[15]

---

[14] We know all too well how easy it is to make these small but annoying errors in creating these data sets, since regrettably we had a few similar errors in our own data set in the Aneja, Donohue, Zhang (2011) published version, which are all corrected here. None of the main conclusions of the published paper were altered by those errors, some of which are set forth in footnote 18.

[15] Even apart from the considerable data problems with the county arrest rates, the measure is also not well defined. Ideally, one might like a measure showing the likelihood that one who commits a certain crime will be arrested.  The Lott and Mustard arrest rates instead are a ratio of arrests to crimes, which means that when one person kills many, for example, the arrest rate falls, but when many people kill one person, the arrest rate rises since only one can be arrested in the first instance and many can in the second.  The bottom line is that this "arrest rate" is not a probability

To see the concern, note that the NRC's model (Table 1b in this paper) is trying to explain the level of seven individual Index I crime categories while using a control that is computed as a crime-specific arrest rate, which is the number of arrests for a given crime divided by the contemporaneous number of crimes.  Thus, murder in 1990 is "explained" by the ratio of arrest to murders in 1990.  Econometrically, it is inappropriate to use this contemporaneous measure since it leaves the dependent variable on both sides of the regression equation (at a minimum, a better approach would lag this variable one year, as discussed in Ayres and Donohue (2009)).  Better still, one could alternatively use the broad categories of violent and property crimes to compute arrest rates, as have many recent papers (such as, Moody and Marvell, 2008).  We adopt this latter approach for all of our regressions in this paper and also lag the arrest rate one year to reduce the endogeneity problem.

### 3.   The Erroneous Standard Errors in the NRC Estimates

Surprisingly, when the NRC presented its estimates (which we reproduce in Table 1), the NRC report did not make the very basic adjustment to their standard errors to correct for heteroskedacticity.  Since Hal White's paper discussing this correction has been the single most cited paper in all of economics since 1970,[16] the failure to make this standard adjustment was unexpected.  Accordingly, in all of our own estimates, we use robust standard errors.

Even more significant in terms of the results, though, is the issue of whether one must cluster the standard errors.  The statistical consequence of the NRC committee's failure to use robust and clustered standard errors is to massively understate the reported standard errors (and consequently to overstate the level of significance).  Unlike the issue of robust standard errors,

---

and is frequently greater than one because of the multiple arrests per crime.  For an extended discussion on the abundant problems with this pseudo arrest rate, see Donohue and Wolfers (2009).

[16] Kim, E.H.; Morse, A.; Zingales, L. (2006). "What Has Mattered to Economics since 1970?". *Journal of Economic Perspectives* 20 (4): 189–202.

**DA 157**

the Committee report actually addressed the issue of clustering, concluding that this adjustment was not necessary. In Section V, we will show that this was an error. Therefore, we will from this time forward only present results based on the clustering adjustment to our standard errors.

### C. Improving on the Table 1 Estimates by Using Better Data and Slightly Improved Lott and Mustard Models

Having just identified three problems with the estimates presented by the NRC, we now seek to fix them. To be clear about our approach, we use annual county-level crime data for the United States from 1977 through either 2000 (to conform to the NRC report) or 2006. We explore the impact of RTC laws on seven Index I crime categories by estimating the reduced-form regression:

$$Y_{it} = \eta RTC_{jt} + \alpha_i + \theta_t + \beta_{jt} + \gamma X_{ijt} + \varepsilon_{it} \tag{1}$$

where the dependent variable $Y_{it}$ denotes the natural log of the individual violent and property crime rates for county $i$ and year $t$. Our explanatory variable of interest—the presence of an RTC law within state $j$ in year $t$—is represented by $RTC_{jt}$. The exact form of this variable shifts according to the three variations of the model we employ (these include our modified version of the Lott and Mustard dummy and spline models, as well as the Ayres and Donohue hybrid model.) Owing to new information that we have gathered about the RTC laws of various states, we use our own modified dummy and spline variables that take into account the exact date when these laws were implemented.[17]

---

[17] As noted in Footnote 3, in the dummy variable approach, the RTC variable is a dichotomous indicator that equals the fraction of the year that the law is in effect the first year the law is implemented and equals one each full year thereafter. In the spline model, the RTC variable indicates the number of post-passage years (adjusted by the fraction of the year the law is first in effect). The hybrid specification contains both dummy and trend variables. Using the effective date when laws were implemented rather than simply assuming that laws take effect one year after passage changes the initial year of a number of RTC laws. In addition, some states (e.g., Texas) passed RTC laws that technically "took effect" on one date but which specified another date when permits could begin to be issued. We treat these states as if their laws took effect on the second date. We also took court-mandated delays in

26

The variable $\alpha_i$ indicates county-level fixed effects (unobserved county traits) and $\theta_t$ indicates year effects.  As we will discuss below, there is no consensus on the use of state-specific time trends in this analysis, and the NRC report did not address this issue.  Nevertheless, we will explore this possibility, with $\beta_{jt}$ indicating state-specific trends, which are introduced in selected models.  Since neither Lott and Mustard (1997) nor the NRC (2004) focus on state trends, this term is dropped when we estimate their models.  The term $X_{ijt}$ represents a matrix of observable county and state characteristics thought by researchers to influence criminal behavior. The components of this term, however, vary substantially across the literature. For example, while Lott uses only "arrest rates" as a measure of criminal deterrence, we discuss the potential need for other measures of deterrence, such as incarceration levels or police presence, which are measured at the state level.

Table 2 reproduces the regressions depicted in Table 1, while correcting for the three problems mentioned above (the inaccurate Lott data, the poorly constructed Lott arrest ratios, and the incorrect standard errors), changing the manner in which RTC dates were determined, and using our reconstruction of the county dataset from 1977 through 2000 (which omits the flawed 1993 county data).  Tables 2a and 2b represent our improved estimates of what the NRC reported and we depict in Tables 1a and 1b.  Table 2b appends our hybrid model, which estimates the effect of RTC laws with both a dummy and a spline component (thus nesting the individual dummy and spline models).

The bottom line is that the superior Table 2 estimates look nothing like the Table 1 estimates presented in the NRC report.  Table 1 shows estimated effects that are almost

---

implementing RTC laws into account when determining when permits would actually first be issued (and the corresponding value of the RTC dummy).  In short, the process of reviewing the effective dates of different RTC laws led us to change the effective year of a number of these laws, changes which are described in greater detail in Appendix G.

**DA 159**

uniformly statistically significant -- at times suggesting crime increases and at times suggesting crime decreases.  Table 2 shows far fewer statistically significant effects, but every one of which suggests RTC laws *increase* crime -- for rape, aggravated assault, robbery, auto theft, burglary, and larceny.  There is not even a hint of any crime declines.

Recall that James Q. Wilson thought that the most important regressions to look at were those presented in Table 1b, because they provided the full set of controls from the Lott and Mustard specification.  While for six of the seven crime categories the story that emerged from Table 1b varied sharply on whether one looked at the dummy or the spline model, Wilson was content to find a beneficial RTC effect on murder because the Table 1 estimates for murder both appeared to be negative and significant.

When we switch to Table 2b, however, we see that there is nothing resembling a statistically significant impact of RTC laws on murder.  In fact, we see that assault, auto theft, and larceny now have estimates that are simultaneously statistically significant and positive for both the dummy and spline model.  Thus, the results that Professor Wilson found to be consistent evidence of RTC laws reducing murder (see Table 1b) disappear with better data and a superior specification.[18]

---

[18] In the process of reviewing our previous published models and data from ADZ (2011), we discovered some errors in the two data sets that we had constructed (the so-called updated 2009 county data and updated 2009 state data), which are corrected in this paper.  For the county data set, we miscoded the state trend variable for Arkansas. Second, Kansas counties had been incorrectly coded as belonging to Kentucky for years 1997-2006.  Third, our spline and hybrid models had included a counter variable to capture the effect of a post-passage trend, but they inadvertently omitted the overall trend variable off of which this post-passage trend was to be estimated. Fourth, Vermont was coded as a "may issue" state instead of a "shall issue" state, although this did not affect our results owing to the inclusion of state fixed effects in our regressions. Fifth, the real per capita income measures from our previous datasets had been calculated incorrectly, and these changes have been made for real per capita income and income maintenance, unemployment insurance, and retirement payments.  (This last change was also made to the state data set.)

In addition to these errors that we discovered, Moody, Lott, Marvell, and Zimmerman (2012) identified three other errors: duplicative observations for Alaska county 2060 were improperly included for 1996, Kansas' year of adoption was coded incorrectly as 1996 instead of 2006, and South Dakota's year of adoption was coded incorrectly as 1986 instead of 1985. All of these errors have been corrected in the tables prepared for this paper.

**DA 160**

In fact, this was essentially the message of the NRC report.  Small changes made the estimates bounce around so much that it was difficult to reach any conclusion about the true causal impact of RTC laws.  Perhaps it might have been helpful to Wilson if the majority had gone one step further and presented something like the alternative results from Table 2.  As we will see in the ensuing sections, there are many additional avenues that could have been explored to probe the robustness of the Table 1b findings that Wilson had accepted so unquestioningly.

We will explore these factors in subsequent sections:  Section VI will explore whether one should control for individual state trends in crime, section VII will look at additional years of data (adding data beyond 2000 to 2006), section VIII will alter the Lott and Mustard specification (beyond the already mentioned correction for the contemporaneous, crime-specific arrest rates and changing the method used to construct the two RTC variables), section IX will go beyond the county data to look at state data, and Section X will consider the additional problem of potential omitted variable bias.  But a key aspect of the Table 2 results is that the standard errors were adjusted using the cluster command, and this is one area where the NRC majority stumbled in concluding that this adjustment was not needed. Section V will now address the clustering question.

---

Moody, Lott et al also claimed that Florida's year of adoption was coded incorrectly as 1989 instead of 1987 but this simply reflects their misreading of our coding. Our county data does not have crime information for Florida counties in the year 1988 (this is evident in the NRC data set as well), so observations for Florida's counties in this year are dropped. Thus, while it may seem that our first year of adoption is erroneously coded as 1989, this simply reflects the fact that we have not included observations for 1988.  Note that we maintained consistency with our other trend variables by beginning the post-passage variable counter with a value of "2" in year 1989 to demonstrate 2 years since the passage of RTC legislation.

For the state data set in ADZ (2011), we note the following corrections: both North and South Dakota should show RTC adoption in year 1985.  Similarly, Oregon's date of adoption for its RTC law should have been 1989 instead of 1990 in the state data set.

Additional changes made to the RTC indicator variables used in this paper are described in footnotes 3 and 17, as well as Appendix G.  The state dataset has also been re-constructed with the most recently available data, the sources of which are provided with this paper at http://works.bepress.com/john_donohue/.

29

**DA 161**

### Table 2

#### Table 2a[19]

Estimated Impact of RTC Laws – with ADZ Changes – No Controls, All Crimes, 1977-2000
Dataset: ADZ Updated 2013 County Data (without 1993 data)
Changes: Updated Dataset, Robust and Clustered Standard Errors, Alternative RTC Dates

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | -0.07 | 34.43 | 22.85 | 26.21* | 32.76 | 32.24 | 38.42 |
| | (8.48) | (24.72) | (19.88) | (15.02) | (21.20) | (22.51) | (26.15) |
| Spline Model: | 0.65 | 4.41* | 3.83* | 2.96 | 4.41* | 4.65* | 5.59* |
| | (0.88) | (2.61) | (2.07) | (1.86) | (2.44) | (2.42) | (2.93) |

#### Table 2b

Estimated Impact of RTC Laws – with ADZ Changes – Lott-Mustard Controls, All Crimes, 1977-2000
Dataset: ADZ Updated 2013 County Data (without 1993 data)
Changes: Updated Dataset, Lagged Violent/Property Arrest Rates, Robust and Clustered Standard Errors, Alternative RTC Dates

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | -1.13 | 17.60 | 17.01*** | 11.69* | 19.54*** | 10.70** | 20.89*** |
| | (7.15) | (11.88) | (6.16) | (6.11) | (7.15) | (5.07) | (5.75) |
| Spline Model: | -0.08 | 1.35 | 1.76* | 0.70 | 1.99** | 0.86 | 1.97* |
| | (0.82) | (1.42) | (0.92) | (0.84) | (0.77) | (0.71) | (1.01) |
| Hybrid Post-Passage Dummy: | -1.11 | 16.41 | 13.14** | 12.04* | 15.28* | 9.73* | 17.28*** |
| | (7.96) | (10.34) | (6.04) | (6.93) | (7.74) | (5.63) | (4.71) |
| Trend Effect: | -0.00 | 0.28 | 0.91 | -0.08 | 1.00 | 0.23 | 0.85 |
| | (0.90) | (1.26) | (0.99) | (0.83) | (0.71) | (0.78) | (0.92) |

[19] All table estimations include year and county fixed effects, and are weighted by county population. Standard errors are robust and clustered at the state level.  * Significant at 10%; ** Significant at 5%; *** Significant at 1%. In Table 2b, the control variables (adopted from the Lott-Mustard model) include: lagged arrest rates, county population, population density, per capita income measures, and 36 demographic composition measures indicating the percentage of the population belonging to a race-age-gender group.

30

**DA 162**

## V. Debate over the Clustering of Standard Errors

### A. Is Clustering Necessary?

Aside from neglecting to use heteroskedastic-robust standard errors, the NRC committee also did not use a cluster adjustment.  Research has found that the issue of whether to "cluster" the standard errors has a profound impact on assessments of statistical significance.  This issue gained prominence beginning primarily with a 1990 paper by Brent Moulton.  Moulton (1990) pointed to the possible need for the clustering of observations when treatments are assigned at a group-level.  In such cases, there is an additive source of variation that is the same for all observations in the group, and ignoring this unique variation leads to standard errors that are underestimated.  Lott, however, suggests that clustered standard errors are not needed (Lott 2004), claiming that county-level fixed effects implicitly control for state-level effects, and therefore, clustering the standard errors by state is unnecessary.

The NRC committee (2004) sided with Lott on this point, stating that "there is no need for adjustments for state-level clustering." (p. 138).  However, we *strongly* believe the committee was mistaken in this decision.  One must account for the possibility that county-level disturbances may be correlated within a state during a particular year by clustering the standard errors by state.  There is also a second reason for clustering that the NRC report did not address.  Specifically, serial correlation in panel data can lead to major underestimation of standard errors.  Indeed, Bertrand, Duflo, and Mullainathan (2004) point out that even the Moulton correction alone may be insufficient for panel-data estimators that utilize more than two periods of data due to autocorrelation in both the intervention variable and the outcome variable of interest.  Wooldridge (2003, 2006), as well as Angrist and Pischke (2009), suggest that clustering the standard errors by state (along with using heteroskedasiticity-robust standard errors) will help

31

**DA 163**

address this problem, and at least provide a lower bound on the standard errors.

### B. Using Placebo Laws to Test the Impact of Clustering

Our Table 2 estimates (which include clustering) reveal that this adjustment makes a major difference in the results generated by the Lott and Mustard models that the NRC report adopted in its analysis -- completely wiping out any sign of statistically significant crime reductions attributable to RTC laws.  But who is correct on the clustering issue—Lott, Mustard, and the NRC panel on the one hand, or Angrist, Pischke, and several other high-end applied econometricians on the other?  To address this important question we run a series of placebo tests.  In essence, we randomly assign RTC laws to states, and re-estimate our model iteratively (1000 times), recording the number of times that the variable(s) of interest are "statistically significant" at the 5% level.  For this experiment, we use our most flexible model: the hybrid model (that incorporates both a dummy and a trend variable) with the controls employed by the NRC.

We run five versions of this test.  In our first test, we generate a placebo law in a random year for all 50 states and the District of Columbia.  Once the law is applied, it persists for the rest of our data period (beginning the year after the law's randomly generated effective date), which is how laws were coded in our original analysis.  We run 1000 trials (where each trial consists of a randomly generated set of RTC passage years) and then proceed to take a simple average of the percentage of significant dummy variable and spline variable estimates. In our second test, we apply a placebo law in a random year to the 32 states that had actually implemented right-to-carry laws between 1979 and 2006.  The remaining 19 states are assumed to either have no RTC law or to have had one during the entire analysis period.[20]  Here again we run 1000 trials in

---

[20] For the purposes of this analysis we do not consider Nebraska or Kansas to have passed an RTC law during this period. These states passed RTC laws in 2006; however, their laws did not take effect until 2007.

which each iteration consists of randomly generated RTC passage years and proceed to take a simple average of the percentage of significant estimates. Third, we randomly select 32 states to receive a placebo law in a random year (to ensure that any random sample of 32 states does not have the potential to inaccurately bias results, we repeat this entire procedure 5 times – that is, we take 5 samples of 32 random states and for each sample, run the aforementioned process of assigning a random year of RTC adoption 1000 times). Then, we take a simple average of the number of statistically significant dummy variable and spline estimates. Thus, we are, in effect, counting the number of significant dummy and trend estimates generated from 5000 hybrid regressions.  Fourth, we apply a placebo law in a random year to the 19 states which did not pass RTC laws within the period, dropping the other 32 states from our dataset, and take the simple average of the statistically significant dummy variable and spline estimates.  Finally, we randomly select 12 of the 19 states (to correspond to the previous randomly generated 32 states) to receive an RTC in a randomized year of adoption and iterate this process 1,000 times over five separate samples. The results of these five tests are presented in Table 3.

Given the random assignment, one would expect to reject the null hypothesis of no effect of these randomized "laws" roughly 5 percent of the time if the standard errors in our regressions are estimated correctly. Instead, the table reveals that the null hypothesis is rejected 21-69 percent of the time for murder and robbery with the dummy variable and even more frequently with the trend variable (35-73 percent). Clearly, this exercise suggests that the standard errors used in the NRC report are far too small.

Table 3b replicates the exercise of Table 3a, but now uses the cluster correction for standard errors (by state).  Table 3b suggests that clustering standard errors does not excessively reduce significance, as the NRC panel feared.  In fact, the percentages of "significant" estimates

33

**DA 165**

produced in all three versions of the test still lie well beyond the 5% threshold.  Similar results

are found when we replicate Tables 3a and 3b using a random selection of either 32 or 12 states

while employing the dummy model instead of the hybrid model (we do not show those results

here).  All of these tests show that if we do *not* cluster the standard errors, the likelihood of

obtaining significant estimates is astonishingly (and unreasonably) high.  The conclusion we

draw from this exercise is that clustering is clearly needed to adjust the standard errors in these

panel-data regressions.  Accordingly, we use this clustering adjustment for all remaining

regressions in this paper.

34

**Table 3**[21]

### Table 3a

Percentage of Significant Estimates (5% Level) – Lott-Mustard Controls, 1977-2006 – **No Clustered Standard Errors**
Dataset: ADZ Updated 2013 County Data (without 1993 data)
Hybrid Model

| *All figures reported in %* | | Dummy Variable | Trend Variable |
|---|---|---|---|
| 1. All 50 States + DC: | Murder | 45.8 | 67.5 |
| | Robbery | 53.8 | 63.9 |
| 2. Exact 32 States: | Murder | 64.6 | 72.0 |
| | Robbery | 68.9 | 73.0 |
| 3. Random 32 States: | Murder | 56.1 | 68.3 |
| | Robbery | 56.6 | 62.7 |
| 4. All 19 States: | Murder | 21.7 | 34.9 |
| | Robbery | 36.3 | 45.4 |
| 5. Random 12 States: | Murder | 23.6 | 42.1 |
| | Robbery | 39.0 | 46.6 |

### Table 3b

Percentage of Significant Estimates (at the 5% Level) – Lott-Mustard Controls, 1977-2006 – **With Clustered Standard Errors**
Dataset: ADZ Updated 2013 County Data (without 1993 data)
Hybrid Model

| *All figures reported in %* | | Dummy Variable | Trend Variable |
|---|---|---|---|
| 1. All 50 States + DC: | Murder | 8.8 | 13.2 |
| | Robbery | 7.8 | 8.5 |
| 2. Exact 32 States: | Murder | 10.9 | 11.4 |
| | Robbery | 8.1 | 9.8 |
| 3. Random 32 States: | Murder | 11.0 | 13.3 |
| | Robbery | 8.5 | 7.6 |
| 4. All 19 States | Murder | 13.9 | 12.9 |
| | Robbery | 12.7 | 13.8 |
| 5. Random 12 States: | Murder | 15.9 | 18.7 |
| | Robbery | 14.1 | 14.4 |

---

[21] Simulation based on NRC with-controls model, which, similar to above estimations, includes year fixed effects, county fixed effects, and weighting by county population. The control variables (adopted from the Lott-Mustard model) include: lagged arrest rate, county population, population density, per capita income measures, and 36 demographic composition measures indicating the percentage of the population belonging to a race-age-gender group. All ten tests use robust standard errors.

35

**DA 167**

## VI. Debate over the Inclusion of Linear Trends

An important issue that the NRC did not address was whether there was any need to control for state-specific linear trends. Inclusion of state trends could be important if, for example, a clear pattern in crime rates existed before a state adopted an RTC law that continued into the post-passage period. On the other hand, there is also a potential danger in using state-specific trends if their inclusion inappropriately extrapolates a temporary swing in crime long into the future or otherwise mars the estimate of the dynamic effect of the policy shock (Wolfers 2006). Lott and Mustard (1997) never controlled for state-specific trends in analyzing handgun laws in their main analysis (only adding these trends for one robustness check mentioned in a footnote), while Moody and Marvel (2008) always controlled for these trends. Ayres and Donohue (2003a) presented evidence with and without such trends.

Table 4 replicates the NRC's full model (with the appropriate clustering adjustment) from Table 2b with one change: here we add a linear state trend to this county-data model. Strikingly, Table 4 suggests that RTC laws increase aggravated assault by roughly 3-4 percent each year, but no other statistically significant effect is observed. Thus, the addition of state trends eliminates the potentially problematic result of RTC laws increasing property crimes, which actually increases our confidence in these results. Certainly an increase in gun carrying and prevalence induced by a RTC law could well be thought to spur more aggravated assaults. Nonetheless, one must at least consider whether the solitary finding of statistical significance is merely the product of running seven different models, is a spurious effect flowing from a bad model, or reflects some other anomaly (such as changes in the police treatment of domestic violence cases, which could confound the aggravated assault results).[22]

---

[22] We tested this theory by creating a new right-hand side dummy variable that identified if a state passed legislation requiring law enforcement officials to submit official reports of all investigated domestic violence cases. Eight

**DA 168**

| **Table 4**[23] | | | | | | | |
|---|---|---|---|---|---|---|---|
| Estimated Impact of RTC Laws – Lott-Mustard Controls, 1977-2000 – Clustered Errors and State Trends | | | | | | | |
| Dataset: ADZ Updated 2013 County Data (without 1993 data) | | | | | | | |
| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
| Dummy Variable Model: | -0.82 | -5.23 | 9.90 | 1.41 | 5.73 | -1.29 | 3.61 |
| | (6.44) | (11.23) | (6.20) | (7.52) | (8.22) | (5.98) | (5.56) |
| Spline Model: | -0.30 | -3.77 | 4.11** | 1.00 | 1.56 | 0.13 | 1.34 |
| | (1.54) | (4.79) | (1.79) | (2.50) | (1.97) | (1.96) | (2.05) |
| Hybrid Post-Passage Dummy: | -0.53 | -1.34 | 5.91 | 0.38 | 4.34 | -1.51 | 2.33 |
| | (6.06) | (7.60) | (6.07) | (7.49) | (7.88) | (5.94) | (5.41) |
| Trend Effect: | -0.27 | -3.70 | 3.79** | 0.98 | 1.32 | 0.21 | 1.22 |
| | (1.46) | (4.54) | (1.79) | (2.54) | (1.90) | (1.98) | (2.07) |

## VII. Extending the Data Through 2006

Thus far we have presented panel-data regression results for the period 1977-2000.  Since more data are now available, we can further test the strength of the MGLC premise over time by estimating the NRC Lott and Mustard covariates specification on data extended through 2006. Table 5a presents our estimates (with clustering), which can be compared with Table 2b (which also clusters the standard errors in the main NRC model, but is estimated on the shorter time period).  This comparison reveals that the additional six years of data do not substantially change the picture that emerged in Table 2b showing that  RTC laws *increase* aggravated assault, auto theft, burglary, and larceny (although the results showing an increase in aggravated assault are

---

states have passed this legislation of which we are aware: Florida (1984), Illinois (1986), Louisiana (1985), New Jersey (1991), North Dakota (1989), Oklahoma (1986), Tennessee (1995), and Washington (1979).  We included this dummy variable when running both the NRC specification (through 2000) and our preferred specification (through 2006) without state-specific trends, and found that this dummy indicator of domestic violence reporting statutes did not undermine our general finding that RTC laws *increase* aggravated assaults.

[23] Estimations include year and county fixed effects and are weighted by county population.  Robust standard errors are provided beneath point estimates in parentheses.   The control variables (adopted from the Lott-Mustard model) include: lagged arrest rate, county population, population density, per capita income measures, and 36 demographic composition measures indicating the percentage of the population belonging to a race-age-gender group.   * Significant at 10%; ** Significant at 5%; *** Significant at 1%.

**DA 169**

stronger with the additional years of data for the dummy model).

Table 5b simply adds state trends to the Table 5a model, which can then be compared to Table 4 (clustering, state trends, and 1977-2000 county data).  Collectively, these results suggest that the added six years of data do not appreciably change the results from the shorter period. The inclusion of state trends on the longer data set suggests that RTC laws *increase* aggravated assault by roughly 8-9 percent.

**DA 170**

# Table 5[24]

## Table 5a

Estimated Impact of RTC Laws – Lott-Mustard Controls, 1977-2006 – Clustered Standard Errors

Dataset: ADZ Updated 2013 County Data (without 1993 data)

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | -3.03 | 15.45 | 15.30*** | 7.55 | 17.72** | 11.20** | 16.40*** |
|  | (6.46) | (14.68) | (5.12) | (5.23) | (7.59) | (4.67) | (5.15) |
| Spline Model: | -0.20 | 0.98 | 1.05 | 0.43 | 1.01 | 0.36 | 1.05* |
|  | (0.59) | (1.25) | (0.71) | (0.53) | (0.63) | (0.46) | (0.53) |
| Hybrid Post-Passage Dummy: | -2.61 | 13.65 | 13.06*** | 6.97 | 16.30** | 11.90** | 14.45*** |
|  | (6.72) | (12.51) | (4.58) | (6.15) | (7.08) | (5.41) | (5.29) |
| Trend Effect: | -0.09 | 0.39 | 0.49 | 0.13 | 0.31 | -0.15 | 0.42 |
|  | (0.60) | (0.96) | (0.71) | (0.61) | (0.51) | (0.52) | (0.55) |

## Table 5b

Estimated Impact of RTC Laws – Lott-Mustard Controls, 1977-2006 – Clustered Standard Errors and State Trends

Dataset: ADZ Updated 2013 County Data (without 1993 data)

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | 0.03 | -8.30 | 9.45** | 6.79 | 9.20 | 3.71 | 6.03 |
|  | (5.61) | (10.75) | (4.33) | (6.19) | (6.16) | (4.93) | (5.14) |
| Spline Model: | -0.44 | -5.57 | 1.65 | -0.54 | -0.84 | -1.37 | -1.54 |
|  | (0.99) | (4.49) | (1.48) | (1.83) | (1.81) | (1.54) | (1.66) |
| Hybrid Post-Passage Dummy: | 0.23 | -5.85 | 8.79** | 7.09 | 9.66* | 4.37 | 6.78 |
|  | (5.68) | (9.28) | (4.18) | (6.11) | (5.76) | (4.71) | (4.78) |
| Trend Effect: | -0.45 | -5.46 | 1.48 | -0.68 | -1.03 | -1.45 | -1.67 |
|  | (1.01) | (4.40) | (1.47) | (1.83) | (1.76) | (1.53) | (1.65) |

---

[24] Estimations include year and county fixed effects, and are weighted by county population.  Robust standard errors are provided beneath point estimates in parentheses.   The control variables (adopted from the Lott-Mustard model) include: lagged arrest rate, county population, population density, per capita income measures, and 36 demographic composition measures indicating the percentage of the population belonging to a race-age-gender group.   * Significant at 10%; ** Significant at 5%; *** Significant at 1%.

## VIII. Revising the Lott-Mustard Specification

We have already suggested that the Lott and Mustard specification that the NRC employed is not particularly appealing along a number of dimensions.  The most obvious problem – omitted variable bias has already been alluded to: the Lott and Mustard (1997) model had no control for incarceration, which Wilson considered to be one of the most important influences on crime in the last 20 years.  In addition to a number of important omitted variables, the Lott-Mustard model adopted by the NRC includes a number of questionable variables, such as the dubious ratio of arrests to murders, and the 36 (highly collinear) demographic controls.

To explore whether these specification problems are influencing the regression estimates, we revise the NRC models in a number of ways.  First, we completely drop Lott and Mustard's flawed contemporaneous arrest rate variable and add in two preferable measures of state law enforcement/deterrence: the incarceration rate and the rate of police.[25]  Second, we add two additional controls to capture economic conditions: the unemployment rate and the poverty rate, which are also state-level variables. Finally, mindful of Horowitz's admonition that the Lott-Mustard model might have *too many* variables (including demographic controls that are arguably irrelevant to the relationship between the guns and crime, and may have a spurious, misleading effect), we decided not to follow the NRC in using the 36 demographic controls employed by Lott-Mustard.  Instead, we adhered to the more customary practice in the econometrics of crime and controlled only for the demographic groups considered to be most involved with criminality (as offenders and victims), namely the percentage of black and white males between ages 10 and

---

[25] We also estimated the model with the arrest rate (lagged by one year to avoid endogeneity concerns), and the results were qualitatively similar to Table 6a except that dummy variable estimates for Rape (10%), Assault (1%), Robbery (5%), Auto (5%), Burglary (1%), and Larceny (1%) are now all significant. For Table 6b, the dummy variable estimates for murder, burglary, and larceny shift from negative to positive (but still remain insignificant) and assault and auto theft become positive and significant at the 10% level.

40 in each county.[26]

The results with this new specification are presented in Tables 6a-6b (which correspond to Tables 5a-5b estimated using the Lott and Mustard specification).  Note that had the NRC panel used our preferred specification while maintaining its view that neither clustering nor controls for state trends are needed, we would have overwhelming evidence that RTC laws *increase* crime.[27]  We don't show these regression results since we are convinced that clustering is needed, although of course when we cluster in Table 6a, the point estimates remain the same (while significance is drastically reduced).  Table 6b shows that this model is sensitive to whether we control for state trends, since adding these trends reverses the sign of most of our estimates (while making all of them statistically insignificant).  Essentially, our preferred specification shows almost no statistically significant crime effects (with the large standard errors reflecting a considerable degree of uncertainty).

---

[26] To test the robustness of this specification to changes in the demographic controls, we also estimated the following variants from our 6 demographic controls: only black males between ages 10 and 40 (three variables); only black males between ages 10 and 30 (two variables); and black and white males between ages 10 and 30 (four variables).  The results were again qualitatively similar across our tests.

[27] Re-estimating Table 6a without clustering (no state trends) shows all dummy variable point estimates (except murder) positive and significant at the 1% level.  The murder dummy variable is positive, but not significant. For the spline model, all spline estimates (except murder) are positive and significant at the 1% level, whereas murder is positive and significant at the 5% level.

## Table 6[28]

### Table 6a

Estimated Impact of RTC Laws – ADZ Preferred Controls, 1977-2006 – Clustered Standard Errors
Dataset: ADZ Updated 2013 County Data (without 1993 data)

| All figures reported in % | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | 1.59 | 25.33 | 22.65 | 22.27 | 27.46 | 30.08 | 31.33 |
| | (7.63) | (18.81) | (19.54) | (14.82) | (21.81) | (23.09) | (26.54) |
| Spline Model: | 0.38 | 2.81 | 3.19 | 2.58* | 3.07 | 3.64 | 4.19 |
| | (0.82) | (1.76) | (1.95) | (1.53) | (2.25) | (2.38) | (2.72) |
| Hybrid Post-Passage Dummy: | -0.43 | 14.75 | 8.74 | 12.20 | 15.81 | 15.49 | 13.56 |
| | (7.75) | (15.38) | (17.15) | (12.83) | (17.82) | (19.46) | (21.54) |
| Trend Effect: | 0.40 | 2.11 | 2.77 | 2.01 | 2.32 | 2.91 | 3.55 |
| | (0.86) | (1.45) | (1.81) | (1.42) | (1.97) | (2.17) | (2.41) |

### Table 6b

Estimated Impact of RTC Laws – ADZ Preferred Controls, 1977-2006 – Clustered Standard Errors and State Trends
Dataset: ADZ Updated 2013 County Data (without 1993 data)

| All figures reported in % | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | -2.66 | -15.99 | -2.36 | 2.73 | 1.26 | -6.39 | -7.06 |
| | (6.34) | (13.35) | (11.59) | (8.58) | (11.70) | (13.18) | (14.71) |
| Spline Model: | -0.43 | -7.93 | 0.58 | -0.60 | -0.71 | -2.23 | -2.68 |
| | (1.26) | (5.54) | (2.66) | (2.41) | (2.98) | (3.05) | (3.42) |
| Hybrid Post-Passage Dummy: | -2.50 | -12.80 | -2.62 | 3.00 | 1.56 | -5.50 | -6.00 |
| | (6.56) | (12.20) | (12.09) | (8.95) | (12.14) | (13.73) | (15.24) |
| Trend Effect: | -0.38 | -7.69 | 0.63 | -0.66 | -0.74 | -2.13 | -2.57 |
| | (1.31) | (5.50) | (2.75) | (2.48) | (3.08) | (3.17) | (3.55) |

---

[28] Estimations include year and county fixed effects and are weighted by county population.  Robust standard errors are provided beneath point estimates in parentheses.   The control variables for this "preferred" specification include: incarceration and police rates (lagged one year to avoid potential endogeneity issues), unemployment rate, poverty rate, population density, per capita income measures, and six demographic composition measures.   * Significant at 10%; ** Significant at 5%; *** Significant at 1%.

## IX. State versus County Crime Data

In their initial study, Lott and Mustard (1997) tested the "More Guns, Less Crime"
hypothesis by relying primarily on county-level data from the FBI's *Uniform Crime Reports*
(UCR).[29]  These FBI reports present yearly estimates of crime based on monthly crime data from
local and state law enforcement agencies across the country.  The NRC report followed Lott and
Mustard in this choice and presented regression estimates using only county data.  Unfortunately,
according to criminal justice researcher Michael Maltz, the FBI's county-level data is highly
problematic.

The major problem with county data stems from the fact that law enforcement agencies
voluntarily submit crime data to the FBI.  As a result, the FBI has little control over the accuracy,
consistency, timeliness, and completeness of the data it uses to compile the UCR reports.  In a
study published in the *Journal of Quantitative Criminology,* Maltz and Targonski (2002)
carefully analyzed the shortcomings in the UCR data set and concluded that UCR county-level
data is unacceptable for evaluating the impact of RTC laws.   For example, in Connecticut,
Indiana, and Mississippi, over 50% of the county-level data points are missing crime data for
more than 30% of their populations (Maltz and Targonski 2002).   In another thirteen states, more
than 20% of the data points have gaps of similar magnitude.  Based on their analysis, Maltz and
Targonski (2002) concluded that:

> "County-level crime data cannot be used with any degree of confidence…The crime rates
> of a great many counties have been underestimated, due to the exclusion of large
> fractions of their populations from contributing to the crime counts. Moreover, counties
> in those states with the most coverage gaps have laws permitting the carrying of
> concealed weapons. How these shortcomings can be compensated for is still an open
> question…it is clear, however, that in their current condition, county-level UCR crime
> statistics cannot be used for evaluating the effects of changes in policy" (pp. 316-317).

---

[29] Lott and Mustard present results based on state-level data, but they strongly endorse their county-level over their
state-level analysis: "the very different results between state- and county-level data should make us very cautious in
aggregating crime data and would imply that the data should remain as disaggregated as possible" (Lott and
Mustard, 1997, p. 39).

**DA 175**

Because of the concerns raised about county-level crime data, it is prudent to test our models on state-level data. According to Maltz and Targonski (2003), state-level crime data are less problematic than county-level data because the FBI's state-level crime files take into account missing data by imputing all missing agency data. County-level files provided by NACJD, however, impute missing data only if an agency provides at least six months of data; otherwise, the agency is dropped completely (Maltz 2006). As with our estimations using county-level data, we compiled our state-level data from scratch, and will refer to it as "Updated 2013 State-level Data."[30]

### A. State Data Results Using the Lott-Mustard Specification

Unsurprisingly, the regression results reproduced using state-level data are again different from the NRC committee's estimates using county-level data. This is shown in Table 7a, which presents the results from the NRC's specification (the Lott-Mustard model) on state data through 2010, with the cluster adjustment.[31] Table 7b simply adds state trends. When we compare these state-level estimates to the county-level estimates (using the Updated 2013 County-Level Data Set), we see that there are marked differences. Considering the preceding discussion on the reliability—or lack thereof—of county data, this result may be unsurprising.[32]  Looking across

---

[30] State poverty data for years 1977 and 1978 are unavailable from the census. Thus all regressions run on our state dataset are effectively using data from 1979 onwards. State poverty figures from 1980 onwards come from the Census Bureau's Historical Poverty Table 21 found at (http://www.census.gov/hhes/www/poverty/data/historical/people.html). The data for 1979 comes from the Census Statistical Abstract for 1982.

[31] Our placebo test on county data showed that standard errors needed to be adjusted by clustering. In Appendix A, we again find that clustering is needed for state data. Thus, all our state-level estimates include clustering.

[32] We also estimated the model on data through 2000 (the last year in the NRC report). Though those results are not shown here, our point estimates for this model are qualitatively similar to those shown in Tables 7a. Interestingly, the patterns of statistical significance are extremely different. For example, when Table 7a is estimated through the year 2000, there is a statistically significant decline in aggravated assault in the hybrid model with no other impact on violent crime. When estimated to the year 2010, however, Table 7a shows no statistically significant decline in aggravated assault and evidence of declines in rape and robbery. Moreover, while Table 7b shows some hints of crime declines for rape and aggravated assault when estimated through 2000, when the data is extended for another

44

**DA 176**

the models with and without state linear trends, there is evidence of increases in aggravated assault and murder and decreases in robbery, burglary, auto theft, and rape after the passage of RTC laws.

As Ayres and Donohue (2003; 1231) noted, the most important driver of the ostensible decline in crime from RTC laws comes from the Lott and Mustard use of 36 highly collinear demographic variables.  The Ayres and Donohue finding that "The results are incredibly sensitive to the inclusion of various seemingly unimportant demographic controls" still applies even after augmenting the data set with 10 more years of data.  To demonstrate the strong influence of these variables, we rerun the regression shown in Table 7a after substituting a more defensible set of 6 controls for black and white men in the higher crime ages (the ADZ demographic variables) for the full set of 36 controls used in the Lott-Mustard specification.  Examining the results of this process (shown in Table 7c) reveals that 27 out of the 28 resulting estimates of the effect of RTC laws on crime are positive, with at least some evidence of statistical significant crime increases for 5 of the 7 crime categories.  The story is somewhat muddier when state trends are added (Table 7d), but the strongest effect in this modified version of the Lott and Mustard specification on more complete data suggests substantial and statistically significant increases in aggravated assaults.

---

decade, the table shows only statistically significant evidence of *increases* in aggravated assault. We also estimate the NRC's no-controls model through 2010 on the state-level data.  See Appendix B for these results.

## Table 7[33]

### Table 7a

Estimated Impact of RTC Laws – Lott-Mustard Controls, 1977-2010 – Clustered Standard Errors

Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | -2.96 | -5.07** | -0.69 | -7.53** | 1.78 | -3.35* | 2.24 |
| | (3.60) | (2.23) | (4.56) | (2.92) | (4.03) | (1.92) | (1.76) |
| Spline Model: | 0.49 | -0.23 | 0.64 | 0.03 | -0.54 | -0.26 | 0.39 |
| | (0.36) | (0.38) | (0.62) | (0.45) | (0.32) | (0.35) | (0.25) |
| Hybrid Post-Passage Dummy: | -4.91 | -4.70* | -2.94 | -8.28*** | 3.75 | -2.75 | 1.10 |
| | (3.59) | (2.68) | (3.76) | (3.01) | (4.48) | (1.90) | (1.59) |
| Trend Effect: | 0.62* | -0.12 | 0.71 | 0.24 | -0.63* | -0.19 | 0.37 |
| | (0.34) | (0.42) | (0.60) | (0.43) | (0.35) | (0.35) | (0.25) |

### Table 7b

Estimated Impact of RTC Laws – Lott-Mustard Controls, 1977-2010 – Clustered Standard Errors and State Trends

Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | -0.87 | -3.54 | -2.93 | -3.91 | 2.20 | -2.28 | 0.45 |
| | (3.48) | (2.43) | (3.07) | (2.76) | (3.10) | (1.51) | (1.36) |
| Spline Model: | 0.70 | 0.03 | 1.70*** | 0.23 | -1.62** | 0.20 | 0.18 |
| | (0.75) | (0.60) | (0.56) | (0.86) | (0.74) | (0.55) | (0.44) |
| Hybrid Post-Passage Dummy: | -1.50 | -3.68 | -4.49 | -4.23 | 3.68 | -2.53 | 0.31 |
| | (3.39) | (2.59) | (3.02) | (2.74) | (3.20) | (1.68) | (1.46) |
| Trend Effect: | 0.76 | 0.17 | 1.87*** | 0.39 | -1.75** | 0.29 | 0.16 |
| | (0.73) | (0.63) | (0.56) | (0.85) | (0.79) | (0.57) | (0.45) |

---

[33] Estimations include year and state fixed effects, and are weighted by state population.  Robust standard errors are provided beneath point estimates in parentheses.   The control variables (adopted from the Lott-Mustard model) include: lagged arrest rate, state population, population density, per capita income measures, and 36 demographic composition measures indicating the percentage of the population belonging to a race-age-gender group.   * Significant at 10%; ** Significant at 5%; *** Significant at 1%.

46

**DA 178**

# Table 7 (Continued)[34]

## Table 7c

Estimated Impact of RTC Laws – Lott-Mustard Controls (with ADZ Demographic Variables), 1977-2010 – Clustered Standard Errors

Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | 2.20 | 9.67* | 7.86 | 12.04 | 17.15 | 11.21* | 10.40** |
| | (6.84) | (5.37) | (5.42) | (8.97) | (10.70) | (6.22) | (4.55) |
| Spline Model: | 0.62 | 0.86 | 1.18* | 1.59* | 1.39 | 0.95 | 1.05** |
| | (0.64) | (0.59) | (0.67) | (0.80) | (0.93) | (0.61) | (0.43) |
| Hybrid Post-Passage Dummy: | -1.21 | 6.54 | 2.22 | 4.82 | 12.55 | 7.96 | 6.31* |
| | (5.78) | (4.76) | (4.62) | (6.86) | (8.30) | (4.81) | (3.75) |
| Trend Effect: | 0.66 | 0.61 | 1.09 | 1.40** | 0.90 | 0.64 | 0.80** |
| | (0.59) | (0.56) | (0.68) | (0.69) | (0.70) | (0.51) | (0.39) |

## Table 7d

Estimated Impact of RTC Laws – Lott-Mustard Controls (with ADZ Demographic Variables), 1977-2010 – Clustered Standard Errors and State Trends

Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | 0.77 | -4.65* | -3.33 | -2.01 | 3.10 | -0.63 | 0.24 |
| | (3.91) | (2.41) | (3.55) | (3.16) | (4.72) | (1.90) | (1.87) |
| Spline Model: | 0.46 | 0.15 | 1.82** | -0.26 | -1.49* | 0.02 | -0.39 |
| | (0.72) | (0.59) | (0.68) | (0.95) | (0.78) | (0.59) | (0.55) |
| Hybrid Post-Passage Dummy: | 0.43 | -4.88* | -4.83 | -1.86 | 4.31 | -0.66 | 0.54 |
| | (3.95) | (2.50) | (3.38) | (3.29) | (4.63) | (2.15) | (2.05) |
| Trend Effect: | 0.45 | 0.31 | 1.97*** | -0.20 | -1.63** | 0.04 | -0.41 |
| | (0.72) | (0.60) | (0.67) | (0.98) | (0.79) | (0.63) | (0.58) |

---

[34] Estimations include year and state fixed effects, and are weighted by state population.  Robust standard errors are provided beneath point estimates in parentheses.   The control variables (adopted from the Lott-Mustard model) include: lagged arrest rate, state population, population density, per capita income measures, and the six demographic composition measures used in the ADZ model.   * Significant at 10%; ** Significant at 5%; *** Significant at 1%.

### B. State Data Results Using the ADZ Preferred Specification

Table 8 mimics Table 7 in that we again employ state data through 2010 but now we use our preferred set of controls.  Here the ostensible evidence that RTC laws increase crime is very strong:  all three models in Table 8a have positive coefficients for every crime category, and 12 of the 28 coefficients are statistically significant.  Table 8b once again shows highly significant evidence (in the spline model and in the trend effect of the hybrid model) that RTC laws increase aggravated assault.  Some significant but conflicting predictions for auto theft emerge with both dummy effects positive and significant, while both trend effects are negative and significant.  None of the remaining coefficients are statistically significant.[35]

While there are a number of differences in the modified Lott-Mustard specification versus the ADZ specification, the most important difference in generating the different estimates of the impact of RTC laws is the Lott-Mustard use of 36 demographic variables.  We illustrate this in Table 8c, by substituting Lott's chosen thirty-six demographic variables in place of our own.  Under this specification, RTC laws are no longer associated with any statistically significant increases in crime and rape, robbery, and auto theft appear to decline.  Adding state trends in Table 8d brings back a result similar to that in Table 7d:  aggravated assault rises sharply and auto theft seems to fall with the adoption of RTC laws.

---

[35] As a robustness check for the Tables 8a and 8b results, we explored the effect of dropping the states with the highest residual variances from the aggravated assault regressions in these two tables.  Appendix C shows the results of this exercise.  Essentially, the basic patterns of Tables 8a and 8b persist, but evidence of RTC laws increasing aggravated assault is strengthened when the high variance states are dropped from Table 8a and somewhat weakened when dropped from Table 8b.xxx

48

**DA 180**

## Table 8[36]

### Table 8a

Estimated Impact of RTC Laws – ADZ Preferred Controls, 1979-2010 – Clustered Standard Errors
Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | 3.31 | 11.53** | 8.03* | 13.85* | 17.83* | 12.54* | 10.80** |
| | (6.51) | (5.73) | (4.46) | (8.03) | (8.95) | (6.28) | (4.70) |
| Spline Model: | 0.58 | 0.82 | 1.05* | 1.27 | 1.20 | 0.81 | 0.85* |
| | (0.64) | (0.63) | (0.60) | (0.82) | (0.80) | (0.63) | (0.49) |
| Hybrid Post-Passage Dummy: | 0.82 | 9.23* | 3.91 | 9.58 | 14.59* | 10.46* | 8.18** |
| | (5.35) | (4.79) | (4.01) | (6.86) | (7.47) | (5.21) | (4.00) |
| Trend Effect: | 0.56 | 0.51 | 0.92 | 0.95 | 0.72 | 0.46 | 0.58 |
| | (0.58) | (0.58) | (0.62) | (0.77) | (0.66) | (0.55) | (0.46) |

### Table 8b

Estimated Impact of RTC Laws – ADZ Preferred Controls, 1979-2010 – Clustered Standard Errors and State Trends
Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | -0.74 | -3.16 | -1.80 | 1.66 | 8.72* | 0.87 | 1.03 |
| | (3.94) | (2.30) | (3.61) | (3.16) | (4.50) | (2.19) | (1.83) |
| Spline Model: | 0.77 | -0.25 | 1.88** | -0.23 | -1.32* | -0.08 | -0.59 |
| | (0.74) | (0.65) | (0.80) | (0.79) | (0.76) | (0.64) | (0.52) |
| Hybrid Post-Passage Dummy: | -1.33 | -3.05 | -3.23 | 1.87 | 9.90** | 0.95 | 1.49 |
| | (3.86) | (2.34) | (3.51) | (3.33) | (4.42) | (2.31) | (1.98) |
| Trend Effect: | 0.81 | -0.16 | 1.99** | -0.29 | -1.64** | -0.11 | -0.64 |
| | (0.72) | (0.65) | (0.79) | (0.83) | (0.73) | (0.66) | (0.55) |

---

[36] These regressions include year and state fixed effects, and are weighted by state population. Robust standard errors are provided beneath point estimates in parentheses. The control variables for this "preferred" specification include: incarceration and police rates (lagged one year to avoid potential endogeneity issues), unemployment rate, poverty rate, population density, per capita income measures, and six demographic composition measures.
* Significant at 10%; ** Significant at 5%; *** Significant at 1%.

49

**DA 181**

## Table 8 (Continued)

### Table 8c[37]

Estimated Impact of RTC Laws – ADZ Preferred Controls (with Lott-Mustard demographic variables), 1979-2010 – Clustered Standard Errors

Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | -4.55 | -5.46** | 0.48 | -6.62** | 3.87 | -3.29 | 0.98 |
| | (3.46) | (2.50) | (4.23) | (3.23) | (3.14) | (2.16) | (1.95) |
| Spline Model: | 0.21 | -0.30 | 0.64 | -0.26 | -0.75* | -0.38 | 0.13 |
| | (0.35) | (0.35) | (0.58) | (0.46) | (0.38) | (0.33) | (0.27) |
| Hybrid Post-Passage Dummy: | -5.51 | -4.91* | -1.47 | -6.27* | 6.43* | -2.34 | 0.66 |
| | (3.46) | (2.73) | (3.59) | (3.49) | (3.45) | (2.22) | (2.01) |
| Trend Effect: | 0.33 | -0.19 | 0.68 | -0.12 | -0.89** | -0.33 | 0.11 |
| | (0.35) | (0.37) | (0.56) | (0.46) | (0.37) | (0.33) | (0.28) |

### Table 8d

Estimated Impact of RTC Laws – ADZ Preferred Controls (with Lott-Mustard demographic variables), 1979-2010 – Clustered Standard Errors and State Trends

Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | -0.32 | -2.36 | -2.50 | -0.21 | 5.29** | -0.74 | 1.12 |
| | (3.27) | (2.54) | (3.08) | (2.60) | (2.30) | (1.61) | (1.19) |
| Spline Model: | 0.96 | 0.05 | 1.92*** | 0.49 | -1.36* | 0.38 | 0.09 |
| | (0.73) | (0.60) | (0.69) | (0.88) | (0.75) | (0.56) | (0.46) |
| Hybrid Post-Passage Dummy: | -1.17 | -2.49 | -4.26 | -0.64 | 6.65*** | -1.10 | 1.08 |
| | (3.10) | (2.65) | (3.00) | (2.59) | (2.32) | (1.68) | (1.30) |
| Trend Effect: | 1.01 | 0.14 | 2.09*** | 0.51 | -1.62** | 0.43 | 0.05 |
| | (0.69) | (0.62) | (0.69) | (0.89) | (0.76) | (0.58) | (0.48) |

---

[37] These regressions include year and state fixed effects, and are weighted by state population. Robust standard errors are provided beneath point estimates in parentheses. The control variables for this "preferred" specification include: incarceration and police rates (lagged one year to avoid potential endogeneity issues), unemployment rate, poverty rate, population density, per capita income measures, and thirty-six demographic composition measures.
* Significant at 10%; ** Significant at 5%; *** Significant at 1%.

**DA 182**

Given the strong influence that demographic variables have on the estimated effect of RTC laws on crime, it is important to reflect on why we prefer our demographic variables to the specification used in the Lott-Mustard model.  The first thing to note about the Lott-Mustard specification is that it is entirely idiosyncratic:  no other major study in the entire empirical literature on crime has used the sheer number of demographic controls found in the Lott-Mustard model.  In fact, many published papers use fewer demographic controls than the six that we include in our own preferred model.  Table 9 modifies our specification by reducing our six demographic controls to only three that represent the size of the younger black male population (in the three age groups of 10-19, 20-29 and 30-39).  The effect of this change can be seen by comparing Table 9a to 8a (no state trends) and Table 9b to 8b (with state trends).  Beginning with the first comparison, we see that using even fewer demographic controls only strengthens our finding that RTC laws are generally associated with higher, not lower, crime rates.  Table 9a suggests that RTC laws caused every crime category apart from murder to rise by 9.5 percent or more.  The comparison of Tables 9b and 8b (with state trends) shows that changing the demographic variables has a small influence on the results when controls are included for state trends.  Nevertheless, reducing the number of demographic variables in Table 9b does not change our finding that there is no evidence that RTC laws decrease violent crime.[38]

---

[38] A fairly standard set of demographics that can be seen in the crime literature includes controls for a few age categories across all races combined with a single identifier of the percentage of blacks in the state.  Table D1 and D2 in Appendix D provide this tweak to the ADZ model by putting in four such demographic variables – the percent of the population falling into the three age categories of 10-19, 20-29, and 30-39 plus the percent black -- in place of the ADZ six demographic variables.  The results for violent crime are not dramatically different from the main ADZ models of Tables 8a and 8b.  Table D1's and Table 8a's estimated violent crime increases for rape, aggravated assault, and robbery are substantial in both sets of dummy variable estimates and significant at the .10 level or better, but only Table 8a has one of these rise to the level of significance at the .05 level (for rape).

51

**DA 183**

## Table 9[39]

### Table 9a
Estimated Impact of RTC Laws – ADZ Preferred Controls (with 3 demographic variables), 1979-2010 – Clustered Standard Errors
Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | 3.01 | 10.77** | 9.69** | 14.66** | 19.65** | 13.26** | 11.24** |
| | (5.71) | (5.36) | (3.84) | (7.29) | (7.76) | (5.51) | (4.25) |
| Spline Model: | 0.50 | 0.87 | 1.04* | 1.26 | 1.08 | 0.89 | 0.88* |
| | (0.60) | (0.59) | (0.54) | (0.75) | (0.72) | (0.56) | (0.45) |
| Hybrid Post-Passage Dummy: | 0.84 | 8.00* | 5.79 | 10.49 | 17.37** | 10.87** | 8.51** |
| | (4.71) | (4.43) | (3.78) | (6.71) | (6.82) | (4.85) | (3.82) |
| Trend Effect: | 0.47 | 0.60 | 0.84 | 0.90 | 0.49 | 0.52 | 0.59 |
| | (0.56) | (0.55) | (0.57) | (0.74) | (0.65) | (0.52) | (0.44) |

### Table 9b
Estimated Impact of RTC Laws – ADZ Preferred Controls (with 3 demographic variables), 1979-2010 – Clustered Standard Errors and State Trends
Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | 0.23 | -3.46 | 1.01 | 4.24 | 11.14** | 1.93 | 1.67 |
| | (3.81) | (2.76) | (3.33) | (3.19) | (4.41) | (2.21) | (1.79) |
| Spline Model: | 0.48 | -0.16 | 1.52* | -0.31 | -0.77 | -0.20 | -0.95* |
| | (0.67) | (0.58) | (0.79) | (0.74) | (0.74) | (0.64) | (0.48) |
| Hybrid Post-Passage Dummy: | -0.06 | -3.41 | 0.08 | 4.50 | 11.78** | 2.08 | 2.28 |
| | (3.74) | (2.80) | (3.18) | (3.34) | (4.44) | (2.30) | (1.97) |
| Trend Effect: | 0.48 | -0.08 | 1.52* | -0.41 | -1.04 | -0.25 | -1.00* |
| | (0.65) | (0.59) | (0.79) | (0.76) | (0.73) | (0.65) | (0.50) |

---

[39] These regressions include year and state fixed effects, and are weighted by state population.  Robust standard errors are provided beneath point estimates in parentheses.  The control variables for this "preferred" specification include: incarceration and police rates (lagged one year to avoid potential endogeneity issues), unemployment rate, poverty rate, population density, per capita income measures, and three demographic composition measures.
\* Significant at 10%; \*\* Significant at 5%; \*\*\* Significant at 1%.

DA 184

### C. The 36 Demographic Controls Should Not be Used in Crime Regressions

In his book *More Guns, Less Crime*, Lott concedes that he "overcontrolled" for demographic composition out of an abundance of caution, in order to avoid potentially problematic omitted variable bias.  However, it is well known that introducing a large number of highly collinear variables into a regression model can lead to highly unstable results.[40]  To test for the degree of collinearity among the independent variables when the Lott-Mustard demographic variables are used in Table 8c, we run auxiliary regressions of one independent variable on the remaining explanatory variables and analyze the resulting variance inflation factor (VIF).[41]  Table 10 shows that the RTC variable has an uncomfortably high VIF greater than 5 in both the dummy and spline models when the 36 demographic controls are used.  Using the 6 ADZ variables (or the more limited set of 3 demographics) reduces the multicollinearity for the RTC dummy to a tolerable level (with VIFs always below 5).  Nonetheless, the degree of multicollinearity for the individual demographics (showing three different black-male categories) can be seen to be astonishingly high with 36 demographic controls and still high with even more limited demographic controls. This analysis makes us highly skeptical of any estimates of the impact of RTC laws that employ the Lott-Mustard set of 36 demographic controls.

---

[40] For a longer discussion of the consequences that multicollinearity can have on a regression model, see Studenmund (1997).

[41] The VIF is an estimate of the extent to which multicollinearity has increased the variance of the estimated coefficient. A VIF of five or more, calculated as the inverse of the difference between 1 and the coefficient of determination ($R^2$) from the auxiliary regression, is evidence of severe multicollinearity.

53

**DA 185**

| Table 10[42] | | RTC | Black Male: 10-19 | Black Male: 20-20 | Black Male: 30-39 |
|---|---|---|---|---|---|
| *VIF Calculations* | | | | | |
| 36 Demographic Controls: | Dummy Variable Model: | 5.9 | 13888.9 | 1733.1 | 1788.9 |
| | Spline Mode: | 7.0 | 13888.9 | 1733.1 | 1785.7 |
| 6 Demographic Controls: | Dummy Variable Model: | 4.1 | 158.8 | 91.4 | 74.1 |
| | Spline Model: | 4.8 | 158.4 | 90.8 | 75.6 |
| 3 Demographic Controls: | Dummy Variable Model: | 3.8 | 136.5 | 82.1 | 67.7 |
| | Spline Model: | 4.4 | 136.8 | 82.6 | 68.8 |

### D. Addressing the Problem of Endogenous Adoption of RTC Laws

The problem of endogenous adoption of RTC laws during a period of rising crime that is unique to a state is obviously a concern, since this would likely bias the estimated effect of the law in a way that would make the law appear more favorable in reducing crime (as crime ultimately returned to prior mean levels).  One way to address this concern is to restrict the analysis to a period such as 1999-2010, which is a far more stable period of crime in the US. The 1999-2010 period does not include the immense increases and then declines associated with the rise and fall of the crack epidemic, which threatened a key assumption of the panel data model of crime (since these dramatic crime shifts were not uniform across states and thus could not be expected to be adequately captured by year fixed effects). Table 11a restricts the analysis of the basic ADZ model to this date range, with the hope that this estimation on a more limited sample involving only 8 states that adopted RTC laws during that time frame will eliminate enough endogeneity bias to offset the cost of having a smaller sample size.  This approach generates evidence that RTC laws increased the rate of murder but had no other statistically

---

[42] These regressions include year and state fixed effects, and are weighted by state population.  The control variables for this "preferred" specification include: incarceration and police rates (lagged one year to avoid potential endogeneity issues), unemployment rate, poverty rate, population density, and per capita income measures. The number of demographic variables (excluding the explanatory variable for which the VIF is calculated) varies by row in the table. The VIF is calculated as $1/(1-R^2)$.

54

**DA 186**

significant impact on crime for the 8 changing states.  Table 11b shows that if state trends need to be controlled for, the results become more varied, with some crime declines (in rape and larceny and possibly auto theft) and a possible crime increase in aggravated assault.

<div style="border:1px solid">

## Table 11[43]

### Table 11a

Estimated Impact of RTC Laws – ADZ Preferred Controls, 1999-2010 – Clustered Standard Errors
Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | 7.40 | 3.00 | 4.76 | -3.55 | -0.21 | 1.79 | -3.18 |
| | (5.84) | (3.50) | (3.73) | (5.23) | (4.07) | (3.40) | (2.64) |
| Spline Model: | 1.47** | 0.34 | 1.10 | 0.12 | -0.61 | 0.59 | 0.15 |
| | (0.55) | (0.42) | (0.67) | (0.43) | (0.73) | (0.38) | (0.33) |
| Hybrid Post-Passage Dummy: | 6.73 | 2.85 | 4.26 | -3.62 | 0.08 | 1.52 | -3.27 |
| | (6.06) | (3.51) | (3.82) | (5.31) | (4.05) | (3.52) | (2.66) |
| Trend Effect: | 1.42*** | 0.32 | 1.07 | 0.14 | -0.61 | 0.58 | 0.18 |
| | (0.53) | (0.42) | (0.67) | (0.44) | (0.73) | (0.39) | (0.33) |

### Table 11b

Estimated Impact of RTC Laws – ADZ Preferred Controls, 1999-2010 – Clustered Standard Errors and State Trends
Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | 5.70 | 4.66 | 6.00* | 1.04 | 1.66 | 1.91 | -0.38 |
| | (5.30) | (3.57) | (3.24) | (6.66) | (5.48) | (4.11) | (2.43) |
| Spline Model: | 1.03 | -2.94** | -1.70 | -1.41 | -5.36* | -0.92 | -1.72** |
| | (3.24) | (1.22) | (1.40) | (1.93) | (2.79) | (1.41) | (0.85) |
| Hybrid Post-Passage Dummy: | 5.79 | 4.44 | 5.87* | 0.93 | 1.24 | 1.84 | -0.52 |
| | (5.32) | (3.53) | (3.21) | (6.75) | (5.26) | (4.07) | (2.34) |
| Trend Effect: | 1.10 | -2.89** | -1.64 | -1.40 | -5.35* | -0.90 | -1.72** |
| | (3.23) | (1.22) | (1.35) | (1.91) | (2.76) | (1.37) | (0.85) |

</div>

55

**DA 187**

## X. Additional Concerns in the Evaluation of Legislation Using Observational Data

We now turn to three critical issues that must be considered when using panel data to evaluate the impact of legislation and public policy (and gun laws in particular). First, we discuss the possibility of difficult-to-measure omitted variables and how such variables can shape estimates of policy impact. We are particularly concerned with how the crack epidemic of the 1980s and 1990s may bias results in the direction of finding a beneficial effect. Second, we explore pre-adoption crime trends in an attempt to examine the potentially endogenous adoption of right-to-carry legislation. Finally, given that the intent of right-to-carry legislation is to increase gun-carrying in law-adopting states, we explore whether these laws may have had a particular effect on gun-related assaults (which is the one crime category that has generated somewhat consistent results thus far).

### A. Further Thoughts on Omitted Variable Bias

As discussed above, we believe it is likely that the NRC's estimates of the effects of RTC legislation are marred by omitted variable bias. In our attempt to improve (at least to a degree) on the original Lott-Mustard model, we included additional explanatory factors, such as the incarceration and police rates, and removed extraneous variables (such as unnecessary and collinear demographic measures). We recognize, however, that there are additional criminogenic influences for which we cannot fully control. In particular, we suspect that a major shortcoming of all of the models presented is the inability to account for the possible influence of the crack-

---

[43] These regressions include year and state fixed effects, and are weighted by state population. Robust standard errors are provided beneath point estimates in parentheses. The control variables for this "preferred" specification include: incarceration and police rates (lagged one year to avoid potential endogeneity issues), unemployment rate, poverty rate, population density, per capita income measures, and six demographic composition measures. The states that adopted shall issue laws during the time period are Colorado (2003), Kansas (2007), Michigan (2001), Minnesota (2003), Missouri (2004), Nebraska (2007), New Mexico (2004), and Ohio (2004).
* Significant at 10%; ** Significant at 5%; *** Significant at 1%.

**DA 188**

cocaine epidemic on crime.[44]

Many scholars now suggest that rapid growth in the market for crack cocaine in the late 1980s and the early 1990s was likely one of the major influences on increasing crime rates (and violent crimes in particular) during this period (Levitt 2004).  Moreover, the harmful criminogenic effect of crack was likely more acute in urban areas of states slow to adopt RTC laws.  Meanwhile, many rural states adopted such laws during this era.  If this was indeed the case, this divergence between states could account for much of the purported "crime-reducing" effects attributed by Lott and Mustard to gun laws (which were then supported by scholars such as James Q. Wilson).  The regression analysis would then identify a relationship between rising crime and the failure to adopt RTC legislation, when the actual reason for this trend was the influence of crack (rather than the passage of the RTC law).

We now explore how results from our main models vary when we restrict the analysis to the time periods before and after the peak of the American crack epidemic. According to Fryer et al. (2005), the crack problem throughout most of the country peaked at some point in the early 1990s.  Coincidentally, the original Lott-Mustard period of analysis (1977-1992) contains years that likely represent the height of crack-induced crime problem.  With this in mind, we run our main regressions after breaking up our dataset into two periods: the original Lott-Mustard period

---

[44] Although Lott and Mustard (1997) do attempt to control for the potential influence of crack cocaine through the use of cocaine price data based on the U.S. Drug Enforcement Agency's STRIDE program, we find their approach wanting for both theoretical and empirical reasons.  First, a control for crack should capture the criminogenic influence of the crack trade on crime.  We know that prior to 1985, there was no such influence in any state and that after some point in the early to mid-1990s this criminogenic influence declined strongly.  Since there is little reason to believe that cocaine prices would be informative on the criminogenic influence of crack in particular geographic areas, it is hard to see how the cocaine price data could be a useful control.  Second, the data that Lott and Mustard use is itself questionable.  Horowitz (2001) argues forcefully that STRIDE data is not a reliable source of data for policy analyses of cocaine.  The data are mainly records of acquisitions made to support criminal investigations in particular cities, and are not a random sample of an identifiable population.  Moreover, since the STRIDE data is at the city-level, we are not sure how this would be used in a county-level analysis.  The data was collected for 21 cities, while there are over 3,000 counties in the U.S.  In addition, the data is missing for 1988 and 1989, which are crucial years in the rise of the crack epidemic in poor urban areas.  Lott and Mustard drop those years of analysis when including cocaine prices as a control.

57

**DA 189**

of analysis (1979-1992) as well as the post-Lott-Mustard period (1993-2010).  We first present the results for the era that includes the crack epidemic (1979-1992) [45] on our preferred model. We run these regressions (with clustered standard errors) on state-level data, with and without state trends.  These results are presented in Tables 12a and 12b.  We then estimate the same models on the post-crack period (see Tables 13a and 13b).

Note that, with a simple naive reading, the regression results in Table 12 from the initial 14-year time period (1979-1992) do suggest that violent crime rates are dampened by RTC laws if state trends are not needed and that murder, rape, and robbery may have declined if state trends are needed.  If we look at the following 18 year period from 1993 – 2010 in Table 13, however, there is no longer any evidence of a statistically significant decline in violent crimes.  Instead, RTC laws are associated with higher rates of murder, aggravated assault, robbery, and burglary. This evidence supports the theory that the initial Lott and Mustard finding was likely the result of the crime-raising impact of crack in non-RTC states.

---

[45] As mentioned in footnote 29, poverty data is not available before 1979. Thus, although the Lott-Mustard period originally was 1977-1992, for our preferred specification the analysis covers 1979-1992.

58

**DA 190**

# Table 12[46]

## Table 12a

Estimated Impact of RTC Laws – ADZ Preferred Controls, 1979-1992 – Clustered Standard Errors

Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | -4.88 | -7.28** | -9.71** | -5.46 | 7.95* | -3.12 | -0.20 |
| | (4.28) | (3.40) | (4.48) | (4.02) | (4.38) | (2.70) | (1.51) |
| Spline Model: | -1.48 | -0.93 | -0.30 | -2.49*** | 0.27 | -0.42 | 0.04 |
| | (1.18) | (0.63) | (1.53) | (0.60) | (0.83) | (0.75) | (0.30) |
| Hybrid Post-Passage Dummy: | -1.02 | -7.20* | -13.75** | 2.58 | 11.14** | -2.97 | -0.49 |
| | (5.02) | (3.67) | (5.64) | (5.06) | (5.13) | (3.56) | (1.69) |
| Trend Effect: | -1.35 | -0.03 | 1.42 | -2.81*** | -1.12 | -0.05 | 0.10 |
| | (1.40) | (0.77) | (1.19) | (0.86) | (0.81) | (0.84) | (0.31) |

## Table 12b

Estimated Impact of RTC Laws – ADZ Preferred Controls, 1979-1992 – Clustered Standard Errors and State Trends

Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | -4.83 | -6.19** | -2.93 | -2.80 | 1.37 | -1.86 | 2.75 |
| | (4.27) | (2.81) | (2.75) | (5.25) | (4.54) | (3.07) | (2.32) |
| Spline Model: | -5.56** | -0.39 | -0.72 | -4.03* | -1.17 | -1.96 | 0.86 |
| | (2.34) | (1.22) | (1.07) | (2.21) | (1.79) | (1.19) | (1.07) |
| Hybrid Post-Passage Dummy: | 5.65 | -7.95*** | -2.56 | 5.11 | 4.58 | 1.76 | 1.98 |
| | (6.22) | (2.83) | (3.61) | (6.88) | (4.20) | (3.99) | (2.54) |
| Trend Effect: | -6.62** | 1.11 | -0.23 | -5.00* | -2.03 | -2.29 | 0.49 |
| | (2.95) | (1.15) | (1.34) | (2.76) | (1.87) | (1.44) | (1.23) |

---

[46] Estimations include year and state fixed effects and are weighted by state population. Robust standard errors are provided beneath point estimates in parentheses. The control variables for this "preferred" specification include: incarceration and police rates (lagged one year to avoid potential endogeneity issues), unemployment rate, poverty rate, population density, per capita income measures, and six demographic composition measures. * Significant at 10%; ** Significant at 5%; *** Significant at 1%.

59

**DA 191**

# Table 13[47]

## Table 13a

Estimated Impact of RTC Laws – ADZ Preferred Controls, 1993-2010 – Clustered Standard Errors
Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | 4.77 | -1.53 | 2.03 | 2.91 | 5.18 | 6.29** | 2.26 |
| | (4.68) | (3.45) | (4.49) | (4.57) | (4.32) | (3.09) | (2.77) |
| Spline Model: | 1.25** | 0.28 | 1.37** | 1.28** | 0.61 | 0.68 | 0.16 |
| | (0.51) | (0.55) | (0.60) | (0.62) | (0.87) | (0.57) | (0.43) |
| Hybrid Post-Passage Dummy: | 4.15 | -1.68 | 1.34 | 2.27 | 4.89 | 5.96* | 2.19 |
| | (4.94) | (3.55) | (4.58) | (4.74) | (4.11) | (3.23) | (2.77) |
| Trend Effect: | 1.22** | 0.29 | 1.36** | 1.26** | 0.58 | 0.65 | 0.15 |
| | (0.52) | (0.54) | (0.61) | (0.63) | (0.86) | (0.57) | (0.43) |

## Table 13b

Estimated Impact of RTC Laws – ADZ Preferred Controls, 1993-2010 – Clustered Standard Errors and State Trends
Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | 6.30* | 0.94 | 1.85 | 4.38 | 4.22 | 1.12 | -0.94 |
| | (3.38) | (3.29) | (3.27) | (3.26) | (4.25) | (2.54) | (2.30) |
| Spline Model: | -0.26 | 0.43 | 1.66 | -0.21 | -3.87** | -1.14 | -1.61** |
| | (1.40) | (0.87) | (1.24) | (0.93) | (1.50) | (0.73) | (0.65) |
| Hybrid Post-Passage Dummy: | 6.62* | 0.74 | 1.03 | 4.61 | 6.38 | 1.76 | -0.12 |
| | (3.46) | (3.23) | (3.01) | (3.54) | (4.07) | (2.47) | (2.13) |
| Trend Effect: | -0.62 | 0.39 | 1.61 | -0.46 | -4.22** | -1.23 | -1.60** |
| | (1.32) | (0.86) | (1.24) | (1.03) | (1.61) | (0.77) | (0.70) |

---

[47] Estimations include year and state fixed effects and are weighted by state population.  Robust standard errors are provided beneath point estimates in parentheses.   The control variables for this "preferred" specification include: incarceration and police rates (lagged one year to avoid potential endogeneity issues), unemployment rate, poverty rate, population density, per capita income measures, and six demographic composition measures.   * Significant at 10%; ** Significant at 5%; *** Significant at 1%.

**DA 192**

Figure 8 depicts a measure of crack prevalence for the period 1980-2000 in the five states with the greatest crack problem, as well as the five states with the least crack, according to Fryer et al. (2005).  Figure 9 shows the murder rates over time for these two sets of states.  We see that crime rose in the high crack states when the crack index rises in the mid-to-late 1980s, but that the crack index does not turn down in those states at the time crime started to fall.  Apparently, the rise of the crack market triggered a great deal of violence, but once the market stabilized, the same level of crack consumption could be maintained while the violence ebbed.

Of course, omitting an appropriate control for the criminogenic influence of crack is problematic if the high-crack states tend not to adopt RTC laws and the low-crack states tend to adopt.  This is in fact the case:  all of the five "high-crack" states are non-RTC states during the time period of Figure 9, whereas four of the five "low-crack" states are RTC states (all four adopted an RTC law by 1994).[48]   The only exception is Nebraska, a state that did not adopt an RTC law until 2007.[49]

---

[48] New Mexico, one of the five highest crack states, became an RTC state in 2004.  Wyoming and Montana adopted RTC laws in 1994 and 1991, respectively.  North Dakota and South Dakota both adopted their laws by 1985.
[49] Out of the ten states with the lowest crack cocaine index, seven adopted an RTC law by 1994.  The exceptions are Nebraska (2007), Minnesota (2003), and Iowa (2011).

61

**DA 193**

**Figure 8: Prevalence of Crack in the 5 Most and 5 Least Crack-affected States**



Source:  Authors' calculations based on the crack index of Fryer et al (2005).

**Figure 9: Murder Rates in the 5 Most and 5 Least Crack-affected States**

Source:  FBI UCR Data.

Moreover, as Table 14 reveals, the 13 states that adopted RTC laws during the initial

62

**DA 194**

Lott-Mustard period (1977-1992) had crack levels substantially below the level of the five high-crack states shown in Figures 8 and 9.  Of the RTC adopters shown in Table 14, the largest has an average crack index of 1.46 (Georgia), while the high-crack states had an average population weighted crack level of 1.76.

### Table 14: Population-weighted Statistics of RTC-Adopting States between 1977 and 1992[50]

| State | Year of RTC Law Adoption | Murder Rate | Crack Index |
|-------|--------------------------|-------------|-------------|
| Indiana | 1980 | 6.56 | 0.30 |
| Maine | 1985 | 2.34 | 0.09 |
| North Dakota | 1985 | 1.32 | 0.04 |
| South Dakota | 1985 | 1.96 | -0.04 |
| Virginia | 1986 | 7.97 | 1.13 |
| Florida | 1987 | 11.53 | 1.24 |
| Georgia | 1989 | 12.89 | 1.46 |
| Pennsylvania | 1989 | 5.75 | 1.13 |
| West Virginia | 1989 | 5.53 | 0.42 |
| Idaho | 1990 | 3.04 | 0.34 |
| Mississippi | 1990 | 11.50 | 0.44 |
| Oregon | 1990 | 4.85 | 1.14 |
| Montana | 1991 | 3.69 | 0.07 |
| *Top Five Crack States[51]* | | 10.64 | 1.76 |
| RTC Adopters | | 8.04 | 0.96 |

In other words, over the initial Lott-Mustard period of analysis (ending in 1992), the criminogenic influence of crack made RTC laws look beneficial since crack was raising crime in non-RTC states.  In the later period, crime fell sharply in the high-crack states, making RTC states look bad in comparison.  Therefore, the effects estimated over this entire period will necessarily water down the initial Lott-Mustard results.  The hope is that estimating the effect

---

[50] The crack index data comes from Fryer et al (2005), which constructs the index (beginning in 1980) based on several indirect proxies for crack use, including cocaine arrests, cocaine-related emergency room visits, cocaine-induced drug deaths, crack mentions in newspapers, and DEA drug busts.  The paper does suggest that these values can be negative. The state with the lowest mean value of the crack index over the data period from 1980 to 1990 is South Dakota (-0.03), and the state with the highest mean value is New York (1.58).

[51] The top five states with the highest population weighted average crack index in the period 1980-1992 were California, Maryland, Massachusetts, New York, and Rhode Island. None of these states adopted RTC laws during this period.

**DA 195**

over the entire period will wash out the impact of the omitted variable bias generated by the lack of an adequate control for the effect of crack.

As an additional test for potential omitted variable bias in both the NRC and our own preferred model specification, we perform an analysis inspired by Altonji et al. (2005). In their influential paper, the authors provide a practical method to test the extent to which potential omitted variable bias drives the results of a multivariate analysis. This test assumes that the selected, observable variables are chosen from a broader set of possible controls, and then explores how strong selection on unobserved variables would have to be relative to selection on observed variables to produce an OLS estimate if the true effect (in our case the effect of RTC laws on crime trends) were zero. We provide further details on this test procedure in Appendix F.

Using the Altonji et al (2005) test procedure, we analyzed the relative strength of the Table 1b estimate from the NRC Report that RTC laws were associated with an 8.33% reduction in murder rates (using the Lott-Mustard county data estimate for 1977-2000). The Altonji test procedure suggests that this Lott-Mustard estimate has a potential bias of -1.03, which implies that the ostensible finding of a crime-reducing estimate would be entirely driven by selection bias if selection on unobservables were only 8 percent as strong as selection on observables. This is strong evidence that the NRC/Lott model suffers fatally from omitted variable bias. In comparison, an analogous test of our preferred specification using state data from 1979 to 2010 (Table 8a) – which showed an estimated *increase* in murder of 3.31% (albeit not statistically significant) – shows that the potential bias in the murder effect was -0.35. In other words, in our case, the implied bias is negative, which means that the positive and statistically insignificant effect of RTC laws on murder that we found is a likely a *lower* bound for the true effect.

64

**DA 196**

### B. Endogeneity and Misspecification Concerns

To this point, our analysis has remained within the estimation framework common to the NRC/Lott-Mustard analyses, which implicitly assumes that passage of right-to-carry legislation in a given state is an exogenous factor influencing crime levels.  Under this assumption, one can interpret the estimated coefficient as an unbiased measure of RTC laws' collective impact.

We probe the validity of this strong claim by estimating a more flexible year-by-year specification, adding pre- and post-passage dummy variables to the analysis.[52]  Pre-passage dummies can allow us to assess whether crime trends shift in unexpected ways prior to the passage of a state's RTC law.  Figures 10 through 13 present the results from this exercise in graphical form.  Using our preferred model as the base specification, we introduce dummies for the eight years preceding and the first eight years following adoption.  We first estimate this regression for each violent crime category over the full sample of 50 states plus the District of Columbia.  However, because of the presence of five states that adopted their RTC law within eight years of 1979, and seven states that adopted laws within the eight years before our dataset ends, we have twelve states that cannot enter into the full set of pre- and post-adoption dummy variables.[53]  Because Ayres and Donohue (2003) showed that the year-by-year estimates can jump wildly when states drop in or out of the individual year estimates, we also estimate the year-by-year model after dropping out the earliest (pre-1987) and latest (post-2002) law-adopting states. In this separate series of regressions, our estimates of the full set of lead and lag variables for the 22 states that adopted RTC laws between 1987 and 2002 are based on a trimmed data set

---

[52] In Appendix C, we further analyze the issue of misspecification and model fit by analyzing residuals from the regression analysis.

[53] We also include a control for more than 8 years before the passage of RTC laws, although these are not shown in the following charts.

**DA 197**

that omits the 12 early and late adopters.[54]

Autor, Donohue, and Schwab (2006) point out that when analyzing the impact of state-level policies using panel data, one would ideally see lead dummies that are near zero.  For the crime of aggravated assault (Figure 12), this desirable pattern is roughly approximated.  Therefore, we would expect these estimates to perhaps be the most reliable among the four violent crime categories.  The graphs for murder, rape, and robbery, though, suggest the possible presence of systematic differences between RTC law adopters that can complicate or thwart the endeavor of obtaining clean estimates of the impact of right-to-carry laws.  Rather than being close to zero in the pre-passage period, the levels of murder, rape, and robbery seemed to be lower in the pre-passage period and rising rapidly.  Such a pattern raises concerns about the presence of endogenous adoption that complicate our thinking about the influence of right-to-carry laws on violent crime.

---

[54] The states that drop out (with dates of RTC law passage in parentheses) include: Indiana (1980), Maine (1985), North Dakota (1985), South Dakota (1985), Virginia (1986), Colorado (2003), Minnesota (2003), Missouri (2004), New Mexico (2004), Ohio (2004), Kansas (2007), and Nebraska (2007).

**DA 198**

**Figure 10**[55]



**Figure 10: Normalized Year-by-Year Estimates of the Impact of RTC Laws on Murder (State Data, 1979-2010)**

If one looks at the four lines in Figure 10, one sees four different sets of year-by-year estimates of the impact of RTC laws on murder.  The lines have been normalized to show a zero value in the year of adoption of a RTC law.  Let's begin with the bottom line (looking at the right hand side of the figure) and the line just above it.  The lower line represents the naive year-by-year estimates from the preferred model estimated on the 1979-2010 period, while the line just above it drops out the early and late adopters, so that the estimated year-by-year estimates are based on the "clean" sample of all non-adopting states (over the sample period) plus the 22 RTC adopters for which complete data is available from 8 years prior to adoption through 8 years after

---

[55] Estimations include year and state fixed effects and are weighted by county population.  The control variables include: incarceration and police rates (lagged one year to avoid potential endogeneity issues), unemployment rate, poverty rate, population density, per capita income measures, and six demographic composition measures.

67

**DA 199**

adoption.  One sees that the trimmed estimates are different and less favorable to the "More Guns, Less Crime" hypothesis, as evidenced by the higher values in the post-passage period.

How should we interpret these trimmed sample estimates?  One possibility is to conclude that on average the pre-passage estimates are reasonably close to zero and then take the post-passage figures as reasonable estimates of the true effect.  If we do this, none of the estimates would be statistically significant, so one could not reject the null hypothesis of no effect.

Perhaps, though, what is most important is the trend just prior to passage.  This might suggest that rising crime in fact increases the likelihood that a state would adopt a RTC law.  In particular, since murder is typically the crime most salient in the media, we suspect it has the greatest effect on the implementation of purported crime control measures such as RTC legislation.  Of course, this would suggest an endogeneity problem that would also likely lead to a bias in favor of finding a deterrent effect.  The mechanism driving this bias would presumably be that rising crime strengthens the NRA push for the law, and the mean reversion in crime would then falsely be attributed to the law by the naive panel data analysis (incorrectly premised on exogenous RTC law adoption).   But in the trimmed model, there is no sign of mean reversion.  Murder rates keep increasing after RTC adoption.  There is certainly no evidence of a beneficial impact from RTC laws, but conclusions about causation are difficult given the strong pre-passage crime trends.

Another striking feature we note is the strong influence of Florida and Georgia on our estimates of the impact of RTC laws on murder (Figure 10).  When we remove these two states, the post-adoption trend lines for murder clearly shift upwards.  Moreover, when dropping them from the set of RTC states that already excludes the early and late adopters—still leaving us with 20 RTC states to analyze—we see that murder increases in each post-adoption year.  As previous

68

**DA 200**

papers have noted, Florida experienced enormous drops in murder during the 1990s that may have been completely unrelated to the passage of its right-to-carry policy.  Donohue (2003) points out that the 1980 Mariel boat lift temporarily added many individuals prone to committing crimes to Florida's population, causing a massive increase in crime in Florida during the 1980s. Thus, it is plausible that the massive 1990s crime reductions in Florida were not driven by the adoption of the state's RTC law but rather a return to traditional population dynamics that were less prone to violent crime (again, a reversion to the mean).  This is important to consider given the strong downward pull of Florida on aggregate murder rates.

The line based on dropping Florida and Georgia from the trimmed sample would suggest that for the 20 other states, the impact of RTC laws on murder was highly pernicious.  Again a number of interpretations are possible: 1) Florida and Georgia are unusual and the best estimate of the impact of RTC laws comes from the trimmed sample that excludes them (and the early and late adopters); 2) there is heterogeneity in the impact of RTC laws, so we should conclude that the laws help in Florida and Georgia, and tend to be harmful in the other 21 states; and 3) omitted variables mar the state-by-state estimates but the aggregate estimates that include Florida and Georgia may be reasonable if the state-by-state biases on average cancel out.

Note that Figure 11, which presents the comparable year-by-year estimates of the impact of RTC laws on rape, shows a similar yet even more extreme pattern of apparent spikes in crime leading to the adoption of RTC laws.  The rape estimates are less sensitive than the murder estimates to the dropping of the early and late adopters (or Georgia and Florida).  Clearly, the rate of rape is higher in the post-passage period but Figure 11 shows why the controls for state trends can be influential for this crime. If one believes that the pre-passage trend of increasing rapes would have continued without the adoption of RTC laws then you might conclude that the

69

**DA 201**

RTC laws moderated that upward trend.  Alternatively, a dummy variable model that just compared pre- and post-passage would show greater evidence of RTC laws increasing the rate of rape.

**Figure 11**[56]



Figure 11: Normalized Year-by-Year Estimates of the Impact of RTC Laws on Rape (State Data, 1979-2010)

---

56 Estimations include year and state fixed effects, state trends, and are weighted by state population.  The control variables include: incarceration and police rates (lagged one year to avoid potential endogeneity issues), unemployment rate, poverty rate, state population, population density, per capita income, and six demographic composition measures.

70

**DA 202**

**Figure 12**[57]



Figure 12: Normalized Year-by-Year Estimates of the Impact of RTC Laws on Assault (State Data, 1979-2010)

[57] Estimations include year and state fixed effects, state trends, and are weighted by state population.  The control variables include: incarceration and police rates, unemployment rate, poverty rate, state population, population density, per capita income, and six demographic composition measures.

71

**DA 203**

**Figure 13**[58]



Figure 13: Normalized Year-by-Year Estimates of the Percent Change in Robbery (State Data, 1979-2010)

As noted, the pattern of near-zero pre-passage estimates for the crime of assaults gives us greater confidence that we are able to estimate the impact of RTC laws on this crime. The general story here seems to be that assault increases markedly over the time period after law passage, which squares with our results discussed in previous sections. One observes positive coefficient changes that are initially modest, but that increase dramatically and uniformly over the second half of the post-passage period. Moreover, in contrast to the year-by-year murder estimate, assault trends are not demonstrably different when we alter the sample to exclude early

---

[58] Estimations include year and state fixed effects, state trends, and are weighted by state population. The control variables include: incarceration and police rates, unemployment rate, poverty rate, state population, population density, per capita income, and six demographic composition measures.

**DA 204**

and late adopters, as well as Florida and Georgia.  The pattern is generally unaffected by sample, giving us some confidence that RTC laws may be having an adverse impact on the rate of assault.  Robbery rates similarly increase over time after the passage of RTC laws.

If the near uniform increases in assault coefficients means that aggravated assault did actually increase over time with the passage of right-to-carry legislation, this would strongly undercut the "More Guns, Less Crime" thesis.  Interestingly, the robbery data (Figure 13) either suggests a pernicious effect similar to that on aggravated assault (particularly for the trimmed estimates dropping only early and late adopters) or a strong upward trend in crime, starting well before passage, that might be taken as a sign of the absence of any impact of RTC laws on robbery.

### C. Effects of RTC Laws on Gun-related Assaults

A general concern in evaluating the impact of generic law X is that there is not some other law or policy Y that is generating the observed effect.  In this case, the apparent finding that RTC laws increase aggravated assaults raises the question of whether changes in reporting or documenting aggravated assaults might be a possible confounding factor.  Specifically, over the last two decades a number of states and municipalities have launched programs designed to combat domestic violence by increasing the arrests of likely perpetrators.  These programs could influence the count of aggravated assaults appearing in the FBI crime data we employ.  If such programs are more likely to be adopted in either RTC or non-RTC states than the potential for bias must be considered.

One way to address this problem would be to collect data on the various state or municipal initiatives that lead to higher rates of arrest of those committing acts of domestic violence.  However, collecting uniform panel data along these lines that also fully captures the

73

**DA 205**

nature and intensity of the police initiatives is extremely difficult.  An alternative approach is to look at assaults that we think are less likely to be influenced by these domestic violence initiatives (or by other shifts in the likelihood of arrest for potentially assaultive conduct), but which are most likely to be influenced by RTC laws (if there is in fact such an influence). Counts of gun assaults would seem to meet these two criteria, because assaults with a gun tend to be serious enough that the level of discretion as to whether to arrest is reduced, and because gun assaults are precisely the types of crimes that we might expect would be influenced if more guns are on the street because of the passage of RTC laws.  For this reason, we may get more reliable estimates of the impact of RTC laws by looking at gun-related aggravated assaults than at overall aggravated assaults.

To test this possibility, we estimate our preferred regression using gun-related aggravated assaults as the dependent variable (both with and without state-specific trends) in Table 15 below.  Unfortunately, our confidence in these results is undermined by data quality issues similar to those described in section IX.  Since agencies report gun assault data to the FBI on a voluntary basis, there are significant gaps in which areas are reporting their gun assault totals in a given year.  In addition, if reporting bias were correlated with either the gun assault rate or a state's adoption of an RTC statute, our coefficient estimates of the effect of RTC laws on the gun assault rate would be biased (although the direction of this bias would depend on the nature of this correlation).  Nevertheless, we report our results for these regressions to examine whether they are consistent with our other evidence that right-to-carry laws increase aggravated assault rates.

Comparing these new results with the assault estimates in Tables 8a and 8b and Figure 12 above, our bottom-line story of how RTC laws increase rates of aggravated assault is further

74

strengthened when limiting our analysis to assaults involving a gun.  Without state trends, we uniformly see very large, positive estimates, some of which are significant at the 5% and 10% level.  With state trends, we again see some evidence that gun-related aggravated assault rates are increased by RTC legislation, although none of the resulting coefficients are statistically significant.  These results again suggest that RTC laws may be generating higher levels of assaultive conduct, although more refined tools (or cleaner data) will be needed before confident predictions can be made.

---

### Table 15[59]

Estimated Impact of RTC Laws on Gun-Related Aggravated Assaults –
ADZ Preferred Controls, 1979-2010 – Clustered Standard Errors
Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | Gun-Related Aggravated Assault (No State Trends) | Gun-Related Aggravated Assault (With State Trends) |
|---|---|---|
| Dummy Variable Model: | 32.96** | 4.36 |
|  | (13.24) | (8.19) |
| Spline Model: | 2.86* | 3.07 |
|  | (1.47) | (2.13) |
| Hybrid Post-Passage Dummy: | 23.49** | 2.08 |
|  | (9.77) | (8.01) |
| Trend Effect: | 2.08 | 3.00 |
|  | (1.30) | (2.11) |

---

[59] Estimations include year and state fixed effects, and are weighted by state population.  Robust standard errors are provided beneath point estimates in parentheses.   The control variables for this "preferred" specification include: incarceration and police rates (lagged one year to avoid potential endogeneity issues), unemployment rate, poverty rate, population density, per capita income measures, and six demographic composition measures.   * Significant at 10%; ** Significant at 5%; *** Significant at 1%. The gun assault data comes from the FBI master file, available upon request from the agency. The data is provided at the local level; thus for state values we sum the reported gun assaults over all of the reporting agencies by year. However, not all agencies report their estimates during each reporting period, leaving our gun assault figures likely to be undervalued.

**DA 207**

## XI. Conclusion

In this paper, we have explored the question of the impact of RTC laws on crime and the NRC panel's 2004 report concluding that the then-current literature was too fractured to reach a conclusion on what that impact is. We agree with the conclusion that the NRC panel reached at that time, as well as with the pointed rebuke the panel gave to James Q. Wilson who argued -- without scientific merit according to the NRC majority -- that RTC laws reduce murder. We do take issue, though, with the NRC majority report in a few respects.

First, as we show in this paper, there is a clear need to employ the cluster correction to the standard errors when estimating panel data models of crime, and the NRC majority erred when it concluded otherwise. As our placebo tests show, the standard errors that the NRC presented in their panel data models were far too low and greatly exaggerated the statistical significance of their results. Indeed, the clustering gaffe was on top of the NRC failure to use the robust correction for heteroskedasticity, which created additional downward bias in the standard errors (although less dramatically than the failure to cluster). Both corrections are needed, and this error alone set the stage for Wilson's dissent. With correct standard errors, none of the estimates that Wilson thought established a benign effect of RTC laws on murder would have been statistically significant. Thus, getting the standard errors right might have kept Wilson from writing his misguided dissent -- to the benefit of Wilson, the NRC majority, and the public.

Second, beyond getting the standard errors correct and therefore undermining the ostensible statistical significance of their presented murder regression, the NRC majority could have said much more than they did to refute Wilson's reliance on extremely limited statistical evidence to endorse the view that RTC laws reduce murder. Wilson's conclusion essentially rested on the NRC report's presentation of two Lott and Mustard models (the dummy and the

76

**DA 208**

spline) based on county data from 1977-2000.   The NRC majority did point out that the estimates for six out of 7 crimes were contradictory (some suggesting crime increases and some suggesting crime decreases), so the fact that  for the seventh crime -- murder -- both models suggested RTC laws reduced crime might well be a spurious result.  But the NRC majority could have given many more reasons to be cautious about relying on the two Lott and Mustard regressions.

Specifically, the NRC response to Wilson could easily have noted that Wilson had previously written that incarceration was perhaps the most important factor explaining the drop in crime in the United States in the 1990s, and he had also written on the importance of police (Wilson, 2008).  Yet the Lott and Mustard model that the NRC presented (and that Wilson relied on) did not control for either of these factors.[60]  Thus, on these grounds alone, one would have thought Wilson would have been particularly wary not to rely on a regression which was potentially subject to a charge of omitted variable bias. Neither the NRC majority nor Wilson ever noted this omission.

Moreover, we note in this paper some of the data problems with the Lott data set that the NRC panel used and then address an array of issues about data and model specification that Wilson ideally should have explored before he uncritically accepted the ostensible finding of a RTC impact on murder.  These issues included the danger of omitted variable bias concerning the crack epidemic, the choice of county over state-level data, the inclusion of state-specific linear trends, and the over-use of highly collinear demographic variables, all of which have enough impact on the panel data estimates to influence one's perception of the "More Guns, Less Crime" theory and thus warrant closer examination than they received from Wilson.

---

[60] The Lott and Mustard model omitted a control for the incarceration and police rates (which is indicated implicitly —though not explicitly highlighted — in the notes to each table of the NRC report, which listed the controls included in each specification).

77

**DA 209**

Perhaps Wilson was so wedded to his position that nothing could have persuaded him not to write his ill-conceived dissent, but the NRC majority could have done more to buttress their entirely correct assessment that "the scientific evidence does not support [Wilson's] position" (pg. 275). As a result, Lott now claims that Wilson, one of the most eminent criminologists of our time, supports his position (Lott, 2008).  If one of the goals of the NRC report was to shield the public and policymakers from claims based on inadequate empirical evidence, the Wilson dissent represents a considerable failure.

A number of important lessons emerge from this story for both producers and consumers of econometric evaluations of law and policy.  The first and most obvious is that a single statistical study cannot resolve an important question.  Instead, one must wait until a literature has developed.  But even then, the conclusion that emerges may be one of uncertainty as the NRC report showed.

 A second lesson is how easy it is for mistakes to creep into these empirical studies.  The pure data errors that entered into the NRC data set when Lott transmitted an imperfect data set or the error in the 1993 Uniform Crime Reports data (or the errors that entered into our own work in Aneja et al (2011), which are described in greater detail in Footnote 18) were not major enough to have an impact, but at times the errors will be decisive (and the process of peer review is not well-equipped to detect such errors).  This episode underscores the value of making publicly available data and replication files that can reproduce published econometric results.  This exercise can both help to uncover errors prior to publication and then assist researchers in the process of replication, thereby aiding the process of ensuring accurate econometric estimates that later inform policy debates.

A third lesson is that the "best practices" in econometrics are evolving. Researchers and

78

**DA 210**

policymakers should keep an open mind about controversial policy topics in light of new and better empirical evidence or methodologies.  Prior to the important work of Bertrand, Duflo, and Mullainathan (2004) on difference-in-differences estimation, few researchers understood that clustering standard errors on the state-level in order to account for serial correlation in panel data was necessary.  The results in many pre-2004 published papers would be wiped out with this single adjustment.  Despite its impressive array of talent, the NRC report in 2004 got this important issue wrong, even though most applied econometricians today would make this cluster adjustment to avoid greatly increasing the level of Type I error.

While the NRC majority decision of uncertainty was clearly influenced by the sensitivity of the estimates to various modeling choices, the separate statement by Horowitz was even more categorical in its nihilism, essentially rejecting all applied econometric work on RTC legislation, as indicated by his independent statement in an appendix to the NRC's (2004) report:

> "It is unlikely that there can be an empirically based resolution of the question of whether Lott has reached the correct conclusions about the effects of right-to-carry laws on crime."  (p. 304, NRC Report.)

Of course, if there can be no empirically based resolution of this question, it means that short of doing an experiment in which laws are randomly assigned to states, there will be no way to assess the impact of these laws.  But there is nothing particularly special about the RTC issue, as the recent National Research Council report on the deterrence of the death penalty shows (essentially adopting the Horowitz position on the question of whether the death penalty deters murders). The econometrics community needs to think deeply about what these NRC reports and the Horowitz appendix imply more broadly for the study of legislation using panel data econometrics and observational data.

Finally, despite our belief that the NRC's analysis was imperfect in certain ways, we agree with the committee's cautious final judgment on the effects of RTC laws: "with the current

evidence it is not possible to determine that there is a causal link between the passage of right-to-carry laws and crime rates." Our results here further underscore the sensitivity of guns-crime estimates to modeling decisions.[61] But not being able to "determine" with the level of certainty one strives for in academic work does not mean that one cannot offer conclusions at some lower level of certainty such as "more probable than not." Since policymakers need to act, it is more useful to offer guidance as to which evidence is likely to be most reliable than to simply reject all evidence until the highest level of certainty has been attained.

Clearly, we now have more believable panel data models of the type used in the NRC report estimated on more complete state and county data, coupled with the additional evidence presented in this article examining gun assaults (Table 15) and estimating year by year effects on crime (Figures 10-13). Can a consistent story be distilled from this evidence?

We would consider our preferred regression models run on either the most complete data (state data from 1979-2010) or the data likely to be free of the confounding effect of the crack cocaine epidemic (state data from 1999-2010) as likely to yield more reliable estimates of the effect of RTC laws on crime than the Lott-Mustard specification. If we estimate both the dummy and spline models using our preferred specification without state trends for each of these two time periods (overall or after 1999), then we have 4 estimates of the impact of RTC laws for each of seven crime categories (Tables 8a and 11a). In each of the seven crime categories, at least one of these four estimates suggests that RTC laws increase crime at the .10 level of significance, with murder, rape, and larceny estimates reaching significance at the .05 level. These crime increases are substantial, with the dummy variable model for the complete period (Table 8a) suggesting that RTC laws increased every crime category by at least 8 percent, except

---

[61] For a quick and clear sense of how sensitive estimates of the impact of right-to-carry laws are, see Appendix E, where we visually demonstrate the range of point estimates we obtain throughout our analysis.

murder (in that model, murder rose 3 percent but it is not statistically significant).   For the post-1999 regressions, spline estimate (Table 11a) suggests that RTC laws increased the rate of murder by 1.5 percentage points each year (significant at the .05 level).   In none of those 28 regressions was there any statistically significant estimate suggesting that RTC laws decreased crime.

Thus, the evidence that RTC laws increase crime is strongest if one accepts the dummy variable model with our preferred specification on state data (the Table 8a and 11a results) and accepts the Wolfers (2006) critique that one should avoid controlling for state trends.[62]   But even here questions remain.   First, one might argue that the fact that estimates suggest that RTC laws increase property crime is an indication that these models are not giving credible causal estimates since this link is not based on a strong theoretical foundation.[63]   Second, for all but aggravated assault, the state year by year estimates of Figures 10-13 raise endogeneity concerns that may undermine the state panel data results.

But the fact that Figure 12 shows a more ideal pattern of no pre-RTC adoption effects followed by sharp rises in aggravated assault and that the data on gun aggravated assaults also

---

[62] If one were to reject the Wolfers proposition and conclude that one *must* control for state trends in estimating the impact of RTC laws, the story becomes even more complicated.  Exhibit E shows (using the .10 level or better for significance) that there are two estimates with state trends suggestive of crime *decreases* in rape, six suggestive of crime *increases* in aggravated assault and one suggesting a decrease in this crime, four suggestive of *decreases* in auto theft and one suggesting an increase in this crime, and one suggestive of *decreases* in larceny.

[63] It is not clear why the property crimes of burglary, auto theft, and larceny would rise as a result of RTC passage. Three possible explanations for this finding come to mind.  First, the results are correctly capturing the impact of RTC laws and perhaps the indirect effect of increasing the weapons available to criminals (through loss or theft) facilitates all criminal activity (perhaps by emboldening newly armed criminals) or the increase in violent crime diverts police resources so that property crime is stimulated.  Second, it is possible that states adopting RTC laws were less successful in fighting crime than non-adopting states, so the RTC law was not itself increasing crime but was simply a proxy for states that on the whole adopted less successful crime-fighting strategies over the last quarter century.  Third, it is possible that states chose to adopt RTC laws at a time when crime was on the rise, so their post-passage crime experience reflects an adverse crime shock that is incorrectly causally attributed to RTC laws.  If this endogenous timing argument is correct, then it might suggest that post-1999 estimates of Table 11a are preferable, since that has been a period of greater crime stability (as opposed to the dramatic crime swings of the late 1980s and 1990s).  The Table 11a estimates show that RTC laws only affected one crime category – with the laws causing a substantial *increase* in murder.

provides evidence that RTC laws increase these crimes may provide the strongest conclusion of a causal impact of RTC laws on crime.  The evidence that RTC laws increase aggravated assault is not overwhelming but it does find support in different models and different time periods using both state and county data sets in different panel data regressions both for all assaults and gun assaults (Table 15), and in models estimating year-by-year effects.  As Tables E5 and E6 reveal, eleven of the 28 estimates of the impact of RTC laws on aggravated assault meet at least the minimal standard of significance at the .10 level and show evidence of crime increases (against only one model showing a significant decline, but only if the data stops in 2000 instead of 2010).[64]  Moreover, the omitted variable bias test suggests that if anything our 8 percent estimate of the increase in aggravated assault from RTC laws (at the .10 level, see Table 8a) is likely to understate the true increases in aggravated assault caused by RTC law.[65]

Further research will hopefully further refine our conclusions as more data and better methodologies are employed to estimate the impact of RTC laws on crime.

---

[64] The one regression suggesting declines in aggravated assault was the Lott/Mustard state data dummy model with linear state trends estimated only through 2000.  Even this effect disappears when the full data set through 2010 is used).

[65] Note that the assaults can be committed either by RTC permit holders or those who have acquired their guns -- either via theft or appropriation of lost guns.

**DA 214**

## References

**Altonji, Joseph G., Todd E. Elder, and Christopher R. Taber.** 2005. "Selection on Observed and Unobserved Variables: Assessing the Effectiveness of Catholic Schools." *Journal of Political Economy* 113(1): 151-184.

**Angrist, Joshua and Jorn-Steffen Pischke.** 2009. *Mostly Harmless Econometrics*. Princeton: Princeton University Press.

**Autor, David, John J. Donohue, and Stewart Schwab.** 2006. "The Costs of Wrongful-Discharge Laws." *Review of Economics and Statistics* 88(2): 211-231.

**Ayres, Ian and John J. Donohue.** 2003a. "Shooting Down the More Guns, Less Crime Hypothesis." *Stanford Law Review*, 55(4): 1193-1312.

**Ayres, Ian and John J. Donohue.** 2003b. "The Latest Misfires in Support of the More Guns, Less Crime Hypothesis." *Stanford Law Review*, 55(4): 1371-1398.

**Ayres, Ian and John J. Donohue.** 2009. "More Guns Less Crime Fails Again: The Latest Evidence from 1977-2006." *Econ Journal Watch*, 6(2): 218-238. http://www.aier.org/aier/publications/ejw_com_may09_ayresdonohue.pdf

**Bertrand, Marianne, Esther Duflo, and Sendhil Mullainathan**. 2004. "How Much Should We Trust Differences-in-Differences Estimates?" *Quarterly Journal of Economics*, 119(1): 249-275.

**Black, Dan A., and Daniel S. Nagin**. 1998. ''Do Right-to-Carry Laws Deter Violent Crime?'' *Journal of Legal Studies*, 27: 209-219.

**Cramer, Clayton E., and David B. Kopel.** 1995. "'Shall Issue': The New Wave of Concealed Handgun Permit Laws." *Tennessee Law Review,* 62 (3)*:* 679-757.

**Collins, Gail**. 2009. "Have Gun, Will Travel." *The New York Times*. 31 July 2009.

**DA 215**

**Donohue, John J.** 2003.  "The Impact of Concealed-carry Laws." *Evaluating Gun Policy*. J. Ludwig & P. J. Cook (Eds.). Washington, DC: Brookings Institution Press.  287–324.

**Donohue, John J**. 2004. "Guns, Crime, and the Impact of State Right-to-Carry Laws." *Fordham Law Review*, 73: 623-652.

**Donohue, John J. and Justin Wolfers**. 2009. "Estimating the Impact of the Death Penalty on Murder." *American Law and Economics Review, 11 (2): 249-309*

**Elder, Todd and Christopher Jepsen**. 2013. "Are Catholic Primary Schools More Effective Than Public Primary Schools?" *Journal of Urban Economics*, forthcoming.

**Fryer, Roland, Paul Heaton, Steven Levitt, and Kevin Murphy.** 2005. "Measuring the Impact of Crack Cocaine." NBER Working Paper Series No. W11318. National Bureau of Economic Research, Cambridge, MA.

**Horowitz, Joel L.** "Should the DEA's STRIDE Data Be Used for Economic Analyses of Markets for Illegal Drugs?" *Journal of the American Statistical Association*, 96(465): 1254-1271.

**Kovandzic, T. V., Vieraitis, L. M. and Boots, D. P.** (2009), Does the death penalty save lives? *Criminology & Public Policy*, 8: 803–843.

**Levitt, Steven D.** 2004. "Understanding Why Crime Fell in the 1990's: Four Factors that Explain the Decline and Six that Do Not," *Journal of Economic Perspectives*, 17: 163-190.

**Lott, John R.** 2000. *More Guns, Less Crime*. Chicago: University of Chicago Press.

**Lott, John R**. 2004. "Right-to-Carry Laws and Violent Crime Revisited: Clustering, Measurement Error, and State-by-State Breakdowns."  http://ssrn.com/abstract=523002 or doi:10.2139/ssrn.523002.

**DA 216**

**Lott, John R.**  2008.  "Do Guns Reduce Crime?" *Intelligence Squared Debate Series*.

   http://intelligencesquaredus.org/wp-content/uploads/Guns-Reduce-Crime-102808.pdf

**Lott, John R. and David Mustard**. 1997. "Crime, Deterrence and Right-to-Carry Concealed

   Handguns." *Journal of Legal Studies*, 26(1): 1-68.

**Ludwig, J.** 1998. "Concealed Gun-carrying Laws and Violent Crime: Evidence from State Panel

   Data." *International Review of Law and Economics*, 18: 239-254.

**Maltz, Michael D**. 2006. *Analysis of Missingness in UCR Crime Data*. NCJ 215343

   Washington: U.S. Department of Justice.

**Maltz, Michael D., and J. Targonski**. 2002. "A note on the use of county-level crime data."

   *Journal of Quantitative Criminology*, 18(3): 297-318.

**Maltz, Michael D., & J. Targonski**. 2003. "Measurement and other errors in county-level UCR

   data: A reply to Lott and Whitley." *Journal of Quantitative Criminology*, 19: 199-206.

**Moody, Carlisle E. and Thomas B. Marvell.** 2008. "The Debate on Shall-Issue Laws." *Econ

   Journal Watch*, 5(3): 269-293. http://www.aier.org/ejw/archive/doc_view/3610-ejw-

   200809?tmpl=component&format=raw.

**Moody, Carlisle E. John R Lott, Jr., Thomas B. Marvell, and Paul R. Zimmerman.** 2012.

   "Trust but Verify: Lessons for the Empirical Evaluation of Law and Policy."

**Moulton, Brent.** 1990. "An Illustration of a Pitfall in Estimating the Effects of Aggregate

   Variables on Micro Units." *Review of Economics and Statistics*, 72: 334-338.

**Nagin, Daniel S. and John V. Pepper**, editors, 2012. *Deterrence and the Death Penalty*.

   Washington: The National Academies Press.

**National Research Council**. 2004. *Firearms and Violence: A Critical Review*. Washington: The

   National Academies Press.

**DA 217**

**Plassman, Florenz and John Whitley.**  2003. "Confirming More Guns, Less Crime." *Stanford Law Review*, 2003: 1313-1369.

**Studenmund, AH.** 1997.  *Using Econometrics: A Practical Guide*. Reading, MA: Addison-Wesley.

**Wilson, James Q.** 2000.  "Guns and Bush."  *Slate Politics*.  http://slate.msn.com/?id=91132. (accessed on November 29 2009).

**Wilson, James Q.** 2008. "What Do We Get From Prison?" *The Volokh Conspiracy*. http://volokh.com/posts/chain_1213046814.shtml. (accessed on 20 November 2009).

**Wooldridge, Jeffrey M.** 2003. "Cluster-sample Methods in Applied Econometrics" *American Economic Review*, 93: 133-138.

**Wooldridge, Jeffrey M.** 2006. "Cluster-Sample Methods in Applied Econometrics: An Extended Analysis." Unpublished manuscript. Michigan State University.

**Wolfers, Justin.** 2006. "Did Unilateral Divorce Laws Raise Divorce Rates? A Reconciliation and New Results." American Economic Review, 96(5): 1802-1820.

**Zimring, Franklin and Gordon Hawkins.** 1997. "Concealed handguns: The counterfeit deterrent." *The Responsive Community*, 7:46-60.

DA 218

**Appendix A:  Using Placebo Laws to Test the Impact of Clustering in the State Data**

Table 3 reports the results of our placebo tests using county data.  In this appendix, we use state-level data to again conduct our experiment with placebo laws to examine the effects of clustering the standard errors.  As seen in Tables 1-4 of Appendix A, we find results similar to those generated with our county data:  without clustering, the Type 1 error rates are often an order of magnitude too high or worse for our murder and robbery regressions (see Tables A1 and A3).  In fact, even *with* clustered standard errors (Tables A2 and A4), the rejection of the null hypothesis (that RTC laws have no significant impact on crime) occurs at a relatively high rate.  This finding suggests that, at the very least, we should include clustered standard errors to avoid unreasonably high numbers of significant estimates.

**DA 219**

# Appendix A[66]

## Table A1

Percentage of Significant Estimates (5% Level) – Lott-Mustard Controls, 1979-2010 – Hybrid Model

Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | | Dummy Variable | Trend Variable |
|---|---|---|---|
| 1. All 50 States + DC: | Murder | 47.6 | 63.9 |
| | Robbery | 46.5 | 63.7 |
| 2. Exact 34 States: | Murder | 46.9 | 61.6 |
| | Robbery | 51.5 | 64.4 |
| 3. Random 34 States: | Murder | 52.4 | 68.0 |
| | Robbery | 53.0 | 67.1 |
| 4. All 17 States: | Murder | 36.4 | 58.5 |
| | Robbery | 45.4 | 72.5 |
| 5. Random 11 States: | Murder | 35.4 | 64.4 |
| | Robbery | 43.4 | 73.0 |

## Table A2

Percentage of Significant Estimates (5% Level) – Lott-Mustard Controls, 1979-2010 – Hybrid Model and **Clustered Standard Errors**

Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | | Dummy Variable | Trend Variable |
|---|---|---|---|
| 1. All 50 States + DC: | Murder | 16.1 | 28.5 |
| | Robbery | 13.4 | 18.3 |
| 2. Exact 34 States: | Murder | 15.8 | 23.0 |
| | Robbery | 14.6 | 15.3 |
| 3. Random 34 States | Murder | 21.5 | 35.1 |
| | Robbery | 17.1 | 25.8 |
| 4. All 17 States | Murder | 23.9 | 45.5 |
| | Robbery | 24.2 | 53.0 |
| 5. Random 11 States: | Murder | 23.7 | 48.7 |
| | Robbery | 23.0 | 53.7 |

---

[66] Simulation based on NRC with-controls model, includes year fixed effects, state fixed effects, and weighting by state population.  The control variables (adopted from the Lott-Mustard model) include: lagged arrest rate, state population, population density, per capita income measures, and 36 demographic composition measures indicating the percentage of the population belonging to a race-age-gender group.

88

# DA 220

# Appendix A (Cont.)

## Table A3

Percentage of Significant Estimates (5% Level) – Lott-Mustard Controls, 1979-2010 – Dummy Model

Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | | Dummy Variable |
|---|---|---|
| 1. All 50 States + DC: | Murder | 47.1 |
| | Robbery | 46.9 |
| 2. Exact 34 States: | Murder | 46.3 |
| | Robbery | 50.6 |
| 3. Random 34 States: | Murder | 61.6 |
| | Robbery | 56.8 |
| 4. All 17 States: | Murder | 35.9 |
| | Robbery | 45.4 |
| 5. Random 11 States: | Murder | 37.5 |
| | Robbery | 49.8 |

## Table A4

Percentage of Significant Estimates (5% Level) – Lott-Mustard Controls, 1979-2010 – Dummy Model and **Clustered Standard Errors**

Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | | Dummy Variable |
|---|---|---|
| 1. All 50 States + DC: | Murder | 16.3 |
| | Robbery | 13.2 |
| 2. Exact 34 States: | Murder | 13.7 |
| | Robbery | 13.1 |
| 3. Random 34 States | Murder | 29.6 |
| | Robbery | 21.4 |
| 4. All 17 States | Murder | 22.2 |
| | Robbery | 24.4 |
| 5. Random 11 States: | Murder | 25.2 |
| | Robbery | 28.0 |

89

**DA 221**

## Appendix B – Panel Data Models over the Full Period with No Covariates

The NRC panel sought to underscore the importance of finding the correct set of covariates by presenting county panel data estimates (on data through 2000) of the impact of RTC without covariates but including county and year fixed effects.  For completeness, this Appendix presents these same no controls estimates for models (with and without state trends) estimated on both county and state data for the periods from 1977-2006 and 1977-2010 (respectively).

 If one compares the results from these four tables with no controls with the analogous tables using the preferred model for the same time period, one sees some interesting patterns.  For example, if we compare the county results without state trends from both our preferred specification (Table 6a) and the no-controls specification (Table B1), we see that both sets of results are always positive (suggesting crime increases) but rarely statistically significant when covariates are added (although quite frequently for the no-controls model).  The basic story in these two different county data regressions seems to be that there is no evidence of an effect of RTC laws on murder, while if there is *any* RTC effect on other crimes generally, it is a crime-*increasing* effect.  When we compare those from the county models that include state trends (Tables 6b and B2), some negative point estimates emerge, although there is no sign of any statistically significant results at even the .10 level in either Table.

When we shift to a comparison of the state-level results, we again see similarities between the preferred and no-controls specifications.  When looking at the results without state trends (Tables 8a and B3), we see that the estimates are fairly similar in terms of direction, although the no-controls estimates are often larger in magnitude and more statistically significant (with Table B3 showing statistically significant increases at the .05 level in all crime categories other than murder and rape).  When doing a similar comparison of the specifications that now

90

**DA 222**

add in state trends (Tables 8b and B4), we also see similar results.  In both tables, the only statistically significant effect on violent crime at the .05 level is that RTC laws increase aggravated assaults.

91

# Appendix B[67]

## Table B1

Estimated Impact of RTC Laws – No Controls, 1977-2006 – Clustered Standard Errors
Dataset: ADZ Updated 2013 County Data (without 1993 data)

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | 0.53 | 35.43 | 28.59 | 28.64* | 36.66 | 39.79* | 41.22 |
| | (8.91) | (23.88) | (19.84) | (15.18) | (22.40) | (22.93) | (26.50) |
| Spline Model: | 0.35 | 3.25* | 2.96* | 2.75** | 3.30* | 3.68* | 4.08* |
| | (0.73) | (1.92) | (1.61) | (1.32) | (1.96) | (1.95) | (2.23) |
| Hybrid Post-Passage Dummy: | -2.02 | 24.26 | 16.86 | 18.64 | 25.58 | 27.02 | 25.84 |
| | (9.13) | (20.04) | (18.53) | (13.86) | (19.05) | (20.58) | (23.32) |
| Trend Effect: | 0.45 | 1.99 | 2.08 | 1.78 | 1.97 | 2.27 | 2.73 |
| | (0.71) | (1.24) | (1.29) | (1.07) | (1.47) | (1.54) | (1.70) |

## Table B2

Estimated Impact of RTC Laws – No Controls, 1977-2006 – Clustered Standard Errors and State Trends
Dataset: ADZ Updated 2013 County Data (without 1993 data)

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | -1.93 | -13.42 | 3.00 | 4.37 | 5.28 | -0.25 | -0.04 |
| | (6.33) | (12.08) | (11.00) | (8.89) | (10.58) | (12.16) | (13.23) |
| Spline Model: | 0.04 | -5.77 | 2.50 | 0.29 | 0.51 | -0.43 | -0.39 |
| | (1.26) | (4.40) | (2.36) | (2.41) | (2.59) | (2.44) | (2.59) |
| Hybrid Post-Passage Dummy: | -1.98 | -9.90 | 1.43 | 4.24 | 5.03 | 0.03 | 0.21 |
| | (6.45) | (11.32) | (11.62) | (9.40) | (11.19) | (12.99) | (14.14) |
| Trend Effect: | 0.09 | -5.55 | 2.47 | 0.19 | 0.40 | -0.43 | -0.40 |
| | (1.28) | (4.40) | (2.46) | (2.49) | (2.69) | (2.59) | (2.76) |

---

[67] Estimations include year and county fixed effects, and are weighted by county population.  Robust standard errors are provided beneath point estimates in parentheses. * Significant at 10%; ** Significant at 5%; *** Significant at 1%.

92

## Appendix B (Cont.)

### Table B3

Estimated Impact of RTC Laws – No Controls, 1977-2010 – Clustered Standard Errors
Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | 1.07 | 13.83 | 13.38** | 21.63** | 26.88** | 23.32*** | 17.63*** |
| | (8.23) | (8.98) | (5.51) | (8.99) | (12.81) | (8.00) | (5.73) |
| Spline Model: | 0.37 | 1.10 | 1.33** | 1.86** | 1.79 | 1.70** | 1.32** |
| | (0.72) | (0.84) | (0.61) | (0.85) | (1.16) | (0.73) | (0.52) |
| Hybrid Post-Passage Dummy: | -1.62 | 9.48 | 6.96 | 13.62* | 21.32** | 17.27** | 12.75** |
| | (6.86) | (6.26) | (4.36) | (7.59) | (9.10) | (6.52) | (4.98) |
| Trend Effect: | 0.44 | 0.70 | 1.04* | 1.29 | 0.90 | 0.98 | 0.79 |
| | (0.66) | (0.70) | (0.61) | (0.80) | (0.93) | (0.63) | (0.47) |

### Table B4

Estimated Impact of RTC Laws – No Controls, 1977-2010 – Clustered Standard Errors and State Trends
Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | -0.83 | -4.56* | 0.57 | 4.45 | 9.59 | 3.10 | 1.98 |
| | (4.57) | (2.67) | (3.64) | (4.59) | (5.92) | (3.60) | (2.50) |
| Spline Model: | 1.09 | -0.53 | 2.03** | 0.13 | -0.27 | -0.41 | -1.03** |
| | (0.73) | (0.88) | (0.86) | (1.03) | (1.12) | (0.62) | (0.48) |
| Hybrid Post-Passage Dummy: | -1.36 | -4.34 | -0.40 | 4.42 | 9.78 | 3.32 | 2.48 |
| | (4.43) | (2.70) | (3.39) | (4.76) | (5.94) | (3.76) | (2.54) |
| Trend Effect: | 1.10 | -0.47 | 2.04** | 0.07 | -0.41 | -0.46 | -1.07** |
| | (0.73) | (0.88) | (0.86) | (1.05) | (1.13) | (0.65) | (0.51) |

Note:  In earlier tables, our data period begins in 1979 for models that include the poverty rate as a control since that is when that information becomes available.

**DA 225**

**Appendix C – Trimming the Sample to Address Questions of Model Fit**

Given our concerns about how well the guns-crime econometric models fit all 50 US states (plus D.C.), we decided to examine the residuals from various regressions models.  For example, one potentially important issue is whether one should include linear state trends in our models.  To further explore this issue, we examined the variance of the residuals for the aggravated assault regression estimates using our preferred models on state data for the period through 2010—both with and without state trends.[68]  In particular, we found that the residual variance was high for smaller states, even when we do not weight our regressions by population.[69]

We explored how these "high residual-variance" states (defined from the aggravated assault regressions on our preferred model through 2010) might be influencing the results.  We estimated our preferred model (both with and without state trends) after removing the 10 percent of states with the highest residual variance.  This step is also repeated after removing the highest 20 percent of states in terms of residual variance.  Our results for our preferred specification (which includes clustered standard errors and is run over the 1979-2010 time period) are shown in Table 8a and 8b (without and with state trends, respectively).  The results from our two trimmed set of states are presented below. Tables C1 and C2 should be compared to Table 8a (no state trends), and Tables C3 and C4 should be compared to Table 8b (adding in state trends).

Removing high residual-variance states (based on the aggravated assault regressions)

---

[68] Since evidence that RTC laws increased aggravated assault appeared in a number of different models and with different data sets, we focused specifically on the residuals obtained using assault rate as the dependent variable.

[69] We removed the population weight for this exercise because it is likely that when regressions are weighted by population, the regression model will naturally make high-population states fit the data better.  As a result, we expect that residuals for smaller states will be higher.  We find, however, that the results are qualitatively similar even when we obtain the residuals from regressions that include the population-weighting scheme (although the patterns of statistical significance sometimes change significantly when dropping the highest variance 20% of states from the sample).

94

does not alter the story told in Table 8a (no state trends) that there is no hint that RTC laws reduce crime and this message comes through again in Tables C1 and C2.  Indeed, removing the high variance states has increased the statistical significance of the finding that RTC laws *increase* aggravated assault from the .10 level in Table 8a to the .05 level in both Tables C1 and C2.  Removing the high residual-variance states from the models with state trends again reveals the same Table 8b estimates of a statistically significant increase in aggravated assault at the .05 level (Table C3), but reduces this level of significance to the .10 level in Table C4.

Of the states dropped from Tables C1 because of their high residual variance, all adopted RTC laws during the 1977-2010 period (with date of adoption in parentheses): Montana (1991), Maine (1985), West Virginia (1989), North Dakota (1985), and Tennessee (1996).  Of the *additional* states dropped from Table C2, the following two states adopted RTC laws during the 1977-2010 period (with date of adoption in parentheses): Nebraska (2007) and Oregon (1990). Results from Table C3 come from dropping Montana, North Dakota, New Hampshire, Nebraska, and Vermont.[70]  Finally, in addition to the five RTC states that were dropped in Table C3, Table C4 dropped the following five RTC states: West Virginia (1989), Nevada (1995), Kentucky (1996), Indiana (1980), and South Dakota (1985).

---

[70]The dropped states are slightly different between Tables C1 and C3, as well as between Tables C2 and C4, because the state ranks based on residual variances differed when the models were run with and without state trends.

**DA 227**

# Appendix C[71]

## Table C1

Estimated Impact of RTC Laws – ADZ Preferred Controls, 1979-2010 – Clustered Standard Errors

Dataset: ADZ Updated 2013 State Data

Dropping States with Highest Residual Variance (Top 10%: ND, MT, WV, TN, ME)

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | 3.54 | 11.70** | 8.48** | 14.12* | 19.32** | 12.40* | 10.43** |
| | (6.66) | (5.74) | (3.93) | (8.13) | (9.15) | (6.26) | (4.76) |
| Spline Model: | 0.61 | 0.65 | 1.03* | 1.21 | 1.31 | 0.79 | 0.87* |
| | (0.65) | (0.64) | (0.59) | (0.84) | (0.80) | (0.61) | (0.50) |
| Hybrid Post-Passage Dummy: | 0.95 | 10.35** | 4.51 | 10.22 | 15.82** | 10.44* | 7.66* |
| | (5.60) | (4.96) | (3.39) | (7.13) | (7.83) | (5.40) | (4.06) |
| Trend Effect: | 0.57 | 0.30 | 0.88 | 0.87 | 0.78 | 0.44 | 0.61 |
| | (0.60) | (0.60) | (0.60) | (0.80) | (0.67) | (0.55) | (0.48) |

## Table C2

Estimated Impact of RTC Laws – ADZ Preferred Controls, 1979-2010 – Clustered Standard Errors

Dataset: ADZ Updated 2013 State Data

Dropping States with Highest Residual Variance (Top 20%: ND, MT, WV, TN, ME, NE, NH, HI, OR, VT)

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | 3.93 | 12.52** | 10.21** | 15.19* | 20.26** | 13.11* | 10.85** |
| | (7.01) | (5.91) | (3.92) | (8.48) | (9.54) | (6.56) | (4.97) |
| Spline Model: | 0.80 | 0.78 | 1.30** | 1.49* | 1.43* | 0.91 | 0.91* |
| | (0.65) | (0.65) | (0.58) | (0.83) | (0.83) | (0.62) | (0.53) |
| Hybrid Post-Passage Dummy: | 0.47 | 10.62** | 5.23 | 10.06 | 16.33* | 10.64* | 8.01* |
| | (5.83) | (5.20) | (3.58) | (7.35) | (8.17) | (5.64) | (4.26) |
| Trend Effect: | 0.78 | 0.43 | 1.13* | 1.16 | 0.89 | 0.56 | 0.64 |
| | (0.59) | (0.60) | (0.59) | (0.78) | (0.70) | (0.55) | (0.50) |

---

[71] Estimations include year and state fixed effects, and are weighted by state population.  Robust standard errors are provided beneath point estimates in parentheses.   The control variables for this "preferred" specification include: incarceration and police rates (lagged one year to avoid potential endogeneity issues), unemployment rate, poverty rate, population density, per capita income measures, and six demographic composition measures.   * Significant at 10%; ** Significant at 5%; *** Significant at 1%.

96

**DA 228**

## **Appendix C (Cont.)**

## Table C3

Estimated Impact of RTC Laws – ADZ Preferred Controls, 1979-2010 – Clustered Standard Errors and State Trends

Dataset: ADZ Updated 2013 State Data

Dropping States with Highest  Residual Variance (Top 10%: MT, ND, NH, NE, VT)

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | -0.13 | -3.20 | -0.33 | 1.86 | 9.64** | 1.12 | 1.11 |
| | (4.02) | (2.34) | (3.62) | (3.21) | (4.52) | (2.24) | (1.88) |
| Spline Model: | 0.86 | -0.23 | 1.71** | -0.26 | -1.41* | -0.10 | -0.57 |
| | (0.76) | (0.65) | (0.79) | (0.83) | (0.76) | (0.65) | (0.53) |
| Hybrid Post-Passage Dummy: | -0.78 | -3.10 | -1.63 | 2.10 | 10.95** | 1.23 | 1.57 |
| | (3.93) | (2.38) | (3.51) | (3.40) | (4.43) | (2.37) | (2.06) |
| Trend Effect: | 0.89 | -0.13 | 1.76** | -0.33 | -1.76** | -0.14 | -0.62 |
| | (0.74) | (0.65) | (0.79) | (0.86) | (0.73) | (0.67) | (0.56) |

## Table C4

Estimated Impact of RTC Laws – ADZ Preferred Controls, 1979-2010 – Clustered Standard Errors and State Trends

Dataset: ADZ Updated 2013 State Data

Dropping States with Highest Residual Variance (Top 20%:  MT, ND, NH, NE, VT, WV, NV, KY, IN, SD)

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | -0.30 | -3.11 | 1.36 | 2.56 | 10.91** | 0.89 | 1.24 |
| | (4.26) | (2.47) | (3.44) | (3.25) | (4.38) | (2.36) | (1.97) |
| Spline Model: | 0.94 | -0.15 | 1.38* | -0.11 | -1.39 | -0.13 | -0.55 |
| | (0.83) | (0.71) | (0.78) | (0.89) | (0.84) | (0.73) | (0.57) |
| Hybrid Post-Passage Dummy: | -0.98 | -3.07 | 0.40 | 2.70 | 12.16*** | 1.01 | 1.67 |
| | (4.16) | (2.51) | (3.38) | (3.49) | (4.30) | (2.50) | (2.18) |
| Trend Effect: | 0.97 | -0.06 | 1.37* | -0.20 | -1.78** | -0.17 | -0.60 |
| | (0.81) | (0.71) | (0.79) | (0.94) | (0.80) | (0.76) | (0.61) |

97

**DA 229**

**Appendix D – Alternative Demographic Variable Specification**

A fairly standard set of demographics that can be seen in the crime literature includes controls for a few age categories across all races combined with a single identifier of the percentage of blacks in the state.  Table D1 and D2 in Appendix D provide yet another robustness check to the ADZ model by putting in four such demographic variables – the percent of the population falling into the three age categories of 10-19, 20-29, and 30-39 plus the percent black -- in place of the ADZ six demographic variables.  The results are not dramatically different from the main ADZ models of Tables 8a and 8b, and they essentially show only evidence of RTC laws increasing crime.  Table D1's and Table 8a's estimated violent crime increases for rape, aggravated assault, and robbery are substantial in both sets of dummy variable estimates and significant at the .10 level or better, only Table 8a has one of these estimates rise to the level of significance at the .05 level (for rape).

**DA 230**

# Appendix D

## Table D1[72]

Estimated Impact of RTC Laws – ADZ Preferred Controls (with four demographic variables), 1979-2010 – Clustered Standard Errors

Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | 2.25 | 9.45* | 8.15* | 12.06* | 15.06* | 11.33** | 11.06** |
| | (5.75) | (5.43) | (4.27) | (6.51) | (8.15) | (4.88) | (4.29) |
| Spline Model: | 0.47 | 0.97 | 1.07 | 1.27 | 1.12 | 0.83 | 0.93* |
| | (0.63) | (0.64) | (0.64) | (0.76) | (0.76) | (0.58) | (0.49) |
| Hybrid Post-Passage Dummy: | 0.08 | 5.90 | 3.81 | 7.31 | 11.73 | 8.90** | 8.02** |
| | (4.69) | (4.21) | (3.77) | (5.52) | (7.12) | (4.00) | (3.49) |
| Trend Effect: | 0.47 | 0.77 | 0.94 | 1.03 | 0.72 | 0.52 | 0.66 |
| | (0.60) | (0.60) | (0.66) | (0.75) | (0.70) | (0.55) | (0.47) |

## Table D2

Estimated Impact of RTC Laws – ADZ Preferred Controls (with four demographic variables), 1979-2010 – Clustered Standard Errors and State Trends

Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | 0.60 | -2.86 | -0.73 | 3.25 | 9.47** | 1.74 | 1.52 |
| | (3.99) | (2.57) | (3.97) | (3.17) | (4.34) | (2.13) | (1.72) |
| Spline Model: | 0.59 | -0.28 | 1.53* | -0.70 | -1.06 | -0.42 | -0.71 |
| | (0.70) | (0.63) | (0.78) | (0.94) | (0.79) | (0.61) | (0.48) |
| Hybrid Post-Passage Dummy: | 0.15 | -2.71 | -1.95 | 3.88 | 10.54** | 2.11 | 2.12 |
| | (3.89) | (2.63) | (3.90) | (3.41) | (4.23) | (2.29) | (1.86) |
| Trend Effect: | 0.59 | -0.19 | 1.59** | -0.82 | -1.39* | -0.49 | -0.78 |
| | (0.68) | (0.64) | (0.78) | (0.97) | (0.75) | (0.63) | (0.52) |

---

[72] These regressions include year and state fixed effects, and are weighted by state population. Robust standard errors are provided beneath point estimates in parentheses. The control variables for this "preferred" specification include: incarceration and police rates (lagged one year to avoid potential endogeneity issues), unemployment rate, poverty rate, population density, per capita income measures, and four demographic variables (percent of the population that is between 10 and 19, 20 and 29, and 30 and 39 as well as percent black in the state).
* Significant at 10%; ** Significant at 5%; *** Significant at 1%.

DA 231

**Appendix E – Summarizing Estimated Effects of RTC Laws Using Different Models, State v. County Data, and Different Time Periods**

This appendix provides graphical depictions of 14 different estimates of the impact of RTC laws for both the dummy and spline models for specific crimes using different data sets (state and county), time periods (through 2000, 2006, or 2010), and models (Lott and Mustard versus our preferred model and with and without state trends). For example, Figure E1 shows estimates of the impact on murder using the dummy model, designed to capture the average effect of RTC laws during the post-passage period. The first bar in each of the first six groupings corresponds to county-level estimates; the second bar corresponds to state-level estimates, for a total of 14 estimates per figure. Since our county model estimates are generally run through 2006 and our state model estimates are run through 2010, we generally paired state and county model results that were otherwise identical and which were run through 2010 and 2006 (respectively). Additionally, the last two estimates only contain one bar corresponding to state models run between 1999 and 2010. The value of the figures is that they permit quick visual observation of the size and statistical significance of an array of estimates. Note, for example, that only one of the estimates of RTC laws on murder in either Figure E1 or Figure E2 is significant at even the .10 threshold. This is the estimate for the 1999-2010 period on state data, which shows a statistically significant *increase* in murder (at the .05 level) in the spline model. This sharp contrast to the conclusion drawn by James Q. Wilson on the NRC panel is in part driven by the fact that all of the estimates in this appendix come from regressions in which we adjusted the standard errors by clustering.

In contrast to the solitary statistically significant estimate for murder (suggesting an increase), the estimates of the impact of RTC laws on aggravated assault in Figures E5 and E6

100

**DA 232**

are significant at at least the .10 level suggesting crime increases in 11 of the 28 estimates depicted, as indicated by the shading of the columns.[73]  Note that the overall impression from these two figures is suggestive that RTC laws *increase* aggravated assault, although the evidence is not uniformly strong in the more preferred models.  No other crime category has as strong evidence of an impact of RTC laws as the findings on aggravated assault.

Figure E1. Various Murder Estimates (Dummy Model)



Figure E2. Various Murder Estimates (Spline Model)



---

[73] No shading indicates insignificance, and the shading darkens as significance increases (from a light grey indicating significance at the .10 level, slightly darker indicating significance at the .05 level, and black indicating significance at the .01 level).

101

Figure E3. Various Rape Estimates (Dummy Model)



Figure E4. Various Rape Estimates (Spline Model)



Figure E5. Various Aggravated Assault Estimates (Dummy Model)



Figure E6. Various Aggravated Assault Estimates (Spline Model)



102

**DA 234**

Figure E7. Various Robbery Estimates (Dummy Model)



Figure E8. Various Robbery Estimates (Spline Model)



Figure E9. Various Auto Theft Estimates (Dummy Model)



Figure E10. Various Auto Theft Estimates (Spline Model)



103

**DA 235**

Figure E11. Various Burglary Estimates (Dummy Model)



Figure E12. Various Burglary Estimates (Spline Model)



Figure E13. Various Larceny Estimates (Dummy Model)



Figure E14. Various Larceny Estimates (Spline Model)



104

**DA 236**

### Appendix F – Methodological Description of Using Selection on the Observables to Assess Selection Bias

Altonji et al. (2005) provides a test for whether there is omitted variable bias in a regression that attempts to quantify whether selection bias drives the OLS estimate. An underlying assumption of this approach is that the observable controls are selected independently from the larger set of possible controls. Elder and Jepsen (2013) provides a useful description of the methodological features of the test, and footnote 6 of that paper states that potential bias can be calculated with the given equation $\frac{cov(CS, \varepsilon_i)}{var(\widetilde{CS_i})} = \frac{cov(\widetilde{CS_i}, \varepsilon_i)}{var(\widetilde{CS_i})}$, where CS corresponds to our right-to-carry dummy variable.[74]

Drawing on this equation and equation (3) of the Elder and Jepsen paper, one can generate an expression for the potential bias: $\frac{cov(CS_i, X_i'\gamma) \cdot var(\varepsilon_i)}{var(\widetilde{CS_i}) \cdot var(X_i'\gamma)}$. Here $\widetilde{CS}_i$ is given by the formula $CS_i = X_i\beta + \widetilde{CS}_i$ (that is, $\widetilde{CS}_i$ is simply the residual from the regression of $CS_i$ on $X_i\beta$). Putting this formula in terms of our RTC dummy variable gives the expression $\frac{cov(Shall_i, X_i'\gamma) \cdot var(\varepsilon_i)}{var(\widetilde{Shall}_i) \cdot var(X_i'\gamma)}$. Because the beta coefficient of the bivariate regression of the RTC dummy on the fitted values of the regression of $Y_i$ (murder rate) on our full set of controls (less the RTC dummy variable) amounts to $\frac{cov(Shall_i, X_i'\gamma)}{var(X_i'\gamma)}$, the only remaining variables needed are $var(\varepsilon_i)$ and $var(\widetilde{Shall}_i)$. With this information one can calculate the "potential bias," which then can be compared to the beta coefficients we estimate in this paper.

The ratio of this implied bias to the estimate of the beta coefficient represents how strong selection on unobserved variables would have to be relative to selection on observed variables to

---

[74] In Elder and Jepsen's (2013) paper, CS refers to the effect of Catholic schools on educational achievement.

**DA 237**

attribute the entire estimated effect to selection bias.  For the ADZ preferred specification (Table 8a), we find a beta coefficient of 0.0331, with a potential bias of -0.3549.  This implied ratio is negative, implying that selection on observables and unobservables would have to be of <u>opposite signs</u> to be consistent with a true effect of zero.  This finding implies that our slightly positive coefficient is a lower bound of the true effect of RTC laws on murder.

In contrast, the Altonji test applied to the NRC regression (Table 1b) finding of a statistically significant beta coefficient on murder of -0.0833 indicates strong evidence of omitted variable bias.  The test reveals an estimate of potential bias of -1.0304, which implies that the -0.0833 OLS estimate would be solely driven by selection bias if selection on unobservables were <u>only 8 percent</u> as strong as selection on observables.

Finally, owing to the frequency with which RTC laws are associated with statistically significant increases in aggravated assault rates, we analyze the results of the Altonji test when using the ADZ preferred specification (Table 8a) and aggravated assaults as the relevant dependent variables.   The coefficient associated with this model is .080334, with a potential bias of -.07211.  Thus, our results again suggest that selection on observables and unobservables would have to be biased in opposite directions to eliminate our estimated effect of RTC laws on aggravated assault.  This strongly suggests that our finding that RTC laws increase aggravated assaults is, if anything, biased toward zero.

106

**DA 238**

## Appendix G – Summarizing Changes to Our RTC Dates

In this appendix, we detail all of the changes that we have made to the years when RTC laws took effect.  As noted in Footnote 3 and Footnote 17, the most recent version of our analysis includes a change in how the RTC dummy was defined.  Whereas in earlier work, we modeled RTC laws on the assumption that their impact would take effect only during the first full year after they were passed, we now assume that they take effect immediately after they are actually implemented.

**Missouri:**  While the state's right-to-carry law was originally intended to take effect in 2003 (the date that we used in earlier versions of this paper), a legal challenge based on the state's constitution prevented the law from taking effect until February 26, 2004.  For this reason, we use the date that the law's legal challenges were dismissed rather than the statutory date that the law was originally intended to take effect as its effective date.

**New Mexico & Oklahoma:**  This law passed in 2003 but took effect January 1st, 2004.  For this reason, while the initial year of the law switches from 2003 to 2004 in our most recent version of the paper, New Mexico's RTC dummy does not change after this revision.  Similarly, Oklahoma's RTC law passed in 1995 (our passage year) but took effect January 1st, 1996 (our new effective date).

**South Dakota:** Earlier versions of this paper inaccurately identified the state's 1986 legislation modifying its concealed carry laws as making the state "shall issue," but a careful re-examination of the details of this statute reveals that the state's 1985 legislation is a more appropriate candidate.

**DA 239**

**Tennessee:**  While we earlier identified the state's 1994 law as making the state's concealed carry permitting system "shall issue," this law continued to allow sheriffs to deny permits "for good cause and in the exercise of reasonable discretion" without precisely defining what "good cause" entails.  For this reason, we now use the state's 1996 law (which took effect the same year) as the basis for determining the effective date of the state's RTC status.

**Texas:**  Texas's RTC law passed in 1995 and took effect that same year, but the state's statute specifies that permits (even those issued in 1995) are not supposed to have legal backing before January 1st, 1996.  For this reason, while our original passage year for RTC legislation was 1995, our new effective date for this legislation is actually in 1996.

**Virginia:**  Virginia's RTC law has undergone so many changes that it is difficult to say which one eliminated discretion in the issuance of permits.  While our earlier analysis used the state's 1988 revisions as the proper year for this transition, our decision to use this date was based on the date used in Lott (2000), which was based on research by Cramer and Kopel (1995).  Surprisingly, the language that he identified as coming from the state's 1988 law was actually introduced in earlier legislation passed in 1986, so we accordingly changed our chosen effective date from 1988 to the effective date of this 1986 law.

**DA 240**



ELSEVIER

# Concealed-Gun-Carrying Laws and Violent Crime: Evidence from State Panel Data

Jens Ludwig

*Georgetown University and Northwestern University/University of Chicago Poverty Center,
Chicago, Illinois, USA
E-mail: ludwigj@gunet.georgetown.edu*

A recent study concludes that permissive concealed-handgun-carrying (or "shall-issue") laws have sharply reduced crime rates, including the rate of homicide. The method of the study has been critiqued by several authors. In this paper, I report a quite different approach that exploits the minimum age requirements for concealed-carry permits to more effectively control for unobserved variables that may vary over time. Because even permissive concealed-carry states require permit holders to meet minimum age requirements, any deterrent benefits from these laws should be concentrated among adults and, therefore, should be reflected in the gap between adult and juvenile victimization rates. My results suggest that shall-issue laws have resulted, if anything, in an *increase* in adult homicide rates. © 1998 by Elsevier Science Inc.

## I. Introduction

Crime is one of the American public's top priorities,[1] a source of concern and frustration that has translated into individual as well as collective action. Motivated in large part by fear of crime, between 35% and 40% of all American households keep a total of 127 million long guns and 65 million handguns [Cook and Ludwig (1997)], despite uncertainty about whether such widespread gun ownership increases or decreases public safety [Zimring and Hawkins (1997a)]. For the owner, firearms may be used for protection against intruders, yet keeping a gun also seems to be a risk factor for unintentional injury, suicide, and homicide [Vernick et al. (1997)]. Keeping a gun also may impose costs and benefits on others. High rates of gun ownership may produce

Thanks to Dan Black, John Cawley, Jeffrey Conte, Philip Cook, Geof Gee, John Graham, Paul Harrison, David Hemenway, John Lott, James Mercy, Jean Mitchell, Daniel Nagin, Steve Pischke, Elizabeth Scott, Jon Vernick, Daniel Webster, Doug Weil, Franklin Zimring and two anonymous referees for assistance and comments. Any remaining errors of fact or interpretation are mine alone.

[1]For example, a USA Today/CNN/Gallup poll from January 5 to 7, 1996 ($N = 1000$), found that 66% of voters listed violent crime as an issue that would be a "high priority" in deciding whom to vote for, second only to the quality of public education (67%). (*USA Today*, "Ideal citizens go face to face," by Richard Wolf, January 22, 1996, p. 6D).

International Review of Law and Economics 18:239–254, 1998
© 1998 by Elsevier Science Inc.                                    0144-8188/98/$19.00
655 Avenue of the Americas, New York, NY 10010                    PII S0144-8188(98)00012-X

general deterrence effects, for example by reducing the frequency with which burglars rob occupied homes. On the other hand, over 500,000 firearms are stolen each year, and keeping guns out of dangerous hands is made more difficult by over 2 million private transfers of second-hand guns annually [Cook et al. (1995); Cook and Ludwig (1997)]. In a recent survey, 85% of those without guns and 40% of gun owners report that they would feel less safe if more people in their community obtained a gun [Hemenway et al. (1995)].

Given the uncertainty surrounding the benefits and costs of widespread gun ownership, it is noteworthy that many states have responded to the crime problem by expanding the opportunities of private citizens to arm themselves in public. To date, 31 states have enacted "shall-issue" laws, which require local law enforcement authorities to issue concealed-handgun-carrying permits to any applicant who meets a set of specified criteria related to age, criminal history, and mental illness [Jost (1997)]. The number of states with shall-issue laws is likely to increase in the near future, as suggested by the consideration of shall-issue legislation in California and eight other states during 1997 [Hill (1997)].

The net effects of shall-issue laws are as difficult to predict as those of widespread gun ownership, though shall-issue laws have an even greater potential for positive and negative externalities. If gun carrying increases once these laws are passed, homicide rates may increase as guns are substituted for less lethal weapons in hostile confrontations [Zimring (1968); Cook (1991)]. Shall-issue laws also could cause homicides to increase if higher rates of gun carrying among potential victims causes criminals to arm themselves with greater frequency [Cook (1991)]. On the other hand, if shall-issue laws cause more citizens to carry handguns, then the expected costs associated with committing crimes may increase. An increase in the costs of crime may deter some criminal activity [Lott and Mustard (1997)], particularly as the number of permits issued within a state increases over time. It is also possible that the publicity surrounding the passage of the law may be sufficient to cause criminals to revise their perceptions of the costs of crime,[2] in which case any deterrent benefits may surround changes in the legal regime.

Unfortunately, there is currently little empirical evidence on the relationship between shall-issue laws and crime. A recent study by John Lott and David Mustard (1997) analyzes county-level panel data for 1977 through 1992 and finds evidence that shall-issue laws are negatively correlated with crime rates, including homicide. The authors conclude that "concealed handguns are the most cost-effective method of reducing crime thus far analyzed by economists" (p. 65). However, their method has been critiqued by several authors. Their study seems to suffer from model specification problems that will bias their estimates, a point that receives empirical support from Black and Nagin's (1998) reanalysis of the Lott and Mustard data.

In this paper, I present the results of a quite different approach to examining the effects of shall-issue laws on crime that exploits the fact that each shall-issue state enforces a minimum-age requirement for obtaining a concealed-carry permit to help control for the effects of unobserved variables. Because juveniles will not be eligible for concealed-carry permits even after shall-issue laws are passed, any deterrent benefits from these laws should be concentrated among adults. Any deterrent benefits of these laws should, therefore, reveal themselves in the difference in homicide victimization rates between adults and juveniles. My sample includes observations through 1994, an

---

[2]Zimring and Hawkins (1997b) call this an "announcement effect."

important extension of Lott and Mustard, because some of the shall-issue states studied in their sample enacted these laws as late as 1991. My results suggest that shall-issue laws have resulted, if anything, in an *increase* in adult homicide rates.

The paper is organized as follows. The next section offers a critical review of the available evidence on shall-issue laws. The third section reviews the data and empirical strategy used in this paper, as well as the results of my analysis. The fourth section offers a discussion of my findings.

## II. Previous Research

The effects of shall-issue laws on crime will depend, in part, on how concealed-handgun carrying changes when such laws are passed. Although almost nothing is known on this point, most gun carrying in the United States seems to occur without benefit of a concealed-carry permit. Cook and Ludwig (1997) find that 7.5% of American adults carried a firearm on their person or in a motor vehicle at some point during 1994. By way of comparison, a total of 1.4% of adults had obtained a concealed-carry permit in Florida 7 years after that state passed a shall-issue law,[3] and a recent review of other estimates suggests that in 12 of 16 shall-issue states fewer than 2% of adults had obtained permits [Hill (1997)]. Presumably, some fraction of those who apply for permits carried illegally before the shall-issue law was passed, so the number of permits issued may overstate the degree to which gun carrying changes. The effects of shall-issue laws on the prevalence of gun carrying are likely to be small.

Lott and Mustard (1997) examine the effects of shall-issue laws on crime by applying regression models to a panel dataset of all counties in the United States from 1977 through 1992.[4] Their dependent variables include the natural logarithm of several violent and property crime rates. Explanatory variables include age, race, *per capita* income, population, people per square mile, and *per capita* spending on social programs to proxy for poverty, though whether these proxy variables should be positively or negatively correlated with an area's level of material deprivation is not clear.[5] The variables also include year-specific dummy variables to capture changes in the U.S. crime rate over time, county-specific dummy variables to capture unobserved county "fixed effects," and the county's arrest ratio to control for other policy changes that may affect crime.[6] Lott and Mustard find that shall-issue laws are, in general, negatively correlated with violent crimes and are positively correlated with property crimes.

Yet, Lott and Mustard's (1997) analysis may suffer from bias from omitted variables for at least two reasons. First, the Lott and Mustard fixed-effects approach cannot control for unobserved factors that influence county crime trends but are not fixed over time. Crack is one example of a factor that is not explicitly controlled for in the Lott and

---

[3]Calculated from permit figures reported in McDowall, et al. (1995, p. 194) together with population estimates from the U.S. Statistical Abstracts (1995, Table 34).

[4]McDowall et al. (1995) estimate the effects of shall-issue laws on crime rates using data from three states. Because their approach is susceptible to the same biases as that of Lott and Mustard, I restrict my attention to the problems with the Lott and Mustard estimates based on national data.

[5]A given level of *per capita* social spending may reflect a large number of pre-government-transfer poor who each receive a relatively meager transfer payment, or a small number of pretransfer poor who each receive a relatively generous transfer payment; the implications for the level of material deprivation are obviously different.

[6]The problems with using arrest ratios in this way have been well known since Blumstein et al. (1978). Yet in practice the Lott and Mustard results do not seem sensitive to the inclusion or exclusion of the arrest ratio [Black and Nagin (1998)].

Mustard study, is likely to be different between shall-issue states such as Idaho and other states such as California and New York, and is unlikely to have fixed effects over time [Zimring and Hawkins (1997b)].[7] Other examples include gang activity [Klein (1995)] and, as noted above, poverty. Second, passage of a shall-issue law presumably reflects a jurisdiction's preferences for anticrime measures, which may manifest themselves in other government anticrime responses beyond passage of shall-issue legislation. Lott and Mustard include policy variables that are likely to capture only a subset of the many possible public-sector responses to crime.[8]

Empirical evidence that Lott and Mustard's (1997) analysis produces biased estimates comes from Black and Nagin (1998). By applying a formal model mis-specification test that exploits the panel structure of the dataset [Heckman and Hotz (1989)], Black and Nagin find evidence to suggest that the Lott and Mustard regression model is unable to control for all of the factors that cause crime rates to differ between shall-issue states and other states *before* these laws are adopted. As a result, Lott and Mustard's estimates for the effects of shall-issue laws will reflect in whole or part the effects of omitted factors that are not captured by their regression model.[9]

Lott and Mustard (1997) present an additional set of regressions that uses two-stage least squares (2SLS) methods in an attempt to control for the omitted variables highlighted by Black and Nagin's analysis. To produce unbiased estimates for the effects of shall-issue laws, their 2SLS approach requires that lagged crime rates (or changes in crime over time), the proportion of a state that belongs to the National Rifle Association or voted Republican in the most recent Presidential election, and *per capita* (and per crime) police resources will only affect a county's crime rate by influencing the state's shall-issue law status. Nagin (1978) offers a relevant discussion of why many of the variables used by Lott and Mustard are unlikely to be valid for this purpose. Unfortunately, Lott and Mustard do not present the results of statistical tests such as those discussed in Hausman (1983) or Newey (1985), which could shed light on the validity of their estimation procedure.

Yet, some evidence that the Lott and Mustard 2SLS estimates are biased comes from their implausibly large magnitudes [Lott and Mustard (1997), Table 11]: The estimates imply that passage of a shall-issue law will reduce homicides by 67%, rapes by 65%, and assaults by 73%.[10] In sum, Lott and Mustard's analysis seems to suffer from bias and, as

---

[7]How to conceptualize and measure drug market activity is not obvious. Lott and Mustard (1997) experiment with drug prices as an additional covariate, though they ultimately reject this model specification because of missing data problems. Drug prices may be positively correlated with criminal activity if, as Lott and Mustard (1997, note 50) suggest, higher drug prices make addicts more prone to commit crimes to finance their habits. On the other hand, prices could be negatively correlated with criminal activity if low prices reflect the frequency of and (potentially violent) competition among drug suppliers. Unfortunately, as Kleiman and Smith (1990, p. 102) note, "[N]o city has anything resembling a quantitatively accurate description of its own drug problem."

[8]In addition to controlling for arrest ratios and (in some cases) burglary and robbery rates, Lott and Mustard (1997) experiment with including variables for sentencing enhancements for crimes committed with weapons, handgun purchase waiting periods, conviction rates, and sentence lengths (apparently available only for Oregon).

[9]Lott and Mustard (1997) also experiment with a model specification that includes a county's burglary or robbery rate as an additional explanatory variable to control for omitted variables. In unpublished calculations, Black and Nagin find that this model specification is also rejected using the Heckman and Hotz test (Dan Black, personal communication).

[10]Lott and Mustard (1997) report that the "percent of a standard deviation change in the endogenous variable [logged crime rate] that can be explained by a 1 standard deviation change in the exogenous variable [predicted probability of enacting a shall-issue law]" (p. 47). The implied effects on crime rates from passing a shall-issue law can

a result, is unlikely to provide reliable information about the effects of shall-issue laws on crime.

## III. Empirical Methods and Results

This section presents the results of a new test for the causal effects of shall-issue laws using state homicide data disaggregated by age. After reviewing the data, I discuss why my estimation approach may help control for the omitted variables problems that seem to plague Lott and Mustard (1997). Then, I show that there is little evidence to suggest that shall-issue laws have reduced homicide victimization rates for adults.

### Data

The dataset used in this paper contains information for each state in the United States from 1977 through 1994. Of the various crime rates that may be used in assessing the effects of shall-issue laws, homicide is widely considered to be measured most accurately [Cook and Laub (1997)] and, as such, is the focus of the analysis presented here. Annual state-by-state homicide counts are taken from vital statistics reports compiled by the U.S. Department of Health and Human Services. State population data are taken from the Statistical Abstracts for the United States, while data on the age distribution within each state are from the Census Bureau's Population Estimates and Population Distribution Branches.[11] Descriptive statistics for these data can be found in Table 1.

Lott and Mustard (1997) classify the following states as having enacted shall-issue laws between 1987 and 1991: Florida (1987); Georgia (1989); Idaho (1990); Maine (1985); Mississippi (1990); Montana (1991); Oregon (1990); Pennsylvania (1989); Virginia (1988); and West Virginia (1989). As Lott and Mustard note, whether Virginia and Maine should be included in this list is unclear, because Maine passed a series of modifications to its concealed-carry laws starting in 1981, and Virginia enacted additional shall-issue legislation on July 1, 1995, that eliminated the previous law's "need-to-carry" requirement and greatly increased the rate at which permits were issued [Hill (1997); Webster et al. (1997)]. The appropriate treatment of Pennsylvania in my sample is also complicated, because the shall-issue law exempts Philadelphia [Lott and Mustard (1997)].

Several additional states had shall-issue laws in place at the start of my sample period (Alabama, Connecticut, Indiana, New Hampshire, North Dakota, South Dakota, Vermont, and Washington). Although I present descriptive statistics for these states in what follows, identification of the effects of shall-issue laws using estimation approaches that control for state fixed effects (as does my empirical strategy) will rest on the states that change their laws during the sample period.

The minimum age requirement for obtaining a concealed-carry permit in those states that changed their laws from 1987 to 1991 is 18 in Maine, Montana, and West Virginia and is 21 in the others. For my empirical analysis, I define juvenile homicide victimization rates as those involving victims between the ages of 12 and 17. I exclude homicides to younger children because they tend to have characteristics that are quite different from those involving older children or adults, though replicating the analysis presented

---

be calculated as $e^{\beta} - 1$ for the coefficient $\beta$ on the shall-issue variable, because the dependent variable is the logarithm of the crime rate [for example, see Kennedy (1993), p. 106]. Thanks to Daniel Nagin for this point.

[11]Annual state population estimates taken from the U.S. Department of Commerce web page, http://www.census.gov/population/www/estimates/statepop.html.

TABLE 1. Descriptive statistics for state data

|  | Homicide rate (per 100,000 population) | Adult (21+) homicide rate (per 100,000 adults) | Youth (12–17) homicide rate (per 100,000 youth) |
|---|---|---|---|
| U.S., 1977–1994 | 9.35 | 11.17 | 5.93 |
| Non-shall-issue states, 1977–1994 | 9.75 | 11.73 | 6.07 |
| Rates for states with concealed-carry laws before 1977,* for 1977–1994 | 6.68 | 8.18 | 3.68 |
| Rates for states that implemented concealed-carry laws between 1987–1991,† for the period before these laws went into effect | 10.96 | 13.89 | 4.08 |
| Rates for states that implemented concealed-carry laws between 1987–1991,† for the period after these laws went into effect | 9.95 | 11.48 | 7.62 |

Notes: All means were calculated using state population figures as weights. Homicide counts taken from U.S. Vital Statistics, population counts taken from U.S. Census Bureau.

*States with shall-issue laws before 1977: Alabama, Connecticut, Indiana, New Hampshire, North Dakota, South Dakota, Vermont, and Washington.

†States that implemented shall-issue laws between 1987 and 1991: Florida, Georgia, Idaho, Mississippi, Montana, Oregon, and West Virginia. Pennsylvania, Maine, and Virginia are excluded from the sample for reasons discussed in the text.

below using victimization rates for all those under 18 years of age produces qualitatively similar results.[12]

### Estimation Strategy

Of primary concern with previous research such as Lott and Mustard (1997) are the difficulties involved in controlling for unobserved or difficult-to-measure factors that influence local crime rates but change over time. One way to address the problem of unobserved, time-varying factors is suggested by the requirement in each shall-issue state that permit holders be at least 18, or more typically 21, years of age. As a result, the probability of encountering an armed juvenile (the costs of committing crime against juveniles) should be largely unaffected by shall-issue laws. Any deterrent benefits from these laws thus should be concentrated among adults and should be reflected by a decrease in the difference between adult and juvenile victimization rates (that is, adult rates should decrease relative to juvenile rates).

Both the standard fixed-effects approach and the empirical strategy used here can be illustrated using Table 2, adapted from Joyce and Kaestner (1996). The standard fixed-effects approach consists of comparing the rate of change in adult homicide victimization rates in shall-issue states (*a-b*) with the change in non-shall-issue states (*e-f*) to control for unobserved state fixed effects that cause crime rates to differ between

---

[12]Thanks to an anonymous referee for this suggestion.

TABLE 2. Differences-in-differences-in-differences model

| | Pre-shall-issue | Post-shall-issue | Difference |
|---|---|---|---|
| Shall-issue states | | | |
| Adults ("treatment") | b | a | (a-b) |
| Juveniles ("control") | d | c | (c-d) |
| Difference in differences | | | (a-b) − (c-d) |
| Non-shall-issue states | | | |
| Adults ("treatment") | f | e | (e-f) |
| Juveniles ("control") | h | g | (g-h) |
| Difference in differences | | | (e-f) − (g-h) |
| DDD | | | [(a-b) − (c-d)] − [(e-f) − (g-h)] |

Source: Joyce and Kaestner (1996). Cell entries represent homicide rates per 100,000 for the group defined at left.

shall-issue states and other states by the same amount each period. Yet, the fixed-effects approach will not address the effects of unobserved variables that differ between shall-issue states and other states and that vary over time. For example, suppose that crack use and gang activities have increased more substantially during the sample period in states without shall-issue laws relative to states that have such laws. Fixed-effects comparisons will reveal that adult homicide rates have grown more slowly in shall-issue states $[(a-b) < (e-f)]$, even if shall-issue laws have no effect on crime.

The "difference-in-difference-in-difference" (DDD) estimation strategy exploits the fact that juveniles are not eligible to obtain gun-carrying permits after shall-issue laws are passed but will still be affected by other fixed and time-varying state-specific factors that influence crime victimization rates. Juveniles thus provide a natural "control group" for examining the effects of shall-issue laws (the "treatment") on adults who are 21 years of age and older (the "treatment group"). The difference between the change in adult homicide victimization rates and the change in juvenile rates $[(a-b) − (c-d)]$ differences out the effects of both fixed and time-varying factors that cause both adult and juvenile rates to change over time, and it will reflect only those factors that act on the difference between adult and juvenile homicides. To control for the possibility that there are nationwide changes in the differences between adult and juvenile homicide victimization rates that are independent of the shall-issue laws, the difference in the adult-juvenile trends in shall-issue states are compared with the difference in the adult-juvenile trends in other states $[(a-b) − (c-d) − (e-f) − (g-h)]$. The DDD estimator thus isolates those factors that are unique to shall-issue states (such as shall-issue laws) that will cause adult homicide rates to decrease relative to the rates for juveniles.[13]

More formally, the proposition that shall-issue laws reduce adult homicide victimization rates suggests that $[(a-b) − (c-d) − (e-f) − (g-h)]$ will be negative, which can be tested by estimating the following regression model:

$$y_{it} = \theta_0 + \theta_1(Exper_i) + \theta_2(Adult_i) + \theta_3(Post_t) + \theta_4(Exper_i*Adult_i) + \theta_5(Adult_i*Post_t)$$
$$+ \theta_6(Exper_i*Post_t) + \theta_7(Exper_i*Post_t*Adult_i) + v_{it} \qquad (1)$$

The sample used to estimate equation (1) will include two observations for each state ($i$) for each period ($t$); one corresponds to the state's juvenile homicide victimization

---

[13]The DDD estimator is discussed further in Card (1992), Gruber (1994), and Joyce and Kaestner (1996).

TABLE 3. Differences-in-differences-in-differences regression model*

|  | Pre-shall-issue | Post-shall-issue | Difference |
|---|---|---|---|
| **Shall-issue states** |  |  |  |
| Adults ("treatment") | $(\theta_0 + \theta_1 + \theta_2 + \theta_4)$ | $(\theta_0 + \theta_1 + \theta_2 + \theta_3 + \theta_4 + \theta_5 + \theta_6 + \theta_7)$ | $(\theta_3 + \theta_5 + \theta_6 + \theta_7)$ |
| Juveniles ("control") | $(\theta_0 + \theta_1)$ | $(\theta_0 + \theta_1 + \theta_2 + \theta_3 + \theta_4 + \theta_5 + \theta_6 + \theta_7)$ | $(\theta_3 + \theta_6)$ |
| Difference in differences |  |  | $(\theta_5 + \theta_7)$ |
| **Non-shall-issue states** |  |  |  |
| Adults ("treatment") | $(\theta_0 + \theta_2)$ | $(\theta_0 + \theta_2 + \theta_3 + \theta_5)$ | $(\theta_3 + \theta_5)$ |
| Juveniles ("control") | $(\theta_0)$ | $(\theta_0 + \theta_3)$ | $(\theta_3)$ |
| Difference in differences |  |  | $(\theta_5)$ |
| DDD |  |  | $(\theta_5 + \theta_7) - (\theta_5) = (\theta_7)$ |

Source: Modification of Joyce and Kaestner (1996). Cell entries represent homicide rates per 100,000 for group defined at left.

*Regression model:*

$$y_{it} = \theta_0 + \theta_1(Exper_i) + \theta_2(Adult_i) + \theta_3(Post_t) + \theta_4(Exper_i*Adult_i) + \theta_5(Adult_i*Post_t) + \theta_6(Exper_i*Post_t)$$

$$+ \theta_7(Exper_i*Post_t*Adult_i) + v_{it}$$

$y_{it}$ = homicide victimization rate for observation (either adult or juvenile) in state ($i$), period ($t$)
$Exper_i$ = 1 if state (i) enacts shall-issue law during sample period, 0 otherwise
$Adult_i$ = 1 if observation corresponds to adult victimization rate, 0 if juvenile rate
$Post_t$ = 1 if observation occurs in post-shall-issue law period, 0 if pre-shall-issue law period

rate in period ($t$), whereas the other corresponds to the adult rate in period ($t$). That is, with a data sample consisting of $N$ states in the panel, with observations on the states for $T$ periods that span changes in shall-issue law status in a subset of states, then equation (1) is estimated using $2NT$ observations. The variable $y_{it}$ represents a homicide rate measure for state ($i$) in period ($t$), whereas $Adult_i$ equals 1 if the observation is for adult homicide rates (zero otherwise), $Exper_i$ is equal to 1 if state ($i$) adopts a shall-issue law during the sample period (zero otherwise), and $Post_t$ equals 1 if the period is after the shall-issue laws have been enacted (zero otherwise). Equation (1) is estimated using state populations as weights to control for heteroskedasticity in the regression residuals [Greene (1993)].

The parameters in this regression model will capture fixed factors that reflect differences between shall-issue states and other states during the sample period ($\theta_1$), differences between adult and juvenile homicide rates ($\theta_2$), trends over time in homicide rates ($\theta_3$), differences in the effects of fixed-state factors on adults versus juveniles ($\theta_4$), differences in the trends of adult versus juvenile homicide rates over time ($\theta_5$), and differences in homicide trends over time between shall-issue states and other states ($\theta_6$). The key parameter of interest is $\theta_7$, which represents $[(a\text{-}b) - (c\text{-}d) - (e\text{-}f) - (g\text{-}h)]$, the effects of the shall-issue law on the difference between adult and juvenile homicide rates in states that do adopt a shall-issue law during this period versus those that do not.

That the estimate for $\theta_7$ from equation (1) represents an estimate for the quantity $[(a\text{-}b) - (c\text{-}d) - (e\text{-}f) - (g\text{-}h)]$ can be seen with the help of Table 3, which is identical to Table 2 except that the homicide rates are now expressed in terms of the parameters underlying equation (1). For example, the expected value of adult homicide victimization rates in shall-issue states after these laws are passed is given by [$a = (\theta_0 + \theta_1 + \theta_2 +$

$\theta_3 + \theta_4 + \theta_5 + \theta_6 + \theta_7)$], because each of the dummy variables underlying equation (1) will be equal to one in this case. The expected value of juvenile homicide victimization rates in states that never pass these laws, during the period before the adoption of shall-issue laws by the shall-issue states, is equal to $[h = (\theta_0)]$, because none of the dummy variables are "switched on" in this case. Taking the difference between adult and juvenile homicide trends over time in shall-issue states, and subtracting from this the difference between adult and juvenile homicide trends in non-shall-issue states, leaves us with $\theta_7$.

Note also that the DDD approach differs in important ways from that used in Section IV-C of Lott and Mustard (1997), in which they apply their standard regression model to data for 1977 through 1992 to examine whether shall-issue laws change the age composition of homicide victimizations. They find a negative, but not statistically significant, relationship between shall-issue laws and the proportion of murder victims above some age level, though the specific age cutoff and regression coefficients are not reported. Yet, the strategy of using the ratio of adult to total homicides will not help control for unobserved state factors that vary over time.[14]

### Empirical Results

Figure 1 provides a graphical representation of my results. The graph shows trends in the difference between adult (age 21 and over) and juvenile (ages 12 to 17) homicide victimization rates over time for those states that passed a shall-issue law during the period 1977 to 1994 (Florida, Georgia, Idaho, Mississippi, Montana, Oregon, and West Virginia), those that did not have a shall-issue law in effect during this period, and those that had enacted a shall-issue law before the sample period (Alabama, Connecticut, Indiana, New Hampshire, North Dakota, South Dakota, Vermont, and Washington). The sample excludes Pennsylvania, Virginia, and Maine because of the uncertainty surrounding how these states should be classified.

As noted above, any deterrent benefits of shall-issue laws should manifest themselves as a decrease in the difference between adult and juvenile homicide rates. Moreover, any change in the adult-juvenile difference should be greater in shall-issue states than in other states if the shall-issue laws themselves exert any influence on adult homicide rates beyond those factors that affect adult homicide nationwide. However, as seen in Figure 1, adult and juvenile homicide rates converged throughout the United States during the 1980s, and the rate of this convergence in shall-issue states after these laws were passed (1987–1991) does not seem to be noticeably different than the rates observed in other states. Figure 1 thus presents informal evidence that shall-issue laws did not serve to reduce adult homicide rates.

The results of testing this proposition more formally by estimating regression equation (1) are shown in Table 4. The one complication is the proper definition of the pretreatment and posttreatment periods. Because the states that passed shall-issue laws between 1987 and 1991 passed these laws in different years, "the" treatment period actually consists of a several-year window. In my preferred regressions, I define the 10

---

[14]This can be seen by imagining two separate regression equations with adult and juvenile homicide rates as the dependent variables of interest and the various explanatory variables on the right-hand side. The regression equation with the ratio of adult to total homicides can be written as the ratio of the adult equation divided by the adult plus juvenile equations, with a residual term that still includes unobserved, time-varying state effects that influence adult and juvenile rates equally. These terms will be purged with my differencing strategy.



Fig. 1. Difference Between Adult (21+) and Juvenile (12–17) Homicide Victimization Rates, 1977–1994. States that enacted shall-issue laws during the sample period are as follows: Florida (1987), Georgia (1989), Idaho (1990), Mississippi (1990), Montana (1991), Oregon (1990), and West Virginia (1989). States with shall-issue laws in effect during entire sample period are: Alabama, Connecticut, Indiana, New Hampshire, North Dakota, South Dakota, Vermont, and Washington. Excluded from the sample are Maine, Virginia, and Pennsylvania (see text).

years before Florida's implementation of its shall-issue law as the "pretreatment" period (1977 through 1986) and the 3 years after Montana's shall-issue law as the "posttreatment" period (1992 through 1994).

Because this analysis compares homicide rates that are averaged over several pretreatment and posttreatment years, the method is not well suited for determining whether shall-issue laws have immediate versus gradual effects on crime. If the effects of shall-issue laws change over time, for example because the number of concealed-carry permits issued within a state increases, then the posttreatment effect will reflect the average treatment effect for states with these laws in place for different lengths of time. Any bias that may arise from time-varying treatment effects will be exacerbated by including those states that enacted shall-issue laws before 1977 in the comparison (no change in shall-issue regime) group, because the change in the comparison-group homicide rates in this case may in part reflect changes in the shall-issue "dose" in some comparison-group states. As a result, these states are excluded from the my analytic sample, though below I examine the sensitivity of my estimates to the treatment of these states.

The regression results shown in Table 4 reveal that parameter $\theta_7$, which captures the effects of shall-issue laws on adult homicide rates, is slightly positive, implying an increase of around one-sixth of a homicide per 100,000 adults. With an average adult homicide victimization rate of 11.17 per 100,000 in the United States for 1977 through 1994, this implies an increase of 1.4%. Because the sample of states that change their laws from 1977 to 1994 is relatively small, the standard errors around this point estimate

DA 250

TABLE 4. Differences-in-differences-in-differences regression results

| Explanatory Variable† | Coeff. | Controls for | Estimate (standard error) |
|---|---|---|---|
| Exper = 1 if state ever passes shall-issue law (=0 else) | $\theta_1$ | Fixed factors which differ between shall-issue and other states | −1.53 (0.53)* |
| Adult = 1 if observation is for adult homicide rates (=0 if observation is for juvenile homicide rate) | $\theta_2$ | Differences in levels between adult and juvenile homicide rates | 7.19 (0.26)* |
| Post = 1 if period is after implementation of shall-issue laws | $\theta_3$ | Trends over time in homicide rates | 4.80 (0.44)* |
| Adult × Exper | $\theta_4$ | Differences in shall-issue state fixed-effects on adult versus juvenile homicide rates | 2.62 (0.73)* |
| Adult × Post | $\theta_5$ | Differences in trends of adult versus juvenile homicide rates over time | −6.10 (0.52)* |
| Exper × Post | $\theta_6$ | Differences in homicide trends in shall-issue v. other states over time | −1.43 (1.01) |
| Exper × Post × Adult | $\theta_7$ | Effects of shall-issue laws on adult homicide rates relative to juvenile homicide rates | 0.16 (1.42) |
| N | | | 1,039 |
| Adjusted $R^2$ | | | 0.64 |

Notes: Preprogram years included in the model are 1977 through 1986. Postprogram years included in the model are 1992 through 1994. The regression model also includes a constant term, the percentage of state population living in poverty, the percentage of state that is African-American, the state *per capita* personal income (measured in 1987 constant dollars), and the percentage of the state population living in urban areas, and it is estimated using state population counts as weights. Shall-issue states are Florida, Georgia, Idaho, Maine, Mississippi, Montana, Oregon, Virginia, and West Virginia. The sample excludes states with shall-issue laws enacted before the sample period (Alabama, Connecticut, Indiana, New Hampshire, North Dakota, South Dakota, Vermont, and Washington), as well as Maine, Pennsylvania, and Virginia (see text). "Pretreatment" period is defined as 1977 to 1986, "posttreatment" period is defined as 1992 to 1994.

* = significant at 1%.

†Dependent variables: Adult (21 and older) and juvenile (12–17) homicide victimization rates per 100,000 population.

are somewhat large. The standard errors imply that the point estimate is not statistically significant, with a 95% confidence interval of −2.68 to 3.00 homicides per 100,000. Yet even fairly small standard errors (such as those produced by Lott and Mustard's county-level ordinary least squares analysis) would imply that these estimates are consistent with positive, negative, or nonexistent effects of shall-issue laws on adult homicides.

As shown in Table 5, the results are not qualitatively different when states with shall-issue laws enacted before 1977 are included in the comparison group for the analysis, when the natural logarithm of the adult and juvenile victimization rates are

TABLE 5. Sensitivity analysis of DDD regression results

| *Difference in regression model from that used in Table 4* | *Estimated effect (standard error) of shall-issue laws on adult homicide rates (per 100,000)* |
|---|---|
| Alternative weighting variable | |
|   Use adult (21+) rather than total population as weighting variable | 0.15 (1.62) |
| Alternative functional form | |
|   Use natural logarithm of homicide victimization rates | −0.04 (0.19) |
| Alternative definitions of "pre" and "post treatment" periods | |
|     "Pre-law" period defined as 1982–1986 | 0.35 (1.65) |
|     "Pre-law" period defined as 1980–1986 | 0.24 (1.55) |
|     "Post-law" period defined as 1992 | 0.67 (1.98) |
|     "Post-law" period defined as 1992–1993 | 0.26 (1.62) |
|     "Post-law" period defined as 1993–1994 | −0.09 (1.63) |
| Alternative "comparison state" groupings | |
|   Include states with shall-issue laws on books before 1977 in comparison group | −0.05 (1.33) |
| Alternative "shall-issue" state groupings | |
|   Include Pennsylvania as shall-issue state | 1.20 (1.23) |
|   Include Virginia as shall-issue state | 0.53 (1.30) |
|   Include Maine as shall-issue state | 0.43 (1.39) |
|   Drop Florida | 0.76 (1.86) |
|   Drop Georgia | 1.18 (1.60) |
|   Drop Idaho | 0.05 (1.46) |
|   Drop Mississippi | 0.11 (1.48) |
|   Drop Montana | −0.01 (1.45) |
|   Drop Oregon | −0.29 (1.50) |
|   Drop West Virginia | −0.29 (1.47) |

Notes: Standard errors in parentheses. Results presented above taken from estimating regression equations similar to those underlying Table 4; coefficients presented above correspond to the variable in the last row of Table 4.

used rather than the raw values,[15] or when the adult (rather than total) populations are used as regression weights. The results are also generally not sensitive to the choice of pretreatment and posttreatment periods, though the exclusion of data from 1993 and 1994 causes the estimated positive effect of shall-issue laws on homicide to become even larger. When Pennsylvania, Virginia, or Maine are included, in turn, as shall-issue states, the estimated effect of shall-issue laws on adult homicides becomes even more positive, though the idiosyncrasies in how these laws were enacted makes interpretation of these results difficult.

Previous research has found that the shall-issue "treatment effects" implied by the Lott and Mustard model vary quite substantially across states [Black and Nagin (1998)].

---

[15]Using the natural logarithm for the homicide victimization rates is complicated somewhat by the fact that several states reported no homicides to victims ages 12 to 17 for some of the years between 1977 and 1994. Because the logarithm of 0 is undefined, I substitute the logarithm of (0.1) in these cases. Substitution of the logarithm of yet smaller values will increase the implied difference between adult and juvenile homicides when there are no juvenile homicide cases and will serve to make the shall-issue coefficient more negative.

**DA 252**



FIG. 2. Difference in Adult (21+) minus Juvenile (12–17) Homicide Victimization Rates in Florida and Georgia, 1977–1994. Florida enacted shall-issue law in 1987, while Georgia enacted shall-issue law in 1989.

This finding may reflect heterogeneity across states that is not captured by the Lott and Mustard regression model, including differences in the way that shall-issue laws are written or enacted and the rate at which citizens within a state obtain concealed-carry permits. For example, state shall-issue laws vary with respect to fingerprint and safety training requirements, as well as to permit application fees, and even to the degree to which carrying privileges are restricted within some counties in a state [National Rifle Association (1998)]. Estimates for the proportion of adults who have been issued permits range from 0.2 percentage points in Mississippi to as high as 6.0% in South Dakota [Hill (1997)]. Although most of the permit holders in shall-issue states seem to be middle-aged white men, there does seem to be some variation across states in the age distribution of those holding permits [Hill (1997)].

Figures 2 and 3 provide informal evidence that the effects of shall-issue laws may vary across states. Figure 2 presents trends in the difference between adult and juvenile homicide victimization rates in Florida and Georgia, those states with the most noticeable changes in the difference between adult and juvenile homicide rates. However, as seen in Figure 3, even after enacting shall-issue laws the remaining states reflect the kind of cyclicality in homicide rates that is typical in the United States [Blumstein (1995)].

The sensitivity of my estimates to the exclusion of each shall-issue state in turn is shown in Table 5. As suggested by Figures 2 and 3, evidence for any crime-reducing benefits are concentrated in Florida and Georgia: The exclusion of these states causes the estimated effect of shall-issue laws on adult homicides to become even more positive. This finding is consistent with Black and Nagin (1998), who note that many of the negative shall-issue effects estimated by Lott and Mustard (1997) disappear once Florida is excluded from the sample. The results are generally not sensitive to excluding any of the other shall-issue states from the sample, or even to excluding such atypical

DA 253



Fig. 3. Difference between Adult (21+) and Juvenile (12–17) Homicide Victimization Rates for Idaho, Mississippi, Montana, Oregon, and West Virginia, 1977–1994. Idaho, Mississippi, and Oregon enacted shall-issue laws in 1990, whereas Montana enacted a shall-issue law in 1991 and West Virginia in 1989.

non-shall-issue states as California or New York, with estimated effects that are consistently no larger than one-third of a homicide in absolute value. Taken together, this analysis produces little evidence that shall-issue laws reduce crime and suggests that these laws are as likely to cause crime to increase as to decrease.

### IV. Discussion

Whether "shall-issue" laws that liberalize concealed-handgun-carrying requirements cause crime rates to increase or to decrease has become an increasingly important public policy question, as a growing number of states adopt or consider such legislation. The widely publicized study of Lott and Mustard (1997) suggests that shall-issue laws reduce crime and save lives and money. However, as I have argued above, the Lott and Mustard study does not seem to have controlled adequately for omitted variables and other problems and, as a result, is unlikely to provide reliable information about the effects of shall-issue laws on crime.

In this paper, I present the results of an alternative test for the effects of shall-issue laws on homicide rates that exploits the fact that juveniles are not eligible for concealed-carry permits to control for time-varying unobserved state factors. The results of my analysis suggest that shall-issue laws have resulted, if anything, in an increase in adult homicide rates.

What explains the difference between the findings in Lott and Mustard (1997) and those presented here? My use of state-level rather than county-level data is unlikely to explain the difference, inasmuch as Lott and Mustard's analysis of state-level data using their fixed-effects regression approach produces results that are similar to their county-level analysis. The additional 2 years of data that I use (1993 and 1994) also do not seem to explain the difference across studies, because excluding data from 1993 and 1994 in

my analysis causes the estimated positive effect of shall-issue laws on adult homicides to become even larger.

I believe that the most compelling explanation for the differences between the results in Lott and Mustard (1997) and those presented here is that my estimation strategy is able to more adequately control for unobserved state variables that vary over time. Lott and Mustard's (1997) analysis is susceptible to bias from any unobserved state or county factor that varies over time, which in fact seems to be the case on the basis of Black and Nagin's (1998) analysis and the implausibility of Lott and Mustard's 2SLS results. In contrast, only social or public policy changes that are unique to shall-issue states, concurrent with the implementation of these laws, and that affect the difference between adult and juvenile homicide rates may impart bias to the estimates presented here. It is also possible that some criminals change their behavior after shall-issue laws are passed and now either victimize juveniles instead of adults or leave crime altogether, in which case my estimates may be subject to a slight negative or positive bias, respectively. The possibility of some unmodeled heterogeneity in my estimates is suggested by the sensitivity of the estimates to the exclusion of Florida and Georgia from the sample; these sample restrictions cause the estimated positive effect of shall-issue laws on homicide to become even larger. My results are generally robust to dropping other shall-issue and non-shall-issue states from the analytic sample.

The omitted variables problems highlighted in this paper are of general concern in evaluating the effects of anticrime efforts and seem even more severe than the problems involved in evaluating other areas of public policy such as education. In both crime and education, many of the important factors that influence policy outcomes vary at the local level. In the area of education policy, the government has invested substantial resources to collect rich data at levels as disaggregated as the school or student. In contrast, many of the important factors that influence crime are not measured, are not systematically compiled by government agencies, or are unusually difficult to measure. Even sophisticated measurement techniques such as fixed-effects or 2SLS models may produce biased estimates in the face of these problems, given that many of the unmeasured factors that cause crime are likely to vary over time and that valid instrumental variables are difficult to find. Public policymakers should be made aware of the unique identification problems in evaluating anticrime policies such as concealed-carry laws and should recognize that even elaborate studies such as Lott and Mustard (1997) may not provide reliable information. There may be many reasons for state and federal legislators to support shall-issue laws, but the belief that these laws reduce crime should not be one of them.

## References

BLACK, D., AND D. NAGIN. (1998). "Do 'Right to Carry' Laws Reduce Violent Crime?" *Journal of Legal Studies* **27**(1):209–219.

BLUMSTEIN, A., J. COHEN, AND D. NAGIN. (1978). *Deterrence and Incapacitation: Estimating the Effects of Criminal Sanctions on Crime Rates.* Washington, D.C.: National Academy of Sciences.

CARD, D. (1992). "Do Minimum Wages Reduce Employment? A Case Study of California, 1987–89." *Industrial and Labor Relations Review* **46**(1):38–54.

COOK, P.J. (1991). The Technology of Personal Violence. In *Crime and Justice: A Review of Research*, ed. M. Tonry, Vol 13, 1–70. Chicago: University of Chicago Press.

COOK, P.J., AND J.H. LAUB. (1997). "The Unprecedented Epidemic in Youth Violence." Duke University, unpublished paper.

COOK, P.J., AND J. LUDWIG. (1997). *Guns in America: Results of a Comprehensive National Survey on Firearms Ownership and Uses.* Washington, D.C.: Police Foundation.

COOK, P.J., S. MOLLICONI, AND T. B. COLE. (1995). "Regulating Gun Markets." *Journal of Criminal Law and Criminology* **86**(1):59–92.

GREENE, W.H. (1993). *Econometric Analysis.* 2nd ed. New York: Macmillan.

GRUBER, J. (1994). "The Incidence of Mandated Maternity Benefits." *American Economic Review.* **84**(3): 622–641.

HAUSMAN, J.A. (1983). "Specification and Estimation of Simultaneous Equation Models." In *Handbook of Econometrics*, Vol 1, eds. Z. Griliches and M. Intriligator, 391–448. Amsterdam: North Holland.

HECKMAN, J.J., AND V.J. HOTZ. (1989). "Choosing Among Alternative Nonexperimental Methods for Estimating the Impact of Social Programs: The Case of Manpower Training." *Journal of the American Statistical Association* **84**(408):862–880.

HEMENWAY, D., S.J. SOLNICK, AND D.R. AZRAEL. (1995). "Firearms and Community Feelings of Safety." *Journal of Criminal Law and Criminology* **86**(1):121–132.

HILL, J.M. (1997). "The Impact of Liberalized Concealed Weapons Statutes on Rates of Violent Crime." Duke University undergraduate thesis.

JOST, K. (1997). "Gun Control Standoff." *Congressional Quarterly Researcher* **7**(47):1107–1114.

JOYCE, T., AND R. KAESTNER. (1996). "The Effect of Expansions in Medicaid Income Eligibility on Abortion." *Demography* **33**(2):181–192.

KENNEDY, P. (1993). *A Guide to Econometrics*, 3rd ed. Cambridge, MA: MIT Press.

KLEIMAN, M.A.R., AND K.D. SMITH. (1990). "State and Local Drug Enforcement: In Search of a Strategy." In *Crime and Justice: A Review of Research*, Vol 12, 69–107. Chicago: University of Chicago Press.

KLEIN, M.W. (1995). *The American Street Gang: Its Nature, Prevalence, and Control.* New York: Oxford University Press.

LOTT, J.R., AND D.B. MUSTARD. (1997). "Crime, Deterrence, and Right-to-Carry Concealed Handguns." *Journal of Legal Studies* **26**:1–68.

MCDOWALL, D., C. LOFTIN, AND B. WIERSEMA. (1995). "Easing Concealed Firearms Laws: Effects on Homicide in Three States." *Journal of Criminal Law and Criminology* **86**(1):193–206.

NAGIN, D. (1978). "General Deterrence: A Review of the Empirical Literature." In *Deterrence and Incapacitation: Estimating the Effects of Criminal Sanctions on Crime Rates*, eds. A. Blumstein, J. Cohen, and D. Nagin, 95–139. Washington, D.C.: National Academy of Sciences.

National Rifle Association. (1998). *State Firearm Laws: ILA Research & Information Division Fact Sheet.* Washington, D.C.: National Rifle Association.

NEWEY, W. (1985). "Generalized Method of Moments Specification Testing." *Journal of Econometrics* **29**:229–256.

U.S. Bureau of the Census. (1995). *Statistical Abstract of the United States: 1995*, 11th ed. Washington, D.C.: Government Printing Office.

VERNICK, J.S., S.P. TERET, AND D.W. WEBSTER. (1997). "Regulating Firearm Advertisements That Promise Home Protection: A Public Health Intervention." *Journal of the American Medical Association* **277**(27): 1391–1397.

WEBSTER, D.W., J.S. VERNICK, J. LUDWIG, AND K.J. LESTER. (1997). "Flawed Gun Policy Research Could Endanger Public Safety." *American Journal of Public Health* **87**(6):918–921.

ZIMRING, F.E. (1968). "Is Gun Control Likely to Reduce Violent Killings?" *University of Chicago Law Review* **35:**721–737.

ZIMRING, F.E., AND G. HAWKINS. (1997a). *Crime Is Not the Problem: Lethal Violence in America.* New York: Oxford University Press.

ZIMRING, F.E., AND G. HAWKINS. (1997b). "Concealed Handguns: The Counterfeit Deterrent." *The Responsive Community* **7**(2):46–60.

# Lives Saved or Lives Lost?
## The Effects of Concealed-Handgun Laws on Crime

*By* Hashem Dezhbakhsh and Paul H. Rubin*

The role of handguns in crime has been the subject of extensive policy and academic debate in recent years. The interest in the issue has grown with the enactment of the restrictive (federal) Brady Bill and the adoption by many states of the right-to-carry concealed-handgun laws. These "shall issue" laws make it much easier for noncriminals to obtain licenses to carry concealed handguns. (Ten states passed such laws from 1977 to 1992, and 13 states have passed such laws since 1992.) This observed dichotomy in policy reflects the lack of consensus among policymakers regarding the role of handguns in violence. A similar disagreement exists in academic circles. For example, results reported in Philip Cook et al. (1995), Arthur Kellermann et al. (1995), Cook and Jen Ludwig (1996), and David Hemenway (1996) imply that an increase in gun ownership increases rates of crime. Daniel Polsby (1995) and John Lott and David Mustard (1997) are doubtful of such implications.

There are two theoretical possibilities regarding the effects of these laws. Increased gun ownership might lead to increased crime because of the increased availability of guns—the facilitating effect. Alternatively, because increased gun ownership might help potential victims to arm and protect themselves, thus increasing the criminals' uncertainty regarding an armed response, such laws might lead to reduced crime against persons—the deterrent effect. Which effect dominates might depend on population characteristics in a given jurisdiction. Concealed-handgun laws might

lead to increases in crime in some jurisdictions, while leading to decreases in other jurisdictions.

In a controversial paper, Lott and Mustard (1997) have examined this issue. They find that passage of concealed-handgun (shall-issue) laws by a state causes a significant reduction in violent as well as property crimes (Lott and Mustard, 1997 table 11). They attribute the results to a deterrent effect: as criminals become aware that victims might be armed, they reduce the rate of commission of crimes.[1]

We believe Lott and Mustard's findings are suspect, mainly because of the way they parameterize and measure the effect of permissive handgun laws on crime. They model the effect as a shift in the intercept of the linear crime equation they estimate at the county level. This approach is predicated on two assumptions: (i) all behavioral (response) parameters of this equation (slope coefficients) are fixed (unaffected by the law), and (ii) the effect of the law on crime is identical across counties. Obviously, if the law affects the behavior of the criminals or of citizens, then these response parameters should change, and not only the intercept term. Moreover, it seems highly unlikely that the magnitude of the ef-

* Department of Economics, Emory University, Atlanta, GA 30322-2240. We thank John Lott and David Mustard for providing us with the data and Bill Sribney, from Stata Corporation, for helpful programming suggestions. We also acknowledge financial support from the Emory University Research Committee. The usual disclaimer applies.

[1] The Lott-Mustard results that have received the most attention from media and from critics, and that the authors themselves emphasize in the abstract, are based on their table 3, which uses least squares and does not correct for the endogeneity of the arrest rate. This is the specification that shows a trade-off between violent and property crimes as states adopt "shall issue" laws. In the two-stage least-squares regression reported in Lott and Mustard (1997 table 11) the trade-off does not exist; they find a significant, and very substantial, decrease in all categories of crime in this specification. Our results are also based on two-stage least-squares methods. We should also note that the Lott-Mustard results in their table 11 are based on predicted arrest rates, from the first-stage estimation, which does not include the county fixed-effect estimates. This may also render suspect the results in their table 11.

fects such laws may have on crime rates in a county would be independent of economic and demographic characteristics of the county. In fact, the effect may vary with the age and gender composition of the population and the economic conditions of the counties, among other things. Others who have commented on Lott and Mustard (1997) (e.g., Ludwig, 1996; Dan Black and Daniel Nagin, 1998) have overlooked this problem, and consequently their alternative estimates may be subject to the same criticism; see also the reply by Lott (1998) to Black and Nagin's criticisms.

We reexamine the effect of permissive concealed-handgun laws on crime using a procedure to overcome these shortcomings, allowing all behavioral parameters of the model to change. Our method also allows the effect of the law on crime rates to be heterogeneous across counties so that we can infer how various factors influence the magnitude of the change in crime resulting from such laws. More specifically, we project the 1992 crime rate for counties without such laws if they had adopted the law by 1992. We then compare these projections, which are a function of county characteristics, with actual crime data for 1992 to infer how the absence of the law has affected crime in these counties. We also examine the relationship between these projected changes and county characteristics.

### I. Model and Estimation Approach

Lott and Mustard (1997) use county-level panel data to estimate several linear crime equations. The dependent variable is one of several crime rates: murder, rape, aggravated assault, robbery, burglary, larceny, and auto theft. The regressors include the corresponding arrest rate, a host of economic and socio-demographic factors, and a (0 or 1) binary variable measuring the status of the concealed-handgun law. The other regressors serve as control variables. The model they estimate is therefore

$$(1) \quad C_{it} = \alpha + \gamma I_{it} + \beta A_{it} + \delta X_{it} + \varepsilon_{it}$$

where $I$ is the binary variable, $A$ is the arrest rate, $X$ includes the economic and demo-

graphic variables and a set of time and county dummies (one for each sampling year or county), $\varepsilon$ is the regression error, and $i$ and $t$ denote counties and time periods, respectively.

Lott and Mustard's inference about the effect of concealed-handgun laws on various categories of crime is based on the sign and statistical significance of the estimated coefficient of the binary variable: the estimate of $\gamma$. A positive and significant estimate suggests that concealed-handgun provisions would increase the crime rate, while a negative and significant estimate points to the contrary conclusion. This representation assumes that the law only affects the intercept of the crime equation, so the crime equations for the counties with and those without the law have different intercepts but identical slopes. The coefficient of the binary variable captures the difference between the two intercept terms.

The implicit assumptions behind this characterization is that all other response parameters are identical for the two groups of counties and that all counties that adopt the law will observe identical changes in their crime rates. Both assumptions are unwarranted. Each of these parameters measures the change in the crime rate resulting from a change in the corresponding control variable (arrest rate, economic variables, or demographic characteristics). If adopting the law does indeed affect the action of criminals or their potential victims, it would do so by altering these response parameters.[2] The statistical consequences of ignoring such changes are biased estimation and potentially invalid results. Moreover, assuming the effect of the law on crime rates (parameter $\gamma$) to be fixed across counties is unjustified given the diversity of the county characteristics. Finally, using an intercept change to measure the effect of a change in the law causes the estimated effect to be fragile with respect to small specification changes. William Bartley et al. (1998) use

---

[2] Lott and Mustard (1997) in one of their least-squares regressions (their table 7) which, as explained earlier, is inappropriate in the present context, allow the slope coefficient of county population (one of the 53 regressors in their model) to change. However, they do not examine the combined effect.

extreme-bounds analysis to examine the range of the estimates of the intercept change and find it to be apparently quite wide in many cases.

We reexamine the effect of the concealed-handgun laws on crime using a regression-based procedure that overcomes these limitations. We allow all behavioral parameters of the model to respond to a change in the status of the law. The data will then show which of these parameters the law indeed affects. We implement this parameter flexibility by estimating two separate crime equations, one for counties in states with a concealed-handgun law and the other for the remaining counties:

$$(2a) \quad C_{L,it} = \alpha_L + \beta_L A_{L,it} + \delta_L X_{L,it} + \varepsilon_{L,it}$$

$$(2b) \quad C_{NL,it} = \alpha_{NL} + \beta_{NL} A_{NL,it}$$
$$+ \delta_{NL} X_{NL,it} + \varepsilon_{NL,it}$$

where the subscripts L and NL indicate the presence or the absence of the concealed-handgun law, respectively.

First, we examine whether the law affects the response parameters by using an asymptotic Wald test of the null hypothesis $H_0: \Theta_L = \Theta_{NL}$ against the alternative $H_0: \Theta_L \neq \Theta_{NL}$, where $\Theta$ denotes $(\beta, \delta)$.[3] A rejection of the null hypothesis implies that the law affects the response parameters of the model and therefore the crime rate. Following Isaac Ehrlich (1973), in all our estimations we treat the arrest rate, $A$, as an endogenous variable that is affected by such variables as the lagged crime rate, economic and demographic variables in the crime equation, police employment and payroll, and variables to control for political influences. These include percentage of Republican presidential votes and the percentage of a states' population who are members of the National Rifle Asso-

ciation (NRA); see Lott and Mustard (1997 p. 42). We estimate equations (2a) and (2b) along with the corresponding arrest equations via two-stage least-squares (2SLS) analysis, allowing the concealed-handgun law to shift the coefficients of the arrest equation in the first stage of estimation; such shifts are incorporated in cases where the Wald test applied to an arrest equation suggests that such a change is warranted. This ensures the consistency of the second-stage estimates. In all our estimations, we correct the residuals from the second-stage least square to account for using predicted rather than the actual arrest rate in estimation of the crime equation (see e.g., Russell Davidson and James G. MacKinnon, 1993 Ch. 7).

We estimate for each county the direction and extent of the change in crime rate that may result from introducing the concealed-handgun law. We determine how different the crime rate would have been during 1992 in the counties that did not have the concealed-handgun law in place, had they adopted the law by 1992. We obtain these estimates, which are useful for policy purposes, simply by switching the estimates of the behavioral parameters in equations (2a) and (2b) and computing the resulting predicted values for the dependent variable (the crime rate) over the relevant year. The estimates are obtained from $\hat{C} = \hat{\alpha}_L + \hat{\Theta}_L Z_{NL}$, where $Z_{NL}$ denotes the regressors in equation (2b). These are predicted crime rates conditional on adopting the concealed-handgun law. The difference between these predicted crime rates and the actual crime rates is our measure of the effect of concealed-handgun laws on crime. We emphasize that our interest is in estimating the expected 1992 crime rates conditional on the law being in place in a county that did not have it in 1992. This estimate is then compared with the county's actual 1992 crime rate to estimate the expected change. It is important to note that, in the above comparison, one should not use the county's predicted 1992 crime rate in the absence of the law, $\hat{\alpha}_L + \hat{\Theta}_{NL} Z_{NL}$, in place of the observed crime rate. This is because the former has no useful information for our inference that is not contained in the county's observed 1992 crime rate. Therefore, if we used $\hat{\Theta}_{NL} Z_{NL}$ instead of

[3] The Wald statistic is the quadratic form constructed on the estimate of the difference $(\Theta_L - \Theta_{NL})$. The statistic is asymptotically distributed as a $\chi^2$ variate with degrees of freedom equal to the number of parameters tested (Leslie Godfrey, 1988 Ch. 4; Andrew Lo and Whitney Newey, 1985).

the actual crime rate, we would add extra noise (residual), thus reducing the accuracy of the inference. Also, note that all the information relevant to adopting the law is incorporated in $\Theta_L$, which is estimated using counties with the law.

We summarize the predictions we obtain to make inferences about the scope of the potential influence of the law in each state that did not have a concealed-handgun law in place in 1992. The projections are then further analyzed to determine factors that influence their direction or magnitude. The effect of concealed-handgun laws, therefore, may vary with population density, racial and gender characteristics, income, and so forth.

## II. Data and Results

We use the data provided by Lott and Mustard (1997). The complete data set covers 3,054 counties for the period 1982–1992. The data set includes the FBI's crime data for murder, rape, aggravated assault, and robbery which comprise "violent crime" and auto theft, burglary, and larceny which comprise "property crime." The series also include the corresponding arrest rate for these nine crime categories,[4] population and population density, population characteristics for 36 age and race segments (black, white, and other; male and female; and age divisions), retirement payments per person over 65 years of age, and the ratio of real per capita income to personal income, unemployment insurance payments, and income maintenance payments. The data set also includes state-level data on police employment and payroll, the percentage of Republican presidential votes, and the percentage of each state's population who are members of the NRA. This is the most exhaustive panel data set available for research in this area.

Using a Wald test for all nine categories of crimes, we find that the Lott-Mustard hypoth-

esis of no change in slope coefficients is rejected strongly (with $p$ values close to zero) for all categories of crime.[5] That is, in all cases, there are significant changes in the slope coefficients, so that assuming all changes to be embedded in the intercept is incorrect. This suggests that the Lott-Mustard results are biased due to a misspecification. Similar results for the arrest equation, used in the first stage of the 2SLS estimation, indicate that the coefficients of these equations also change with the law. In fact, we incorporate these changes when obtaining the predicted arrest rates. A comparison of our predicted arrest rates to those of Lott and Mustard (1997) reveals the inaccuracy introduced by limiting the change to the intercept term. For example, depending on the crime category, the mean-square errors of Lott and Mustard's predicted arrest rates are 1.5–5.2 times larger than those of ours. Their predicted arrest rates also include a large number of negative values (i.e., out of about 33,000 observations for each crime category, over 19,000 are negative for auto theft, 9,900 for aggravated assault, and 13,500 for property crimes).[6]

We use the two-stage procedure described earlier to estimate the hypothetical effect on crime in each county in states that did not have a concealed-handgun law in place if such a law had been in effect in 1992. We examine these effects in two ways, both on a county-by-county basis. First, we examine for each crime and county the predicted effect of changing the law. Second, we examine the effect of county characteristics on predicted change in crime rates for each aggregated crime category.

Table 1 contains summary statistics derived from these county-level conditional predictions; more extensive results including estimated percentages are available from the

---

[4] The arrest series we use are slightly different than those used by Lott and Mustard (1997). As indicated in the last paragraph of their data appendix, Lott and Mustard use arrest series that erroneously contain zero's instead of some missing values. We use the corrected series.

[5] Results reported here are slightly different than those in an earlier draft, where we did not use population weights in estimation. Here the weights are included to make our specification as close to that of Lott and Mustard (1997) as possible, given the difference in the way we model the effect of the law.

[6] These large negative values may be partly due to Lott and Mustard's omission of the county fixed effects from the predicted arrest rates.

TABLE 1—THE PREDICTED EFFECT OF ADOPTING
CONCEALED-HANDGUN LAWS ON VIOLENT CRIMES
IN STATES WITHOUT SUCH LAWS IN 1992

| State | Murder | Rape | Robbery | Aggrevated assault |
|---|---|---|---|---|
| Arizona | no | + | + | + |
| Arkansas | no | − | no | − |
| Colorado | no | no | no | + |
| Illinois | − | no | mix | mix |
| Iowa | no | mix | + | mix |
| Kansas | − | − | + | + |
| Kentucky | − | mix | + | − |
| Louisiana | no | no | + | − |
| Maryland | no | no | + | mix |
| Michigan | no | no | + | no |
| Minnesota | − | no | + | mix |
| Missouri | no | mix | mix | mix |
| Nebraska | no | no | no | mix |
| Nevada | no | no | + | no |
| New Jersey | no | no | no | + |
| New Mexico | no | no | + | + |
| New York | no | no | no | mix |
| North Carolina | no | + | no | + |
| Ohio | − | mix | + | mix |
| Oklahoma | no | no | no | mix |
| South Carolina | no | + | no | no |
| Tennessee | no | mix | + | mix |
| Texas | − | − | mix | mix |
| Utah | no | no | no | + |
| Wisconsin | no | + | + | − |

*Notes:* Entries indicate the effect of such laws on crimes in 1992 for each state, had the state adopted the law by then. A + (−) indicates an unambiguous increase (decrease), "no" indicates that no county would have been affected, and "mix" indicates increases for some counties in the state and decreases for others. The states with "no" in all four categories are dropped for brevity; these include Alaska, California, Delaware, the District of Columbia, Hawaii, Massachusetts, Rhode Island, Wyoming, and Pennsylvania (Philadelphia County).

authors upon request. Our results suggest that for counties in six states a concealed-handgun law would have reduced murder rates, and for all counties in the other 27 states it would have been ineffective. Overall, the results indicate a relatively small, and crime-reducing, effect of concealed-handgun laws on murder rates. There would have been little effect on rape, with 22 states unaffected, four states with unambiguous increases, and two states with unambiguous decreases. The effect on robbery would have been an increase in crime for many states. For counties in 13 states, there would have

been unambiguous increases in robbery; there would have been a mixed effect (increases in some counties and decreases in some) in only three states. The overall increase in robbery is not surprising given that concealed handguns add little deterrence in this case. Many potential robbery targets already have armed protection; therefore, concealed firearms would not increase the deterrence factor. It would, however, have a crime-facilitating effect, helping the robbers.

For aggravated assault, 12 states would have been unaffected, seven states would have been adversely affected, and four states would have observed a drop in crime. The result for the remaining states is mixed. For the three categories of property crime, the effect would have been more mixed. The largest percentage of counties predicted to be affected in one direction by changing the law would have been the 15 percent of counties predicted to experience an increase in larceny; all other predicted percentage changes in any direction are less than 10 percent.

We next determine which characteristics of counties are associated with increases or decreases in each aggregate type of crime (violent and property crime) for counties. We do this by regressing the predicted change in crime rates as a function of a list of demographic and economic variables for the county. The economic variables, all measured per capita, are personal income, unemployment insurance, and retirement payments per person over 65. We also include (predicted) arrest rates and population density. We include demographic variables. Since most crime is committed by young males, we include the number of males 10–29 years old, and similarly for females. We include persons 65 and over, who are perhaps more likely to be victims than perpetrators of crimes.[7] Finally, we include per capita measures of number of NRA members in the state and police pay-

---

[7] Experiments with other specifications indicate that this specification provides most of the useful information in the data and is sufficiently aggregated so that the results are easily interpreted.

roll. In all cases, we measure the effect of the relevant variable on predicted changes in crime by category of the passage of a concealed-handgun law by county.

Regression results show that for counties that spend relatively more on police the laws lead to crime reductions. This is plausible: higher spending on police will not affect the deterrent benefit of handguns but will reduce the facilitating effect of handguns that benefits criminal activity. On the other hand, for counties with higher arrest rates, passage of shall-issue laws leads to increased crime, perhaps because there are more criminals in these counties. The other consistent results are for likely victims: more elderly people and more young (10–29-year-old) nonblack females are associated with reduced crime as a result of passage of gun laws. This may represent evidence of the deterrent effect in some cases. Evidence that potential criminals (generally, young males) use these laws to obtain guns and commit crimes is weak; only one of the four possible coefficients is significant and positive, and one is negative (*t* values for both black and nonblack young males are less than 0.2 in the property-crime estimate).

### III. Concluding Remarks

We have reexamined the effect of concealed-handgun laws on crime rates using a statistical procedure that overcomes the limitations of previous studies. Our procedure allows us to assess the full implications of the right-to-carry gun provisions. We find that the results of concealed-weapons laws are much smaller than suggested by Lott and Mustard (1997) and by no means negative across all crime categories. For murder, for example, there is only at best a small reducing effect. For robbery, many states experience increases in crime. For other crimes, results are ambiguous, with some counties showing predicted increases, and some predicted decreases.

We also examine demographic and other influences on the likely effect of passage of laws on crime rates. We find that there are predictable patterns on the effect of shall-issue laws on crime. For example, counties spending more on police could expect a decrease in

crime from the passage of a law or a smaller increase where the law leads to an increase in crime. The sort of analysis developed here could be used to enable policymakers to tailor laws more carefully to particular conditions in a jurisdiction. More research in this important area is warranted.

### REFERENCES

**Bartley, William; Cohen, Mark and Froeb, Luke.** ''The Effect of Concealed Weapon Laws: An Extreme Bounds Analysis.'' *Economic Inquiry*, 1998 (forthcoming).

**Black, Dan and Nagin, Daniel.** ''Do 'Right-to-Carry' Laws Deter Violent Crime?'' *Journal of Legal Studies*, January 1998, *27*(1), pp. 209–19.

**Cook, Philip J. and Ludwig, Jen.** ''Guns in America: Results of a Comprehensive National Survey on Firearms Ownership and Uses.'' Report prepared for the National Institute of Justice, Washington, DC, 1996.

**Cook, Philip; Molliconi, Stephanie and Cole, Thomas.** ''Regulating Gun Markets.'' *Journal of Criminal Law and Criminology*, Fall 1995, *86*(1), pp. 59–92.

**Davidson, Russell and MacKinnon, James G.** *Estimation and inference in econometrics*. New York: Oxford University Press, 1993.

**Ehrlich, Isaac.** ''Participation in Illegitimate Activities: A Theoretical and Empirical Investigation.'' *Journal of Political Economy*, May–June 1973, *81*(3), pp. 521–65.

**Godfrey, Leslie.** *Misspecification tests in econometrics: The Lagrange multiplier principle and other approaches*. Cambridge: Cambridge University Press, 1988.

**Hemenway, David.** ''Survey Research and Self-Defense Gun Use: An Explanation of Extreme Overestimates.'' Working paper, Harvard University, 1996.

**Kellermann, Arthur; Westohal, Lori; Fischer, Lauri and Harvard, Beverly.** ''Weapon Involvement in Home Invasion Crime.'' *Journal of the American Medical Association*, 14 June 1995, *273*(22), pp. 1759–62.

**Lo, Andrew and Newey, Whitney.** ''A Large-Sample Chow Test for the Linear Simultaneous Equation.'' *Economics Letters*, 1985, *18*(4), pp. 351–53.

**Lott, John.** ''The Concealed Handgun Debate.'' *Journal of Legal Studies*, January 1998, *27*(1), pp. 221–43.

**Lott, John and Mustard, David.** ''Crime, Deterrence, and Right-to-Carry Concealed Handguns.'' *Journal of Legal Studies*, January 1997, *26*(1), pp. 1–68.

**Ludwig, Jens.** ''Do Permissive Concealed-Carry Laws Reduce Violent Crime?'' Mimeo, Georgetown University, 1996.

**Polsby, Daniel.** ''Firearm Costs, Firearm Benefits, and the Limits of Knowledge.'' *Journal of Criminal Law and Criminology*, Fall 1995, *86*(1), pp. 207–20.



Journal of Public Economics 90 (2006) 379 391



www.elsevier.com/locate/econbase

# The social costs of gun ownership

## Philip J. Cook[a,*], Jens Ludwig[b]

[a]Duke University and NBER, United States
[b]Georgetown University and NBER, United States

Received 17 August 2004; received in revised form 18 February 2005; accepted 18 February 2005
Available online 31 May 2005

### Abstract

This paper provides new estimates of the effect of household gun prevalence on homicide rates, and infers the marginal external cost of handgun ownership. The estimates utilize a superior proxy for gun prevalence, the percentage of suicides committed with a gun, which we validate. Using county and state level panels for 20 years, we estimate the elasticity of homicide with respect to gun prevalence as between $+0.1$ and $+0.3$. All of the effect of gun prevalence is on gun homicide rates. Under certain reasonable assumptions, the average annual marginal social cost of household gun ownership is in the range $100 to $1800.
© 2005 Elsevier B.V. All rights reserved.

*Jel classifications:* H21; I18; K42
*Keywords:* Regulation; Social costs; Evaluation methods; Externalities; Gun violence

## 1. Introduction

Like many other private decisions about health and safety, such as getting vaccinated, purchasing LoJack (Ayres and Levitt, 1998), or driving a sport utility vehicle (Gayer, 2004), private gun ownership may impose externalities. Widespread gun ownership in a community could provide a general deterrent to criminal predation, lowering the risk to owners and non-owners alike. But widespread gun ownership could also lead to increased

---

\* Corresponding author.
*E-mail address:* pcook@duke.edu (P.J. Cook).

0047-2727/$ - see front matter © 2005 Elsevier B.V. All rights reserved.
doi:10.1016/j.jpubeco.2005.02.003

**DA 264**

380          *P.J. Cook, J. Ludwig / Journal of Public Economics 90 (2006) 379 391*

risks of various sorts, including the possibility that guns will be misused by the owners or transferred to dangerous people through theft or unregulated sale. Whether the social costs of gun ownership are positive or negative is arguably the most fundamental question for the regulation of firearms in the United States.

Previous research has produced conflicting conclusions. One prominent estimate for the effects of gun prevalence on homicide is by John Lott (2000), who relates state-level estimates of gun ownership rates from voter exit polls in 1988 and 1996 to state crime rates, conditioning on several socioeconomic variables in a cross-section analysis. His estimate of the elasticity of homicide with respect to state gun ownership rates is extraordinarily large, equal to $-3.3$.[1]

Mark Duggan (2001) identifies the relationship between guns and crime using over-time variation in panels of states and also counties. Duggan's elasticity estimate, $+0.2$, is of the opposite sign from Lott's and an order of magnitude smaller. There is some question about the validity of his proxy for gun prevalence, the subscription rate to *Guns and Ammo* magazine.

In this paper we follow Duggan's lead in using panel regression methods to estimate the effect of gun prevalence on homicide rates, but with a different and well-validated proxy variable. Our results suggest that the social cost of an additional household acquiring a handgun depends on the rate of violence and the existing prevalence of guns, but under a wide range of assumptions is greater than $100 per year.

## 2. FSS as a proxy for gun prevalence

Since most states lack any sort of registration or licensing system that would generate administrative data on firearms ownership, household surveys provide the only direct source of information on this matter. But survey data are not always available or reliable for sub-national units, so analysts have employed a variety of proxy variables. Two independent inquiries have recently identified one such proxy as superior to all others for the purpose of estimating the cross-section structure of gun prevalence across large geographic entities (Azrael et al., 2004; Kleck, 2004). That proxy is the fraction of suicides committed with a firearm (FSS).

Our use of FSS is primarily to estimate variation over time rather than in the cross-section. To validate this use requires consistent estimates of gun prevalence over time, preferably at a sub-national level. The "gold standard" for national surveys of gun ownership is the General Social Survey (GSS). We ran panel regressions of GSS-based estimates of gun prevalence against two proxies, FSS and the subscription rate to *Guns and Ammo*, the proxy used by Duggan (2001). The estimated coefficients of our GSS

---

[1] Lott conditions on region but not state dummies in his regressions, so his estimates will be identified primarily by cross-sectional variation in gun ownership rates (Azrael et al., 2004). A more fundamental problem is that there are serious problems with his voter exit poll data, which suggest that from 1988 to 1996 gun ownership rates increased for the U.S. as a whole from 27.4 to 37.0% (p. 36). Yet the best source of national data on gun ownership trends  the General Social Survey  indicates that individual gun ownership trends were essentially flat during this period (Kleck, 1997, pp. 98 99).

*P.J. Cook, J. Ludwig / Journal of Public Economics 90 (2006) 379 391*                    381

measures on FSS are in every case significantly positive, and are especially strong when year fixed effects are omitted, while the subscription rate to *Guns and Ammo* performs less well and in some cases yields a negative coefficient estimate.[2]

## 3. Data

The estimates presented below are based on panel data for 200 counties that had the largest population in 1990,[3] or a subset of those counties, for the period 1980 to 1999. We also present estimates based on state-level panel data. The 200 largest counties accounted for 74% of all homicides in the United States in 1990.[4]

Suicide and homicide counts are taken from Vital Statistics Program mortality data, based on reports of coroners and medical examiners and compiled by the National Center for Health Statistics. Data on robbery, burglary, and other types of crime besides homicide are from the FBI's Uniform Crime Reports.

Finally, we control for other changes over time in county socio-demographic characteristics that could affect both crime and gun prevalence. Such data are available at the county level only from the decennial Census, from which we interpolate data for the inter-Censal years. Covariates include the prevalence of blacks, households headed by a female, urban residents, and residents living in the same house 5 years ago.

## 4. Empirical strategy

The basic empirical approach here is to estimate the relationship between gun prevalence and homicide by exploiting the substantial across-area differences in trends in gun ownership over a 20-year period. Our baseline estimates are generated from model (1), which relates the natural log of jurisdiction (i)'s homicide rate (or, alternatively, the gun- or non-gun homicide rate) in year $t$ against FSS, the proxy for the jurisdiction's gun ownership rate, in year $(t - 1)$. FSS is lagged by one period out of concern for reverse causation – gun ownership may be consequence as well as cause of a county's crime rate – although the lag can also be justified for substantive reasons: the thefts and secondary-

---

[2] The GSS is conducted by the National Opinion Research Center most years from 1972 to 1993 and biennially since 1994 (Davis and Smith, 1998), and is capable of providing representative samples at the national or census region or even division level. Our panel dataset for this validation exercise is defined over the nine Census divisions and the 14 years in which GSS fielded gun questions between 1980 and 1998. In these regressions, we condition on fixed effects for Census division in all model specifications. We define "prevalence" in the GSS data for either handguns or all guns, and for either households or individuals. For additional details, see Cook and Ludwig (2004b).

[3] Kelly (2000) used this sample of counties in studying the determinants of crime rates. The 5 counties of New York City are combined in our analysis due to data limitations. Oklahoma City was dropped in 1995 due to the large homicide count associated with the bombing of the federal building there.

[4] Also of some interest is what fraction of all guns in the U.S. is found in the top 200 counties. While we cannot perform this calculation with our FSS proxy, which is not available for all counties, we find that 43% of all *Guns and Ammo* subscriptions in the U.S. are in the 200 largest counties.

market transfers that move guns from households to use by criminals will ordinarily take some time. To further control for the possibility of reverse causation, we condition on the natural log of the area's burglary and robbery rates, which are the kinds of crimes that seem likely to motivate the acquisition of a firearm for self-defense. These crime variables also are a good reflection of criminogenic factors in the community that influence homicide rates (Blumstein, 2000). To account for other county or state characteristics that affect homicide, the regression model includes year and county/state fixed effects, as well as the logs of the socio-demographic variables. The regression estimates are weighted by each county or state's population to account for heteroskedasticity in the error term.

$$\log Y_{it} = \beta_0 + \beta_1 \log FSS_{it\ 1} + \beta_2 X_{it} + d_i + d_t + \varepsilon_{it}. \tag{1}$$

Another concern is serial correlation in the error structure, given that FSS changes only slowly over time within counties and that other unmeasured determinants of county crime rates may also have jurisdiction-specific trends.[5] We address this problem by calculating Huber–White standard errors that are robust to an arbitrary autocorrelation pattern in the errors over time within counties. Bertrand et al. (2004) show that this approach works better than more parametric strategies in panels with a short time dimension.

A final concern in estimating Eq. (1) is that the proxy for gun prevalence, FSS, is subject to measurement error of two types. First, because it is only a proxy, the correlation between FSS and the "true" prevalence is presumably less than one. Judging the quality of the proxy in that sense is difficult, given that there are no error-free measures of the criterion variable. In particular, survey-based estimates are subject to sampling error and reporting error. Based on an analysis of national GSS estimates over time, the hypothesis that FSS *is* a "perfect" proxy cannot be rejected, but that is not the same thing as demonstrating that it is perfect in fact.[6]

Second, and probably more important, is that the reliability of FSS will depend on the number of suicides used to compute it. For the 21 years of data on 200 large counties, the 10th and 90th percentiles have 27 and 142 suicides respectively, with a median of 52 and a mean of 196. If the choice of weapon in suicide follows a binomial process, then a jurisdiction with 50 suicides a year would generate an observed FSS that is subject to a standard error of 7 percentage points. The effect of this measurement error will be to bias the coefficient estimate of FSS toward zero. We address this problem in a variety of ways below, including re-calculating our estimates with state-level data. While the state data have the advantage of reducing measurement error in FSS, one drawback is that county-

---

[5] Testing for the presence of serial correlation in fixed-effects models is complicated in applications where the time dimension is fairly short compared to the number of observational units. Following Solon (1984), we test for serial correlation by first-differencing the data, and then keep the residuals from a regression of the log change in homicides against the log change in FSS and year effects. A regression of these residuals against their 1-year lag yields a coefficient of   0.4, close to the value of   0.5 characteristic of an error structure that is serially uncorrelated. Additional tests indicate that serial correlation is a somewhat greater problem with the state-level data.

[6] The correlation between national household handgun prevalence and FSS over 18 waves of the GSS is 0.635, very close to the mean of a large number of correlations generated from a simulation based on the assumption that FSS is exact and the GSS estimates are unbiased but subject to normal sampling error. That mean is 0.664.

**DA 267**

*P.J. Cook, J. Ludwig / Journal of Public Economics 90 (2006) 379 391*                383

Table 1
Descriptive statistics for county data

|  | Full sample (largest 200) | Bottom quartile 1980 FSS | Top quartile 1980 FSS |
|---|---|---|---|
| *Full period (1980 1999)* | | | |
| FSS | 49.9 | 34.6 | 66.9 |
| Homicide rate | 11.0 | 10.9 | 14.4 |
| Gun homicide rate | 7.3 | 6.9 | 10.1 |
| %Urban | 92.6 | 94.7 | 91.8 |
| %Percent black | 14.0 | 13.5 | 19.5 |
| %Female household head | 18.0 | 20.1 | 18.5 |
| # Suicides | 195.8 | 192.5 | 120.0 |
| | | | |
| *FSS in selected years* | | | |
| 1980 | 48.0 | 29.2 | 73.3 |
| 1990 | 52.8 | 37.2 | 69.1 |
| 1999 | 48.0 | 34.9 | 59.8 |

Source: Mortality   National Center for Health Statistics, Vital Statistics, Mortality; Crime   Federal Bureau of Investigation, Uniform Crime Reports; Demographics   US Census Bureau, 1980, 1990 and 2000 Censuses.

level gun prevalence may be more relevant for local gun availability in the used or "secondary" gun market (Cook et al., 1995).[7]

## 5. Results

Table 1 presents descriptive statistics for the full panel assembled from annual data for the 200 largest counties for the years 1980–1999 (all calculations are weighted by county population). Over the entire sample period, the average homicide rate is 11 per 100,000 residents, with half of all suicides having been committed with a firearm.

Table 1 also provides some sense for the variation in gun ownership that identifies the panel data estimates shown below. The second and third columns of Table 1 present data for the top and bottom quartiles for our 200 counties ranked according to their gun ownership rates at the start of our panel, in 1980. The (disproportionately Southern) counties where guns are most common in 1980 experience a persistent and pronounced reduction in household gun ownership rates during the 20 years of our panel, as reflected by the nearly 20% decline in FSS over this period. At the same time, counties where guns were least common in 1980 (disproportionately in the Northeast and Midwest regions) experienced an increase in FSS of 20% from 1980 to 1999.

The source of this convergence remains something of a mystery (Azrael et al., 2004). If whatever drove this convergence between high- and low-gun ownership areas was orthogonal to the determinants of homicide trends, then a difference-in-differences

---

[7] On the other hand, a potential advantage of the state-level data comes from the possibility that people cross county lines to obtain firearms. This may not be a very severe problem, at least for youth, who account for a disproportionate share of all gun crime. When Cook and Ludwig (2004a) regress an indicator for youth gun carrying against FSS the relationship is much stronger when FSS is measured at the county than at the state level.

384          *P.J. Cook, J. Ludwig / Journal of Public Economics 90 (2006) 379 391*

estimate of the effect of FSS on homicide ($Y$) would be unbiased. In particular, expression (2) is an estimate of the elasticity of $Y$ with respect to FSS, where $\Delta$ indicates the difference between 1999 and 1980, and the subscripts $Q1$ and $Q4$ refer to "top quartile" and "bottom quartile" respectively.

$$\left(\Delta\ln Y_{Q1} - \Delta\ln Y_{Q4}\right)/\left(\Delta\ln FSS_{Q1} - \Delta\ln FSS_{Q4}\right). \tag{2}$$

The elasticity of homicide with respect to FSS estimated in this fashion is $+0.18$. A similar calculation for gun homicides yields an elasticity with respect to gun ownership rates of $+0.35$. These simple estimates turn out to be quite compatible with those derived from the panel regression analysis that uses all of the variation across counties over time.

### 5.1. Panel regression findings

The first column of Table 2 presents the results for our most parsimonious model, which includes county and year fixed effects but no other covariates. The estimated elasticity of homicide with respect to the lagged value of log FSS equals $+0.100$ ($p < 0.05$). The final three columns of Table 2 show that this point estimate is not sensitive to controlling for several sets of influential covariates.

Table 3 reports results for a number of alternative specifications, in each case for three dependent variables: the logs of the homicide rate, the gun homicide rate, and the non-gun homicide rate. If the predominant causal mechanism linking gun prevalence to homicide is that increased prevalence induces substitution of guns for other weapons in assaults, with a consequent increase in lethality, then only the gun homicide rate will increase in response to an increase in FSS. Table 3 generally supports this prediction.

The results are robust to a variety of modifications to our basic estimation approach. In the second row, additional county-level characteristics are added –percentages of resident

Table 2
Baseline results, county-level data, 1980 1999

|  | Ln(Hom) | Ln(Hom) | Ln(Hom) | Ln(Hom) |
|---|---|---|---|---|
| Ln FSS ($t$ 1) | 0.100** (0.044) | 0.107*** (0.037) | 0.085* (0.044) | 0.086** (0.038) |
| Ln Rob ($t$) |  | 0.139*** (0.043) |  | 0.149*** (0.042) |
| Ln Burg ($t$) |  | 0.258*** (0.068) |  | 0.226*** (0.072) |
| Ln percent black ($t$) |  |  | 0.233 (0.166) | 0.278* (0.164) |
| Ln %Urb ($t$) |  |  | 0.389** (0.161) | 0.537*** (0.157) |
| Ln %same house 5 years ago |  |  | 10.209*** (0.430) | 0.690 (0.419) |
| Ln %female headed house |  |  | 0.790* (0.460) | 0.303 (0.413) |
| Year fixed effects? | Yes | Yes | Yes | Yes |
| County fixed effects? | Yes | Yes | Yes | Yes |
| $R^2$ | 0.915 | 0.921 | 0.918 | 0.923 |
| $N$ | 3822 | 3822 | 3822 | 3822 |

Parentheses contain standard errors adjusted for serial correlation (see text). Estimates utilize county population as weight. Analytic sample consists of annual observations for 200 largest counties in U.S. over the period 1980 1999.
   * Significantly different from zero at the 10% level.
  ** Significantly different from zero at the 5% level.
 *** Significantly different from zero at the 1% level.

**DA 269**

*P.J. Cook, J. Ludwig / Journal of Public Economics 90 (2006) 379 391*                385

Table 3
Sensitivity analysis

|  | Ln(Homicide) | Ln(Gun Homicide) | Ln(Non-gun Homicide) |
|---|---|---|---|
| *Alternative specifications* | | | |
| Baseline model, final column, Table 2 | 0.086** (0.038) | 0.173*** (0.049) | 0.033 (0.040) |
| 2 Additional covariates (age, poverty, immigrants) | 0.086** (0.036) | 0.173*** (0.043) | 0.020 (0.040) |
| 3 Baseline model, unweighted | 0.051 (0.043) | 0.167*** (0.043) | 0.061 (0.042) |
| 4 Add census division/year fixed effects | 0.068* (0.035) | 0.162*** (0.044) | 0.047 (0.038) |
| 5 Condition on lag dependent variable | 0.061* (0.033) | 0.108** (0.046) | 0.032 (0.040) |
| *Alternative samples* | | | |
| 6 Average FSS over 2 years | 0.148** (0.059) | 0.317*** (0.089) | 0.054 (0.061) |
| 7 Limit sample to largest 100 counties | 0.131*** (0.047) | 0.207*** (0.066) | 0.026 (0.051) |
| 8 Limit sample to largest 50 counties | 0.223*** (0.076) | 0.252** (0.101) | 0.114 (0.078) |
| 9 State-level data, baseline model | 0.407*** (0.142) | 0.562*** (0.180) | 0.106 (0.130) |
| 10 State data, add division/year fixed effects | 0.335*** (0.114) | 0.534*** (0.167) | 0.066 (0.099) |
| 11 State data, condition on lag dependent variable | 0.208** (0.081) | 0.272** (0.110) | 0.103 (0.116) |

Unless otherwise noted, analytic sample consists of 200 largest counties in US using data from 1980 to 1999. Each cell in table presents the coefficient estimate and standard error for the log of FSS ($t$ 1) (except for row 6), with the robbery rate, burglary rate, indicators for missing values for robbery and burglary, and percent black as covariates. Parentheses contain standard errors adjusted for serial correlation (see text). Estimates utilize county population (rows 1 8) or state population (rows 9 11) as weights.

  \* Statistically significant at 10%.
  \*\* Statistically significant at 5%.
  \*\*\* Statistically significant at 1%.

population living in poverty, born outside of the U.S., and in different age groupings – which have almost no effect on the point estimates for FSS. Re-calculating the estimates without weighting by county population produces an elasticity estimate for homicide with respect to guns that is about two-thirds as large as the weighted estimate (row 3). We prefer the weighted estimates because they provide a heteroskedasticity correction. Finally, the results reported in rows 4 and 5 demonstrate that the results hold up quite well to the inclusion of separate year fixed effects for each of the nine Census divisions, or to inclusion of the lagged dependent variable.[8]

The second panel of Table 3 reports the results of several efforts to deal with the fact that our measure of gun prevalence, FSS, is subject to error, primarily due to the relatively small number of suicides in some counties. To increase the "sample" of suicides, we average FSS over 2 years (row 6), limit the analysis to the largest 100 or largest 50 counties (rows 7 and 8), and utilize state-level data (rows 9, 10, and 11). The results suggest that the reduction in measurement error, as expected, tends to increase the point

---

  [8] When we condition on county-specific linear trends (or state trends with the state data), the point estimates for FSS are generally about half as large as in Table 3. These estimates are statistically significant in the state data but not quite significant in the county data, with $p$-values on the order of $p \approx 0.2$.

386        *P.J. Cook, J. Ludwig / Journal of Public Economics 90 (2006) 379 391*

Table 4
Specification checks for county and state results, 1980 1999

| Outcome | 200 Largest county data | State data |
|---|---|---|
| Ln(UCR murder) | 0.073* (0.043) | 0.645*** (0.200) |
| Ln(UCR rape) | 0.012 (0.048) | 0.201 (0.382) |
| Ln(UCR aggravated asslt) | 0.040 (0.038) | 0.275 (0.168) |
| Ln(UCR larceny) | 0.004 (0.015) | 0.096 (0.074) |
| Ln(UCR MV theft) | 0.041 (0.038) | 0.046 (0.189) |
| Ln(Fatality rate from falls) | N/A | 0.058 (0.158) |
| Ln(MV crash fatality rate) | N/A | 0.081 (0.068) |

Each cell presents the coefficient and standard error (adjusted for serial correlation) for a separate regression of the outcome measure described in the first column against the log of lagged FSS, controlling for the log of the robbery and burglary rates as well as the other covariates described in the final column of Table 4. The county-level regressions condition on county and year fixed effects and weight by county population, using a sample of the 200 largest counties in the U.S.; the state-level regressions condition on year and state fixed effects, as well as weight by state population.

    * Statistically significant at 10%.
  *** Statistically significant at 1%.

estimates by a factor of from 1.5 to 3 or 4 times our baseline specification. County-level estimates that adjust for measurement error using the approach suggested by Griliches and Hausman (1986), based on a comparison of the within- and first-difference estimators, are also generally about 3 or 4 times those from the baseline model.[9]

A final way to test for the possibility of bias from unmeasured variables is to determine whether FSS predicts outcomes that logically have little relationship to gun prevalence, in the spirit of Altonji et al. (2000, 2002). Table 4 reports the results of estimating the baseline model (final column, Table 2) on rates of other types of crime from the UCR, and on the fatality rate from falls and from motor-vehicle accidents. The estimated coefficients on FSS are not significantly different from zero in any of these regressions.[10,11]

Finally, Table 5 provides suggestive evidence that gun prevalence leads to elevated rates of homicide through the transfer of guns from "legal" to "illegal" owners, rather than through increased gun misuse by otherwise legal owners. In this exercise, we

---

[9] When we recalculate our estimates with the state-level data using a weighted average of the three gun proxies that are available to us (FSS, gun prevalence from the GSS, and Guns and Ammo subscription rates, where the weights are calculated using factor analysis as in Fryer et al., 2005), the point estimates are about 1.3 times those from our baseline model.

[10] Another implication from Table 4 is that the results are not sensitive to measuring homicides using data from the UCR rather than our preferred source, the Vital Statistics. Note that Duggan (2001) also finds evidence that gun prevalence as proxied by Guns and Ammo subscription rates are not systematically related to other types of crime besides homicide.

[11] We also calculated our estimates using just the long-term variation in gun ownership rates and homicide from the early 80s to the late 90s. This long-difference approach circumvents the problem of modeling the sharp increase and fall of the homicide rate during our sample period. We estimate a long-difference model that shows the changes in log homicides (or log gun or non-gun homicides) from 1980 to 1999, regressed against the change in log FSS over the same period, conditioning the log changes in the other explanatory variables included in our baseline model. This long-difference estimator yields an elasticity of homicide with respect to gun prevalence of +.3, which is even larger when we pool data from multiple years to correct for measurement error.

**DA 271**

*P.J. Cook, J. Ludwig / Journal of Public Economics 90 (2006) 379 391*            387

Table 5
Effects of gun ownership on Youth Homicides, State Data, 1980 1999

|  | Ln(Hom 15 19) | Ln(Gun hom 15 19) | Ln(Nongun 15 19) |
|---|---|---|---|
| *State data* | | | |
| Ln(State FSS) | 0.593** (0.194) | 0.458* (0.205) | 0.053 (0.373) |

Each cell presents a coefficient and standard error (adjusted for serial correlation) from a separate regression. Each regression controls for the log of the state's burglary and robbery rate and percent black, log state alcohol consumption per capita, and year and state fixed effects. Estimates are calculated using state populations as weights.
 * Statistically significant at 10%.
** Statistically significant at 5%.

focus on homicide rates to victims 15 to 19, a relatively high percentage of whom are killed in gang- and felony-related attacks by youthful criminals—with guns that are typically obtained from the secondary market (Cook and Ludwig, 2004a). That this market is closely tied to the prevalence of gun ownership is suggested by the large coefficient on FSS.[12]

## 6. Social costs

In sum, gun prevalence is positively associated with overall homicide rates but not systematically related to assault or other types of crime. Together, these results suggest that an increase in gun prevalence causes an *intensification* of criminal violence—a shift toward greater lethality, and hence greater harm to the community. Of course, gun ownership also confers benefits to the owners and possibly other members of the household. The benefits are associated with the various private uses of guns—gun sports, collecting, protection of self and household against people and varmints. But if our estimates are correct, the net external effects appear to be negative.

The magnitude of these net external costs is suggested by the elasticity estimates of homicide with respect to FSS. The baseline model applied to county-level data yields an elasticity of +0.09 or +0.10, although our various attempts to correct for measurement error typically suggest estimates on the order of +0.3 or more. All of these have the feature that the effect on overall homicide is due to changes in gun use, with the possibility of some substitution away from other types of weapon.

These elasticity estimates with respect to FSS also serve as estimated elasticities with respect to the household prevalence of gun ownership, if FSS is proportional to prevalence. Based on cross-section data, FSS does not appear to be strictly proportional—the best-fit line between FSS and survey-based gun ownership rates is linear with a significantly negative intercept (Azrael et al., 2004). But proportionality is

---

[12] Note that all of the estimates presented here assume that the elasticity of homicide with respect to guns is constant across counties. When we test this assumption by including interactions between FSS and indicators for whether the county's value of FSS in 1980 is in the top or bottom quartile, these interactions are not statistically significant.

a defensible assumption for time-series data: a regression of national handgun prevalence rates (from GSS data) on FSS yields an intercept with a *t*-statistic of only −1. In what follows, we treat the elasticity with respect to FSS as equal to the elasticity with respect to the prevalence of gun ownership.

The positive elasticity estimates imply that an increase in the prevalence of gun ownership has positive marginal social cost. It is relevant to translate the elasticity into a ratio: the annual change in the homicide count associated with a change in the number of households with guns. That ratio is related to the elasticity by this formula:

$$\text{Ratio of changes in homicides to gun−owning households} = [e \times h \times n]/g \qquad (3)$$

where $e$=elasticity of homicide rate to prevalence of guns; $h$=homicide rate per capita; $g$=household prevalence of gun ownership; $n$=number of people per household.

This ratio is proportional to the marginal social cost of an additional gun homicide. The formula implies that the marginal social cost of acquiring a gun increases with the homicide rate. For a given homicide rate, the marginal social cost is lower for high-prevalence jurisdictions than low-prevalence—an implication of the log–log specification.

It is important to distinguish between gun types. While handguns make up only about one-third of the private inventory of guns, they account for 80% of all gun homicides and a still-higher percentage of gun robberies. Handguns are also used in most gun suicides. Hence the social costs of handgun ownership are much higher than ownership of rifles and shotguns. Unfortunately, it is difficult to distinguish between the prevalence of long-gun ownership and handgun ownership in aggregate data, since they are very highly correlated across jurisdictions. There is some divergence over time, as overall gun ownership has had a strong downward trend that is not so evident for handgun ownership. FSS is a better proxy over time for handgun ownership.

If the marginal social cost of gun prevalence is entirely attributable to handguns, then the relevant national average is about 20%. Using that value, together with a homicide rate of 10/100,000 (which is close to the average for the 200 counties), an elasticity of +0.10, and 2 people per household, then the formula indicates one additional homicide per year for every 10,000 additional handgun-owning households. In a county with 10% prevalence and a baseline homicide rate of 20, there are 4.0 additional homicides per year for every additional 10,000 handguns; if the baseline homicide rate is 5, and handgun prevalence 30%, just 0.3 homicides are engendered. If the true elasticity is closer to +0.3 instead of +0.1, then the predicted changes in homicides should be tripled.

Two additional questions relevant to calculating marginal social cost cannot be resolved satisfactorily from our results: which margin, and what geographic unit?

*6.1. Which margin?*

Most households that own one gun own several.[13] FSS is a valid proxy for the prevalence of gun ownership, but much of the "action" is at the intensive margin. With

---

[13] About three-quarters of all guns are owned by the one-third of gun-owning households that own at least four (Cook and Ludwig, 1996).

**DA 273**

respect to providing the right attribution of marginal social cost, it is important to determine whether the acquisition of the nth gun by a gun-owning household has the same cost on average as the acquisition of the first gun. Of course it is only the latter acquisition that will change prevalence.

## 6.2. What geographic unit?

While our focus has been on county-level ownership, we note that guns often travel across county lines. For that reason, household gun ownership in nearby counties may affect gun availability to local criminals. If true, then "gun prevalence in nearby counties" is a variable that belongs in the homicide regressions, since it is substantively relevant and quite possibly correlated with within-county prevalence. We experimented with specifications that included rest-of-state FSS in addition to the usual within-county FSS, but the results were not very sensible. At this point, it is necessary to be guided by other sorts of evidence regarding the importance of diffuse sources of guns outside of the immediate county. If there are few frictions in the flow of guns to criminals within a state, then our state-level estimates are a better basis for imputing the social costs than the county-level estimates.

Translated into the policy domain, the answers to these questions should influence the nature of regulation adopted in response to the cost argument, and also the geographic scope of the regulatory system. If the number of households with guns, as opposed to the number of guns, is the main concern, then a licensing system may be the preferred form of regulation.[14]

What would be the optimal license fee per household? Answering this question requires monetizing the social costs of the additional homicides that appear to be generated by widespread gun prevalence. One possibility would be to assign each homicide the value per statistical life that has been estimated in previous research, a range of $3 to $9 million (Viscusi, 1998), which come primarily from studies of workplace wage-risk tradeoffs. But even the lower end of this range may overstate the dollar value required to compensate the average homicide victim for a relatively higher risk of death, given that (as noted above) such a large proportion of homicide victims are engaged in criminal activity that entails a high risk of death. For example, a study of the wage premium paid to gang members engaged in selling drugs suggests a value per statistical life on the order of $8000 to $127,000 (Levitt and Venkatesh, 2000).

Suppose that given local conditions with respect to violence and gun ownership, we estimate a ratio of 10,000 handgun-owning households per annual homicide (approximately what holds at the national average for gun prevalence and homicide with an elasticity of homicide to gun prevalence of +0.1) Given a conservative value of life, $1 million, then the appropriate license fee for a household would be $100 per year. That license fee would increase with the homicide rate, and in some jurisdictions, such as Washington, DC, would become so high that as to be the practical equivalent of a ban on ownership (a ban on handgun acquisition is currently in place in Washington, Chicago, and some other cities). Of course, this calculation ignores the problem of compliance.

---

[14] If it is the number of guns that matters, as opposed to the number of households, then an annual tax per gun could be assessed. But our estimates are not directly relevant to estimating the appropriate fee in that case.

390          *P.J. Cook, J. Ludwig / Journal of Public Economics 90 (2006) 379 391*

This calculation will understate the optimal license fee per gun-owning household if our assumption about the average value per statistical life for homicide victims is too low, or if, as seems likely, gun violence imposes costs on society that are not well captured by any study of the value per statistical life.

Contingent valuation estimates intended to capture the complete social costs of gun violence indicate a value of around $1 million per assault-related gunshot injury (Cook and Ludwig, 2000; Ludwig and Cook, 2001). On average one in six assault-related gunshot injuries results in death (Cook, 1985; Cook and Ludwig, 2000). Under the assumption that this case-fatality rate is stable across time and space, then at the national averages for gun prevalence and homicide our baseline estimate of a guns/homicide elasticity of +0.10 implies that each additional 10,000 gun-owning households leads to around 6 additional crime-related gunshot injuries. If these contingent valuation estimates are approximately correct, the optimal license fee per gun-owning household would be on the order of $600. If the true elasticity of homicide with respect to gun prevalence is on the order of +0.30 rather than +0.10, as suggested by some of our estimates that are based on modifications intended to reduce measurement error, the optimal license fee may be as high as $1800 per household.[15]

## Acknowledgements

The research reported here was supported by a grant from the Joyce Foundation, and was conducted in part while the authors were residents at the Rockefeller Foundation's Bellagio Study and Conference Center. Thanks to Mark Duggan for sharing his data on gun magazine subscriptions, to Bob Malme, Dmitri Mirovitski, Joe Peters and Eric Younger for excellent research assistance, and to seminar participants at the NBER Health Spring 2004 meetings, and to David Hemenway, for helpful comments. All opinions and any errors are our own.

## References

Altonji, J.G., Elder, T.E., Taber, C.R., 2000. Selection on observed and unobserved variables: assessing the effectiveness of catholic schools. NBER Working Paper, vol. 7831. National Bureau of Economic Research, Cambridge, MA.

Altonji, J.G., Elder, T.E., Taber, C.R., 2002. An evaluation of instrumental variable strategies for estimating the effects of Catholic schools. NBER Working Paper, vol. 9358. National Bureau of Economic Research, Cambridge, MA.

Ayres, I., Levitt, S., 1998. Measuring positive externalities from unobservable victim precaution: an empirical analysis of LoJack. Quarterly Journal of Economics 113 (1), 43 77.

Azrael, D., Cook, P.J., Miller, M., 2004. State and local prevalence of firearms ownership: measurement, structure and trends. Journal of Quantitative Criminology 20 (1), 43 62.

---

[15] Note that all of these calculations ignore any additional costs that may arise from increased gun prevalence in the form of additional gun accidents or suicides (for estimates of the relationship between gun prevalence and suicide, see Duggan, 2003).

*P.J. Cook, J. Ludwig / Journal of Public Economics 90 (2006) 379 391*                    391

Bertrand, M., Duflo, E., Mullainathan, S., 2004. How much should we trust differences-in-differences? Quarterly Journal of Economics 119 (1), 249 275.

Blumstein, A., 2000. Disaggregating the violence trends. In: Blumstein, A., Wallman, J. (Eds.), The Crime Drop in America. Cambridge University Press, New York, pp. 13 44.

Cook, P.J., 1985. The case of the missing victims: gunshot woundings in the National Crime Victimization Survey. Journal of Quantitative Criminology 1 (1), 91 102.

Cook, P.J., Ludwig, J., 1996. Guns in America: Results of A Comprehensive Survey of Gun Ownership and Use. Police Foundation, Washington, DC.

Cook, P.J., Ludwig, J., 2000. Gun Violence: The Real Costs. Oxford University Press, New York.

Cook, P.J., Ludwig, J., 2004a. Does gun prevalence affect teen gun carrying after all? Criminology 42 (1), 27 54.

Cook, P.J., Ludwig, J., 2004b. The social costs of gun ownership. NBER Working Paper, vol. 10736. National Bureau of Economic Research, Cambridge, MA.

Cook, P.J., Molliconi, S., Cole, T.B., 1995. Regulating gun markets. Journal of Criminal Law and Criminology 86 (1), 59 92.

Davis, J.A., Smith, T.W., 1998. General social surveys, 1972 1998 (machine-readable data file)/Principal Investigator J.A. Davis; Director and Co-Principal Investigator, T.W. Smith; Sponsored by National Science Foundation NORC ed. National Opinion Research Center, Chicago (producer); The Roper Center for Public Opinion Research, University of Connecticut, Storrs, CT (distributor).

Duggan, M., 2001. More guns, more crime. Journal of Political Economy 109 (5), 1086 1114.

Duggan, M., 2003. Guns and suicide. In: Ludwig, J., Cook, P.J. (Eds.), Evaluating Gun Policy. Brookings Institution Press, Washington, DC, pp. 41 73.

Fryer, R., Heaton, P.S., Levitt, S.D., Murphy, K.M., 2005. Measuring the impact of crack cocaine. Working paper, Department of Economics, University of Chicago.

Gayer, T., 2004. The fatality risks of sport-utility vehicles, vans and pickup trucks relative to cars. Journal of Risk and Uncertainty 28 (2), 103 133. Errors in variables in panel data. Journal of Econometrics 31, 93 118.

Griliches, Z., Hausman, J., 1986. Errors in variables in panel data. Journal of Econometrics 31, 93 118.

Kelly, M., 2000. Inequality and crime. Review of Economics and Statistics 82 (4), 530 539.

Kleck, G., 1997. Targeting Guns: Firearms and Their Control. Aldine de Gruyter, New York.

Kleck, G., 2004. Measures of gun ownership levels for macro-level crime and violence research. Journal of Research in Crime and Delinquency 41 (1), 3 36.

Levitt, S., Venkatesh, S., 2000. An economic analysis of a drug-selling gang's finances. Quarterly Journal of Economics 115, 755 789.

Lott, J.R., 2000. More Guns, Less Crime, 2nd ed. University of Chicago Press, Chicago.

Ludwig, J., Cook, P.J., 2001. The benefits of reducing gun violence: evidence from contingent-valuation survey data. Journal of Risk and Uncertainty 22 (3), 207 226.

Solon, G., 1984. Estimating autocorrelations in fixed-effects models. National Bureau of Economic Research Working Paper, No. 32. National Bureau of Economic Research, Cambridge, MA.

Viscusi, W.K., 1998. Rational Risk Policy. Oxford University Press, New York.

# Investigating the Link Between Gun Possession and Gun Assault

| Charles C. Branas, PhD, Therese S. Richmond, PhD, CRNP, Dennis P. Culhane, PhD, Thomas R. Ten Have, PhD, MPH, and Douglas J. Wiebe, PhD

Among a long list of issues facing the American public, guns are third only to gay marriage and abortion in terms of people who report that they are "not willing to listen to the other side." In concert with this cultural rift, scholarly discussion over guns has been similarly contentious.[1] Although scholars and the public agree that the roughly 100 000 shootings each year in the United States are a clear threat to health, uncertainty remains as to whether civilians armed with guns are, on average, protecting or endangering themselves from such shootings.[2–4]

Several case control studies have explored the relationship between homicide and having a gun in the home,[5,6] purchasing a gun,[7,8] or owning a gun.[9] These prior studies were not designed to determine the risk or protection that possession of a gun might create for an individual at the time of a shooting and have only considered fatal outcomes. This led a recent National Research Council committee to conclude that, although the observed associations in these case control studies may be of interest, they do little to reveal the impact of guns on homicide or the utility of guns for self defense.[3,10]

However, the recent National Research Council committee also concluded that additional individual level studies of the association between gun ownership and violence were the most important priority for the future.[3] With this in mind, we conducted a population based case control study in Philadelphia, Pennsylvania, to investigate the relationship between being injured with a gun in an assault and an individual's possession of a gun at the time. We included both fatal and nonfatal outcomes and accounted for a variety of individual and situational confounders also measured at the time of assault.

## METHODS

We applied a case control study design to determine the association between being injured with a gun in an assault and an individual's possession of a gun at the time. To determine this in the most generalizable way, we chose our target population to be residents

*Objectives.* We investigated the possible relationship between being shot in an assault and possession of a gun at the time.

*Methods.* We enrolled 677 case participants that had been shot in an assault and 684 population-based control participants within Philadelphia, PA, from 2003 to 2006. We adjusted odds ratios for confounding variables.

*Results.* After adjustment, individuals in possession of a gun were 4.46 ($P<.05$) times more likely to be shot in an assault than those not in possession. Among gun assaults where the victim had at least some chance to resist, this adjusted odds ratio increased to 5.45 ($P<.05$).

*Conclusions.* On average, guns did not protect those who possessed them from being shot in an assault. Although successful defensive gun uses occur each year, the probability of success may be low for civilian gun users in urban areas. Such users should reconsider their possession of guns or, at least, understand that regular possession necessitates careful safety countermeasures. (*Am J Public Health.* 2009;99:2034–2040. doi:10.2105/AJPH.2008.143099)

of Philadelphia prompting the use of population based control participants. We considered trial, cohort, and matched cohort designs but for various reasons (ethical considerations, prohibitively long implementation time, limited generalizability, and so on.) these were not pursued.

We assumed that the resident population of Philadelphia risked being shot in an assault at any location and at any time of day or night. This is an acceptable assumption because guns are mobile, potentially concealable items and the bullets they fire can pass through obstacles and travel long distances.[11–14] Any member of the general population has the potential to be exposed to guns and the bullets they discharge regardless of where they are or what they are doing. As such, we reasonably chose not to exclude participants as immune from hypothetically becoming cases because they were, for instance, asleep at home during the night or at work in an office building during the day. Instead we measured and controlled for time based situational characteristics that might have changed, but did not eliminate, the possibility of being shot in an assault.

### Participant Identification and Matching

Gunshot assault cases caused by powder charge firearms were identified as they occurred, from October 15, 2003, to April 16,

2006. The final 6 months of this period were limited to only fatal cases. We excluded self inflicted, unintentional, and police related shootings (an officer shooting someone or being shot), and gun injuries of undetermined intent. We excluded individuals younger than 21 years because it was not legal for them to possess a firearm in Philadelphia and, as such, the relationship we sought to investigate was functionally different enough to prompt separate study of this age group. We excluded individuals who were not residents of Philadelphia as they were outside our target population and individuals not described as Black or White as they were involved in a very small percentage of shootings (<2%). Even after these exclusions, the study only needed a subset of the remaining shootings to test its hypotheses. A random number was thus assigned to these remaining shootings, as they presented, to enroll a representative one third of them.

Data coordinators at the Philadelphia Police Department identified and enrolled new shooting case participants as they occurred by reviewing an electronic incident tracking system and interviewing police officers, detectives, and medical examiners. Basic data for eligible case participants were wirelessly sent to the University of Pennsylvania where study leaders forwarded them to a survey research firm for recruitment of a matched control participant.

| RESEARCH AND PRACTICE |

More detailed information for each enrolled case was later filled in with additional data from state and local police, medical examiner, emergency medical services, and hospital data sources.[15]

We pair matched case participants to control participants on the date and time (within 30 minute intervals; i.e., 10:30 PM, 11:00 PM) of each shooting. This was done because the factors we planned to analyze, including gun possession, were often short lived making the time of the shooting most etiologically relevant.[16] This also helped to control for a great many unmeasurable confounders related to time. We also matched our control participants to case participants on the basis of age group (aged 21 24 years, 25 39 years, 40 64 years, and 65 years and older), gender, and race (Black or White). We pair matched on these variables to avoid extremely sparse data in certain subgroups given a priori knowledge that exceedingly different age, race, and gender distributions existed among assaultive shootings relative to the general population of Philadelphia.[17] We did not pair match case participants and control participants on location. On the basis of early power calculations, we matched 1 control participant to each shooting case.

Control participants were in Philadelphia at the time their matched case was shot. The median number of days between the time a shooting occurred and the time a control participant interview was completed was 2 days. More than three quarters of all control participant interviews were completed within 4 days of their matched shooting. Control participants were interviewed as rapidly as possible to minimize recall bias.

Control participants were sampled from all of Philadelphia via random digit dialing.[10,18] In the interest of time, multiple interviewers may have simultaneously begun and then completed control participant interviews. This resulted in 7 case participants that had more than 1 control participant. These few additional control participants were retained in final analyses. We also tested for the possibility of unequal sampling by using an inverse probability of selection weight defined as the number of eligible control participants divided by the number of phone lines in a household. These weighted models generated only very small differences (<5%) in our results.

We took several steps to maximize participation and avoid selection biases caused by nonresponse.[15,10,19–21] According to standard formulae, the cooperation rate for our control participant survey was calculated to be 74.4% and the response rate 56.0%.[22] These rates exceeded those of other surveys conducted at about the same time[23] and were high enough to produce a reasonably representative sample of our target population.[24,25] Our control participants were statistically similar to the general population of Philadelphia in terms of marital status, retirement, education, general health status, and smoking status within the age, gender, and race categories specified earlier.[26] Our control participants were, however, significantly more unemployed than the general population.

## Conceptual Framework and Variables

We conceptually separated confounding variables in the association between victim gun possession and gun assault into individual and situational characteristics, both of which feed the eventual victim offender interaction that results in gun assault (Figure 1).[27–29]

Case subsets included fatal gun assaults and gun assaults in which the victim had at least some chance to resist the threat posed by an offender, based on circumstance data and written accounts from police, paramedics, and medical examiners. Case participants with at least some chance to resist were typically either 2 sided, mutual combat situations precipitated by a prior argument or 1 sided attacks where a victim was face to face with an offender who had targeted him or her for money, drugs, or property. Case participants with at least some chance to resist were in contrast to those that happened very suddenly, involved substantial distances, had no face to face contact, and had physical barriers between victim and shooter (e.g., an otherwise uninvolved victim shot in his living room from a gun fired during a fight down the street).[30–33] Each case's chance to resist status was assigned after being independently rated by 2 individuals (initial $\kappa$=0.64 indicating substantial agreement[34]) who then reconciled differential ratings.

For case participants, gun possession at the time of the shooting was determined by police observations at crime scenes and police interviews with victims and witnesses, as well as confiscation and recovery of guns by police investigators. We coded case participants as in possession if 1 or more guns were determined to have been with them and readily available at the time of the shooting. We coded control participants as in possession if they reported any guns in a holster they were wearing, in a pocket or waistband, in a nearby vehicle, or in another place, quickly available and ready to fire at the time of their matched case's shooting. We determined gun possession status for 96.8% of case participants and 99.6% of control participants. We imputed missing data by using multiple imputation by chained equations.[35,36]

We collected participants' locations as street intersection or blockface points. We collected environmental factors as centroid and population weighted centroid points of blocks, block groups, and tracts.[37] We assigned study participants cumulative, inverse distance weighted measures of each environmental factor on the basis of the points where they were located and the point locations and magnitudes of the factors surrounding them. The higher the measure, the greater the clustering and magnitude of factors around a participant's location.[15,38]



**FIGURE 1—Conceptual framework showing the relationships between victim gun possession, gun assault, and other important characteristics.**

**DA 278**

| RESEARCH AND PRACTICE |

## Statistical Analyses

We modeled gun possession as the focal independent variable with the outcome of gun assault and other confounding variables by using conditional logistic regression.[39] We excluded excessively collinear confounders to keep variance inflation factors less than 10.[40]

We adjusted all regression models for yearly age (to control for residual variability within age groups that remained after matching[17]) and numerous other potential individual and situational confounders based on previous work and theory (Table 1).[5–8,27,32,33,41–48] We defined workers at high probability of being assaulted based on their profession (e.g., their job involved handling of cash) as being at high risk.[46] We

calculated reduced regression models with confounders that, when added to the model of gun possession and yearly age, changed the matched odds ratio by more than 15%.[49,50] We also calculated full regression models with all confounders that were not excessively collinear regardless of how much they changed the matched odds ratio. Robust sandwich estimators of variance were specified.[51] Regression model residuals were not statistically significant for spatial autocorrelation.[52,53]

We performed sensitivity analyses to assess the potential impact of misclassification bias on our analyses of gun possession and gun assault. To do this we purposely miscoded the gun possession status of case participants and

control participants by specifying that a randomly selected 1%, 3%, 5%, and 10% of them had their guns go undetected and then reran our regression models to determine the effect on our original odds ratio. We repeated this procedure 100 times for each percentage combination of miscoded case participants and control participants and averaged the results to produce a mean biased odds ratio and standard error. The 2 misclassification biases upon which we most concentrated were case participants without guns recoded to having guns (e.g., to test the bias of a shooting victim or others on scene disposing of their guns before police arrived) and control participants without guns recoded to having guns (e.g., to

**TABLE 1—Comparison of Case and Control Participants, by Situational and Individual Characteristics: Philadelphia, PA, 2003–2006**

| | All Gun Assaults | | Fatal Gun Assaults | | Gun Assaults Where Victim Had at Least Some Chance to Resist | |
|---|---|---|---|---|---|---|
| | Case Participants (n 677) | Control Participants (n 684) | Case Participants (n 163) | Control Participants (n 166) | Case Participants (n 446) | Control Participants (n 451) |
| **Situational characteristics** | | | | | | |
| Gun possession, % | 5.92 | 7.16 | 8.80 | 7.85 | 8.28 | 7.37 |
| Alcohol involvement, % | 26.34 | 13.82** | 24.55 | 14.20** | 28.94 | 13.58** |
| Illicit drug involvement, % | 11.27 | 7.51** | 23.38 | 4.75** | 9.00 | 8.85 |
| Being outdoors, % | 83.13 | 9.05** | 70.77 | 9.24** | 82.21 | 9.65** |
| Other persons present, mean no. | 3.12 | 2.91 | 3.29 | 2.90 | 3.36 | 2.95 |
| Surrounding area | | | | | | |
| Blacks, mean 1000 persons per mile | 26.04 | 20.19** | 24.44 | 20.62** | 25.81 | 19.56** |
| Hispanics, mean 1000 persons per mile | 4.50 | 2.68** | 4.21 | 2.89* | 4.65 | 2.68** |
| Unemployment, mean 1000 persons per mile | 2.44 | 1.98** | 2.29 | 2.02** | 2.43 | 1.96** |
| Income, mean million dollars per mile | 594.90 | 652.79** | 577.11 | 632.32 | 586.65 | 660.26** |
| Alcohol outlets, mean no. per mile | 79.87 | 82.12 | 73.05 | 82.42 | 78.48 | 84.28 |
| Illicit drug trafficking, mean arrests per mile | 953.21 | 563.60** | 809.94 | 634.19* | 958.58 | 551.69** |
| **Individual characteristics** | | | | | | |
| Age, mean, y | 30.56 | 32.65** | 31.99 | 34.12** | 30.88 | 32.84** |
| Black, % | 87.89 | 87.87 | 87.69 | 87.31 | 85.56 | 85.31 |
| Male, % | 91.88 | 91.67 | 91.38 | 91.54 | 94.40 | 94.25 |
| Hispanic, % | 7.15 | 3.51** | 7.63 | 4.23 | 8.12 | 3.82** |
| Occupation | | | | | | |
| Professional, % | 33.00 | 29.93 | 28.68 | 30.82 | 34.70 | 30.43 |
| Working class, % | 31.34 | 46.70 | 30.77 | 41.39 | 30.49 | 46.40 |
| Not working, % | 35.66 | 23.38 | 40.55 | 27.79 | 34.81 | 23.17 |
| High risk occupation (those handling cash), % | 24.34 | 11.40** | 13.78 | 10.45 | 27.21 | 10.99** |
| Education, mean y | 11.59 | 12.73** | 11.66 | 12.68** | 11.59 | 12.76** |
| Prior arrests, % | 53.12 | 37.06** | 54.58 | 35.95** | 52.80 | 37.17** |

*$P \leq .05$; **$P \leq .01$.

test the bias of having been in possession of a gun but not admitting it to an interviewer). The levels of misclassification we tested were based on prior work[54–56] and our own data that indicated less than 1% of our control participants were not "very sure" of their gun possession status. Statistical tests were 2 tailed and significance was indicated by *P* values less than .05 throughout our analyses.

## RESULTS

Over the study period, our research team was notified of 3485 shootings of all types occurring in Philadelphia. This translated into an average of 4.77 (standard deviation [SD]=2.82) shootings per day, with a maximum of 21 shootings in a single day and an average of 9 days a year that were free from shootings. From among all these shootings, 3202 (91.88%) were assaults, 167 were self inflicted (4.79%), 60 were unintentional (1.72%), 54 were legal interventions (1.55%), and 2 were of undetermined intent (0.06%). When we considered only assaults, an average of 4.39 (SD=2.70) individuals were shot per day in Philadelphia with a maximum of 20 in a single day and an average of 13 days a year in which no individuals were shot.

From among all 3202 individuals who had been shot in an assault, we excluded those aged younger than 21 years or of unknown age (29.83%), non Philadelphia residents (4.34%), individuals not described as being Black or White (1.62%), and police officers that had been shot (0.09%). From the remaining group of 2073 participants, we randomly selected and enrolled 677 individuals (32.66%). We also concurrently identified and enrolled an age , race , and gender matched group of 684 control participants.

Case participants and control participants showed no statistically significant differences in age group, race, and gender distributions, or in the times of day, days of the week, and months of the year when their data were collected. Case participants and control participants were thus successfully matched on age category, race, gender, and time.

However, compared with control participants, shooting case participants were significantly more often Hispanic, more frequently working in high risk occupations[1,2], less educated, and

had a greater frequency of prior arrest. At the time of shooting, case participants were also significantly more often involved with alcohol and drugs, outdoors, and closer to areas where more Blacks, Hispanics, and unemployed individuals resided. Case participants were also more likely to be located in areas with less income and more illicit drug trafficking (Table 1).

## Association Between Gun Possession and Gun Assault

After we adjusted for confounding factors, individuals who were in possession of a gun were 4.46 (95% confidence interval [CI]=1.16, 17.04) times more likely to be shot in an assault than those not in possession. Individuals who were in possession of a gun were also 4.23 (95% CI=1.19, 15.13) times more likely to be fatally shot in an assault. In assaults where the victim had at least some chance to resist, individuals who were in possession of a gun were 5.45 (95% CI=1.01, 29.92) times more likely to be shot.

When we only considered independent variables that most strongly affected our models, smaller but correspondingly significant adjusted odds ratios were noted. In these reduced models, individuals who were in possession of a gun were 2.55 (95% CI=1.00, 6.58) times more likely to be shot in an assault than those not in possession. Individuals who were in possession of a gun were also 3.54 (95% CI=1.18, 10.58) times more likely to be fatally shot in an assault. In assaults where the victim had at least some chance to resist, individuals who were in possession of a gun were 2.92 (95% CI=1.01, 8.42) times more likely to be shot (Table 2 ).

Sensitivity analyses produced no odds ratio estimates less than 1.00. If we assumed that both case participants and control participants had 5% of their guns go undetected, the observed odds ratio of 4.46 (significant) would have been reduced to 2.23 (nonsignificant). Similarly, among gun assaults where the victim had a reasonable chance to resist, 5% under detection of guns among both case participants and control participants would have reduced the observed odds ratio of 5.45 (significant) to 3.12 (nonsignificant; Table 3).

## DISCUSSION

After we adjusted for numerous confounding factors, gun possession by urban adults was associated with a significantly increased risk of being shot in an assault. On average, guns did not seem to protect those who possessed them from being shot in an assault. Although successful defensive gun uses can and do occur,[33,57] the findings of this study do not support the perception that such successes are likely.

A few plausible mechanisms can be posited by which possession of a gun increases an individual's risk of gun assault. A gun may falsely empower its possessor to overreact, instigating and losing otherwise tractable conflicts with similarly armed persons. Along the same lines, individuals who are in possession of a gun may increase their risk of gun assault by entering dangerous environments that they would have normally avoided.[58–60] Alternatively, an individual may bring a gun to an otherwise gun free conflict only to have that gun wrested away and turned on them.

**TABLE 2—Regression Results Showing the Association Between Gun Possession and Gun Assault: Philadelphia, PA, 2003–2006**

| | Total Participants (Cases and Controls), No. | Full Models, AOR (95% CI) | Reduced Models, AOR (95% CI) |
|---|---|---|---|
| All gun assaults | 1361 | 4.46 (1.16, 17.04)* | 2.55 (1.00, 6.58)* |
| Fatal gun assaults | 329 | 4.23 (1.19, 15.13)* | 3.54 (1.18, 10.58)* |
| Gun assaults where victim had at least some chance to resist | 897 | 5.45 (1.01, 29.92)* | 2.92 (1.01, 8.42)* |

*Notes.* AOR   adjusted odds ratio; CI   confidence interval. The full models adjusted for all characteristics listed in Table 1; reduced models adjusted for age, illicit drug involvement, being outdoors, and unemployment.
*$P \leq .05$.

TABLE 3—Sensitivity Analyses Showing the Effects of Simulated Misclassification Because of Undetected Gun Possession: Philadelphia, PA, 2003–2006

| % of Control Participants Without Guns Randomly Recoded to Having Guns[a] | % of Case Participants Without Guns Randomly Recoded to Having Guns[b] | | | | |
|---|---|---|---|---|---|
| | 0% | 1% | 3% | 5% | 10% |
| All gun assaults | | | | | |
| 0% | 4.46* | 4.80* | 5.45* | 6.22* | 8.25** |
| 1% | 3.66 | 3.83 | 4.51* | 5.07* | 6.91** |
| 3% | 2.49 | 2.69 | 3.11 | 3.51 | 4.81* |
| 5% | 1.86 | 2.01 | 2.37 | 2.23 | 3.07* |
| 10% | 1.03 | 1.14 | 1.32 | 1.26 | 1.78 |
| Fatal gun assaults | | | | | |
| 0% | 4.23* | 4.76* | 5.48* | 6.30* | 8.36** |
| 1% | 3.62 | 3.87* | 4.44* | 5.28* | 7.21* |
| 3% | 2.52 | 2.85 | 3.35 | 3.84 | 4.45* |
| 5% | 1.89 | 2.29 | 2.54 | 2.87 | 4.01 |
| 10% | 1.03 | 1.31 | 1.53 | 1.74 | 2.31 |
| Gun assaults where victim had at least some chance to resist | | | | | |
| 0% | 5.45* | 4.78* | 5.66* | 6.27* | 8.34** |
| 1% | 3.59 | 4.75 | 5.48 | 6.24* | 8.73* |
| 3% | 2.46 | 3.25 | 3.82 | 4.34 | 6.00* |
| 5% | 1.86 | 2.53 | 2.80 | 3.12 | 4.36 |
| 10% | 1.03 | 1.42 | 1.66 | 1.83 | 2.48 |

[a]For instance, to compensate for control participants who failed to disclose their gun possession.
[b]For instance, to compensate for case participants who discarded their guns after they were shot.
*P ≤ .05; **P ≤ .01; base adjusted odds ratio is adjusted odds ratios from full models with 0% of case and 0% of control participants recoded.

Situations in which the victim had at least some chance to resist may have generated gun assault risks when one considers that many of these events were 2 sided situations in which both parties were ready and mutually willing to fight on the basis of a prior argument.[29,30] Because both victim and offender had some sense of each other's capabilities prior to the event they may have had more time to prepare for their ensuing conflict.[61] More preparation may have increased the likelihood that both individuals were armed with guns and that at least 1 or both were shot.

Although less prevalent, 1 sided situations in which a victim had at least some chance to resist an unprovoked attack may have also generated gun assault risks for victims who possessed guns.[29] In these situations, victim and offender were often interacting for the first time and the element of surprise afforded the offender likely limited the victim's ability to quickly produce a gun and defuse or dominate their advantaged opponent. If the victim did produce a gun, doing so may have simply exacerbated an already volatile situation and gotten them shot in the process.

In contrast, when victims had little to no chance to resist, they were almost always confronted with events that happened very suddenly, involved substantial distances, had no face to face contact, and had physical barriers between them and the shooter (e.g., bystander or drive by shootings). These victims likely had no meaningful opportunity to use a gun even if they had one in their possession.

### Prior Case–Control Studies

We endeavored to improve upon prior case control studies that have explored the relationship between homicide and exposure to guns.[5–9] Although gun homicides are important to prevent, the ability to produce a more general conclusion about the risk of gun assault, not simply the risk of being murdered with a gun,

was of greater importance to public health and safety. This prompted us to enroll all shootings, regardless of their survival, as one improvement to our case control study.

A second improvement was our use of an incidence density sampling framework to select control participants. This allowed us to make a judgment about the risk associated with gun possession proximal to the shooting event itself. Prior case control work has involved less proximal gun exposure measures owning,[9] purchasing,[7,8] or having a gun in the home.[5,6] These measures leave open to question the actual risk that a gun may pose for an individual concurrent with the time they were shot. That is, someone may have a gun in their home, may have purchased a gun, or may own a gun, but without knowledge of whether that gun was in their possession at the time they were shot, the possibility that they have been misclassified as being exposed to a gun when in fact they were not is a potential bias.[43,62,63] This bias erodes the ability to speculate on plausible causal mechanisms other than to say that general access to a gun, over some amount of space or time, is a risk factor.

Finally, as this was a case control study, we had the advantage of being able to statistically adjust for numerous confounders of the relationship between gun possession and gun assault. These confounders included important individual level factors that did not change with time such as having a high risk occupation, limited education, or an arrest record. Other confounders that we included were situational factors that could have influenced the relationship under study: substance abuse, being outside, having others present, and being in neighborhood surroundings that were impoverished or busy with illicit drug trafficking. Although these situational confounders were potentially short lived (e.g., a participant may have metabolized the drugs or alcohol they consumed, moved to another location, or left the company of others) this was less important given the incidence density sampling and the fact that case and control participants were essentially matched on time.

### Study Limitations

A number of study limitations deserve discussion. Our control population was more unemployed than the target population of

Philadelphians that it was to intended to rep resent. Although we did account for employ ment status in our regression models and our control population was found to be represen tative of Philadelphians for 5 other indicators, having a preponderance of unemployment among our control participants may mildly erode our study's generalizability. It is also worth noting that our findings are possibly not generalizable to nonurban areas whose gun injury risks can be significantly different than those of urban centers like Philadelphia.[64]

Certain other variables that may have con founded the association between gun posses sion and assault were also beyond the scope of our data collection system and, therefore, were not included in our analyses. For instance, any prior or regular training with guns was a potentially important confounding variable that we did not measure and whose inclusion could have affected our findings (although the inclusion of other confounding variables pos sibly related to training may account for some of this unmeasured confounding).

We also did not account for the potential of reverse causation between gun possession and gun assault. Although our long list of con founders may have served to reduce some of the problems posed by reverse causation,[65] future case control studies of guns and assault should consider instrumental variables tech niques to explore the effects of reverse causation. It is worth noting, however, that the probability of success with these techniques is low.[66]

Finally, our results could have been affected by misclassification of gun possession status. Because of prior discussion[63] and likely levels of misclassification,[54–56] we concentrated on undetected gun possession. The ensuing sensi tivity analyses demonstrated odds ratio estimates that increased and decreased in statistical signif icance but that did not drop below 1.00, even when challenged with high levels of misclassifi cation. Thus, even after simulating high levels of misclassification bias, a net protective effect of gun possession was not evident.

## Conclusions

On average, guns did not protect those who possessed them from being shot in an assault. Although successful defensive gun uses are possible and do occur each year,[33,57] the probability of success may be low for civilian gun users in urban areas. Such users should rethink their possession of guns or, at least, understand that regular possession necessitates careful safety countermeasures. Suggestions to the contrary, especially for urban residents who may see gun possession as a surefire defense against a dan gerous environment,[61,67] should be discussed and thoughtfully reconsidered. ∎

**About the Authors**

*Charles C. Branas and Douglas J. Wiebe are with the Department of Biostatistics and Epidemiology, Firearm and Injury Center at Penn, University of Pennsylvania School of Medicine, Philadelphia. Therese S. Richmond is with the Division of Biobehavioral and Health Sciences, Firearm and Injury Center at Penn, and University of Pennsylvania School of Nursing, Philadelphia. Dennis P. Culhane is with the Cartographic Modeling Laboratory, University of Pennsylvania School of Social Policy and Practice, Phila delphia. Thomas R. Ten Have is with the Department of Biostatistics and Epidemiology, University of Pennsylvania School of Medicine, Philadelphia.*

*Correspondence should be sent to Charles C. Branas, PhD, Department of Biostatistics and Epidemiology, Uni versity of Pennsylvania School of Medicine, Room 936 Blockley Hall, 423 Guardian Dr, Philadelphia, PA 19104 6021 (e mail: cbranas@upenn.edu). Reprints can be ordered at http://www.ajph.org by clicking the "Reprints/Eprints" link.*

*This article was accepted February 7, 2009.*

**Contributors**

C.C. Branas originated the study idea, oversaw the implementation of the study, and analyzed the data. T.S. Richmond and D.P. Culhane advised the study's imple mentation and analyses. T.R. Ten Have and D.J. Wiebe advised the study's implementation and analyzed the data. All authors wrote this article.

**Acknowledgments**

This study was funded by the National Institutes of Health, National Institute on Alcohol Abuse and Alco holism (grant R01AA013119).

The authors are also indebted to numerous dedicated individuals at the Philadelphia Police, Public Health, Fire, and Revenue Departments as well as DataStat Inc, who collaborated in this work.

**Human Participant Protection**

The study was approved by both the University of Pennsylvania and the Philadelphia Department of Public Health institutional review boards. A federal certificate of confidentiality was also provided by the National In stitutes of Health.

## References

1. Branas CC. A review of: suing the gun industry: a battle at the crossroads of gun control and mass torts. *J Leg Med.* 2006;27(1):103 108.

2. Centers for Disease Control and Prevention. Web based Injury Statistics Query and Reporting System: 2000 2001. Available at: http://www.cdc.gov/ncipc/wisqars. Accessed March 1, 2009.

3. Wellford CF, Pepper JV, Petrie CV. *Firearms and Violence: A Critical Review.* Washington, DC: National Academies Press; 2005:6.

4. Vizzard W. *Shots in the Dark. The Policy, Politics, and Symbolism of Gun Control.* New York, NY: Rowman and Littlefield; 2000.

5. Wiebe DJ. Homicide and suicide risks associated with firearms in the home: a national case control study. *Ann Emerg Med.* 2003;41:771 782.

6. Kellermann AL, Rivara FP, Rushforth NB, et al. Gun ownership as a risk factor for homicide in the home. *N Engl J Med.* 1993;329:1084 1091.

7. Grassel KM, Wintemute GJ, Wright MA, Romero MP. Association between handgun purchase and mor tality from firearm injury. *Inj Prev.* 2003;9:48 52.

8. Cummings P, Koepsell T, Grossman D, Savarino J, Thompson R. The association between the purchase of a handgun and homicide or suicide. *Am J Public Health.* 1997;87:974 978.

9. Kleck G, Hogan M. National case control study of homicide offending and gun ownership. *Soc Probl.* 1999;46(2):275 293.

10. Weiner J, Wiebe DJ, Richmond TS, et al. Reducing firearm violence: a research agenda. *Inj Prev.* 2007;13:80 84.

11. Poole C. Critical appraisal of the exposure potential restriction rule. *Am J Epidemiol.* 1987;125:179 183.

12. Poole C. Exposure opportunity in case control studies. *Am J Epidemiol.* 1986;123:352 358.

13. Poole C. Controls who experienced hypothetical causal intermediates should not be excluded from case control studies. *Am J Epidemiol.* 1999;150:547 551.

14. Richmond TS, Branas CC, Cheney RA, Schwab CW. The case for enhanced data collection of gun type. *J Trauma.* 2004;57:1356 1360.

15. Branas C, Richmond T, Culhane D, Wiebe D. Novel linkage of individual and geographic data to study firearm violence. *Homicide Stud.* 2008;12(3):298 320.

16. Roberts I. Methodologic issues in injury case control studies. *Inj Prev.* 1995;1:45 48.

17. Rothman KJ, Greenland S. Case control studies. In: Rothman KJ, Greenland S, eds. *Modern Epidemiology.* 2nd ed. Philadelphia, PA: Lippincott Williams & Wilkins; 1998:93 114.

18. Waksberg J. Sampling methods for random digit dialing. *J Am Stat Assoc.* 1978;73:40 46.

19. Koepsell TD, McGuire V, Longstreth WT Jr, Nelson LM, van Belle G. Randomized trial of leaving messages on telephone answering machines for control recruitment in an epidemiologic study. *Am J Epidemiol.* 1996;144:704 706.

20. Harlow BL, Crea EC, East MA, Oleson B, Fraer CJ, Cramer DW. Telephone answering machines: the in fluence of leaving messages on telephone interviewing response rates. *Epidemiology.* 1993;4:380 383.

21. Herzog A, Rodgers W. The use of survey methods in research on older Americans. In: Woolson R, ed. *The Epidemiologic Study of the Elderly.* New York, NY: Oxford University Press; 1992.

22. Daves R. *Standard Definitions: Final Dispositions of Case Codes and Outcome Rates for Surveys.* 4th ed. Lenexa, KS: The American Association for Public Opinion Research; 2006.

23.  Galea S, Tracy M. Participation rates in epidemiologic studies. *Ann Epidemiol.* 2007;17:643 653.

24.  Keeter S, Kennedy C, Dimock M, Best J, Craighill P. Gauging the impact of growing nonresponse on estimates from a national RDD telephone survey. *Public Opin Q.* 2006;70:759 779.

25.  Groves R. Nonresponse rates and nonresponse bias in household surveys. *Public Opin Q.* 2006;70:646 675.

26.  Southeastern Pennsylvania Household Health Survey. Adult Respondent File, 2002, 2004, 2006. Philadelphia, PA: Public Health Management Corporation; 2006.

27.  Ziegenhagen E, Brosnan D. Victim responses to robbery and crime control policy. *Criminology.* 1985; 23:675 695.

28.  Felson R, Steadman H. Situational factors in disputes leading to criminal violence. *Criminology.* 1983; 21:59 74.

29.  Wells W. The nature and circumstances of defensive gun use: a content analysis of interpersonal conflict situations involving criminal offenders. *Justice Q.* 2002;19:127 157.

30.  Denton JF, Fabricius WV. Reality check: using newspapers, police reports, and court records to assess defensive gun use. *Inj Prev.* 2004;10:96 98.

31.  Wolfgang M. A tribute to a view I have opposed. *J Crim Law Criminol.* 1995;86(1):188 192.

32.  Kleck G, DeLone M. Victim resistance and offender weapon effects in robbery. *J Quant Criminol.* 1993;9(1): 55 81.

33.  Kleck G, Gertz M. Armed resistance to crime: the prevalence and nature of self defense with a gun. *J Crim Law Criminol.* 1995;86(1):150 187.

34.  Koepsell TD, Weiss NS. *Epidemiologic Methods: Studying the Occurrence of Illness.* New York, NY: Oxford University Press; 2003:200.

35.  van Buuren S, Boshuizen HC, Knook DL. Multiple imputation of missing blood pressure covariates in survival analysis. *Stat Med.* 1999;18:681 694.

36.  Rubin D. *Multiple Imputation for Nonresponse in Surveys.* New York, NY: Wiley; 1987.

37.  Xie D, Raghunathan TE, Lepkowski JM. Estimation of the proportion of overweight individuals in small areas   a robust extension of the Fay Herriot model. *Stat Med.* 2007;26:2699 2715.

38.  Branas CC, Elliott MR, Richmond TS, Culhane DP, Wiebe DJ. Alcohol consumption, alcohol outlets, and the risk of being assaulted with a gun. *Alcohol Clin Exp Res.* 2009;33:906 915.

39.  Breslow NE. Statistics in epidemiology: the case control study. *J Am Stat Assoc.* 1996;91(433):14 28.

40.  Fox J. *Regression Diagnostics: An Introduction. Sage University Paper Series on Quantitative Applications in the Social Sciences.* Newbury Park, CA: Sage; 1991:7 79.

41.  Nelson DE, Grant Worley JA, Powell K, Mercy J, Holtzman D. Population estimates of household firearm storage practices and firearm carrying in Oregon. *JAMA.* 1996;275:1744 1749.

42.  Kleck G, Gertz M. Carrying guns for protection: results from the National Self Defense Survey. *J Res Crime Delinq.* 1998;35(2):193 224.

43.  Kleck G. What are the risks and benefits of keeping a gun in the home? *JAMA.* 1998;280:473 475.

44.  Decker S, Caldwell A. *Illegal Firearms: Access and Use by Arrestees.* Washington, DC: US Department of Justice, Office of Justice Programs, National Institute of Justice; 1997. Report ID NCJ 163496.

45.  Dahlberg LL, Ikeda RM, Kresnow MJ. Guns in the home and risk of a violent death in the home: findings from a national study. *Am J Epidemiol.* 2004;160: 929 936.

46.  Islam SS, Edla SR, Mujuru P, Doyle EJ, Ducatman AM. Risk factors for physical assault. State managed workers' compensation experience. *Am J Prev Med.* 2003;25:31 37.

47.  Warner BD, Wilson Coomer B. Neighborhood drug arrest rates: are they a meaningful indicator of drug activity? A research note. *J Res Crime Delinq.* 2003;40(2): 123 138.

48.  Kleck G, McElrath K. The effects of weaponry on human violence. *Soc Forces.* 1991;69(3):669 692.

49.  Mickey RM, Greenland S. The impact of confounder selection criteria on effect estimation. *Am J Epidemiol.* 1989;129:125 137.

50.  Kleinbaum DG. Epidemiologic methods: the "art" in the state of the art. *J Clin Epidemiol.* 2002;55: 1196 1200.

51.  White H. A heteroscedasticity consistent covariance matrix estimator and a direct test for heteroscedasticity. *Econometrica.* 1980;48:817 838.

52.  Getis A. Spatial statistics. In: Longley P, Goodchild M, Maguire D, Rhind D, eds. *Geographical Information Systems Volume 1 Principles and Technical Issues.* 2nd ed. Chichester, England: John Wiley and Sons; 2000:239 251.

53.  Gruenewald PJ, Remer L. Changes in outlet densities affect violence rates. *Alcohol Clin Exp Res.* 2006; 30:1184 1193.

54.  Smith T. A seeded sample of concealed carry permit holders. *J Quant Criminol.* 2003;19:441 445.

55.  Rafferty AP, Thrush JC, Smith PK, McGee HB. Validity of a household gun question in a telephone survey. *Public Health Rep.* 1995;110:282 288.

56.  Kellermann AL, Rivara FP, Banton J, et al. Validating survey responses to questions about gun ownership among owners of registered handguns. *Am J Epidemiol.* 1990;131:1080 1084.

57.  Hemenway D. The myth of millions of annual self defense gun uses: a case study of survey overestimates of rare events. *Chance.* 1997;10(3):6 10.

58.  Thompson DC, Thompson RS, Rivara FP, Adams J, Hillman M. Risk compensation theory should be subject to systematic reviews of the scientific evidence. *Inj Prev.* 2001;7(2):86 88.

59.  Peltzman S. The effects of automobile safety regulation. *J Polit Econ.* 1975;83:677 725.

60.  Wilkinson DL, Fagan J. Role of firearms in violence scripts: the dynamics of gun events among adolescent males. *Law Contemp Probl.* 1996;59(1) 55 89.

61.  Wilkinson DL. *Guns, Violence, and Identity Among African American and Latino Youth.* New York, NY: LFB Scholarly Publishing LLC; 2003.

62.  Ikeda RM, Dahlberg LL, Kresnow MJ, Sacks JJ, Mercy JA. Studying "exposure" to firearms: household ownership v access. *Inj Prev.* 2003;9(1):53 57.

63.  Cummings P, Koepsell TD. Does owning a firearm increase or decrease the risk of death? *JAMA.* 1998; 280:471 473.

64.  Branas CC, Nance ML, Elliott MR, Richmond TS, Schwab CW. Urban rural shifts in intentional firearm death: different causes, same results. *Am J Public Health.* 2004;94:1750 1755.

65.  Brookhart MA, Wang PS, Solomon DH, Schneeweiss S. Evaluating short term drug effects using physician specific prescribing preference as an instrumental variable. *Epidemiology.* 2006;17:268 275.

66.  Staiger D, Stock J. Instrumental variables regression with weak instruments. *Econometrica.* 1997;65: 557 586.

67.  Anderson E. *Code of the Street: Decency, Violence, and the Moral Life of the Inner City.* New York, NY: W. W. Norton; 1999.

■ BRIEF REPORT

# Criminal Records of Homicide Offenders

Philip J. Cook, PhD

Jens Ludwig, PhD

Anthony A. Braga, PhD

HOMICIDE IS A SERIOUS PUBLIC health problem in the United States, with 17 638 victims in 2002.[1] Programs to prevent homicide can be distinguished by whether they are addressed to the general public or are targeted toward individuals who are considered high risk because of their previous criminal involvement. For example, federal gun laws incorporate both approaches; there are general provisions, such as the near prohibition on the private possession of fully automatic weapons, and targeted provisions, such as the ban on possession of any firearm by convicted felons and domestic violence offenders. Similarly, the criminal law poses a general threat of punishment to any adult contemplating criminal violence but targets individuals with convictions for more severe sentences. Other criminal justice interventions are highly targeted, affecting only individuals who are actually arrested or convicted: mandated drug programs and other rehabilitation-oriented programs, incarceration, parole and probation supervision, and so forth.

Although the criminology literature includes a number of studies of the criminal histories of select groups of homicide offenders,[2-7] previous studies have typically dealt with special subsets of homicide offenders, provided few specifics on criminal record, and lacked comparable information for the gen-

**For editorial comment see p 623.**

**Context**  Homicide prevention strategies can be either targeted toward high-risk groups or addressed to the population at large. One high-risk group of particular interest is adults with a criminal record. But the prevalence of a criminal record among homicide offenders has not been reliably quantified, nor has the prevalence of criminal record in the general population.

**Objective**  To determine what portion of the homicide problem would be addressed by interventions linked to arrest or conviction.

**Design, Setting, and Participants**  A case-control analysis was performed using a comprehensive data set of all arrests and felony convictions in Illinois for 1990-2001. Cases were defined as Illinois residents aged 18 to 64 years who were arrested for homicide in 2001. Controls were all other Illinois residents aged 18 to 64 years in 2001. Illinois criminal and juvenile record information for cases and controls was compiled for 1990-2000. Five definitions of previous record were considered (arrest, arrest for a violent crime, 5 or more arrests with at least 1 for a violent crime, felony conviction, and violent-felony conviction), each measured for 1990-2000 and for 1996-2000.

**Main Outcome Measure**  The population-attributable risk: the portion of homicide offenses that would be eliminated by a hypothetical intervention that reduced the offending risk of individuals with a record to the offending risk of those who lack a record.

**Results**  For 1990-2000, 42.6% of 884 cases had at least 1 felony conviction compared with 3.9% of nearly 7.9 million controls, for a population-attributable risk of 40.3% (95% CI, 37.0%-43.8%); among cases, 71.6% had experienced any arrest from 1990-2000 compared with 18.2% of controls, for a population-attributable risk of 65.3% (95% CI, 61.6%-68.8%). For 1996-2000, the population-attributable risk among individuals with a felony conviction or any arrest was 31.0% (95% CI, 27.9%-34.2%) and 58.5% (95% CI, 54.9%-62.1%), respectively.

**Conclusions**  Interventions after arrest or conviction, such as supervised release, imprisonment, correctional programs, or bans on firearm possession, are targeted toward a group that has relatively high incidence of lethal violence, but they leave a large portion of the problem untouched.

*JAMA. 2005;294:598-601*                                      www.jama.com

eral population. As a result, this literature offers little guidance on the relative scope of targeted vs general prevention strategies in addressing the homicide problem. Specifically, how much would the homicide rate be reduced by a hypothetical intervention that eliminated the excess risk of homicide offending among people with a criminal record, defined, for example, by felony conviction within the previous decade? To answer this question, we conducted a case-control study comparing the prevalence of criminal histories among homicide offenders to the prevalence of criminal histories among the general population.

**Author Affiliations:** Department of Public Policy Studies, Duke University, Durham, NC (Dr Cook); Georgetown University, Washington, DC (Dr Ludwig); and the John F. Kennedy School of Government, Harvard University, Cambridge, Mass (Dr Braga).
**Corresponding Author:** Philip J. Cook, PhD, Sanford Institute of Public Policy, Duke University, Durham, NC 27708-0245 (pcook@duke.edu).

©2005 American Medical Association. All rights reserved.

## DA 284

Downloaded From: http://jama.jamanetwork.com/ on 07/08/2015

## METHODS

The data include all arrests of juveniles and adults in Illinois from 1990-2001. They were extracted from the Illinois State Police mainframe computer by a special program written by the Illinois Criminal Justice Information Authority and are stored at the Chapin Hall Center for Children, University of Chicago. The specific data files used in our analysis are described in more detail elsewhere.[8]

Every "arrest event" included in these data files was assigned a unique identification number. Every arrestee was also assigned a unique identification number by the Illinois State Police that was the basis for compiling an individual's complete arrest and conviction record over time. (The identity of arrestees is routinely confirmed by the police by use of fingerprint data.) Details on the arrest event included information on the date of arrest and the criminal charges initially filed against the arrestee. A separate data file compiled from reports from the state's prosecuting attorney's offices lists additions or deletions to the criminal charges filed against arrestees for each arrest event. Another data file reported separately by the court clerks provided information on court hearings and dispositions and was the basis for determining convictions.

All individuals arrested for murder or manslaughter in Illinois in 2001 were identified in the arrest data files for that year and linked to their arrests and convictions in Illinois for 1990-2000. We defined the cases as just those homicide arrestees who were Illinois residents aged 18 to 64 years. Of the 1032 individuals arrested for homicide in 2001, we excluded 32 who were out-of-state residents, 110 who were younger than 18 years, and 6 who were older than 64 years. Arrestees younger than 18 years were excluded because they are too young to have a criminal history that can be meaningfully compared with those who are older.

The data on court dispositions are somewhat less complete than the data on arrests. To deal with this problem of missing data, we generated 2 sets of

**Table.** Attributable Risks of Homicide

| | No. of Cases (n = 884) | Proportion of Population | Proportion of Cases | Population-Attributable Risk (95% CI) |
|---|---|---|---|---|
| Criminal record during 1990-2000 | | | | |
| Arrest | 633 | 0.182 | 0.716 | 0.653 (0.616-0.688) |
| Violent arrest | 327 | 0.078 | 0.370 | 0.317 (0.283-0.352) |
| ≥5 Arrests, ≥1 violent | 258 | 0.028 | 0.292 | 0.272 (0.242-0.304) |
| Felony conviction | 377 | 0.039 | 0.426 | 0.403 (0.370-0.438) |
| Violent-felony conviction | 82 | 0.009 | 0.093 | 0.085 (0.067-0.106) |
| Criminal record during 1996-2000 | | | | |
| Arrest | 559 | 0.113 | 0.632 | 0.585 (0.549-0.621) |
| Violent arrest | 228 | 0.042 | 0.258 | 0.225 (0.197-0.257) |
| ≥5 Arrests, ≥1 violent | 157 | 0.011 | 0.178 | 0.169 (0.144-0.195) |
| Felony conviction | 287 | 0.021 | 0.325 | 0.310 (0.279-0.342) |
| Violent-felony conviction | 55 | 0.004 | 0.062 | 0.058 (0.045-0.077) |

Abbreviation: CI, confidence interval.

estimates of the prevalence of felony convictions (and convictions for violent felonies) that bracket the true prevalence; the low estimate assumed no conviction in cases in which the data were unclear, and the high estimate assumed a conviction in these cases. Disposition was unclear in this sense in 56 046 instances, 22.6% of the known felony convictions. For the sake of brevity, and because in practice it made little difference in the pattern of results, we report only the high estimates.

We computed the prevalence of an arrest record for the controls (the Illinois resident population aged 18 to 64 years in 2001 who were not arrested for homicide in that year) by counting all individuals who were arrested at least once in Illinois from 1990-2000 and who were between 18 and 64 years on April 15, 2001, and dividing by the state population in this age range. We also computed the prevalence of arrest from 1996-2000. Similarly, we computed the prevalence of other types of criminal record for 1990-2000 and 1996-2000: arrest for a violent crime (including homicide, rape, robbery, and assault); 5 or more arrests, including a violent crime arrest; felony conviction; and felony conviction for a violent crime.

The Illinois population for 2001 for residents aged 18 to 64 years was estimated from 2 sources. The noninstitutionalized population was estimated from the US Census Bureau's American Community Survey for 2001.[9] The institutionalized population is not included in the American Community Survey. We estimated it from the Census Bureau's public use microfile data for 2000[10] on the assumption that the institutionalized population did not change in size or composition between 2000 and 2001.

The prevalence of a record among cases (homicide arrestees) and controls (the population at large) were compared, and attributable risks were computed.[11] (The population-attributable risk is the proportion of homicides that would be eliminated if the homicide risk of those with a record dropped to the rate of those without a record.) We used SAS software, version 9.1 (SAS Institute Inc, Cary, NC).

## RESULTS

There were 884 cases and 7 879 478 controls. From 1990-2000, 42.6% of cases and 3.9% of controls had at least 1 felony conviction, implying a population-attributable risk of 40.3% (95% CI, 37.0%-43.8%) (TABLE). For every definition of record, the population-attributable risk is less when record is defined on the 5-year interval 1996-2000 than on the 11-year interval 1990-2000. It differs widely across the 5 definitions of record, depending mostly on the prevalence of that record among cases. For example, for records defined on the interval 1996-2000, the

©2005 American Medical Association. All rights reserved.

Downloaded From: http://jama.jamanetwork.com/ on 07/08/2015

population-attributable risk is 58.5% for arrest (95% CI, 54.9%-62.1%), 31.0% for felony conviction (95% CI, 27.9%-34.2%), and 5.8% for violent-felony conviction (95% CI, 4.5%-7.7%).

## COMMENT

These estimates of population-attributable risk are useful in assessing conflicting perspectives in the literature about the importance of general as opposed to targeted prevention strategies for homicide.

Some observers have characterized most homicide offenders as ordinary citizens who kill in a moment of rage or sudden impulse when provoked by acquaintances or relatives.[12-15] This perspective seems to be supported by Federal Bureau of Investigation data indicating that about half of all homicides are committed by an acquaintance or relative of the victim, more than a quarter of all female victims are killed by boyfriends or husbands, and arguments precipitate about a third of all homicides.[16] This type of evidence has been offered in support of increased controls on firearms commerce, possession, and use in the general population to forestall lethal attacks by generally nonviolent citizens.[12-15]

In contrast, there is a large body of research evidence documenting the previous criminal justice system involvement of a majority of homicide offenders.[3,6,7,17-20] Most domestic homicides are preceded by a history of assaults,[20,21] and "acquaintance" homicides often turn out to be killings among rival gang members, drug dealers, or organized crime figures.[22,23] This evidence supports an intervention strategy targeted toward serious offenders.

Our findings provide some support to both perspectives. Homicide offending in Illinois is certainly concentrated among individuals with a criminal record. The prevalence of a serious criminal record among homicide offenders is far higher than for the general population. Nonetheless, a large part of the homicide problem lies beyond the reach of any preventive treatment that is limited to individuals who

have been arrested or convicted. For example, just 32.5% of homicide arrestees have been convicted of a felony in the previous 5 years. An intervention that reduced the homicide risk of felons to that of the general population would reduce the homicide rate by just 31.0%. Such findings indicate the potential importance of general prevention strategies. Of course, whether any prevention program is worthwhile depends on its effectiveness in influencing behavior of the target population and on its cost.

There are several limitations to our study, stemming from the nature of the data. First, the identification of homicide offending with homicide arrest leads to 2 types of misclassification. An unknown fraction of homicide arrestees in Illinois in 2001 was not factually guilty, and hence some individuals are incorrectly classified as "cases." And some proportion of killers in 2001 were not arrested for homicide in that year so that a relatively small number of "controls" are in fact killers. Some indication of the magnitude of the latter problem is given by the fact that 60.2% of Midwestern-region homicides were cleared by arrest in 2001.[24] For our purposes, the main concern is that individuals who were arrested in 2001 were not strictly representative of the population of killers with respect to record.

Second, we have no information on arrests or convictions occurring in other states. That omission is not necessarily relevant to assessing the opportunities available to Illinois state agencies to prevent lethal violence through interventions in the lives of individuals arrested or convicted. But an out-of-state record may be relevant to sentencing options and to federal law governing firearms possession. (In federal law, any conviction for domestic violence and any conviction for a felony bar an individual from obtaining or possessing a firearm.[25])

Third, our method for estimating the prevalence of an Illinois criminal record among Illinois residents in 2001 has a positive bias of unknown magnitude. We tabulated the number of in-

dividuals who were arrested or convicted in Illinois during a specified period and divided by the resident population in 2001. Yet not all individuals arrested in Illinois during the given period were living there in 2001; there was attrition because of death and relocation out of state. This problem does not apply to the cases, because all of them are identified as individuals. Thus, homicide arrest in Illinois is somewhat more concentrated among individuals with an Illinois criminal record than indicated by our statistics. As a logical matter, this bias should be smaller for record defined for the 5-year period (1996-2000) than for the 11-year period (1990-2000).

Finally, we have limited our analysis to the record of arrests and convictions. There are other opportunities for official intervention in the lives of dangerous people, including civil restraining orders and court-ordered hospitalization for certain kinds of mental illness.[26,27]

## CONCLUSION

Interventions after arrest or conviction, such as mandatory drug treatment, supervised release, imprisonment, correctional programs, or bans on firearm possession, are targeted toward a group that has relatively high incidence of lethal violence, but they leave a large portion of the problem untouched. Broader prevention strategies, including general deterrence and the regulation of markets for "criminogenic" commodities (firearms, alcohol, and drugs), may also be warranted as part of a comprehensive strategy.

**Author Contributions:** Drs Cook and Ludwig had full access to all of the data in the study and take responsibility for the integrity of the data and the accuracy of the data analysis.
*Study concept and design:* Cook, Ludwig, Braga.
*Acquisition of data:* Ludwig.
*Analysis and interpretation of data:* Cook, Ludwig, Braga.
*Drafting of the manuscript:* Cook, Ludwig, Braga.
*Critical revision of the manuscript for important intellectual content:* Cook, Ludwig, Braga.
*Statistical analysis:* Cook, Ludwig.
*Administrative, technical, or material support:* Ludwig, Braga.
*Study supervision:* Ludwig.

**Financial Disclosures:** None reported.

©2005 American Medical Association. All rights reserved.

**DA 286**

Downloaded From: http://jama.jamanetwork.com/ on 07/08/2015

## REFERENCES

1. *WISQARS Injury Mortality Reports, 1999-2002*. Centers for Disease Control and Prevention. Atlanta, Ga: Centers for Disease Control and Prevention; 2005.
2. Wolfgang ME. *Patterns of Criminal Homicide*. Philadelphia: University of Pennsylvania Press; 1958.
3. Kleck G, Bordua D. The factual foundation of certain key assumptions of gun control. *Law Policy Q*. 1983;5:271-298.
4. Straus M. Domestic violence and homicide antecedents. *Bull N Y Acad Med*. 1986;62:446-465.
5. Braga AA. Serious youth gun offenders and the epidemic of youth violence in Boston. *J Quant Criminol*. 2003;19:33-54.
6. McGarrell EF, Chermak S. Problem solving to reduce gang and drug-related violence in Indianapolis. In: Decker SH, ed. *Policing Gangs and Youth Violence*. Belmont, Calif: Wadsworth; 2003:77-101.
7. Tita G, Riley J, Greenwood P. From Boston to Boyle Heights: the process and prospects of a "pulling levers" strategy in a Los Angeles barrio. In: Decker SH, ed. *Policing Gangs and Youth Violence*. Belmont, Calif: Wadsworth; 2003: 102-130.
8. Chapin Hall Center for Children. *Illinois State Police Arrests Database, Codebook Version 1*. Chicago, Ill: Chapin Hall Center for Children at the University of Chicago; 2003.
9. US Bureau of the Census. *American Community Survey: 2001*. Washington, DC: US Bureau of the Census; 2001.
10. US Bureau of the Census. *Public-Use Microdata Samples: Census 2000*. Washington, DC: US Bureau of the Census; 2000.
11. Leung H, Kupper L. Comparison of confidence intervals for attributable risk. *Biometrics*. 1981;37:293-302.
12. Zimring FE, Hawkins G. *Crime is Not the Problem: Lethal Violence in America*. New York, NY: Oxford University Press; 1997.
13. Christoffel KK. Toward reducing pediatric injuries from firearms: charting a legislative and regulatory course. *Pediatrics*. 1991;88:294-305.
14. Webster DW, Chaulk CP, Teret SP, Wintemute GJ. Reducing firearms injuries. *Issues Sci Technol*. 1991; 7:73-79.
15. Conklin B, Seiden R. Gun deaths: biting the bullet on effective control. *Public Aff Rep*. 1981;22:1-7.
16. Spitzer RJ. *The Politics of Gun Control*. 2nd ed. New York, NY: Chatham House; 1998.
17. Dowd MD, Knapp J, Fitzmaurice L. Pediatric firearm injuries, Kansas City 1992: a population-based study. *Pediatrics*. 1994;94:867-873.
18. Kennedy DM, Piehl AM, Braga AA. Gun buybacks: where do we stand and where do we go? In: Plotkin M, ed. *Under Fire: Gun Buyback, Exchanges, and Amnesty Programs*. Washington, DC: Police Executive Research Forum; 1996:141-174.
19. Lane R. *Murder in America: A History*. Columbus: Ohio State University Press; 1997.
20. Mercy JA, Saltzman L. Fatal violence among spouses in the United States. *Am J Public Health*. 1989; 79:595-599.
21. Campbell JC, Webster DW, Koziol-McLain J, Block C, Campbell D, Curry MA. Risk factors for femicide in abusive relationships: results from a multisite case control study. *Am J Public Health*. 2003;93:1089-1097.
22. Braga AA, Piehl AM, Kennedy DM. Youth homicide in Boston: an assessment of supplementary homicide reports. *Homicide Studies J*. 1999;3:277-299.
23. Kates DB, Schaffer H, Lattimer JK, et al. Guns and public health: epidemic of violence or pandemic of propaganda. *Tenn Law Rev*. 1995;62:513-596.
24. Bureau of Justice Statistics. *Sourcebook for Criminal Justice Statistics*. Washington, DC: Bureau of Justice Statistics, US Dept of Justice; 2002.
25. Vernick JS, Hepburn LM. State and federal gun laws: trends for 1970-99. In: Ludwig J, Cook PJ, eds. *Evaluating Gun Policy*. Washington, DC: Brookings Institution Press; 2003:345-402.
26. Myers WC, Scott K. Psychotic and conduct disorder symptoms in juvenile murderers. *Homicide Stud*. 1998;2:160-175.
27. Langford L, Isaac N, Kabat S. Homicides related to intimate partner violence in Massachusetts. *Homicide Studies J*. 1998;2:353-377.

©2005 American Medical Association. All rights reserved.

**DA 287**

Downloaded From: http://jama.jamanetwork.com/ on 07/08/2015



# DRUG & VIOLENT CRIME TASK FORCES
## 2011 Annual Report

**March 2011**
**Prepared by the Office of Justice Programs – Minnesota Department of Public Safety**

# BACKGROUND

**Narcotics Task Forces –** Since 1988, the Minnesota Department of Public Safety Office of Justice Programs has funded multijurisdictional narcotics task forces with a portion of its annual Edward Byrne Memorial Grant from the U.S. Department of Justice. One of the purposes of the funding is to support programs that integrate federal, state and local drug law enforcement agencies and prosecutors to conduct effective multijurisdictional investigations and prosecutions.  For many years, Minnesota's drug task forces received $2.6 million in federal funding each year.

The 2005 Minnesota Legislature passed legislation to improve coordination of gang and drug enforcement efforts throughout the state. To ensure an effective outcome, the legislature established a **GANG AND DRUG OVERSIGHT COUNCIL** ("Council") to provide guidance related to the investigation and prosecution of gang and drug crime. One of the Council's primary responsibilities was to establish multijurisdictional task forces to combat gang and drug crime throughout the state. At the same time, the Minnesota legislature appropriated state funding for task force efforts to fund statewide gang enforcement efforts and to replace the rapidly and dramatically declining federal resources used for drug enforcement.

Subsequently, the 2010 Minnesota Legislature established the **VIOLENT CRIMES COORDINATING COUNCIL (VCCC")** to provide guidance related to the investigation and prosecution of gang crime, drug crime and related violent crime. The Council is comprised of 19 voting members that represent federal, state and local law enforcement and prosecution agencies and includes four citizen members. The council provides direction and oversight to the multijurisdictional task forces and enforcement teams located throughout the state.  This new council replaced the Gang and Drug Oversight Council that had been in existence since 2005.

The council's primary duty is to "develop an overall strategy to ameliorate the harm caused to the public by gang and drug crime within the State of Minnesota".   In addition, the council works closely with the Commissioner of Public Safety and is charged with additional responsibilities:

- The development of an operating procedures and policies manual to guide gang and drug investigation;
- The identification and recommendation of an individual to serve as the statewide gang and drug coordinator;
- The development of grant eligibility criteria and application review process;
- The recommendation for multijurisdictional task force funding termination for those not operating in a manner consistent with the best interest of the state or the public;
- The development of processes to collect and share investigative data;
- The development of policies to prohibit the improper use of personal characteristics to target individuals for law enforcement, prosecution or forfeiture actions; and ,
- The adoption of objective criteria and identifying characteristics for use in determining whether individuals are or may be members of gangs involved in criminal activity.

**DA 289**

There are currently twenty-four funded task forces that span sixty-five counties.  The task forces are staffed by over 200 investigators from over 120 individual agencies.  Funding available for SFY 11 was $4,975,147 with 85% of the funding coming from state general funds.   Annual grant amounts range from $35,000 to $518,500.  The work of the task force teams is supported by an appointed Statewide Gang and Drug Coordinator; an experienced sworn officer who provides training, monitoring and technical assistance services to all funded task forces.  Task force officers also sought to develop their own professional skills, completing 11,775 hours of POST certified training in 2010.

## STATEWIDE THREAT ASSESSMENT

As a part of their application for funding that was completed in the Fall of 2009, each task force was asked to comment on the current threats and emerging trends they were facing within their service area.  They also report on emerging trends when they prepare extensive quarterly narrative reports submitted to the office of Justice Programs.  A summary follows.

### DRUG ASSESSMENT

The wide spread production of methamphetamine has continued to taper off, with all regions reporting significant drops in lab seizures since 2004.  The reduction over time is largely attributed to legislation restricting access to precursor ingredients needed in the production of methamphetamine. Use by minors has also decreased dramatically due to the success of anti-methamphetamine advertising campaigns.  However, many regions are now reporting smaller scale production of methamphetamine in remote areas or in mobile labs producing quantities for personal use. The year 2010 indicated a slight upward trend.



Despite the reduction in the manufacture of methamphetamine, it continues to be the greatest concern for many of the task force regions in the state.  Increasingly, large quantities of high grade methamphetamine being trafficked into the area from the southwest U.S. and Mexico.  Evidence of intravenous use of methamphetamine has increased in some task force areas.  This all comes along with high rates of property crimes, child abuse and neglect, and the drain on social services agencies that are seeing families affected by addiction to methamphetamine.

**DA 290**



The abuse and illegal sale of pharmaceutical drugs, such as OxyContin, has also significantly increased. Seizures and arrests involve both pills and fentanyl patches.  This has been a particular problem on Indian reservations in the northern part of the state.  In fact, both the White Earth and Red Lake nations have recently declared public health emergencies related to prescription drug abuse.  In 2005, prescription drugs were involved in 4.5% of drug arrests and that number increased to 14.3% in 2010.  Task forces have reported some significant sale cases where large quantities of OxyContin have been sold.  At an average cost of $1.00/milligram, there is a high profit margin on the sale of the drug.  Illicit sellers are getting their product from forged prescriptions, "doctor shopping", paid procurers of the drug and pharmacy burglaries.  There have been an alarming number of minors and young adults abusing prescription medications. Individuals often take it from household medicine cabinets or receive it or buy it from friends.



*NOTE:  Chart does not include 83,746 pills seized in 2009 from an internet pharmacy.*

Historically, increases in the abuse of prescription pain killers including OxyContin; morphine; codeine; and fentanyl patches, reduces the demand for heroin.  Despite this, investigators have seen an increase in the trafficking and use of heroin.  Heroin arrests increased 116% from 2008 to 2010.  Minnesota has been identified as the state that has the lowest price and highest purity of heroin available.  Heroin overdose deaths and hospital emergency room visits related to heroin were at a very high level in 2009.  Past use of heroin by 12th graders in Minnesota is above the national average.  Marijuana is undoubtedly the most commonly abused and readily available drug throughout the state.  It is cultivated locally and imported from Canada and source states along

the border with Mexico.   As such, the importation and local cultivation of marijuana continues to be a significant target for task forces primarily with high volume trafficking and the dismantling of grow operations.  The sale of marijuana is very profitable and is often associated with violence. According to the local Drug Enforcement Administration office, an ounce of fairly low quality Mexican marijuana retails for $150 - $175.  The lack of serious criminal consequences for cultivators and sellers of marijuana makes it difficult to disrupt the supply of this very available drug.

In terms of local production, indoor marijuana grow operations are becoming more prevalent, and operations are often more sophisticated than seen in the past. Nationwide, the environmental and health hazards of such operations are becoming apparent. The potency of marijuana has risen with higher concentrations of THC found in seized samples. Task forces have also reported an increase in the street price of marijuana.



While crack cocaine continues to be a fairly common drug of abuse it is declining in popularity for distribution and use throughout the state. The amounts encountered by task forces are not at previous levels and the cost has increased significantly. However, cocaine and crack cocaine are more prevalent in the Mankato, Rochester and Duluth areas. In these areas, the importation and distribution of the drug is often gang related.   In Greater Minnesota, the principal wholesale distribution centers for cocaine and crack cocaine are Minneapolis, Chicago and Detroit.

Other substances have also presented challenges for law enforcement in 2010.

- Over 1,000 pounds of khat was seized by task forces in 2010, but absent significant penalties for the importation of the drug, few arrests follow.

- Synthetic marijuana products (K2, Spice, Blade, Red X Dawn, etc.) have been found in many parts of the state and have become increasingly popular, particularly among teens and young adults. These products consist of plant material that has been coated with chemicals that claim to mimic THC, the active ingredient in marijuana, and are sold at a variety of retail outlets, in head shops, and over the Internet. These products that can cause serious side effects for users.  There have been an increasing number of reports from poison control centers, hospitals and law enforcement regarding these products.

**DA 292**

- Mephedrone is also being sold in both the metro and greater Minnesota areas. This is a synthetic stimulant. It is reportedly manufactured in China and is chemically similar to the compounds found in khat. It comes in the form of tablets or a powder, which users can swallow, snort or inject, producing similar effects to MDMA, amphetamines and cocaine. In the USA it can be sold legally if labeled as 'plant food' or 'bath salts'.

## GANG AND VIOLENT CRIME ASSESSMENT

Gang activity and violence related to the sale and distribution of narcotics is growing, especially in rural areas, according to many task force reports. Aside from narcotics violations, weapons violations appear to be the criminal activity of choice. Prostitution and other forms of human trafficking and victimization of women are also an operating procedure for some street gangs.

The primary distributors of the three most common drugs (cocaine, meth and marijuana) are Mexican drug trafficking organizations. As a result, illegal drugs are present in increasing amounts. These organizations are well documented as using extreme violence to advance their interests in Mexico as well as increasing violence in the southwest US. Some of these organizations have connections to the La Familia gang and there are multiple cells operating within the northern portion of Dakota County. It is only logical that their presence will continue to grow in the twin cities area.

Many regions are reporting intensified recruiting efforts by gangs, and many gang members from major metropolitan areas such as Chicago, Minneapolis and Detroit are moving into rural regions for criminal purposes. The Surenos 13 is the fastest growing gang in Minnesota. This is a gang that has a history of violence and connections to drug cartels in South America. Another growing gang threat in Minnesota, particularly within the Twin Cities and Rochester areas, is from the evolution of Somali gangs. Somali gangs are believed to be responsible for crimes ranging from drive by shootings to drug activity. It has been difficult for law enforcement to penetrate these gangs due to the very much closed network that they establish.

Outlaw motorcycle gangs operate throughout the state and prison based gang members reside in many parts of the state. For example, the Supreme White Power "SWP" prison gang members are now living in the Iron Range area after recently being paroled. This group poses a serious safety threat to the area as they have a high propensity for violence and has suspected ties to the use and sale of methamphetamine. One of the SWP members was arrested in the City of Virginia and is in custody awaiting trial on murder charges for a stabbing death.

Native gangs pose significant threats on tribal lands and in parts of the Twin Cities. There has been a significant increase in gang violence in the state and local areas involving the Native Mob and associates. During the past 12-18 months Native Mob members and associates have been the victim of drive-by shootings, assaults and other violence. It has been reported that as older members of the Native Mob are being released from prison the gang is becoming more structured and organized throughout the state. This is substantiated by Department of Corrections

**DA 293**

investigations and informant information.  There has also been an increase in 'council' meetings for the Native Mob across the state.

Both metro and rural task forces are experiencing an increase in the size and violence of hybrid gangs as they attempt to gain power.  Individuals may join one or more of these loosely affiliated "gangs" that have no hierarchy or code of conduct. In the case of hybrid gangs, rival gang members are more apt to work together in criminal endeavors.  The metro area reports that currently, gangs tend to be smaller and more factionalized with violence becoming less about drug territory and more about on-going feuds.

Violence in the community has increased and in many cases is violence for the sake of violence. Task forces report increases in armed robberies and burglaries. The frequency of weapons seized during investigations continues to increase.  High capacity guns are not unique.  It is not unusual for some gang members, particularly members of outlaw motorcycle gangs, to have a permit to carry a firearm.  The firearm issue has resulted in task forces using a variety of tactics to promote officer and community safety.  Whenever possible, suspects that have potential to be violent or have access to weapons are arrested in tightly controlled situations.  Removal of gun permits through felony criminal charges is a strategy used to disrupt assignments and structures within gangs.

## BENEFITS OF THE TASK FORCE MODEL

In their regular reporting, task forces provide testimony and examples of the benefits of the task force approach and examples of how collaboration has fostered success.  In the words of one task force commander, "We also have had some luck in identifying out-of-the-area sources and pass that information on to other task forces and agencies or collaborate with them on continuing the investigation.  Collaborating with other law enforcement fosters information and resource sharing and creates relationships that are mutually beneficial."  The situation in the past where there was competition for good cases has been replaced by cooperation.  Data from 2010 indicate the highest degree of cooperation ever experienced with over 1,500 cases worked collaboratively with another law enforcement entity.

In previous examinations of the task force model as employed in Minnesota, the following were identified as benefits:  (1) The level of expertise and knowledge increases when you combine a variety of experience and training in one location;  (2) Task force officers have access to training not readily available to officers on other assignments; (3) When officers return to their home agencies, they take that experience, training and their resources back to their departments; (4) Co-location provides for constant communication between task force members and helps to build rapport, trust and solid relationships.  It also provides an atmosphere where a wide variety of techniques and experiences can be consulted while discussing and planning investigative activities; (5) Task forces frequently provide assistance and resources to other law enforcement agencies during other non-drug investigations.  That assistance is usually welcomed by other agencies, and helps task forces produce positive results and create a favorable image within the law enforcement community.

## RESULTS OF 2010 TASK FORCE OPERATIONS

The following is a summary of task force results throughout the state.

**Drug Enforcement** - In calendar year 2010, task forces made 3,382 arrests for narcotics violations with 93% of the arrests at a felony-level. Individuals prosecuted at the federal level numbered 195. Of the arrests, 40% involved methamphetamine, 36.6% involved marijuana, 14.3% involved prescription drugs and 17.6% involved cocaine/crack cocaine.  In the course of their investigations, task forces seized 28 methamphetamine labs, 28 pounds of cocaine/crack cocaine, 86 pounds of methamphetamine, one half pound of heroin, 1,102 dosage units of ecstasy, over 16,000 dosage units of prescription drugs, 1,284 pounds of marijuana and 7,618 cultivated marijuana plants. Firearm seizures totaled 662.  In addition to drug arrests, task force officers made 307 arrests for other criminal activity.



*TOTAL of $14 million including all task forces, VOTF's and the St. Cloud MGSF*

Results since 2007 indicate that task forces are improving and addressing what the program intends: major cases that have the potential to significantly affect drug trafficking and related crimes within their regions.  The year 2007 saw the highest results ever in terms of: percentage of felony arrests and the percentage of cases prosecuted federally. In 2009, the highest percentage of drug arrests for "sales" was attained.  Working these complex cases requires collaboration with other task forces, as well as other local, state and federal agencies.  Data from 2010 indicates that approximately 45% of all the cases worked by task forces were done in cooperation with another local, state or federal law enforcement entity.

 **St. Cloud Metro Gang Strike Force** - This multijurisdictional effort between the City of St. Cloud and Sherburne County began in 2007.  In its fourth year of operation, this unit reports 85 felony-level drug arrests.  Forty-six of the individuals arrested were confirmed gang members.  Seventeen additional arrests were made for felony-level violent offenses and fourteen of those arrested were confirmed gang members.  Thirty-five additional arrests were made for non-felony drug arrests, non-violent Part I offenses and other Part II offenses.  Probation violation or outstanding warrants

**DA 295**

accounted for twenty-three arrests.  In the course of their work they executed 24 search warrants, seized 32 firearms, and took quantities of crack, marijuana and meth off the streets.  They responded to 51 requests for assistance from other agencies and expended over 450 person hours in doing so. In addition to their enforcement duties they gave many presentations to a variety of audiences.

The SCMGSF notes a continuing trend of older gang members returning to the community. Most of these gang members have been released from prison in the recent past. Some of these older gang members are resuming the distribution of narcotics. In one quarter of 2010, some of these recently released gang members were involved in five shootings.  In addition to responding to violations of the law, the strike force is working with local probation officers to keep track of the location and activity of these gang members and to get their probation revoked if they violate probation conditions.

**Gang Specialists Assigned to Task Forces** - In 2010, there were 10 task forces outside the metro area that had a total of 18 assigned gang officers.  In addition, 3 suburban task forces added gang and violent crime specialists to ensure that specialized gang knowledge was not lost with the demise of the Metro Gang Strike Force.  Other metro agencies also incorporated gang specialists to their task forces. These officers worked hand in hand with the drug agents and their specialized knowledge of gangs, gang crimes and gang members enhanced the work of the task forces. Specifically, of the arrests noted above under "drug enforcement," 116 of the arrests were of suspected or confirmed gang members.  Of the non-drug arrests noted, there were 37 violent Part I crimes, 4 non-violent Part I crimes and 3 Part II crimes committed by suspected or confirmed gang members.  In addition, 9 individuals were arrested for outstanding warrants or probation violation.  Eleven of those arrested were charged federally. Forty-four handguns were seized from the individuals noted above.

**Violent Offender Task Forces -**  Newly funded in 2008 were two task forces in Hennepin County that target violent offenders.  The Violent Offender Task Forces (VOTFs) were started as a new strategy in combating violent crimes that was increasing in some neighborhoods in Minneapolis and the surrounding suburbs.

Analyses of the problem showed clearly that the vast majority of the violence was due to guns and drugs but, more importantly, that the same individuals were at the core of the problem time and time again. An overloaded system was ineffectively dealing with the same repeat violent offenders continually engaged in narcotics trafficking, gang activity and related violence.

To deal with these challenges, task forces were formed that consist of local and federal investigators and prosecutors. The rationale behind the VOTFs is: rather than target a specific crime (i.e. narcotics, robbery, etc.), target the individuals who are repeatedly causing the violent crimes. The methods of investigation in these cases are lengthy, complex and resource intensive. In 2010, the Minneapolis VOTF was reconfigured as a FBI "Safe Streets" task force and the Bureau of Criminal Apprehension and the St. Paul Police Department joined the effort.

In 2010, the two Violent Offender Task Forces demonstrated meaningful results. In many instances they work cases jointly.  The VOTFs executed 216 search warrants and seized 152 firearms, including 45 handguns and 49 semi-automatic weapons. Substantial amounts of narcotics were also seized including: 16.9 pounds of cocaine and crack cocaine, 66 pounds of marijuana, 38.44 pounds of methamphetamine, 1.9 pounds of heroin and over 15,000 doses of ecstasy. They arrested 251 individuals for narcotics violations, of which 89 were confirmed gang members. Thirty-five individuals were arrested for violent crimes and 20 were confirmed gang members. Ninety-eight of the individuals arrested were accepted for federal prosecution. Of those that are federally indicted, almost all dependents plead guilty to crimes that will result in sentences averaging ten years. In addition to their own arrests, the two VOTFs participated in the arrests of other individuals while responding to requests for assistance from other law enforcement entities.

There are several excellent examples of the impact that the VOTFs are having on the quality of life and crime within neighborhoods in the metro area. The Safe Streets initiative developed information in two separate instances where murders were planned and overt acts to carry out the murders were made.  In both instances, officers conducted surveillance on the suspects in order to ascertain the veracity of the information.  Using advanced, investigative techniques, officers worked with other local units and agencies and disrupted the murder plots.  Guns were recovered and arrests were made.

"Operation Family Ties" is a case that was worked jointly by the two VOTFs.  The violent, criminal gang it addressed had been making resurgence in Minneapolis since it was hit hard by law enforcement in the late 1990's.  The reason this violent gang was targeted by Safe Streets was due to the gang's stated desire to reorganize after many of its leaders were getting out of prison. Hennepin County VOTF was of particular benefit in the investigation as the gang was not only talking about re-establishing their former gang territory through the use of violence, but expanding their territory to other parts of Minneapolis and the northern suburbs.

**Prevention and Education** -It is important to note that beyond their objective of combating drug trafficking through law enforcement, task force officers spent a significant amount of time educating other criminal justice personnel, health professionals, teachers, parents and members of the public about drugs and gangs.  In the words of one task force, "officers gave five presentations to community groups, schools, and law enforcement and news agencies.   These presentations are an opportunity to inform the public of our presence and give rudimentary training on drug and gang activity in the task force area.  We also work with local law enforcement to keep them abreast of gang activity, drug trends, and legal updates pertaining to narcotics and search and seizure". In 2010, task force officers made 443 presentations with a total attendance of 16,509 people.

Task force personnel also participate in many local initiatives aimed at reducing the demand for drugs and sharing enforcement strategies to address emerging issues.  For example the task force in Polk County was compelled to respond when the County Attorney's Office noted that approximately 50% of felony drug possession crimes being prosecuted in 2010 were prescription

related.  The Pine to Prairie Task Force has developed a strategy in response to the increasing prescription drug problem in the area:  Working with local heath care providers to create "prescription drug-seeker" policy; conducting interviews with cooperating defendants to ascertain the "bigger picture" of the prescription drug problem; collaborating with the county attorney's office to obtain successful prosecution of defendants selling prescription pills; and sharing information learned from interviews and investigations with local law enforcement officers and public officials.

Another example is that in response to an emerging trend, the Southwest Metro Task Force produced a PowerPoint slide show educating people about synthetic marijuana and the problems and dangers associated with its use. It has been presented to the emergency room staff at one of the local hospitals and was shared with local school liaison officers. It was subsequently presented to the counselors at a local high school who then showed it to the all of the 9th grade health classes.  At their request, it was presented to one of the local city councils who are acting on banning the substances.

Last, but not least, task force officers also engage in prevention in a very personal way.  The following are just a few examples:

- Six Minneapolis officers assigned to Safe Streets are active in youth sports and activities to promote prevention activities and serve as positive role models.  The activities included: hockey, baseball, football, camping, fishing and academic activities.
- One of the Paul Bunyan Task Force officers is the coach for the local football team.  Many of the kids on this team are from dysfunctional families, have learning disabilities and may have a history of problems at school.  The officer has been a positive influence on these boys and is more than just a coach to them.  He also participated in the local area national night out: a community activity that promotes interaction with law enforcement.
- The BLLRR Task Force commander continues to do his radio talk show "Twenty Minutes with the Task Force." Most recently he discussed the widespread abuse of prescription drugs.

## ATTACHMENTS

<div align="center">

● Gang and Drug Case Summaries
● Map of 2011 Drug and Violent Crime Enforcement Teams
● List of 2010 - 2011 Task Force Grants
● List of Violent Crime Coordinating Council Members

</div>

**DA 298**

## GANG and DRUG CASE SUMMARIES

**The following are selected summaries of completed or active investigations.  These are examples as to the types of investigations and types of illegal activities being committed by different criminal elements throughout the state.**

The **Dakota County Task Force**, along with Eagan and Apple Valley Police Departments, conducted a joint investigation involving stolen property and narcotics.  Two search warrants were executed.  Stolen property valued over $250,000, 6 grams methamphetamine, marijuana, and $1,300 currency were seized.  The **Dakota County Task Force also** assisted the Apple Valley Police Department in the recovery of 4,039 doses of Vicodin, 809 doses Hydrocortisone, and numerous other controlled prescription medication that were stolen during a burglary of a drug store in Cannon Falls.  Two suspects were arrested.

In December 2010, the **Southeast Minnesota Task Force** arrested 14 suspects after a 7 month investigation.   The task force had 17 First Degree Drug Sales complaints approved for the sale of cocaine.  Twelve of the suspects have been identified as Black P-Stone or Black Disciples gang members.    Gang members were purchasing large amounts of cocaine in Chicago and Minneapolis.  This operation took some significant criminals off of the streets of Rochester and the entire task force area.

During the fall of 2010, the **Buffalo Ridge Task Force** and ATF joined forces to recover stolen firearms in the Worthington area.  The burglary, which included the theft of 42 firearms, took place at a Vail, IA gun store on May 31, 2010.  Early in the investigation, the primary suspects, who were identified as Norteno gang members, were arrested and federally indicted on bank robbery charges.  They had robbed a Rushmore, MN Bank in an effort to raise enough funds to repay drug debts. Four suspects were identified and arrested at a Worthington residence. Cash from the bank robbery and two firearms were located and seized.  Within a few days, a shooting was investigated at a Worthington residence. The uninjured occupants of the house were linked to those suspected in the bank robbery.  Further investigation by the task force led to two long guns being located that were buried in the yard;  five handguns in a plastic bag hidden under a tree ; two SKS assault rifles and magazines located in a body of water in southern Nobles County; and additional weapons and narcotics located at the scene during subsequent search warrants.

**Paul Bunyan Task Force** officers were involved in the successful rescue of a child hostage and subsequent arrest of the suspect at a house in Bemidji.  Officers had just finished a drug deal in Bemidji when the call was received and they were all in a position to act as perimeter cover officers and eventually make entry into the residence.

Agents of the **North Central Task Force** executed a search warrant at an apartment in Onamia.  During the execution of the search warrant, a half pound of marijuana was found along with drug paraphernalia.  Children were also present in the apartment along with marijuana smoke and Mille Lacs Family Services was called in to deal with the endangered children. The suspect and his girlfriend were both charged in Mille Lacs District Court with the drugs and child endangerment.

**Pine to Prairie Task Force** officers were requested to investigate a suspected methamphetamine lab 6 miles north of East Grand Forks.  The case was worked in collaboration with other agencies in conducting the investigation and task force officers processed the methamphetamine lab.  The investigation resulted in one arrest for First Degree-Manufacture of Methamphetamine.  The investigation indicated the suspect had "cooked" meth approximately 50 to 100 times throughout 2009 within three different northwest Minnesota counties.

**Paul Bunyan Task Force** officers spent many hours investigating gang-related shootings on the Leech Lake and White Earth Reservations.  They worked with investigators from several agencies during the course of building a case against the shooters at Leech Lake and two people have currently been charged with attempted murder. We hope to enhance the charges with "crime to benefit a gang".  The task force gang officer and a DOC investigator have obtained information that this shooting took place at the direction of Native Mob leaders and was retaliation for prior conflict between the Mob and victim. The shootings have demonstrated an increased propensity of the Native Mob to settle its' problems by violence.

An **Anoka-Hennepin Task Force** investigation into a suspected drug dealer in Coon Rapids led to a search warrant. The results of the search were three arrests, two children placed, and the seizure of 51 grams of marijuana, 24 ecstasy pills, 46 diazepam pills, $1,354 in cash and two handguns.

The **Boundary Waters Task Force** reports that there have been two deaths in the communities of Hibbing and Gilbert directly related to pill overdoses and the Gilbert police, a member of the BWDTF, arrested 7 juveniles that were selling prescription pills inside the junior high school.  The task force remains focused on fighting this problem and have charges currently pending against 16 more individuals for illegal pill sales.

**Central Minnesota Task Force** investigators concluded an investigation into the distribution of crack cocaine by local gang members.  Three known gang members and a number of previously unidentified female associates were responsible for a crack cocaine delivery operation.  One of the defendants, a violent felon, was arrested in the possession of a loaded revolver during a crack deal.  This person was already out on bail for possession of a handgun by a felon at the time of his arrest.  This case has been presented to the United States Attorney's Office for possible charges.

A **Red River Valley Task Force** officer had a ten day jury trial in federal court which resulted in guilty verdicts for three upper tier traffickers of methamphetamine.  These defendants were indicted under Operation "Abrasion" and were responsible for approximately 40 pounds s of methamphetamine trafficked into the region.  One defendant was the president of the "Dakota Riders Motorcycle Club" based in Bismarck, North Dakota.

In December, the **Lake Superior Task Force** concluded a methamphetamine/pill sales case on a high profile local dealer with two search warrants.  The first warrant resulted in seizure of methamphetamine, heroin, Opana pills, $754 cash and 2 firearms.  A second warrant yielded seizure of third firearm and large amount of ammunition.  Charges were presented and the case adopted in the federal system.

In the City of Willmar**, a CEE-VI Task Force** drug agent bought 200 prescription pills at one time from two female individuals while there were small children in the vehicle.  In addition to drug charges there were also child endangerment charges.

Members of the **South Central Task** Force teamed with members of the MN BCA, MN State Patrol K-9 and Truck Enforcement), DEA, and our local agencies for an interdiction project.  This was a coordinated effort along I-35 and I-90, with the State Patrol opening an old scale site for enforcement efforts on large trucks.  Well over 200 traffic stops were conducted by officers, deputies and troopers as well as a large number of trucks at the scale site.  Numerous citations for license violations, speed, seatbelt, insurance, illegal drugs and paraphernalia were issued.  There was also a 40 pound marijuana seizure from the trunk of a car that was on a semi car hauler.  A controlled delivery of the marijuana was later conducted near the University of Minnesota and three additional suspects were apprehended.

The **Minnesota River Valley Task Force** wrapped up a marijuana investigation involving a known Gangster Disciple gang member in the St. Peter area after he sold marijuana at a local recreation center while pushing his 9 month old baby in a stroller. Also, what agents believed to be a simple marijuana search warrant in St. James turned into something a lot more complex after several items of child pornography were discovered.  The local police executed a separate search warrant and removed a high volume of evidence in that case.

The **Lakes Area Drug Investigation Division** (LADID) was able to arrest a large supplier of methamphetamine in the Crow Wing County area as a result of citizen concerns and good police work.  A concerned citizen had been supplying license plate numbers of people frequenting a house of a known drug dealer.  Agents installed a GPS tracker and conducted garbage pulls on the suspect.  Through the use of uniformed officers and drug interdiction techniques, LADID obtained a search warrant for the residence which resulted in the seizure of 2 ounces of methamphetamine.  The suspect provided useful information about drug trafficking in Crow Wing County.

The **Northwest Metro Task Force** had a large cocaine seizure during the third quarter of 2010.  A suspect was identified that was believed to be a cocaine dealer. A GPS tracker was placed on the suspect's car and eventually the suspect was seen going to Dallas, Texas then turning around after staying there for only about an hour and coming home. The task force found the suspect entering Minnesota and with the assistance of the Minnesota State Patrol made a traffic stop on the suspect. During the stop just over one pound of cocaine was recovered. Follow up search warrants turned up more cocaine and a large amount of cash.

**Ramsey County Violent Crime Enforcement Team** officers completed an investigation on a mid-level methamphetamine dealer who is a member of a local outlaw motorcycle gang.  Through the use of an undercover officer, several ounces of methamphetamine were purchased from the target.  Search warrants were executed and additional meth, 10 pounds of marijuana and 2 handguns were recovered.  The target has an extensive criminal history and is a registered sex offender.



## 2011 Drug and Violent Crime Enforcement Teams
### Department of Public Safety
### OFFICE OF JUSTICE PROGRAMS

**GRANTS FOR DRUG AND VIOLENT OFFENDER TASK FORCES:  January 1, 2010 – June 30, 2011**

| Task Force | Fiscal Agent | 2010 Grant | Grant for 1/1/11 - 6/30/11 | New Total Award |
|---|---|---|---|---|
| Anoka-Hennepin TF | Anoka County Sheriff's Office | $290,000 | $141,375 | $431,375 |
| B-L-L-R-R Task Force | New Ulm Police Department | $175,000 | $86,625 | $261,625 |
| Boundary Waters TF | St. Louis County Sheriff's Office | $100,000 | $49,500 | $149,500 |
| Buffalo Ridge TF | Worthington Police Department | $200,000 | $97,500 | $297,500 |
| CEE-VI  TF | Kandiyohi County Sheriff's Office | $210,000 | $102,375 | $312,375 |
| Central MN  MCIU | Central Minnesota Major Crimes Investigation Unit | $295,000 | $143,813 | $438,813 |
| Dakota County TF | City of Eagan | $310,000 | $138,938 | $448,938 |
| East Metro VCET | Ramsey County Sheriff's Office | $530,000 | $253,500 | $783,500 |
| Hennepin County VOTF | Hennepin County Sheriff's Office | $470,000 | $229,125 | $699,125 |
| Lake Superior TF | Duluth Police Department | $335,000 | $163,313 | $498,313 |
| Lakes Area TF | Crow Wing Co Sheriff's Office | $35,000 | $17,500 | $52,500 |
| MN River Valley TF | No. Mankato Police Department | $150,000 | $74,250 | $224,250 |
| North Central TF | Mille Lacs County Sheriff's Office | $62,500 | $30,938 | $93,438 |
| Northwest Metro VCET | St. Louis Park Police Dept. | $90,000 | $44,550 | $134,550 |
| Paul Bunyan  TF | Beltrami County Sheriff's Office | $297,768 | $145,162 | $442,930 |
| Pine To Prairie  TF | Crookston Police Department | $125,000 | $61,875 | $186,875 |
| Red River Valley  TF | Moorhead Police Department | $125,000 | $61,875 | $186,875 |
| St. Cloud Metro GSF | St. Cloud Police Department | $100,000 | $49,500 | $149,500 |
| South Central  TF | Owatonna Police Department | $160,000 | $79,200 | $239,200 |
| Southeast MN  TF | Olmsted County Sheriff's Office | $200,000 | $97,500 | $297,500 |
| Southwest Metro  TF | Shakopee Police Department | $85,000 | $42,075 | $127,075 |
| Washington County  TF | Washington Co Sheriff's Office | $135,000 | $66,825 | $201,825 |
| West Central  TF | Douglas County Sheriff's Office | $160,000 | $79,200 | $239,200 |
| Safe Streets Task Force | Minneapolis Police | $250,000 | $75,000 | $325,000 |
| Safe Streets Task Force | St. Paul Police | $147,000 | $75,000 | $222,000 |
| Statewide Prosecution | Attorney General's Office | $50,000 | $25,000 | $75,000 |
| **TOTAL** | | **$5,087,268** | **$2,431,513** | **$7,518,781** |

**DA 303**

## MINNESOTA VIOLENT CRIME COORDINATING COUNCIL (January 2011)

| TITLE | NAME | AGENCY |
|---|---|---|
| Acting Superintendent | David Bjerga | Bureau of Criminal Apprehension |
| U.S. Attorney | B. Todd Jones | District of Minnesota |
| Deputy Attorney General | David Voigt | Office of the Attorney General |
| Asst. Chief **(VICE CHAIR)** | Ken Reed | St. Paul Police Department |
| Chief | Tim Dolan | Minneapolis Police Department |
| Chief | Mike Goldstein | Plymouth Police Department |
| Chief **(CHAIR)** | Dana Waldron | Virginia Police Department |
| Sheriff | Rich Stanek | Hennepin County Sheriff's Office |
| Sheriff | Matt Bostrom | Ramsey County Sheriff's Office |
| Sheriff | Bill Hutton | Washington County Sheriff's Office |
| Sheriff | Rodney Bartsh | Wabasha County Sheriff's Office |
| Director | Cari Gerlicher | MN Department of Corrections - Office of Special Investigations |
| Assistant County Attorney | Hilary Caligiuri | Hennepin County Attorney's Office |
| Assistant County Attorney | Benjamin Bejar | Rice County Attorney's Office |
| Chief | Garr Pemberton | Leech Lake Tribal Police |
| Mr. | Hector Garcia | Chicano Latino Affairs Council |
| Ms. | Nicole Matthews | Minnesota Indian Women's Sexual Assault Coalition |

**LEGAL COUNSEL**

| | | |
|---|---|---|
| Asst. Attorney General | John Gross | Office of the Attorney General |

## DA 304

one thousand seven hundred and ninety-six, intituled "An act laying duties upon carriages for the conveyance of persons, and repealing the former act for that purpose," as limits the duration of said act, shall be and the same is hereby repealed, and said act is hereby continued in force, without limitation of time.

APPROVED, February 25, 1801.

*riages," &c. continued without limitation. May 28, 1796, ch. 37.*

———

STATUTE II.

CHAP. XII.—*An Act declaring the consent of Congress to an act of the state of Maryland, passed the twenty-eighth day of December, one thousand seven hundred and ninety-three, for the appointment of a Health Officer.*

Feb. 27, 1801.

[Expired.]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the consent of Congress be, and is hereby granted and declared, to the operation of an act of the General Assembly of Maryland, passed the twenty-eighth day of December, one thousand seven hundred and ninety-three, intituled "An act to appoint a health officer for the port of Baltimore, in Baltimore county," so far as to enable the state aforesaid to collect a duty of one cent per ton, on all vessels coming into the district of Baltimore from a foreign voyage, for the purposes in said act intended.

SEC. 2. *And be it further enacted,* That this act shall be in force for three years, from the passing thereof, and from thence to the end of the next session of Congress thereafter, and no longer.

APPROVED, February 27, 1801.

Continued by Act of March 1, 1805, ch. 19.

———

STATUTE II.

CHAP. XIII.—*An Act to allow the transportation of goods, wares and merchandise, to and from Philadelphia and Baltimore, by the way of Appoquinimink and Sassafras.*

Feb. 27, 1801.

———

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That any goods, wares and merchandise, which lawfully might be transported to or from the city of Philadelphia and Baltimore, by the way of Elkton, Bohemia or Frenchtown, and Port Penn, Appoquinimink, New Castle, Christiana Bridge, Newport or Wilmington, shall and may lawfully be transported, to and from the city of Philadelphia and Baltimore, by the way of Appoquinimink and Sassafras river, and shall be entitled to all the benefits and advantages, and shall be subject to all the provisions, regulations, limitations and restrictions, existing in the case of goods, wares and merchandise, transported by any of the routes before mentioned.

APPROVED, February 27, 1801.

Goods imported into Baltimore or Philadelphia may be transported by Appoquinimink and Sassafras rivers.

1799, ch. 22.

———

STATUTE II.

CHAP. XV.—*An Act concerning the District of Columbia.(a)*

Feb. 27, 1801.

SECTION 1. *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the

Laws of Virginia and Mary-

———

(a) District of Columbia. The acts for the government and administration of justice in the District of Columbia, are:
1. An act for establishing the temporary and permanent seat of the government of the United States, July 16, 1790, chap. 28.
2. An act supplementary to an act entitled, "An act concerning the District of Columbia," March 3, 1801, chap. 24.
3. An act concerning the District of Columbia, February 27, 1801, chap. 15.
4. An act additional to an act amendatory of an act entitled, "An act concerning the District of Columbia," May 3, 1802, chap. 52.
5. An act to amend the judicial system of the United States, April 29, 1802, chap. 31, sec. 24.
6. An act for the relief of insolvent debtors within the District of Columbia, March 3, 1803, chap. 31.
7. An act to extend the jurisdiction of justices of the peace in the recovery of debts, in the District of Columbia, March 1, 1823, chap. 24.
8. An act respecting the adjournment of the circuit court of the District of Columbia, March 3, 1825.

**104**                        SIXTH CONGRESS.  Sess. II. Ch. 15.  1801.

land continued
in force in the
district.

laws of the state of Virginia, as they now exist, shall be and continue
in force in that part of the District of Columbia, which was ceded by
the said state to the United States, and by them accepted for the perma-
nent seat of government; and that the laws of the state of Maryland,

---

9. An act altering the times of holding the circuit courts in the District of Columbia, May 20, 1826, chap. 131.

10. An act to establish a criminal court in the District of Columbia, July 7, 1838, chap. 192.

11. An act to restrain the circulation of small notes as a currency in the District of Columbia, and for other purposes, July 7, 1838, chap. 212.

12. Resolution directing the manner in which certain laws of the District of Columbia shall be executed, March 2, 1839.

13. An act for granting possessions, enrolling conveyances and securing the estates of purchasers within the District of Columbia, May 31, 1832, chap. 112.

14. An act changing the times of holding the courts in the District of Columbia, May 31, 1832, chap. 114.

Act of February 30, 1839, chap. 30.

The decisions of the courts of the United States upon this and other statutes relating to the District of Columbia, and other questions arising in the district, have been :

The act of Congress of 27 February, 1801, concerning the District of Columbia, directs that writs of error shall be prosecuted in the same manner, under the same regulations, and the same proceedings *shall be had thereon, as is or shall be provided in case of writs of error on judgments, or appeals upon orders or decrees, rendered in the circuit courts of the United States.* United States *v.* Hooe et al., 1 Cranch, 318 ; 1 Cond. Rep. 322.

By the separation of the District of Columbia from the state of Maryland, the residents in that part of Maryland which became a part of the district ceased to be citizens of the state. Reilly, Appellant *v.* Lamar et al., 2 Cranch, 344 ; 1 Cond. Rep. 419.

A citizen of the District of Columbia, could not be discharged by the insolvent law of Maryland, out of the district. *Ibid.*

A citizen of the District of Columbia, cannot maintain an action in the circuit court of the United States, out of the district ; he not being a citizen of a state within the meaning of the provision in the law of the United States, regulating the jurisdiction of the courts of the United States. Hepburn and Dundas *v.* Ellzey, 2 Cranch, 445 ; 1 Cond. Rep. 444.

A justice of the peace, in the District of Columbia, is an officer of the government of the United States ; and is exempt from militia duty. Wise *v.* Withers, 3 Cranch, 331 ; 1 Cond. Rep. 552.

Under the sixth and eighth sections of the act of assembly of Virginia, of the 22d of December, 1794, property pledged to the Mutual Assurance Society, &c. continues liable for assessments, on account of the losses insured against, in the hands of a bona fide purchaser, without notice. The Mutual Assurance Society *v.* Watts' Ex'r, 1 Wheat. 279 ; 3 Cond. Rep. 570.

A mere change of sovereignty produces no change in the state of rights existing in the soil ; and the cession of the District of Columbia to the national government did not affect the lien created by the above act on real property situate in the town of Alexandria ; though the personal character or liability of a member of the society could not be thereby forced on a purchaser of such property. *Ibid.*

Congress has authority to impose a direct tax on the District of Columbia, in proportion to the census directed to be taken by the constitution. Loughborough *v.* Blake, 5 Wheat. 317 ; 4 Cond. Rep. 660.

Congress, when legislating for the District of Columbia, under the fifth section of the first article of the constitution, is still the *legislature of the Union,* and its acts are the laws of the United States. Cohens *v.* Virginia, 6 Wheat. 264 ; 5 Cond. Rep. 90.

An act of the legislature of Maryland, passed the 19th of December, 1791, entitled "An act concerning the territory of Columbia, and the city of Washington," which, by the 6th section, provides for the holding of lands by "foreigners," is an enabling act ; and applies to those only who could not take lands without the provisions of that law. It enables a "foreigner" to take in the same manner as if he were a citizen. Spratt *v.* Spratt, 1 Peters, 343.

A foreigner who becomes a citizen, is no longer a foreigner, within the view of the act. Thus, after purchase, lands vested in him as a citizen ; not by virtue of the act of the legislature of Maryland, but because of his acquiring the rights of citizenship. *Ibid.*

Land in the county of Washington, and District of Columbia, purchased by a foreigner, before naturalization, was held by him under the law of Maryland, and might be transmitted to the relations of the purchasers, who were foreigners : and the capacity so to transmit those lands, is given, absolutely, by this act, and is not affected by his becoming a citizen ; but passes to his heirs and relations, precisely as if he had remained a foreigner. *Ibid.*

The supreme court of the United States has jurisdiction of appeals from the orphans' court, through the circuit court for the county of Washington, by virtue of the act of Congress of February 13, 1801 ; and by the act of Congress subsequently passed, the matter in dispute, exclusive of costs, must exceed the value of one thousand dollars, in order to entitle the party to an appeal. Nicholls et al. *v.* Hodges' Ex'rs, 1 Peters, 565.

The statute of Elizabeth is in force in the District of Columbia. Cathcart et al. *v.* Robinson, 5 Peters, 264.

The levy court of Washington county is not entitled to one half of all the fines, penalties, and forfeitures imposed by the circuit court in cases at common law, and under the acts of Congress, as well as the acts of assembly of Maryland, adopted by Congress as the law of the District of Columbia. Levy Court of Washington *v.* Ringgold, 5 Peters, 451.

The supreme court of the United States has no jurisdiction of causes brought before it, upon a certificate of division of opinion of the judges of the circuit court for the District of Columbia. The appellate jurisdiction, in respect to that court, extends only to its final judgments and decrees. Ross *v.* Triplett. 3 Wheat. 600 ; 4 Cond. Rep. 351.

By the insolvent law of Maryland, of January 3, 1800, the chancellor of Maryland could not discharge one who was an inhabitant of the District of Columbia, after the separation from Maryland, unless previous

---

# DA 306

as they now exist, shall be and continue in force in that part of the said district, which was ceded by that state to the United States, and by them accepted as aforesaid.

SEC. 2. *And be it further enacted,* That the said district of Columbia shall be formed into two counties; one county shall contain all that part of said district, which lies on the east side of the river Potomac, together with the islands therein, and shall be called the county of Washington; the other county shall contain all that part of said district, which lies on the west side of said river, and shall be called the county of Alexandria; and the said river in its whole course through said district shall be taken and deemed to all intents and purposes to be within both of said counties.

<div align="right">

It shall be formed into two counties.

Washington county.

Alexandria county.

</div>

SEC. 3. *Be it further enacted,* That there shall be a court in said district, which shall be called the circuit court of the district of Columbia; and the said court and the judges thereof shall have all the powers by law vested in the circuit courts and the judges of the circuit courts of the United States. Said court shall consist of one chief judge and two assistant judges resident within said district, to hold their respective offices during good behaviour; any two of whom shall constitute a quorum; and each of the said judges shall, before he enter on his office, take the oath or affirmation provided by law to be taken by the

<div align="right">

Circuit court established in it.

To consist of one chief judge and two assistant judges.

</div>

---

to that separation he had entitled himself to a discharge by performing all the requisites of the act. Reilly v. Lamar et al. 2 Cranch, 344; 1 Cond. Rep. 419.

No appeal or writ of error lies, in a criminal case, from the judgment of the circuit court of the District of Columbia, to the supreme court of the United States: the appellate jurisdiction given by the act of Congress, is confined to civil cases. United States v. More, 3 Cranch, 159; 1 Cond. Rep. 480.

There is, in the District of Columbia, no division of powers between the general and the state governments. Congress has the entire control over the district, for every purpose of government: and it is reasonable to suppose that, in organizing a judicial department in the district, all the judicial power, necessary for the purpose of government, would be vested in the courts of justice. Kendall, Postmaster General v. The United States, 12 Peters, 524.

The circuit court of the United States, for the District of Columbia, has a right to award a mandamus to the postmaster-general of the United States, requiring him to pass to the credit of certain contractors for conveying the mail of the United States, a sum found to be due to them by the solicitor of the treasury of the United States, the solicitor acting under the special provisions of an act of Congress. *Ibid.*

There can be no doubt, that, in the state of Maryland, a writ of mandamus might be issued to an executive officer, commanding him to perform a ministerial act, required of him by the laws: and if it would lie in that state, there can be no good reason why it should not lie in the District of Columbia, in analogous cases. *Ibid.*

The powers of the supreme court of the United States, and of the circuit courts of the United States, to issue writs of mandamus, granted by the fourteenth section of the judiciary act of 1789, is only for the purpose of bringing the case to a final judgment or decree, so that it may be reviewed. The mandamus does not direct the inferior court how to proceed, but only that it must proceed, according to its own judgment, to a final determination; otherwise it cannot be reviewed in the appellate court. It is different in the circuit court of the District of Columbia, under the adoption of the laws of Maryland, which included the common law. *Ibid.*

The power of the circuit court of the District of Columbia, to exercise the jurisdiction to issue a writ of mandamus to a public officer, to do an act required of him by law, results from the third section of the act of Congress of February 27, 1804; which declares that the court and judges thereof shall have all the powers by law vested in the circuit courts of the United States. The circuit courts referred to, were those established by the act of February 13, 1801. The repeal of that law, fifteen months afterwards, and after that law had gone into operation, under the act of February 27, 1801, could not in any manner affect that law, any further than was provided by the repealing act. *Ibid.*

The circuit courts of the United States, sitting in the states of the Union, have no jurisdiction in a case in which a citizen of the District of Columbia is plaintiff. Westcott's Lessee v. Inhabitants, &c. Peters' C. C. R. 45.

The act of Congress of June, 1822, authorizes any person to whom administration has been granted in the states of the United States, to prosecute claims by suits in the District of Columbia, in the same manner as if the same had been granted by proper authority, in the District of Columbia, to such persons. The power is limited by its terms to the institution of suits, and does not authorize suits against an executor or administrator. The effect of this law was to make all debts due by persons in the District of Columbia, not local assets, for which the administrator was bound to account in the courts of the district, but general assets which he had full authority to receive, and for which he was bound to account in the courts of the state from which he derived his letters of administration. Vaughan et al. v. Northup et al., 15 Peters' Rep. 1.

The courts of the United States in the District of Columbia, have a like jurisdiction upon personal property, with the courts in England, and in the states of the Union; and in the absence of statutory provisions, in the trial of them they must apply the same common law principle which regulates the mode of bringing such actions, the pleadings and the proof. M'Kenna v. Fiske, 17 Peters' Rep. 245.

judges of the circuit courts of the United States; and said court shall have power to appoint a clerk of the court in each of said counties, who shall take the oath and give a bond with sureties, in the manner directed for clerks of the district courts in the act to establish the judiciary of the United States.

**Sessions of the court in Washington county,**

**in Alexandria county.**

Sec. 4. *Be it further enacted,* That said court shall, annually, hold four sessions in each of said counties, to commence as follows, to wit: for the county of Washington, at the city of Washington, on the fourth Mondays of March, June, September and December; for the county of Alexandria, at Alexandria, on the second Mondays of January, April, July, and the first Monday of October.

**Subjects for the cognizance of the court.**

Sec. 5. *Be it further enacted,* That said court shall have cognizance of all crimes and offences committed within said district, and of all cases in law and equity between parties, both or either of which shall be resident or be found within said district, and also of all actions or suits of a civil nature at common law or in equity, in which the United States shall be plaintiffs or complainants; and of all seizures on land or water, and all penalties and forfeitures made, arising or accruing under the laws of the United States.

**Where local actions shall be commenced.**

**No suits to be brought, but against inhabitants or persons found in the district.**

**A marshal to be appointed for the district.**

Sec. 6. *Provided, and be it further enacted,* That all local actions shall be commenced in their proper counties, and that no action or suit shall be brought before said court, by any original process against any person, who shall not be an inhabitant of, or found within said district, at the time of serving the writ.

Sec. 7. *Be it further enacted,* That there shall be a marshal for the said district, who shall have the custody of the gaols of said counties, and be accountable for the safe keeping of all prisoners legally committed therein; and he shall be appointed for the same term, shall take the same oath, give a bond with sureties in the same manner, shall have generally, within said district, the same powers, and perform the same duties, as is by law directed and provided in the case of marshals of the United States.

**Writs of error and appeal.**

Sec. 8. *Be it further enacted,* That any final judgment, order or decree in said circuit court, wherein the matter in dispute, exclusive of costs, shall exceed the value of one hundred dollars, may be re-examined and reversed or affirmed in the supreme court of the United States, by writ of error or appeal,(*a*) which shall be prosecuted in the same manner, under the same regulations, and the same proceedings shall be had therein, as is or shall be provided in the case of writs of error on judgments, or appeals upon orders or decrees, rendered in the circuit court of the United States.

**An attorney to be appointed.**

**Allowances to the attorney, marshal and clerks.**

Sec. 9. *Be it further enacted,* That there shall be appointed an attorney of the United States for said district, who shall take the oath and perform all the duties required of the district attornies of the United States; and the said attorney, marshal and clerks, shall be entitled to receive for their respective services, the same fees, perquisites and emoluments, which are by law allowed respectively to the attorney, marshal and clerk of the United States, for the district of Maryland.

Sec. 10. *Be it further enacted,* That the chief judge, to be appointed by virtue of this act, shall receive an annual salary of two thou-

---

(*a*) By an act entitled, "An act to limit the right of appeal from the circuit court of the United States for the District of Columbia, passed April 2, 1816, chap. 39, it is provided that no cause shall be removed from the circuit court of the District of Columbia, unless the matter in dispute in the cause shall be of the value of one thousand dollars and upwards. But when a party in a cause shall deem himself aggrieved by any final judgment or decree of the said circuit court, where the matter in dispute shall be of the value of $100, and of less value than $1000, on a petition to a justice of the supreme court, if the said justice shall be of opinion that errors in the proceedings of the court involve questions of law of such extensive interest and operation as to render the final judgment of the supreme court desirable, the case may be removed at the discretion of the said justice.

sand dollars, and the two assistant judges, of sixteen hundred dollars each, to be paid quarterly, at the treasury of the United States.(a)

**Compensation of the judges.**

Sec. 11. *Be it further enacted,* That there shall be appointed in and for each of the said counties, such number of discreet persons to be justices of the peace, as the President of the United States shall from time to time think expedient, to continue in office five years; and such justices, having taken an oath for the faithful and impartial discharge of the duties of the office, shall, in all matters, civil and criminal, and in whatever relates to the conservation of the peace, have all the powers vested in, and shall perform all the duties required of, justices of the peace, as individual magistrates, by the laws herein before continued in force in those parts of said district, for which they shall have been respectively appointed; and they shall have cognizance in personal demands to the value of twenty dollars, exclusive of costs; which sum they shall not exceed, any law to the contrary notwithstanding; and they shall be entitled to receive for their services the fees allowed for like services by the laws herein before adopted and continued, in the eastern part of said district.

**Justices of the peace to be appointed.**

**Their jurisdiction.**

Sec. 12. *And be it further enacted,* That there shall be appointed in and for each of the said counties, a register of wills, and a judge to be called the judge of the orphans' court, who shall each take an oath for the faithful and impartial discharge of the duties of his office; and shall have all the powers, perform all the duties, and receive the like fees, as are exercised, performed, and received, by the registers of wills and judges of the orphans' court, within the state of Maryland; and appeals from the said courts shall be to the circuit court of said district, who shall therein have all the powers of the chancellor of the said state.

**Registers of wills and judges of the orphans' court to be appointed.**

**Act of May 19, 1828, ch. 59.**

Sec. 13. *And be it further enacted,* That in all cases where judgments or decrees have been obtained, or hereafter shall be obtained, on suits now depending in any of the courts of the commonwealth of Virginia, or of the state of Maryland, where the defendant resides or has property within the district of Columbia, it shall be lawful for the plaintiff in such case upon filing an exemplification of the record and proceedings in such suits, with the clerk of the court of the county where the defendant resides, or his property may be found, to sue out writs of execution thereon, returnable to said court, which shall be proceeded on, in the same manner as if the judgment or decree had originally been obtained in said court.

**How to obtain execution within the district, upon judgments already rendered in courts of Maryland and Virginia.**

Sec. 14. *And be it further enacted,* That all actions, suits, process, pleadings, and other proceedings of what nature or kind soever, depending or existing in the courts of Hustings for the towns of Alexandria and Georgetown, shall be, and hereby are continued over to the circuit courts to be holden by virtue of this act, within the district of Columbia, in manner following; that is to say: all such as shall then be depending and undetermined, before the court of Hustings for the town of Alexandria, to the next circuit court hereby directed to be holden in the town of Alexandria; and all such as shall then be depending and undetermined, before the court of Hustings for Georgetown, to the next circuit court hereby directed to be holden in the city of Washington: *Provided nevertheless,* that where the personal demand in such cases, exclusive of costs, does not exceed the value of twenty dollars, the justices of the peace within their respective counties, shall have cognizance hereof.

**Suits in the courts of Hustings for Alexandria and Georgetown continued to the circuit court.**

Sec. 15. *And be it further enacted,* That all writs and processes whatsoever, which shall hereafter issue from the courts hereby established

**Test of writs.**

---

*(a)* An act concerning the District of Columbia, February 27, 1801, chap. 15; an act to increase the salaries of the judges of the circuit court for the District of Columbia, March 3, 1811; an act to increase the salaries of the judges of the circuit court for the District of Columbia, April 20, 1818; an act concerning the orphans' court of Alexandria county, in the District of Columbia, May 19, 1828, chap. 59.

**DA 309**

within the district, shall be tested in the name of the chief judge of the district of Columbia.

Saving of the rights of corporations.

SEC. 16. *And be it further enacted,* That nothing in this act contained shall in any wise alter, impeach or impair the rights, granted by or derived from the acts of incorporation of Alexandria and Georgetown, or of any other body corporate or politic, within the said district, except so far as relates to the judicial powers of the corporations of Georgetown and Alexandria.

APPROVED, February 27, 1801.

STATUTE II.

March 2, 1801.

[Obsolete.]

Act of May 7, 1800, ch. 41.
Certain suits revived.

CHAP. XVI.—*An Act supplementary to an act, intituled "An act to divide the territory of the United States northwest of the Ohio, into two separate governments."*

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That all suits, and process and proceedings, which, on the third day of July, one thousand eight hundred, were pending in any court of either of the counties, which by the act intituled "An act to divide the territory of the United States northwest of the Ohio, into two separate governments," has been included within the Indiana territory; and that all suits, process and proceedings, which, on the aforesaid third day of July, were pending in the general court of the territory of the United States northwest of the Ohio, in consequence of any writ of removal or order for trial at bar, had been removed from either of the counties now within the limits of the Indiana territory aforesaid, shall be and they are hereby revived and continued; and the same proceedings, before the rendering of final judgment and thereafter, may and shall be had, in the same courts, in all suits and process aforesaid, and in all things concerning the same, as by law might have been had in case the said territory of the United States northwest of the Ohio had remained undivided.

APPROVED, March 2, 1801.

STATUTE II.

March 2, 1801.

[Repealed.]

District of Massac.

CHAP. XVII.—*An Act to add to the district of Massac, on the Ohio, and to discontinue the district of Palmyra in the state of Tennessee, and therein to amend the act, intituled "An act to egulate the collection of duties on imports and tonnage."*

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the district of Massac, in addition to the territory it already possesses, shall include all waters, shores, and inlets, now included within the district of Palmyra, and all rivers, waters, shores and inlets, lying within the state of Tennessee.

District of Palmyra.
Section 16, Act of March 2, 1799, repealed.

SEC. 2. *And be it further enacted,* That from and after the thirtieth day of June next, so much of the "Act to regulate the collection of duties on imports and tonnage," as establishes the district of Palmyra in the state of Tennessee, shall be repealed, except as to the recovery and receipts of such duties on goods, wares and merchandise, and on the tonnage of ships or vessels, as shall have accrued, and as to the recovery and distribution of fines, penalties and forfeitures, which shall have been incurred before and on the said day.

APPROVED, March 2, 1801.

STATUTE II.

March 2, 1801.

[Obsolete.]

CHAP. XVIII.—*An Act making appropriations for the Military establishment of the United States, for the year one thousand eight hundred and one.*

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That for defraying the

*Ordinances*

# ACTS

## OF

# THE CORPORATION

### OF THE

### *CITY OF WASHINGTON,*

#### PASSED BY

### THE FIRST COUNCIL.

##### TO WHICH IS PREFIXED

### THE ACT OF INCORPORATION.

*PRINTED BY ORDER OF THE COUNCIL.*

--->+<---

### Washington:

PRINTED BY A. AND G. WAY.

1803.

**DA 311**

Digitized by Google

## 18

be paid them by the seller. **Before they**
Oath of   enter upon the duties of their office they
office.   shall take an oath before some justice of the
peace for the faithful performance of their
duty.

*Approved, November 23d, 1809.*

---

AN ACT making an appropriation for C
street north, from 8th street to Pennsyl-
vania avenue.

*Be it enacted by the first and second
chambers of the city council of Washington,*
That the sum of eighty dollars be, and the
Appropria- same is hereby appropriated for opening C
tion for C   street north, from 8th street to Pennsylvania
st. north.   avenue, out of any monies in the treasurer's
hands not otherwise appropriated, and that
the same be expended under the direction
of the mayor.

*Approved, November 23d, 1809.*

---

AN ACT to suppress horse running and
shooting, in certain cases, in the city of
Washington.

Sec. 1. *BE it enacted by the first and
second chambers of the city council of Wash-
ington,* That from and after the first of Janu-
ary next, it shall not be lawful for any person

Digitized by Google

to run an animal of the horse kind in any of the streets or avenues in the city of Washington, within three hundred yards of any house or building in said city, under a penalty of ten dollars for each offence. *Horse-running in the streets prohibited.*

Sec. 2. *And be it enacted,* That if the owner of any horse shall permit any minor, slave, or other person, to run his horse in any street or avenue of the city, within three hundred yards of any house or building in said city, he shall incur the penalty of ten dollars for each offence, one half to go to the informer and the other half to the corporation, and any person shall be authorized to stop or seize any horse so running until the owner shall pay the above penalty. *Owners of horses incur a penalty if they permit them to be run in the streets by slaves, &c.*

Sec. 3. *And be it enacted,* That if any slave shall be seen running any horse in any street or avenue of the city, within three hundred yards of any house or building, it shall be the duty of any constable to take such slave before a magistrate, and on his being convicted of such offence he shall be publicly whipped any number of lashes not exceeding thirty-nine. *Slaves to be publicly whipped for running horses in the streets.*

Sec. 4. *And be it enacted,* That if any person or persons, from and after the first day of January next, shall shoot with a gun or other fire arms, within four hundred yards of any house in said city, or on the sabbath in any part of the city, shall forfeit and pay a fine of ten dollars, one half of said penalty to go to the informer and the other half to the use of the city. *Shooting in the streets prohibited.*

*Approved, December 9th,* 1809.

Digitized by Google

which such offender may be, upon complaint made to Punishment of Crimes. him upon oath that such crime or offence hath been committed, or upon receiving a copy of the indictment or other process, if any, which shall have been found or issued in the said District of Columbia against such offender, to issue his warrant to apprehend such offender, and to cause him, at the expense of the United States, to be arrested and imprisoned or bailed (as the case may require) for trial before such court in the District of Columbia, as may have jurisdiction of the offence; and copies of the process shall be returned as speedily as may be into the clerk's office of such court, together with the recognizance of bail, and the recognizances of the witnesses for their appearance to testify in the case, if any such shall have been taken : which recognizances the said judge may require on pain of imprisonment ; and the said judge, if bail shall not have been given, shall seasonably issue and the marshal of his district shall execute a warrant for the removal of the offender and the witnesses (in case they shall be in prison) or either of them, (as the case may be) to the said District of Columbia : and the expenses of such arrest, commitment, and removal being ascertained and certified by the judge of the district in which the offender shall have been so arrested, shall be charged by the marshal of the said district in his account with the United States, and shall be allowed by the proper accounting officers of the treasury. And in case such recognizance of bail, Recognizance. or the recognizances of the witnesses should be forfeited, *scire facias* and execution may issue upon a certified copy thereof in any judicial district within the jurisdiction of the United States in which the respective recognitors may reside or may be found.

Sec. 40. No man, great nor small, of what condition soever he be, except the ministers of justice in executing the precepts of the courts of justice, or in executing their office, and such as may be in their

2 E. 3. c. 3.
2 R. 2. c. 13.
20 R. 2. c. 1.
V.L. 30. c. 21.
Punishing affrays.

**Punishment of crimes.**

**No person to come before the court with force and arms; nor to go about armed, to the terror of the country.**

company assisting them, shall be so hardy as to come with force and arms before the justices or judges of any court within the District of Columbia, or either of their ministers of justice, doing their office, on pain to forfeit his armour to the United States, and his body to prison, at the pleasure of such court; nor go, nor ride armed by night nor by day, in fairs, or markets, or in other places, in terror of the country, upon pain of being arrested and committed to prison by any justice or judge on his own view, or proof by others, and of forfeiture of his armour to the United States; but no person shall be imprisoned for any offence against this act, by a longer space of time than one month.

**1. G. 1. st. 2. c. 5. § 1.**
**Riots, &c.**

**Penalty for not dispersing when ordered.**

Sec. 41. If any persons, to the number of twelve or more, being unlawfully, riotously, and tumultuously assembled together, to the disturbance of the public peace in the District of Columbia, and being required or commanded by any one or more justice or justices of the peace, or by the marshal of the said District, or his deputy, or by the mayor, or other chief officer of any city or town corporate in the said District, where such an assembly shall be, by proclamation, to be made in the name of the United States, in the form or to the effect herein after directed, to disperse themselves, and peaceably to depart to their habitations, or to their lawful business, shall, (notwithstanding such proclamation made) to the number of twelve or more, unlawfully, riotously, and tumultuously remain or continue together by the space of one hour after such request or command made by proclamation, as aforesaid, then such continuing together, to the number of twelve or more, after such request or demand made by proclamation, as aforesaid, shall be adjudged a high misdemeanor, and the offenders therein not being slaves, shall, upon conviction, be confined at hard labour, or in solitude, not exceeding ten years, and may be fined not exceeding one thousand dollars.

DA 315

Just 8 — District of Columbia. Laws, statutes, etc. — 19
Codes

# THE

# REVISED CODE ct

OF THE

## DISTRICT OF COLUMBIA,

PREPARED

UNDER THE AUTHORITY OF THE ACT OF CONGRESS,

ENTITLED

" AN ACT TO IMPROVE THE LAWS OF THE DISTRICT OF COLUMBIA,
AND TO CODIFY THE SAME," APPROVED MARCH 3, 1855.

———————————

0

WASHINGTON:

A. O. P. NICHOLSON, PUBLIC PRINTER.

1857.

S
US/DI
253
E5

## DA 316

SEC. 2. On the trial of every indictment, the party accused shall be allowed to be heard by counsel, and he may defend himself, and he shall have a right to produce witnesses and proofs in his favor, and to be confronted with the witnesses who are produced against him.

SEC. 3. No person indicted for an offence shall be convicted thereof, unless by confession of his guilt in open court, or by admitting the truth of the charge against him by his plea or demurrer, or by the verdict of a jury, accepted and recorded by the court.

SEC. 4. No person shall be held to answer on a second indictment for any offence of which he has been acquitted by the jury, upon the facts and merits, on a former trial; but such acquittal may be pleaded by him in bar of any subsequent prosecution for the same offence, notwithstanding any defect in the form or in the substance of the indictment on which he was acquitted.

SEC. 5. No person who is charged with any offence against the law, shall be punished for such offence, unless he shall have been duly and legally convicted thereof in a court having competent jurisdiction of the cause and of the person.

# CHAPTER 141.

### OF PROCEEDINGS TO PREVENT AND DETECT THE COMMISSION OF CRIMES.

SECTION
1. Officers authorized to keep the peace.
2. Complaint; how made.
3. Arrest.
4. Trial; recognizance to keep the peace.
5. Party; when to be discharged.
6. Refusing to recognise, to be committed.
7. Party, when discharged; and complainant, when to pay costs.
8. Payment of costs in other cases.
9. Appeal allowed.
10. On appeal, witnesses to recognise.
11. Proceedings upon an appeal.
12. Recognizance; when to remain in force.
13. Persons committed for not recognising; how discharged.
14. Recognizances to be transmitted to the court.

SECTION
15. Recognizances; when to be required on view of the court or magistrate.
16. Persons who go armed may be required to find sureties for the peace, &c.
17. Proceedings when person is suspected of selling liquor contrary to law.
18. Surety may surrender his principal, who may recognise anew.

#### SEARCH WARRANTS.

19. Search warrants for property stolen.
20. In what other cases to be issued.
21. } Warrant; to whom directed, and when
22. } and how executed.
23. Property seized may be kept as evidence, and then restored to owner or destroyed.

DA 317

discharge the appellant, or may require the appellant to enter into a new recognizance, with sufficient sureties, in such sum and for such time as the court shall think proper, and may also make such order in relation to the costs of prosecution as may be deemed just and reasonable.

Sec. 12. If any party appealing shall fail to prosecute his appeal, his recognizance shall remain in full force and effect, as to any breach of the condition, without an affirmation of the judgment or order of the magistrate, and shall also stand as a security for any costs which shall be ordered by the court appealed to, to be paid by the appellant.

Sec. 13. Any person committed for not finding sureties, or refusing to recognise, as required by the court or magistrate, may be discharged by any judge or justice of the peace on giving such security as was required.

Sec. 14. Every recognizance taken pursuant to the foregoing provisions shall be transmitted by the magistrate to the criminal court on or before the first day of the next term, and shall be there filed by the clerk.

Sec. 15. Every person who shall, in the presence of any officer mentioned in the first section of this chapter, make an affray, or threaten to kill or beat another, or to commit any violence or outrage against his person or property, and every person who, in the presence of such officer, shall contend with hot and angry words, to the disturbance of the peace, may be ordered, without process or any other proof, to recognise for keeping the peace, or being of good behavior, for a term not exceeding one year, and in case of refusal may be committed as before directed.

Sec. 16. If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury or violence to his person, or to his family or property, he may, on complaint of any person having reasonable cause to fear an injury or breach of the peace, be required to find sureties for keeping the peace for a term not exceeding six months, with the right of appealing as before provided.

Sec. 17. If any justice of the peace suspect any person of selling, by retail, wine or ardent spirits, or a mixture thereof, contrary to law, he shall summon the person and such witnesses as he may think

DA 318

# CORPORATION LAWS

OF THE

# CITY OF WASHINGTON,

TO THE

## End of the Fiftieth Council,

**(To June 3d, 1853, inclusive,)**

REVISED AND COMPILED

### BY JAMES W. SHEAHAN,

Under the direction of a Joint Committee, consisting of the Mayor and one member
of the Board of Aldermen and one member of the Board of Common Council:

AND, ALSO

## THE ACTS OF INCORPORATION AND OTHER ACTS OF CONGRESS, WITH AN APPENDIX,

TO WHICH ARE ADDED

**THE LAWS ENACTED FROM JUNE 3, 1853 TO JUNE 1, 1860,**

EMBRACING THE

## 51st, 52d, 53d, 54th, 55th, 56th and 57th Councils.

For Laws passed since June 3, 1853, see Index opposite page 396.

Prepared and Published by order of the Corporation of Washington.

**Washington:**
PRINTED BY ROBERT A. WATERS.
1853 & 1860.

**DA 319**

Case 1:15-cv-02304-JEJ Document 19-3 Filed 10/25/2015 Page 323 of 332

the limits of this city, shall be fifty dollars per annum, to be paid to this Corporation by the insurance company or agent applying for such license before the issuing thereof; and all licenses under this act shall be issued for one year from the date of the application and payment of the tax, and shall be issued by the Register, under the direction of the Mayor, by whom they shall be signed, and countersigned by the Register, and shall express on their face the name of the insurance company authorized by it to establish an agency in this city, where such company is established or located, the kind of insurance it is authorized to effect, and the name of its agent; and such licenses shall confer authority to establish an agency in this city only to the company and the agent therein named: *Provided*, That a license issued to one insurance company or agent may be transferred to another insurance company or agent: but no such transfer shall be valid, or confer any rights or privileges under it until the transfer has been recorded in the Register's office, and endorsed on the license by the Register: *And provided, also*, That no person shall be authorized, under one license, to act as agent for more than one insurance company, and that one the company named in such license; and any person offending against the provisions of this section shall be liable for every offence to the fine imposed by the first section of this act.

Sec. 3. *And be it enacted*, That all former acts or parts of acts inconsistent with the provisions of this act be, and the same are hereby repealed: *Provided*, That this act shall not be construed so as to affect licenses for insurance agencies already issued until the expiration of the time for which said licenses have been so issued.—(See page 78, Sheahan's Digest.)

*Approved October* 29, 1857.

---

## CHAP. 5.

##### AN ACT to prevent the carrying of dangerous weapons in the City of Washington.

*Be it enacted by the Board of Aldermen and Board of Common Council of the city of Washington*, That it shall not hereafter be lawful for any person or persons to carry or have about their persons any deadly or dangerous weapons, such as dagger, pistol, bowie knife, dirk knife, or dirk, colt, slung shot, or brass or metal knuckles, within the city of Washington; and any person or persons who shall be duly convicted of so carrying or having on their persons any such weapon shall forfeit and pay upon such conviction not less than twenty nor more than fifty dollars, which fines shall be prosecuted and recovered in the same manner as other penalties and forfeitures accruing to the city are sued for and recovered: *Provided*, That the police officers, members of the Auxiliary Guard, and the military, when on duty, shall be exempt from such penalties and forfeitures.

*Approved November* 4, 1857.

DA 320

stationery, and for all other contingent and necessary expenses of each of said schools; and it shall be the duty of the two Boards to make provision by law for the payment of all such salaries and other necessary expenses, out of any money to the credit of the School Fund, and when that shall be insufficient, out of the General Fund; and all such appropriations shall be subject to the order of the Board of Trustees, from time to time, as the same may be required, to be properly disbursed, and for which, receipts shall in every case, be taken and returned to the Register of the Corporation, for settlement.

SEC. 12. *And be it enacted,* That all acts or parts of acts heretofore passed relative to the Public Schools; to organize and establish a Board of Trustees of the Public Schools, the salary of the Secretary and Treasurer, and the duties of the Board, be, and the same are hereby, repealed.—(See page 261, Sheahan's Digest.)

*Approved November* 12, 1858.

---

### CHAP. 11.

AN ACT to prevent the carrying of concealed and dangerous weapons in the City of Washington.

*Be it enacted by the Board of Aldermen and Board of Common Council of the city of Washington,* That it shall not hereafter be lawful for any person or persons, to carry or have concealed about their persons any deadly or dangerous weapons, such as dagger, pistol, bowie-knife, dirk-knife or dirk, colt, slung-shot, or brass or other metal knuckles, within the city of Washington, and any person or persons who shall be duly convicted of so carrying or having concealed about their persons any such weapon, shall forfeit and pay upon such conviction, not less than twenty dollars nor more than fifty dollars: which fines shall be prosecuted and recovered in the same manner as other penalties and forfeitures accruing to the city, are sued for and recovered; *Provided,* That the Police officers and the members of the Auxiliary Guard, when on duty, shall be exempt from such penalties and forfeitures.

*Approved November* 18, 1858.

---

### CHAP. 12.

AN ACT explanatory of the Seventh section of the "Act regulating Auctions in the City of Washington," approved June fourth, eighteen hundred and twenty-nine.

*Be it enacted by the Board of Aldermen and Board of Common Council of the city of Washington,* That the true intent and meaning of the seventh section of the "Act regulating auctions in the city of Washington," is to prevent two or more persons who shall take a joint license as auctioneers, from having different houses of business or es-

DA 321

116      FIFTY-SECOND CONGRESS. Sess. I. Chs. 158, 159. 1892.

submitting plan and estimate for its improvement; and the Chief of Engineers shall submit to the Secretary of War the reports of the local and division engineers, with his views thereon and his opinion of the public necessity or convenience to be subserved by the proposed improvement;

<span style="float:left">Reports to be sent to House of Representatives and printed.</span> and all such reports of preliminary examinations with such recommendations as he may see proper to make, shall be transmitted by the Secretary of War to the House of Representatives, and are hereby ordered to be printed when so made.

<span style="float:left">Appropriation for examinations, etc.</span> SEC. 8. For preliminary examinations, contingencies, expenses connected with inspection of bridges, the service of notice required in such cases, the examination of bridge sites and reports thereon, and for incidental repairs for which there is no special appropriation for rivers and harbors, one hundred and twenty-five thousand dollars:

<span style="float:left">Provisos.<br>No survey, etc., unless provided for.</span> *Provided,* That no preliminary examination, survey, project, or estimate for new works other than those designated in this act shall be made: *And provided further,* That after the regular or formal report on any examination, survey, project, or work under way or proposed is

<span style="float:left">No supplemental reports, etc., to be made.</span> submitted, no supplemental or additional report or estimate, for the same fiscal year, shall be made unless ordered by a resolution of Congress. The Government shall not be deemed to have entered upon any project for the improvement of any water way or harbor mentioned in

<span style="float:left">No project authorized until appropriation made.</span> this act until funds for the commencement of the proposed work shall have been actually appropriated by law.

Approved, July 13, 1892.

---

<span style="float:left">July 13, 1892.</span> **CHAP. 159.—An Act to punish the carrying or selling of deadly or dangerous weapons within the District of Columbia, and for other purposes.**

*Be it enacted by the Senate and House of Representatives of the United*
<span style="float:left">District of Columbia.</span> *States of America in Congress assembled,* That it shall not be lawful for any person or persons within the District of Columbia, to have concealed
<span style="float:left">Carrying concealed weapons forbidden.</span> about their person any deadly or dangerous weapons, such as daggers, air-guns, pistols, bowie-knives, dirk knives or dirks, blackjacks, razors, razor blades, sword canes, slung shot, brass or other metal knuckles.

<span style="float:left">Openly carrying weapons with unlawful intent forbidden.</span> SEC. 2. That it shall not be lawful for any person or persons within the District of Columbia to carry openly any such weapons as hereinbefore described with intent to unlawfully use the same, and any person or persons violating either of these sections shall be deemed guilty of
<span style="float:left">Punishment, first offense.</span> a misdemeanor, and upon conviction thereof shall, for the first offense, forfeit and pay a fine or penalty of not less than fifty dollars nor more than five hundred dollars, of which one half shall be paid to any one giving information leading to such conviction, or be imprisoned in the jail of the District of Columbia not exceeding six months, or both such
<span style="float:left">Provisos.<br>Exceptions.</span> fine and imprisonment, in the discretion of the court: *Provided,* That the officers, non-commissioned officers, and privates of the United States Army, Navy, or Marine Corps, or of any regularly organized Militia Company, police officers, officers guarding prisoners, officials of the United States or the District of Columbia engaged in the execution of the laws for the protection of persons or property, when any of such persons are on duty, shall not be liable for carrying necessary arms for use in performance of their duty: *Provided, further,* that nothing
<span style="float:left">Lawful use of weapons.</span> contained in the first or second sections of this act shall be so construed as to prevent any person from keeping or carrying about his place of business, dwelling house, or premises any such dangerous or deadly weapons, or from carrying the same from place of purchase to his dwelling house or place of business or from his dwelling house or place of business to any place where repairing is done, to have the same repaired, and back again: *Provided further,* That nothing contained in the first or second sections of this act shall be so construed as to apply
<span style="float:left">Permits.</span> to any person who shall have been granted a written permit to carry such weapon or weapons by any judge of the police court of the District

**DA 322**

of Columbia, and authority is hereby given to any such judge to grant such permit for a period of not more than one month at any one time, upon satisfactory proof to him of the necessity for the granting thereof; and further, upon the filing with such judge of a bond, with sureties to be approved by said judge, by the applicant for such permit, conditioned to the United States in such penal sum as said judge shall require for the keeping of the peace, save in the case of necessary self-defense by such applicant during the continuance of said permit, which bond shall be put in suit by the United States for its benefit upon any breach of such condition.

Sec. 3. That for the second violation of the provisions of either of the preceding sections the person or persons offending shall be proceeded against by indictment in the supreme court of the District of Columbia, and upon conviction thereof shall be imprisoned in the penitentiary for not more than three years.   **Punishment, second offense.**

Sec. 4. That all such weapons as hereinbefore described which may be taken from any person offending against any of the provisions of this act shall, upon conviction of such person, be disposed of as may be ordered by the judge trying the case, and the record shall show any and all such orders relating thereto as a part of the judgment in the case.   **Disposition of weapons taken from offenders.**

Sec. 5. That any person or persons who shall, within the District of Columbia, sell, barter, hire, lend or give to any minor under the age of twenty-one years any such weapon as hereinbefore described shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof, pay a fine or penalty of not less than twenty dollars nor more than one hundred dollars, or be imprisoned in the jail of the District of Columbia not more than three months.   No person shall engage in or conduct the business of selling, bartering, hiring, lending, or giving any weapon or weapons of the kind hereinbefore named without having previously obtained from the Commissioners of the District of Columbia a special license authorizing the conduct of such business by such person, and the said Commissioners are hereby authorized to grant such license, without fee therefor, upon the filing with them by the applicant therefor of a bond with sureties to be by them approved, conditioned in such penal sum as they shall fix to the United States for the compliance by said applicant with all the provisions of this section; and upon any breach or breaches of said condition said bond shall be put in suit by said United States for its benefit, and said Commissioners may revoke said license.   Any person engaging in said business without having previously obtained said special license shall be guilty of a misdemeanor, and upon conviction thereof shall be sentenced to pay a fine of not less than one hundred dollars nor more than five hundred dollars, of which one half shall be paid to the informer, if any, whose information shall lead to the conviction of the person paying said fine.   All persons whose business it is to sell barter, hire, lend or give any such weapon or weapons shall be and they hereby, are, required to keep a written register of the name and residence of every purchaser, barterer, hirer, borrower, or donee of any such weapon or weapons, which register shall be subject to the inspection of the major and superintendent of Metropolitan Police of the District of Columbia, and further to make a weekly report, under oath to said major, and superintendent of all such sales, barterings, hirings, lendings or gifts.   And one half of every fine imposed under this section shall be paid to the informer, if any, whose information shall have led to the conviction of the person paying said fine.   Any police officer failing to arrest any person guilty in his sight or presence and knowledge of any violation of any section of this act shall be fined not less than fifty nor more than five hundred dollars   **Punishment for sale of weapons to minors.**   **Special license for dealers in weapons.**   **Penalty for dealing without license.**   **Register of sales, etc.**   **Half of fine to informer.**   **Penalty for failure to arrest by officers.**

Sec 6. That all acts or parts of acts inconsistent with the provisions of this act be, and the same hereby are, repealed.   **Repeal.**

Approved, July 13, 1892.

States, for the purpose of having such communication delivered by the post-office establishment of such foreign country to the post-office establishment of the United States and by it delivered to such addressee in the United States, and as a result thereof such communication is delivered by the post-office establishment of such foreign country to the post-office establishment of the United States and by it delivered to the address to which it is directed in the United States, then such person shall be punished in the same manner and to the same extent as provided in section 1 of this Act: *Proviso,* That any person violating this section may be prosecuted either in the district into which such letter or other communication was carried by the United States mail for delivery according to the direction thereon, or in which it was caused to be delivered by the United States mail to the person to whom it was addressed.

*[margin notes]* Punishment for.
*Proviso.*
Jurisdiction.

Approved, July 8, 1932.

---

[CHAPTER 465.]

*[margin note]* July 8, 1932.
[H. R. 8754.]
[Public, No. 275.]

## AN ACT

To control the possession, sale, transfer, and use of pistols and other dangerous weapons in the District of Columbia, to provide penalties, to prescribe rules of evidence, and for other purposes.

*[margin note]* Unauthorized use, etc., of pistols and other dangerous weapons in District of Columbia.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

*[margin note]* Definitions.

### DEFINITIONS

*[margin note]* "Pistol."

SECTION 1. " Pistol," as used in this Act, means any firearm with a barrel less than twelve inches in length.

*[margin note]* "Sawed-off shotgun."

" Sawed-off shotgun," as used in this Act, means any shotgun with a barrel less than twenty inches in length.

*[margin note]* "Machine gun."

" Machine gun," as used in this Act, means any firearm which shoots automatically or semiautomatically more than twelve shots without reloading.

*[margin note]* "Person."

" Person," as used in this Act, includes, individual, firm, association, or corporation.

*[margin note]* "Sell" and "purchase," etc.

" Sell " and " purchase " and the various derivatives of such words, as used in this Act, shall be construed to include letting on hire, giving, lending, borrowing, and otherwise transferring.

*[margin note]* "Crime of violence."

" Crime of violence " as used in this Act, means any of the following crimes, or an attempt to commit any of the same, namely: Murder, manslaughter, rape, mayhem, maliciously disfiguring another, abduction, kidnaping, burglary, housebreaking, larceny, any assault with intent to kill, commit rape, or robbery, assault with a dangerous weapon, or assault with intent to commit any offense punishable by imprisonment in the penitentiary.

### COMMITTING CRIME WHEN ARMED

*[margin note]* Committing crime of violence when armed.
Punishment for.

SEC. 2. If any person shall commit a crime of violence in the District of Columbia when armed with or having readily available any pistol or other firearm, he may, in addition to the punishment provided for the crime, be punished by imprisonment for a term of not more than five years; upon a second conviction for a crime of violence so committed he may, in addition to the punishment provided for the crime, be punished by imprisonment for a term of not more than ten years; upon a third conviction for a crime of violence so committed he may, in addition to the punishment provided for the

crime, be punished by imprisonment for a term of not more than fifteen years; upon a fourth or subsequent conviction for a crime of violence so committed he may, in addition to the punishment provided for the crime, be punished by imprisonment for an additional period of not more than thirty years.

### PERSONS FORBIDDEN TO POSSESS CERTAIN FIREARMS

Persons forbidden to possess certain firearms.

SEC. 3. No person who has been convicted in the District of Columbia or elsewhere of a crime of violence shall own or have in his possession a pistol, within the District of Columbia.

Convicted of a crime.

### CARRYING CONCEALED WEAPONS

SEC. 4. No person shall within the District of Columbia carry concealed on or about his person, except in his dwelling house or place of business or on other land possessed by him, a pistol, without a license therefor issued as hereinafter provided, or any deadly or dangerous weapon.

Illegally carrying, etc., dangerous weapon.

### EXCEPTIONS

Exceptions.

SEC. 5. The provisions of the preceding section shall not apply to marshals, sheriffs, prison or jail wardens, or their deputies, policemen or other duly appointed law-enforcement officers, or to members of the Army, Navy, or Marine Corps of the United States or of the National Guard or Organized Reserves when on duty, or to the regularly enrolled members of any organization duly authorized to purchase or receive such weapons from the United States, provided such members are at or are going to or from their places of assembly or target practice, or to officers or employees of the United States duly authorized to carry a concealed pistol, or to any person engaged in the business of manufacturing, repairing, or dealing in firearms, or the agent or representative of any such person having in his possession, using, or carrying a pistol in the usual or ordinary course of such business or to any person while carrying a pistol unloaded and in a secure wrapper from the place of purchase to his home or place of business or to a place of repair or back to his home or place of business or in moving goods from one place of abode or business to another.

Law enforcement officers.

Army, Navy, or Marine Corps.

National Guard, etc., on duty.

Other organizations.

Carrying to places of assembly, etc.

Manufacturer, etc.

### ISSUE OF LICENSES TO CARRY

Licenses.

SEC. 6. The superintendent of police of the District of Columbia may, upon the application of any person having a bona fide residence or place of business within the District of Columbia or of any person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his person issued by the lawful authorities of any State or subdivision of the United States, issue a license to such person to carry a pistol within the District of Columbia for not more than one year from date of issue, if it appears that the applicant has good reason to fear injury to his person or property or has any other proper reason for carrying a pistol and that he is a suitable person to be so licensed. The license shall be in duplicate, in form to be prescribed by the Commissioners of the District of Columbia and shall bear the name, address, description, photograph, and signature of the licensee and the reason given for desiring a license. The original thereof shall be delivered to the licensee, and the duplicate shall be retained by the superintendent of police of the District of Columbia and preserved in his office for six years.

DA 325

### SELLING TO MINORS AND OTHERS

Selling to minors or others.

SEC. 7. No person shall within the District of Columbia sell any pistol to a person who he has reasonable cause to believe is not of sound mind, or is a drug addict, or is a person who has been convicted in the District of Columbia or elsewhere of a crime of violence or, except when the relation of parent and child or guardian and ward exists, is under the age of eighteen years.

### TRANSFERS REGULATED

Time, etc., provisions.

SEC. 8. No seller shall within the District of Columbia deliver a pistol to the purchaser thereof until forty-eight hours shall have elapsed from the time of the application for the purchase thereof, except in the case of sales to marshals, sheriffs, prison or jail wardens or their deputies, policemen, or other duly appointed law-enforcement officers, and, when delivered, said pistol shall be securely wrapped and shall be unloaded.  At the time of applying for the purchase

Register to be kept.

of a pistol the purchaser shall sign in duplicate and deliver to the seller a statement containing his full name, address, occupation, color, place of birth, the date and hour of application, the caliber, make, model, and manufacturer's number of the pistol to be purchased and a statement that he has never been convicted in the District of Columbia or elsewhere of a crime of violence.  The seller shall, within six hours after such application, sign and attach his address and deliver one copy to such person or persons as the superintendent of police of the District of Columbia may designate, and shall retain the

Limitation.

other copy for six years.  No machine gun, sawed-off shotgun, or blackjack shall be sold to any person other than the persons designated in section 14 hereof as entitled to possess the same, and then only after permission to make such sale has been obtained from the

Wholesale trade.

superintendent of police of the District of Columbia.  This section shall not apply to sales at wholesale to licensed dealers.

### DEALERS TO BE LICENSED

Dealers to be licensed.

SEC. 9. No retail dealer shall within the District of Columbia sell or expose for sale or have in his possession with intent to sell, any pistol, machine gun, sawed-off shotgun, or blackjack without being licensed as hereinafter provided.  No wholesale dealer shall, within the District of Columbia, sell, or have in his possession with intent to sell, to any person other than a licensed dealer, any pistol, machine gun, sawed-off shotgun, or blackjack.

### DEALERS' LICENSES, BY WHOM GRANTED AND CONDITIONS THEREOF

Conditions, etc., for issuing dealers' licenses. *Ante,* p. 558.

SEC. 10. The Commissioners of the District of Columbia may, in their discretion, grant licenses and may prescribe the form thereof, effective for not more than one year from date of issue, permitting the licensee to sell pistols, machine guns, sawed-off shotguns, and blackjacks at retail within the District of Columbia subject to the following conditions in addition to those specified in section 9 hereof, for breach of any of which the license shall be subject to forfeiture and the licensee subject to punishment as provided in this Act.

1. The business shall be carried on only in the building designated in the license.

2. The license or a copy thereof, certified by the issuing authority, shall be displayed on the premises where it can be easily read.

3. No pistol shall be sold (a) if the seller has reasonable cause to believe that the purchaser is not of sound mind or is a drug addict or has been convicted in the District of Columbia or elsewhere of a crime of violence or is under the age of eighteen years, and (b) unless the purchaser is personally known to the seller or shall present clear evidence of his identity. No machine gun, sawed-off shotgun, or blackjack shall be sold to any person other than the persons designated in section 14 hereof as entitled to possess the same, and then only after permission to make such sale has been obtained from the superintendent of police of the District of Columbia.

4. A true record shall be made in a book kept for the purpose, the form of which may be prescribed by the Commissioners, of all pistols, machine guns, and sawed-off shotguns in the possession of the licensee, which said record shall contain the date of purchase, the caliber, make, model, and manufacturer's number of the weapon, to which shall be added, when sold, the date of sale. *Records.*

5. A true record in duplicate shall be made of every pistol, machine gun, sawed-off shotgun, and blackjack sold, said record to be made in a book kept for the purpose, the form of which may be prescribed by the Commissioners of the District of Columbia and shall be personally signed by the purchaser and by the person effecting the sale, each in the presence of the other and shall contain the date of sale, the name, address, occupation, color, and place of birth of the purchaser, and, so far as applicable, the caliber, make, model, and manufacturer's number of the weapon, and a statement signed by the purchaser that he has never been convicted in the District of Columbia or elsewhere of a crime of violence. One copy of said record shall, within seven days, be forwarded by mail to the superintendent of police of the District of Columbia and the other copy retained by the seller for six years.

6. No pistol or imitation thereof or placard advertising the sale thereof shall be displayed in any part of said premises where it can readily be seen from the outside. No license to sell at retail shall be granted to anyone except as provided in this section. *Display, etc., forbidden.*

### FALSE INFORMATION FORBIDDEN

SEC. 11. No person, shall, in purchasing a pistol or in applying for a license to carry the same, or in purchasing a machine gun, sawed-off shotgun, or blackjack within the District of Columbia, give false information or offer false evidence of his identity. *False information or evidence forbidden.*

### ALTERATION OF IDENTIFYING MARKS PROHIBITED

SEC. 12. No person shall within the District of Columbia change, alter, remove, or obliterate the name of the maker, model, manufacturer's number, or other mark or identification on any pistol, machine gun, or sawed-off shotgun. Possession of any pistol, machine gun, or sawed-off shotgun upon which any such mark shall have been changed, altered, removed, or obliterated shall be prima facie evidence that the possessor has changed, altered, removed, or obliterated the same within the District of Columbia: *Provided, however,* That nothing contained in this section shall apply to any officer or agent of any of the departments of the United States or the District of Columbia engaged in experimental work. *Alteration, etc., of identification marks, prohibited.* *Proviso. Experimental work.*

### EXCEPTIONS

SEC. 13. This Act shall not apply to toy or antique pistols unsuitable for use as firearms. *Toys, etc., excepted.*

POSSESSION OF CERTAIN DANGEROUS WEAPONS

Possession of certain dangerous weapons forbidden.

SEC. 14. No person shall within the District of Columbia possess any machine gun, sawed-off shotgun, or any instrument or weapon of the kind commonly known as a blackjack, slung shot, sand club, sandbag, or metal knuckles, nor any instrument, attachment, or appliance for causing the firing of any firearm to be silent or intended to lessen or muffle the noise of the firing of any firearms: *Provided, however,* That machine guns, or sawed-off shotguns, and blackjacks may be possessed by the members of the Army, Navy, or Marine Corps of the United States, the National Guard, or Organized Reserves when on duty, the Post Office Department or its employees when on duty, marshals, sheriffs, prison or jail wardens, or their deputies, policemen, or other duly appointed law-enforcement officers, officers or employees of the United States duly authorized to carry such weapons, banking institutions, public carriers who are engaged in the business of transporting mail, money, securities, or other valuables, wholesale dealers and retail dealers licensed under section 10 of this Act.

*Proviso.*
Exceptions.

PENALTIES

Punishment for violations.

SEC. 15. Any violation of any provision of this Act for which no penalty is specifically provided shall be punished by a fine of not more than $1,000 or imprisonment for not more than one year, or both.

CONSTITUTIONALITY

Invalidity of any provision not to affect remainder.

SEC. 16. If any part of this Act is for any reason declared void, such invalidity shall not affect the validity of the remaining portions of this Act.

CERTAIN ACTS REPEALED

Vol. 31, p. 1328, repealed.

SEC. 17. The following sections of the Code of Law for the District of Columbia, 1919, namely, sections 855, 856, and 857, and all other Acts or parts of Acts inconsistent herewith, are hereby repealed.

Approved, July 8, 1932.

---

[CHAPTER 466.]

JOINT RESOLUTION

July 8, 1932.
[H. J. Res. 462.]
[Pub. Res., No. 35.]

Making an appropriation to provide transportation to their homes for veterans of the World War temporarily quartered in the District of Columbia.

World War veterans. Appropriation for, to provide transportation from District of Columbia to their homes.
*Post,* p. 701.

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That to enable the Administrator of Veterans' Affairs, upon the request of any honorably discharged veteran of the World War, temporarily quartered in the District of Columbia, who is desirous of returning to his home, to provide such veteran with railroad transportation thereto prior to July 15, 1932, together with travel subsistence at the rate of 75 cents per day, there is hereby appropriated, out of any money in the Treasury not otherwise appropriated, the sum of $100,000: *Provided,* That all amounts expended under this appropriation in behalf of any veteran shall constitute a loan without interest which, if not repaid to the United States, shall be deducted from any amounts payable to such veteran on his adjusted-service certificate.

*Proviso.*
Credited as a loan.

Approved, July 8, 1932.

[CHAPTER 295]

November 4, 1943
[S. 970]
[Public Law 181]

AN ACT

Authorizing the Postmaster General to use post-office clerks and city
letter carriers interchangeably.

*Be it enacted by the Senate and House of Representatives of the*
*United States of America in Congress assembled,* That the Postmaster

Postal Service.
Interchange of personnel.

General may, in an emergency, when the interest of the Service
requires, temporarily assign any post-office clerk to the duties of city
delivery carrier or any such carrier to the duties of such clerk and
in an emergency, when the interest of the Service requires, may temporarily assign any post-office clerk or city delivery carrier to the
duties of a railway postal clerk or any railway postal clerk to the
duties of a post-office clerk or city delivery carrier without change of
pay-roll status, the compensation of any temporarily assigned
employee to be paid from the appropriation made for the work to
which he is regularly assigned.

Termination.

SEC. 2. This Act shall terminate on June 30, 1945, or such earlier
date as the Congress by concurrent resolution may prescribe.

Approved November 4, 1943.

[CHAPTER 296]

November 4, 1943
[S. 1151]
[Public Law 182]

AN ACT

To amend the law of the District of Columbia relating to the carrying
of concealed weapons.

*Be it enacted by the Senate and House of Representatives of the*
*United States of America in Congress assembled,* That section 4 of

District of Columbia.

the Act entitled "An Act to control the possession, sale, transfer, and
use of pistols and other dangerous weapons in the District of Columbia, to provide penalties, to prescribe rules of evidence, and for other
purposes", approved July 8, 1932 (47 Stat. 651; D. C. Code, 1940
edition, title 22, sec. 3204) be, and it hereby is, amended to read as
follows:

Carrying of a pistol
or other dangerous
weapon.

"SEC. 4. No person shall within the District of Columbia carry
either openly or concealed on or about his person, except in his
dwelling house or place of business or on other land possessed by
him, a pistol, without a license therefor issued as hereinafter provided, or any deadly or dangerous weapon capable of being so
concealed."

Approved November 4, 1943.

[CHAPTER 297]

November 8, 1943
[H. R. 2859]
[Public Law 183]

AN ACT

To amend the Naval Reserve Act of 1938, as amended.

*Be it enacted by the Senate and House of Representatives of the*
*United States of America in Congress assembled,* That the Naval Re-

Naval Reserve Act
of 1938, amendments.
56 Stat. 730.
34 U. S. C., Supp.
II, § 857a.

serve Act of 1938, as amended, is hereby further amended as follows:
Strike out section 502 and substitute therefor the following:

Women's Reserve.
Ranks and ratings.

"SEC. 502. Members of the Women's Reserve may be commissioned
or enlisted in such appropriate ranks and ratings, not above the rank
of captain, corresponding to those of the Regular Navy, as may be
prescribed by the Secretary of the Navy: *Provided,* That there shall

Grade of captain.

not be more than one officer in the grade of captain, exclusive of officers
appointed in the Medical Department of the Naval Reserve: *Provided*

Military authority
of officers.

*further,* That military authority of officers commissioned under the
provisions of this title may be exercised over women of the Reserve
only and is limited to the administration of the Women's Reserve."

56 Stat. 730.
34 U. S. C., Supp.
II, § 857e.

Strike out section 506 and substitute therefor the following: