# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MATTHEW GRACE, *et al.,* <br><br> Plaintiffs, <br><br> v. <br><br> DISTRICT OF COLUMBIA, *et al.,* <br><br> Defendants. | Civ. Action No. 15-2234 (RJL) |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS'
## APPLICATION FOR A PRELIMINARY AND/OR PERMANENT INJUNCTION

KARL A. RACINE
Attorney General for the District of Columbia

ELIZABETH SARAH GERE
Acting Deputy Attorney General
Public Interest Division

TONI MICHELLE JACKSON (#453765)
Chief, Equity Section

ANDREW J. SAINDON (#456987)
Senior Assistant Attorney General
441 Fourth Street, N.W., Sixth Floor South
Washington, D.C. 20001
Telephone: (202) 724-6643
Facsimile: (202) 730-1470
Email: andy.saindon@dc.gov

CHAD A. NASO (#1001694)
Assistant Attorney General
441 Fourth Street, N.W., Sixth Floor South
Washington, D.C. 20001
Telephone: (202) 724-7854
Facsimile: (202) 741-8951
Email: chad.naso@dc.gov

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

STATEMENT OF FACTS ............................................................................................ 2

STANDARDS FOR A PRELIMINARY INJUNCTION ............................................... 6

ARGUMENT ................................................................................................................ 7

    I.      PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIM; RATHER, THE DISTRICT IS LIKELY TO PREVAIL ............ 7

          A.      Because regulation of public carrying in cities is longstanding, the District's "good reason" standard is beyond the scope of the Second Amendment ................................................................................. 8

          B.      Alternatively, the "good reason" standard is likely to survive heightened scrutiny ................................................................................ 15

                 1.   The "good reason" standard is not categorically unconstitutional ....... 15

                 2.   Even if constitutional scrutiny is warranted, the appropriate standard is intermediate scrutiny ...................................................... 21

                 3.   The "good reason" standard survives intermediate scrutiny ............... 25

                        a. The evidence relied on by the Council ...................................... 28

                        b. The evidence the District will introduce here ........................... 32

                        c. The Council's tailoring of the "good reason" standard to accomplish its objectives ................................................... 35

    II.     PLAINTIFFS HAVE NOT SHOWN IRREPARABLE INJURY ....................... 38

    III.    THE BALANCE OF EQUITIES TIPS HEAVILY IN FAVOR OF THE DEFENDANTS ................................................................................... 41

    IV.    ALLOWING BROAD CARRYING OF CONCEALED WEAPONS IS NOT IN THE PUBLIC INTEREST ................................................... 42

    V.     PLAINTIFFS' MOTION FOR JUDGMENT AS A MATTER OF LAW SHOULD BE REJECTED ....................................................... 43

CONCLUSION ........................................................................................................... 45

# TABLE OF AUTHORITIES*

**Cases**

*Baze v. Rees,*
    553 U.S. 35 (2008) ........................................................................... 27

*Bonidy v. USPS,*
    790 F.3d 1121 (10th Cir. 2015) .................................................. 23, 37

*Chaplaincy of Full Gospel Churches v. England,*
    454 F.3d 290 (D.C. Cir. 2006) ................................................... 38, 40

*Cincinnati v. Discovery Network,*
    507 U.S. 410 (1993) ......................................................................... 24

*CityFed Fin. v. Office of Thrift Supervision,*
    58 F.3d 738 (D.C. Cir. 1995) ........................................................... 38

*Clapper v. Amnesty Int'l,*
    133 S.Ct. 1138 (2013) ...................................................................... 38

*Cobell v. Norton,*
    455 F.3d 301 (D.C. Cir. 2006) ........................................................... 7

*Dearth v. Lynch,*
    791 F.3d 32 (D.C. Cir. 2015) ........................................................... 22

*Dist. 50, United Mine Workers of Am. v. Int'l Union, United Mine Workers of Am.,*
    412 F.2d 165 (D.C. Cir. 1969) ........................................................... 7

*\*District of Columbia v. Heller,*
    554 U.S. 570 (2008) (*Heller I*) ..................................................Passim

*\*Drake v. Filko,*
    724 F.3d 426 (3d Cir. 2013) .......................................................Passim

*Edenfield v. Fane,*
    507 U.S. 761 (1993) ......................................................................... 23

*Edwards v. District of Columbia,*
    755 F.3d 996 (D.C. Cir. 2014) ......................................................... 28

---

\*        Authorities upon which we chiefly rely are marked with asterisks.

*Friedman v. Highland Park,*
 784 F.3d 406 (7th Cir. 2015) ................................................................. 14

*Fyock v. City of Sunnyvale,*
 25 F. Supp. 3d 1267 (N.D. Cal. 2014) ................................................... 42

*Gonzales v. Carhart,*
 550 U.S. 124 (2007) ........................................................................... 16, 27

*Gordon v. Holder,*
 721 F.3d 638 (D.C. Cir. 2013) ............................................................ 39, 44

*Hecht Co. v. Bowles,*
 321 U.S. 321 (1944) .............................................................................. 42

*\*Heller v. District of Columbia,*
 670 F.3d 1244 (D.C. Cir. 2011) (*Heller II*) ................................... Passim

*Hightower v. City of Boston,*
 693 F.3d 61 (1st Cir. 2012) ................................................................... 20

*Holder v. Humanitarian Law Project,*
 561 U.S. 1 (2010) .................................................................................. 16

*In re Navy Chaplaincy,*
 738 F.3d 425 (D.C. Cir 2013) ................................................................. 7

*Kachalsky v. Cacace,*
 817 F.Supp.2d 235 (S.D.N.Y. 2011) ..................................................... 18

*\*Kachalsky v. Cnty. of Westchester,*
 701 F.3d 81 (2d Cir. 2012) ............................................................... Passim

*Keystone Bituminous Coal v. DeBenedictis,*
 480 U.S. 470 (1987) .............................................................................. 24

*Lorillard Tobacco Co. v. Reilly,*
 533 U.S. 525 (2001) .............................................................................. 28

*Lujan v. Defenders of Wildlife,*
 504 U.S. 555 (1992) .............................................................................. 39

*Maryland v. King,*
 133 S. Ct. 1 (2012) ................................................................................ 41

*Mazurek v. Armstrong,*
520 U.S. 968 (1997) ........................................................................................ 8

*McDonald v. City of Chicago,*
561 U.S. 742 (2010) ..................................................................................... 3, 8

*Mills v. District of Columbia,*
571 F.3d 1304 (D.C. Cir. 2009) ................................................................... 40

*Minney v. OPM,*
2015 WL 5442403 n.6 (D.D.C. Sept. 15, 2015) .......................................... 7

*Moore v. Madigan,*
702 F.3d 933 (7th Cir. 2012) ................................................ 11, 17, 19, 20

*Nat'l Taxpayers Union, Inc. v. United States,*
68 F.3d 1428 (D.C. Cir. 1995) .................................................................... 38

*Neb. Dep't of Health & Human Servs. v. U.S. Dep't of Health & Human Servs.,*
435 F.3d 326, (D.C. Cir. 2006) .................................................................... 41

*Nken v. Holder,*
556 U.S. 418 (2009) ....................................................................................... 7

*Ohralik v. Ohio State Bar Ass'n,*
436 U.S. 447, 456 (1978) (1978) ............................................................ 23, 24

*Palmer v. District of Columbia,*
59 F. Supp. 3d 173 (D.D.C. 2014) ................................................................ 3

*Peruta v. County of San Diego,*
742 F.3d 1144 (9th Cir. 2014), *vacated,* 781 F.3d 1106 ....................... 9, 19

*Reichle v. Howards,*
132 S. Ct. 2088 (2012) ................................................................................. 16

*Rumber v. District of Columbia,*
595 F.3d 1298 (D.C. Cir. 2010) ................................................................... 41

*\*Schrader v. Holder,*
704 F.3d 980 (D.C. Cir. 2013) ............................................................. Passim

*Sherbert v. Verner,*
374 U.S. 398 (1963) ..................................................................................... 24

*Sherley v. Sebelius,*
   644 F.3d 388 (D.C. Cir. 2011) .................................................................. 7

*Sweis v. U.S. Foreign Claims Settlement Comm'n,*
   950 F. Supp. 2d 44 (D.D.C. 2013) ....................................................... 7, 39

*\*Turner Broadcasting System v. FCC,*
   512 U.S. 622 (1994) (*Turner I*) ...................................................... Passim

*\*Turner Broadcasting System v. FCC,*
   520 U.S. 180 (1997) (*Turner II*) ..................................................... Passim

*United States v. Chester,*
   628 F.3d 673 (4th Cir. 2010) ................................................................ 22

*\*United States v. Masciandaro,*
   638 F.3d 458 (4th Cir. 2011) .................................................... 22, 25, 43

*United States v. McCane,*
   573 F.3d 1037 (10th Cir. 2009) ............................................................ 14

*United States v. Oakland Cannabis Buyers' Co-op,*
   532 U.S. 483 (2001) ............................................................................. 42

*United States v. O'Brien,*
   391 U.S. 367 (1968) ............................................................................. 24

*United States v. Skoien,*
   614 F.3d 638 (7th Cir. 2010) ........................................................... 19, 25

*United States v. Williams,*
   616 F.3d 685 (7th Cir. 2010) ................................................................ 19

*United States v. Yancey,*
   621 F.3d 681 (7th Cir. 2010) ................................................................ 19

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council,*
   425 U.S. 748 (1976) ............................................................................. 23

*Ward v. Rock Against Racism,*
   491 U.S. 781 (1989) ............................................................................. 25

*Weinberger v. Romero-Barcelo,*
   456 U.S. 305 (1982) ............................................................................. 42

*Winter v. Nat. Res. Def. Council,*
  555 U.S. 7 (2008) .................................................................................................. 7, 39

*Wisc. Gas Co. v. FERC,*
  758 F.2d 669 (D.C. Cir. 1985) .................................................................................. 39

*\*Woollard v. Gallagher,*
  712 F.3d 865 (4th Cir. 2013) ............................................................................... Passim

*Wrenn v. District of Columbia,*
  808 F.3d 81 (D.C. Cir. 2015) .................................................................................... 43

*Zauderer v. Office of Disciplinary Counsel,*
  471 U.S. 626 (1985) .................................................................................................. 23

**Statutes**

18 U.S.C. § 926A ......................................................................................................... 17

18 U.S.C. § 930 ............................................................................................................ 18

27 Stat. 116 (1892) ................................................................................................... 2, 12

47 Stat. 651, ch. 465, § 4 (1932) ................................................................................. 12

57 Stat. 586, ch. 296 (1943) ........................................................................................ 12

An Act to Prevent the Carrying of Concealed and Dangerous Weapons in the
  City of Washington (Nov. 18, 1858) ......................................................................... 12

An Act to Prevent the Carrying of Dangerous Weapons in the
  City of Washington (Nov. 4, 1857) ........................................................................... 12

D.C. Code § 22-4504 (2009 Supp.) ............................................................................... 3

D.C. Code § 22-4504.01 .............................................................................................. 17

D.C. Code § 22-4506(a) ............................................................................................. 1, 3

D.C. Code § 7-2501.01(a) .............................................................................................. 2

D.C. Code § 7-2502.02(a)(4) ...................................................................................... 2, 3

D.C. Code § 7-2509.06(a) ............................................................................................ 18

D.C. Code § 7-2509.11(1)(A) ......................................................................................... 3

D.C. Code § 7-2509.11(1)(B) ......................................................................................... 3

D.C. Code § 7-2509.11(1) ............................................................................................ 20

**Rules**

Fed. R. Civ. P. 12(c) ................................................................................... 43

Fed. R. Civ. P. 56 ....................................................................................... 44

**Other Authorities**

2 Edw. 3, 258, ch. 3 (1328) (Statute of Northampton) ................................. 9

1694 Mass. Laws 12, No. 6 ........................................................................ 11

1859 N.M. Laws 94, § 2 ............................................................................ 11

1870 S.C. Laws 402 ................................................................................... 11

1870 W. Va. Laws 702 ............................................................................... 12

1871 Tex. Laws 1322, art. 6512 ................................................................. 12

1873 Minn. Laws 1025 .............................................................................. 12

Ayres & Donohue, *Nondiscretionary Concealed Weapons Laws: A Case Study of Statistics, Standards of Proof, and Public Policy*, 1 Am. L. & Econ. Rev. 436 (1999) (1999) ................29

Ayres & Donohue, *Shooting Down the "More Guns, Less Crime" Hypothesis*, 55 Stan. L. Rev. 1193 (2003) ................................................................... 29

Bill for the Office of Coroner and Constable (Mar. 1, 1882) (N.J. Constable Oath) ................... 11

Blocher, *Firearm Localism,* 123 Yale L.J. 82 (2013) .................................................................. 12, 13

Bogus, *A Symposium on Firearms, the Militia, and Safe Cities,* 1 Alb. Gov't L. Rev. 440 (2008) .............................................................. 13

Charles, *The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of Review,* 60 Clev. St. L. Rev. 1 (2012) ..................................... 9, 10, 11

Checotah, Okla., Ordinance No. 11 (1890) ................................................. 13

Cook, *et al.*, *Gun Control After Heller: Threats and Sideshows from a Social Welfare Perspective,* 56 UCLA L. Rev. 1041 (2009) ..............................................34

Dallas, Tex., Ordinance of July 18, 1887 (1887) ........................................ 13

Dodge City, Kan., City Ordinances no. 16, § 11 (Sept. 22, 1876) ............................................... 13

Donohue, *Guns, Crime, and the Impact of State Right-to-Carry Laws,*
73 Fordham L. Rev. 623 (2004) ................................................................................................. 29

Dunlapp, The New York Justice (New York 1815) ..................................................................... 11

Henigan, *The Woollard Decision and The Lessons of the Trayvon Martin Tragedy,*
71 Md. L. Rev. 1188 (2012) ...................................................................................................... 10

Herz, *Gun Crazy: Constitutional False Consciousness and Dereliction of Dialogic Responsibility,* 75 B.U. L. Rev. 57 (1995) ................................................................................ 24

Kleck & Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense With a Gun,* 86 J. Crim. L. & Criminology 150 (1995) ....................................................................... 28

Kleck & Gertz, *Carrying Guns for Protection: Results from the National Self-Defense Survey,* 35 J. of Res. in Crime & Delinquency 193, 195 (1998)) ................................................ 29

Los Angeles, Cal., Ordinance Nos. 35-36 (1878) ...................................................................... 13

Lott & Mustard, *Crime, Deterrence, and Right-to-Carry Concealed Handguns,*
26 J. Legal Stud. 1 (1997) ......................................................................................................... 29

McKinney, Tex., Ordinance No. 20 (1899) ................................................................................ 13

Md. Const. of 1776, art. III, § 1 ................................................................................................. 11

Nashville, Tenn., Ordinance Ch. 108 (1873) .............................................................................. 13

Nebraska City, Neb., Ordinance no. 7 (1872) ............................................................................ 13

Niles, The Connecticut Civil Officer: In Three Parts…: with Suitable and approved forms for each: together with numerous legal forms of common use and general convenience. 2nd ed., ch. 14 (Hartford, Conn. 1833) ................................................................................................. 11

Rawlins, Wyo., Rev. Ordinances Art. 7 (1893) .......................................................................... 13

Ruben & Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 126 Yale L.J. Forum 121, 129 n.43 (2015) ................................................... 11

Salina, Kan., Ordinance No. 268 (1879) .................................................................................... 13

Syracuse, N.Y., Ordinances Ch. 27 (1885) ................................................................................ 13

U.S. Government Accountability Office, *Gun Control: States' Laws and Requirements for Concealed Carry Permits Vary Across the Nation*, Report to Congressional Requesters, GAO-12-717 ................................................................................................................................15

Wichita, Kan., Ordinance No. 1641 (1899) ............................................................................. 13

Winkler, *Gunfight: The Battle over the Right to Bear Arms in America* 13 (2011) [[[p13]]]

Winkler, *Scrutinizing the Second Amendment,* 105 Mich. L. Rev. 683 (2007) ............................................................................................ 21

## INTRODUCTION

District of Columbia law authorizes the Chief of Police to issue licenses for the public carrying of concealed handguns if, among other requirements, the applicant has "good reason to fear injury to his or her person or property or has any other proper reason for carrying a pistol[.]" D.C. Code § 22-4506(a). Plaintiffs Matthew Grace and Pink Pistols argue that this "good reason" requirement amounts to a "wholesale ban on the right of typical, law-abiding citizens to bear arms for the purpose of self-defense" and is thus "unconstitutional *per se*." P.Mem. at 20. They ask the Court to issue an order preliminarily and permanently enjoining the District (1) from enforcing the "good reason" requirement and (2) "to issue concealed carry licenses to Mr. Grace and to members of Pink Pistols who, apart from the 'proper reason' requirement, are otherwise eligible for a concealed carry license." *See* Doc. No. 6-2 (plaintiffs' proposed order).

Plaintiffs are not entitled to this extraordinary relief. Three courts of appeals have found the "good reason" standard constitutional, and the District is just as likely to prevail here. Moreover, the plaintiffs cannot establish irreparable injury, as is necessary for a preliminary injunction to issue, and indeed they concede that they cannot demonstrate any particularized reason to fear harm. In contrast, the overbroad injunction plaintiffs demand would threaten the safety of the public, a risk that weighs heavily against granting such relief.

Neither the D.C. Circuit, nor any controlling court, has held that there is an absolute right to carry guns in public for self-defense. And, contrary to Plaintiffs' repeated arguments, the District's public-carry licensing scheme does *not* impose a complete ban on public carrying, but is a mechanism that furthers the District's important public safety interests by ensuring that public carrying of firearms is limited to those individuals who have a particularized need for self-defense.

The District has a compelling interest in public safety, prevention of crime, and the protection of law-enforcement officers. Plaintiffs do not dispute these obvious points. Nor do they contest—or even mention—the evidence relied on by the Council of the District of Columbia when it enacted the "good reason" standard. The Council found the standard necessary to prevent crime and promote public safety, and this finding is entitled to deference under any level of scrutiny. Plaintiffs have failed to meet their burden for the extraordinary and drastic relief of a mandatory preliminary injunction, and their motion should be denied. And even if they could meet this burden, they have not shown that they are entitled to judgment as a matter of law—a permanent injunction—without even affording the District an opportunity to develop a record or fully brief the question.

## STATEMENT OF FACTS

For more than a century, the District of Columbia has regulated the carrying of handguns in public. *See* Committee on the Judiciary and Public Safety, D.C. Council, Report on Bill 20-930 (Nov. 26, 2014), Defendants' Appendix (DA) 2–3.[1] For much of that time, some carrying was allowed under a licensing scheme. *See*, *e.g.*, 27 Stat. 116 (1892); 57 Stat. 586, ch. 296 (1943). Starting in 1976, however, the District generally banned the possession of handguns. D.C. Code §§ 7-2502.01(a), 7-2502.02(a)(4) (2001).

The Supreme Court found this ban unconstitutional in *District of Columbia v. Heller*, 554 U.S. 570 (2008) (*Heller I*), under the Second Amendment, which directs that "the right of the people to keep and bear Arms, shall not be infringed." The Court held that the Second

---

[1]     The Committee Report and its relevant attachments are included in the Defendants' Appendix. The complete report (188 pages long, including attachments) are available online at *http://lims.dccouncil.us/Download/32576/B20-0930-CommitteeReport1.pdf*. A video of the public hearing of October 16, 2014, on the legislation is available at *http://lims.dccouncil.us/Download/32576/B20-0930-HearingRecord1.pdf*.

Amendment codified a pre-existing, individual right and that, "whatever else it leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." 554 U.S. at 592, 635. In *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Court found this right "fully applicable to the States," but assured that "state and local experimentation with reasonable firearms regulation will continue." *Id.* at 750, 785.

In response to *Heller I*, the Council of the District of Columbia amended the law to allow use of handguns for self-defense in the home, which the Court described as the core right enshrined in the Second Amendment. D.C. Code § 7-2502.02(a)(4); *Heller I*, 554 U.S. at 628–30. Carrying handguns in public remained prohibited. D.C. Code § 22-4504 (2009 Supp.). The district court struck down this carrying ban in *Palmer v. District of Columbia*, 59 F. Supp. 3d 173 (D.D.C. 2014). In response, the Council enacted comprehensive legislation to permit the issuance of concealed-carry licenses if, among other qualifications, the applicant has either "good reason to fear injury to his or her person or property" or "any other proper reason for carrying a pistol." D.C. Law 20-279, § 3(b), 62 D.C. Reg. 1944 (effective June 16, 2015) (codified at D.C. Code § 22-4506(a)). To show "good reason to fear injury," an applicant must demonstrate "a special need for self-protection distinguishable from the general community as supported by evidence of specific threats or previous attacks that demonstrate a special danger to the applicant's life." D.C. Law 20-279, § 2(f) (codified at D.C. Code § 7-2509.11(1)(A)). "[O]ther proper reason . . . shall at a minimum include types of employment that require the handling of cash or other valuable objects that may be transported upon the applicant's person." D.C. Code § 7-2509.11(1)(B).

The Council based the "good reason" standard on similar provisions in New York, Maryland, and New Jersey, all of which "have withstood constitutional challenges in federal courts of appeal." DA 1, 9 & n.39 (citing *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81 (2d Cir. 2012); *Woollard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013); *Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013)). This "revival of the original concealed carry law reinstates the District as a 'may issue' jurisdiction," unlike states with "'shall issue' laws, which require the issuing authority to grant most permits." DA 8. The Council credited empirical studies demonstrating that the "right-to-carry laws" enacted in "shall issue" states "are associated with substantially higher rates of aggravated assault, rape, robbery and murder." DA 17; *see* DA 133–240. It found "undeniable" that "introducing a gun into any conflict can escalate a limited danger into a lethal situation," and that this "danger extends to bystanders and the public at large." DA 18. Given the "substantial governmental interest in public safety and crime prevention," the Council concluded that the "good reason" standard "offers a reasonable, balanced approach to protecting the public safety and meeting an individual's specific need for self-defense." DA 18–19.

The Council also found the licensing regime necessary to prevent federal and local law enforcement agencies from "turn[ing] the District into a semi-police state" in an effort to protect its thousands of "high-value security targets." DA 5, 17. Unlike any state, the District's "68 square miles . . . is completely contained in a dense urban setting." DA 7. And compared to other large cities, the District has greater "public safety and national security concerns" given that "[i]t is the home of the President" and "all high-ranking federal officials and members of Congress," many of whom "are under constant protection" by the Secret Service or Capitol Police. DA 4, 7. It also "is home to a diplomatic corps more extensive and omnipresent than anywhere else in the country"—"approximately 3,000 foreign dignitaries spend[] time in our city each year"—and

"threats are a constan[t] for the diplomatic corps." DA 5, 6. The Metropolitan Police Department (MPD) "also provides security support for more than 4,000 special events annually." DA 6.

Moreover, the Council noted, the city is already "heavily patrolled and protected by the more than two dozen law enforcement entities that operate here," few of which fall under the District's authority. DA 7. Without the licensing regime, these entities would have to account for the increased risk associated with increased carrying—a result that, the Council found, would unfairly infringe on the constitutional rights of its citizenry. DA 4–7. "At some point the presence of law enforcement crosses a psychological line between providing public safety and infringing upon a sense of freedom. Citizens of the United States take pride in the freedom granted to them through the Constitution—freedom of expression, freedom of movement." DA 7. "But increasing the posting of armed officers, or clearing streets of all automobiles and restricting pedestrian movement except through checkpoints, tips society away from the freedom and openness we value in our society." *Id*. Thus, "[t]he circumstances unique to the District require a regulatory system different than perhaps any other jurisdiction, and especially, far different than what would be necessary for public safety in a rural place." *Id*.

Just like the Council's law, the regulations issued by MPD were modeled on standards applied in New York, Maryland, and New Jersey. They define "good reason" as a "special need for self-protection distinguishable from the general community." 24 DCMR § 2333.1. To satisfy this standard, an applicant must "allege, in writing, serious threats of death or serious bodily harm, any attacks on his or her person, or any theft of property from his or her person," and that "the threats are of a nature that the legal possession of a pistol is necessary as a reasonable precaution." 24 DCMR § 2333.2. "The fact that a person resides in or is employed in a high crime area shall not by itself establish a good reason . . . for the issuance of a concealed carry

license." 24 DCMR § 2333.4. Alternatively, an applicant can demonstrate any "other proper reason" for carrying a handgun in public, such as employment that requires the personal transport of "large amounts of cash or other highly valuable objects" or the need to protect a family member who has "good reason" but "cannot act in defense of himself or herself." 24 DCMR § 2334.1. If the Chief of Police denies an application for a concealed-carry license, the applicant may appeal to the Concealed Pistol Licensing Review Board, 1 DCMR § 1202, and then "pursue judicial review" if needed, 1 DCMR § 1221.6.

On December 22, 2015, plaintiffs Matthew Grace and Pink Pistols (PP) brought this suit. Complaint [Doc. No. 1]. A week later, they moved for a preliminary and/or permanent injunction. Plaintiffs' Application for a Preliminary and/or Permanent Injunction [Doc. No. 6]. Grace alleges that his concealed-carry application was denied because he failed to "[d]emonstrate a good reason to fear injury to person or property, or other proper reason for a concealed carry license." P.Mem. [Doc. No. 6-1] at 5. He concedes that he does not meet the requirements of the District's law because he "does not face specific threats that differentiate him from the typical, law-abiding citizen[.]" *Id.* at 6. PP is an organization "that advocates the use of lawfully owned, lawfully concealed firearms for self-defense of the sexual minority community." Plaintiffs' Exhibit No. 4 (Declaration of Gwendolyn S. Patton) ("Pink Pistols believes that the right to bear arms is particularly important for members of discriminated against minorities."). It alleges that, "[b]ut for the District of Columbia laws and regulations set forth above, at least one member . . . would carry a firearm outside the home for self-defense." *Id.*

## STANDARDS FOR A PRELIMINARY INJUNCTION

A plaintiff seeking a preliminary injunction must establish that: (1) "he is likely to succeed on the merits"; (2) "he is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in his favor"; and (4) "an injunction is in the public

interest." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011). The last two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Because injunctive relief is such an extraordinary remedy, a plaintiff seeking such relief must prove all four prongs of the standard before relief can be granted. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008); *In re Navy Chaplaincy*, 738 F.3d 425, 428 (D.C. Cir 2013).

"The usual role of a preliminary injunction is to preserve the status quo pending the outcome of litigation." *Cobell v. Norton*, 455 F.3d 301, 314 (D.C. Cir. 2006) (quoting *Dist. 50, United Mine Workers of Am. v. Int'l Union, United Mine Workers of Am.*, 412 F.2d 165, 168 (D.C. Cir. 1969)). Where a plaintiff seeks a "mandatory injunction"—*i.e.*, one that would compel a positive act by the defendant—this Court has required the plaintiff to meet a higher standard and show "extreme or very serious damage" or that he is "clearly entitled" to immediate relief. *Sweis v. U.S. Foreign Claims Settlement Comm'n*, 950 F. Supp. 2d 44, 48 (D.D.C. 2013) (citations omitted)). *But see Minney v. OPM*, No. 1:15-cv-1092 (RJL), 2015 WL 5442403, at *3 n.6 (D.D.C. Sept. 15, 2015) (noting that the D.C. Circuit "has yet to address whether [a] plaintiff [seeking a mandatory injunction] carries a heightened burden"). Becauses the plaintiffs here seek a "mandatory injunction" that would require the District to issue concealed-carry licenses to plaintiff Grace and all members of PP who, apart from the "good reason" requirement are eligible for a concealed carry license, in derogation of the status quo, the Court should hold them to this higher standard.

## ARGUMENT

## I.   PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIM; RATHER, THE DISTRICT IS LIKELY TO PREVAIL.

The District of Columbia is unique. Unlike any state, its jurisdiction is entirely urban and densely populated. Unlike any city, it is filled with thousands of high-ranking federal officials and diplomats from around the world, and it hosts hundreds of heavily attended events each year,

including numerous political marches and protests. The Second Amendment preserves the ability of local jurisdictions "to devise solutions to social problems that suit local needs and values," *McDonald*, 561 U.S. at 784–85, and that is precisely what the Council has done through the "good reason" standard.

Against the weight of established precedent and the Council's considered judgment, plaintiffs contend that the Second Amendment requires the District—and every jurisdiction in the nation, irrespective of local conditions—to allow carrying of handguns in public spaces without considering any particular license applicant's self-defense needs. Anything else, they say, "*extinguishes*" the right, which they take as an absolute right to carry a firearm without a good reason. P.Mem. at 27 (emphasis in original). They argue that the circuits that unanimously conclude otherwise are wrong, and that the quarter of the American population in "may issue" jurisdictions must change to "shall issue," no matter what they and their elected representatives wish and what the public-safety consequences will be.[2]

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11 A.C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2948 (2d ed. 1995). Plaintiffs cannot meet this high standard.

A.      **Because regulation of public carrying in cities is longstanding, the District's "good reason" standard is beyond the scope of the Second Amendment.**

"Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Heller I*, 554 U.S. at 634–35. "[L]ongstanding" firearm prohibitions,

---

[2]      Plaintiffs assert that the "vast majority" of states are "shall issue" jurisdictions and, implicitly, that this "readily available alternative" demonstrates that the District's regime violates the Second Amendment. *See* P.Mem. at 32–33. But the interpretation of the Constitution is not a popularity contest, and the District faces unique challenges not present elsewhere.

those in place during the Framing era, and those reaching into the early 20th Century, are considered "presumptively lawful." *Id.* at 626–27 & n.6; *see also Heller v. District of Columbia*, 670 F.3d 1244, 1253 (D.C. Cir. 2011) (*Heller II*) (noting that "[t]he Court in *Heller* considered 'prohibitions on the possession of firearms by felons' to be 'longstanding' although states did not start to enact them until the early 20th century"). The District's regulation of public carrying—providing licenses only to individuals who have a particularized self-defense need—is less restrictive than longstanding prohibitions on public carrying, and therefore does not infringe on a Second Amendment right.

For as long as citizens have owned firearms, English and American law has restricted any right to carry in populated public places. In 1328, England enacted the Statute of Northampton, which stated that "no Man great nor small" shall "go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere." 2 Edw. 3, 258, ch. 3 (1328). The statute reflected a general rule that, in populated public places, "the authority to ensure the public peace rested with the local government authorities," not individually armed citizens. Patrick Charles, *The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of Review*, 60 Clev. St. L. Rev. 1, 20 (2012) ("Charles 2012"); *see also Peruta v. County of San Diego*, 742 F.3d 1144, 1182 (9th Cir. 2014) (Thomas, J., dissenting) ("Restrictions on the carrying of open and concealed weapons in public have a long pedigree in England."), *vacated*, 781 F.3d 1106 (9th Cir. Mar. 26, 2015).

Plaintiffs argue that the right to carry in public was recognized by both William Blackstone and William Hawkins in the 18th century, noting that both scholars' treatises described the right of self-defense. P.Mem. at 13–14. But these provisions are consistent with the Statute of Northampton, which was understood to permit carrying in the countryside, where

individuals hunted with firearms and travelers could not expect police protection. *See* Charles 2012, *supra*, at 19. The Statute also explicitly excluded from its prohibition "the King's servants in his presence," "his ministers," and citizens summoned to "keep the peace," 2 Edw. 3, 258, ch. 3, making it consistent with the Second Amendment's prefatory "militia" clause. *See* P.Mem. at 11. And both Blackstone and Hawkins, along with virtually every other legal scholar at the time, acknowledged the continued vitality of the Statute of Northampton's broad prohibition on public carrying. Historian Patrick Charles has examined the treatises, restatements, and prosecutorial records published from the sixteenth to early-eighteenth centuries and found it "abundantly clear" that the Statute barred "the carrying of dangerous weapons in the public concourse" "without the license of government." Charles, *The Statute of Northampton by the Late Eighteenth Century: Clarifying the Intellectual Legacy*, 41 Fordham Urb. L.J. City Square 10, 21 (2013) ("Charles 2013"); *see also* Charles 2012, *supra*, at 32–33 (analyzing additional historical material); *see* Ruben & Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 Yale L.J. F. 121, 129 (2015).

The Statute of Northampton's broad prohibition continued into the 17th and 18th centuries, *id.* at 23–25, and the "tradition of restricting both the concealed and the open carry of firearms in public places . . . was reflected in various state laws immediately following the ratification of the Constitution." Dennis Henigan, *The* Woollard *Decision and The Lessons of the Trayvon Martin Tragedy*, 71 Md. L. Rev. 1188, 1202 (2012). Massachusetts, Virginia, North Carolina, Tennessee, Maine, Delaware, New Mexico, and South Carolina all adopted the public-

carrying ban of the Statute of Northampton,[3] and it was in effect through common law in New York, Connecticut, New Jersey, and Maryland.[4] And "[m]ost states enacted laws banning the carrying of concealed weapons." *Kachalsky*, 701 F.3d at 95 (citing statutes); *see also Moore v. Madigan*, 702 F.3d 933, 944 (7th Cir. 2012) (Williams, J., dissenting) ("In contrast to inside the home, where one could largely do what he wished, there was a long history of regulating arms in public.").

When Congress established the District's judicial systems in 1801, it adopted "the laws of the state of Maryland as they now exist." DA 305–307, District of Columbia Organic Act, 2 Stat. 103 (1801). Maryland had adopted the common law of England, Md. Const. of 1776, art. III, § 1, where "the Statute of Northampton and regulations touching upon public carriage were alive and well." Charles 2013, *supra*, at 20. The first codification of the District's common law, completed by Judge William Cranch in 1818, included the Statute's ban on public carrying. DA 314–15, D.C. Code of 1818 at 253–54. When the District's common law was again put in writing in 1857, the ban was tempered by the precursor to the "good reason" standard—public carrying was allowed only for people with "reasonable cause to fear an assault or other injury or violence to his person." DA 318, Revised Code of the District of Columbia at 570. Similar laws were adopted in Massachusetts, Wisconsin, Maine, Michigan, Virginia, Minnesota, Oregon,

---

[3]     *See* Eric Ruben & Saul Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 126 Yale L.J. Forum 121, 129 n.43 (2015); 1694 Mass. Laws 12, No. 6; 1859 N.M. Laws 94, § 2; 1870 S.C. Laws 402, No. 288.

[4]     *See* A Bill for the Office of Coroner and Constable (Mar. 1, 1882) (N.J. Constable Oath); John A. Dunlapp, The New York Justice (New York 1815); John M. Niles, The Connecticut Civil Officer: In Three Parts…: with Suitable and approved forms for each: together with numerous legal forms of common use and general convenience. 2nd ed., ch. 14 (Hartford, Conn. 1833); Md. Const. of 1776, art. III, § 1 (adopting English common law).

Pennsylvania, Texas, and West Virginia.[5] From that point on, the District's laws strictly regulated open and/or concealed carrying, at some points banning public carrying altogether.[6] *See*, *e.g.*, DA 320, An Act to Prevent the Carrying of Dangerous Weapons in the City of Washington (Nov. 4, 1857) (banning carrying); DA 321, An Act to Prevent the Carrying of Concealed and Dangerous Weapons in the City of Washington (Nov. 18, 1858) (banning concealed carrying without repealing ban on open carrying); DA 322–23, 27 Stat. 116 (1892) (banning concealed carrying without a license, which required good reason); DA 324–28, 47 Stat. 651, ch. 465, § 4 (1932) (similar); DA 329, 57 Stat. 586, ch. 296 (1943) (banning all carrying without a license, which required good reason).

The District's actions in this compact, urban jurisdiction were consistent with how the Statute of Northampton's public carrying ban was "geographically contextual and tailored to public places like 'Fairs' and 'Markets.'" Joseph Blocher, *Firearm Localism*, 123 Yale L.J. 82, 113 (2013). London began enacting gun-control laws "[a]s early as the 1300s." *Id.* at 112; *see also Heller I*, 554 U.S. at 587 n.10 (quoting a 1704 law barring any person from "bear[ing] any Arms within London, and the Suburbs"). And in America, "[u]rban gun control was . . . a nationwide phenomenon, reaching from the harbors of Boston to the dusty streets of Tombstone." Blocher, *supra*, at 120. Indeed, this "urban/rural divide appears to have been even more pronounced out West," where "even the towns most associated with gun violence . . .

---

[5]     *See* Ruben & Cornell, *supra*, at 130–31 & n.52–53, 132–33 & n.61 (quoting statutes); 1870 W. Va. Laws 702, ch. 153, § 8; 1871 Tex. Laws 1322, art. 6512; 1873 Minn. Laws 1025, § 17.

[6]     Other jurisdictions' longstanding regulations likewise demonstrate that the "good reason" requirement does not implicate Second Amendment rights. *See Drake*, 724 F.3d at 434 ("We discern no hint in the Second Amendment jurisprudence of either the Supreme Court or this Court that the analysis of a particular regulation in a particular jurisdiction should turn entirely on the historical experience of that jurisdiction alone.").

required people to leave their weapons at the city limits when arriving in town." Blocher, *supra*, at 117 (citing Adam Winkler, *Gunfight: The Battle over the Right to Bear Arms in America* 13 (2011); Dodge City, Kan., City Ordinances no. 16, § 11 (Sept. 22, 1876)). "Almost everyone carried firearms in the untamed wilderness," but "[i]n the frontier towns, . . . where people lived and businesses operated, the law often forbade people from toting their guns around." *Id.* (quoting Winkler, *supra*, at 165); *see also* Carl Bogus, *A Symposium on Firearms, the Militia, and Safe Cities*, 1 Alb. Gov't L. Rev. 440, 464 (2008) (explaining that, even in the "Wild West," "'[t]hose entering the towns had to come disarmed, since it was against the law for anyone but law enforcement officials to carry a gun'"). By the late 1800s, many cities completely banned public carrying.[7]

Plaintiffs note that several founding-era States either drafted constitutional provisions guaranteeing a right to carry in public or interpreted their constitutions to afford this right. P.Mem. at 15. But the fact that some states wanted broader public-carrying rights does not suggest a "widely understood" national consensus that individuals had a pre-existing right to carry in populated areas. *Heller I*, 554 U.S. at 605. Nor can plaintiffs establish this consensus through judicial decisions in the 1800s by courts in Southern States. *See* P.Mem. at 18–19. These rulings come from "a time, place, and culture where slavery, honor, violence, and the public carrying of weapons were intertwined." Ruben & Cornell, *supra*, at 125. "The judges deciding the Southern right-to-carry cases were thus immersed in a social and legal atmosphere unique to the South." *Id.* at 128. "No similar judicial record exists in the North," where "public carry

---

[7]     *See*, *e.g.*, Nebraska City, Neb., Ordinance no. 7 (1872); Nashville, Tenn., Ordinance Ch. 108 (1873); Los Angeles, Cal., Ordinance Nos. 35-36 (1878); Salina, Kan., Ordinance No. 268 (1879); Syracuse, N.Y., Ordinances Ch. 27 (1885); Dallas, Tex., Ordinance of July 18, 1887 (1887); Checotah, Okla., Ordinance No. 11 (1890); Rawlins, Wyo., Rev. Ordinances Art. 7 (1893); Wichita, Kan., Ordinance No. 1641 (1899); McKinney, Tex., Ordinance No. 20 (1899).

restrictions appear to have gone unchallenged." *Id.* at 127. And none of these cases addresses the specific regulation challenged here, which applies only in the District's densely populated setting and makes exception for individuals with a special self-defense need. Even if some states did not ban public carrying, *cities* historically had broad discretion to limit public carrying in populated places. Blocher, *supra* at 112–20. Indeed, as *Heller I* acknowledges, London broadly banned public carrying in 1704. 554 U.S. at 587 n.10.

The historical record here is at least as persuasive as the evidence supporting other regulations found presumptively lawful in *Heller I*, like the ban on possession by felons, 554 U.S. at 626–27, whose history is neither uniform nor centuries old, *United States v. McCane*, 573 F.3d 1037, 1047–49 (10th Cir. 2009) (Tymkovich, J., concurring). That plaintiffs can point to a few states with less restrictive laws is of no moment. "What history demonstrates is that states often disagreed as to the scope of the right to bear arms." *Drake*, 724 F.3d at 431. And this disagreement itself demonstrates that, during the Framing era, public carrying *in cities*, without reasonable cause to fear assault, was not an inviolable right, but rather was subject to the policy judgment of local lawmakers. *Cf. Friedman v. Highland Park*, 784 F.3d 406, 412 (7th Cir. 2015) ("[T]he Constitution establishes a federal republic where local differences are cherished as elements of liberty, rather than eliminated in a search for national uniformity."). If nothing else, this dispute shows the futility of asking the parties to resolve this question before it has been fully presented in this Court, and when the District has little time and few pages to address the question.

Plaintiffs also argue that "there is no longstanding tradition of limiting the right to bear arms to a select group of individuals the government deems to have a proper reason to exercise their right." P.Mem. at 22. But a regulation need not precisely match a longstanding restriction to

be presumptively lawful—the "good reason" standard is *less* burdensome than the Statute of Northampton's ban on carrying, which was in force in more than half of the founding colonies. If an absolute ban on carrying was generally understood to be lawful, the "good reason" standard cannot implicate a pre-existing right codified in the Second Amendment.

Although the historical evidence introduced thus far is not as extensive as what can be expected on a full record, it heightens the likelihood that the District, not plaintiffs, will prevail on the merits, because it suggests that the "pre-existing right" that the Second Amendment codified, *Heller I*, 554 U.S. at 592, did not encompass carrying in densely populated cities, let alone doing so without "good reason."

**B.     Alternatively, the "good reason" standard is likely to survive heightened scrutiny.**

1.     The "good reason" standard is not categorically unconstitutional.

*Heller I* found the District's handgun ban categorically unlawful because it "totally ban[ned] handgun possession in the home," "where the need for defense of self, family, and property is most acute." 554 U.S. at 628. Plaintiffs argue that the "good reason" standard is likewise categorically unlawful—or at least subject to strict scrutiny—because it is a "wholesale ban" on "core Second Amendment conduct." P.Mem. at 20. But the "good reason" standard is nothing like the handgun ban struck down in *Heller I*. "Few laws in the history of our Nation have come close to the severe restriction of the District's handgun ban." *Heller I*, 554 U.S. at 629. The "good reason" standard, in contrast, currently applies in New York, New Jersey, Maryland, and California, which make up 23 percent of the population of the United States.[8] Delaware, Connecticut, Rhode Island, and Massachusetts also have "may-issue" laws that allow

---

[8]     Census data is available at *http://quickfacts.census.gov/qfd/index.html*.

licensing officials to exercise discretion. *Gun Control: States' Laws and Requirements for Concealed Carry Permits Vary Across the Nation*, U.S. Government Accountability Office, Report to Congressional Requesters, GAO-12-717, at 5, 11 (July 2012) (http://www.gao.gov/assets/600/592552.pdf).

Plaintiffs devote most of their argument to defeating a straw man, arguing that "the Second Amendment applies outside the home," P.Mem. at 9–19, then claiming that the "good reason" standard categorically destroys this right, *Id.* at 20–21. What is burdened by the District's law, however, is not the broad right to "bear arms" outside the home, but something much narrower, tailored to match exactly what the "good reason" standard precludes: carrying a handgun in a densely populated city, filled with unique, high-risk security targets, without any specific self-defense reason. *Cf. Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010) (holding that issue was "more refined than" "whether the Government may prohibit pure political speech," as plaintiffs framed it). The circular reasoning relied on by plaintiffs—defining a "right" as precisely what a law precludes, then arguing that it is categorically unconstitutional—could be used to evade means-ends scrutiny in any situation. A humanitarian organization could claim that, because it has a broad right to "pure political speech," its "right" to provide humanitarian speech to foreign terrorist organizations is "destroyed" by a material-aid ban. *But see id.* at 28–36. Or a woman could argue that, because she has a broad right to obtain an abortion, her "right" to a partial-birth abortion is "destroyed" by a law banning that procedure. *But see Gonzales v. Carhart*, 550 U.S. 124, 166–67 (2007).  This is not how rights are analyzed. *Cf. Reichle v. Howards*, 132 S. Ct. 2088, 2094 (2012) (explaining that, in qualified-immunity analyses, "right" must be established in a "particularized" sense, not as a "broad general proposition").

Moreover, even assuming that the Second Amendment protects a right to "bear arms" outside the home,[9] that right is not at the Amendment's core, and the "good reason" standard does not "destroy" it. The standard applies only in the District, a jurisdiction "completely contained in a dense urban setting" filled with "critical official and symbolic buildings, monuments, and events, and high-profile public officials." DA 7, 20. Of course, the Second Amendment applies in the District, but the right it codifies has always been sensitive to context. As a practical matter, "presumptively lawful" regulations, such as "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings," make it impossible for many Americans to carry guns to work, school, or other sensitive places that make up their daily lives. *Heller I*, 554 U.S at 626. The District's unique status as the densely populated Nation's capital means that laws that are a poor fit in rural areas and wilderness may justifiably apply to the entire jurisdiction. And a public-carry license is not needed to transport a properly secured firearm to a firing range, or outside the District for some other lawful purpose, such as hunting. D.C. Code § 22-4504.01; 18 U.S.C. § 926A.

Nor does the standard "destroy" any individual's ability to carry an operable handgun in the District. *Cf. Heller I*, 554 U.S. at 630 (striking down law requiring firearms in the home to be kept inoperable, without an exception for self-defense). The "good reason" standard is not a "wholesale ban," P.Mem. at 20, but is more akin to the "time, place, and manner restrictions" of protected speech, which "are subject to an intermediate level of scrutiny because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue."

---

[9]     It is not clear that this is so. Plaintiffs argue that *Heller I* and *McDonald* establish that "individual self-defense" outside the home "is at the core of the Second Amendment right." P.Mem. at 11. But, as the Seventh Circuit explained in *Moore*, "the Supreme Court has not yet addressed th[at] question." 702 F.3d at 935.

*Turner Broadcasting System v. FCC*, 512 U.S. 622, 642 (1994) (*Turner I*). In essence, the standard speaks not to who may carry a handgun, but when a handgun may be carried: after the applicant develops a non-speculative need for armed self-defense. That some people will never encounter such a need does not mean that any right has been destroyed. Any person could, at some point in time, find himself particularly threatened. When that happens, the District's law allows him to apply for a carry license—there is no quota or limit to the number of licenses that can be issued. As a federal court explained in upholding a similar licensing scheme in New York:

> The statute does not function as an outright ban on concealed carry, but rather calls for individualized, case-by-case determinations regarding whether full-carry permit applicants have an actual and articulable—rather than merely speculative, potential, or even specious—need for self-defense. As crafted, the statute seeks to limit the use of handguns to self-defensive purposes—a use which, although in this context existing outside the home, is nonetheless a hallmark of *Heller*—rather than for some other use that has not been recognized as falling within the protections of the Second Amendment.

*Kachalsky v. Cacace*, 817 F.Supp.2d 235, 271 (S.D.N.Y. 2011), *aff'd*, 701 F.3d 81 (2d Cir. 2012).

The Supreme Court has made clear that limitations on carrying do not necessarily destroy a Second Amendment right. It has recognized the presumptive validity of "[l]aws forbidding the carrying of firearms in sensitive places such as schools and government buildings," *Heller I*, 554 U.S. at 626, and this alone effectively makes public carrying impossible for many people who live and work in the District. *See* 18 U.S.C. § 930 (barring carrying in federal facilities); D.C. Code § 7-2509.06(a) (barring carrying in District buildings). Plaintiffs do not suggest that these restrictions destroy those individuals' Second Amendment right, because these restrictions—no different from the "good reason" standard—constitute permissible regulation, not destruction of any right. As the Seventh Circuit noted in *Horsley v. Trame*, 2015 U.S. App. LEXIS 21607 (7th

Cir. 2015), courts "have affirmed categorical bans on firearm possession in other instances." *Id.* at *12 n.2 (citing *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010) (affirming *categorical* ban on possession of firearms by felons); *United States v. Yancey*, 621 F.3d 681, 683 (7th Cir. 2010) (unlawful users of controlled substances); *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (domestic violence misdemeanants)). And, as explained, the good reason requirement is not a categorical ban.

Plaintiffs rely heavily on the analysis of the panel in *Peruta v. County of San Diego*, 742 F.3d 1144 (9th Cir. 2014), *see* P.Mem at 10, 13, 17, 19, 21, 32, 34, 35 & 36, but they fail to note that the decision in *Peruta* was vacated over 10 months ago pending rehearing *en banc* and is no longer good law. *See* 781 F.3d 1106 (9th Cir. Mar. 26, 2015); http://www.ca9.uscourts.gov/ content /view.php?pk_id=0000000722 (online public docket) (last visited Jan. 15, 2016). They also rely on *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012), *see* P.Mem. at 10, 11, 12, 19, 21, 30, 31, 34, 35, 40 & 41, but that decision does not have the talismanic significance plaintiffs place on it. To be sure, *Moore* held that the "right to bear arms" "implies a right to carry" "outside the home," and that Illinois had not justified its statewide "flat ban" on public carrying. *Id.* at 936, 940. But the Third Circuit has criticized *Moore* as reading *Heller I* "too broadly." *See Drake*, 724 F.3d at 431 ("*Heller's* language 'warns readers not to treat *Heller* as containing broader holdings than the Court set out to establish: that the Second Amendment created individual rights, one of which is keeping operable handguns at home for self-defense.'" (quoting *Skoien*, 614 F.3d at 640)). In any event, *Moore* did not hold that the narrower asserted right at issue here—to carry a handgun in a densely populated city without a special self-defense reason—was likewise protected, much less inviolable. *See* 702 F.3d at 942. And *Moore's* historical analysis shows the importance of this distinction: it found a general right to carry

despite England's Statute of Northampton because American settlers had different self-defense needs than citizens in England, where there was "no wilderness" or "hostile Indians" and "the right to hunt was largely limited to landowners." *Id.* at 936. Thus, English law, which limited public carrying "in locations at which going armed was thought dangerous to public safety (such as in fairs or in the presence of judges)," did not establish that the Second Amendment right was limited to the home. *Id.*

*Moore* did refer to "a Chicagoan's" right to carry for self-defense, *id.* at 937, but it was not asked to rule on whether Chicago could limit public carrying within city limits to people with a special self-defense need. Indeed, it criticized the state's flat ban for not protecting those especially "vulnerable to being attacked" outside the home, like "[a] woman who is being stalked or has obtained a protective order against a violent ex-husband." *Id.* at 937. The District's law permits such people to obtain public-carry permits.

Plaintiffs also wrongly suggest that the District's law is analogous to a "prior restraint" on free speech. P.Mem. at 23–25. But the doctrine prohibiting prior restraints "is specific to the First Amendment" and stems from a concern that "the mere existence of the licensor's unfettered discretion, coupled with the power of prior restraint, [will] intimidate[] parties into censoring their own speech." *Hightower v. City of Boston*, 693 F.3d 61, 81 (1st Cir. 2012). It "is not a label that may be attached to allow any facial challenge, whatever the constitutional ground." *Id.* at 80. And the prior restraint doctrine cannot apply here, because the District's law does not give Chief Lanier unfettered discretion. *Id.* D.C. Code § 7-2509.11(1) requires rulemaking to "establish criteria for determining when an applicant has" demonstrated "good reason" and "suitability." The regulations issued under this statute provide unambiguous standards and guarantee substantive administrative and judicial review. 24 DCMR §§ 1202, 1221.6, 2333.1–.4. As the

Second Circuit explained in its rejection of an identical argument in *Kachalsky*, "[p]laintiffs' complaint is not that the proper cause requirement is standardless; rather, they simply do not like the standard—that licenses are limited to those with a special need for self-protection." 701 F.3d at 92. "Plaintiffs question New York's ability to limit handgun possession to those demonstrating a threat to their safety. This is precisely the type of argument that should be addressed by examining the purpose and impact of the law in light of the Plaintiffs' Second Amendment right." *Id.*

> 2. Even if constitutional scrutiny is warranted, the appropriate standard is intermediate scrutiny.

Plaintiffs assert that "strict scrutiny" is required here, because the right to bear arms is "fundamental." P.Mem. at 26. But "[t]he [Supreme] Court has not said, . . . and it does not logically follow, that strict scrutiny is called for whenever a fundamental right is at stake." *Heller II*, 670 F.3d at 1256. "Many, indeed most, of the Bill of Rights guarantees do not trigger strict scrutiny." Adam Winkler, *Scrutinizing the Second Amendment*, 105 Mich. L. Rev. 683, 694 (2007). In their consideration of statutes similar to the "good reason" requirement, the Second, Third, and Fourth Circuits all found that the laws were subject only to intermediate scrutiny, because they do not completely prohibit the exercise of any core Second Amendment right.[10] *Drake*, 724 F.3d at 430; *Kachalsky*, 701 F.3d at 93 & n.17; *Woollard*, 712 F.3d at 876. The D.C. Circuit previously has found intermediate scrutiny appropriate for the District's gun registration laws because they do "not severely limit" the core Second Amendment right, *see Heller II*, 670 F.3d at 1257; the District's ban on assault weapons and large-capacity ammunition magazines

---

[10] The Third Circuit held that the "good reason" standard was so longstanding that it did not even implicate the Second Amendment. *Drake*, 724 F.3d at 430. However, "because of the important constitutional issues presented," the court applied heightened scrutiny in the alternative—holding that the law should be examined under intermediate scrutiny. *Id.*

because the law does not "prevent a person from keeping a suitable and commonly used weapon for protection in the home," *id.* at 1262; and a federal law barring firearm possession by convicted criminals because, although the burden "is certainly severe, it falls on individuals who cannot be said to be exercising the core of the Second Amendment right identified in *Heller, i.e.*, 'the right of law-abiding, responsible citizens to use arms in defense of hearth and home,'" *see Schrader v. Holder*, 704 F.3d 980, 989 (D.C. Cir. 2013). In fact, "the overwhelming majority of cases from [the D.C. Circuit's] sister circuits" also have "applied intermediate scrutiny to various statutes regulating firearms." *Dearth v. Lynch*, 791 F.3d 32, 39 (D.C. Cir. 2015) (Henderson, J., dissenting) (remanded for unrelated findings).

If the District's "good reason" standard implicates the Second Amendment at all, it should also be measured under this standard. Anything stricter than intermediate scrutiny would be inconsistent with the Supreme Court's recognition that "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Heller I*, 554 U.S. at 634–35. As explained, "longstanding" prohibitions, those in place during the Framing era as well as those reaching well into the 1800s, are "presumptively lawful." *Id.* at 626–27 & n.6. And the historical evidence at least demonstrates that the "good reason" standard does not implicate any right at the Second Amendment's *core*, making it inappropriate to apply any test more rigorous than intermediate scrutiny. *See, e.g., Woollard*, 712 F.3d at 876 (applying intermediate scrutiny to "good reason" standard); *Kachalsky*, 701 F.3d at 96 (same); *Horsely*, 2015 U.S. App. LEXIS 21607 at 14–19 (applying intermediate scrutiny to law requiring parental consent for carrying license to adults under 21); *United States v. Chester*, 628 F.3d 673, 683 (4th Cir. 2010) (applying intermediate scrutiny to ban on possession by domestic violence misdemeanant); *cf. United States v. Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011) ("Since historical meaning

enjoys a privileged interpretative role in the Second Amendment context, this longstanding out-of-the-home/in-the-home distinction bears directly on the level of scrutiny applicable." (citations omitted)).

The reasons for restricting public carrying in early American cities apply with even greater force today. *See* Charles 2012, *supra*, at 48 (comparing the Framing-era gunman's ability to inflict "two deaths per minute" with the current "twelve, twenty-four, or as high as forty-eight potential deaths per minute"). "The risk inherent in firearms . . . distinguishes the Second Amendment right from other fundamental rights that have been held to be evaluated under a strict scrutiny test, such as the right to marry and the right to be free from viewpoint discrimination, which can be exercised without creating a direct risk to others." *Bonidy v. USPS*, 790 F.3d 1121, 1126 (10th Cir. 2015). Intermediate scrutiny "places the burden on the government to justify its restrictions, while also giving governments considerable flexibility to regulate gun safety." *Id.* Thus, "while the state's ability to regulate firearms is circumscribed in the home, 'outside the home, firearm rights have always been more limited, because public safety interests often outweigh individual interests in self-defense.'" *Kachalsky*, 701 F.3d at 94.

Intermediate scrutiny is applied to laws regulating the exercise of other fundamental rights for similar reasons. Commercial speech is "indispensable to the proper allocation of resources in a free enterprise system," *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 765 (1976), but even the most burdensome content-based restrictions may be measured under intermediate scrutiny, *see*, *e.g.*, *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 647 (1985). This is because commercial speech "is 'linked inextricably' with the commercial arrangement that it proposes," *Edenfield v. Fane*, 507 U.S. 761, 767 (1993), and commerce is "an area traditionally subject to government regulation," *Ohralik v. Ohio State*

*Bar Ass'n*, 436 U.S. 447, 456 (1978). Thus, the government's "interest in preventing commercial harms justifies more intensive regulation." *Cincinnati v. Discovery Network*, 507 U.S. 410, 426 n.21 (1993). And "when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *United States v. O'Brien*, 391 U.S. 367, 376 (1968).

So too for the free exercise of religion, where intermediate scrutiny applies to laws that ban "overt acts" that "pose[] some substantial threat to public safety, peace or order." *Sherbert v. Verner*, 374 U.S. 398, 403 (1963). And an individual's right to use his private property for economic gain, protected under the Fifth Amendment, is subject to regulation to ensure it is not "injurious to the health, morals, or safety of the community." *Keystone Bituminous Coal v. DeBenedictis*, 480 U.S. 470, 489 (1987). These restrictions are "properly treated as part of the burden of common citizenship"—"[w]hile each of us is burdened somewhat by such restrictions, we, in turn, benefit greatly from the restrictions that are placed on others." *Id.* at 491.

The government has an even greater interest in regulating the conduct of its citizenry when that conduct involves carrying a deadly weapon in a populated public place. Just as there is a "'common-sense' distinction" between commercial and noncommercial speech, *Ohralik*, 436 U.S. at 455–56, and between religious beliefs and overt acts, *Sherbert*, 374 U.S. at 403, there is a common-sense distinction between carrying a handgun in one's home or business and carrying a handgun on the crowded streets of the nation's capital. A handgun in the home may increase the risk of domestic homicide, suicide, or accidental injury, *see Heller I*, 554 U.S. at 703 (Breyer, J., dissenting), but that risk is largely borne by those who live in or visit that home. Not so for public carrying, where a stray bullet can instantly destroy the lives of anyone who happens to be

24

in the area. *See* Andrew Herz, *Gun Crazy: Constitutional False Consciousness and Dereliction of Dialogic Responsibility*, 75 B.U. L. Rev. 57, 60 n.7 (1995) ("[S]tray bullets are a particular problem in large cities.").

What is more, public carrying creates new potential for armed conflict, increasing the chances that "[i]ncidents such as bar fights and road rage" will "take on deadly implications," criminals will target carriers "precisely because they possess handguns," or "an additional person bearing a gun" will cause confusion during a police operation. *Woollard*, 712 F.3d at 779–80 (citing experts). "It is axiomatic that if the gun carrier accidentally discharges his gun in public, decides to settle an argument with his gun in public, makes a mistake in judgment with his gun in public, or commits a crime with his gun in public, the community-at-large is at risk of death or serious injury from those actions." Henigan, *supra*, at 1200. "Were [courts] to require strict scrutiny for firearm restrictions outside the home, they 'would likely foreclose an extraordinary number of regulatory measures, thus handcuffing lawmakers' ability to 'prevent[] armed mayhem' in public places," *Masciandaro*, 638 F.3d at 471 (quoting *Skoien*, 587 F.3d at 809), and "depriving them of 'a variety of tools for combating that problem,'" *id.* (quoting *Heller I*, 554 U.S. at 636).

3.      The "good reason" standard survives intermediate scrutiny.

In *Heller II*, the D.C. Circuit adopted the intermediate-scrutiny test articulated in *Turner I* and 520 U.S. 180 (1997) (*Turner II*). 670 F.3d at 1257–59. It again applied intermediate scrutiny to firearm regulations in *Schrader*. Both decisions recognized that, under intermediate scrutiny, the "fit" between the challenged law and the important governmental interest "[need only] be reasonable, not perfect." *Schrader*, 704 F.3d at 990. It "is satisfied 'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation,'" and "the means chosen are not substantially broader than necessary to achieve the

25

government's interest." *Heller II*, 670 F.3d at 1258 (quoting, in parenthetical, *Ward v. Rock Against Racism*, 491 U.S. 781, 799–800 (1989)).

In assessing whether a law is "substantially related to an important governmental objective," *Heller II*, 670 F.3d at 1258, the D.C. Circuit "afford[s] 'substantial deference to the predictive judgments of [the legislature],'" *Schrader*, 704 F.3d at 990. In doing so, it must defer to the legislature both "as to the harm to be avoided and to the remedial measures adopted for that end," *Turner II*, 520 U.S. at 196, because the legislature "'is "far better equipped than the judiciary" to make sensitive public policy judgments . . . concerning the dangers in carrying firearms and the manner to combat those risks,'" *Schrader*, 704 F.3d at 990. Thus, in reviewing a law, the courts' role is simply to "'assure that, in formulating its judgments, [the legislature] has drawn reasonable inferences based on substantial evidence.'" *Heller II*, 670 F.3d at 1259.

This Court also should defer to the Council's predictive judgments regarding the question of "fit"—whether the "good reason" standard is "not substantially broader than necessary to achieve" the stated interest. *Turner II* deferred to Congress's assessment of "fit" when it rejected a "more limited set of must-carry rules," noting that Congress had considered this option but made "a deliberate congressional choice to adopt the present levels of protection, *to which this Court must defer.*" 580 U.S. at 219 (citing legislative history) (emphasis added); *id.* at 213 ("afford[ing] the Government latitude in designing a regulatory solution"); *see id.* at 220–21 (affording deference to Congress's decision to reject "'A/B' switches" as less-burdensome alternative").[11] And in *Humanitarian Law Project*, the Supreme Court again deferred to Congress on whether a law burdened a constitutional right substantially more than necessary,

---

[11]     *Turner II* also explained that, under this test, laws "are not 'invalid simply because there is some imaginable alternative that might be less burdensome.'" 520 U.S. at 217.

upholding a ban on the provision of "material support" to foreign terrorist organizations when it precluded pure speech that advanced only legitimate activities. 561 U.S. at 28–29, 33.

This makes sense. If the Council is better equipped than the judiciary to determine "the degree to which" District laws should promote public safety, *see Turner II*, 520 U.S. at 193, and whether a firearm regulation will likely do so, *see Heller II*, 670 F.3d at 1269, it is also better equipped to determine whether the regulation is necessary to accomplish that goal. Indeed, these factors often are so intertwined they are treated as one. *See*, *e.g.*, *Turner II*, 520 U.S. at 211 (considering whether the challenged law "is necessary to prevent a substantial number of broadcast stations from losing cable carriage and suffering significant financial hardship"); *Schrader*, 704 F.3d at 990 (considering whether "to accomplish the goal of preventing gun violence 'firearms must be kept away from persons, such as those convicted of serious crimes, who might be expected to misuse them'"). And the Council's expertise in policy matters "is not the sum of the matter"—courts "owe [a legislature's] findings an additional measure of deference out of respect for [its] authority to exercise the legislative power." *Turner II*, 520 U.S. at 196. To hold otherwise would "infringe on traditional legislative authority to make predictive judgments when enacting . . . regulatory policy." *Id.*; *cf. Gonzalez*, 550 U.S. at 163 ("The Court has given state and federal legislatures wide discretion to pass legislation in areas where there is medical and scientific uncertainty." (citing cases); *Baze v. Rees*, 553 U.S. 35, 90 (2008) (Scalia, J., concurring) ("It is simply not our place to choose one set of responsible empirical studies over another in interpreting the Constitution. Nor is it our place to demand that state legislatures support their criminal sanctions with foolproof empirical studies, rather than commonsense predictions about human behavior.").

The District's "good reason" requirement easily survives intermediate scrutiny. Even in cases alleging infringement of the First Amendment, the Supreme Court has "permitted litigants to justify speech restrictions by reference to studies and anecdotes pertaining to different locales altogether, or even, in a case applying strict scrutiny, to justify restrictions based solely on history, consensus, and simple common sense." *Edwards v. District of Columbia*, 755 F.3d 996, 1003 (D.C. Cir. 2014) (quoting *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001)). The Council based its findings on considerable evidence, and the District will introduce even more evidence here.

a.      The evidence relied on by the Council.

The Council substantiated its finding that the "good reason" standard will help prevent crime and promote public safety. It primarily relied on a 2014 Stanford University study led by Professor John Donohue III, an economist, legal scholar, and leading empirical researcher, who explained that "[t]he totality of the evidence based on educated judgments about the best statistical models suggests that right-to-carry laws are associated with substantially higher rates of aggravated assault, rape, robbery and murder." DA 17; *see* DA 133–240, Donohue, *The Impact of Right to Carry Laws and the NRC Report: The Latest Lessons for the Empirical Evaluation of Law and Policy* (Sept. 4, 2014) (Donohue 2014).

Plaintiffs ignore this data, and argue that the "leading study" on defensive gun use demonstrates that over 2 *million* such uses occur each year, many of which "involve carrying firearms in public." P.Mem. at 30 (citing Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense With a Gun*, 86 J. Crim. L. & Criminology 150, 164 (1995) and Gary Kleck & Marc Gertz, *Carrying Guns for Protection: Results from the National*

*Self-Defense Survey*, 35 J. of Res. in Crime & Delinquency 193, 195 (1998)). But the empirical foundation of this "more guns, less crime" hypothesis has been thoroughly discredited.[12] Professor Donohue and Yale Law School Professor Ian Ayres began researching the effect of right-to-carry laws in response to a 1997 study that reported that they *decreased* violent crime. DA 137–139 (citing John Lott & David Mustard, *Crime, Deterrence, and Right-to-Carry Concealed Handguns*, 26 J. Legal Stud. 1 (1997)); *see* Ayres & Donohue, *Nondiscretionary Concealed Weapons Laws: A Case Study of Statistics, Standards of Proof, and Public Policy*, 1 Am. L. & Econ. Rev. 436 (1999). They found the "more guns, less crime" conclusion impossible to replicate. *See*, *e.g.*, Ayres & Donohue, *Shooting Down the "More Guns, Less Crime" Hypothesis*, 55 Stan. L. Rev. 1193 (2003) ("Ayres & Donohue 2003"); Donohue, *Guns, Crime, and the Impact of State Right-to-Carry Laws*, 73 Fordham L. Rev. 623 (2004).

In 2004, the National Research Council convened a panel of researchers who extended the "more guns, less crime" study to 2000; they too found no credible statistical evidence to support the claim. DA 147–52 (citing Nat'l Research Council, *Firearms and Violence: A Critical Review* (2004)). Over the next ten years, Ayres and Donohue tested the models applied in these earlier studies—correcting for errors they uncovered, gathering more reliable crime data, and extending the study up to 2010. DA 153–207; *see also* Ayres & Donohue, *Yet Another Refutation of the More Guns, Less Crime Hypothesis*, 6 Econ. J. Watch 35 (2009); Ayres & Donohue, *More Guns, Less Crime Fails Again: The Latest Evidence from 1977–2006*, 6 Econ. J.

---

[12]    *See also, e.g.,* David Hemenway, "The Myth of Millions of Annual Self-Defense Gun Uses: A Case Study of Survey Overestimates of Rare Events," 10 *Chance* No. 3 (American Statistical Ass'n 1997) (*available online at* https://stat.duke.edu/~dalene/chance/chanceweb/103.myth0.pdf).

Watch 218 (2009). Finally, in 2014, Donohue concluded that right-to-carry laws were likely to result in "substantially higher rates" of violent crime. DA 104–105.

Donohue acknowledged that "it is not possible to determine that there is a causal link between the passage of right-to-carry laws and crime rates." DA 212. "But not being able to 'determine' with the level of certainty one strives for in academic work does not mean that one cannot offer conclusions at some lower level of certainty such as 'more probable than not.'" DA 212. "Since policymakers need to act, it is more useful to offer guidance as to which evidence is likely to be most reliable than to simply reject all evidence until the highest level of certainty has been attained." DA 212. And, Donohue reported, for each of the seven crime categories they studied, at least one of the most-favored models demonstrated a substantial increase in crime after right-to-carry laws were enacted. DA 212. One model "suggest[ed] that [right-to-carry] laws increased every crime category [except murder] by at least 8 percent," DA 212–13, and this "may understate the true harmful impact of [right-to-carry] laws" on "gun assaults," DA 134.

These increased risks could have unparalleled consequences in this unique jurisdiction. The District "is completely contained in a dense urban setting" and gun violence is particularly devastating in large cities, where there are "higher rates of violent crime than suburbs and rural areas," and where crowded public spaces make it all too likely that a stray bullet will hit an innocent bystander. DA 7. It also "is the home of the President," "all high-ranking federal officials and members of Congress," and "a diplomatic corps more extensive and omnipresent than anywhere else in the country." DA 4–5, 7. As a result, "the likelihood of attack is higher" in the District than in any other city, "and the challenges to protecting the city are greater." DA 6. The Council predicted that a significant increase in public carrying would force federal law enforcement agencies to step up protection of thousands of high-risk targets, which could

interfere with the rights of the people who live, visit, and work here. DA 7. "[I]ncreasing the posting of armed officers, or clearing streets of all automobiles and restricting pedestrian movement except through checkpoints, tips society away from the freedom and openness we value in our society." DA 7.

Plaintiffs argue that "leading studies find[] a lack of evidence that easing restrictions on the right to carry arms in public increases criminal violence." P.Mem. at 29. But the studies they cite all pre-date Donohue's latest conclusions—indeed, the statistical modeling he developed was designed to *correct* errors in these earlier studies. *See* DA 153–207. In any event, if the studies are truly inconclusive, this Court must defer to the *Council's* findings, not plaintiffs' contentions. *See Turner II*, 520 U.S. at 199 (affording deference even "with respect to conflicting . . . predictions"); *Heller II*, 670 F.3d at 1269 ("It is not [the Court's] place . . . to determine in the first instance whether [a firearm restriction] would promote important law-enforcement objectives.").

The Council also relied on the predictive judgments of the legislatures of New York, New Jersey, and Maryland, all of which have found the "good reason" standard necessary to prevent crime (and had those findings upheld by federal circuit courts). *See* DA 2, 9 & n.39. *Kachalsky* noted, in upholding New York's "proper cause" requirement under intermediate scrutiny, that "studies and data demonstrat[e] that widespread access to handguns in public increases the likelihood that felonies will result in death and fundamentally alters the safety and character of public spaces." 701 F.3d at 99. *Woollard* identified several different ways in which Maryland's "good reason" standard "protects citizens and inhibits crime," citing expert testimony of key law enforcement specialists. 713 F.3d at 879–80. And *Drake* upheld New Jersey's determination that the "good reason" standard "combat[s] handgun violence" and

improves public safety by "combating the dangers and risks associated with the misuse and accidental use of handguns" and "reduc[ing] the use of handguns in crimes." 724 F.3d at 437–38.

This evidence applies with even greater force here. Unlike those states, the District has no rural or unpopulated areas—it "is completely contained in a dense urban setting," with correspondingly "higher rates of violent crime than suburbs and rural areas." DA 4, 7. And "as the seat of the federal government, with its multitude of critical official and symbolic buildings, monuments, and events, and high-profile public officials traversing its streets every day," the District is "filled with sensitive places from a public safety perspective." DA 5.

The Council also relied on expert testimony from Chief Lanier and information from the Secret Service and Capitol Police explaining the District's special security concerns. *See* DA 20, 23, 24. It relied on anecdotal evidence, noting that "much of the District's violent crime is the result of gang members carrying guns" and, regardless of the illegality of the practice, "the fact that [gang members] are carrying provokes gun violence, rather than lessens it." DA 18. And it relied on common sense, finding it "undeniable" that "introducing a gun into any conflict can escalate a limited danger into a lethal situation" and that, "[w]hen the deadly force being used is a gun, the danger extends to bystanders and the public at large." *Id*.

b.      The evidence the District will introduce here.

This Court should also consider evidence presented in this Opposition, as well as what it will likely present on a full record. *See Turner I*, 512 U.S. at 667–68; *Heller II*, 670 F.3d at 1259–60 (remanding for additional factual development even after judgment had been entered). "An impressive body of empirical evidence now shows that state laws making it easier to carry concealed weapons in public . . . have had the net effect of making those states more dangerous." Henigan, *supra*, at 1201. This is not limited to the 2014 Donohue study. For example, in 1998, a Georgetown University professor tested the "more guns, less crime" theory by using juveniles

(who cannot qualify for public-carry permits) as a control group, and concluded that "shall-issue laws have resulted, if anything, in an *increase* in adult homicide rates." DA 243, Jens Ludwig, *Concealed-Gun-Carrying Laws and Violent Crime: Evidence from State Panel Data*, 18 Int'l L. Rev. L. & Econ. 239, 241 (1998). Another study that year applied corrected models to the "more guns, less crime" data and found that, "[f]or robbery, many states experience increases in crime" after enacting right-to-carry laws. DA 262, Hashem Dezhbakhsh & Paul Rubin, *Lives Saved or Lives Lost? The Effects of Concealed-Handgun Laws on Crime*, 88 Am. Econ. Rev. 468, 473 (1998). Indeed, recent data shows that gun-related deaths are more than four times higher in jurisdictions with lax (or non-existent) controls on public carrying. Libby Isenstein, *The States with the Most Gun Laws See the Fewest Gun-Related Deaths*, National Journal (Aug. 28, 2015), *available at* http://www.nationaljournal.com/s/53345/states-with-most-gun-laws-see-fewest-gun-related-deaths.

   Plaintiffs argue that public safety is better served with an armed public, pointing to studies quantifying "defensive uses of guns," as well as studies reporting that licensed carriers rarely misuse their handguns. P.Mem. at 29–30, 32–33. But raw numbers on defensive gun use (even if accurate) say nothing about the public-safety risks created by public carrying, which was the focus of Donohue's study. And plaintiffs' reliance on low levels of license revocation is misplaced—these states "have poorly administered, ineffective permitting systems that routinely let ineligible people slip through the cracks" in obtaining permits; it is unlikely they diligently pursue license revocation. *See* Everytown for Gun Safety, Federally Mandated Concealed Carry Reciprocity: How Congress Could Undercut State Laws on Guns in Public, 13 (http://everytown.org/documents/2015/02/federally-mandated-concealed-carry-reciprocity.pdf). And states can revoke a license only when a perpetrator is identified. Nationwide, only 46.8

percent of violent crimes were cleared by arrest or exceptional means in 2012, *see* FBI, Crime in the United States (2012) (https://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2012/crime-in-the-u.s.-2012/offenses-known-to-law-enforcement/clearances), and "shall-issue" states may require more than an arrest to justify revocation.

Nor are the risks inherent in public carrying confined to conduct that would justify revocation. A 2009 study of Philadelphia residents found that individuals who possessed a gun during an assault were 4.46 times more likely to be shot, and these odds *increased* to 5.45 when the victim had an opportunity to resist. DA 280, Charles Branas, *et al.*, *Investigating the Link Between Gun Possession and Gun Assault*, 99 Am. J. Pub. Health 2034, 2037 (2009). Handguns are often stolen and used against the carrier or used to commit a host of other crimes. *See Woollard*, 712 F.3d at 879 (quoting Baltimore Police Department Commissioner, who attested that "criminals often target victims '*precisely because* they possess handguns,' and that Baltimore police have 'frequently investigated homicides and robberies where it appears that one, if not the primary, goal of the attacker was to deprive the victim of his handgun or other weapons'"); Ayres & Donohue 2003, *supra*, at 1205 ("[S]ome estimates suggest[] that as many as one million or more guns are stolen each year."). And an upswing in public carrying may well encourage criminals to "shift toward greater lethality, and hence greater harm to the community." DA 272, Philip Cook & Jens Ludwig, *The Social Costs of Gun Ownership*, 90 J. Pub. Econ. 379, 387 (2006). "Two-thirds of prisoners incarcerated for gun offenses reported that the chance of running into an armed victim was very or somewhat important in their own choice to use a gun." Philip Cook, *et al.*, *Gun Control After* Heller*: Threats and Sideshows from a Social Welfare Perspective*, 56 UCLA L. Rev. 1041, 1081 (2009). "If increased gun carrying among potential victims causes criminals to carry guns more often themselves, or become

quicker to use guns to avert armed self-defense, the end result could be that street crime becomes more lethal." *Id.*

"Shall-issue" laws can also affect how police officers interact with the law-abiding public. According to a former Baltimore Police Commissioner, the presence of a third person with a handgun in a confrontation between an officer and a suspect can "cause confusion as to which side of the confrontation the person is on, which could lead to hesitation by the police officer," with "potentially tragic circumstances" for "innocent victims, including the permit holder, innocent bystanders, and police officers." *Woollard*, 712 F.3d at 879–80. A former Police Chief for Baltimore County added that, "[i]f the number of legal handguns on the streets increased significantly, [police] officers would have no choice but to take extra precautions before engaging citizens, effectively treating encounters between police and the community that now are routine, friendly, and trusting, as high-risk stops, which demand a much more rigid protocol." *Id.* at 880.

And again, to the extent a judgment must be made on uncertain data, it is the Council's judgment that is entitled to deference, not plaintiffs' or their *amicus*. *Turner II*, 520 U.S. at 199; *Heller II*, 670 F.3d at 1269.

c. The Council's tailoring of the "good reason" standard to accomplish its objectives

This Court should also defer to the Council's conclusion that the "good reason" standard is not substantially more burdensome than necessary to accomplish its objectives. Intermediate scrutiny requires only that "the fit . . . be reasonable, not perfect." *Schrader*, 704 F.3d at 990. And the District offers ample evidence of fit. The Council relied on the 2014 Donohue study, which demonstrates that it is more likely than not that public-carry laws significantly increase violent crime. DA 133–240. It relied on the persuasive judgment of legislatures in New York,

35

New Jersey, and Maryland, all of which found the "good reason" standard reasonably tailored to prevent an increase in gun violence. *Kachalsky*, 701 F.3d at 99; *Woollard*, 713 F.3d at 879–80; *Drake*, 724 F.3d at 437–38. And it heard the lay and expert witness testimony describing the District's unique security concerns. DA 4–7, 17–19, 89–99.

The Council's conclusion that the "good reason" standard is reasonably tailored flows naturally from this evidence. *See* DA 19 (finding that the "good reason" standard "offers a reasonable, balanced approach to protecting the public safety and meeting an individual's specific need for self-defense"). If an increase in public carrying is likely to increase violent crime, escalate conflicts that otherwise might dissipate, and make it more likely that innocent bystanders will be shot, it is reasonable to conclude that a law limiting public carrying to those with a special self-defense need will help prevent these harms. And if federal law enforcement agencies are likely to respond to a substantial increase in public carrying by taking protective measures that interfere with the public's right to freely travel in the District, it is reasonable to conclude that limiting public carrying to those with a special self-defense need will discourage such measures.

Plaintiffs argue that the District "'has too readily foregone options that could serve its interests just as well' without unduly burdening Second Amendment rights." P.Mem. at 34. But plaintiffs have not suggested an alternative that would prevent the increase in crime associated with right-to-carry laws. *Cf. Turner II*, 520 U.S. at 222 (rejecting subsidies as a less-burdensome alternative to challenged law because plaintiff cable operators "ha[d] not proposed any particular subsidy scheme"). Instead, in accordance with plaintiffs' absolutist view of the Second Amendment, the preliminary injunction they seek would bar the District from enacting *any* measure that would ensure that the public bears this risk only for individuals with a special self-

defense reason to carry a handgun in public. It is based on a theory that the District must be a "shall-issue" regime, required to face the very dangers the Council meant to prevent by enacting the "good reason" standard.

Plaintiffs argue that the "good reason" standard is "unrelated to the problem it intends to solve" because "[t]he fact that one has a greater need for self-defense tells us nothing about whether he is less likely to misuse or accidentally use handguns." P.Mem. at 33–34. This criticism, however, misunderstands the purpose of the standard. The Council recognized that, beyond obvious suitability standards that look to criminal and mental-health records (already applied in most "shall-issue" states), it is difficult to predict whether a seemingly responsible person will misuse his handgun. Every citizen is law-abiding until he breaks the law, and the government cannot know in advance who will do so. *See* DA 285, Philip Cook, *et al.*, *Criminal Records of Homicide Offenders*, 294 JAMA 598, 599 (2005) (noting that fewer than half of adults arrested for criminal homicide have prior felony convictions). Gangs, for instance, could travel with arms carried by members who have not acquired criminal records (or they could recruit such members). *See* DA 294, Minnesota Drug & Violent Crime Task Forces, 2011 Annual Report, at 6 ("It is not unusual for some gang members . . . to have a permit to carry a firearm."). Public carrying also "may create or exacerbate accidents or deadly encounters, as the longstanding bans on private firearms in airports and courthouses illustrate." *Bonidy*, 790 F.3d at 1126. "Incidents such as bar fights and road rage that now often end with people upset, but not lethally wounded, take on deadly implications when handguns are involved." *Woollard*, 712 F.3d at 879; *cf.* Bogus, *supra*, at 445 ("The largest percentage of murders [in the United States], more than 40%, occurs during arguments.").

The Council properly concluded that the issuance of *any* public-carry permit, regardless of whether it is based on "good reason," increases the likelihood of public harm. At the same time, the Council understood that some individuals do have particularized needs to carry handguns for self-defense. It then engaged in tailoring that is entirely appropriate under the circumstances facing the District—accepting some additional public risk, but only for individuals with a special self-defense need to carry a handgun in public. The "good reason" standard "provides a means to determine whether the increase in risk and danger borne by the public is justified by a demonstrated risk and danger borne to the person seeking to carry a handgun." *Drake*, 724 F.3d at 437. It is "the result of a 'careful balancing of the interests involved' and not a general animus towards guns." *Kachalsky*, 701 F.3d at 97 n.22; *see Woollard*, 712 F.3d at 881 (similar).

As Plaintiffs have failed to demonstrate that they are likely to succeed on the merits of their claims, their Motion should be denied.[13]

## II.     PLAINTIFFS HAVE NOT SHOWN IRREPARABLE INJURY.

This Court can avoid a premature analysis of the merits and instead deny the plaintiffs' request for a preliminary injunction because they have failed to show irreparable injury. A plaintiff seeking emergency injunctive relief must make a threshold showing of irreparable

---

[13]     Indeed, PP lacks standing here. Organizational standing "requires 'more than allegations of damage to an interest in 'seeing' the law obeyed or a social goal furthered.' Indeed, '[t]he organization must allege that discrete programmatic concerns are being directly and adversely affected' by the challenged action." *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995). It is not enough to claim, as PP does, that the District's laws "are a direct affront to Pink Pistols' central mission." Declaration of Gwendolyn S. Patton, ¶ 5; Complaint, ¶ 3 (same). PP also lacks standing to ask for an injunction entitling all its members to concealed-carry licenses. See *Clapper v. Amnesty Int'l*, 133 S.Ct. 1138, 1143 (2013) (injury for standing purposes "must be certainly impending," and "'[a]llegations of possible *future* injury' are not sufficient.") (emphasis in original). At the appropriate time, the District will move to dismiss PP as a plaintiff.

injury. *CityFed Fin. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995). Indeed, failure to show any irreparable harm is grounds to deny the requested relief, even if the other factors are in plaintiffs' favor. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). The alleged injury "must be both certain and great; it must be actual and not theoretical." *Sweis*, 950 F. Supp. 2d at 47 (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (*per curiam*)). And where, as here, the relief requested would change rather than preserve the *status quo*, that standard is even higher: plaintiffs must show "extreme or very serious damage" or that they are "clearly entitled" to immediate relief. *Id.*

Plaintiffs, however, premise their standing on their claim that they *cannot* demonstrate any particularized reason to fear harm and therefore cannot satisfy the "good reason" standard. Complaint at 8, 9; *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (requiring "concrete and particularized" injury). These concessions cannot be reconciled with plaintiffs' claim that they will suffer imminent harm if they are denied public-carry licenses while this lawsuit is pending. It is not enough for plaintiffs to claim that it is *possible* that they will suffer injury without the ability to carry a handgun in public. "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. Even if plaintiffs were highly likely to succeed on the merits (and they are not), their inability to point to any imminent, non-speculative harm from the "good reason" standard independently justifies denial of the preliminary injunction.

Plaintiffs state that "[t]he allegation of the [constitutional] violation, without more, satisfies the irreparable injury requirement." P.Mem. at 37. But the D.C. Circuit has rejected this proposition, explaining that, "even though Congress has provided for interlocutory review of

preliminary injunctions, premature resolution of difficult constitutional questions is undesirable." *Gordon v. Holder*, 721 F.3d 638, 644–45 (D.C. Cir. 2013). Plaintiffs argue that their right to keep and bear arms under the Second Amendment is like the right to free expression under the First Amendment, and that these "intangible and unquantifiable interests" "cannot be compensated by damages." P.Mem. at 37. But the rights protected under the First Amendment are inherently different from those protected under the Second Amendment. Rights such as free expression and free exercise of religion are so intrinsically valuable that "the irreparable nature of the harm may be presumed." *Full Gospel Churches*, 454 F.3d at 301 (free exercise of religion); *cf. Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (freedom from unreasonable seizure). The right to keep and bear arms, however, has no intrinsic value—it is not an end in itself. Rather, it is "the inherent right of self-defense" that is "central to the Second Amendment." *Heller I*, 554 U.S. at 628. If no occasion arises where a handgun is needed for self-defense, its absence cannot cause harm.

Moreover, activity under the First Amendment is difficult to regulate without, even accidentally, infringing on its core rights, and those core rights are not typically expressed through conduct that presents an inherent risk of grievous danger to the general public. In contrast, even a temporary injunction barring the enforcement of a firearm regulation could have serious and tragic consequences.

Plaintiffs' theory of the case—that they cannot obtain a license under the "good reason" requirement because they have *no* particularized reason to fear harm, but just the general fear that they could find themselves in a situation where a firearm would be helpful—makes it impossible for them to establish irreparable harm if forced to wait for a license while their challenge is pending in this Court. In essence, they have conceded the speculative nature of their

theory of injury, when they are entitled to injunctive relief only if they can show their injury is "both certain and great," "actual and not theoretical." *Chaplaincy*, 454 F.3d at 297.

## III.   THE BALANCE OF EQUITIES TIPS HEAVILY IN FAVOR OF THE DEFENDANTS

"[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers). The District also has an interest in the uniform application of its laws, and an injunction would establish two disparate legal regimes: one for Mr. Grace and PP members, and another for everyone else. An injunction would harm the District and its citizens by injecting massive uncertainty into an important public-safety measure.

By their motion, plaintiffs seek to enjoin the implementation of a law of substantial local importance.[14] Enjoining the "good reason" requirement would clearly have a negative impact on thousands of District residents and visitors, because of the uncertain public impact of allowing untold numbers of concealed handguns to be carried on the streets of the city. Automatic issuance of concealed-carry licenses would directly affect the District's public spaces. Unlike possession in a person's home, public carrying subjects everyone who occupies those places to the dangers, intentional and accidental, presented by handgun possession. District residents, through their elected representatives, have decided that allowing the public carrying without "good reason" is inconsistent with public safety.

---

[14]   Plaintiffs, of course, only have standing to assert their *own* rights. *See, e.g., Rumber v. District of Columbia*, 595 F.3d 1298, 1301 (D.C. Cir. 2010). The unnamed PP members could not possibly all be beneficiaries of an injunction requiring the issuance of concealed-carry licenses. Surely the District has the right to check for itself to determine whether self-declared "otherwise eligible" applicants are responsible and law-abiding. *See Neb. Dep't of Health & Human Servs. v. U.S. Dep't of Health & Human Servs.*, 435 F.3d 326, (D.C. Cir. 2006) ("An injunction must be narrowly tailored to remedy the specific harm shown.").

Plaintiffs describe the injunction they seek as "narrow." P.Mem. at 7. But the "good reason" standard is critically important. It is the heart of plaintiffs' challenge and—as the analyses in *Kachalsky*, *Woollard*, and *Drake* demonstrate—it is an essential component of a system crafted to balance public safety with the needs of individuals particularly at risk. Without this standard, the District becomes a "shall issue" regime, despite the Council's legislative judgment based on empirical studies that such regimes are "associated with substantially higher rates of aggravated assault, rape, robbery, and murder." DA at 17. As discussed, the Council's finding is entitled to considerable deference.

Plaintiffs' speculative harms are simply not enough to overcome the potential harm to public safety that would arise should a preliminary injunction be erroneously granted. "[B]ecause gun violence threatens the public at large, the court balances the public's interest in preserving its constitutional rights against the public's interest in preventing gun violence." *Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267, 1283 (N.D. Cal. 2014); *id.* at 1278 (refusing to enjoin enforcement of a law prohibiting possession of high-capacity magazines, despite finding that the ordinance "comes relatively near the core of the Second Amendment right").

## IV.   ALLOWING BROAD CARRYING OF CONCEALED WEAPONS IS NOT IN THE PUBLIC INTEREST

While for "several hundred years" courts sitting in equity have had the discretion to weigh the public interest in granting or denying injunctive relief, such courts "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *United States v. Oakland Cannabis Buyers' Co-op*, 532 U.S. 483, 496 (2001) (citing *Hecht Co. v. Bowles*, 321 U.S. 321, 329–30 (1944), and *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)). Plaintiffs argue that the public has no interest in the enforcement of an unconstitutional law. P.Mem. at 39. But a final determination of the constitutionality of the "good

reason" provision should only be made after full development of the record, including discovery, expert testimony, and full briefing. The Council speaks for the people, and its position is plain: public carrying comes at a great societal cost, and the public should bear this cost only when an individual has a specific self-defense need. DA 18–19.

In *Wrenn v. District of Columbia*, 808 F.3d 81 (D.C. Cir. 2015), the district court granted a preliminary injunction to a group of plaintiffs with claims almost identical to those raised here, barring the District from enforcing the "good reason" standard while litigation was pending. The D.C. Circuit granted the District's motion to stay the injunction—to permit the District to enforce this critical public safety law—holding that the District had "satisfied the requirements for a stay pending appeal." *See Wrenn*, No. 15-7057, Order Granting Mot. to Stay (June 29, 2015). These same standards are applicable here, and this Court should follow the Circuit's lead.

The review of public-carrying laws is "serious business"; courts "do not wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of [their] judicial chambers [they] miscalculated as to Second Amendment rights." *Masciandaro*, 638 F.3d at 475 (Wilkinson, J., concurring). "It is not far-fetched to think the *Heller* Court wished to leave open the possibility that such a danger would rise exponentially as one moved the right from the home to the public square. If ever there was an occasion for restraint, this would seem to be it." *Id*. at 475–76.

## V.   PLAINTIFFS' MOTION FOR JUDGMENT AS A MATTER OF LAW SHOULD BE REJECTED.

This Court should not consider plaintiffs' alternative request for a permanent injunction. P.Mem. at 40. If plaintiffs want this Court to enter judgment now, before any development of the record, they should move for judgment on the pleadings under Fed. Civ. P. 12(c) or for

summary judgment under Rule 56. This would give the District an opportunity to oppose the request without the time restrictions imposed by the procedures applicable to preliminary relief.

Plaintiffs' request also fails on the merits. The categorical analysis they propose only emphasizes the need for a full record. Before this Court can determine whether the "good reason" standard "destroys" a right, it must consider whether, during the Framing era, the right to keep and bear arms was "widely understood" to protect an inviolable right to carry a handgun on the streets of the country's most densely populated cities, regardless of reason. *Heller I*, 554 U.S. at 605. Plaintiffs devote many pages of discussion of the scope of the historical right to bear arms. *See* P.Mem. at 12–19. But even if that discussion were complete or correct (it is neither), it does no more than demonstrate that the Court should have the benefit of a full record here, and not decide these important issues on abbreviated briefing. It makes no sense to undertake this significant inquiry on consideration of a preliminary injunction, where the parties and *amici* are constrained by an expedited schedule and strict briefing limitations. *See Gordon*, 721 F.3d at 644–45.

And for means-ends scrutiny, a full record is even more critical. Both strict scrutiny and intermediate scrutiny involve serious factual questions, and the District is entitled to an opportunity to fully defend this critically important law. Indeed, *Turner I* and *Heller II* remanded claims for additional factual development even after a full record had been developed, summary judgment had been briefed, and judgment had been entered. *Turner I*, 512 U.S. at 667–68; *Heller II*, 670 F.3d at 1259–60. On remand, the parties offered extensive, additional evidence, including expert evidence, on why the new law appropriately balances the right of self-defense and protecting public safety in the District of Columbia. *See Turner II*, 520 U.S. at 187 ("The District Court oversaw another 18 months of factual development on remand 'yielding a record of tens of

thousands of pages' of evidence"); *Heller*, 45 F. Supp. 3d at 39–42, 57–62 (describing extensive expert testimony and empirical data introduced on remand).

## CONCLUSION

Plaintiffs' motion for a preliminary and/or permanent injunction should be denied.

DATE: January 15, 2016.

Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

ELIZABETH SARAH GERE
Acting Deputy Attorney General
Public Interest Division

/s/ Toni Michelle Jackson
TONI MICHELLE JACKSON (#453765)
Chief, Equity Section

/s/ Andrew J. Saindon
ANDREW J.SAINDON (#456987)
Senior Assistant Attorney General
441 Fourth Street, N.W., Sixth Floor South
Washington, D.C. 20001
Telephone: (202) 724-6643
Facsimile: (202) 730-1470
Email: andy.saindon@dc.gov

/s/ Chad A. Naso
CHAD A. NASO (#1001694)
Assistant Attorney General
441 Fourth Street, N.W., Sixth Floor South
Washington, D.C. 20001
Telephone: (202) 724-7854
Facsimile: (202) 741-8951
chad.naso@dc.gov

*Counsel for the District of Columbia*