# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MATTHEW GRACE and
PINK PISTOLS,

        *Plaintiffs,*

    v.

DISTRICT OF COLUMBIA and
CATHY LANIER,

        *Defendants.*

Civil Action No. 15–2234 (RJL)

# BRIEF OF EVERYTOWN FOR GUN SAFETY
# AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS

DEEPAK GUPTA
JONATHAN E. TAYLOR
GUPTA WESSLER PLLC
1735 20th Street, NW
Washington, DC 20009
(202) 888-1741
*deepak@guptawessler.com*

J. ADAM SKAGGS
MARK ANTHONY FRASSETTO
EVERYTOWN FOR GUN SAFETY
P.O. Box 4184
New York, NY 10163

*Counsel for Amicus Curiae*
*Everytown for Gun Safety*

January 15, 2016

# TABLE OF CONTENTS

Table of authorities ................................................................................................... iv

Introduction and interest of *amicus curiae* ............................................................ 1

Background ............................................................................................................... 2

    A.   English history ............................................................................................. 2

        1.   Beginning in 1328, England broadly restricts public carry in populated areas ......................................................................................... 2

        2.   In the 17th and 18th centuries, English authorities interpret the Statute of Northampton to restrict public carry in populated areas ................. 4

        3.   The law's narrow exceptions confirm this general public-carry prohibition ............................................................................................ 6

        4.   The Statute of Northampton's public-carry restriction remains fully in effect following the English Bill of Rights of 1689 .............................. 7

    B.   Founding-era American history ..................................................................... 8

        1.   The colonies begin importing England's tradition of regulating public carry into their own laws ................................................................ 8

        2.   Many States enact laws mirroring the Statute of Northampton both before and after the Constitution's adoption ..................................... 8

    C.   Early-19th-century American history ....................................................... 11

        1.   Many States enact a variant of the Statute of Northampton, allowing public carry with "reasonable cause to fear an assault" ................... 11

        2.   Taking a different approach, most southern States elect to permit public carry, but only if the weapon is not concealed ..................... 13

    D.   Mid-to-late-19th-century American history ............................................. 14

        1.   States continue to restrict public carry both before and after the 14th Amendment's ratification ................................................................ 14

        2.   Beginning immediately after the 14th Amendment's ratification, many legislatures enact laws banning public carry in populated areas .................... 15

Argument .............................................................................................................. 16

    Because the District's law carries forward a seven-century Anglo-American tradition of restricting public carry in populated areas, it is a "longstanding," constitutional regulation under *Heller*. ................................................................ 16

    A.   "Longstanding" laws are deemed constitutional under *Heller* because they are consistent with our "historical tradition." ................................................ 17

    B.   The District of Columbia's law has a centuries-long pedigree in Anglo-American history and is therefore "longstanding" and constitutional under *Heller*. .............................................................................................................. 18

Conclusion ................................................................................................................ 20

Appendix of historical laws ................................................................................. App. 1

    English statutes and royal proclamations ....................................................... App. 1

        13 Edw. 1, 102 (1285) .................................................................... App. 1

        7 Edw. 2, 170 (1313) ...................................................................... App. 2

        Statute of Northampton, 2 Edw. 3, 258, ch. 3 (1328)...................... App. 3

        25 Edw. 3, 320, ch. 2, § 13 (1350)................................................. App. 4

        34 Edw. 3, 364, ch. 1 (1360) .......................................................... App. 10

        7 Ric. 2, 35, ch. 13 (1383) ............................................................. App. 12

        20 Ric. 2, 93, ch. 1 (1396) ............................................................. App. 15

        *Calendar of the Close Rolls, Henry IV* (Jan. 30, 1409)................... App. 17

    Early American enactments of the Statute of Northampton................... App. 19

        1694 Mass. Laws 12, no. 6............................................................. App. 19

        1786 Va. Laws 33, ch. 21 .............................................................. App. 22

        1792 N.C. Laws 60, ch. 3 .............................................................. App. 23

        1795 Mass. Laws 436, ch. 2 .......................................................... App. 27

        1801 Tenn. Laws 710, § 6.............................................................. App. 28

        1821 Me. Laws 285, ch. 76, § 1 ..................................................... App. 29

        1852 Del. Laws 330, ch. 97, § 13 ................................................... App. 35

        1859 N.M. Laws 94, § 2 ................................................................. App. 43

    Other colonial-era American laws.......................................................... App. 48

        1686 N.J. Laws 289, ch. 9.............................................................. App. 48

    American good-cause variants of the Statute of Northampton ................ App. 50

        1836 Mass. Laws 750, § 16 ............................................................ App. 50

        1838 Wisc. Laws 381, § 16............................................................. App. 54

        1841 Me. Laws 709, ch. 169, § 16 ................................................. App. 55

        1846 Mich. Laws 690, ch. 162, § 16 .............................................. App. 56

        1847 Va. Laws 127, ch. 14, § 16 .................................................... App. 59

        1851 Minn. Laws 526, ch. 112, § 18............................................... App. 62

        1853 Or. Laws 218, ch. 16, § 17 .................................................... App. 66

        1861 Pa. Laws 248, 250, § 6 .......................................................... App. 69

        1870 W. Va. Laws 702, ch. 153, § 8............................................... App. 88

        1871 Tex. Laws 1322, art. 6512 ..................................................... App. 91

1873 Minn. Laws. 1025, § 17 ........................................................................ App. 94

1891 W. Va. Laws 915, ch. 148, § 7 ............................................................. App. 95

Southern "lash and pistol" laws ......................................................................... App. 97

1854 Ala. Laws 588, § 3272 ........................................................................... App. 97

1861 Ga. Laws 859, § 4413 ......................................................................... App. 101

Post-Civil-War enactments of Northampton-style laws ......................................... App. 102

1869 N.M. Laws 312, § 1 ............................................................................. App. 102

1870 S.C. Laws 403, no. 288, § 4 .............................................................. App. 105

1871 Tenn. Laws 81, ch. 90, § 1 ................................................................ App. 108

1875 Wyo. Laws 352, ch. 52, § 1 ............................................................... App. 109

1881 Ark. Laws 490, ch. 53, § 1907 ......................................................... App. 110

1889 Ariz. Laws 16, ch. 13, § 1 ................................................................. App. 111

1889 Idaho Laws 23, § 1 ............................................................................. App. 112

1901 Mich. Laws 687, § 8 ........................................................................... App. 113

1909 Tex. Laws 105 .................................................................................... App. 115

American municipal ordinances ......................................................................... App. 116

Nebraska City, Neb., Ordinance no. 7 (1872) ............................................ App. 116

Nashville, Tenn., Ordinance ch. 108 (1873) ............................................... App. 117

Los Angeles, Cal., Ordinance nos. 35-36 (1878) ........................................ App. 119

Salina, Kan., Ordinance no. 268 (1879) ...................................................... App. 120

Syracuse, N.Y., Ordinances ch. 27 (1885) .................................................. App. 121

Dallas, Tex., Ordinance (1887) ................................................................... App. 122

Checotah, Okla., Ordinance no. 11 (1890) .................................................. App. 123

New Haven, Conn., Ordinances § 192 (1890) ............................................. App. 124

Rawlins, Wyo., Rev. Ordinances art. 7 (1893) ............................................ App. 125

Wichita, Kan., Ordinance no. 1641 (1899) .................................................. App. 127

McKinney, Tex., Ordinance no. 20 (1899) .................................................. App. 129

San Antonio, Tex., Ordinance ch. 10 (1899) ............................................... App. 130

# TABLE OF AUTHORITIES*

**Cases**

*Chune v. Piott,*
  80 Eng. Rep. 1161 (K.B. 1615) ............................................................. 5

*Dearth v. Holder,*
  893 F. Supp. 2d 59 (D.D.C. 2012) ......................................................... 18

* *District of Columbia v. Heller,*
  554 U.S. 570 (2008) ............................................. 1, 2, 4, 7, 16, 17, 18, 19

*Drake v. Filko,*
  724 F.3d 426 (3d Cir. 2013) .................................................................. 18

*Friedman v. Highland Park,*
  784 F.3d 406 (7th Cir. 2015) ................................................................. 19

* *Heller v. District of Columbia,*
  670 F.3d 1244 (D.C. Cir. 2011) ................................................. 16, 17, 20

*Jackson v. City & County of San Francisco,*
  746 F.3d 953 (9th Cir. 2014) ................................................................. 17

*King v. Hutchinson,*
  168 Eng. Rep. 273 (1784) ....................................................................... 9

*McDonald v. City of Chicago,*
  561 U.S. 742 (2010) .............................................................................. 13

*Miller v. Texas,*
  153 U.S. 535 (1894) .............................................................................. 20

*National Rifle Association of America, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives,*
  700 F.3d 185 (5th Cir. 2012) ................................................................. 17

*Payton v. New York,*
  445 U.S. 573 (1980) ................................................................................ 4

*Rex v. Sir John Knight,*
  90 Eng. Rep. 330 (K.B. 1686) ................................................................. 7

*Semayne's Case,*
  77 Eng. Rep. 194 (K.B. 1603) ................................................................. 6

---

\* Authorities upon which we chiefly rely are marked with asterisks.

*Sir John Knight's Case,*
   87 Eng. Rep. 75 (K.B. 1686) ................................................................ 6, 7

*State v. Barnett,*
   34 W. Va. 74 (1890) ...................................................................... 14, 20

*United States v. Chester,*
   628 F.3d 673 (4th Cir. 2010) .................................................................. 18

*United States v. Marzzarella,*
   614 F.3d 85 (3d Cir. 2010) .................................................................... 18

*United States v. Rene E.,*
   583 F.3d 8 (1st Cir. 2009) ..................................................................... 18

*United States v. Seay,*
   620 F.3d 919 (8th Cir. 2010) .................................................................. 18

*United States v. Skoien,*
   614 F.3d 638 (7th Cir. 2010) .................................................................. 17

*United States v. White,*
   593 F.3d 1199 (11th Cir. 2010) ............................................................... 18

## American statutes

1686 N.J. Laws 289, ch. 9 ...................................................................... 8

1694 Mass. Laws 12, no. 6 ..................................................................... 9

1786 Va. Laws 33, ch. 21 ....................................................................... 9

1792 N.C. Laws 60, ch. 3 ....................................................................... 9

1795 Mass. Laws 436, ch. 2 ................................................................... 9

1801 Tenn. Laws 710, § 6 ..................................................................... 10

1821 Me. Laws 285, ch. 76, § 1 ............................................................. 10

1836 Mass. Laws 750, § 16 ............................................................... 11, 12

1838 Wisc. Laws 381, § 16 .................................................................... 12

1841 Me. Laws 709, ch. 169, § 16 .......................................................... 12

1846 Mich. Laws 690, ch. 162, § 16 ........................................................ 12

1847 Va. Laws 127, ch. 14, § 16 ........................................................ 12, 20

1851 Minn. Laws 526, ch. 112, § 18 ........................................................................ 12

1852 Del. Laws 330, ch. 97, § 13 ........................................................................... 10

1853 Or. Laws 218, ch. 16, § 17 ............................................................................ 12

1854 Ala. Laws 588, § 3272 ................................................................................... 13

1859 N.M. Laws 94, § 2 ......................................................................................... 14

1861 Ga. Laws 859, § 4413 .................................................................................... 13

1869 N.M. Laws 312, § 1 ....................................................................................... 15

1870 S.C. Laws 403, no. 288, § 4 .......................................................................... 13

1870 W. Va. Laws 702, ch. 153, § 8 ...................................................................... 14

1871 Tenn. Laws 81, ch. 90, § 1 ............................................................................ 13

1871 Tex. Laws 1322, art. 6512 ............................................................................. 15

1873 Minn. Laws. 1025, § 17 ................................................................................. 12

1875 Wyo. Laws 352, ch. 52, § 1 .......................................................................... 15

1881 Ark. Laws 490, ch. 53, § 1907 ...................................................................... 13

1889 Ariz. Laws 16, ch. 13, § 1 ............................................................................. 15

1889 Idaho Laws 23, § 1 ........................................................................................ 15

1891 W. Va. Laws 915, ch. 148, § 7 ...................................................................... 14

1901 Mich. Laws 687, § 8 ...................................................................................... 15

1909 Tex. Laws 105 ............................................................................................... 15

Act of Feb. 27, 1801, ch. 15, § 1, 2 Stat. 103 ........................................................ 10

D.C. Code § 22-4506(a) ........................................................................................... 1

**American municipal ordinances**

Checotah, Okla., Ordinance no. 11 (1890) ............................................................. 16

Dallas, Tex., Ordinance (1887) ............................................................................... 16

Los Angeles, Cal., Ordinance nos. 35-36 (1878) ................................................... 16

McKinney, Tex., Ordinance no. 20 (1899) ................................................................ 16

Nashville, Tenn., Ordinance ch. 108 (1873) ............................................................. 16

Nebraska City, Neb., Ordinance no. 7 (1872) ........................................................... 16

New Haven, Conn., Ordinances § 192 (1890) ........................................................... 16

Rawlins, Wyo., Rev. Ordinances art. 7 (1893) .......................................................... 16

Salina, Kan., Ordinance no. 268 (1879) .................................................................... 16

San Antonio, Tex., Ordinance ch. 10 (1899) ............................................................ 16

Syracuse, N.Y., Ordinances ch. 27 (1885) ................................................................ 16

Wichita, Kan., Ordinance no. 1641 (1899) ............................................................... 16

**English statutes and royal proclamations**

13 Edw. 1, 102 (1285) ................................................................................................. 3

7 Edw. 2, 170 (1313) ................................................................................................... 3

* Statute of Northampton, 2 Edw. 3, 258, ch. 3 (1328) ...................................... 3, 19

25 Edw. 3, 320, ch. 2, § 13 (1351) ............................................................................. 3

34 Edw. 3, 364, ch. 1 (1360) .................................................................................... 11

7 Ric. 2, 35, ch. 13 (1383) .......................................................................................... 3

20 Ric. 2, 93, ch. 1 (1396) .......................................................................................... 3

*Calendar of the Close Rolls, Henry IV* (Jan. 30, 1409) ...................................... 7, 19

English Bill of Rights of 1689, 1 W. & M. st. 2. c. 2 ................................................ 8

**Books and articles**

Joel Prentiss Bishop, *Commentaries on the Law of Statutory Crimes* (1873) ............ 9

William Blackstone, *Commentaries on the Laws of England* (1769) ................. 4, 6, 8

Joseph Blocher, *Firearm Localism*, 123 Yale L.J. 82 (2013) ................................... 16

John Bond, *A Compleat Guide for Justices of the Peace* (1707) ................................. 9

John Carpenter & Richard Whitington, *Liber Albus: The White Book of the City of London* (1419) (1861 reprint) ................................................................................. 7

Patrick J. Charles, *The Faces of the Second Amendment Outside the Home*, 60 Clev. St. L. Rev. 1 (2012) ................................................................................................... 3, 4, 7, 9, 19

Patrick J. Charles, *The Statute of Northampton by the Late Eighteenth Century*, 41 Fordham Urb. L.J. 1695 (2012) ...................................................................................................... 4

Edward Coke, *The Third Part of the Institutes of the Laws of England* (1817 reprint) ..................... 4, 5, 6

*Commission and Instructions to the Justices of Peace & Constables* (1661) .................................... 5

Saul Cornell, *The Right to Carry Firearms Outside of the Home*, 39 Fordham Urb. L.J. 1695 (2012) ................................................................................................................ 12

Clayton E. Cramer, *Concealed Weapon Laws of the Early Republic* (1999) .......................................... 13

Oliver Cromwell, *Instructions Concerning Constables* (1665) .................................................................. 5

John A. Dunlap, *The New York Justice* (1815) ........................................................................................ 10

James Ewing, *A Treatise on the Office & Duty of a Justice of the Peace* (1805) ...................................... 11

Robert Gardiner, *The Compleat Constable* (1692) ..................................................................................... 8

Matthew Hale, *History of the Pleas of the Crown* (1800) ......................................................................... 6

Elisha Hammond, *A Practical Treatise; Or an Abridgement of the Law Appertaining to the Office of Justice of the Peace* (1841) ........................................................................................ 12

William Hawkins, *A Treatise of the Pleas of the Crown* (1721) ..................................................... 6, 7, 9

John Haywood, *A Manual of the Laws of North-Carolina* (1814) ........................................................ 10

John Haywood, *The Duty & Authority of Justices of the Peace, in the State of Tennessee* (1810) .............. 10

John Haywood, *The Duty and Office of Justices of the Peace, and of Sheriffs, Coronoers, Constables* (1800) ........................................................................................................................ 10

Gilbert Hutcheson, *Treatise on the Offices of Justice of Peace* (1806) ................................................... 5

Joseph Keble, *An Assistance to the Justices of the Peace, for the Easier Performance of Their Duty* (1683) ...................................................................................................................................... 5

William Lambarde, *The Duties of Constables, Borsholders, Tythingmen, and Such Other Low and Lay Ministers of the Peace* (1602) ........................................................................................ 5

Aaron Leaming & Jacob Spicer, *Grants, Concessions & Original Constitutions* (1881) ........................ 10

Jonathan Meltzer, *Open Carry for All*, 123 Yale L.J. 1486 (2014) ..................................................... 8

John M. Niles, *The Connecticut Civil Officer: In Three Parts* (1833) ..................................................... 10

North Riding Record Society, *Quarter Sessions Records* (1884) ........................................................... 5

Frederick Law Olmsted, *A Journey in the Back Country* (1860) ........................................................... 13

Horace V. Redfield, *Homicide, North and South* (1880) .................................................................... 14

Eric M. Ruben & Saul A. Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 Yale L.J. Forum 121 (Sept. 25, 2015)................................. 13

William Oldnall Russell, *A Treatise on Crimes & Misdemeanors* (1826) ....................................... 6, 7, 9

George Tucker, *Blackstone's Commentaries* (1803) ......................................................................... 4, 6

Francis Wharton, *A Treatise on the Criminal Law of the United States* (1846)....................................... 11

Adam Winkler, *Gunfight: The Battle over the Right to Bear Arms in America* (2011).............................. 16

**INTRODUCTION AND INTEREST OF *AMICUS CURIAE***

Everytown for Gun Safety is the largest gun-violence-prevention organization in the country, with over three million supporters. Everytown has drawn on its substantial research on historical firearms laws to file briefs in several recent Second Amendment cases. *See Wrenn v. District of Columbia*, No. 15–162 (D.C. Cir.); *Peruta v. San Diego*, No. 10–56971 (9th Cir.); *Silvester v. Harris*, No. 14–16840 (9th Cir.). As in those cases, Everytown seeks to assist this Court by providing relevant, previously overlooked historical materials.[1]

This case involves a constitutional challenge to the District of Columbia's regulation of the public carrying of handguns. The District does not ban all public carry. Instead, it has taken an approach like that of eight States, collectively expressing the popular will of more than a quarter of the American people: It permits people to carry a firearm on the streets of Washington, but only upon a showing that they have either (1) "good reason to fear injury to [their] person or property" or (2) "any other proper reason for carrying a pistol," both of which require more than a generalized desire for self-defense. D.C. Code § 22-4506(a).

In striking down the good-reason requirement in *Wrenn v. District of Columbia*, 107 F. Supp. 3d 1, 8 (D.D.C. 2015)—a decision recently vacated by the D.C. Circuit—Judge Scullin of the Northern District of New York determined that there was no "historical evidence" establishing that the requirement is sufficiently "longstanding" to qualify as constitutional under *District of Columbia v. Heller*, 554 U.S. 570 (2008). That is incorrect. Far from no evidence, there is in fact a seven-century Anglo-American tradition of restricting public carry in populated areas—a tradition that includes many early American laws that were *more* restrictive than the District's law.

---

[1] An appendix of historical gun laws accompanies this brief. In addition, all parties consent to the filing of this brief, and no counsel for any party authored it in whole or part. Apart from *amicus curiae*, no person contributed money intended to fund the brief's preparation and submission.

This brief provides an account of that tradition. For centuries, English law broadly prohibited anyone from carrying a dangerous weapon in public, beginning with the Statute of Northampton in 1328, and continuing after the English Bill of Rights of 1689. This tradition took hold in America in the 17th and 18th centuries, when several colonies enacted similar restrictions. And it continued into the 19th century, when many States and municipalities broadly prohibited public carry in cities, towns, and villages, while many others did what the District does today: allow public carry by those with "reasonable cause to fear an assault or other injury." Although a more permissive approach to public carry began emerging in the South around that time, these antebellum southern laws were motivated largely by the ever-present fear of slave rebellions, and they did not represent a majority approach.

Altogether, by the end of the 19th century, nearly 20 States and many cities had enacted laws that either entirely prohibited public carry in urban areas or required "good reason" to carry a firearm in public. Because the District's law carries forward this longstanding tradition, it is constitutional under *Heller*. Such a robust historical pedigree is not necessary to satisfy the Second Amendment, but it is sufficient to do so. Whatever the Second Amendment's precise contours, there can be no doubt that a law that has its roots in 14th-century England, and is *more* permissive of public carry than dozens of American laws that existed from the founding era through the 19th century, is consistent with our "historical tradition," *id*. at 627, and thus constitutional.

## BACKGROUND

**A.**     **English History**

*1. Beginning in 1328, England broadly restricts public carry in populated areas.* The Anglo-American tradition of broadly restricting public carry in populated areas stretches back to at least 1328, when England enacted the Statute of Northampton, providing

that "no Man great nor small" shall "go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, *nor in no part elsewhere*." 2 Edw. 3, 258, ch. 3 (1328) (emphasis added). Shortly thereafter, King Edward III directed sheriffs and bailiffs to arrest "all those whom [they] shall find going armed." Charles, *The Faces of the Second Amendment Outside the Home*, 60 Clev. St. L. Rev. 1, 13–14 (2012). His successors did so as well. *Id.* at 16–25.

This prohibition expanded on two earlier laws: one making it a crime "to be found going or wandering about the Streets of [London], after Curfew . . . with Sword or Buckler, or other Arms for doing Mischief," 13 Edw. 1, 102 (1285), and another prohibiting coming with "Force [or] Armour" to the "Parliament at Westminster," 7 Edw. 2, 170 (1313)—the seat of the English government.

Over the ensuing decades, England repeatedly reenacted the Statute of Northampton's public-carry restriction. *See, e.g.*, 7 Ric. 2, 35, ch. 13 (1383); 20 Ric. 2, 93, ch. 1 (1396). Because this restriction carried misdemeanor penalties, violators were usually required to forfeit their weapons and pay a fine. *Id.* A separate law went further, outlawing "rid[ing] armed covertly or secretly with Men of Arms against any other." 25 Edw. 3, 320, ch. 2, § 13 (1351). This law had heavier penalties because it regulated threatening behavior rather than simply carrying weapons in public, the conduct prohibited by the Statute of Northampton. *Id.*

By the 16th century, firearms had become increasingly accessible in England, and the possibility that they would be carried in public had become increasingly threatening to public safety. To guard against this threat, Queen Elizabeth I in 1579 called for robust enforcement of the Statute of Northampton's prohibition on carrying "Daggers, Pistols, and such like, not only in Cities and Towns, [but] in all parts of the Realm in common high[ways], whereby her Majesty's good quiet people, desirous to live in [a] peaceable manner, are in fear and danger of their lives." Charles, *Faces*, 60 Clev. St. L. Rev. at 21 (spelling modernized). The carrying of "such offensive

3

weapons" (like "Handguns"), she elaborated, and "the frequent shooting [of] them in and near Cities, Towns corporate, [and] the Suburbs thereof where [the] great multitude of people do live, reside, and trav[el]," had caused "great danger" and "many harms [to] ensue." *Id.* at 22 (spelling modernized). Fifteen years later, she reaffirmed that publicly carrying pistols and daggers—whether "secretly" or in the "open"—was "to the terrour of all people professing to travel and live peaceably." *Id.*

**2. In the 17th and 18th centuries, English authorities interpret the Statute of Northampton to restrict public carry in populated areas.** This understanding of the law—as broadly prohibiting carrying guns in populated public places—continued into the 17th and 18th centuries. *See generally* Charles, *The Statute of Northampton by the Late Eighteenth Century*, 41 Fordham Urb. L.J. 1695 (2012). In 1644, for example, Lord Coke—"widely recognized by the American colonists as the greatest authority of his time on the laws of England," *Payton v. New York*, 445 U.S. 573, 593–94 (1980)—described the Statute of Northampton as making it unlawful "to goe nor ride armed by night nor by day . . . in any place whatsoever." Coke, *The Third Part of the Institutes of the Laws of England* 160 (1817 reprint).

One century later, Blackstone—"the preeminent authority on English law for the founding generation," *Heller*, 554 U.S. at 593–94—described the statute similarly: "The offence of riding or going armed with dangerous or unusual weapons is a crime against the public peace, by terrifying the good people of the land; and is particularly prohibited by the statute of Northampton." 4 Blackstone, *Commentaries on the Laws of England* 148–49 (1769).[2] In other words, because carrying a dangerous weapon (such as a firearm) in populated public places naturally

---

[2] The same description appears in "the most important early American edition of Blackstone's Commentaries (by the law professor and former Antifederalist St. George Tucker)." *Heller*, 554 U.S. at 594; *see* Tucker, *Blackstone's Commentaries* 149 (1803).

4

terrified the people, it was a crime against the peace—even if unaccompanied by a threat, violence, or any additional breach of the peace. *See Chune v. Piott*, 80 Eng. Rep. 1161, 1162 (K.B. 1615) ("Without all question, the sheriffe hath power to commit . . . if contrary to the Statute of Northampton, he sees any one to carry weapons in the high-way, in terrorem populi Regis; he ought to take him, and arrest him, notwithstanding he doth not break the peace in his presence.").

To carry out the Statute of Northampton's prohibition, British constables, magistrates, and justices of the peace were instructed to "Arrest all such persons as they shall find to carry Daggers or Pistols" publicly. Keble, *An Assistance to the Justices of the Peace, for the Easier Performance of Their Duty* 224 (1683). This mandate was unmistakably broad: "[I]f any person whatsoever . . . shall be so bold as to go or ride Armed, by night or by day, in Fairs, Markets, or any other places . . . then any Constable . . . may take such Armor from him for the Kings use, and may also commit him to the Gaol." *Id.*[3]

Heeding this instruction, one court issued an arrest warrant for a man who committed "outragious misdemeanours" by going "armed" with "pistolls[] and other offensive weapons." *Rex v. Harwood*, Quarter Sessions at Malton (Oct. 4-5, 1608), *reprinted in* North Riding Record Society, *Quarter Sessions Records* 132 (1884). Another sentenced a man to prison because he "went armed under his garments," even though he had not threatened anyone and had done so only to "safeguard . . . his life" because another man had "menaced him." Coke, *Institutes* 161. And a jury convicted a man "for going Armed with a Cutlass Contrary to the Statute," for which he

---

[3] *See also* Lambarde, *The Duties of Constables, Borsholders, Tythingmen, and Such Other Low and Lay Ministers of the Peace* 13–14 (1602) (same); 1 Hutcheson, *Treatise on the Offices of Justice of Peace* app. I at xlviii (1806) (citing Cromwell, *Instructions Concerning Constables* (1665)) ("A constable shall arrest any person, not being in his Highness service, who shall be found wearing naugbuts, or guns, or pistols, of any sort."); *id.* at lxv–lxvi (citing *Commission and Instructions to the Justices of Peace & Constables* (1661)) (same).

was sentenced to two years in prison plus fines. *Middlesex Sessions: Justices' Working Documents* (1751), *available at* http://bit.ly/1U8OhO7.

### 3. The law's narrow exceptions confirm this general public-carry prohibition.

In addition to its focus on populated public places, the Statute of Northampton was understood to contain limited exceptions. One important exception was that the prohibition did not apply inside the home, in keeping with principles of self-defense law, which imposed a broad duty to retreat while in public but conferred a strong right to self-defense at home. Blackstone, 4 *Commentaries* 185. As Lord Coke explained, using force at home "is by construction excepted out of this act[,] . . . for a man's house is his castle." *Institutes* 162. "But [a man] cannot assemble force," Coke continued—including by carrying firearms—even "though he [may] be extremely threatened, to go with him to Church, or market, or any other place, but that is prohibited by this act." *Id.*[4] William Hawkins likewise explained that "a man cannot excuse the wearing [of] such armour in public, by alleging that such a one threatened him, and he wears it for [his] safety," but he may assemble force "in his own House, against those who threaten to do him any Violence therein, because a Man's House is as his Castle." 1 Hawkins, *A Treatise of the Pleas of the Crown* 489, 516 (1721) (1824 reprint); 1 Russell, *A Treatise on Crimes & Misdemeanors* 589 (1826) (same in American edition).[5]

---

[4] *See also* 1 Hale, *History of the Pleas of the Crown* 547 (1800) (noting that armed self-defense was permitted at home, but not during "travel, or a journey," because of "special protection" accorded "home and dwelling"); *Semayne's Case*, 77 Eng. Rep. 194, 195 (K.B. 1603) ("[E]very one may assemble his friends and neighbors to defend his house against violence: but he cannot assemble them to go with him to the market, or elsewhere for his safeguard against violence.").

[5] A contrary rule—permitting armed self-defense in populated areas, even though it terrified the public—would have suggested that "the King were not able or willing to protect his subjects." *Sir John Knight's Case*, 87 Eng. Rep. 75, 76 (K.B. 1686). Hence, the castle doctrine was confined to the home. Tucker, *Blackstone's Commentaries* 225.

There were two other important exceptions to the public-carry prohibition: a narrow (unwritten) exception permitting high-ranking nobles to wear fashionable swords and walk in public with armed servants, and a narrow (written) exception for the King's officers. *See* Hawkins, *Treatise of the Pleas of the Crown* 489, 798 (explaining that noblemen were in "no danger of offending against this statute" by wearing "weapons of fashion, as swords, &c., or privy coats of mail," or by "having their usual number of attendants with them for their ornament or defence," for that would not "terrify the people").[6]

Putting these exceptions together, "no one" could "carry arms, by day or by night, except the vadlets of the great lord of the land, carrying the swords of their masters in their presence, and the serjeants-at-arms [of the royal family]," as well as those responsible for "saving and maintaining the peace." Carpenter & Whitington, *Liber Albus: The White Book of the City of London* 335 (1419) (1861 reprint).[7]

**4. The Statute of Northampton's public-carry restriction remains fully in effect following the English Bill of Rights of 1689.** In the late 17th century, William and Mary enshrined the right to have arms in the Declaration of Rights, later codified in the English Bill of Rights in 1689. This right—which "has long been understood to be the predecessor to our Second Amendment," *Heller*, 554 U.S. at 593—ensured that subjects "may have arms for their

---

[6] *See also* Russell, *Treatise on Crimes & Misdemeanors* 588–89 (same); Charles, *Faces*, 60 Clev. St. L. Rev. at 26 n.123 (citing 18th-century legal dictionary's distinction between "go[ing] or rid[ing] *armed*" and nobleman "wear[ing] common *Armour*"); *Rex v. Sir John Knight*, 90 Eng. Rep. 330 (K.B. 1686) (noting a "general connivance" for "gentlemen" to carry arms in this way, but declining to dismiss indictment for "walk[ing] about the streets armed with guns" against a defendant who was later acquitted because he was a King's officer); *Sir John Knight's Case*, 87 Eng. Rep. at 76 (acquittal); *see* Charles, *Faces*, 60 Clev. St. L. Rev. at 28–30 (discussing *Sir John Knight's Case*).

[7] A 1409 royal order confirms the narrow exception allowing noblemen to carry swords. It "forb[ade] any man of whatsoever estate or condition to go armed within [London] and [its] suburbs, or any except lords, knights and esquires with a sword." 3 *Calendar of the Close Rolls, Henry IV* 485 (Jan. 30, 1409).

defence suitable to their conditions, and as allowed by law." 1 W. & M. st. 2. ch. 2. As Blackstone later wrote, this right was considered "a public allowance, under due restrictions[,] of the natural right of resistance and self-preservation, when the sanctions of society and laws are found insufficient to restrain the violence of oppression." 1 Blackstone, *Commentaries* 144. One such "due restriction" was the Statute of Northampton, which remained in effect after the right to bear arms was codified in 1689. *See* 4 Blackstone, *Commentaries* 148–49; Gardiner, *The Compleat Constable* 18 (1692); *Middlesex Sessions* (reporting conviction under statute in 1751).

**B.    Founding-Era American History**

    ***1.  The colonies begin importing England's tradition of regulating public carry into their own laws.*** Around the time that the English Bill of Rights was adopted, America began its own public-carry regulation. The first step was a 1686 New Jersey law that sought to prevent the "great fear and quarrels" induced by "several persons wearing swords, daggers, pistols," and "other unusual or unlawful weapons." 1686 N.J. Laws 289, 289–90, ch. 9. To combat this "great abuse," the law provided that no person "shall presume privately to wear any pocket pistol" or "other unusual or unlawful weapons," and "no planter shall ride or go armed with sword, pistol, or dagger," except for "strangers[] travelling" through. *Id.* This law was only the start of what would become a long history of regulation "limiting gun use for public safety reasons"—especially public carry in populated areas. Meltzer, *Open Carry for All*, 123 Yale L.J. 1486, 1523 (2014). As against this history, "there are no examples from the Founding era of anyone espousing the concept of a general right to carry." *Id.*

    ***2. Many States enact laws mirroring the Statute of Northampton both before and after the Constitution's adoption.*** Eight years after New Jersey's law, Massachusetts enacted its own version of the Statute of Northampton, authorizing justices of the peace to arrest

anyone who "shall ride or go armed Offensively before any of Their Majesties Justices, or other Their Officers or Ministers doing their Office, or elsewhere." 1694 Mass. Laws 12, no. 6.

By using the word "offensively," Massachusetts ensured that this prohibition applied only to "offensive weapons," as it had in England—not *all* arms. Constable oaths of the 18th century described this law with similar language. *See* Charles, *Faces*, 60 Clev. St. L. Rev. at 34 n.178. One treatise, for example, explained that "[a] person going or riding with offensive Arms may be arrested." Bond, *A Compleat Guide for Justices of the Peace* 181 (1707). Thus, under the law, a person could publicly carry a hatchet or horsewhip, but not a pistol. *See* Hawkins, *Treatise of the Pleas of the Crown* 665 (explaining that hatchets and horsewhips were not "offensive weapons," while "guns, pistols, daggers, and instruments of war" were); *King v. Hutchinson*, 168 Eng. Rep. 273, 274 (1784) (explaining that firearms are offensive weapons).[8]

One century later, Massachusetts reenacted its law, this time as a State. 1795 Mass. Laws 436, ch. 2. Because the prohibition had been on the books for so long, it was "well known to be an offence against law to ride or go with . . . firelocks, or other dangerous weapons," as one newspaper later reported, so it "[could not] be doubted that the vigilant police officers" would arrest violators. Charles, *Faces*, 60 Clev. St. L. Rev. at 33 n.176 (quoting *The Salem Gazette*, June 2, 1818, at 4).

Following Massachusetts's lead, additional States enacted similar laws, including founding-era statutes in Virginia and North Carolina, and later enactments in States ranging from Maine to Tennessee. *See, e.g.*, 1786 Va. Laws 33, ch. 21; 1792 N.C. Laws 60, 61, ch. 3; 1801

---

[8] American treatises said the same. *See* Russell, *Treatise on Crimes & Misdemeanors* 124; Bishop, *Commentaries on the Law of Statutory Crimes* 214 (1873).

Tenn. Laws 710, § 6; 1821 Me. Laws 285, ch. 76, § 1; 1852 Del. Laws 330, 333, ch. 97, § 13. And still other States incorporated the Statute of Northampton through their common law.[9]

Northampton's prohibition also applied in the District of Columbia. The District was created through grants of territory from Maryland and Virginia, and the laws of both States continued to apply. Act of Feb. 27, 1801, ch. 15, § 1, 2 Stat. 103, 103–05. Thus, Virginia's version of the Statute of Northampton applied in the portion of the District west of the Potomac (which reverted to Virginia in 1846). *Id.* East of the Potomac, Northampton applied by virtue of Maryland's incorporation of "the Common Law of England" and "the English statutes." Md. Const. of 1776, art. III, § 1; *see also* D.C. Code of 1818, § 40, at 253–54 (including Northampton's prohibition in a compilation of District law).

To ensure that these public-carry bans were enforced, the constables, magistrates, and justices of the peace in these jurisdictions were required to "arrest all such persons as in your sight shall ride or go armed." Haywood, *A Manual of the Laws of North-Carolina* pt. 2 at 40 (1814) (N.C. constable oath). That was because, as constables were informed, "riding or going armed with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land, and is prohibited by statute." Haywood, *The Duty and Office of Justices of the Peace, and of Sheriffs, Coronoers, Constables* 10 (1800); *see also* Haywood, *The Duty & Authority of Justices of the Peace, in the State of Tennessee* 176 (1810).

---

[9] *See, e.g.*, A Bill for the Office of Coroner and Constable (Mar. 1, 1682), reprinted in *Grants, Concessions & Original Constitutions* 251 (N.J. constable oath) ("I will endeavour to arrest all such persons, as in my presence, shall ride or go arm'd offensively."); Niles, *The Connecticut Civil Officer* 154 (1833) (explaining that it was a crime to "go armed offensively," even without threatening conduct); Dunlap, *The New York Justice* 8 (1815); *Vermont Telegraph*, Feb. 7, 1838 (observing that "[t]he laws of New England" provided a self-defense right "to individuals, but *forb[ade] their going armed* for the purpose").

As with the English statute, prosecution under these laws did not require the defendant to have "threaten[ed] any person in particular, or committed any particular act of violence." Ewing, *A Treatise on the Office & Duty of a Justice of the Peace* 546 (1805). Nor did these laws have a self-defense exception: No one could "excuse the wearing [of] such armor in public, by alleging that such a one threatened him." Wharton, *A Treatise on the Criminal Law of the United States* 527–28 (1846).

## C.   Early-19th-Century American History

*1. Many States enact a variant of the Statute of Northampton, allowing public carry with "reasonable cause to fear an assault."* In 1836, Massachusetts amended its public-carry prohibition to provide a narrow exception for those having "reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property." 1836 Mass. Laws 748, 750, ch. 134, § 16. Absent such "reasonable cause," no person could "go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon." *Id.* Those who did so could be punished by being made to pay sureties for violating the statute, *id.*; if they did not do so, they could be imprisoned. *See id.* at 749.[10]

Although the legislature chose to trigger these penalties using a citizen-complaint mechanism (allowing "any person having reasonable cause to fear an injury, or breach of the peace" to file a complaint, *id.* at 750, § 16), the law was understood to restrict carrying a firearm in public without good cause. This was so even when the firearm was not used in any threatening or violent manner: The legislature placed the restriction in a section entitled "Persons who go armed may be required to find sureties for the peace," and expressly cited the State's previous

---

[10] Sureties were a form of criminal punishment, akin to a bond. *See, e.g.*, Punishments, The Proceedings of the Old Bailey, London's Central Criminal Court, 1674 to 1913, http://bit.ly/1ED5tC2; 34 Edw. 3, 364, ch. 1 (1360).

enactment of the Statute of Northampton. *Id.* And elsewhere in the same statute the legislature separately punished "any person [who] threatened to commit an offence against the person or property of another." *Id.* at 749, § 2. Thus, as Massachusetts Judge Peter Oxenbridge Thatcher explained in a grand jury charge appearing in the contemporary press in 1837, there was little doubt at the time that "no person may go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to apprehend an assault or violence to his person, family, or property." Cornell, *The Right to Carry Firearms Outside of the Home*, 39 Fordham Urb. L.J. 1695, 1720 & n.134 (2012); *see also* Hammond, *A Practical Treatise; Or an Abridgement of the Law Appertaining to the Office of Justice of the Peace* 184–86 (1841).

Within a few decades, many States (all but one outside the slaveholding South) had adopted nearly identical laws. *See, e.g.*, 1838 Wisc. Laws 381, § 16; 1841 Me. Laws 709, ch. 169, § 16; 1846 Mich. Laws 690, 692, ch. 162, § 16; 1847 Va. Laws 127, 129, ch. 14, § 16; 1851 Minn. Laws 526, 528, ch. 112, § 18; 1853 Or. Laws 218, 220, ch. 16, § 17; 1861 Pa. Laws 248, 250, § 6. Most copied the Massachusetts law verbatim—enforcing the public-carry prohibition through a citizen-complaint provision and permitting a narrow self-defense exception. *See, e.g.*, 1851 Minn. Laws at 527–28, §§ 2, 17, 18 (section entitled "Persons carrying offensive weapons, how punished"); 1873 Minn. Laws. 1025, § 17 (same after 14th Amendment's ratification). At least one State (Virginia) used slightly different language. 1847 Va. Laws at 129, § 16 ("If any person shall go armed with any offensive or dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may be required to find sureties for keeping the peace."). Semantic differences aside, these laws were understood

to do the same thing: broadly restrict public carry, while establishing a limited exception for those with a particular need for self-defense.[11]

### 2. Taking a different approach, most southern States elect to permit public carry, but only if the weapon is not concealed.

In contrast to the Northampton model and its good-cause variant, most—but not all—States in the slaveholding South were more permissive of public carry. They generally allowed white citizens to carry firearms in public so long as the weapons were not concealed. *See, e.g.*, 1854 Ala. Laws 588, § 3272; 1861 Ga. Laws 859, § 4413; *see generally* Cramer, *Concealed Weapon Laws of the Early Republic* (1999).[12]

That this "lash and pistol" model emerged in the South is perhaps unsurprising given the widespread concerns about slave rebellions and dramatically higher levels of interpersonal violence there. Frederick Law Olmsted, for example, "attributed the need to keep slaves in submission as the reason that 'every white stripling in the South may carry a dirk-knife in his pocket, and play with a revolver before he has learned to swim.'" *Id.* at 21 (quoting Olmsted, *A Journey in the Back Country* 447 (1860)); *cf. McDonald v. City of Chicago*, 561 U.S. 742, 844 (2010) (Thomas, J., concurring) ("[I]t is difficult to overstate the extent to which fear of a slave uprising gripped slaveholders and dictated the acts of Southern legislatures."). And historians agree that "the South was substantially more violent than the North." Cramer, *Concealed Weapon Laws* 18.

---

[11] *See, e.g.*, Ruben & Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 Yale L.J. Forum 121 (Sept. 25, 2015), at 131 n.58, http://bit.ly/1RiqHwv (citing prosecution of a Massachusetts man for publicly carrying a gun without reasonable cause to fear injury); *Daily State Journal* (Alexandria), Sept. 16, 1872 (noting that Virginia justices of the peace "may issue a warrant for the arrest of any party going armed with a deadly or dangerous weapon"); *The Daily Dispatch* (Richmond), June 1, 1861 (account of Virginia man "held to bail" for "habitually going armed").

[12] Not all southern States were so permissive. South Carolina enacted a Northampton-style law in 1870. 1870 S.C. Laws 403, no. 288, § 4. Tennessee made it illegal for "any person to publicly or privately carry a . . . pocket pistol or revolver other than an army pistol." 1871 Tenn. Laws 81, ch. 90, § 1. And Arkansas did similarly, while permitting "carrying any weapon when upon a journey, or upon [one's] own premises." 1881 Ark. Laws 490, ch. 53, § 1907.

One southern social scientist, who was "the first person to explore the issue of Southern violence in depth," undertook an exhaustive study of homicide rates in the 19th century and concluded that the rate in southern states was 18 times the rate in New England, and was "greater than any country on earth the population of which is rated as civilized." Redfield, *Homicide, North and South* vii, 10, 13 (1880) (2000 reprint).

**D.    Mid-to-Late-19th-Century American History**

**1. States continue to restrict public carry both before and after the 14th Amendment's ratification.** As America entered the second half of the 19th century, additional jurisdictions began enacting laws broadly restricting public carry, often subject to limited self-defense exceptions. Before the Civil War, New Mexico passed *An Act Prohibiting The Carrying Of Weapons, Concealed Or Otherwise*, making it unlawful for "any person [to] carry about his person, either concealed or otherwise, any deadly weapon," and requiring repeat offenders to serve a jail term "of not less than three months." 1859 N.M. Laws 94, § 2.

After the Civil War, several other States enacted similar prohibitions notwithstanding the recent passage of the 14th Amendment. West Virginia and Texas enacted laws that broadly prohibited public carry without good cause. West Virginia's law made clear that "[i]f any person go armed with a deadly or dangerous weapon, without reasonable cause to fear violence to his person, family, or property, he may be required to give a recognizance." 1870 W. Va. Laws 702, 703, ch. 153, § 8.[13] Courts construed this self-defense exception narrowly to require specific evidence of a concrete, serious threat. *See, e.g.*, *State v. Barnett*, 34 W. Va. 74 (1890). Texas's law

---

[13] A later version reaffirmed the law's breadth by clarifying that it didn't "prevent any person from keeping or carrying about his dwelling house or premises, any such revolver or other pistol, or from carrying the same from the place of purchase to his dwelling house, or from his dwelling house to any place where repairing is done, to have it repaired and back again." 1891 W. Va. Laws 915, 915−16, ch. 148, § 7. Violators could be fined or jailed. *Id.*

contained a similarly circumscribed exception, barring anyone not acting in "lawful defense of the state" ("as a militiaman" or "policeman") from "carrying on or about his person … any pistol" without "reasonable grounds for fearing an unlawful attack on his person" that was "immediate and pressing." 1871 Tex. Laws 1322, art. 6512. This law prompted a Rhode Island doctor visiting Texas in 1890 to remark: "I had expected to find all of your people going armed, and that it would not be safe for a man from the North to travel alone in your country, but on the contrary, I find that you have laws that prohibit the carrying of weapons concealed or otherwise, and that they are enforced." Ft. Worth Daily Gazette, Apr. 5, 1890.

**2.     *Beginning immediately after the 14th Amendment's ratification, many legislatures enact laws banning public carry in populated areas.*** Starting with New Mexico in 1869, many legislatures enacted Northampton-style prohibitions on public carry in cities and other populated areas. New Mexico made it "unlawful for any person to carry deadly weapons, either concealed or otherwise, on or about their persons within any of the settlements of this Territory," while providing a narrow self-defense exception. 1869 N.M. Laws 312, *Deadly Weapons Act of 1869*, § 1. Violators could serve up to 50 days in jail. *Id.* § 3. Wyoming prohibited carrying firearms "concealed or openly" "within the limits of any city, town or village." 1875 Wyo. Laws 352, ch. 52, § 1. Idaho made it unlawful "to carry, exhibit or flourish any … pistol, gun or other-deadly weapons, within the limits or confines of any city, town or village or in any public assembly." 1889 Idaho Laws 23, § 1. Arizona banned "any person within any settlement, town, village or city within this Territory" from "carry[ing] on or about his person, saddle, or in his saddlebags, any pistol." 1889 Ariz. Laws 16, ch. 13, § 1. And, at the turn of the century, Texas and Michigan granted cities the power to "prohibit and restrain the carrying of pistols." 1909 Tex. Laws 105; *see* 1901 Mich. Laws 687, § 8.

By this time, many cities throughout the country had imposed such public-carry bans for decades.[14] "A visitor arriving in Wichita, Kansas, in 1873," for example, "would have seen signs declaring, 'LEAVE YOUR REVOLVERS AT POLICE HEADQUARTERS, AND GET A CHECK.'" Winkler, *Gunfight* 165 (2011). Dodge City was no different. A sign read: "THE CARRYING OF FIREARMS STRICTLY PROHIBITED." *Id.* Even in Tombstone, Arizona, people "could not lawfully bring their firearms past city limits. In fact, the famed shootout at Tombstone's O.K. Corral was sparked in part by Wyatt Earp pistol-whipping Tom McLaury for violating Tombstone's gun control laws." Blocher, *Firearm Localism*, 123 Yale L.J. 82, 84 (2013).

## ARGUMENT

### BECAUSE THE DISTRICT'S LAW CARRIES FORWARD A SEVEN-CENTURY ANGLO-AMERICAN TRADITION OF RESTRICTING PUBLIC CARRY IN POPULATED AREAS, IT IS A "LONGSTANDING," CONSTITUTIONAL REGULATION UNDER *HELLER*.

The question in this case is not whether the Second Amendment, which the Supreme Court held in *Heller* protects "the right of law-abiding, responsible citizens to use arms in defense of hearth and home," 554 U.S. at 635, has any application outside the home. Rather, it is whether the District of Columbia's public-carry regime is consistent with the Second Amendment's protections.

To answer that question, the D.C. Circuit follows "a two-step approach," first asking whether the law "impinges upon a right protected by the Second Amendment," and then determining, "if it does," whether the law "passes muster under the appropriate level of constitutional scrutiny." *Heller v. District of Columbia*, 670 F.3d 1244, 1252 (D.C. Cir. 2011) (*Heller*

---

[14] *See, e.g.*, Nebraska City, Neb., Ordinance no. 7 (1872); Nashville, Tenn., Ordinance ch. 108 (1873); Los Angeles, Cal., Ordinance nos. 35–36 (1878); Salina, Kan., Ordinance no. 268 (1879); Syracuse, N.Y., Ordinances ch. 27 (1885); Dallas, Tex., Ordinance (1887); New Haven, Conn., Ordinances § 192 (1890); Checotah, Okla., Ordinance no. 11 (1890); Rawlins, Wyo., Ordinances art. 7 (1893); Wichita, Kan., Ordinance no. 1641 (1899); McKinney, Tex., Ordinance no. 20 (1899); San Antonio, Tex., Ordinance ch. 10 (1899).

*II*). Although the District's law would satisfy the appropriate level of scrutiny (for reasons laid out in the District's opposition to the plaintiffs' motion) this brief shows that the analysis needn't go that far: This law survives at step one.

### A.   "Longstanding" laws are deemed constitutional under *Heller* because they are consistent with our "historical tradition."

One way to determine whether a law burdens the Second Amendment right is to assess the law based on a "historical understanding of the scope of the right," *Heller*, 554 U.S. at 625, and consider whether the law is one of the "prohibitions 'that have been historically unprotected,'" *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 960 (9th Cir. 2014), *cert. denied* 135 S. Ct. 2799 (2015). The Supreme Court in *Heller* identified several "examples" of such regulations, including "prohibitions on the possession of firearms by felons and the mentally ill" and "laws imposing conditions and qualifications on the commercial sale of arms," which are "presum[ed]" not to violate the Second Amendment because of their historical acceptance as consistent with its protections. 554 U.S. at 626–27 & n.26. Such "longstanding" laws, the Court explained, are treated as tradition-based "exceptions" by virtue of their "historical justifications." *Id.* at 635. Or, put in the D.C. Circuit's words: Longstanding laws "are presumed not to burden conduct within the scope of the Second Amendment" because they have "long been accepted by the public" as consistent with its protections. *Heller II*, 670 F.3d at 1253.

So what does it mean to be "longstanding" under *Heller*? As numerous courts have recognized, it does not require that a law "mirror limits that were on the books in 1791." *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) (en banc). To the contrary, laws may qualify as longstanding even if they "cannot boast a precise founding-era analogue," *NRA v. BATF*, 700 F.3d 185, 196 (5th Cir. 2012)—as was the case with "the early 20th century" regulations deemed longstanding in *Heller*. *Heller II*, 670 F.3d at 1253; *see also Dearth v. Holder*, 893 F. Supp. 2d 59, 66

(D.D.C. 2012) (Wilkins, J.) (upholding 1968 law). But the law in this case is no 20th-century creation; it embodies a tradition of regulation stretching back seven centuries.

The National Rifle Association's *amicus* brief, however, contends that this seven-century tradition is "largely beside the point" because the law has more than a de minimis effect. NRA Br. 18. That view cannot be squared with *Heller* or with precedent from other circuits, which recognize that "longstanding limitations are exceptions to the right to bear arms" under *Heller*. *United States v. Marzzarella*, 614 F.3d 85, 91 (3d Cir. 2010).[15] Although the NRA wants this Court to read the D.C. Circuit's decision in *Heller II* as compelling a contrary conclusion, that is mistaken. To be sure, *Heller II* included dicta hypothesizing that a plaintiff could "rebut" a "presumption" of lawfulness by showing that a longstanding law has "more than a de minimis effect upon his right." 670 F.3d at 1253. But the D.C. Circuit has never subjected a longstanding law to heightened scrutiny, much less struck one down as unconstitutional. And no wonder: That would not only create a split with the other circuits; it would also conflict with *Heller*, which makes clear that longstanding laws are "exceptions" to the Second Amendment, and that even laws with more than a de minimis effect (like absolute bans on possession by felons and the mentally ill) are "presumptively lawful." *Id.* at 626–27 n.26, 635.

## B.    The District of Columbia's law has a centuries-long pedigree in Anglo-American history and is therefore "longstanding" and constitutional under *Heller*.

**1.** If any law is longstanding under *Heller*, it is the District's public-carry regulation. For centuries, English and American laws have restricted public carry in populated areas, much like (and indeed *more* than) the District does today. The Statute of Northampton, first enacted in 1328,

---

[15] *See also United States v. Rene E.*, 583 F.3d 8, 12 (1st Cir. 2009); *Drake v. Filko*, 724 F.3d 426, 432–35 (3d Cir. 2013); *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010); *NRA*, 700 F.3d at 203–05; *United States v. Seay*, 620 F.3d 919, 925 (8th Cir. 2010); *United States v. White*, 593 F.3d 1199, 1205–06 (11th Cir. 2010).

trained its prohibition on "fairs," "markets," and other populous places, 2 Edw. 3, 258, ch. 3, while a royal declaration from a century later specifically directed "the mayor and sheriffs of London" to enforce the prohibition against "any man of whatsoever estate or condition [who] go[es] armed within the city and suburbs." 3 *Calendar of the Close Rolls* 485. One century after that, Queen Elizabeth spoke of the need to focus enforcement in the areas where the "great multitude of people do live, reside, and trav[el]." Charles, *Faces*, 60 Clev. St. L. Rev. at 21.

When this tradition came to America, it gained popularity in the late-18th century and proliferated throughout the 19th century. From 1795 to 1870, at least twelve States and the District of Columbia incorporated a broad Northampton-style prohibition into their laws at some point. *See supra*, at 9–10, 13 n.12, 14. By 1890, New Mexico, Wyoming, Idaho, and Arizona had all enacted laws broadly prohibiting public carry in cities, towns, and villages. *See supra*, at 15. And numerous local governments imposed similar restrictions around the same time—from New Haven to Nashville, Dallas to Los Angeles, and even in places like Dodge City and Tombstone. *See supra*, at 16 n.14.

These laws illustrate "how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century." *Heller*, 554 U.S. at 605. Because they help "determine *the public understanding* of a legal text in the period after its enactment or ratification," they are "a critical tool of constitutional interpretation." *Id.* And they unmistakably show that large swaths of the American public considered public-carry prohibitions to be permissible in populated areas and consonant with the right to bear arms. Although not all States and cities enacted such laws in the 19th century, "the Constitution establishes a federal republic where local differences are cherished as elements of liberty, rather than eliminated in a search for national uniformity." *Friedman v. Highland Park*, 784 F.3d 406, 412 (7th Cir. 2015) (Easterbrook, J.).

19

**2.** Given this robust and longstanding history, the District would have been well within its right to enact a broad prohibition on public carry. That is particularly true because of the uniqueness of the District—an entirely urban area in which Supreme Court justices, members of Congress, and diplomats frequently walk the streets without security.

Yet the District chose to adopt a more permissive public-carry regime—one that has its own longstanding historical pedigree: allowing public carry only by those with "good reason" to do so. In the mid-19th century, nine States enacted laws containing such a requirement. *See supra*, at 14–16, 18–19. Virginia, for example, made it unlawful for anyone to "go armed" with a gun "without reasonable cause to fear an assault or other injury." 1847 Va. Laws at 129, § 16. Such prohibitions would have meant nothing if anyone could have satisfied the exception by asserting a generalized fear of self-defense, and they were not enforced that way. *See, e.g.*, *Barnett*, 34 W. Va. 74. Indeed, when the Supreme Court considered Texas's law in 1894, it noted that the law "forbid[s] the carrying of weapons" and "authoriz[es] the arrest without warrant of any person violating [it]," and determined that a person arrested under the law is not "denied the benefit" of the right to bear arms. *Miller v. Texas*, 153 U.S. 535, 538 (1894).

The District of Columbia has not violated our Constitution by continuing this tradition. Nor have the eight States that currently have similar laws. Although such a lengthy historical pedigree is not necessary to satisfy the Second Amendment, it is sufficient to do so. Whatever else the Second Amendment permits, it surely allows a law that traces back to 14th-century England, has been accepted in America for well over "a century in diverse states and cities," and is "now applicable to more than one fourth of the Nation by population." *Heller II*, 670 F.3d at 1254.

## CONCLUSION

This Court should deny the plaintiffs' request for a preliminary or permanent injunction.

Respectfully submitted,

/s/ Deepak Gupta
_____

DEEPAK GUPTA
JONATHAN E. TAYLOR
GUPTA WESSLER PLLC
1735 20th Street, NW
Washington, DC 20009
(202) 888-1741
deepak@guptawessler.com

J. ADAM SKAGGS
MARK ANTHONY FRASSETTO
EVERYTOWN FOR GUN SAFETY
P.O. Box 4184
New York, NY 10163

January 15, 2016                    Counsel for Amicus Curiae
                                    Everytown for Gun Safety

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Local Rule 7(o)(4) because it contains fewer than 25 pages, exclusive of the portions excluded by Rule 32(a)(7)(B)(iii).

*/s/ Deepak Gupta*
Deepak Gupta

## CORPORATE DISCLOSURE STATEMENT

Everytown for Gun Safety has no parent corporations. It has no stock and hence no publicly held company owns 10% or more of its stock.

*/s/ Deepak Gupta*
Deepak Gupta

## CERTIFICATE OF SERVICE

I hereby certify that on January 15, 2016, I electronically filed the foregoing with the Clerk of the Court of the United States District Court for the District of Columbia by using the CM/ECF system. All participants are registered CM/ECF users, and will be served by the CM/ECF system.

*/s/ Deepak Gupta*
Deepak Gupta