# EXHIBIT 2

No. 15-cv-2234-RJL

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MATTHEW GRACE and ) | |
| PINK PISTOLS, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Civil Action No. 15-2234 (RJL) |
| v. ) | |
| ) | |
| DISTRICT OF COLUMBIA and ) | |
| CATHY LANIER, in her official capacity as ) | |
| Chief of Police for the Metropolitan Police ) | |
| Department, ) | |
| ) | |
| Defendants. ) | |

**PLAINTIFFS' MEMORANDUM IN RESPONSE TO THE BRADY CENTER
TO PREVENT GUN VIOLENCE'S AMICUS CURIAE BRIEF**

The Brady Center to Prevent Gun Violence ("Brady Center") opens its amicus brief by describing the recent "unprecedented" and "dramatic increase in violence in D.C." Br. of Amicus Curiae Brady Center to Prevent Gun Violence in Supp. of Defs. at 1–2 (Jan. 22, 2016), Doc. 25-1 ("Brady Br."). Because of this "surge," it maintains, "[l]ives depend" on this Court permitting the District to enforce its ban on the public carrying of firearms by ordinary, law-abiding citizens, *id.* at 1, 3. In fact, this "dramatic increase in violence" shows precisely the opposite; indeed, it dooms the District's attempt to justify its ban. The District has enforced a variety of unconstitutional bans on the carrying and possession of firearms over the past several decades, yet homicides and other violent crimes have recently skyrocketed. The District's ban cannot be justified as directly advancing its interest in the prevention of violent crime when its approach has already failed so palpably to further that end. And it is precisely when crime rates are surging that *law-abiding* citizens have the *greatest* need to carry firearms for the "core lawful purpose of

1

self-defense." *District of Columbia v. Heller*, 554 U.S. 570, 630 (2008). The Brady Center makes a variety of arguments in an attempt to justify the District's decision to ban ordinary citizens from exercising that right, and each one fails to persuade. But the Brady Center is right about one thing. Lives do depend on this Court's decision: the lives of the ordinary, law-abiding citizens who wish to exercise the right the Constitution secures them to protect themselves from the gun violence that the District has utterly failed to curb.

## ARGUMENT

1. By banning ordinary law-abiding citizens from bearing arms in public, the District has joined the company of only a handful of outlier jurisdictions. As the Brady Center owns, just nine states have restrictive "may issue" schemes like the District's, Brady Br. 3–4; the other 41 honor their citizens' right to bear arms in public as a matter of course.[1] The Brady Center attempts to skew this math, casting the District's ban as no more onerous or discretionary than the approach adopted in "nineteen of the so-called 'shall issue' states," where "officials retain some discretion to evaluate an application based on more qualitative criteria." Brady Br. 4. That attempt fails. Though some "shall-issue" States may grant their licensing officials limited discretion, the District's scheme is worlds away from the approach adopted by any of these jurisdictions.

This is best seen by contrasting the District's law with the systems in place in New Hampshire and Indiana—the two States the Brady Center holds up as " 'shall issue' states" that "require applicants to demonstrate a 'proper purpose' for requiring a concealed carry permit." *Id.* at 4 n.13. While the District uses innocuous language like "good reason" and "proper purpose" to

---

[1] In Connecticut, one of the nine may-issue states, the courts have limited local officials' discretion such that the system is more akin to shall-issue. *See, e.g.*, *Nicholson v. Board of Firearms Permit Exam'rs*, 1995 WL 584377, at *4–*5 (Conn. Super. Ct. Sept. 28, 1995).

2

describe the narrow class of applicants it suffers to exercise their right to bear arms, it defines those standards in a way that excludes the very reason and purpose the Second Amendment was designed to safeguard. *See* D.C. CODE § 7-2509.11(1)(A) (requiring "a showing of a special need for self-protection distinguishable from the general community"). By contrast, though the New Hampshire law the Brady Center points to does indeed require the issuance of a permit only upon showing of a "proper purpose," it *goes on* to provide that "self-defense shall be considered a proper purpose." N.H. REV. STAT. § 159:6(I)(a). Similarly, while Indiana law, as the Brady Center notes, likewise requires an applicant to show "a proper reason for carrying a handgun," that State's case law makes clear that "self-defense" alone is "constitutionally a 'proper reason.' " *Schubert v. DeBard*, 398 N.E2d 1339, 1340, 1341 (Ind. Ct. App. 1980).

Indeed, far from supporting the District's law, Indiana's case law condemns it. Like the Second Amendment, Indiana's Constitution contains a provision guaranteeing its citizens the "right to bear arms, for the defense of themselves and the State," IND. CONST. art 1, § 32, and putting the exercise of that right at the mercy of "an administrative official's subjective determination of whether the applicant needs defending," the courts of that State have reasoned, would

> contravene[ ] the essential nature of the constitutional guarantee. It would supplant a right with a mere administrative privilege which might be withheld simply on the basis that such matters as the use of firearms are better left to the organized military and police forces even where defense of the individual citizen is involved.

*Schubert*, 398 N.E.2d at 1341. So too here. The District's conclusion that defense against crime is "better left to the police"—despite the miserable failure of the District's attempt to curb violent crime through a long pattern of laws openly hostile to the Second Amendment—flouts the "essential nature" of the Second Amendment as interpreted in *Heller*.

2. The principle that the government simply cannot impose a discretionary scheme that "supplant[s] a right with a mere administrative privilege," *id.*, has been adopted across a wide range of constitutional rights, including free speech, freedom of religion, and the right to confrontation. While the government can regulate when, where, and how these rights are exercised, it cannot ban them entirely, nor can it grant its functionaries the unfettered right to do so based on their subjective judgment that a citizen does not have a "good enough" reason for exercising the right. The Brady Center resists this logic, maintaining that the "importation of the First Amendment's 'time, place, and manner' restrictions into the Second Amendment context is problematic." Brady Br. 5. But as just noted, the rule against prior restraints of free speech is merely *one of many* doctrines to this effect; the Brady Center would thus not only wall the Second Amendment off from the Free Speech Clause; it would make its protections different from—and weaker than—the great bulk of constitutional rights jurisprudence.

Moreover, the Brady Center's reason for singling out the Second Amendment for this "specially unfavorable . . . treatment," *McDonald v. City of Chicago*, 561 U.S. 742, 779 (2010), does not hold water. Unlike a "prior restraint of speech," the Brady Center solemnly urges, "restrictions on gun use can save lives." Brady Br. 6. That rather underestimates the power of ideas. Bans on speech, too, are almost certainly thought to "save lives" by those that impose them, *id.*, but our Constitution protects the freedom of speech from such restrictions. *See New York Times Co. v. United States*, 403 U.S. 713, 714 (1971). "The right to keep and bear arms," then, "is not the only constitutional right that has controversial public safety implications." *McDonald*, 561 U.S. at 783 (plurality).

3. Finally, even if the District theoretically could justify its ban by demonstrating that it will "save lives," it has not and cannot make that showing. The Brady Center attempts to fill this

4

void, but it, too, comes up short. The bulk of the empirical studies relied upon by the Brady Center were also cited by the District—and as shown in our Reply Memorandum, they wholly fail to support the District's ban.[2] The few studies that the Brady Center cites in addition to those relied upon by the District fare no better. For instance, the brief cites a 1991 article by Colin Loftin, which claimed to show that the District's ban on *possessing* handguns—the one struck down in *Heller*—led to a decline in violent crime. But the Loftin study has been shown to suffer from several crippling methodological flaws, leading the National Research Council, in its survey of firearms social science to conclude that it was based on a "weak experimental design," making it "difficult to draw any causal inferences." NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE: A CRITICAL REVIEW 98 (Charles F. Wellford, John V. Pepper, & Carol V. Petrie eds., 2004). Similarly, the studies by Charles Branas and David Hemenway, also relied upon by the Brady Center, do nothing to show the effectiveness of restrictions on the public carrying of arms. *See* Amicus Curiae Brief of National Rifle Association of America, Inc. in Support of Plaintiffs-Appellants and Urging Reversal at 9, *Richards v. Prieto*, 560 F. App'x 681 (9th Cir. 2014) (No. 11-16255), ECF No. 15 (Branas study did not even purport to show a causal link); *see also id.* at 4 (Hemenway's own data indicated six times the number of defensive gun uses as he reports in his 1997 article).[3]

---

[2] For example, the Brady Center, like, the District, puts most of its emphasis on the 2014 study by law-professor John Donohue, which it calls "the most up-to-date research in this area." Brady Br. 8. But as noted in our Reply, the latest Donohue study—aside from being flawed in a number of respects—*explicitly disavows* any suggestion that the available empirical data show any causal link between right-to-carry laws and higher crime, Reply Memorandum in Supp. of Pls.' Application for a Preliminary and/or Permanent Injunction at 19–20 (Jan. 22, 2016), Doc. 23 (which is perhaps why the Brady Center quotes extensively from a *news report* covering the Donohue study rather than the study itself, Brady Br. 8.).

[3] The Brady Center also relies prominently on a webpage maintained by the Violence Policy Center, Concealed Carry Killers, http://goo.gl/SPRCCp, (along with the PDF to which it links, the "VPC Webpage"), which it says shows that "since 2007, at least 849 people have been

Unable to show that *bearing* arms leads to appreciably higher rates of violent crime, the Brady Center turns to *keeping* them. "[E]ven within the home, gun possession has been linked to increased violence," and "[l]ogically, an increase of guns in the streets is also likely to lead to an increase in guns in D.C. homes." Brady Br. 9 n.23. But this line of reasoning does not even *pretend* to be consistent with *Heller*. If the relationship between violent crime and possession of handguns in the home did not justify the District's ban on possessing handguns in the home, *Heller*, 554 U.S. at 634–36, it surely cannot justify its ban on carrying handguns in public as a roundabout means of accomplishing the same end.

## CONCLUSION

For the foregoing reasons, the Court should preliminary or permanently enjoin the District's unconstitutional ban on bearing arms.

Dated: January 26, 2016

Respectfully submitted,

s/ Charles J. Cooper
Charles J. Cooper (Bar No. 248070)
David H. Thompson (Bar No. 450503)
Peter A. Patterson (Bar No. 998668)
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600

*Attorneys for Plaintiffs*

---

killed by individuals with concealed carry permits." Brady Br. 8. The "Concealed Carry Killers" webpage—which is not a scientific study but rather a collection of "vignettes" of "concealed carry incidents" that are "taken primarily from news reports," VPC Webpage—is vitiated by obvious errors. Most prominently, VPC's "tally" contains a significant number of incidents that do not speak at all to the comparative likelihood of concealed-carry permit holders to engage in public firearm violence. To take just two examples, the VPC includes (as of January 19, 2016—the page is continually updated): (i) 81 firearms-related killings that took place in the gun-owner's home, where the possession of a public carry permit is entirely irrelevant, and (ii) over 250 "vignettes" describing suicides, most of which do not even indicate that a firearm was used in the suicide. The VPC's tally of "Concealed Carry Killers" is a sham and proves nothing.