# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MATTHEW GRACE, *et al.*,<br><br>    Plaintiffs,<br><br>  v.<br><br>DISTRICT OF COLUMBIA, *et al.*,<br><br>    Defendants. | Civ. Action No. 15-2234 (RJL) |

## DEFENDANTS' SUPPLEMENTAL BRIEF IN OPPOSITION TO PLAINTIFFS' APPLICATION FOR A PRELIMINARY INJUNCTION

KARL A. RACINE
Attorney General for the District of Columbia

ELIZABETH SARAH GERE
Deputy Attorney General
Public Interest Division

TONI MICHELLE JACKSON (#453765)
Chief, Equity Section

ANDREW J. SAINDON (#456987)
Senior Assistant Attorney General
441 Fourth Street, N.W., Sixth Floor South
Washington, D.C. 20001
Telephone: (202) 724-6643
Facsimile: (202) 730-1470
Email: andy.saindon@dc.gov

CHAD A. NASO (#1001694)
Assistant Attorney General
441 Fourth Street, N.W., Sixth Floor South
Washington, D.C. 20001
Telephone: (202) 724-7854
Facsimile: (202) 741-8951
Email: chad.naso@dc.gov

HOLLY M. JOHNSON (#476331)
Assistant Attorney General

Office of the Solicitor General
Office of the Attorney General
441 Fourth Street, N.W., Suite 600 S
Washington, D.C. 20001
Telephone: (202) 442-9890
Facsimile: (202) 741-8951
Email: holly.johnson@dc.gov

*Counsel for the District of Columbia*

# TABLE OF CONTENTS

ARGUMENT ....................................................................................................................... 1

I.      THE BALANCE OF EQUITIES TIPS HEAVILY IN FAVOR OF THE
        DEFENDANTS ..................................................................................................... 1

II.     HISTORICAL   ANALOGUES   TO   THE   "GOOD   REASON"
        STANDARD   ARE   NUMEROUS,   WIDESPREAD,   AND
        LONGSTANDING ................................................................................................ 3

III.    THE "GOOD REASON" STANDARD IS CONSISTENT WITH THE
        PROPER HISTORICAL UNDERSTANDING OF THE RIGHT TO
        "BEAR ARMS" ..................................................................................................... 6

IV.     UNDER ANY LEVEL OF SCRUTINY, THE COURT SHOULD DEFER
        TO THE COUNCIL'S PREDICTIVE JUDGMENT THAT THE "GOOD
        REASON" STANDARD IS NECESSARY TO PROTECT PUBLIC
        SAFETY ............................................................................................................. 11

V.      THE DISTRICT HAS ADOPTED CONCRETE AND ARTICULABLE
        CRITERIA TO ENSURE CONSISTENT APPLICATION OF THE LAW ........ 13

CONCLUSION .................................................................................................................. 15

# TABLE OF AUTHORITIES

**Cases**

*Chaplaincy of Full Gospel Churches v. England,*

   454 F.3d 290 (D.C. Cir. 2006) ................................................................................. 1

*\*District of Columbia v. Heller*,

   554 U.S. 570 (2008) (*Heller I*) ..........................................................................6, 7, 10

*\*Drake v. Filko,*

   724 F.3d 426 (3d Cir. 2013) ........................................................................... 1, 2, 3, 4

*Friedman v. Highland Park,*

   784 F.3d 406 (7th Cir. 2015) .................................................................................... 2

*\*Heller v. District of Columbia,*

   670 F.3d 1244 (D.C. Cir. 2011) .......................................................................Passim

*Heller v. District of Columbia,*

   801 F.3d 264 (D.C. Cir. 2015) .......................................................................... 12, 13

*Holder v. Humanitarian Law Project,*

   561 U.S. 1 (2010) ..................................................................................................... 11

*In re Preis,*

   573 A.2d 148 (N.J. 1990) ........................................................................................ 15

*\*Kachalsky v. Cty. of Westchester,*

   701 F.3d 81 (2d Cir. 2012) ........................................................................... 1, 2, 3, 13

*Kaplan v. Bratton,*

   673 N.Y.S.2d 66 (N.Y. App. Div. 1st Dep't 1998) .................................................. 14

*Matter of Bastiani,*

   881 N.Y.S.2d 591 (N.Y. County Ct. 2008) ............................................................. 15

*Peruta v. County of San Diego,*

742 F.3d 1144 (9th Cir. 2014), *vacated pending reh'g en banc*, 781 F.3d 1106 (2015) ............. 1

*Scherr v. Handgun Permit Review Bd.*,

   880 A.2d 1137 (Md. Ct. Spec. App. 2005) ............................................................... 14

*Schrader v. Holder*,

   704 F.3d 980 (D.C. Cir. 2013) ............................................................................... 11

*Siccardi v. State*,

   284 A.2d 533 (N.J. 1971) ...................................................................................... 15

*Snowden v. Handgun Permit Review Bd.*,

   45 Md. App. 464 (Md. Ct. Spec. App. 1980) ........................................................... 14

*Turner Broad. Sys. v. FCC*,

   512 U.S. 622 (1994) (*Turner I*) ............................................................................ 11

*Turner Broad. Sys. v. FCC*,

   520 U.S. 180 (1997) (*Turner II*) ..................................................................... 11, 12

*United States v. Marzzarella*,

   614 F.3d 85 (3d Cir. 2010) ..................................................................................... 6

*United States v. Salerno*,

   481 U.S. 739 (1987) ............................................................................................ 13

*Woollard v. Gallagher*,

   712 F.3d 865 (4th Cir. 2013) ......................................................................... 1, 2, 15

**Statutes**

D.C. Code § 7-2509.11(1)(B) ..................................................................................... 13

D.C. Code § 7-2509.11(1)(A) ..................................................................................... 13

N.Y. Penal Law § 400.00(2)(f) ..................................................................................... 3

**Other Authorities**

1 DCMR § 1202 ....................................................................................................... 14

1 DCMR § 1221.6 ................................................................................................................14

2 Edw. 3, 258, ch. 3 (1328) ...................................................................................................9

24 DCMR § 2333.2 ............................................................................................................14

24 DCMR § 2333.4 ............................................................................................................14

24 DCMR § 2334.1 ............................................................................................................14

1694 Mass. Laws 12, no. 6 ..................................................................................................7

1699 N.H. Laws 1 ...............................................................................................................7

1786 Va. Laws 33, ch. 21 .................................................................................................7, 9

1792 N.C. Laws 60, ch. 3 .................................................................................................7, 9

1801 Tenn. Laws 710 ..........................................................................................................7

1821 Me. Laws 285 .............................................................................................................7

1836 Mass. Laws 750 § 6 ....................................................................................................5

1838 Wisc. Laws 381 ..........................................................................................................5

1841 Me. Laws 709 .............................................................................................................5

1846 Mich. Laws 690 ..........................................................................................................5

1847 Va. Laws 127 ..............................................................................................................5

1851 Minn. Laws 526 ..........................................................................................................5

1852 Del. Laws 330 .............................................................................................................7

1853 Or. Laws 218 ..............................................................................................................5

1861 Pa. Laws 248 ..............................................................................................................5

1869 N.M. Laws 312 .........................................................................................................4, 9

1870 S.C. Laws 403 .............................................................................................................7

1870 W. Va. Laws 702 ........................................................................................................5

1871 Tex. Laws 1322, art. 6512 .........................................................................................4

1873 Minn. Laws. 1025 .......................................................................................................5

1875 Wyo. Laws 352, ch. 52, § 1 .............................................................................9

1889 Ariz. Laws 16, ch. 13, § 1 ...............................................................................9

1889 Idaho Laws 23, § 1 ...........................................................................................9

1891 W. Va. Laws 915 ...............................................................................................4

1913 Laws of N.Y., ch. 608 .......................................................................................3

Blackstone, William, Commentaries (1765–1769).....................................................8

Charles, Patrick J., *The Statute of Northampton by the Late Eighteenth Century: Clarifying the Intellectual Legacy*, 41 Fordham Urb. L. J. City Square 10, 21 (2013) ................................... 8

Dallas Tex., Ordinance (1887).....................................................................................4

Davis, James, *The Office and Authority of a Justice of the Peace* 13 (Newbern, James Davis 1774) ................................................................................................................. 8

D.C. Code of 1855 ........................................................................................................5

District of Columbia Organic Act, 2 Stat. 103 (1801).................................................7

Dunlapp, John A., *The New York Justice* (New York 1815) .....................................7

Masterpieces of Eloquence 2569, 2578 (Hazeltine, *et al.* eds. 1905)...........................10

Md. Const. of 1776, art. III, § 1 ..................................................................................7

McKinney, Tex., Ordinance, no. 20 (1899) .................................................................4

Niles, John M., *The Connecticut Civil Officer: In Three Parts*, (2d ed. Hartford, Conn. 1833)... 7

San Antonio, Tex., Ordinance ch. 10 (1899) .............................................................. 4

Tayloe, Benjamin Oble, *In Memoriam: Anecdotes and Reminisces* 95–96 (Washington, D.C., 1872)................................................................................................................. 10

Va. Acts (1869–1870), chap. 349, pt. 510 ................................................................... 9

*Writings of Thomas Jefferson, The* 398 (H. A. Washington ed., 1853)........................ 10

**ARGUMENT**

I.  **THE BALANCE OF EQUITIES TIPS HEAVILY IN FAVOR OF THE DEFENDANTS.**

A plaintiff seeking interim injunctive relief must demonstrate irreparable harm. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). This is a "high standard"—the injury "must be both certain and great," "actual and not theoretical." *Id.* Plaintiffs, however, did not even mention irreparable harm at argument, even after the District raised it as an independent ground to deny the injunction. *See* 2/2/16 Transcript (Tr.) 4–26, 72–75.

It is unlikely plaintiffs have ever lawfully carried a handgun in the District. Possession was largely banned from 1976 to 2008, and public carrying was banned until the current licensing process was enacted in 2014. Yet plaintiffs have not identified a single instance when their inability to carry a handgun caused them injury. Nor do they allege that injury is likely, much less imminent, if they must adhere to the "good reason" standard while their constitutional challenge is litigated.

In contrast, the District will be irreparably harmed, and the public interest obstructed, if it cannot enforce the "good reason" standard. Plaintiffs downplay the importance of the injunction they seek, Tr. 7–8, but the "good reason" standard is critically important. It is an essential—if not the central—component of a system crafted to balance public safety with the needs of individuals particularly at risk. It is the sole issue in this case, as it was in all four Circuit cases addressing similar public carrying laws. *Kachalsky v. Cty. of Westchester*, 701 F.3d 81 (2d Cir. 2012); *Woollard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013); *Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013); *Peruta v. County of San Diego*, 742 F.3d 1144 (9th Cir. 2014), *vacated pending reh'g en banc*, 781 F.3d 1106 (2015). In fact, the Ninth Circuit found it so important to California's licensing regime that it vacated a panel decision striking the standard and granted rehearing *en banc*. *Peruta*, 781 F.3d at 1106. Without the "good reason" standard, the District becomes a

"shall-issue" regime which, the Council found, is associated with substantial increases in aggravated assault, rape, robbery and murder. Defendants' Appendix ("DA") 17. The District has offered this Court considerable evidence that public carrying increases violent crime, makes it more likely that criminals will use handguns, and makes it more difficult for law enforcement to protect the public. DA 133–304.

Even if only a fraction of District residents choose to publicly carry, their ability to do so will radically alter its public spaces. Laws that "make[] the public feel safer" offer "a substantial benefit," *Friedman v. Highland Park*, 784 F.3d 406, 412 (7th Cir. 2015), and the "good reason" standard does more than foster a perception of safety. Unlike possession in a person's home or place of business, public carrying subjects innocent bystanders to the dangers, intentional and accidental, presented by the handgun. District residents, through their elected representatives, have decided based on a solid foundation of empirical and other evidence that allowing public carrying without "good reason" is inconsistent with public safety, and this finding is entitled to deference. *Heller v. District of Columbia*, 670 F.3d 1244, 1269 (D.C. Cir. 2011) (*Heller II*). The Second, Third, and Fourth Circuits concur. *Kachalsky* pointed to studies showing that "widespread access to handguns in public increases the likelihood that felonies will result in death and fundamentally alters the safety and character of public spaces." 701 F.3d at 99. *Drake* credited New Jersey's judgment that, "when an individual carries a handgun in public for his or her own defense, he or she necessarily exposes members of the community to a somewhat heightened risk that they will be injured by that handgun." 724 F.3d at 439. *Woollard* quoted expert testimony of law-enforcement specialists when it listed numerous ways in which Maryland's "good reason" standard "protects citizens and inhibits crime." 712 F.3d at 879–80.

In *Wrenn v. District of Columbia*, No. 15-7057, the D.C. Circuit granted the District's motion to stay an injunction identical to the one sought here—thereby allowing the District to continue enforcing this critical public safety law—because the District had "satisfied the requirements for a stay pending appeal." Order Granting Mot. to Stay (June 29, 2015). These same standards are applicable here and warrant denial of the preliminary relief sought.

## II.   HISTORICAL ANALOGUES TO THE "GOOD REASON" STANDARD ARE NUMEROUS, WIDESPREAD, AND LONGSTANDING.

At argument, this Court asked whether there was "historical precedent for this type of regulatory scheme." Tr. 32. The answer is yes. For more than a century, New York State has banned public carrying without "proper cause" which, in the context of self-defense, is defined as "a special need for self-protection distinguishable from that of the general community or of persons engaged in the same profession." *Kachalsky*, 701 F.3d at 86 (quoting N.Y. Penal Law § 400.00(2)(f); citing 1913 Laws of N.Y., ch. 608, at 1629). This led the Third Circuit to find New Jersey's "justifiable need" standard—a "close analogue" to New York's law—"longstanding" and therefore beyond the scope of the Second Amendment. *Drake*, 724 F.3d at 433, 434. The court rejected an argument that a "longstanding" law had to be in existence "at the time of the adoption of the *Bill of Rights*," noting that "the Supreme Court 'considered prohibitions on the possession of firearms by felons to be "longstanding" although states did not start to enact them until the early 20th century.'" *Id.* at 433–34 (quoting *Heller II*, 670 F.3d at 1253). The court also rejected an argument that, to be "longstanding," the history of a regulation must arise out of the jurisdiction where it is challenged, finding "no hint in the Second Amendment jurisprudence … that the analysis of a particular regulation in a particular jurisdiction should turn entirely on the historical experience of that jurisdiction alone." *Id.* at 434. To find New Jersey's law "longstanding" and therefore beyond the scope of the Second

3

Amendment, it was enough that New York's standard had been in place for more than a century, and New Jersey's standard "ha[d] existed … in some form for nearly 90 years." *Id.* at 432–33.

Other close analogues to the "good reason" standard reach back to the 1800s. In 1871, Texas criminalized all public carrying unless the carrier had "reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing." Everytown Appendix ("EA") 91, 1871 Tex. Laws 1322, art. 6512. The first violation was punishable by fine and forfeiture; the second by incarceration.[1] *Id.* The law did not apply to a person's own "premises" or "place of business," nor in areas designated as "frontier country, and liable to incursions of hostile Indians." EA 91–92, 1871 Tex. Laws 1322, art. 6512, 6515. West Virginia enacted a similar law in 1891, allowing incarceration for the first offense. EA 95, 1891 W. Va. Laws 915, ch. 148, § 7. And, in 1869, New Mexico banned public carrying in all "settlements" of the territory, except when done "in the lawful defense of themselves, their families or their property, *and the same being then and there threatened with danger*." EA 102, 1869 N.M. Laws 312, §§ 1–2 (emphasis added).

Another precursor to the "good reason" standard reaches back even farther in time. From 1836 to 1891, Massachusetts, Wisconsin, Maine, Michigan, Virginia, Minnesota, Oregon, Pennsylvania, West Virginia, Minnesota, and the District enacted laws allowing a person to carry a firearm only if he had "reasonable cause to fear an assault or other injury or violence to his person." DA 318; EA 50–96. The NRA argues that these statutes were "not criminal prohibitions," but "surety laws" that left a guilty party "perfectly free to continue carrying [their]

---

[1]   Some Texas cities, like Dallas, San Antonio, and McKinney, enacted stricter laws, defining "reasonable grounds" as "danger … so imminent and threatening as not to admit of the arrest of the party about to make such attack upon legal process." EA 122, Dallas Tex., Ordinance (1887); EA 129, McKinney, Tex., Ordinance, no. 20 (1899); EA 130–31, San Antonio, Tex., Ordinance ch. 10 (1899).

firearms" during the probationary period so long as they did not "use them to breach the peace or cause injury." Tr. 29–30. But these laws were listed in the *criminal* section of the code, alongside other indisputably criminal acts, such as "threaten[ing] to kill or beat another."[2] Nor does NRA's argument make sense. Finding a surety to secure good behavior was like being released on probation, and failing to find a surety could lead to incarceration. *See*, *e.g.*, EA 51, 1836 Mass. Laws 750 § 6; *see also* EA 57, 60, 63, 67, 90 (similar provisions). That the lawbreaker was, essentially, sentenced to probation did not render his conduct lawful, much less constitute recognition that it was constitutionally protected. Plaintiffs also appear to suggest these laws could not have applied to peaceful carrying because enforcement was triggered by citizen complaint. P.Mem 9. Again, however, the mechanism of enforcement does not render the prohibited conduct lawful, and some states did not even have a citizen-enforcement mechanism. *See*, *e.g.*, 1847 Va. Laws 127, ch. 14, § 16; 1870 W. Va. Laws 702, ch. 153, § 8.

In *Heller II*, the D.C. Circuit found "the basic requirement to register a handgun" "longstanding in American law" because it had been "accepted for a century in diverse states and cities" and was "now applicable to more than one fourth of the Nation by population." 670 F.3d at 1254. It based this holding on laws enacted in New York, Illinois, and Georgia in 1910 and 1911, and several other states over the next 20 years. *Id.* The same circumstances exist here. Laws analogous to the "good reason" standard reach back to the mid-1800s across the United States. A virtually identical law was enacted in New York in 1913, and that law now applies in

---

[2]     *See* DA 318, D.C. Code of 1855 at 570; EA 52, 1836 Mass. Laws 750 §§ 15–16; EA 54, 1838 Wisc. Laws 381, §§ 15–16; EA 55, 1841 Me. Laws 709, ch. 169, §§ 15–16; EA 58, 1846 Mich. Laws 690, ch. 162, §§ 15–16; EA 59, 1847 Va. Laws 127, ch. 14, §§ 15–16; EA 64, 1851 Minn. Laws 526, ch. 112, §§ 17–18; EA 68, 1853 Or. Laws 218, ch. 16, §§ 16–17; EA 71, 1861 Pa. Laws 248, 250, § 6; EA 89, 1870 W. Va. Laws 702, ch. 153, §§ 8–9; EA 94, 1873 Minn. Laws. 1025, §§ 16–17.

New York, New Jersey, Maryland, and California, which make up 23 percent of the population of the United States.  Applying *Heller II*, this Court should conclude the "good reason" standard is longstanding and therefore presumptively lawful. 670 F.3d at 1254.

## III.   THE "GOOD REASON" STANDARD IS CONSISTENT WITH THE PROPER HISTORICAL UNDERSTANDING OF THE RIGHT TO "BEAR ARMS."

A plaintiff can rebut the presumption that a longstanding law is beyond the scope of the Second Amendment "by showing the regulation does have more than a de minimis effect upon his right." *Heller II*, 670 F.3d at 1254. But what is "his right"? It cannot be *any* right—a right beyond the scope of the Second Amendment cannot justify Second-Amendment scrutiny, no matter how severely it is burdened. *See United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010). And it cannot be a right to carry any time he needs a gun for self-defense—*Heller I* identified possession bans for felons and the mentally ill as "presumptively lawful," despite any self-defense need they may have.[3] *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008) (*Heller I*). Thus, "his right" can only mean a right within the scope of the Second Amendment.

Plaintiffs attempt to satisfy this burden by pointing to the plain language of the Second Amendment, arguing that the right to "bear arms" only makes sense if it applies outside of the home. Tr. 9–11. But the District does not challenge this assumption for purposes of this motion. Instead, the District focuses on the narrow question at issue here: whether, at the time the Second Amendment was codified, the right to "bear arms" encompassed a right to carry a handgun in public in a crowded city without a particularized self-defense reason for doing so.

---

[3]      Indeed, plaintiffs admitted they "have no problem" with laws banning carrying in "sensitive places," Tr. 8, and *Heller I* identified these as longstanding and presumptively lawful. 554 U.S. at 626. For people who live and work in those places, however, such restrictions would necessarily impose a more than de minimis burden on the ability to bear arms for self-defense.

6

History demonstrates that this was not a "venerable, widely understood liberty" when the Second Amendment was codified. *See Heller I*, 554 U.S. at 605; *see id.* at 634–35 ("Constitutional rights are enshrined with the scope they were understood to have when the people adopted them."). Early American laws were largely based on the laws of England, and England was governed by the Statute of Northampton, which banned open and concealed public carrying in markets, fairs, and other populated places. EA 1–17. During the Framing era, six of the original thirteen States, as well as the District, were bound by Northampton-style laws. Before the Second Amendment was even codified, Massachusetts, Virginia, and New Hampshire enacted such laws, and Maryland and New Jersey adopted the Statute of Northampton in their common law. EA 20–21, 1694 Mass. Laws 12, no. 6; EA 22, 1786 Va. Laws 33, ch. 21; 1699 N.H. Laws 1; Md. Const. of 1776, art. III, § 1; A Bill for the Office of Coroner and Constable (Mar. 1, 1882) (N.J. Constable Oath). By 1801, North Carolina and Tennessee had enacted similar laws, and the District had adopted Maryland's common law. EA 25–26, 1792 N.C. Laws 60, ch. 3; EA 28, 1801 Tenn. Laws 710, § 6; DA 306–07, District of Columbia Organic Act, 2 Stat. 103 (1801). Maine followed suit in 1821, Delaware in 1852, and South Carolina in 1870. EA 29, 1821 Me. Laws 285, ch. 76, § 1; EA 38, 1852 Del. Laws 330, ch. 97, § 13; EA 105–06, 1870 S.C. Laws 403, no. 288, § 4. Similar prohibitions were in effect through common law in New York and Connecticut. John A. Dunlapp, *The New York Justice* (New York 1815); John M. Niles, *The Connecticut Civil Officer: In Three Parts*, ch. 14 (2d ed. Hartford, Conn. 1833). Because these Northampton-style laws explicitly prohibited "go[ing]" or "rid[ing] armed" in populated areas, where carrying was likely to terrify the public, the right to carry *in cities* could not have been widely understood as a "*pre-existing* right." *See Heller I*, 554 U.S. at 592.

7

Plaintiffs do not dispute that these Northampton-style laws were widespread during the Framing era. Instead, they offer four reasons why these laws could not have banned both open and concealed carrying. *First*, they point to *Heller I*'s reference to the use of firearms for "self-defense," "hunting," and "military training" all of which take place "outside of the home." Tr. 10–11. But this is consistent with the Northampton-style statutes, which applied in the public concourse, not the countryside. William Blackstone likened the Statute to the laws of ancient Greece, where "every Athenian was finable who walked about the city in armour." 4 William Blackstone, Commentaries 148–49 (1765–1769) (citation omitted). "Michael Dalton's *The Countrey Justice*" explains that people in the public concourse "could always seek the assistance of the constable to have 'the Peace against the other persons' enforced." Patrick J. Charles, *The Statute of Northampton by the Late Eighteenth Century: Clarifying the Intellectual Legacy*, 41 Fordham Urb. L.J. City Square 10, 21 (2013). And James Davis wrote that "Justices of the Peace … may apprehend any Person who shall go or ride armed with unusual and offensive Weapons, in an Affray, *or among any great Concourse of the People*." James Davis, *The Office and Authority of a Justice of the Peace* 13 (Newbern, James Davis 1774) (emphasis added). Thus, "[w]hen traveling on unprotected highways or through the unsettled frontier, it would certainly have been common for late eighteenth century Americans to arm themselves." Charles, *supra*, at 26. The District's law does not impose any burden on that right, assuming one exists.

*Second*, plaintiffs argue that the Northampton-style laws could not have imposed a "de facto ban" on carrying because "there would have been no need for states like Virginia and Tennessee to subsequently … ban conceal[ed] carry." Tr. 12. But concealed carry laws began to replace Northampton-style laws in the second half of the 19th century as law enforcement became more structured and less reliant on citizen complaints, sureties, and untrained justices of

the peace. *See, e.g.*, DA 321; Va. Acts (1869–1870), chap. 349, pt. 510. These new laws do not suggest that public carrying was a "venerable, widely understood liberty" half a century earlier.

Moreover, at the same time as some states were enacting concealed-carry bans, many *cities* were banning public carrying altogether. *See* EA 116–31. Plaintiffs note that only four of the twelve cities cited by the District were in "the top 100 population centers." Tr. 74. But, as discussed, many cities had no reason to ban public carrying because longstanding Northampton-style laws at the state level already restricted carrying in the public concourse. And the territories of New Mexico, Wyoming, Arizona, and Idaho banned carrying in *all* cities, towns, and settlements.[4]

*Third*, plaintiffs and their amici argue that Northampton-style laws "actually were prohibitions on carrying firearms with intent to terrorize the people or … cause a breach of the peace." Tr. 28. But, like the Statute of Northampton itself, many of these laws made exception for government officials charged with keeping the peace, which would make no sense if the statute only banned carrying with intent to breach the peace. *See, e.g.*, EA 22, 1786 Va. Laws 33, ch. 21 (excluding "Ministers of Justice") (spelling modernized); EA 25, 1792 N.C. Laws 60, ch. 3 (excluding "the King's servants in his presence, and his Ministers in executing the King's precepts, … and also upon a cry made for arms to keep the peace") (spelling modernized); 2 Edw. 3, 258, ch. 3 (1328) (similar). Instead, carrying was banned in the public concourse *because* it terrified the people. As William Blackstone explained in 1769, "going armed … is a

---

[4]      *See, e.g.*, EA 102, 1869 N.M. Laws 312, § 1 (banning carrying "within any of the settlements"); EA 109, 1875 Wyo. Laws 352, ch. 52, § 1 ("within the limits of any city, town or village"); EA 111, 1889 Ariz. Laws 16, ch. 13, § 1 ("within any settlement, town, village or city"); EA 112, 1889 Idaho Laws 23, § 1 ("within the limits or confines of any city, town or village or in any public assembly").

crime against the public peace, by terrifying the good people of the land; and is particularly prohibited by the statute of Northampton." 4 William Blackstone, *Commentaries* 148–49.

*Fourth*, plaintiffs argue that George Washington, Thomas Jefferson, and John Adams all advocated public carrying. Tr. 12, 74. But context matters. Thomas Jefferson recommended hunting to his nephew as a "species of exercise" because "it gives boldness, enterprise, and independence to the mind," adding "[l]et your gun therefore be the constant companion of your walks."[5] 1 *The Writings of Thomas Jefferson* 398 (letter of August 19, 1785) (H. A. Washington ed., 1853). Northampton-type laws permitted this. John Adams defended Bostonians who used their weapons to suppress "dangerous rioters." John Adams, *First Day's Speech in Defence of the British Soldiers Accused of Murdering Attucks, Gray and Others, in the Boston Riot of 1770, in* 6 Masterpieces of Eloquence 2569, 2578 (Hazeltine, *et al.* eds. 1905). Northampton-type laws permitted this as well. And plaintiffs' evidence that it was George Washington's "custom" to carry his pistol, Tr. 12, comes from a book of anecdotes, tall tales, and jokes—the next page describes Washington joining in a jumping contest for a wife. Benjamin Oble Tayloe, *In Memoriam: Anecdotes and Reminisces* 95–96 (Washington, D.C., 1872). In any event, as the anecdote itself indicates, the road between Alexandria and Mount Vernon was rural, not urban.

The Second Amendment "is the very product of an interest balancing by the people." *Heller I*, 554 U.S. at 635. Those people recognized the need for strict regulation of public carrying in cities and drafted their laws accordingly. A huge segment of the Framing-era population was governed by Northampton-style laws banning carrying in the public concourse because that is where carrying poses the greatest public risk. This interest-balancing was codified in the Second Amendment, and provides context and nuance to the words "bear arms." Because

---

[5]     The full quotations of these three Founding Fathers are attached as Exhibit A.

plaintiffs cannot show that the "good reason" standard imposes a more than *de minimis* burden on their Second Amendment right, the District is likely to succeed on the merits.

## IV.   UNDER ANY LEVEL OF SCRUTINY, THE COURT SHOULD DEFER TO THE COUNCIL'S PREDICTIVE JUDGMENT THAT THE "GOOD REASON" STANDARD IS NECESSARY TO PROTECT PUBLIC SAFETY.

The Council found the "good reason" standard necessary to prevent "substantially higher rates of aggravated assault, rape, robbery and murder." DA 17. Under any level of scrutiny, this finding is entitled to deference. The D.C. Circuit "afford[s] 'substantial deference to the predictive judgments of [the legislature],'" because it is "is far better equipped than the judiciary to make sensitive public policy judgments … concerning the dangers in carrying firearms and the manner to combat those risks." *Schrader v. Holder*, 704 F.3d 980, 990 (D.C. Cir. 2013) (quoting *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 665 (1994) (*Turner I*)) (internal quotation marks omitted). Thus, in reviewing a law under intermediate scrutiny, a court's role is simply to "'assure that, in formulating its judgments, [the legislature] has drawn reasonable inferences based on substantial evidence.'" *Heller II*, 670 F.3d at 1259. And the legislature's expertise in policy matters "is not the sum of the matter"—courts "owe [a legislature's] findings an additional measure of deference out of respect for [its] authority to exercise the legislative power." *Turner Broad. Sys. v. FCC*, 520 U.S. 180, 196 (1997) (*Turner II*). To hold otherwise would "infringe on traditional legislative authority to make predictive judgments when enacting … regulatory policy." *Id.*

Even under strict scrutiny, legislative findings—especially those predicting risks to public safety—are entitled to deference. In *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), the Supreme Court upheld a ban on the provision of "material support" to foreign terrorist organizations, even when it amounted to a content-based restriction on pure speech that advanced only legitimate activities. *Id.* at 28–29. The Court held that Congress was "justified" in

11

"reject[ing] the view that ostensibly peaceful aid would have no harmful effects," *id.* at 29, and that its "assessment … is entitled to deference," *id.* at 33.

The Council based its decision on empirical studies, expert testimony, the evidence relied on by New York, New Jersey, and Maryland legislatures, anecdotal evidence, and common sense. DA 1–19. Plaintiffs dismiss this evidence as "just correlation based," arguing that "[i]t's just impossible to know" whether "there's any causal relationship between gun carriage laws and public safety." Tr. 23. But where evidence is inconclusive, the Court should defer to the *Council's* view, not plaintiffs'. As the Supreme Court explained in *Turner II*, because "[t]he Constitution gives to Congress the role of weighing conflicting evidence in the legislative process," courts "give considerable deference … to Congress' findings and conclusions," even "with respect to conflicting … predictions." 520 U.S. at 199. The D.C. Circuit has held that the Council is entitled to similar consideration: "It is not [the Court's] place … to determine in the first instance whether [a firearm restriction] would promote important law-enforcement objectives." *Heller II*, 670 F.3d at 1269.

Nor is the record limited to evidence relied on by the Council. *See Turner II*, 520 U.S. at 187 (reviewing "materials acquired during Congress' three years of pre-enactment hearings … as well as additional expert submissions, sworn declarations and testimony, and industry documents obtained on remand"); *Heller II*, 670 F.3d at 1259–60 (remanding for additional factual development even after judgment had been entered). The District has already offered considerable evidence supporting the Council's conclusion that the "good reason" standard is necessary to control crime and promote public safety. *See* DA 133–304. And it plans to introduce additional empirical studies and expert testimony after it has had an opportunity to develop a full record. *See Heller v. District of Columbia*, 801 F.3d 264, 272 (D.C. Cir. 2015) (*Heller III*)

(affirming district court's decision to admit testimony of three experts based on their "substantial relevant experience and the sources they cited in support of their conclusions," including "stories, studies, and research").

The government's interest in public safety and crime prevention is "substantial, indeed compelling." *Kachalsky*, 701 F.3d at 97; *see United States v. Salerno*, 481 U.S. 739, 755 (1987). The Council has found right-to-carry laws inconsistent with these compelling interests, and has tailored the District's law to protect the public from substantial increases in violent crime while authorizing the issuance of licenses for those with the most acute self-defense need. Plaintiffs argue that this method is foreclosed by *Heller III*'s rejection of the District's law prohibiting the registration (and thus legal possession) of more than one pistol every thirty days, 801 F.3d at 280. Tr. 21–23, 73. But the "good reason" standard is fundamentally different from that restriction. It imposes no quota or limit on the number of concealed-carry licenses that may be issued. Nor does it burden the core right at the heart of the Second Amendment—the right to keep arms in the home. *See id.* (noting that the one-pistol-per-thirty-day limit "restrict[s] an individual's undoubted constitutional right to keep arms (plural) in his or her home").

## V.   THE DISTRICT HAS ADOPTED CONCRETE AND ARTICULABLE CRITERIA TO ENSURE CONSISTENT APPLICATION OF THE LAW.

To show "good reason to fear injury," an applicant must demonstrate "a special need for self-protection distinguishable from the general community as supported by evidence of specific threats or previous attacks that demonstrate a special danger to the applicant's life." D.C. Code § 7-2509.11(1)(A). "[O]ther proper reason … shall at a minimum include types of employment that require the handling of cash or other valuable objects that may be transported upon the applicant's person." D.C. Code § 7-2509.11(1)(B). To ensure consistent application of this standard, the Metropolitan Police Department has issued regulations requiring an applicant to

"allege, in writing, serious threats of death or serious bodily harm, any attacks on his or her person, or any theft of property from his or her person," and that "the threats are of a nature that the legal possession of a pistol is necessary as a reasonable precaution."[6] 24 DCMR § 2333.2. "The fact that a person resides in or is employed in a high crime area shall not by itself establish a good reason … for the issuance of a concealed carry license." *Id*. § 2333.4. Alternatively, an applicant can demonstrate any "other proper reason" for carrying a handgun in public, such as employment that requires the personal transport of "large amounts of cash or other highly valuable objects" or the need to protect a family member who has "good reason" but "cannot act in defense of himself or herself." 24 DCMR § 2334.1. If the Chief of Police denies an application for a concealed-carry license, the applicant may appeal to the Concealed Pistol Licensing Review Board, 1 DCMR § 1202 (published at 62 D.C. Reg. 11123 (Aug. 10, 2015)), and then "pursue judicial review" if needed, 1 DCMR § 1221.6.

The District modeled the "good reason" standard on similar standards in New York, New Jersey, and Maryland. DA 9. Those laws, like the District's, provide for judicial review, and the case law from those states can provide useful guidance regarding how the standard will be applied here. Maryland courts have affirmed the denial of public-carry permits where someone's job might raise the ire of other people, but had not resulted in direct threats from any named individual.[7] New York courts have affirmed denial of permits where applicants based their concerns on the need to travel through high-crime areas, but the applicants themselves had not

---

[6]     At argument, plaintiffs' counsel identified several circumstances that made Matthew Grace particularly concerned for his safety. Tr. 16. Mr. Grace, however, did not identify any of these in his application for a public-carry license. *See* Exhibit C.

[7]     *See Scherr v. Handgun Permit Review Bd.*, 880 A.2d 1137, 1148–50 (Md. Ct. Spec. App. 2005); *Snowden v. Handgun Permit Review Bd.*, 45 Md. App. 464, 469–70 (Md. Ct. Spec. App. 1980).

been victims of crime. *See Kaplan v. Bratton*, 673 N.Y.S.2d 66, 68–69 (N.Y. App. Div. 1st Dep't 1998); *Matter of Bastiani*, 881 N.Y.S.2d 591, 594 (N.Y. County Ct. 2008). And New Jersey courts have affirmed the denial of a permit where the applicant's job required him to carry substantial sums of money in a high-crime area but, in the twenty years he had done so, he had never been attacked or robbed, *Siccardi v. State*, 284 A.2d 533, 548 (N.J. 1971), and denials for private investigators who could not demonstrate that their duties "present a substantial threat of serious bodily harm" and that carrying "is necessary to reduce" that threat, *In re Preis*, 573 A.2d 148, 152 (N.J. 1990).

At argument, the Court asked whether there was a mechanism by which the public could see the accepted and rejected applications for public carrying licenses, so they could know what types of circumstances are found to constitute "good reason." Tr. 16–17, 33–34, 55–56. Attached is a declaration of Twana V. Smalls, who reviewed all of the applications that were approved as well as most of those that were denied. Smalls Decl., attached as Exhibit B, at 2. Her declaration summarizes the various reasons licenses were issued, while preserving the anonymity of the applicants.[8] Generally, licenses are granted to applicants who have been victims of crime in the past and have reason(s) to believe they will be targeted again by the same people, and to applicants who have been threatened on their own property or place of business. *Id.* at 3–5.

## CONCLUSION

For the foregoing reasons and those set forth in the District's Opposition, plaintiffs' motion for a preliminary and/or permanent injunction should be denied.

---

[8]     Allowing public access to the applications themselves would pose security risks for those involved. As the Fourth Circuit noted in *Woollard*, "criminals often target victims 'precisely because they possess handguns." 712 F.3d at 879.

DATE: February 24, 2016.

Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

ELIZABETH SARAH GERE
Deputy Attorney General
Public Interest Division

/s/ Toni Michelle Jackson
TONI MICHELLE JACKSON (#453765)
Chief, Equity Section

/s/ Andrew J. Saindon
ANDREW J. SAINDON (#456987)
Senior Assistant Attorney General
441 Fourth Street, N.W., Sixth Floor South
Washington, D.C. 20001
Telephone: (202) 724-6643
Facsimile: (202) 730-1470
Email: andy.saindon@dc.gov

/s/ Chad A. Naso
CHAD A. NASO (#1001694)
Assistant Attorney General
441 Fourth Street, N.W., Sixth Floor South
Washington, D.C. 20001
Telephone: (202) 724-7854
Facsimile: (202) 741-8951
Email: chad.naso@dc.gov

/s/ Holly M. Johnson
HOLLY M. JOHNSON (#476331)
Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General
441 4th Street, NW,
Suite 600S
Washington, D.C. 20001
(202) 442-9890
holly.johnson@dc.gov

*Counsel for the District of Columbia*

16