**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| MATTHEW GRACE and | ) | |
| PINK PISTOLS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 15-2234 (RJL) |
| v. | ) | |
| | ) | |
| DISTRICT OF COLUMBIA and | ) | |
| CATHY LANIER, in her official capacity as | ) | |
| Chief of Police for the Metropolitan Police | ) | |
| Department, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' SUPPLEMENTAL BRIEF
IN SUPPORT OF THEIR APPLICATION FOR A
<u>PRELIMINARY AND/OR PERMANENT INJUNCTION</u>**

Charles J. Cooper (Bar No. 248070)
David H. Thompson (Bar No. 450503)
Peter A. Patterson (Bar No. 998668)
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
ccooper@cooperkirk.com

*Attorneys for Plaintiffs*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ........................................................................................................ ii

INTRODUCTION .................................................................................................................1

ARGUMENT.......................................................................................................................1

I. The Second Amendment Fully Protects the Right To Bear Arms in the District...............1

    A. The Second Amendment Extends to Bearing Arms in Public. ...............................1

    B. There Is No Longstanding Tradition of Restricting the Right To Bear Arms
       to a Tiny Subset of Citizens Who Can Establish a "Good Cause" To Exercise
       Their Second Amendment Rights. ........................................................................3

II. The District's Ban Is Categorically Unconstitutional. .........................................................8

III. The District's Ban Fails Any Level of Heightened Constitutional Scrutiny. ....................11

CONCLUSION...................................................................................................................15

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page**

*Cooke v. United States*, 275 F.2d 887 (D.C. Cir. 1960)..............................................3

\* *District of Columbia v. Heller*, 554 U.S. 570 (2008)........................................... *passim*

*Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013) ...............................................................14

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ...................................................9

*Fisher v. University of Texas at Austin*, 133 S. Ct. 2411 (2013) ...................................12

\* *Heller v. District of Columbia ("Heller II")*, 670 F.3d 1244 (D.C. Cir. 2011)...............8, 9, 10, 14

\* *Heller v. District of Columbia ("Heller III")*, 801 F.3d 264 (D.C. Cir. 2015)........................12, 13

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ............................................12

*In re Brickey*, 8 Idaho 597 (1902).................................................................................8

*Kachalsky v. County of Westchester*, 701 F.3d 81 (2d Cir. 2012) ................................14

*McDonald v. City of Chicago*, 561 U.S. 742 (2010)......................................................2

\* *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012)....................................................2, 9

*Nunn v. State*, 1 Ga. 243 (1846)...................................................................................2

*Palmer v. District of Columbia*, 59 F. Supp. 3d 173 (2014)......................................9, 10

*Peruta v. County of San Diego*, 742 F.3d 1144 (9th Cir. 2014) .....................................9

*Rex v. Knight*, 90 Eng. Rep. 330 (K.B. 1689)................................................................4

*Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622 (1994).................................................15

*Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180 (1997).................................................14

*United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013)...............................................9

*Woollard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013) .................................................14

**Statutory Materials and Regulations**

D.C. CODE

    § 7-2509.09(a)...........................................................................................10

    § 7-2509.11(1)(A) .................................................................................10, 13

    § 7-2509.11(1)(B) .........................................................................................11

D.C. MUN. REGS. tit. 24, § 2333.2–.4 .........................................................................10

2 Edw. 3, 258, c. 3 (1328)..............................................................................................4

**Other**

BUREAU OF JUSTICE STATISTICS, CRIMINAL VICTIMIZATION IN THE UNITED STATES, 2008
    STATISTICAL TABLES tbl. 61 (2010), *available at* http://goo.gl/6NAuIB .................................2

U.S. Bureau of the Census, *State & County QuickFacts: District of Columbia* (2015),
http://goo.gl/orLffL .............................................................................................................11

U.S. Bureau of the Census, *Table 11. Population of the 100 Largest Urban Places: 1880* (1998),
http://goo.gl/WbK87R ...........................................................................................................8

## INTRODUCTION

In *District of Columbia v. Heller*, the Supreme Court held that the "very enumeration of the [Second Amendment] right takes out of the hands of government . . . the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." 554 U.S. 570, 634 (2008). Since that decision was handed down, the District has obstinately maintained its view that the right to bear arms is not worth insisting upon. At oral argument it continued to press this view, maintaining that "there is great public risk to public carrying," and that in most cases "the public shouldn't bear that burden." Transcript of Preliminary Injunction Hearing at 59 (Feb. 2, 2016) ("Tr."). But the Second Amendment does not leave that judgment open to the District; it enacts *precisely the opposite* balance into our highest law, elevating the right to bear arms in self-defense "above all other interests." *Heller*, 554 U.S. at 635. The reasons the District has given for its continuing hostility to the Second Amendment right to bear arms fail utterly to justify its current ban, and this Court should strike it down.

## ARGUMENT

### I.     The Second Amendment Fully Protects the Right To Bear Arms in the District.

#### A.     The Second Amendment Extends to Bearing Arms in Public.

At argument, this Court asked whether *Heller* was focused on "safety in the home and self-protection in the home." Tr. 10. This is true to a certain extent, as the specific issue before the Court was whether the District's ban on possessing handguns *in the home* violated the Second Amendment. But the Court's reasoning was that the central component of the Second Amendment is the right to self-defense *generally*, and *therefore* that the District's ban on handguns in the home was unconstitutional. *See, e.g.*, *Heller*, 554 U.S. at 599 ("individual self-defense . . . was the *central component* of the right"); *id*. at 628 ("the inherent right of self-defense has been central to the Second Amendment right"). This is made crystal clear in the lead

1

opinion in *McDonald*, which begins, "Two years ago, in [*Heller*] we held that the Second Amendment protects *the right to keep and bear arms for the purpose of self-defense*, *and* we struck down a District of Columbia law that banned the possession of handguns in the home." *McDonald v. City of Chicago*, 561 U.S. 742, 749–50 (2010) (emphases added).

That the self-defense interest recognized by *Heller* is not cabined to the home is further confirmed by *Heller*'s treatment of *Nunn v. State*, 1 Ga. 243 (1846), which, as *Heller* explained, "struck down a ban on carrying pistols *openly*," *Heller*, 554 U.S. at 612 (emphasis added), because it "construed the Second Amendment as protecting the 'natural right of self-defence,' " *id.* (emphasis omitted) (quoting *Nunn*, 1 Ga. at 251). *Heller* cited *Nunn* approvingly, stating that the opinion "perfectly captured the way in which the operative clause of the Second Amendment furthers the purpose announced in the prefatory clause," *id.*—and it identified Georgia's open carry ban as one of the "[f]ew laws in the history of our nation" that "have come close to the severe restriction [on the Second Amendment] of the District's handgun ban," *id.* at 629.

The foregoing makes clear that, as the Seventh Circuit recognized, "[t]he Supreme Court has decided that the [Second Amendment] confers a right to bear arms for self-defense, which is as important outside the home as inside." *Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012). Indeed, if anything a law-abiding citizen's need to be armed for self-defense is *heightened* when he leaves his home to walk about the District's streets. *See id.* at 937. At argument, the Court asked about statistics comparing crime in the home and crime in public. Tr. 25. According to the latest nationwide data from the Bureau of Justice Statistics, 18.4% of violent crimes occur at or in the victim's home, while 26.5% occur on the street or in a parking lot or garage.[1]

---

[1] BUREAU OF JUSTICE STATISTICS, CRIMINAL VICTIMIZATION IN THE UNITED STATES, 2008 STATISTICAL TABLES tbl. 61 (2010), *available at* http://goo.gl/6NAuIB.

**B.      There Is No Longstanding Tradition of Restricting the Right To Bear Arms to a Tiny Subset of Citizens Who Can Establish a "Good Cause" To Exercise Their Second Amendment Rights.**

At argument the Court inquired whether "a regulatory scheme similar to this one," requiring "a 'good' or 'proper' reason as a basis to permit a person to carry in public" is a longstanding type of restriction on the Second Amendment right. Tr. 63. The answer is plain: both in the District and the rest of the Nation, there is no longstanding tradition of either banning the public bearing of arms entirely or restricting it to a minuscule subset of law-abiding citizens who are able to prove that they have a "good reason" to exercise their Second Amendment rights. This is demonstrated by the District's own history, which has long been one of the most restrictive jurisdictions in the Nation when it comes to gun control laws. With the exception of a cryptic law enacted in 1857 but apparently repealed the following year,[2] the District experimented with three different regulations of public arms-bearing between 1801, when it was officially organized, and 1943, when all public carrying of handguns without a "good" or "proper" reason was first prohibited. *See Cooke v. United States*, 275 F.2d 887, 889 n.3 (D.C. Cir. 1960). None provides the District's current ban any historical support.

1.  The District suggests that as early as 1801 a version of the Statute of Northampton was in force within its limits. Defs.' Opp'n to Pls.' Appl. for a Prelim. and/or Permanent Inj. at

---

[2] In 1857, the District enacted a law apparently forbidding "any person" to "carry or have about their persons any deadly or dangerous weapons" including a "pistol." Defendants' Appendix at DA320 (Jan. 15, 2016), Doc. 19-1. Almost exactly a year later, the District apparently replaced that law with a nearly-identically worded provision forbidding anyone "to carry or have *concealed* about their persons any deadly or dangerous weapons," defined to include an identical list of arms. *Id.* at DA321 (emphasis added). The fact that the expansively-worded 1857 law was so swiftly replaced by one limited to *concealed* carrying—combined with the fact that around the same time the District enacted a surety-style restriction on bearing arms, discussed below, that would have been entirely superfluous had *all* public carrying been illegal—suggests that this short-lived 1857 law was meant only to prohibit *concealed* carrying. In any event, the District does not heavily rely on this 1857 law, so we set it aside.

11 (Jan. 15, 2016), Doc. 20 ("PI Opp."). That statute, however, provides *no support* to its current ban. For as we show in our briefing, far from a flat ban on "carrying in the public concourse," Tr. 46, Northampton was well understood both here and in England to prohibit something far narrower: carrying arms in public *with the evil intent to terrify the people*. *Rex v. Knight*, 90 Eng. Rep. 330 (K.B. 1689) (Holt, C.J.). It bears emphasis that *Heller* itself adopted this limited interpretation of Northampton—as forbidding "terrorizing the people" by carrying "dangerous or unusual weapons," as opposed to firearms that are "in common use" and thus constitutionally protected. 554 U.S. at 623, 627. Moreover, the fact that *Heller* used Northampton's prohibition on *carrying* "dangerous or unusual weapons" as justifying its conclusion that a ban on *possessing* such weapons in the home is a presumptively lawful restriction, *id.*, shows that citizens have the right to *carry* the same arms they have the right to *keep*. *Heller* thus forecloses any interpretation of Northampton as banning the carrying of common firearms such as handguns.

The District and Everytown at argument pointed to Northampton's exceptions for arms-bearing by, *inter alia*, "the King's Servants in his presence, and his Ministers," 2 Edw. 3, 258, c. 3 (1328), suggesting that the exceptions "would make no sense" if the general prohibition on carrying arms required evil intent. Tr. 48, 70. But this inference is far too weak to overcome the *explicit statements* by contemporary jurists and commentators that the statute required intent. Moreover, the existence of these exceptions is easily explained. The District focuses on the clause of Northampton that restricted bearing arms "in fairs, markets, . . . *nor in no part elsewhere*," 2 Edw. 3, 258, c. 3 (1328) (emphasis added), and the authorities we have cited also concentrate on this clause. But the statute *in addition* contained more targeted prohibitions on bearing arms "before the King's justices, or other of the King's ministers," *id.*—restrictions akin to modern limits on carrying firearms in schools or government buildings—and the exceptions

the District points to are easily read as applying to those specific prohibitions, which may not have required intent, rather than the residual "in no part elsewhere" clause.

2.  Around 1857, the District adopted a surety-style regulation of public arms-bearing— what Everytown at oral argument referred to as a "Massachusetts model" law and described as the "most analogous example" of a historical regulation similar to its current ban. Tr. 63. That regulation required any person who bore arms in public to post a deposit or "surety" "for keeping the peace" upon complaint of "any person having reasonable cause to fear an injury or breach of the peace," unless he himself could show that he had "reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property." Defendants' Appendix at DA318 (Jan. 15, 2016), Doc. 19-1 ("DA"). But this and the other surety-style laws adopted during this era are worlds away from the flat ban the District now imposes. To begin, these laws were triggered only when some person who reasonably felt threatened by someone bearing arms in public lodged a complaint. *Id.* Moreover, even if there *was* a reasonable complaint, the individual in question could nonetheless *continue to carry his firearm*, so long as he posted a surety designed to cover the potential costs of any breach of the peace. *Id.* Thus, this law actually allowed the public carriage of arms in all circumstances, though in some cases public arms-bearing was conditioned on the posting of a surety.

The District's surety law was also accompanied by a safe-harbor provision for anyone carrying a firearm because of "reasonable cause to fear an assault or other injury" to himself, his family, or his property. *Id.* Such individuals were allowed to freely carry *regardless* of whether their actions caused some other person to reasonably fear injury. It is this provision that the District attempts to read as precedent for its own "good cause" requirement; but that twists a provision designed to ensure that individuals with a reasonable need for self-defense would not

be subject to *even a marginal* restriction on their right to bear arms into a draconian ban that

prohibits *anyone* from bearing arms *at all* unless they can make this atypical showing.

Finally, it must be noted that the very enactment of this surety law in the mid-nineteenth

century demolishes Defendants' argument that Northampton flatly "banned carrying in the

public concourse," Tr. 46, as well as their attempt to draw a line between Northampton's

applicability in rural and urban areas.  For if an analogue of Northampton was in force within the

District from 1801 onward, and if Defendants' interpretation of that statute were accurate, why

on earth would the District feel the need to enact the *additional*—and *less restrictive*—limits on

public carrying found in its surety-style law? The answer can have nothing to do with the

urban/rural distinction, since, as Defendants repeatedly point out, the District "is entirely urban

and densely populated." PI Opp. 7.

That distinction is also belied by the statements of the Founders themselves. Everytown

suggested at oral argument that we had not produced any "statements by the Founders indicating

that they thought it was permissible to walk down the streets of Philadelphia or Boston or other

major cities armed." Tr. 66. Again, that is simply false. When defending the British soldiers

charged in the Boston Massacre, John Adams conceded that, in this country, "every private

person is authorized to arm himself; and on the strength of this authority I do not deny the

inhabitants had a right to arm themselves at that time for their defence." Mem. of P. & A. in

Supp. of Pls.' Appl. for a Prelim. and/or Permanent Inj. at 16 (Dec. 28, 2015), Doc. 6-1 (quoting

John Adams, *First Day's Speech in Defence of the British Soldiers Accused of Murdering*

*Attucks, Gray and Others, in the Boston Riot of 1770*, *in* 6 MASTERPIECES OF ELOQUENCE 2569,

2578 (Hazeltine et al. eds. 1905)). The Boston Massacre, of course, occurred on "the streets

of . . . Boston," Tr. 66, just in front of the Old State House. If it were well understood that

bearing arms was illegal "in an exclusively urban area at the seat of government," *id.* at 67, surely John Adams would have seized upon this convenient fact in defense of his clients.

3.  In 1858, the District made it illegal for "any person . . . to carry or have concealed about their persons any deadly or dangerous weapons," including a "pistol." DA 321. As with its earlier regulations, the District acted as part of a broader trend among the States when it banned carrying concealed firearms. Far from supporting the District's current ban, however, these limits on carrying concealed weapons underscore why a flat ban on *all* arms bearing *is not* consistent with our traditions. For as *Heller* emphasized, while laws restricting carrying concealed arms were generally understood to be "lawful under the Second Amendment or state analogues," 554 U.S. at 626, that was only true against the background assumption that *openly* bearing arms was freely allowed; and some of the rare laws enacted during this period that banned *all arms bearing of any kind*, as the law challenged here does for typical law-abiding citizens, were struck down as flatly unconstitutional when subject to judicial review, *see id.* at 629.

4.  In 1892, Congress enacted a law making it illegal to carry a concealed handgun in the District, but providing that openly carrying a handgun was illegal only when done "with intent to unlawfully use" the firearm. DA 322. Congress acted again in 1932, this time banning the carriage of concealed handguns without a license. Issuance of a license was subject to a good or proper reason requirement, but the law restricted only a person's right to carry a concealed firearm and did not restrict carrying a firearm openly. DA 325. It was not until 1943 that this restriction on bearing concealed arms was extended to open carrying. DA 329.

5.  Finally, Defendants and Everytown seek to draw support from an odd assortment of territorial laws and city ordinances enacted during the last few decades of the nineteenth century that banned outright bearing arms in public. But these scattered, outlier laws hardly amount to a

longstanding tradition. To begin, these laws were enacted nearly a century after the founding, so any light they shed on the original meaning of the Second Amendment is pale and indirect. What is more, these laws were clearly outside the mainstream of our constitutional tradition. One of the territorial laws cited by Everytown, enacted by Idaho's territorial legislature, was in fact *struck down as inconsistent with the right to bear arms. In re Brickey*, 8 Idaho 597, 609 (1902) ("Under these constitutional provisions, the legislature has no power to prohibit a citizen from bearing arms in any portion of the state of Idaho, whether within or without the corporate limits of cities, towns, and villages."). And the bulk of the city ordinances Everytown cites were not passed by "highly urbanized area[s]" like the District, Tr. 72, but rather by small frontier towns in the Wild West, like Salina, Wichita, and Dodge City. Indeed, only *four* of the cities named by Everytown were in the Census Bureau's 1880 list of the 100 most populous cities in the Nation.[3] The other 96 most populous cities—including New York, Chicago, Boston, and the District itself—allowed public arms bearing of at least some kind during this period.

## II.     The District's Ban Is Categorically Unconstitutional.

Because the District's "good cause" requirement effectively bans ordinary, law-abiding citizens from exercising the right to bear arms, under *Heller* it is flatly unconstitutional. "[T]he enshrinement" of that constitutional right "necessarily takes certain policy choices off the table." *Heller*, 554 U.S. at 636. At oral argument, the Court expressed some concern that the D.C. Circuit's decision in *Heller v. District of Columbia ("Heller II")*, 670 F.3d 1244 (D.C. Cir. 2011), might foreclose this categorical approach—and require the application of "either intermediate or strict scrutiny." Tr. 15. But *Heller II* in fact contemplates the application of *Heller*'s categorical approach here. While the D.C. Circuit did indeed provide that "restriction[s]

---

[3] U.S. Bureau of the Census, *Table 11. Population of the 100 Largest Urban Places: 1880* (1998), http://goo.gl/WbK87R.

*significantly less severe* than the total prohibition of handguns at issue [in *Heller*]" should be subject to one of the tiers of scrutiny, laws that *are not* "significantly less restrictive" than that ban are properly struck down categorically. 670 F.3d at 1266–67 (emphasis added).

Courts in both the Seventh and Ninth Circuits have already travelled this path. While the Seventh Circuit in *Ezell v. City of Chicago* established the familiar "two-part" inquiry that includes application of the "appropriate standard of review [chosen] from among the heightened standards of scrutiny," like *Heller II*, it left open the possibility that "broadly prohibitory laws restricting the core Second Amendment right . . . are categorically unconstitutional." 651 F.3d 684, 703 (7th Cir. 2011). And in *Moore v. Madigan*, a later panel struck down a ban on public carriage in just this way, noting that its reasons for doing so were "not based on degrees of scrutiny." 702 F.3d 933, 941 (7th Cir. 2012). Similarly, while the Ninth Circuit likewise adopted the familiar tiers of scrutiny for most restrictions challenged on Second Amendment grounds, *United States v. Chovan*, 735 F.3d 1127, 1137 (9th Cir. 2013), a later panel noted that this ordinary approach did not apply to "the most severe cases"—where "[a] law effect[s] a '*destruction* of the right' "—which are subject to the "approach used in *Heller* itself." *Peruta v. County of San Diego*, 742 F.3d 1144, 1168 (9th Cir. 2014), *reh'g granted*, 781 F.3d 1106 (9th Cir. 2015).

Perhaps most importantly, this Court *itself* has already applied the exception implicit in *Heller II*. In *Palmer v. District of Columbia*, a challenge to the ban on carrying firearms that preceded the law challenged here, this Court noted that it was bound to "apply the two-step approach that the District of Columbia Circuit set forth in [*Heller II*]." 59 F. Supp. 3d 173, 179 (2014). Based on text, history, and purpose, it held that "carrying a handgun outside the home for self-defense comes within the meaning of 'bear[ing] Arms' under the Second Amendment." *Id.*

at 182 (alteration in original). But at step two, it held that the District's "complete ban on the carrying of ready-to-use handguns outside the home" was flatly unconstitutional, without undertaking any inquiry into the end the District sought to achieve or the plausibility of its predictive judgment that its ban would actually advance its claimed interest. *Id.*

Just like the ban struck down in *Palmer*, the law challenged here simply cannot be called "significantly less restrictive than the outright ban on all handguns invalidated in [*Heller*]." *Heller II*, 670 F.3d at 1267. To be sure, the District has changed its ban by adding an exception for those few citizens who can prove that they have "a special need for self-protection distinguishable from the general community." D.C. CODE § 7-2509.11(1)(A). And as the Court noted at oral argument, it is difficult to discern what type of evidence Defendants will deem sufficient to establish such a "special need," since the District's licensing regime is "a bit of a black box." Tr. 33; *see also* D.C. CODE § 7-2509.09(a) (providing that records regarding persons who have applied for licenses generally are not available under the District's freedom of information law). What is not hidden within a black box, however, is the plain text of Defendant's good-cause requirement and the regulations interpreting it; and those provisions *on their face* bar every typical, law-abiding citizen from bearing arms within the District.

The District's code provides that a law-abiding citizen has a "good reason" to carry a firearm only if she can demonstrate "a *special need for self-protection distinguishable from the general community* as supported by evidence of specific threats or previous attacks that demonstrate a special danger to the applicant's life." *Id.* § 7-2509.11(1)(A) (emphasis added); *accord* D.C. MUN. REGS. tit. 24, § 2333.2–.4. By limiting the right to bear arms to those individuals who can specifically document some threat that *distinguishes* their need for self-defense from that shared by "the general community," these rules *extinguish* the core Second

Amendment rights of the *average* law-abiding citizen—who, by definition, cannot distinguish himself from every other average citizen.[4]

The insignificance of this paltry "good reason" exception to the constitutional analysis is underscored by the tiny number of individuals who have actually been able to prove to Defendants that they have such a good reason. According to the District at oral argument, only 61 applications have been approved under this regime. Tr. 55. That is less than 19% of the 324 applications that have been filed, *id.*—itself a sorry number. But far more significantly, it is only slightly over *one hundredth of one percent* of the roughly 543,000 adults living inside the District[5]—many hundreds if not thousands of whom would very likely apply for a permit to carry a firearm in public were it not clear from the plan text of the licensing law that they have no hope of obtaining one.

It is this requirement—the rationing of the right to bear arms to those who can establish a "good" or "proper" reason for doing so—that Plaintiffs challenge. Plaintiff Matthew Grace does not claim that *he should have obtained* a license under the District's standards. Rather, Plaintiffs' claim is that the District's law is flatly unconstitutional *precisely because* it forecloses the issuance of a license to Mr. Grace and all other typical, law-abiding citizens.

## III.    The District's Ban Fails Any Level of Heightened Constitutional Scrutiny.

Even if such analysis were appropriate, the District's law would fail any potentially applicable level of scrutiny. At oral argument, the District argued that under "both intermediate scrutiny and strict scrutiny," whenever "there are empirical questions that are up in the air, this

---

[4] This is reinforced by the additional authority to grant a license for "any other proper reason . . . , which shall at a minimum include types of employment that require the handling of cash or other valuable objects that may be transported upon the applicant's person." D.C. CODE § 7-2509.11(1)(B). Most people, obviously, do not have such a distinguishing factor.

[5] U.S. Bureau of the Census, *State & County QuickFacts: District of Columbia* (2015), http://goo.gl/orLffL.

Court must defer to the legislature." Tr. 56–57. That is plainly not the law with respect to strict scrutiny. While the District suggested that *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), supports such deference, Tr. 57, that case—which involved the federal ban on providing material support to terrorist organizations—at most holds that the government's "factual inferences" should receive some level of deference in those cases that "implicate[ ] sensitive and weighty interests of national security and foreign affairs." *Humanitarian Law Project*, 561 U.S. at 33–34. Outside that unique and narrow context, as the Supreme Court recently held, "strict scrutiny . . . require[s] a court to examine with care, and *not defer to*" the government's judgment of fit. *Fisher v. University of Texas at Austin*, 133 S. Ct. 2411, 2420 (2013) (emphasis added). Even with respect to intermediate scrutiny, the District's insistence upon deference to its "predictive judgments," Tr. 58, cannot justify its infringement of the right to bear arms.

     1.  To begin, the "predictive judgment" to which the District asks this Court to defer is the simplistic proposition that fewer guns in public means fewer gun crimes. As the District put the point again at oral argument, the *number* of people carrying firearms in public must be restricted because "the District has . . . determined that there is great public risk to public carrying." *Id.* at 59. That judgment is simply *illegitimate* and cannot be accepted by this Court even if it were supported by indisputable social science, for the government simply cannot *target for outright elimination* the core exercise of a constitutional right in this way.

     That is the clear holding of the D.C. Circuit's recent decision in *Heller v. District of Columbia ("Heller III")*, 801 F.3d 264 (D.C. Cir. 2015). That case struck down the District's prohibition on registering "more than one pistol per registrant during any 30-day period." *Id.* at 280. As here, the District defended that ban as designed to "promote public safety by limiting the number of guns in circulation," based on its theory "that more guns lead to more gun theft, more

gun accidents, more gun suicides, and more gun crimes." *Id.* But the D.C. Circuit rejected the District's more-guns, more-crime syllogism as flatly contrary to "an individual's undoubted constitutional right to keep arms (plural) in his or her home." *Id.* "[T]aken to its logical conclusion," the D.C. Circuit recognized, "that reasoning would justify a total ban on firearms kept in the home," and so it simply cannot be right. *Id.* So too here. Taken to the natural destination of its logic, the District's suggestion that the right to bear arms in public must be *rationed* to all but a precious few because "there is great public risk to public carrying," Tr. 59, would just as easily "justify a total ban" on bearing arms in public. Indeed, that is exactly what the District tried to do before this Court rejected that attempt in *Palmer*. Its new attempt to suppress the exercise of the fundamental right to bear arms is just as illegitimate.

The District attempts to sweep this binding language from *Heller III* to the side, suggesting that "there is no quota here." *Id.* But that is simply wrong; the District's "good reason" requirement operates as a quota in any meaningful sense of that term. By doling out the right to bear arms only to those few individuals who can "*distinguish[ ] . . . [themselves] from the general community,*" D.C. CODE § 7-2509.11(1)(A) (emphasis added), the District's "good reason" requirement deliberately operates as limit on the total amount of pubic carrying it will allow. And for the same reason, the District is also wrong to suggest that "[i]f 90 percent of the people had their various different, special reasons, then 90 percent of the people could carry a handgun." Tr. 59.  Whether 61 law-abiding District residents have a specific, and documented need for self-defense or all 543,000 do, by simple logic only a small percentage of the entire population will be able to show that their need is "*distinguishable from the general community.*" D.C. CODE § 7-2509.11(1)(A) (emphasis added).

13

The District also repeatedly has "urge[d] this Court to look at *Kachalsky*, *Woollard*, and *Drake*," Tr. 53, three decisions that have upheld limitations on carrying firearms similar to the District's. Binding precedent forecloses this Court from following those three out-of-circuit decisions because each of them rests on the reasoning that the D.C. Circuit expressly rejected in *Heller III*—that the Constitution allows the government to seek to reduce gun violence simply by reducing the number of guns in the hands of law-abiding citizens. *See Drake v. Filko*, 724 F.3d 426, 439 (3d Cir. 2013); *Woollard v. Gallagher*, 712 F.3d 865, 879 (4th Cir. 2013); *Kachalsky v. County of Westchester*, 701 F.3d 81, 98–99 (2d Cir. 2012).[6] As we noted at oral argument, this Court simply would not entertain the suggestion that the District could do away with or seek to suppress the exclusionary rule or the right to a *Miranda* warning, so long as it produced ironclad social-scientific evidence that these steps would materially reduce crime. So too here.

2.  Even setting this threshold objection aside, the District is simply not entitled to the overwhelming level of deference it claims. The principal authority the District seeks to marshal is *Turner Broad. Sys., Inc. v. FCC ("Turner II")*, 520 U.S. 180, 195–96 (1997). While *Turner II* does include language suggesting that under intermediate scrutiny "courts must accord substantial deference to the predictive judgments of Congress," the Court also made clear that it gave "special significance" to the respect owed the legislature's predictions in that case because it involved "congressional judgments concerning regulatory schemes of inherent complexity and assessments about the likely interaction of industries undergoing rapid economic and technological change." *Id.* at 195–96. Regulation of cable television was still new in the 1990s,

---

[6] *Drake*'s erroneous, alternative conclusion that New Jersey's "justifiable need" standard was longstanding and therefore immune from Second Amendment scrutiny, *see* 724 F.3d at 431–44, is independently foreclosed by *Heller II*'s holding that the presumption of constitutionality attending longstanding laws may be rebutted "by showing the regulation does have more than a de minimis effect" on the plaintiff's Second Amendments rights, 670 F.3d at 1253.

and where, as in that context, the government seeks to regulate an emergent industry without the benefit of any real social science or empirical data, deferring to the legislature's "predictive judgments" makes some sense. But even in that context, as *Turner I* emphasizes in language that the District does *not* quote, this deference does "not foreclose [a court's] independent judgment of the facts bearing on an issue of constitutional law." *Turner Broad. Sys., Inc. v. FCC ("Turner I")*, 512 U.S. 622, 666 (1994).

That is not this case. Law-abiding citizens have been bearing arms for self-defense in America since colonial times, and social-scientists have accrued a wealth of data studying the effects on violent crime accomplished by various different restrictions on carrying firearms. As established by the independent, comprehensive expert reviews conducted by the National Research Council and the Centers for Disease Control, the only thing that is clear from this body of research is that it *cannot be proven* that restricting carriage of arms in public causes any tangible reduction in gun crime. Indeed, this conclusion is so well established that the District itself concedes that "it is not possible to determine that there is a causal link between the passage of right-to-carry laws and crime rates." PI Opp. 30 (quoting Abhay Aneja, John J. Donohue III, & Alexandria Zhang, *The Impact of Right to Carry Laws and the NRC Report* 80 (Dec. 1, 2014) (unpublished manuscript)). Because that is so, the District's "predictive judgment" that restricting the right to carry *will* cause a reduction in crime is not a judgment "based on substantial evidence," *Turner I*, 512 U.S. at 666; it is a judgment *in spite of* the available evidence. Nothing in the *Turner* decisions requires deference to such a judgment.

## CONCLUSION

For the foregoing reasons, this Court should enjoin Defendants from enforcing their unconstitutional ban on the right of ordinary law-abiding citizens to bear arms.

Dated:  February 24, 2016

Respectfully submitted,

<u>s/ Charles J. Cooper</u>
Charles J. Cooper (Bar No. 248070)
David H. Thompson (Bar No. 450503)
Peter A. Patterson (Bar No. 998668)
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
ccooper@cooperkirk.com

*Attorneys for Plaintiffs*