# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

BRIAN WRENN, *et al.*,
       Plaintiffs

     v.

DISTRICT OF COLUMBIA, *et al.*,
       Defendants

Civil Action No. 15-162 (CKK)

## MEMORANDUM OPINION and ORDER
(March 7, 2016)

In this case, Plaintiffs Brian Wrenn, Joshua Akery, Tyler Whidby, and the Second

Amendment Foundation, Inc., challenge several provisions of the District of Columbia's

licensing scheme for carrying handguns in public, including the permissive nature of the scheme

and the "good reason/other proper reason" requirement for obtaining a concealed carry handgun

license. Plaintiffs claim that the challenged requirements violate their rights under the Second

Amendment to the Constitution to "keep and bear Arms." Before the Court is Plaintiffs' [6]

Motion for Preliminary Injunction. Plaintiffs ask the Court to enter an order enjoining

Defendants District of Columbia and Cathy Lanier, Chief of Police of the District of Columbia's

Metropolitan Police Department, from enforcing the "good reason/other proper reason"

requirement against the individual Plaintiffs and against the members of the Second Amendment

Foundation and from denying a concealed carry license to anyone who satisfies the applicable

statutory criteria for such licenses, such as those pertaining to the suitability of the license holder,

as explained in further depth below.

Upon consideration of the pleadings,[1] the relevant legal authorities, and the record for purposes of this motion, the Court DENIES Plaintiffs' [6] Motion for Preliminary Injunction. The Court concludes that, even assuming without deciding for the purposes of this motion *alone* that the Second Amendment includes a right to carry arms publicly in the District of Columbia,[2] Plaintiffs have not met their burden of showing a likelihood of success on the merits. With respect to the other equitable factors the Court must consider in evaluating a motion for a preliminary injunction, the Court concludes that Plaintiffs have satisfied the irreparable harm factor in light of their allegation of a constitutional violation, but that Plaintiffs have not met their burden of showing that the equities tip in their favor or that the issuance of an injunction would be in the public interest. Upon assessing these four factors taken together, the Court determines that Plaintiffs have not met their burden of showing that a preliminary injunction is warranted.

---

[1] The Court's consideration has focused on the following documents:

- Pls.' Mot. for Preliminary Injunction ("Pls.' Mot."), ECF No. 6;
- Defs.' Opp'n to Pls.' Mot. ("Defs.' Opp'n"), ECF No. 48;
- Pls.' Mem. of Points & Auth. in Reply to Defs.' Opp'n ("Pls.' Reply"), ECF No. 51; and
- Defs.' Surreply, ECF No. 53.

In addition, the Court acknowledges the amicus briefs of Everytown for Gun Safety ("Everytown Amicus Br."), ECF No. 49, and the Brady Center to Prevent Gun Violence ("Brady Amicus Br."), ECF No. 47, both in support of Defendants.

In an exercise of its discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision. *See* LCvR 7(f). The Court notes that, because Plaintiffs raised arguments in their Reply brief that they had not raised earlier, the Court provided Defendants a short additional period to respond to those arguments in a surreply. The Court finds that doing so is in the interest of justice and will not prejudice the parties. *See* LCvR 65.1(d).

[2] The Court reiterates: this assumption has no implications regarding the merits of the arguments regarding the scope of rights under Second Amendment.

# I. BACKGROUND

The Court provides a brief review of the background necessary to resolve the pending motion for a preliminary injunction. Pursuant to District of Columbia law, "[n]o person shall carry within the District of Columbia either openly or concealed on or about their person, a pistol, without a license issued pursuant to District of Columbia law, or any deadly or dangerous weapon."[3] D.C. Code § 22-4504(a). A "pistol" is defined as "any firearm originally designed to be fired by use of a single hand or with a barrel less than 12 inches in length." *Id.* § 7-2501.01(12); *see id.* § 22-4501(6) (cross-reference). The terms "pistol" and "handgun," therefore, are used interchangeably in this opinion. Under the following provision of the District of Columbia Code, which became effective on June 16, 2015, the Chief of Police may now issue licenses for the concealed carrying of handguns in public:

> The Chief of the Metropolitan Police Department ("Chief") *may*, upon the application of a person having a bona fide residence or place of business within the District of Columbia, or of a person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his or her person issued by the lawful authorities of any State or subdivision of the United States, issue a license to such person to carry a pistol concealed upon his or her person within the District of Columbia for not more than 2 years from the date of issue, *if it appears that the applicant has good reason to fear injury to his or her person or property or has any other proper reason for carrying a pistol*, and that he or she is a suitable person to be so licensed.

---

[3] A person with a valid firearm registration is not barred from carrying that firearm in the following circumstances:

> (1) Within the registrant's home;
>
> (2) While it is being used for lawful recreational purposes;
>
> (3) While it is kept at the registrant's place of business; or
>
> (4) While it is being transported for a lawful purpose as expressly authorized by District or federal statute and in accordance with the requirements of that statute.

D.C. Code § 22-4504.01. Similarly, D.C. law allows the transportation of firearms subject to certain conditions not relevant here. *See id.* § 22-4504.02.

D.C. Code § 22-4506(a) (emphasis added). It is the permissive nature of the licensing scheme and the penultimate condition to the licensing scheme—both italicized above—that are challenged in this action. For reasons of verbal economy and simplicity, the Court refers to the penultimate combined licensing condition as the "good reason/other proper reason" requirement or simply as the "good reason" requirement. District of Columbia law further instructs the Chief of Police to develop rules to implement the licensing provision. *Id.* § 7-2509.11. Among other categories of rules the Chief of Police is mandated to develop, the Chief of Police must "establish criteria for determining when an applicant has" satisfied the criteria stated in section 22-4506(a). With respect to the requirement that an applicant has "[d]emonstrated a good reason to fear injury to his or her person," those rules "shall *at a minimum* require a showing of a special need for self-protection distinguishable from the general community as supported by evidence of specific threats or previous attacks that demonstrate a special danger to the applicant's life." *Id.* § 7-2509.11(1)(A) (emphasis added). With respect to the alternative requirement that an applicant has "[d]emonstrated any other proper reason for carrying a concealed pistol," those rules "shall *at a minimum* include types of employment that require the handling of cash or other valuable objects that may be transported upon the applicant's person." *Id.* § 7-2509.11(1)(B) (emphasis added).

Pursuant to the parameters for the licensing scheme stated in the D.C. Code, Chief of Police Cathy Lanier issued the following regulations elucidating the requirement of "good reason to fear injury to person or property":

§ 2333.1    A person shall demonstrate a good reason to fear injury to his or her person by showing a special need for self-protection distinguishable from the general community as supported by evidence of specific threats or previous attacks which demonstrate a special danger to the applicant's life.

4

§ 2333.2        For the purposes of satisfying the specifications of § 2333.1, a person shall allege, in writing, serious threats of death or serious bodily harm, any attacks on his or her person, or any theft of property from his or her person. The person shall also allege that the threats are of a nature that the legal possession of a pistol is necessary as a reasonable precaution against the apprehended danger.

§ 2333.3        The person shall provide all evidence of contemporaneous reports to the police of such threats or attacks, and disclose whether or not the applicant has made a sworn complaint to the police or the courts of the District of Columbia concerning any threat or attack.

§ 2333.4        The fact that a person resides in or is employed in a high crime area shall not by itself establish a good reason to fear injury to person or property for the issuance of a concealed carry license.

D.C. Mun. Regs., tit. 24, § 24-2333.1-4 (2015); *see* 62 D.C. Reg. 9781 (July 17, 2015). The

Chief of Police also promulgated the following regulation elucidating the "other proper reason"

alternative criterion:

A person may allege any other proper reason that the Chief may accept for obtaining a concealed carry license which may include:

(a)      Employment of a type that requires the handling of large amounts of cash or other highly valuable objects that must be transported upon the applicant's person; or

(b)      The need for a parent, son, daughter, sibling, or other adult member of the immediate family to provide protection of a family member who is physically or mentally incapacitated to a point where he or she cannot act in defense of himself or herself, and the family member who is physically or mentally incapacitated can demonstrate a good reason to fear injury to his or her person by showing a special need for self-protection distinguishable from the general community as supported by evidence of specific threats or previous attacks which demonstrate a special danger to the applicant's life in the manner described in § 2333.

D.C. Mun. Regs., tit. 24, § 24-2334 (2015); *see* 62 D.C. Reg. 9781 (July 17, 2015). These

requirements are further implemented through the Concealed Carry Pistol Application developed

by the Metropolitan Police Department. *See* Pls.' Mot., Ex. 6; *see also* "Applying for a

Concealed Carry Pistol License," Metropolitan Police Department website, available at

http://mpdc.dc.gov/page/applying-concealed-carry-pistol-license (including links to application and associated instructions) (last visited March 2, 2016).

Essentially, the individual Plaintiffs—who are members of the Second Amendment Foundation—claim that they were denied concealed carry pistol licenses on the basis that they did not demonstrate "good reason to fear injury" or "other proper reason" to justify such a license. *See* Pls.' Mot. at 6-9 (citing attached declarations). In addition, Plaintiffs state that other members of the Second Amendment Foundation would qualify for a concealed carry license but for the good reason/other proper reason requirement and that they have refrained from applying for concealed carry licenses because they believe that doing so would be futile in light of the applicable legal requirements. *See* Pls.' Mot., Declaration of Alan Gottlieb, ECF No. 6-11, ¶ 7.

In this case, Plaintiffs argue that three aspects of the licensing scheme violate what they claim is their Second Amendment right to carry handguns in public in the District of Columbia: (1) the permissive nature of the scheme—that the Chief of Police *may* issue a license rather than being required to issue a license (e.g., "shall issue") upon an applicant's satisfaction of the relevant statutory and regulatory criteria; (2) the good reason/other proper reason requirement; and (3) the rules promulgated to elucidate the good reason/other proper reason requirement, including those mandated by the applicable D.C. Code provisions, *see* D.C. Code § 7-2509.11, and those promulgated by the Chief of Police, *see* D.C. Mun. Reg., tit. 24, §§ 24-2333, 2334. Compl. ¶ 40. Plaintiffs claim that these requirements are unconstitutional on their face and as applied to the individual Plaintiffs and to other members of the Second Amendment Foundation that would qualify for a concealed carry license were it not for the good reason/other proper reason requirement. *Id.*

Through Plaintiffs' motion for a preliminary injunction, they ask the Court to enter the following two-pronged injunction:

> [1] Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, are enjoined from denying handgun carry licenses to applicants who meet the requirements of D.C. Code § 22-4506(a) and all other current requirements for the possession and carrying of handguns under District of Columbia law; moreover,

> [2] Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, are enjoined from enforcing the requirement of D.C. Code § 22-4506(a) that handgun carry license applicants have a "good reason to fear injury to his or her person or property or has any other proper reason for carrying a pistol," including, but not limited to, the manner in which that requirement is defined by D.C. Code § 7-2509.11 and 24 D.C.M.R. §§ 2333.1, 2333.2, 2333.3, 2333.4 and 2334.1, against Brian Wrenn, Joshua Akery, Tyler Whidby, and other [Second Amendment Foundation] members.

Pls.' Mot., Proposed Order, ECF No. 6-12. In essence they seek first to enjoin Defendants from enforcing the good reason/other proper reason requirement (as implemented in the District's regulations) against the individual Plaintiffs and against other members of the Second Amendment Foundation. They also seek to enjoin Defendants from denying a concealed carry license pistol application upon a showing that *any applicant* satisfies the requirements that remain applicable to them, including those requirements regarding the applicant's suitability,[4]

---

[4] Under the regulation promulgated pursuant to D.C. Code § 24-5406(a), a "person is suitable to obtain a concealed carry license" if that person meets all of the following requirements:

> (a)     Meets all of the requirements for a person registering a firearm pursuant to the Act;

> (b)     Has completed a firearms training course, or combination of courses, conducted by an instructor (or instructors) certified by the Chief;

> (c)     Is not presently an alcoholic, addict, or habitual user of a controlled dangerous substance, unless the habitual use of a controlled dangerous substance is under licensed medical direction;

place of residence, and licensure in other jurisdictions. In short, under the injunction sought by

Plaintiffs, the good reason/other proper reason requirement would not apply to the individual

Plaintiffs or to members of the Second Amendment Foundation; but it would apply to other

applicants. With respect to all applicants, as a result of the injunction Plaintiffs seek, Defendants

would be required to issue a license to any applicant upon a showing of compliance with the

applicable requirements, such as suitability, place of residence, and licensure in other

jurisdictions; that is, Defendants could not refuse to issue a license once an applicant has shown

that they have met all of those requirements.

Previously, Senior Judge Frederick J. Scullin, Jr., of the Northern District of New York,

was assigned to this case and issued the preliminary injunction sought by Plaintiffs. *See Wrenn v.

D.C.*, 107 F. Supp. 3d 1, 14 (D.D.C. 2015) *vacated*, 808 F.3d 81 (D.C. Cir. 2015). That injunction

was vacated by the D.C. Circuit Court of Appeals in light of its conclusion that the assignment of

the case to Judge Scullin exceeded his jurisdictional authority under the applicable statutory

provisions. *See Wrenn v. D.C.*, 808 F.3d 81, 84 (D.C. Cir. 2015). Upon the issuance of the Court

of Appeals' mandate, this case was reassigned to this undersigned judge on February 9, 2016.

The Court provided the parties an opportunity to supplement and replace their original briefing

---

(d)      Has not exhibited a propensity for violence or instability that may
reasonably render the person's possession of a concealed pistol a danger to the
person or another; and

(e)      Does not currently suffer nor has suffered in the previous five (5) years
from any mental disorder, illness or condition that creates a substantial risk that he
or she is a danger to himself or herself or others, or if the Chief has determined
that the person is suitable based upon documentation provided by the person
pursuant to § 2337.3.

D.C. Mun. Regs., tit. 24, § 24-2335 (2015); *see* 62 D.C. Reg. 9781 (July 17, 2015). Plaintiffs do
not challenge these requirements in this action.

regarding the pending motion, and that briefing was complete as of March 2, 2016. The motion

for preliminary injunction is now ripe for resolution.

## II. LEGAL STANDARD

"A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a

clear showing that the plaintiff is entitled to such relief.' " *Sherley v. Sebelius*, 644 F.3d 388, 392

(D.C. Cir. 2011) (quoting *Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22 (2008)); see*

*also Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) ("[A] preliminary injunction is an

extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear*

*showing,* carries the burden of persuasion." (emphasis in original; quotation marks omitted)). "A

plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the

merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that

the balance of equities tips in his favor, and [4] that an injunction is in the public interest."

*Aamer v. Obama,* 742 F.3d 1023, 1038 (D.C. Cir. 2014) (quoting *Sherley,* 644 F.3d at 392

(quoting *Winter,* 555 U.S. at 20) (alteration in original; quotation marks omitted)). " 'When

seeking a preliminary injunction, the movant has the burden to show that all four factors, taken

together, weigh in favor of the injunction.' " *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir.

2014) (quoting *Davis v. Pension Benefit Guar. Corp., 571 F.3d 1288, 1292 (D.C. Cir. 2009)).

"The four factors have typically been evaluated on a 'sliding scale.' " *Davis,* 571 F.3d at 1291.

Under this sliding-scale framework, "[i]f the movant makes an unusually strong showing on one

of the factors, then it does not necessarily have to make as strong a showing on another factor."

*Id.* at 1291-92.

The Court notes that it is not clear whether this Circuit's sliding-scale approach to

assessing the four preliminary injunction factors survives the Supreme Court's decision in

*Winter. See Save Jobs USA v. U.S. Dep't of Homeland Sec.*, 105 F. Supp. 3d 108, 112 (D.D.C.

2015). Several judges on the D.C. Circuit Court of Appeals have "read *Winter* at least to suggest

if not to hold 'that a likelihood of success is an independent, free-standing requirement for a

preliminary injunction.'" *Sherley*, 644 F.3d at 393 (quoting *Davis*, 571 F.3d at 1296 (concurring

opinion)). However, the Court of Appeals has yet to hold definitively that *Winter* has displaced

the sliding-scale analysis. *See Sherley*, 644 F.3d at 393; *see also Save Jobs USA*, 105 F. Supp. 3d

at 112. In any event, this Court need not resolve the viability of the sliding-scale approach today

as the Court determines that "a preliminary injunction is not appropriate even under the less

demanding sliding-scale analysis." *Sherley*, 644 F.3d at 393.[5]

### III. DISCUSSION

The Court now applies the four-factor analysis for evaluating a motion for preliminary

injunction as stated above. The Court, in turn, considers (1) Plaintiffs' likelihood of success on

the merits, (2) the likelihood of irreparable harm, (3) the balance of the equities, and (4) whether

an injunction is in the public interest. *See Aamer*, 742 F.3d at 1038. Each side in this case

contends that *each* of the four factors weighs in its favor. The Court begins with the first prong,

the likelihood of success on the merits.

---

[5] The Court also notes that Defendants argue that a heightened standard applies because this case
concerns a "mandatory" rather "prohibitory" injunction and because Plaintiffs seek to change,
rather than maintain, the status quo. (Plaintiffs contest these characterizations.) This Circuit has
yet to adopt—or to reject—the applicability of a heightened standard. *See Davis v. Billington*, 76
F. Supp. 3d 59, 69 n.15 (D.D.C. 2014). In any event, because the Court finds that Plaintiffs have
failed to satisfy the unmodified standard for preliminary injunctions, there is no need to consider
the consequences of applying a heightened standard for "mandatory injunctions" in these
circumstances.

## A.  Likelihood of Success on the Merits

In *Heller v. District of Columbia* ("*Heller II*"), the D.C. Circuit Court of Appeals adopted a "two-step approach to determining the constitutionality of the District's gun laws," noting a similar scheme had been adopted by other circuits. 670 F.3d 1244, 1252 (D.C. Cir. 2011) (citing cases); *see also Heller v. District of Columbia* ("*Heller III*"), 801 F.3d 264, 272 (D.C. Cir. 2015). The Court of Appeals described the framework as follows: "We ask first whether a particular provision impinges upon a right protected by the Second Amendment; if it does, then we go on to determine whether the provision passes muster under the appropriate level of constitutional scrutiny." *Heller II*, 670 F.3d at 1252. In turn, to determine whether a provision impinges on a right protected by the Second Amendment, a court must identify whether a particular regulation is "longstanding," which would then be "presumed not to burden conduct within the scope of the Second Amendment." *Id.* at 1253. However, "[a] plaintiff may rebut this presumption by showing the regulation does have more than a de minimis effect upon his right." *Id.* This Court is bound to apply that framework to the challenges raised in this action.

The parties vigorously dispute the history of regulations pertaining to the public carrying of arms, spanning from the English Statute of Northampton of 1328 to regulations from early American history and beyond. Defendants argue that—even if the Second Amendment has some application outside the home—the regulatory scheme in question is beyond the scope of the Second Amendment. The Court need not wade into that contentious dispute today. In order to resolve this matter in an expeditious manner, the Court will assume, without deciding, solely for the purposes of resolving the pending motion and without suggesting anything about the underlying merits, that the Second Amendment protects a right to carry arms publicly in the District of Columbia. The Court does so because, even if the Second Amendment's protections are applicable to that extent, the Court concludes that Plaintiffs have not met their burden of

11

showing a likelihood of success on the merits. As such, the Court will reserve any consideration

of the scope of the Second Amendment, insofar as necessary, for a later date when the Court

considers this case on the merits.[6]

### 1. Level of Scrutiny to Apply

As explained above, upon concluding that a particular regulatory provision "impinges

upon a right protected by the Second Amendment"—as the Court assumes without deciding

here—the Court must then "determine whether the provision passes muster under the appropriate

level of constitutional scrutiny." *Heller II*, 670 F.3d at 1252. Guided by the Court of Appeals'

analysis in *Heller II* and persuaded by the thorough analysis of other "good reason" licensing

schemes that has been conducted by other Circuit Courts of Appeals, this Court concludes that,

insofar as the challenged requirements of the District's licensing scheme impinge on a Second

Amendment right, those requirements warrant intermediate scrutiny.

In *Heller II*, the D.C. Circuit Court of Appeals considered a series of gun registration

requirements that it described as "mak[ing] it considerably more difficult for a person lawfully to

acquire and keep a firearm, including a handgun, for the purpose of self-defense in the home—

the 'core lawful purpose' protected by the Second Amendment." *Id.* at 1255 (quoting *District of

Columbia v. Heller* ("*Heller I*"), 554 U.S. 570, 630 (2008)). The D.C. Circuit explained that the

"level of scrutiny applicable under the Second Amendment surely 'depends on the nature of the

---

[6] Taking this path through the issues presented is not breaking new ground. *See Woollard v. Gallagher*, 712 F.3d 865, 876 (4th Cir. 2013) ("We hew to a judicious course today, refraining from any assessment of whether Maryland's good-and-substantial-reason requirement for obtaining a handgun permit implicates Second Amendment protections. That is, we merely assume that the *Heller* right exists outside the home and that such right of Appellee Woollard has been infringed. We are free to make that assumption because the good-and-substantial-reason requirement passes constitutional muster under what we have deemed to be the applicable standard—intermediate scrutiny.")

conduct being regulated and the degree to which the challenged law burdens the right.' " *Id.*
1257 (quoting *United States v. Chester*, 628 F.3d 673, 682 (4th Cir. 2010) and citing cases). After
canvassing other sources of authority regarding the choice of the level of scrutiny to apply, the
D.C. Circuit concluded that intermediate scrutiny was warranted for the gun registration laws in
question because they did not "prevent[] an individual from possessing a firearm in his home or
elsewhere, whether for self-defense or hunting, or any other lawful purpose." *Id.* at 1258. It is
notable that the D.C. Circuit concluded that intermediate scrutiny was warranted for gun
registration laws which did not impinge on the ability of individuals to keep a firearm "for the
purpose of self-defense in the home—the 'core lawful purpose' protected by the Second
Amendment." *Id.* at 1255. This Court concludes that the same level of scrutiny is appropriate for
the regulations at issue in this case, whether or not the ability to carry handguns in public is
considered part of the "core lawful purpose" protected by the Second Amendment. Moreover, the
Supreme Court described the "home" in *Heller I* as the place "where the need for defense of self,
family, and property is most acute," 554 U.S. at 628. The D.C. Circuit has reiterated this
emphasis on the home, stating that "at the core of the Second Amendment is 'the right of law-
abiding, responsible citizens to use arms in defense of hearth and home.' " *Schrader v. Holder*,
704 F.3d 980, 988 (D.C. Cir. 2013) (quoting *Heller I*, 554 U.S. at 635). Those descriptions give
strong support to the conclusion that the level of scrutiny for regulations governing *public*
carrying of handguns, including the good reason requirement at issue here, merit no higher level
of scrutiny than the intermediate scrutiny wielded by the D.C. Circuit in *Heller II* and *Heller III*.

In this case, the Court is considering a licensing scheme that restricts the ability of people
to carry handguns in public within the 68 square miles of the District of Columbia, but is in no
way a blanket prohibition on doing so. *Cf. Moore v. Madigan*, 702 F.3d 933, 941-42 (7th Cir.

2012) (holding unconstitutional Illinois's "uniquely sweeping ban" on carrying firearms in public, characterized as "the most restrictive gun law of any of the 50 states"). Because the Court is considering regulations on carrying firearms outside the home, rather than a prohibition on doing so, the Court concludes that intermediate scrutiny is the appropriate level of scrutiny. Indeed, three other Circuit Courts of Appeals have similarly concluded that intermediate scrutiny is appropriate for "good reason" licensing schemes, if any level of scrutiny is warranted at all. *See Drake v. Filko*, 724 F.3d 426, 435 (3d Cir. 2013) (applying intermediate scrutiny to New Jersey's "justifiable need" requirement); *Woollard v. Gallagher*, 712 F.3d 865, 876 (4th Cir. 2013) (applying intermediate scrutiny to "good-and-substantial-reason requirement for obtaining Maryland handgun permit"); *Kachalsky v. Count of Westchester*, 701 F.3d 81, 96-97 (2d Cir. 2012) (applying intermediate scrutiny to New York State's "proper cause" requirement); *see also United States v. Masciandaro*, 638 F.3d 458, 471 (4th Cir. 2011) (holding that only intermediate scrutiny "is necessary with respect to laws that burden the right to keep and bear arms outside of the home"). Notably, the parties have characterized the licensing schemes at issue in these states as "may-issue" licensing schemes in light of the discretion afforded to the respective licensing authorities in issuing public carry licenses.[7] *See* Pls.' Mot. at 12 n.1; Defs.' Opp'n, Defendants' App'x ("DA") at 9. Moreover, Plaintiffs have not shown that the use of the language "may" in the District's licensing scheme, *see* D.C. Code § 22-4506(a), has talismanic significance that

---

[7] The Government Accountability Office has characterized "may-issue" states as ones where the "state applies discretion in granting permits to carry concealed handguns." *Gun Control: States' Laws and Requirements for Concealed Carry Permits Vary Across the Nation*, U.S. Government Accountability Office, Report to Congressional Requesters, GAO-12-717, at 5 (July 2012) (http://www.gao.gov/assets/600/592552.pdf). By contrast, the Government Accountability Office characterizes "shall-issue" states as those where the "[i]ssuing authorities are required to issue a permit to an applicant that fulfills the objective statutory criteria if no statutory reason for denial exists." *Id.*

meaningfully distinguishes the scheme at issue in this case from the may-issue schemes considered by Second Circuit, Third Circuit, and Fourth Circuit.

Critically, the Second Circuit, Third Circuit, and Fourth Circuit are the *only* Courts of Appeals to have, thus far, addressed and definitively resolved the constitutionality of "good reason" handgun licensing laws similar to the one at issue here. The Ninth Circuit Court of Appeals has considered the constitutionality of the application of a "good reason" licensing requirement but has not yet issued an opinion that is binding precedent at this time. In *Peruta v. County of San Diego*, a panel of the Ninth Circuit Court of Appeals concluded that San Diego's specific policy implementing the State of California's "good cause" requirement violated the Second Amendment right to bear arms in public under any level of scrutiny. 742 F.3d 1144, 1175 (9th Cir. 2014), *reh'g en banc granted*, 781 F.3d 1106 (9th Cir. 2015). The full Ninth Circuit subsequently granted rehearing en banc, instructing that the panel opinion "shall not be cited as precedent by or to any court of the Ninth Circuit." *Peruta v. Cty. of San Diego*, 781 F.3d 1106, 1106-07 (9th Cir. 2015). The en banc court heard oral argument on June 16, 2015, and has not yet decided the case. The Court notes that Plaintiffs continue to rely on *Peruta*, even in their recently submitted Reply brief as did the district court in *Palmer v. District of Columbia*, 59 F. Supp. 3d 173 (D.D.C. 2014).

For all of these reasons, the Court concludes that, insofar as the challenged provisions of the District of Columbia's regulatory scheme burden Second Amendment rights, that scheme regulating the public carrying of handguns in the District is subject to intermediate scrutiny.[8]

---

[8] Defendants argue that the long history of the regulation of public carrying of firearms further supports the application of intermediate rather than strict scrutiny—insofar as public carrying is within the scope of the Second Amendment right. *See Kachalsky*, 701 F.3d at 96 (history of regulation of firearms in public supports application of intermediate scrutiny). However, the

Before proceeding to the application of intermediate scrutiny, in order to determine whether Plaintiffs have demonstrated a likelihood of success on the merits, the Court addresses arguments made by Plaintiffs in support of standards other than intermediate scrutiny.

### 2. Plaintiffs' Other Arguments

Plaintiffs present several arguments that suggest that intermediate scrutiny is not applicable here. The Court addresses, and rejects, each in turn.

First, Plaintiffs argue that the District's handgun licensing scheme is an unlawful prior restraint. Defendants respond that first, the prior restraint doctrine is inapplicable outside of the First Amendment context and second, even if applicable, it would not govern the challenged scheme because the scheme does not vest the Chief of Police with "unbridled discretion." Because the Court agrees with Defendants that the prior restraint doctrine is not applicable in the Second Amendment context, the Court need not consider Defendants' alternative argument that the challenged scheme does not give the Chief of Police "unbridled discretion."

The authorities on which Plaintiffs rely do not support importing the prior restraint doctrine into the Second Amendment context. Indeed, Plaintiffs acknowledge that no court has applied the doctrine of prior restraint in the Second Amendment context. Pls.' Reply at 23. Plaintiffs argue that the absence of such case law is not surprising because Second Amendment litigation is a relatively recent phenomenon. However, regardless of the merits of that characterization, Plaintiffs have only raised this argument in a cursory manner, providing little support for the Court to embrace this novel argument, particularly in the context of evaluating a motion for a preliminary injunction. Nor do the sole authorities to which Plaintiffs cite support

---

Court need not assess that history at this stage of the litigation in order to conclude that intermediate scrutiny is the proper variant of heightened scrutiny, if any, to apply in this case.

the application of the doctrine of prior restraint in the Second Amendment context. In *Staub v. City of Baxley*, the Supreme Court concluded that a municipal ordinance of the City of Baxley, Georgia, that restricted freedom of speech "impose[d] an unconstitutional prior restraint upon the enjoyment of First Amendment." 355 U.S. 313, 325 (1958). The Supreme Court did characterize the unconstitutional ordinance as "lay[ing] 'a forbidden burden upon the exercise of liberty protected by the Constitution.' " *Id.* (quoting *Cantwell v. State of Connecticut*, 310 U.S. 296, 307 (1940)). However, that general language in no way suggests the prior restraint doctrine ought to be imported into every arena of liberties protected by the Constitution.[9]

Moreover, it is highly persuasive that the three Circuit Courts of Appeals to have considered the issue have rejected the application of the prior restraint doctrine to "good reason" handgun licensing schemes. *See Kachalsky*, 701 F.3d at 91 ("We are hesitant to import *substantive* First Amendment principles wholesale into Second Amendment jurisprudence.") (emphasis in original); *Woollard*, 712 F.3d at 883 n.11 (rejecting plaintiffs' prior restraint argument and citing analysis of Second Circuit in *Kachalsky*); *Drake*, 724 F.3d at 435 (rejecting applicability of prior restraint doctrine).[10] Similarly, other courts have concluded that the doctrine of prior restraint is inapplicable in the Second Amendment context. *See Hightower v. City of Boston*, 693 F.3d 61, 80 (1st Cir. 2012) (concluding that First Amendment prior restraint doctrine is "a poor analogy for purposes of facial challenges under the Second Amendment" and

---

[9] Plaintiffs' reliance on *Kent v. Dulles*, 357 U.S. 116, 123 (1958), is also misplaced. That case is even farther afield: in *Kent*, the Supreme Court considered a statute that pertained to the authority of the Secretary of State to issue passports, which implicated the rights of American citizens to travel abroad. *Id.* at 117, 129. This case provides no support for Plaintiffs' cursory claim that the doctrine of prior restraint is applicable in the Second Amendment context.

[10] As noted above, like the licensing scheme at issue here, the parties have characterized the licensing schemes considered by the Second Circuit, the Third Circuit, and the Fourth Circuit in these cases as "may-issue" schemes in light of the discretion afforded to the respective licensing authorities in issuing public carry licenses.

declining to apply prior restraint doctrine in Second Amendment context); *Bolton v. Bryant*, 71 F. Supp. 3d 802, 817 (N.D. Ill. 2014) (declining to import prior restraint doctrine into Second Amendment context); *Young v. Hawaii*, 911 F. Supp. 2d 972, 991 (D. Haw. 2012) (same). Plaintiffs have not pointed to any authority suggesting a contrary conclusion, nor has the Court found any.

Because the Court concludes that Plaintiffs have not presented any basis for applying the doctrine of prior restraint in the Second Amendment context and because of the weight of the case law against applying that doctrine in this context, the Court concludes that the prior restraint doctrine simply has no applicability to the licensing scheme at issue. Accordingly, the Court need not consider the parties' arguments regarding the scope of discretion afforded to Defendants under the challenged licensing scheme.

Second, Plaintiffs claim that the licensing is effectively a rationing scheme and therefore must fail. The Court disagrees and concludes that there is no basis to conclude that the licensing scheme is an unlawful rationing scheme. In *Woollard*, the Fourth Circuit explicitly rejected Plaintiffs' rationing argument, reasoning that it was not for the court to "substitute [its] views for the considered judgment of the General Assembly that the good-and-substantial-reason requirement strikes an appropriate balance between granting handgun permits to those persons known to be in need of self-protection and precluding a dangerous proliferation of handguns on the streets of Maryland." 712 F.3d at 881. In their Reply, Plaintiffs primarily rely on the D.C. Circuit Court of Appeals' conclusion in *Heller III* that the District's one-pistol-per month purchasing limit did not survive intermediate scrutiny. *See* 801 F.3d at 280. However, the conclusion that the one-pistol-per-month limit was unconstitutional resulted from the court's assessment that "[t]he District has not presented substantial evidence to support the conclusion

18

that its prohibition on the registration of 'more than one pistol per registrant during any 30–day period,' D.C. Code § 7–2502.03(e), 'promotes a substantial governmental interest that would be achieved less effectively absent the regulation.' " *Heller III*, 801 F.3d at 279-80 (quoting *Rock Against Racism*, 491 U.S. at 782-83). In other words, the one-pistol-per-month limit was not unconstitutional because *any* limitation on the rate at which people could purchase guns would necessarily be unconstitutional; rather, the provision was unconstitutional simply because the evidence presented did not support the fit of that rule with the ends identified by the District of Columbia. *See Heller v. D.C.*, No. 14-7071, 2016 WL 760940, at *1 (D.C. Cir. Feb. 26, 2016) (Millett, J., concurring in denial of rehearing en banc) (emphasizing "shortcomings in the record" before the *Heller III* court that undergirded that court's conclusions that certain provisions, including the one-pistol-per-month provision, were unconstitutional).[11] In sum, the Court concludes that the licensing scheme in question is not an unlawful rationing scheme. Therefore, whether Plaintiffs' claim regarding rationing is framed as a reason why intermediate scrutiny is *inapplicable* or a reason why the licensing scheme does not *survive* intermediate scrutiny, their

---

[11] Plaintiffs also rely on a statement of the *Heller III* court in support of their argument. There, the court found that expert testimony that " 'the most effective method of limiting misuse of firearms … is to limit the number of firearms present in a home' … does not justify restricting an individual's undoubted constitutional right to keep arms (plural) in his or her home." 801 F.3d at 280. Notably, this expert testimony concerned firearms in the home generally and did not specifically pertain to a monthly cap. As such, the *Heller III* court found the testimony insufficient to justify a one-pistol-per-month cap. However, this statement does not support the conclusion that it would be impossible to justify the monthly cap on the basis of different evidence. Moreover, a right for a single individual to possess multiple weapons at home is fundamentally different from the imposition of a good reason requirement on the licensing of public carrying of concealed handguns. Therefore, the aforementioned statement in *Heller III* addresses a completely different regulatory scheme from the one at issue here and does not demonstrate that the regulations at issue here constitute an unlawful rationing scheme like the one-pistol-per-month provision.

19

rationing argument is unavailing. The Court, accordingly, proceeds to apply intermediate scrutiny to the challenged licensing requirements.

### 3. Application of Intermediate Scrutiny

For the challenged rules "to pass muster under intermediate scrutiny[,] the District must show they are 'substantially related to an important governmental objective.' " *Heller II*, 670 F.3d at 1258 (quoting *Clark v. Jeter*, 486 U.S. 456, 461 (1988)). In other words, intermediate scrutiny requires "first, that [the challenged provision] 'promotes a substantial governmental interest that would be achieved less effectively absent the regulation,' and second, that 'the means chosen are not substantially broader than necessary to achieve that interest.' " *Heller III*, 801 F.3d at 272 (quoting *Heller II*, 670 F.3d at 1258 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 782–83 (1989))). "To meet the first requirement, the District must demonstrate that the harms to be prevented by the regulation 'are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way.' " *Heller III*, 801 F.3d at 272-73 (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 662–64 (1994) (*Turner I*)). However, in order to apply intermediate scrutiny with respect to the merits of a constitutional challenge, the Court cannot "review de novo the District's evidence of the harm to be prevented and the likely efficacy of the regulation in preventing that harm." *Id.* at 273. Rather, it is the Court's task to "determine only whether the District 'has drawn reasonable inferences based on substantial evidence.' " *Id.* (quoting *Turner I*, 512 U.S. at 666). With respect to second requirement, "the fit between the challenged regulation and the asserted objective [need only] be reasonable, not perfect." *Schrader*, 704 F.3d at 990 (quoting *United States v. Marzzarella*, 614 F.3d 85, 98 (3d Cir. 2010) (alteration in original)).

Defendants assert two interests in support of the challenged concealed carry licensing scheme: preventing crime and promoting public safety. Defs.' Opp'n at 27. The D.C. Circuit has already confirmed that both of these interests, which are in fact linked, qualify as substantial governmental interests under the intermediate scrutiny standard. *See Heller III*, 801 F.3d at 274. Therefore, upon reaching the merits, the question will be whether "the District has, with regard to each challenged [licensing] provision, offered substantial evidence from which it could reasonably have concluded the provision will [prevent crime and promote public safety] 'in a direct and material way.' " *Id.* at 275 (quoting *Turner I*, 512 U.S. at 664).

In considering Plaintiffs' motion for a preliminary injunction, therefore, the Court must assess whether *Plaintiffs* have shown that it is likely that Defendants will not be able to satisfy that burden. *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) ("It is 'an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion.' " (quoting *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004))). Before turning to the evidence that Defendants have identified in support of the means-end fit in opposing the motion for preliminary injunction, the Court notes that this standard effectively means that there is a high hurdle for Plaintiffs to surmount. Indeed, as the D.C. Circuit has emphasized, this Court must ultimately assess the evidentiary record assembled by the parties in order to determine whether the chosen means contribute to the identified ends " 'in a direct and material way,' whether in one of the ways anticipated by the D.C. Council or otherwise." *Heller III*, 801 F.3d at 275 (internal citation omitted). Indeed, in *Heller II*, the Court of Appeals remanded the case to the district court in order to develop a fuller record that would allow an assessment of the fit between means and ends. 670 F.3d at 1258. Effectively, Plaintiffs must show that it is not likely that *Defendants* will be able to present

evidence that will allow the *Court* to find that the *District* could have reasonably concluded that the chosen means serve the identified ends "in a direct and material way." *Heller III*, 801 F.3d at 275.

For present purposes, it is enough to say that Defendants have identified what appears to be substantial evidence of connections between public carrying of guns—and associated regulations on public carrying—and impacts on crime and public safety. *See* Defs.' Opp'n at 27-34; *see also* Brady Amicus Br. at 7-13 (discussing connections between public carrying of firearms and public safety). However, the Court need not conduct an in-depth assessment of the evidence of the means-ends fit presented by Defendants at this stage of the proceedings because, while Plaintiffs assert that the challenged elements of the licensing scheme would not survive intermediate scrutiny, *see* Pls.' Mot. at 21, Plaintiffs submit only a cursory argument as to *why* the scheme cannot survive intermediate scrutiny. *See id.* at 19-21; Pls.' Reply at 23-24. But Plaintiffs' conclusory argument is insufficient to meet their burden at this phase of the proceedings.

In Plaintiffs' Reply, with the full panoply of Defendants' arguments in support of the licensing scheme before them, Plaintiffs' *only* response in the context of intermediate scrutiny is that Defendants are wrong to suggest deference to the legislature with respect to the fit between the government interests identified and legislative means used to achieve those ends. Regardless of the merits of the dispute on the precise quantum of legislative deference applicable, this cursory argument is insufficient. Nowhere do Plaintiffs address the evidence on which the D.C. Council relied in creating the licensing scheme or the additional evidence that Defendants have identified that they would present in support of that scheme in this case. *See* Defs.' Opp'n at 26-36. Instead, the gravamen of Plaintiffs' argument appears to be that means-end scrutiny is

inappropriate and that the licensing scheme is sufficiently destructive of Plaintiffs' Second Amendment rights that it cannot be countenanced at any level of scrutiny.[12] But the Court has already concluded that intermediate scrutiny is appropriate and that it is necessary to examine the ends identified by Defendants and the fit of the chosen means to those ends. Yet, Defendants' explanation of how the evidence supports their scheme is effectively met with silence from Plaintiffs. In the end, without a substantive response to this evidence and its putative support for the licensing, at this step, Plaintiffs cannot prevail on their claim that the licensing scheme fails to survive intermediate scrutiny.

Although not dispositive of the issues before this Court, it is important that the Second Circuit, the Third Circuit, and the Fourth Circuit have each concluded that the state versions of a "good reason" requirement that each was considering—New York's, New Jersey's, and Maryland's, respectively—survive intermediate scrutiny. *Drake*, 724 F.3d at 430; *Woollard*, 712 F.3d at 876; *Kachalsky*, 701 F.3d at 100-01.[13] The consistency of those results emphasizes the steep hill that Plaintiffs have to climb at the preliminary injunction stage, where the burden is on them to make a "clear showing" of the propriety of the "extraordinary remedy" of a preliminary injunction. *Winter*, 555 U.S. at 22. By contrast, Plaintiffs cannot point to any countervailing authority that persuades the Court that a different result is warranted. The Court reiterates that *Peruta*, on which Plaintiffs rely, is no longer precedential, even in the Ninth Circuit, in light of the full Ninth Circuit granting rehearing en banc in that case. 781 F.3d at 1106-07. Similarly, the

---

[12] Insofar as Plaintiffs claim that the District's licensing scheme is an unlawful rationing scheme, the Court considered and rejected that argument above.

[13] Notably, the Third Circuit concluded in *Drake* that New Jersey's "justifiable need" requirement did not even "burden conduct within the scope of the Second Amendment's guarantee," and only considered in the alternative the application of intermediate scrutiny. 724 F.3d at 429-30.

opinion of the Seventh Circuit in *Moore v. Madigan* is also inapposite as it concerned Illinois's "flat ban on carrying ready-to-use guns outside the home," 702 F.3d at 940, whereas this case pertains to a licensing scheme not a "flat ban." In sum, Plaintiffs have not shown that the licensing scheme is unlikely to survive intermediate scrutiny, and, in light of all of the foregoing analysis, the Court concludes that Plaintiffs have not met their burden of showing that they are likely to succeed on the merits on the present record. Therefore, this factor weighs in favor of Defendants.

\*     \*     \*

As noted above, if it is the case that "a likelihood of success is an independent, free-standing requirement for a preliminary injunction," in light of the Supreme Court's decision in *Winter*, then the Court's conclusion that Plaintiffs have not shown a likelihood of success on the merits would be the end of the inquiry, and the Court would deny the motion for the preliminary injunction without further analysis. *Davis*, 571 F.3d at 1296 (concurring opinion). However, because the Court of Appeals has not yet definitively abandoned the sliding-scale approach, *see Sherley*, 644 F.3d at 393, and because this Court concludes that a preliminary injunction is not warranted *even* under the sliding-scale approach, the Court need not resolve the viability of the sliding-scale analysis. Therefore, the Court proceeds to consider the remaining three factors: the likelihood of irreparable harm, the balance of the equities, and the public interest.

## B.  Likelihood of Irreparable Harm

To show that a preliminary injunction is warranted, Plaintiffs must show that there is a likelihood of irreparable harm. *See Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 ("A movant's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief.").

The D.C. Circuit Court of Appeals "has set a high standard for irreparable injury." *Id.* "First, the injury 'must be both certain and great; it must be actual and not theoretical.' " *Id.* (citation omitted). "Second, the injury must be beyond remediation." *Id.* In Plaintiffs' Reply, they clarify that the "certain and great" injury on which they rely is the deprivation of their claimed constitutional right to carry arms in public in the District of Columbia.[14] Pls.' Reply at 24-25. The Court notes that there is a dearth of authority regarding preliminary injunctions in the context of alleged Second Amendment violations. Accordingly, the Court looks to authority in the context of alleged violations of other constitutional provisions to guide this Court's consideration of the irreparable harm factor.

" '[S]uits for declaratory and injunctive relief against the threatened invasion of a constitutional right do not ordinarily require proof of any injury other than the threatened constitutional deprivation itself.' " *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (quoting *Davis v. District of Columbia,* 158 F.3d 1342, 1346 (D.C. Cir. 1998)). "Thus, '[a]lthough a plaintiff seeking equitable relief must show a threat of substantial and immediate irreparable injury, a prospective violation of a constitutional right constitutes irreparable injury for these purposes.' " *Gordon*, 721 F.3d at 653 (quoting *Davis*, 158 F.3d at 1346) (alteration and internal citation omitted in original). With respect to the particular alleged constitutional

---

[14] It is unclear whether Plaintiffs ever purported to rely on any direct injury outside of the putative constitutional violation and, if so, whether they continue to rely on such an injury. *See* Pls.' Reply at 23-24 (discussing only putative constitutional violation as basis for irreparable injury). In any event, insofar as Plaintiffs do continue to rely on such direct injuries, such as an impact on their sense of security suggested obliquely in their Motion for Preliminary Injunction, the Court concludes that such an impact, standing alone, is not "a tangible injury that is … 'certain and great' " such that it could stand as the sole basis for a claim of irreparable injury. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 298. Insofar as Plaintiffs ever relied on the likelihood of being harmed as crime victims deprived of the putative ability to defend themselves with a firearm as a result of the challenged licensing scheme, the Court concludes that such an injury is purely speculative and, therefore, fails to satisfy the standard for irreparable harm.

violation, the parties present diametrically opposed perspectives on the harm embodied in the
putative violation and disagree, accordingly, about whether preliminary relief is warranted in
light of their assessment of the nature of the harm. *Compare* Pls.' Mot. at 21-22 ("No
constitutional right is so directly linked to one's immediate physical well-being as is the right to
keep and bear arms.") *with* Defs.' Opp'n at 38 ("The right to keep and bear arms, however, has
no intrinsic value—it is not an end in itself. … If no occasion arises where a handgun is needed
for self-defense, its absence cannot cause harm."). However, the Court sees no basis in the case
law to conclude that the particular alleged constitutional violation in this case is more or less of
an irreparable injury than the violations of other constitutional provisions discussed by the
parties. *Cf. Chaplaincy of Full Gospel Churches*, 454 F.3d at 303 ("It is unclear what, exactly,
movants alleging an Establishment Clause violation could show to differentiate between
establishments that inflict irreparable harm and those that do not.").

Plaintiffs Wrenn, Akery, and Whidby argue that their Second Amendment rights were
violated when they were denied concealed carry licenses on the basis that they did not satisfy the
good reason/other proper reason requirement of the licensing scheme.[15] Pls.' Mot. at 7-9.
Plaintiff Second Amendment Foundation asserts associational standing on behalf of its members,
who include the individual Plaintiffs. Plaintiffs argue that, in addition to the injury to the
individual Plaintiffs, other members of the Second Amendment Foundation were injured because
they would not be able to satisfy the good reason/other proper reason requirement and that they

---

[15] It is of no consequence for this analysis that Defendants in fact issued concealed carry licenses
to the individual Plaintiffs after Judge Scullin issued an injunction requiring them to do so. *See*
Defendants' Notice Regarding the Status of Plaintiffs' Concealed-Carry Licenses, ECF No. 50.
Defendants have represented that, as of February 23, 2016, they were in the process of revoking
those licenses because there was no longer a legal basis for them as a result of the Court of
Appeals vacating Judge Scullin's injunction. *See id.* Accordingly, for the purposes of the pending
motion, the individual Plaintiffs are situated as they were when they originally filed their motion.

refrained from applying for concealed carry licenses as they believed that doing so would be futile. *See* Pls.' Mot. at 6.

Above, the Court concluded that Plaintiffs have not shown a likelihood of success on the merits of their constitutional claims. However, "[w]ithin the irreparable harm analysis itself—which assumes, without deciding, that the movant has demonstrated a likelihood that the non-movant's conduct violates the law—we examine only whether [the alleged constitutional] violation, if true, inflicts irremediable injury." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 303; *see also id.* ("Of course, this raises the question of the extent to which the disputed government action actually violates the Establishment Clause—but this inquiry is addressed by another prong of the preliminary injunction calculation, the likelihood of the movant's success on the merits."). The claim that Plaintiffs' constitutional rights were violated by the denial of the individual Plaintiffs' license applications and by the alleged futility of the applications of other members of the Second Amendment Foundation is, therefore, a sufficient basis for the Court to conclude that Plaintiffs have satisfied the irreparable harm prong of the preliminary injunction analysis.

Before addressing the remaining two equitable factors, the Court pauses to comment on the impact of this finding as part of the four-factor analysis. It is worth quoting at some length the assessment of the Court of Appeals on the impact of a finding of irreparable injury solely in light of an allegation of a constitutional violation:

> We stress that a finding of irreparable injury is but one of four elements that comprise the preliminary injunction framework. The mere allegation that the government is violating the Establishment Clause may suffice to satisfy the irreparable harm prong, but a preliminary injunction will not issue unless the moving party also shows, on the same facts, a substantial likelihood of success on the merits, that the injunction would not substantially injure other interested parties, and that the public interest would be furthered by the injunction. *It is these other prongs that will ultimately determine meritorious motions for preliminary*

*injunctions in the face of purported Establishment Clause violations.* Unsupported or undeveloped allegations of government establishment, for example, while sufficient to make out irreparable injury, will not withstand scrutiny concerning the movant's likelihood of success on the merits, thereby defeating a request for a preliminary injunction. Likewise, demands for preliminary relief that inflict untoward detriment on persons not party to the case will meet a similar fate, as will motions that do not further the public interest. Thus we do not believe that our decision today in any way lessens the burden for parties seeking preliminary injunctive relief against purported Establishment Clause violations. It merely focuses greater attention on the three other factors that indisputably enter into the preliminary injunction determination.

*Chaplaincy of Full Gospel Churches*, 454 F.3d at 304 (emphasis added). In other words, an alleged constitutional violation may be enough to satisfy the irreparable injury prong. However, such an allegation is not determinative of the Court's assessment of the balance of the equities or of the impact on the public interest or, ultimately, of the outcome of the preliminary injunction analysis. The Court now proceeds to consider the final two factors.

## C. Balance of the Equities

With respect to the third factor, Plaintiffs must show that "the balance of the equities tips in [their] favor." *Gordon*, 721 F.3d at 644 (citation and quotation marks omitted). In support of this factor, Plaintiffs rely on their allegation of a constitutional violation. However, the Court already concluded above that Plaintiffs have not shown a likelihood of success on the merits, and as such, Plaintiffs have not demonstrated at this stage of the proceedings that continued enforcement of the District's licensing scheme will infringe on their constitutional rights. *See Chaplaincy of Full Gospel Churches*, 454 F.3d at 304 (success on allegation of constitutional violation not presumed for assessment of the balance of the equities). Moreover, Defendants have presented equitable interests weighing in their favor: the promotion of public safety and the prevention of crime. Not only does the District itself have a strong interest in those objectives, *see Heller III*, 801 F.3d at 274, but the members of the public themselves have a strong interest in

public safety and crime prevention. That interest is heightened here where the alleged

constitutional violation pertains to the public carrying of operable handguns, which poses a

potential risk to others—carriers and non-carriers alike—far greater than the risk of possessing a

handgun within the home. *See Woollard*, 712 F.3d at 882; *Kachalsky*, 701 F.3d at 99. On the

basis of these factors alone, the Court concludes that Plaintiffs have not met their burden of

showing that the balance of the equities tips in their favor.

      Moreover, the Court views this factor in light of the area that the contested licensing

scheme affects, the densely populated jurisdiction of Washington, D.C.[16] Because the entirety of

the District of Columbia is an urban area, the carrying of operable handguns in public may

further tip this factor in Defendants' favor. Accordingly, the Court concludes that, for this

additional reason, Plaintiffs have not borne their burden of showing that the equities tip in their

favor.

---

[16] The Court takes judicial notice that according to data provided by the United States Census Bureau, the District of Columbia had a population density of *9,856.5* people per square mile of land area in 2010. *See* U.S. Census Quickfacts: District of Columbia, available at http://www.census.gov/quickfacts/table/PST045215/11 (last visited March 6, 2016). By contrast, the population density of the United States as a whole, as of 2010, was *87.4* people per square mile of land area, and that the population density of the District of Columbia was notably higher than that of all of the states in the Union. *See id.* (charts of population density of the states and of the United States). For the sake of relative comparison, the Court notes that the population density of New Jersey was 1,195.5; that of Rhode Island was 1,018.1; and that of New York (State) was 411.2. By contrast, that of Alaska was 1.2; that of Idaho was 19.0; and that of New Hampshire was 147.0.While state populations have changed between 2010 and the present, a comparison of population data from July 2015 and from April 2010 does not reveal any material changes in the orders of magnitude of the respective population densities in the intervening years. *See* U.S. Census Quickfacts: District of Columbia, available at http://www.census.gov/quickfacts/table/PST045215/11 (last visited March 3, 2016) (chart comparing statewide population data for July 1, 2015, and April 2010).

## D.  Public Interest

With respect to this factor, on the one hand, Plaintiffs assert that enforcing an unconstitutional law is not in the public interest, but on the other hand, Defendants assert the District's interest in avoiding the dangers associated with the public carrying of handguns for those who live in, work in, and travel through it. Defendants also emphasize that Plaintiffs have yet to prevail on their constitutional claim. The Court's analysis with respect to the balance of the equities above is equally applicable to this fourth factor. *Cf. Nken v. Holder*, 556 U.S. 418, 435 (2009) (with respect to application for a stay, the balance of the equities and public interest "factors merge when the Government is the opposing party"); *United States Ass'n of Reptile Keepers, Inc. v. Jewell*, 103 F. Supp. 3d 133, 164 (D.D.C. 2015) (applying *Nken* merger doctrine to preliminary injunction context); *FBME Bank Ltd. v. Lew*, No. 15-CV-01270 (CRC), 2015 WL 5081209, at *13 (D.D.C. Aug. 27, 2015) (same). Because the Court determined above that Plaintiffs have not shown a likelihood of success on the merits of their claim that the District's licensing scheme is unconstitutional,[17] and because of the interest that Defendants have identified in reducing risks posed to members of the public in the District of Columbia as a result of concealed weapons carried in public, to which Plaintiffs have not adequately responded, as well as for all the reasons stated above with respect to the balance of the equities, the Court concludes that Plaintiffs have not met their burden of showing that the issuance of a preliminary injunction would be in the public interest.

\*       \*       \*

---

[17] As with the Court's assessment of the balance of the equities, the Court is not bound to assume success on the merits of Plaintiffs' constitutional claim in order to analyze this factor. *See Chaplaincy of Full Gospel Churches*, 454 F.3d at 304.

In sum, the Court has concluded that, on this record, Plaintiffs have not established a likelihood of success on the merits, that the equities tip in their favor, or that the issuance of an injunction would be in the public interest. Therefore, notwithstanding the fact that Plaintiffs have satisfied the irreparable injury factor as a result of their allegation of a Second Amendment violation alone, the Court concludes that the factors, taken together, favor denial of Plaintiffs' motion for preliminary injunction. The Court concludes that Plaintiffs have not made the "clear showing" that the "extraordinary remedy" of a preliminary injunction is warranted in these circumstances. *Winter*, 555 U.S. at 22.

## IV. CONCLUSION

For the foregoing reasons, the Court hereby **ORDERS** that Plaintiffs' [6] Motion for Preliminary Injunction is **DENIED**.

The Court will set a date for an Initial Scheduling Conference by a separate Order.

Dated: March 7, 2016

                    /s/
                    COLLEEN KOLLAR-KOTELLY
                    United States District Judge