UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MATTHEW GRACE and PINK PISTOLS, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Case No. 15-2234 (RJL) |
| ) | |
| DISTRICT OF COLUMBIA and CATHY ) | **FILED** |
| LANIER, in her official capacity as ) | |
| Chief of Police for the Metropolitan Police ) | **MAY 1 7 2016** |
| Department, ) | |
| ) | Clerk, U.S. District & Bankruptcy |
| Defendants. ) | Courts for the District of Columbia |

## MEMORANDUM OPINION
(May __17__, 2016) [Dkt. #6]

In 2008, the Supreme Court recognized for the first time that "the Second Amendment conferred an individual right to keep and bear arms." *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008). As such, it struck down as unconstitutional the District of Columbia's ("the District's") total ban on handguns in the home. *Id.* at 635. Since then, various courts have considered a multitude of challenges to gun laws, charting the contours of a constitutional right that has been the people's since the infancy of our Nation. In this case, plaintiffs Matthew Grace ("Grace") and the Pink Pistols challenge the constitutionality of yet another law, and set of regulations, enacted by the District. In particular, they contend that the District's requirement that applicants for a license to carry a concealed firearm demonstrate a "good reason to fear injury to his or her person or property" or "any other proper reason for carrying a pistol," as further

defined by District law and regulations (collectively "the 'good reason' requirement"), is inconsistent with the individual right to bear arms under the Second Amendment and therefore unconstitutional. *See* Compl. ¶¶ 11–15 [Dkt. #1] (quoting D.C. Code § 22-4506(a)). Presently before the Court is plaintiffs' Motion for a Preliminary and/or Permanent Injunction to enjoin the District and Chief of Police Cathy Lanier ("defendants" or "the District") from enforcing the "good reason" requirement. Pls.' Mot. for Prelim. and/or Permanent Inj. [Dkt. #6]. Upon consideration of the record, the relevant law, and the pleadings, briefs, and oral arguments submitted and presented by the parties and the amici curiae, I find that plaintiffs have demonstrated a substantial likelihood of success on the merits of their claim that the District's "good reason" requirement is unconstitutional, that they will suffer irreparable harm absent preliminary injunctive relief, and that the equities and the public interest weigh in plaintiffs' favor. I will therefore GRANT plaintiffs' request for a preliminary injunction prohibiting the District from requiring individuals to comply with the "good reason" requirement when applying for a concealed carry permit.

## Statutory and Regulatory Background

In *Heller*, the Supreme Court held that the District's ban on the possession of handguns in the home violated the Second Amendment. 554 U.S. at 635. Shortly thereafter, the District adopted the Firearms Registration Amendment Act of 2008 ("FRA"), 56 D.C. Reg. 1365–80 (Feb. 13, 2009), to conform to the Supreme Court's ruling and to provide a "new scheme for regulating firearms." *Heller v. District of*

*Columbia* ("*Heller II*"), 670 F.3d 1244, 1249 (D.C. Cir. 2011).   The FRA required registration of handguns but provided that individuals who were not retired police officers could only obtain "registration of pistols for use in self-defense within the registrant's home" and, therefore, could not carry firearms outside the home.   56 D.C. Reg. 1365.   Six years later, in *Palmer v. District of Columbia*, visiting Judge Frederick J. Scullin, Jr.,[1] sitting by designation, ruled that "the carrying of an operable handgun outside the home for the lawful purpose of self-defense, though subject to traditional restrictions, constitutes 'bear[ing] Arms' within the meaning of the Second Amendment." 59 F. Supp. 3d 173, 181–82 (D.D.C. 2014) (quoting *Peruta v. Cnty. of San Diego*, 742 F.3d 1144, 1166 (9th Cir. 2014)) (alteration in original).[2]   He went on to hold that the District's "complete ban on the carrying of handguns in public [was] unconstitutional." *Id.* at 183.

Undaunted, the District went back to the drawing board and, mimicking legislation in New York, Maryland, and New Jersey, *see* Council of the District of Columbia, Comm. on the Judiciary and Pub. Safety, Report on Bill 20-930, at 9 (2014), enacted a concealed carry licensing scheme that became effective June 16, 2015.   License to Carry a Pistol Amendment Act of 2014, 62 D.C. Reg. 1944–57 (Feb. 6, 2015).   Under the

---

[1] Judge Scullin is a Senior Judge of the Northern District of New York who was at that time serving as a visiting judge in the District of Columbia by designation of the Chief Justice of the United States. *See Wrenn v. District of Columbia*, 808 F.3d 81, 83 (D.C. Cir. 2015).

[2] The Ninth Circuit Court of Appeals has since ordered that *Peruta* be reheard *en banc*. *Peruta v. Cty. of San Diego*, 781 F.3d 1106, 1107 (9th Cir. 2015). Therefore, the three-judge panel's opinion no longer has precedential value, *see id.*, but it nevertheless retains its persuasive authority, *cf. Coal. to End Permanent Cong. v. Runyon*, 979 F.2d 219, 221 (D.C. Cir. 1992) ("[E]ven a vacated opinion, while no longer the law of the case, still may carry persuasive authority.") (internal quotation marks omitted).

current law, "[n]o person shall carry within the District of Columbia either openly or concealed on or about their person, a pistol, without a license issued pursuant to District of Columbia law . . . ." D.C. Code § 22-4504(a). The law provides for a multi-hurdle process for obtaining a concealed carry license, but the open carrying of firearms is, of course, still prohibited. *See id.* § 7-2509.07(e); Transcript of Prelim. Inj. Proceedings at 48 [Dkt. #33]. Applicants for a concealed carry license must meet a variety of age, criminal history, personal history, mental health, and physical requirements. D.C. Code §§ 7-2502.03; 7-2509.02. Thereafter, they must satisfactorily complete a mandatory gun training and safety program and an in-person interview with a member of the Metropolitan Police Department to verify the information included in their application form. D.C. Code §§ 7-2509.02(a)(4), (f). Of relevance here, however, is a different hurdle embedded in a provision which states that the Chief of the Metropolitan Police Department "may" issue otherwise suitable applicants a license to carry a concealed firearm *only* if "it appears that the applicant has good reason to fear injury to his or her person or property or has any other proper reason for carrying a pistol . . . ." *Id.* § 22-4506(a).

Chief Lanier was directed to issue rules establishing criteria for determining whether an applicant has shown "good reason to fear injury to his or her person" or another "proper reason for carrying a concealed pistol." D.C. Code § 7-2509.11(1). The criteria to determine "good reason to fear injury to his or her person" were "at a minimum [to] require a showing of a special need for self-protection distinguishable from the

4

general community as supported by evidence of specific threats or previous attacks that demonstrate a special danger to the applicant's life." *Id.* § 7-2509.11(1)(A)*.* As to other "proper reason[s]" the criteria were "at a minimum [to] include types of employment that require the handling of cash or other valuable objects that may be transported upon the applicant's person." *Id.* § 7-2509.11(1)(B).

Chief Lanier issued regulations stating, "A person shall demonstrate a good reason to fear injury to his or her person by showing a special need for self-protection distinguishable from the general community as supported by evidence of specific threats or previous attacks which demonstrate a special danger to the applicant's life." D.C. Mun. Regs. tit. 24, § 2333.1. To satisfy this requirement, an applicant must "allege, in writing, serious threats of death or serious bodily harm, any attacks on his or her person, or any theft of property from his or her person" and must also "allege that the threats are of a nature that the legal possession of a pistol is necessary as a reasonable precaution against the apprehended danger." *Id.* § 2333.2. "The fact that a person resides in or is employed in a high crime area shall not by itself establish a good reason to fear injury to person or property for the issuance of a concealed carry license." *Id.* § 2333.4. Furthermore, an applicant "may allege any other proper reason that the Chief may accept for obtaining a concealed carry license," including that his or her employment "requires the handling of large amounts of cash or other highly valuable objects that must be transported upon the applicant's person" or that the applicant has an immediate family member "who is physically or mentally incapacitated to a point where he or she cannot

5

act in defense of himself or herself" and who "can demonstrate a good reason to fear injury to his or her person by showing a special need for self-protection distinguishable from the general community . . . ." *Id.* § 2334.1.

## FACTUAL AND PROCEDURAL BACKGROUND

The laws and regulations at issue here were first challenged in *Wrenn v. District of Columbia*, 107 F. Supp. 3d 1 (D.D.C. 2015). This Court's calendar committee assigned that case to visiting Senior Judge Scullin, and in granting the plaintiffs' Motion for a Preliminary Injunction he held that the "good reason" requirement likely "r[an] afoul of the Second Amendment." *Id.* at 12. On appeal, however, our Circuit Court ruled that Judge Scullin's designation to this Court "was limited to specific and enumerated cases" and that *Wrenn* was "not one of those cases." *Wrenn*, 808 F.3d at 83. Accordingly, the Circuit Court vacated Judge Scullin's order.[3] *Id.* at 84. Shortly thereafter, on December 22, 2015, the plaintiffs in this case filed a challenge to these same laws in a new complaint against defendants the District of Columbia and Chief Lanier, in her official capacity. *See* Compl. On December 28, 2015, plaintiffs moved for a preliminary and/or permanent injunction. *See* Pls.' Mot. for a Prelim. and/or Permanent Inj.

Plaintiff Grace is a law-abiding, responsible United States citizen and resident of the District. Compl. ¶ 2, 16. He owns four handguns and has lawfully registered them with the District. Compl. ¶ 17. He would like to carry them outside his home for self-

---

[3] The Circuit Court affirmed, however, the validity of Judge Scullin's designation to preside over *Palmer*. *See Wrenn*, 808 F.3d at 83.

defense and has completed the firearm training required under District law to obtain a concealed carry license.  Compl. ¶ 17.  Grace concedes he does not face any specific threat that differentiates him from a typical resident of the District; however, several events have contributed to his desire to carry a concealed handgun including his wife being robbed on a public street, the discovery of shell casings in front of his home on the sidewalk, and robberies at gunpoint that occurred in his neighborhood and for which there has been no arrest.  Compl. ¶ 18.  In August 2015, Grace applied for a District of Columbia concealed carry license.  Compl. ¶ 20.  The application asked him to state his "special need for self-protection distinguishable from the general community" or any other "proper reason" to carry a firearm under District law.  Compl. ¶ 20.  Having none, Grace cited the Second Amendment instead.  Compl. ¶ 20.  On October 19, 2015, his application was denied on the grounds that he did not demonstrate a "good reason to fear injury to person or property, or other proper reason for a concealed carry license."  Compl. ¶ 21.  This was the sole basis for the rejection of his application.  Compl. ¶¶ 21–22.

The Pink Pistols is a shooting group, of which Grace is a member.  Compl. ¶¶ 3, 16.  The group advocates for "the use of lawfully owned, lawfully concealed . . . firearms for the self-defense of the sexual minority community."  Compl. ¶ 3.  The Pink Pistols has dozens of chapters across the country and is open to all regardless of sexual orientation.  Compl. ¶ 3.  The group believes, as Justice Alito recognized in *McDonald v. City of Chicago*, that "the right to keep and bear arms . . . is especially important for

7

women and members of other groups that may be especially vulnerable to violent crime." Compl. ¶ 3 (quoting 561 U.S. 742, 790 (2010) (controlling opinion)). The Pink Pistols maintain that the District's "restrictive carry laws are a direct affront to [its] central mission." Compl. ¶ 3.

Arguing the District's "good reason" requirement violates the Second Amendment, plaintiffs request a preliminary and/or permanent injunction (1) forbidding defendants from denying concealed carry licenses to applicants who meet all of the District's eligibility requirements other than the "good reason" requirement; (2) forbidding defendants from enforcing the District's laws and regulations establishing and further defining the "good reason" requirement, and (3) directing defendants to issue concealed carry licenses to Grace and other members of the Pink Pistols, who, apart from the "good reason" requirement are eligible for a concealed carry license. Pls.' Proposed Order 1–2 [Dkt. #6-2]. Plaintiffs do not challenge any other aspect of the District's licensing scheme. Mem. of P. & A. in Supp. Pls.' Appl. for a Prelim. and/or Permanent Inj. 7 [Dkt. #6-1] [hereinafter "Pls.' Mem."].

On February 2, 2016, I heard arguments on plaintiffs' motion from the parties and from amici curiae the National Rifle Association, on behalf of plaintiffs, and Everytown for Gun Safety ("Everytown"), on behalf of defendants. Those amici also submitted briefs [Dkts. ##21, 22], as did amicus curiae the Brady Center to Prevent Gun Violence [Dkt. #31]. Ultimately, our Court of Appeals issued its mandate in *Wrenn* on February 5, 2016, and, on February 9, 2016, that case was reassigned to my colleague Judge

8

Kollar-Kotelly. *Wrenn v. District of Columbia*, 2016 WL 912174, at *5 (D.D.C. Mar. 7, 2016). Following the reassignment, Judge Kollar-Kotelly chose not to hear oral argument and instead, on March 7, 2016, issued an opinion denying the *Wrenn* plaintiffs' motion for a preliminary injunction. *Id.* at *15. Not surprisingly, the *Wrenn* plaintiffs filed a notice of appeal as to that decision the same day. Notice of Appeal, Wrenn v. District of Columbia, No. 15-162 (D.D.C. Mar. 7, 2016).

## ANALYSIS

When ruling on a motion for preliminary injunction, the Court must consider "whether (1) the plaintiff has a substantial likelihood of success on the merits; (2) the plaintiff would suffer irreparable injury were an injunction not granted; (3) an injunction would substantially injure other interested parties; and (4) the grant of an injunction would further the public interest." *Sottera, Inc. v. Food & Drug Admin.*, 627 F.3d 891, 893 (D.C. Cir. 2010) (internal quotation marks omitted).[4] I will address each of these factors in turn.[5]

---

[4] "The first component of the likelihood of success on the merits prong usually examines whether the plaintiffs have standing in a given case." *Kingman Park Civic Ass'n v. Gray*, 956 F. Supp. 2d 230, 241 (D.D.C. 2013). I find that Grace has demonstrated standing, as he "invoked his rights under the Second Amendment to challenge the statutory classifications used to bar his [carrying] of a handgun under D.C. law, and the formal process of application and denial, however routine, makes the injury to [Grace's] alleged constitutional interest concrete and particular." *Parker v. District of Columbia*, 478 F.3d 370, 376 (D.C. Cir. 2007), *aff'd sub nom., Heller*, 554 U.S. 570. It is therefore unnecessary to address defendants' argument that the Pink Pistols lacks standing. *See Common Cause v. Biden*, 909 F. Supp. 2d 9, 17–18 (D.D.C. 2012) ("If the Court finds that one of the Plaintiffs has standing, it need not consider the standing of the other Plaintiffs.").

[5] Our Circuit has traditionally applied a "sliding scale" approach to these four factors, *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291 (D.C. Cir. 2009), under which "a strong showing on one factor could make up for a weaker showing on another." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011). Following the Supreme Court's decision in *Winter v. NRDC, Inc.*, 555 U.S. 7 (2008), however,

## I.  Plaintiffs Have Demonstrated a Substantial Likelihood of Success on the Merits.

Our Circuit employs a two-step approach to determining the constitutionality of gun laws, *Heller II*, 670 F.3d at 1252–53.  The Court firsts asks "whether a particular provision impinges upon a right protected by the Second Amendment." *Id.* at 1252.  If it does not, there is no reason for further inquiry.  If it does, however, the Court then "determine[s] whether the provision passes muster under the appropriate level of constitutional scrutiny." *Id.*

### A.  Step One: The "Good Reason" Requirement Likely Impinges Upon A Right Protected by the Second Amendment.

In *Heller*, the Supreme Court held the Second Amendment secures at least "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." 554 U.S. at 635.  The Court did not, however, "undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment[.]" *Id.* at 626.  It therefore left open the questions of whether, and to what extent, the Second Amendment protects a right to carry arms for self-defense *outside* the home. *Heller* made clear, however, that the Second Amendment right to keep and bear arms, like other constitutional rights, is "not unlimited" and "include[s] exceptions." 554 U.S. at 595, 635.  At the same time, it is not a malleable provision that bends to "future judges' assessments of its usefulness"

---

our Circuit Court "has suggested, without deciding, that *Winter* should be read to abandon the sliding-scale analysis in favor of a 'more demanding burden' requiring Plaintiffs to independently demonstrate both a likelihood of success on the merits and irreparable harm." *Smith v. Henderson*, 944 F. Supp. 2d 89, 95–96 (D.D.C. 2013) (citing *Sherley*, 644 F.3d at 392).  Regardless of how *Winter* is read, the Court's analysis here is unaffected because I conclude that plaintiffs have made a sufficient showing of both a likelihood of success on the merits and irreparable harm.

and is instead "enshrined with the scope [it was] understood to have when the people adopted [it.]" *Id.* at 634–35. Thus, a "historical understanding of the scope of the right" is critical to the analysis. *Id.* at 625.

The Supreme Court identified several "longstanding prohibitions on the possession of firearms," and emphasized "nothing in [the] opinion should be taken to cast doubt on" them. *Id.* at 626–27 (citing "prohibitions on the possession of firearms by felons and the mentally ill, [] laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, [and] laws imposing conditions and qualifications on the commercial sale of arms"). The Court stated these laws are a non-exhaustive set of "presumptively lawful regulatory measures," *id.* at 627 n.26, but it "did not explain *why*" that is so. *United States v. Chester*, 628 F.3d 673, 676 (4th Cir. 2010). In *Heller II*, our Circuit Court clarified that longstanding regulations are presumptively lawful because they have "long been accepted by the public," and are therefore presumed not to cover "activities . . . protected from regulation by the Second Amendment." [6] 670 F.3d at 1253. Although our Circuit Court has yet to address the issue of the burden of proof, it seems only fair that the Government should bear the burden of demonstrating

---

[6] Of course, there is a familiar concept in First Amendment jurisprudence, where the classic examples of longstanding regulations are "[l]aws punishing libel and obscenity." *Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 122 (2011). Such laws do not implicate the freedom of speech, because they "existed in 1791 and have been in place ever since." *Id.* As the Supreme Court has explained, a "universal and long-established tradition of prohibiting certain conduct creates a strong presumption that the prohibition is constitutional: Principles of liberty fundamental enough to have been embodied within constitutional guarantees are not readily erased from the Nation's consciousness." *Id.* (quoting *Republican Party of Minn. v. White*, 536 U.S. 765, 785 (2002)); *cf. McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 375 (1995) (Scalia, J., dissenting) ("A governmental practice that has become general throughout the United States, and particularly one that has the validation of long, accepted usage, bears a strong presumption of constitutionality.").

that a challenged regulation is "longstanding" and therefore enjoys a presumption of constitutionality. *See, e.g., Kolbe v. Hogan*, 813 F.3d 160, 176 (4th Cir. 2016) ("[I]t it is the government's burden to establish that a particular weapon or activity falls outside the scope of the Second Amendment right."), *reh'g en banc granted*, No. 14-1945, 2016 WL 851670 (4th Cir. Mar. 4, 2016); *Ezell v. City of Chicago*, 651 F.3d 684, 702–03 (7th Cir. 2011) (stating the government does not establish a challenged regulation "fall[s] outside the scope of the Second Amendment right . . . where the historical evidence is inconclusive or suggests that the regulated activity is *not* categorically unprotected"). If the Government meets this burden, a plaintiff in this Circuit may still rebut the presumption by showing that "the regulation does have more than a de minimis effect upon [his or her Second Amendment] right." *Heller II*, 670 F.3d at 1253.

Here, the parties present two potentially dispositive questions. First, is the Second Amendment's applicability limited only to the home? Second, does the "good reason" requirement enjoy a presumption of constitutionality that cannot be rebutted? If the answer to either question is "yes," the plaintiffs lose at step one because the Second Amendment has not been implicated.[7]   If the answer to both is "no," the Second

---

[7] In their opening brief, plaintiffs took pains to answer the first question, but defendants responded that plaintiffs' arguments regarding the reach of the Second Amendment "defeat[] a straw man." Defs.' Opp'n to Pls.' Appl. for a Prelim. and/or Permanent Inj. 16 [Dkt #20] [hereinafter "Defs.' Opp'n"]. Although defendants are not willing to concede the right to bear arms extends outside the home, Defs.' Opp'n 17 n.9, they say the real issue here is whether the Second Amendment specifically protects a right to bear arms in a "densely populated city, filled with unique, high-risk security targets, without any specific self-defense reason." Defs.' Opp'n 16. Because they address different questions, the parties often talk past each other. I find it necessary to address each question separately, not only for the sake of clarity and thoroughness, but because plaintiffs' argument regarding the Second Amendment's applicability outside the home sets the stage for defendants' opposition.

Amendment applies, and the Court must proceed to step two.

### 1. The Second Amendment's Applicability Is Not Limited to the Home.

Plaintiffs rely on the text and history of the Second Amendment to argue that the individual rights therein extend beyond the threshold of the home. Pls.' Mem. 9–19. As is the case with all constitutional provisions, the meaning of the Second Amendment "is to be interpreted according to standard tools of statutory interpretation, beginning with its text." *Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1312 (D.C. Cir. 2004); *see also Noel Canning v. NLRB*, 705 F.3d 490, 495 (D.C. Cir. 2013) ("When interpreting a constitutional provision, [a court] must look to the natural meaning of the text as it would have been understood at the time of the ratification of the Constitution."). The Second Amendment states, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." The Supreme Court has explained that "[a]t the time of the founding, as now, to 'bear' meant to 'carry.'" *Heller*, 554 U.S. at 584. One does not typically think of "carrying" as an activity exclusively done within the home. *See Peruta*, 742 F.3d at 1152 ("Speakers of the English language will all agree: 'bearing a weapon inside the home' does not exhaust this definition of 'carry.'"). Thus, reading the Second Amendment right to "bear" arms as applying only in the home is forced or awkward at best, and more likely is counter-textual. *See Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1125 (10th Cir. 2015); *Moore v. Madigan*, 702 F.3d 933, 936 (7th Cir. 2012). Moreover, the Supreme Court recognized that when "bear" is used with "'arms' . . . the term has a meaning that refers to carrying

13

for a particular purpose—confrontation." *Heller*, 554 U.S. at 584; *see also id.* (stating

that as used in the Second Amendment, the phrase to "bear arms" means to "wear, bear,

or carry [arms] upon the person or in the clothing or in a pocket, for the purpose of being

armed and ready for offensive or defensive action in a case of conflict with another

person" (alterations omitted) (quoting *Muscarello v. United States*, 524 U.S. 125, 143

(1998) (Ginsburg, J., dissenting))). Surely confrontations do not occur only in the home,

and therefore "[t]o confine the right to be armed to the home is to divorce the Second

Amendment from the right of self-defense described in *Heller* and *McDonald*." *Moore*,

702 F.3d at 937. Indeed, confrontations that might necessitate self-defense are less likely

to occur in the home than on the streets of a city with many dangerous neighborhoods.

*See, e.g.*, Pls.' Supplemental Br. in Supp. of Their App. for a Prelim. and/or Permanent

Inj. 2 [Dkt. #40] (citing the Bureau of Justice Statistics and stating "18.4% of violent

crimes occur at or in the victim's home, while 26.5% occur on the street or in a parking

lot or garage"). Thus, the textual analysis, when viewed with a touch of common sense

and logic, weighs heavily in favor of finding that the right to bear arms reaches beyond

one's doorstep.[8] Finally, I would emphasize that a legitimate need to protect oneself can

---

[8] Indeed the Supreme Court, in undoubtedly carefully selected language, has hinted the Second Amendment has application in settings other than the home. *See McDonald*, 561 U.S. at 780 (plurality opinion) ("[T]he Second Amendment protects a personal right to keep and bear arms for lawful purposes, *most notably* for self-defense within the home." (emphasis added)); *Heller*, 554 U.S. at 628 (stating the "the need for defense of self, family, and property" that is "central to the Second Amendment right" is "*most acute*" in the home (emphasis added)). Furthermore, the Supreme Court recently vacated and remanded an opinion by the Massachusetts Supreme Judicial Court that held there is no Second Amendment right to keep and carry stun guns. *Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016) (per curiam). Without reading too much into what was left unsaid, I note that, as the petitioner there was prosecuted for carrying a stun gun *in a supermarket parking lot*, the case certainly presented the

14

arise at the drop of a hat. Thus, the right to "carry weapons *in case of* confrontation," *Heller*, 554 U.S. at 592 (emphasis added), necessarily includes a right to carry firearms to protect oneself against unanticipated and suddenly arising threats. *Cf. Heller*, 554 U.S. at 679 (Stevens, J., dissenting) (acknowledging "the reality that the need to defend oneself may suddenly arise in a host of locations outside the home").

Not surprisingly, such a reading is also supported by the historical record. The Second Amendment "codified a pre-existing right," *Heller*, 554 U.S. at 592, and therefore the first step in the historical inquiry is examining the right we inherited from English and natural law. England's Bill of Rights of 1689 provided that "the subjects which are Protestants, may have arms for their defense suitable to their conditions, and as allowed by law." 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441. As William Blackstone explained, "the subjects of England [were] entitled . . . to the right of having and using arms for self-preservation and defence," which stems from "the natural right of resistance and self-preservation." 1 William Blackstone, Commentaries *139–40. Early commentators on this side of the pond described the right in substantially similar terms. *See, e.g.*, 1 St. George Tucker, Blackstone's Commentaries, App. 300 (1803) [hereinafter "Tucker's Blackstone"] (stating the that right to keep and bear arms "may be considered the true palladium of liberty" and that "[t]he right of self defence is the first law of nature"); *Heller* 554 U.S. at 585 ("Justice James Wilson interpreted the Pennsylvania

---

opportunity for any of the Justices to assert the view that the Second Amendment right does not extend to public spaces.  None did.

Constitution's arms-bearing right . . . as a recognition of the natural right of defense 'of one's person *or* house'—what he called the law of 'self-preservation.'" (emphasis added) (quoting 2 Collected Works of James Wilson 1142, and n. x (K. Hall & M. Hall eds. 2007))). Notably, these sources in no way suggest that the right to have and use arms in self-defense was considered a domiciliary right.

Moreover, it is unquestionable that the public carrying of firearms was widespread during the Colonial and Founding Eras. And although this fact alone does not directly prove that the people had a *right* to do so, *see McIntyre*, 514 U.S. at 360 (Thomas, J. concurring) ("[T]he simple fact that the Framers engaged in certain conduct does not necessarily prove that they forbade its prohibition by the government."), it does provide an essential context for what the people who ratified the Second Amendment understood bearing arms to entail. Indeed, in the Colonial Period, carrying arms publicly was not only permitted—it was often *required*! "[A]bout half the colonies had laws requiring arms-carrying in certain circumstances." Nicholas J. Johnson et al., Firearms Law and the Second Amendment 106 (2012). For example, in Virginia colonists were forbidden from traveling unless they were well armed, and they were required to "bring their pieces to church." *Id.* (citing William Walter Hening, 1 The Statutes at Large; Being a Collection of all the Laws of Virginia from the First Session of the Legislature in the Year 1619, at 198 (1823)). In 1639, a Newport, Rhode Island law provided that "noe man shall go two miles from the Towne unarmed, eyther with Gunn or Sword; and that none shall come to any public Meeting without his weapon." *Id.* at 107 (citing 1 Records

of the Colony of Rhode Island and Providence Plantations, in New England 94 (John Ressull Bartlett ed., 1856)).

St. George Tucker, an eminent legal scholar and jurist, observed in 1803 that "[i]n many parts of the United States, a man no more thinks, of going out of his house on any occasion, without his rifle or musket in hand, than an European fine gentleman without his sword by his side." 5 Tucker's Blackstone at App. 19. Plaintiffs' brief and an amicus brief filed by historians and legal scholars in the *Wrenn* litigation cite multiple instances of our Founding Fathers carrying or advocating for carrying of firearms—including in populated areas. *See* Pls.' Mem. 15–16; Br. of Amici Curiae Historians, Legal Scholars, and CRPA Found. in Supp. of Appellees and in Supp. of Affirmance 20–23, Wrenn v. District of Columbia, No. 15 7057 (D.C. Cir. Oct. 7, 2015) [hereinafter "Historians & Scholars Br."]. For example, when George Washington traveled between Alexandria and Mount Vernon he holstered pistols to his saddle, "[a]s was then the custom." Pls.' Mem. 15 (quoting Benjamin Ogle Tayloe, In Memoriam 95 (1872)). Patrick Henry lived "just north of Hanover town, but close enough for him to walk to court, his musket slung over his shoulder to pick off small game . . . ." Historians & Scholars Br. 21 (quoting Harlow Giles Unger, Lion of Liberty 30 (2010)). Thomas Jefferson, who in an oft-cited letter advised his nephew to have his gun as a "constant companion on [his] walks," Pls.' Mem. 15 (citing 1 The Writings of Thomas Jefferson 398 (H.A. Washington ed., 1853)), once left his pistol at an inn between Monticello and Washington, D.C. and asked two friends—both members of Congress—to retrieve it and bring it to him at the White

House, Historians & Scholars Br. 22–23.  Regarding the Boston Massacre, John Adams

stated, "every private person is authorized to arm himself; and on the strength of this

authority I do not deny the inhabitants had a right to arm themselves at that time for their

defense."  Pls.' Mem. 15–16 (quoting John Adams, First Day's Speech in Defense of the

British Soldiers Accused of Murdering Attucks, Gray, and Others, in the Boston Riot of

1770, in 6 Masterpieces of Eloquence 2569, 2578 (Hazeltine et al. eds. 1905)).

Finally, and importantly, Antebellum Era jurisprudence confirms that the right to

bear arms includes a right to carry weapons in public for self-defense.  *See Noel Canning*,

705 F.3d at 501 ("The interpretation of [a constitutional provision] in the years

immediately following [its] ratification is the most instructive historical analysis in

discerning the original meaning.").  Nine state constitutional provisions were adopted

from the late eighteenth century to the early nineteenth century, "which enshrined a right

of citizens to 'bear arms in defense of themselves and the state' or 'bear arms in defense

of himself and the state.'"  *Heller* 554 U.S. at 584–85 (citing provisions).[9]  In the early

nineteenth century, several jurisdictions enacted laws that regulated the *manner* in which

firearms could be carried in public by prohibiting the carrying of concealed weapons.

*See* Leider, 89 Ind. L.J. at 1601–06.  When these concealed carry bans were challenged as

---

[9] These provisions predate the Second Amendment's application to the states through the Due Process Clause of the Fourteenth Amendment.  *See McDonald*, 561 U.S. at 791.  Nevertheless, their earliest interpretations are evidence of the Second Amendment's meaning, including its application outside the home, because "nineteenth-century courts viewed the Second Amendment and state analogues as codifying the same preexisting right to bear arms."  Robert Leider, Our Non-Originalist Right to Bear Arms, 89 Ind. L.J. 1587, 1591 n.18 (2014).  Moreover, nineteenth century courts at times invoked the Second Amendment in their discussion of the right.  *See, e.g, Nunn v. State*, 1 Ga. 243, 250–51 (1846); *State v. Chandler*, 5 La. Ann. 489, 490 (1850).

antithetical to the right to bear arms, courts almost uniformly upheld them, provided that open carry was not also prohibited.[10] *See, e.g., State v. Reid*, 1 Ala. 612, 619 (1840) ("[T]he Legislature cannot inhibit the citizen from bearing arms openly because [the state constitution] authorizes him to bear them for the purposes of defending himself and the State, and it is only when carried openly, that they can be efficiently used for defence."); *Nunn*, 1 Ga. at 250 (stating a prohibition of concealed carry was constitutionally permissible "inasmuch as it d[id] not deprive the citizen of his *natural* right of self-defense, or of his constitutional right to keep and bear arms" but making clear that a simultaneous "prohibition against bearing arms *openly*" would be "in conflict with the Constitution, and *void*"); *Chandler*, 5 La. Ann. at 490 (stating the right to carry arms openly for self-defense "is the right guaranteed by the Constitution of the United States").[11] As the open carrying of weapons at issue was not occurring inside homes, *see, e.g., Reid*, 1 Ala. at 612–13, these cases are powerful evidence of a *"public understanding,"* *Heller*, 554 U.S. at 605, that the right to bear arms includes a right to carry arms outside the home for the purpose of self-defense.

---

[10] For outliers, see *Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90, 91–92 (1822) (holding a prohibition of concealed—but not open—carry of firearms impermissibly "restrain[ed] the full and complete exercise of" the right to bear arms); *State v. Buzzard*, 4 Ark. 18, 27 (1842) (opinion of Ringo, C.J.) (endorsing the state's authority to prohibit the carrying of arms, whether concealed or open, except that done "to defend the[] free state and the established institutions of the country").

[11] Defendants argue "judicial decisions in the 1800s by courts in the Southern States" should be excluded from the analysis because they "come from 'a time, place, and culture where slavery, honor, violence, and the public carrying of weapons were intertwined.'" Defs.' Opp'n 13 (quoting Eric M. Ruben & Saul Cornell, Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context, 125 Yale L.J. Forum 121, 129 (2015)). The Southern cases' relevance is indeed the subject of an academic debate, but the practical reality is that *Heller* relied on these very cases as probative of the Second Amendment's original meaning. *See* 554 U.S. at 612 (citing, *inter alia*, *Nunn* and *Chandler*). I am in no position to entertain arguments to the contrary.

Given the textual and historical evidence, I have little trouble concluding that under its original meaning the Second Amendment protects a right to carry arms for self-defense in public. Of course, Judge Scullin already reached this same conclusion in *Palmer*. 59 F. Supp. 3d at 182. And, not surprisingly, the Court of Appeals panels that have directly addressed the issue have also reached the same conclusion. *See Moore*, 702 F.3d at 936 ("A right to bear arms thus implies a right to carry a loaded gun outside the home."); *Peruta*, 742 F.3d at 1166 ("[T]he carrying of an operable handgun outside the home for the lawful purpose of self-defense, though subject to traditional restrictions, constitutes 'bear[ing] Arms' within the meaning of the Second Amendment.") (alteration in original). And other circuits have at least been willing to so assume. *See Bonidy*, 790 F.3d at 1125; *Woollard v. Gallagher*, 712 F.3d 865, 876 (4th Cir. 2014); *Drake v. Filko*, 724 F.3d 426, 431 (3d Cir. 2013); *Kachalsky v. County of Westchester*, 701 F.3d 81, 89 (2d Cir. 2012). Indeed, no Court of Appeals to date has found to the contrary.

### 2. Defendants Are Unlikely to Demonstrate an Unrebutted Presumption of Constitutionality for the District's "Good Reason" Requirement.

Concluding that there is a right to carry arms in self-defense in public places, of course, does not resolve the *extent* of that right. Just as it is inside the home, the Second Amendment right outside the home is *not* unlimited, *see Heller*, 554 U.S. at 626, and is "subject to traditional restrictions." *Palmer*, 59 F. Supp. 3d at 181 (D.D.C. 2014). In this vein, the District persists that the conduct governed by the "good reason" requirement falls outside the scope of the Second Amendment because pursuant to an alleged

longstanding tradition, the right to bear arms does not encompass any right to carry arms in populated, public places—including the entire District of Columbia. [12]  Defs.' Opp'n 9–11.  Indeed defendants maintain that the longstanding tradition of banning public carrying in urban areas is so broad that the District's comparatively less restrictive "good reason" requirement does not even infringe upon a Second Amendment right.[13]  Defs.' Opp'n 9.  Please.  Put simply, this argument strains credulity and flies in the face of prior litigation.  Not only is it severely undercut by the historical record of public carrying of firearms discussed above, but it was already rejected by Judge Scullin who ruled in *Palmer* that the District's complete ban on carrying firearms outside the home runs afoul of the Second Amendment.  59 F. Supp. 3d at 182–83.  Notwithstanding the fact that the District voluntarily *withdrew* its appeal of Judge Scullin's order, Unopposed Mot. to Dismiss Case Voluntarily, Palmer v. District of Columbia, No. 14-7180 (D.C. Cir. Apr. 2, 2015), it is now essentially renewing this argument that was already fully litigated and rejected by him.  Moreover, defendants do not cite a *single* Colonial Era, Founding Era,

---

[12] I note that defendants certainly do not *have to* put forth a "longstanding tradition" to demonstrate certain conduct falls outside the Second Amendment's scope. While "the widespread and longstanding traditions of our people" are among "the most weighty" evidence of a constitutional guarantee's meaning, they are not the only such evidence. *McIntyre*, 514 U.S. 375 (Scalia, J., dissenting). Here, however, defendants have rested on the longstanding tradition theory, and I therefore evaluate their arguments under it.

[13] Unfortunately for defendants, the Supreme Court in *Heller* expressly rejected the notion that the Districts' ban on keeping handguns in the home was constitutionally permissible because it was "limited to an urban area." 554 U.S. at 634. Here, defendants emphasize the District's unique nature in that "compared to other large cities, the District has greater public safety and national security concerns." Defs.' Opp'n 4. Even so, this point does not help defendants on questions of the Second Amendment's scope. *Heller* made abundantly clear that one does not surrender his or her Second Amendment rights upon crossing the Key Bridge. Although the District may impose firearms regulations "that suit local needs and values," its authority to do so is circumscribed by the guarantees of the Second Amendment. *McDonald*, 561 U.S. at 784–85.

or nineteenth-century commentator, let alone jurist, espousing an urban/rural divide on the right to carry arms.[14]   Instead, defendants' rely on the Statute of Northampton, 2 Edw. 3 (Eng. 1328), which forbade, *inter alia*, "go[ing or] rid[ing] armed by night or by day, in Fairs, Markets."   Defendants contend the Statute of Northampton and its American analogues imposed a near-total ban on the carrying of firearms in populated, public places from medieval times until the mid-nineteenth century.   Defs.' Opp'n 9–12. Unfortunately for the District, the weight of the historical evidence demonstrates that the statute forbade only carrying weapons in a terrifying manner that threatened a breach of the peace and not the ordinary carrying of weapons for self-defense.[15]

Defendants next argue that our Nation has a longstanding tradition of "strictly regulat[ing]" the carrying of firearms by requiring an individual to set forth a specific and

---

[14] To be sure, defendants were able to find eleven examples of ordinances from the late 1800's prohibiting public carrying of weapons within city limits, almost exclusively from the frontier and Wild West. Defs.' Opp'n 13.   In addition, Everytown points to a few state and territory-wide provisions either largely prohibiting public carrying in populated areas or giving cities the option to do so. Everytown Br. 15; *see also* Unlawfully Carrying Arms, Art. 317, in The Penal Code of the State of Texas 42–43 (1879). These laws, however, are needles in a legal haystack and come nowhere close to establishing a "universal and long-established tradition," *Carrigan*, 564 U.S. at 122, of prohibiting the carrying of firearms in populated areas. They were in place in only an infinitesimal fraction of American jurisdictions, governed a minute portion of the Nation's population, and were found almost entirely in a particular, homogenous region. *Contrast with Heller II*, 670 F.3d at 1254 (finding regulations in force in "diverse states and cities" and "now applicable to more than one fourth of the Nation by population" to be "longstanding in American law"). Moreover, defendants fail to establish the "*standing*" of "long*standing*." Nowhere do they argue that it is the norm in the United States *today* for the carrying of weapons in populated or public places to be prohibited *Cf. Carrigan*, 564 U.S. at 122 (noting libel and obscenity laws "have been in place ever since" the Founding Era).

[15] For American jurisprudence and commentary supporting this conclusion, see, for example, *State v. Huntley*, 25 N.C. 418, 422–23 (1843); *Simpson v. State*, 13 Tenn. 356, 358–60 (1833); Conductor Generalis, Or, the Office, Duty, and Authority of the Justice of the Peace 11–12 (James Parker, ed. 1764). For English sources see, for example, 1162; *Sir John Knight's Case*, (1686) 87 Eng. Rep. 75 (K.B.) 76, 90 Eng. Rep. 330 (K.B.) 330, Comberbach,; *Chune v. Piott*, (1615) 80 Eng. Rep. 1161 (K.B.) 39; 1 Sir William Oldnall Russell, A Treatise on Crimes and Indictable Misdemeanors 271–72 (2d ed. 1826); 1 William Hawkins, A Treatise of the Pleas of the Crown 489 (1824 ed.); 4 William Blackstone, Commentaries *148–49.

personal reason to fear for his or her safety before being authorized to carry a firearm in public. Defs. Br. 11–12. In support thereof they point to defendants cite an obsolete District law that provided:

> If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury or violence to his person, or to his family or property, he may, on complaint of any person having reasonable cause to fear an injury or breach of the peace be required to find sureties for keeping the peace for a term not exceeding six months . . . .

Of Proceedings to Prevent the Commission of Crimes, § 16, in The Revised Code of the District of Columbia 567, 570 (1857) [hereinafter "D.C. Surety Law"]. From 1836 to 1891, similar surety laws were adopted in Massachusetts, Wisconsin, Maine, Michigan, Virginia, Minnesota, Oregon, Pennsylvania, and West Virginia.[16] Defendants maintain these statutes were "precursor[s]" to the "good reason" requirement and that the jurisdictions that adopted them permitted public carrying of firearms only when an individual had "reasonable cause to fear an assault or other injury or violence to his person."[17] Defs.' Opp'n 11. I disagree.

---

[16] Of Proceedings to Prevent the Commission of Crimes, § 16, in Revised Statutes of the Commonwealth of Massachusetts 748, 750 (1836); An Act to Prevent the Commission of Crimes, § 16, in Statutes of the Territory of Wisconsin 379, 381 (1839); Of Proceedings for Prevention of Crimes, § 16 (1840), in The Revised Statutes of the State of Maine 707, 709 (1841); Of Proceedings to Prevent the Commission of Crimes, § 16, in The Revised Statutes of the State of Michigan 690, 692 (1846); For Preventing the Commission of Crimes, § 8, in Code of Virginia 755, 756 (1849); Of Proceedings to Prevent the Commission of Crimes, § 18, in The Revised Statutes of the Territory of Minnesota 526, 528 (1851); Proceedings to Prevent Commission of Crimes, § 17, in The Statutes of Oregon 218, 220 (1854); Proceedings to Detect the Commission of Crimes, § 6 , in A Digest of the Laws of Pennsylvania 248, 250 (John Purdon comp., 1862); For Preventing the Commission of Crimes, § 8, in The Code of West Virginia 702, 703 (1870).

[17] Defendants also use these statutes to support their argument that public carrying of firearms was almost entirely prohibited in the Northern United States and those prohibitions went unchallenged in that region.

The District's law was located in the section of the Code regarding the recognizance system under which magistrates could order certain individuals to pay a surety guaranteeing they would "keep the peace towards all the people of this District." D.C. Surety Law § 4. The provision's language and context, however, strongly suggest that it did not criminalize public carrying of weapons absent "reasonable cause," but instead provided a mechanism for *preventing crimes* under which individuals with reason to believe another person was likely to breach the peace or injure someone with a weapon could seek law enforcement intervention. *See id.* § 1 (providing that judges and justices of the peace "shall have the power to cause all laws made for the preservation of the public peace to be kept, and, in the execution of that power, may require persons to give security to keep the peace, or for their good behavior, or both . . .").[18] It also seems a fair inference that a respondent could defend himself by demonstrating the complainant had no grounds to fear he would cause an injury or breach the peace. The statutes from other jurisdictions referenced by defendants were almost all virtually identical to the District's

---

Defs.' Opp'n 13. Defendants contend that plaintiffs cannot demonstrate a "widely understood national consensus that individuals had a pre-existing right to carry in populated areas" by pointing to the "fact that some [Southern] states wanted broader public-carrying rights" than those afforded in the North. Defs.'s Opp'n 13. Defendants conflate the burden. *Plaintiffs* have a right to bear arms, and *defendants* seek to prove that carrying weapons in public places without a specific "good" or "proper" self-defense need is somehow outside the purview of that right. If they are to prevail, it is *defendants* who must bear the burden of demonstrating such conduct has long been understood *throughout the Nation* to be unprotected by the right to bear arms.

[18] Everytown makes much of section headings in these statutes; for example, the Minnesota provision was located next to the heading "Persons carrying offensive weapons, how punished." Of Proceedings to Prevent the Commission of Crimes, § 18, in The Revised Statutes of the Territory of Minnesota 526, 528 (1851). But "the heading of a section cannot limit the plain meaning of the text." *Trainmen v. Baltimore & Ohio R. Co.*, 331 U.S. 519, 528–29 (1947).

24

in language and context.[19] I am therefore skeptical, at best, of defendants' interpretation of the surety laws as providing for public carrying only upon a showing of a specific reason to fear for one's safety. Regardless, the consequence imposed by the surety laws was merely the payment of a bond guaranteeing one would not breach the peace. *See, e.g.*, D.C. Surety Law § 16. In contrast, those who carry a firearm in the District today without a license, which would be issued only upon satisfaction of the "good reason" requirement, face not only hefty fines but also up to *five years in prison*! D.C. Code § 22-4504(a)(1). This dramatic disparity in penalties leads me to believe the "good reason" requirement is not "truly the heir[] to" the surety laws. Jonathan Meltzer, Open Carry for All: *Heller* and Our Nineteenth-Century Second Amendment, 123 Yale L.J. 1486, 1510 n.101 (2014).

Even assuming *arguendo*, however, that defendants are correct and that the "good reason" requirement qualifies as a longstanding regulation,[20] under our Circuit Court's framework it would only be afforded a presumption of constitutionality. *Heller II*, 670

---

[19] *But see* For Preventing the Commission of Crimes, § 8, in Code of Virginia 755, 756 (1849) (omitting the language requiring the complainant to have "reasonable cause to fear an injury or breach of the peace"); For Preventing the Commission of Crimes, § 8, in The Code of West Virginia 702, 703 (1870) (same).

[20] Setting the surety laws aside, defendants hint at, but do not develop, the argument that the "good reason" requirement *itself* could squeak in to qualify as a "longstanding" regulation under *Heller II*. The first such requirement was enacted in New York in 1913, and New Jersey's statute has existed "in some form for nearly 90 years." *Drake*, 724 F.3d at 432; *compare Heller II*, 670 F.3d at 1253–54 (finding registration requirements enacted between 1881 and 1927 to be longstanding). Defendants further state that currently twenty-three percent of the Nation's population is governed by a "good reason" statute. Defs.' Opp'n 15–16 (referencing New York, New Jersey, Maryland, and California); *compare Heller II*, 670 F.3d at 1253–54 (finding basic registration requirements to be "longstanding" in part because they are applicable to approximately twenty-five percent of the Nation's population but also noting such requirements were traditionally accepted in "diverse" jurisdictions throughout the country).

F.3d at 1253.  Plaintiffs could then rebut that presumption "by showing the regulation does have more than a de miminis effect upon" their Second Amendment right to bear arms for self-defense.  *Id.*  This they could do, because the "good reason" requirement covers the precise conduct, carrying arms, for the precise reason, self-defense, that the text and historical record make clear the Second Amendment was intended to protect. Further, it is simply beyond dispute that requiring individuals to possess certain self-defense needs that the District deems worthy *before* they are permitted to carry a firearm "meaningfully affect[s] individual self-defense, which is the central component of the Second Amendment right." *Id.* at 1260 (internal quotation and alteration marks omitted). The "good reason" requirement therefore imposes more than a de minimis burden on that right. *See id.* at 1255 (stating a burden that "make[s] it considerably more difficult" for individuals to exercise their Second Amendment rights is not de minimis).

Thus, I easily conclude that the plaintiffs are substantially likely to succeed on the merits in step one.  While defendants have not yet put forth all their evidence, nothing they have presented to date leads me to believe plaintiffs are at all unlikely to prevail on the question of whether the Second Amendment is implicated.  Instead, the record strongly indicates that even if the "good reason" requirement has a robust heritage in the United States, it nevertheless governs—and always has governed—conduct protected by the Second Amendment.  Whether or not the District's "good reason" requirement does so in a constitutionally permissible manner is, of course, the subject of step two.

**B. Step Two: The District's Concealed Carry Scheme Is Likely Unconstitutional.**

Having found that the District's "good reason" requirement implicates conduct protected by the Second Amendment, I turn now to determining whether the provision places an unconstitutional burden on that right. To make this determination, I must decide first the appropriate level of constitutional scrutiny to apply to the District's law, and then whether the law passes muster under that framework. *See Heller II*, 670 F.3d at 1252.

**1. Strict Scrutiny Is Likely the Appropriate Level of Constitutional Scrutiny.**

Although there has been some debate regarding the constitutional framework that applies to laws burdening conduct protected by the Second Amendment, our Circuit Court has indicated that the means-end analysis often employed in the First Amendment context is also appropriate in analyzing Second Amendment challenges. *See Heller II*, 670 F.3d at 1257. Within this framework, there are three levels of scrutiny that may be applied: strict scrutiny, intermediate scrutiny, and rational basis review. However, the Supreme Court in *Heller* specifically *rejected* rational basis review for laws that burden protected Second Amendment conduct, and with it the presumption that these laws are constitutional. *Id.* at 1256 (citing *Heller*, 554 U.S. at 628 n.27). This necessarily means, of course, that the District is required to justify its law under some level of heighted scrutiny. As to whether strict or intermediate scrutiny should apply, our Circuit Court approaches the question, as it does in First Amendment cases, by examining "the nature

27

of the conduct being regulated and the degree to which the challenged law burdens the right." *Id.* at 1257. "[A] regulation that imposes a substantial burden upon the core right of self-defense protected by the Second Amendment must have a strong justification, whereas a regulation that imposes a less substantial burden should be proportionately easier to justify." *Id.* In other words, the former receives strict scrutiny, while the latter receives intermediate scrutiny. *See id.* at 1266 (stating intermediate scrutiny applies to "laws [that] do not affect the core right protected by the Second Amendment"). For the following reasons, I have concluded that the "good reason" requirement substantially burdens the "core right of self-defense protected by the Second Amendment," *id.* at 1257, and I will therefore subject it to strict scrutiny.

### a) The District's "Good Reason" Requirement Burdens Core Second Amendment Conduct.

Plaintiffs argue that *Heller* and *McDonald* make clear "that the core of the Second Amendment guarantee is the right to keep and bear arms for the purpose[] of self-defense," and "that the core of this right to self-defense applies both inside and outside the home." Pls.' Mem. 7. I agree, and conclude that the text and purpose of the Second Amendment demonstrate that the right of law-abiding, responsible citizens to carry arms in public for the purpose of self-defense does indeed lie at the core of the Second Amendment.[21] As discussed previously, *see supra* 13–14, the text of the Second

---

[21] I recognize that several Courts of Appeals considering similar statutory schemes have found otherwise. *See Drake*, 724 F.3d at 436 (stating "[i]f the Second Amendment protects the right to carry a handgun outside the home for self-defense at all, that right is not part of the core of the Amendment"); *see also Woollard*, 712 F.3d at 876; *Kachalsky*, 701 F.3d at 96. As my analysis makes clear, I do not find these

Amendment indicates its protections include "the individual right *to possess and carry weapons in case of confrontation.*" *Heller*, 554 U.S. at 592 (emphasis added). The District's "good reason" requirement infringes on Second Amendment activity because it does not allow individuals to obtain a license to carry a concealed firearm in public for legitimate self-defense purposes, including for protecting themselves from non-particularized threats faced by the general community and from unanticipated, suddenly arising threats.

The question, then, is whether the right to carry arms in public for self-defense lies at the "core" of the Second Amendment. In *Heller*, the Supreme Court held that the right to "keep" a firearm in the home for self-defense lies at the core of the Second Amendment's protections. Because the Second Amendment's text places the right to "keep" and to "bear" arms on equal footing, it follows that the right to "bear" arms for self-defense also lies at the core of the Second Amendment's protections. Indeed, the purpose of the Second Amendment, as articulated by the Supreme Court, supports this conclusion. How so? In *McDonald*, the Court specifically noted that *Heller* "held that the Second Amendment protects the right to keep and bear arms *for the purpose of self-defense.*" *McDonald*, 561 U.S. at 748 (emphasis added); *see also Heller*, 554 U.S. at 616

---

opinions persuasive. In my view, they fail to recognize that the text and purpose of the Second Amendment indicate that carrying weapons in public for the lawful purpose of self-defense is a central component of the right to bear arms. *See Peruta*, 742 F.3d at 1175 ("By evading an in-depth analysis of history and tradition, the Second, Third, and Fourth Circuits missed a crucial piece of the Second Amendment analysis. They failed to comprehend that carrying weapons in public for the lawful purpose of self defense is a central component of the right to bear arms."); *see also Moore,* 702 F.3d at 942 ("The Supreme Court has decided that the amendment confers a right to bear arms for self-defense, which is as important outside the home as inside.").

(describing the Second Amendment as protecting the "individual right to use arms for self-defense"); *Heller II*, 670 F.3d at 1260 (describing *Heller* as stating that self-defense is the "core lawful purpose" that the Second Amendment protects). The need for self-defense is, of course, greater *outside* the home than it is within it. Indeed, the Seventh Circuit noted as much in *Moore* when it observed, "a Chicagoan is a good deal more likely to be attacked on a sidewalk in a rough neighborhood than in his apartment on the 35th floor of the Park Tower." *Moore*, 702 F.3d at 937. So too in our Nation's capital, where so many live in or near the various neighborhoods where street crime is a daily occurrence. Given that the Second Amendment's central purpose is self-defense and that this need arises more frequently in public, it logically follows that the right to carry arms for self-defense in public lies at the very heart of the Second Amendment. *Cf. id.* ("To confine the right to be armed to the home [would be] to divorce the Second Amendment from the right of self-defense described in *Heller* and *McDonald*."). And I do not read *Heller* to suggest otherwise. The law challenged in *Heller* restricted the right to keep a handgun *in one's home* for self-defense. It is therefore of little consequence to the questions presented in this case that *Heller*'s holding was limited to the context of the home.[22]

Furthermore, I note that plaintiffs here are the very type of "law-abiding,

---

[22] *Cf. Snyder v. Phelps*, 562 U.S. 443, 460 (2011) ("Our holding today is narrow. We are required in First Amendment cases to carefully review the record, and the reach of our opinion here is limited by the particular facts before us. As we have noted, 'the sensitivity and significance of the interests presented in clashes between First Amendment and [state law] rights counsel relying on limited principles that sweep no more broadly than the appropriate context of the instant case.'" (quoting *Florida Star v. B.J. F.*, 491 U.S. 524, 533 (1989))).

responsible citizens" whose Second Amendment rights are entitled to full protection under *Heller*. As *Heller* made clear, "the Second Amendment right is exercised individually and belongs to all Americans." 554 U.S. at 581. To the extent that historical prohibitions excluded certain classes of people from the Second Amendment's protections, those classes do not include "law-abiding, responsible citizens." *Id.* at 635; *see also id.* at 626 (noting that "longstanding prohibitions on the possession of firearms by felons and the mentally ill" are presumptively constitutional). Moreover, there is nothing about those excluded from the right to carry in public by the District's "good reason" requirement that would suggest that they somehow lie outside the core protections of the Second Amendment. *Cf. Schrader v. Holder*, 704 F.3d 980, 989 (D.C. Cir. 2013) (finding common-law misdemeanants fall outside the Second Amendment's core protections because they "cannot be considered law-abiding and responsible").

Without citation to the text or to historical support, defendants respond by arguing that a prohibition on bearing arms that is "completely contained in a dense urban setting filled with critical official and symbolic buildings, monuments, and events, and high-profile public officials" does not burden core Second Amendment conduct. Defs.' Opp'n 17 (internal quotation marks omitted). Although a jurisdiction's unique characteristics could be relevant in the means-end analysis, on the record before me they provide no guidance for the inquiry into what protections are at the core of the Second Amendment. The District also makes reference to longstanding "laws that prohibit the carrying of firearms in sensitive places such as schools and government buildings" and

seem to argue that the entire District of Columbia could be considered such a sensitive place. Defs.' Opp'n 17. But the District has already provided that citizens with concealed carry licenses may *not* carry firearms in many sensitive places that require extra regulation, belying the notion that the whole of the District falls into the same category.[23] Again, defendants point to no textual or historical evidence as support for their through-the-looking-glass view that a citizen's right to carry a firearm for self-defense falls outside the "core" of the Second Amendment because the citizen lives in a densely populated and dangerous city where the need for self-protection is elevated. Nor do they wrestle with how downgrading a citizen's rights merely because he or she lives in the same 68 square mile city as many of our Nation's leaders is consistent with our Constitution. I therefore reject these arguments wholesale.

### b) The District's "Good Reason" Requirement Imposes a *Substantial* Burden on Core Second Amendment Conduct.

If, as I find, the District's "good reason" requirement burdens core Second Amendment conduct, then the question remains whether it "substantial[ly]" burdens such conduct and therefore must withstand strict scrutiny. *See Heller II*, 670 F.3d at 1256–57 (noting strict scrutiny is not always required when a fundamental right is at stake). For the following reasons, I have concluded: it surely does.

---

[23] Concealed carry licensees are precluded from carrying their firearms in many sensitive areas including government buildings, school and university buildings and campuses, hospitals, polling places while voting is occurring, public transportation vehicles including the Metrorail transit system and its stations, stadiums and arenas, the public memorials on the National Mall and along the Tidal Basin, the area around the White House, the U.S. Capitol buildings and grounds, and the U.S. Naval Observatory and its perimeter. D.C. Code §7-2509.07(a). Plaintiffs do not challenge these limitations, Pls.' Mem. 26, and an injunction in this case would *not* affect them.

Plaintiffs argue that the District's public carry law, although disguised as "a licensing requirement," actually "amounts to a total ban on the exercise of the Second Amendment right to bear arms by typical, law-abiding citizens." Pls.' Mem. 21. Defendants, not surprisingly, could not disagree more. Far from a "wholesale ban," defendants liken the District's "good reason" requirement to "time, place, manner restrictions" of protected speech. Defs.' Opp'n 17; *see Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984) ("We have often noted that [reasonable time, place, and manner restrictions] are valid provided that they are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information."). Indeed, in the District's view, the requirement "speaks not to who may carry a handgun, but when a handgun may be carried: after the applicant develops a non-speculative need for armed self-defense." Defs.' Opp'n 18. As such, defendants argue the law does not "destroy" any particular person's right to carry a gun for self-defense because any person could, at some point, face a threat that rises to the level necessary to be issued a license under the District's "good reason" requirement. *Id.* Unfortunately for the District, such arguments border on the frivolous! How so?

Turning first to defendants' "insignificance argument," I cannot possibly agree that the burden imposed by the statute at issue is as insignificant as that of a "time, place, and manner restrictions" on speech that leave open "ample alternative channels of communication." *See, e.g., Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)

(upholding sound amplification guideline designed to control noise levels at open-air bandshell events); *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640 (1981) (upholding state fair rule, prohibiting sale or distribution on fair grounds of any merchandise including printed or written material, except from a fixed location). To the contrary, the law at issue is a far cry from the regulations that have been upheld by other courts under intermediate scrutiny as similar to time, place, and manner restrictions, including registration requirements and regulations banning the carrying of certain types of guns.

In *Heller II*, our Circuit Court considered several "novel" registration requirements for firearm ownership, including requirements that applicants submit the firearm for a ballistics-identification procedure, initially appear in person for registration and re-register each firearm after three years, and a limitation that only one firearm be registered per person in a 30-day period. Although our Circuit Court found that these laws burdened core Second Amendment conduct, it subjected them to intermediate scrutiny because the burden was not "substantial." 670 F.3d at 1257–58. To support this view, our Circuit Court noted that "none of the District's registration requirements prevents an individual from possessing a firearm in his home or elsewhere, whether for self-defense or hunting, or any other lawful purpose." *Id.* at 1258. The same cannot be said, however, of the District's "good reason" requirement, which precludes carrying a handgun "without any specific self-defense reason." Defs.' Opp'n 16. Indeed, the requirement's intended effect is to prohibit the typical citizen from carrying a firearm

outside his or her home for several legitimate and constitutionally protected purposes—including when in dangerous neighborhoods, where the need for protection is as undeniable as it is unfortunate, or for self-defense from unanticipated, suddenly arising threats—notwithstanding the fact that he or she can successfully clear a multitude of qualifying hurdles.

Nor can the reasoning employed to uphold bans on the possession of particular types of firearms support the law at issue here. When a jurisdiction bans particular types of guns, such as automatic rifles or guns with obliterated serial numbers, a law-abiding, responsible person can preserve an undiminished right of self-defense by simply choosing a type of gun that is permitted. *Heller II*, 670 F.3d at 1260–64 (applying intermediate scrutiny to a ban on assault weapons and large-capacity magazines because the law did not "effectively disarm individuals or substantially affect their ability to defend themselves"); *Marzzarella*, 614 F.3d at 97 (finding a prohibition on possession of unmarked firearms to be "more accurately characterized as a regulation on the manner in which persons may lawfully exercise their Second Amendment rights" because it left a person "free to possess any otherwise lawful firearm"). Not so with the District's "good reason" requirement. Unless a law-abiding, responsible person can predict and prove some self-defense need beyond that of the typical person, he is wholly banned from exercising his right to carry a gun for the purpose of self-defense outside his home. *See Peruta*, 742 F.3d at 1171 (finding prohibition on carrying in public not to be a time, place, and manner restriction because "it precludes a responsible, law-abiding citizen

35

from carrying a weapon in public for the purpose of lawful self-defense in *any* manner").

    As these examples reveal, the District's "good reason" requirement places a far more significant burden on core Second Amendment conduct than laws previously upheld as akin to time, place, and manner restrictions. In fact, the burden is so substantial that it is tempting, indeed, to agree with plaintiffs that the "good reason" requirement is *per se* unconstitutional. The District continues to rely on the mantra "more guns equals more crime" to prove the safety benefits of disarming typical law-abiding citizens like Grace, who do not face a particularized threat. But there can be no doubt that at least some of those citizens seek a carrying license for the legitimate purpose of protecting against an unexpected confrontation. The District's policy thus bans some citizens from exercising their *constitutional right* to carry firearms outside the home for self-defense, and no amount of proof of the negative effects of exercising a constitutional right can justify a ban. *Heller*, 554 U.S. at 629 ("A statute which, under the pretense of regulating, amounts to a destruction of the right . . . [is] unconstitutional." (quoting *Reid*, 1 Ala. at 6161–17)). In the interest of judicial restraint, however, I will leave for another day the question of whether the "good reason" requirement is *per se* unconstitutional. For today, I will simply assume that the requirement only incidentally sweeps in this sort of protected activity and review the "good reason" requirement under the strict scrutiny standard, which its substantial burden would most assuredly have to survive.

### 2. The District's Concealed Carry Scheme Likely Fails Strict Scrutiny.

    In order for the District's law to pass muster under strict scrutiny, it must be

narrowly tailored to promote a compelling government interest. *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000); *accord Heller II*, 670 F.3d at 1256. If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative. *Id.; see also Sable Comn'cs of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989) ("The Government may . . . regulate the content of constitutionally protected speech in order to promote a compelling interest if it chooses the least restrictive means to further the articulated interest"). Notably, a court applying strict scrutiny must presume the law is invalid, and "the Government bears the burden to rebut that presumption." *Playboy Entm't*, 529 U.S. at 817.

This Court recognizes, as it must, that the District's interests in preventing crime and promoting public safety certainly qualify as "compelling government interests." *See, e.g., Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 376 (1997) (referring to "the significant governmental interest in public safety"); *Heller II*, 670 F.3d at 1258 ("[T]he Government's general interest in preventing crime is compelling." (quoting *United States v. Salerno*, 481 U.S. 739, 750 (1987))). And this Court agrees with defendants that the District's interest in public safety is implicated by people carrying guns in public, and certainly more so than when they keep guns within the confines of their homes. But, unfortunately for defendants, it does not automatically follow that the District has a compelling interest in reducing to the greatest extent possible the number of law-abiding, responsible citizens eligible to carry guns in public. Rather, when the District's pursuit of public safety substantially burdens conduct protected by the Second

Amendment, as issuing licenses only in certain self-defense situations does, it must at the very least prove that the policy achieves significant public safety gains and that those gains would not be achieved by a more inclusive licensing policy.

Defendants have failed to meet these criteria, and I am skeptical that they can. They waste much ink on the irrelevant contention that plaintiffs cannot prove that "more guns equals less crime." In strict scrutiny review, however, *defendants* bear the burden of justifying their policy. More important still, defendants do not even attempt to explain why the District's licensing scheme could not be broader and allow for more responsible, law-abiding citizens to obtain concealed carry permits for their legitimate self-defense needs, while simultaneously protecting public safety. All they offer by way of reasoning is that all guns, even guns carried in self-defense, increase the incentive for criminals to carry guns, or increase the chances for accidents. But as plaintiffs rightly emphasize, "it is 'not a permissible strategy' to reduce the alleged negative effects of a constitutionally protected right by simply reducing the number of people exercising the right." Pls.' Mem. 28 (quoting *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 445 (2002) (Kennedy, J., concurring in judgment) (controlling opinion)); *see also Alameda Books*, 535 U.S. at 445 ("Though the inference may be inexorable that a city could reduce secondary effects by reducing speech, . . . [t]he purpose and effect of a zoning ordinance must be to reduce secondary effects and not to reduce speech."); *Heller*, 554 U.S. at 636 ("[T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table.").

Rather, the District's licensing restrictions would only be narrowly tailored to achieve public safety if they were targeted at keeping guns away from the people who are likely to misuse them or situations where they are likely to be misused. On the record before me, I must agree with plaintiffs that defendants are unlikely to be able to show the "good reason" requirement is narrowly tailored to this end.[24] For a law to be "narrowly tailored," it must actually advance the compelling interest it is designed to serve, *see Eu v. S.F. County Democratic Cent. Comm.*, 489 U.S. 214, 226 (1989), and it must be the least-restrictive method of serving that interest—indeed, the burdening of a significant amount of protected conduct not implicating the interest is evidence the regulation is insufficiently tailored. *See Ashcroft v. ACLU*, 542 U.S. 656, 665–66 (2004).

Although the District's "good reason" requirement likely does keep guns out of the hands of *some* people likely to misuse them, it does so only by keeping guns out of the hands of *most* people. The requirement that a person demonstrate a need for self-defense beyond that of the typical citizen before being granted a concealed carry license

---

[24] Defendants, for their part, do not attempt to show that the law is narrowly tailored to this end. In fact, they concede that the "good reason" requirement was not designed to keep firearms out of the hands of those who might be expected to misuse them, *see* Defs.' Opp'n at 33–34 ("Plaintiffs argue that the 'good reason' standard is 'unrelated to the problem it intends to solve' because '[t]he fact that one has a greater need for self-defense tells us nothing about whether he is less likely to misuse or accidentally use handguns.' This criticism, however, misunderstands the purpose of the standard."). Rather, proceeding on the theory that the compelling interest is in public safety generally and that more guns equal more crime, defendants argue that the "good reason" requirement "offers a reasonable, balanced approach to protecting the public safety and meeting an individual's need for self-defense," *id.* at 36, and is "the result of a 'careful balancing of the interests involved' and not a general animus towards guns." *Id.* at 38 (quoting *Kachalsky*, 701 F.3d at 97 n.22). Of course, such interest balancing squarely contradicts the Supreme Court's admonition that the "core protection" of enumerated constitutional rights should not be "subjected to a freestanding 'interest-balancing' approach" because "[t]he very enumeration of the right takes out of the hand of the government . . . the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Heller*, 554 U.S. at 634. Moreover, even if this type of interest-balancing were permissible, it does nothing to demonstrate that the law is narrowly tailored.

invariably means most people will not qualify. But the fact that a person can demonstrate a heightened need for self-defense says nothing about whether he or she is more or less likely to misuse a gun. Pls.' Mem. 28; *see also Drake*, 724 F.3d at 454 (Hardiman, J., dissenting) ("Put simply, the solution is unrelated to the problem it intends to solve."). Therefore, by employing this standard, the District's law is likely vastly over-inclusive, burdening substantially more of the Second Amendment right than is necessary to advance public safety. *See Peruta*, 742 F.3d at 1177 (explaining that a public carry regulation is not narrowly tailored to achieve public safety if it would "not perform any better than a random rationing system, wherein gun permits were limited to every tenth applicant"). Because the District's law is likely wholly disproportionate to the public interest it could legitimately serve, there is a strong likelihood plaintiffs will ultimately succeed in showing the law *is not* narrowly tailored and is, therefore, unconstitutional.

## II. Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief.

Having concluded that plaintiffs are substantially likely to succeed on their claim that the District's "good reason" requirement acts to deprive them of the rights guaranteed to them by the Second Amendment, there is little need to belabor the irreparable injury prong. Their Second Amendment rights are indeed being violated, and, as our Circuit Court has itself made clear, "the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)); *see also* 11A Wright, et al., Federal Practice and

Procedure § 2948.1 (3d ed. 2013) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.").

Defendants, not surprisingly, argue that this proposition should *not* apply to Second Amendment harms because the right to keep and bear arms is "inherently different" from other constitutional rights in that it "has no intrinsic value." Defs.' Opp'n 39–40. In defendants' view, "[i]f no occasion arises where a handgun is needed for self-defense," the denial of the Second Amendment right to bear arms "cannot cause harm." Defs.' Opp'n 40. What poppycock! Just because present plaintiffs "have not identified a single instance when their inability to carry a handgun caused them injury," does not mean they have failed to demonstrate a likelihood of irreparable harm. Defs.' Supplemental Br. 1 [Dkt. #39]. Once again, defendants, sadly, miss the point. The Second Amendment protects plaintiffs' right to bear firearms *for* self-defense—a right that can be infringed upon whether or not plaintiffs are ever actually called upon to use their weapons to defend themselves. *See Ezell*, 651 F.3d at 699 (explaining that, like other constitutional rights, "[t]he Second Amendment protects . . . intangible and unquantifiable interests," which "cannot be compensated by damages"). The right to bear arms enables one to possess not only the means to defend oneself but also the self-confidence—and psychic comfort—that comes with knowing one could protect oneself if necessary. Moreover, while this Court is not permitted to recognize "a hierarchy among . . . constitutional rights," *Caplin & Drysdale, Chtd v. United States*, 491 U.S. 617, 628 (1989), the Supreme Court has nevertheless made clear that the Second

Amendment is not a "second-class right," *McDonald*, 561 U.S. at 780–81 (plurality).

Thus, because plaintiffs are likely to succeed in showing their Second Amendment rights

are being infringed each and every day the District continues to enforce the "good

reason" requirement, they have more than adequately demonstrated irreparable injury.

## III. The Balance of the Equities and the Public Interest Also Weigh in Plaintiffs' Favor.

The final factors I must consider are the balance of the equities and public interest.

*See Nken v. Holder*, 556 U.S. 418, 435 (2009) (noting these two factors "merge when the

Government is the opposing party"). As a preliminary matter, I emphasize, as plaintiffs

have, that "enforcement of an unconstitutional law is always contrary to the public

interest." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013); *see also Hobby Lobby*

*Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013) ("[I]t is always in the

public interest to prevent the violation of a party's constitutional rights.") (internal

quotation marks omitted)), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct.

2751 (2014). This is the case even though it is otherwise presumed that, "any time a

State is enjoined by a court from effectuating statutes enacted by the representatives of its

people, it suffers a form of irreparable injury." *Maryland v. King*, 133 S. Ct. 1, 3 (2012)

(Roberts, C.J., in chambers). Because plaintiffs are likely to prevail in showing that their

Second Amendment rights are being violated, the public interest weighs heavily in favor

of granting their requested injunction.

Undaunted, the District argues that granting the requested injunction "would

clearly have a negative impact on thousands of District residents and visitors, because of the uncertain public impact of allowing untold numbers of concealed handguns to be carried on the streets of the city." Defs.' Opp'n 41. Defendants appear to reach this conclusion based on the assumption that "automatic issuance of concealed-carry licenses" would result from the requested injunction. Defendants' hyperbole, however, is not only unwarranted but irresponsible.   As plaintiffs point out, they are "not seek[ing] an unfettered right to bear arms free from any regulation or oversight by the District." Pls.' Mem. 38.   Indeed, enjoining the District's "good reason" requirement would have *no* effect whatsoever on a veritable gauntlet of other licensing requirements which would remain intact, including: (1) compliance with a wide range of requirements to even qualify to register a firearm in the District, *e.g.*, age, criminal history, mental health, personal history, and certain physical requirements; (2) successful completion thereafter of a firearms training program; and (3) an in-person interview with the Metropolitan Police Department. D.C. Code § 7-2509.02. One can only wonder what evidence, if any, the District could muster to demonstrate that the type of people who would be willing and able to successfully complete this regulatory gauntlet would nevertheless be likely to pose a safety risk to the greater community.   More importantly, perhaps, the requested injunction would have *no* impact on the District's complete prohibition of (1) carrying without a license, D.C. Code § 22-4504(a); (2) carrying in specified places including government buildings, schools, the National Mall, the area surrounding the White House, public transportation vehicles, and stadiums, *id.* § 7-2509.07(a); and (3) carrying by

violent felons, drug addicts, and other prohibited persons, *id.* §§ 7-2502.03(a); 7-2509.02(a); 22-4503.  Under these circumstances, the Court finds that the public interest and the balance of the equities weigh heavily in favor of granting plaintiffs' request for a preliminary injunction.

## IV.  Issuing a Permanent Injunction Would Be Imprudent.

Finally, in addition to a preliminary injunction, plaintiffs request a permanent injunction.  "[W]hen the eventual outcome on the merits is plain at the preliminary injunction stage, the judge should, after due notice to the parties, merge the stages and enter a final judgment."  *Morris v. District of Columbia*, 38 F. Supp. 3d 57, 62 n.1 (D.D.C. 2014) (quoting *Curtis 1000, Inc. v. Suess*, 24 F.3d 941, 945 (7th Cir. 1994)).  Plaintiffs argue a permanent injunction is appropriate *now* because the "final outcome of this case does not depend on any facts that may be presented at trial, and because there is no genuine uncertainty about what the outcome of this case will be on the merits."  Pls.' Mem. 40.  Plaintiffs point to *Moore*, in which the Seventh Circuit remanded for issuance of a permanent injunction after finding a Second Amendment challenge did not present any evidentiary issues and that "another round of historical analysis" was unnecessary. Pls.' Mem. 40–41 (quoting *Moore*, 702 F.3d at 942).  Defendants counter that the important issues at stake here are deserving of a full record and additional briefing.  They state that "[i]t makes no sense to undertake this significant inquiry on consideration of a preliminary injunction, where the parties and *amici* are constrained by an expedited schedule and strict briefing limitations."  Defs.' Opp'n 44.  Defendants request the

44

opportunity to develop the facts supporting their argument that the "good reason" requirement survives means-end scrutiny. Defs.' Opp'n 44. They point out that our Circuit Court remanded claims for additional factual development in *Heller II*, 670 F.3d at 1259–60. Defs.' Opp'n 44. I agree with defendants. Unlike the situation in *Morris*, the parties here did not come to an agreement that the resolution of the preliminary injunction "also resolves the merits of the case." *Morris*, 38 F. Supp. 3d at 62. And unlike the Court of Appeals for the Seventh Circuit, I have an obligation as a district court judge to oversee the development of a full record, not only to inform my decision-making process but to aid our Court of Appeals when they ultimately review the case. Finally, while I believe plaintiffs are highly likely to succeed on the merits, this case presents novel issues for our Circuit Court, issues on which other Courts of Appeal have reached the contrary conclusion. As such, caution dictates that I pause before declaring "there is *no genuine uncertainty* about what the outcome of this case will be on the merits." Pls.' Mem. 40 (emphasis added). Accordingly, I will DENY plaintiffs' motion for a permanent injunction.

## CONCLUSION

In *Heller*, the Supreme Court's unequivocally asserted that "the enshrinement of constitutional rights necessarily takes certain policy choices off the table." *Heller,* 554 U.S. at 636. The District's understandable, but overly zealous, desire to restrict the right to carry in public a firearm for self-defense to the smallest possible number of law-abiding, responsible citizensis exactly the type of policy choice the Justices had in mind.

Because the right to bear arms includes the right to carry firearms for self-defense both in and outside the home, I find that the District's "good reason" requirement likely places an unconstitutional burden on this right. Accordingly, I hereby GRANT plaintiffs' request for a preliminary injunction and enter an order that enjoins the District of Columbia from denying concealed carry licenses to applicants who meet all eligibility requirements other than the "good reason" requirement. An order consistent with this decision accompanies this Memorandum Opinion.

RICHARD J. LEON
United States District Judge

46